IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| METAVATION, LLC, | ) | Case No. 13-11831 (BLS) |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| | ) | |

**MOTION OF DEBTOR METAVATION, LLC FOR ORDER UNDER SECTIONS 105, 363, AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING PAYMENT OF PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS AND REIMBURSABLE EXPENSES, (II) AUTHORIZING CONTINUATION OF EMPLOYEE BENEFIT PLANS AND PROGRAMS POSTPETITION, AND (III) AUTHORIZING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

Metavation, LLC, a debtor and debtor in possession herein ("**Metavation**" or the "**Debtor**"), submits this motion for an order under Sections 105, 363, and 507 of the Bankruptcy Code (a) authorizing, but not requiring the Debtor to (i) pay and/or honor prepetition wages, commissions, salaries, and other compensation, (ii) maintain employee medical and other benefits, (iii) pay reimbursable employee expenses and (iv) authorizing continuation of employee benefit plans and programs postpetition; and (b) authorizing banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each Debtor's federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450). The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

payment requests relating to the foregoing (the "<u>Motion</u>").  In support of its Motion, the Debtor respectfully states as follows:

## I.    <u>JURISDICTION</u>

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtor's Chapter 11 case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief sought hereby are Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of title 11 of the United States Code (the "<u>**Bankruptcy Code**</u>").

## II.    <u>BACKGROUND</u>

2.    On December 3, 2012, Debtors Revstone Industries, LLC and Spara, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 7, 2013, Debtors Greenwood Forgings, LLC and US Tool and Engineering, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    Pursuant to the Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (Docket No. 173) (the "<u>**Existing Joint Administration Order**</u>"), the chapter 11 cases of Revstone Industries, LLC, Spara, LLC, Greenwood Forgings, LLC and US Tool and Engineering, LLC (the "<u>**Original Debtors**</u>") are jointly administered and are consolidated for procedural purposes.

4.    On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "<u>**Committee**</u>") in the case of Revstone Industries, LLC. No committee has been appointed in the cases of Spara, LLC Greenwood Forgings, LLC and US

2

Tool and Engineering, LLC. No trustee or examiner has been appointed in any of the Original Debtors' chapter 11 cases.

5.    On the date hereof (the "**Metavation Petition Date**"), Metavation filed a voluntary petition in the Court for relief under chapter 11 of the Bankruptcy Code. Metavation continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in Metavation's chapter 11 case. As of the date hereof, no creditors' committee has been appointed in the Metavation chapter 11 case.

6.    The factual background relating to the commencement of the chapter 11 case of Revstone Industries, LLC is set forth in detail in the *Declaration of Jay N. Brown in Support of First Day Pleadings* (the "**Brown Declaration**") filed on December 3, 2012, and incorporated herein by reference. The factual background relating to the commencement of the chapter 11 case of Metavation, LLC is set forth in detail in the *Declaration of John C. DiDonato in Support of Metavation, LLC Petition and First Day Motions* (the "**DiDonato Declaration**") filed concurrently herewith and incorporated herein by reference.

7.    Metavation, LLC (the "**Company**") is a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry. Metavation specializes in designing and manufacturing dampers that are included on original equipment manufacturers' ("**OEMs**") engine platforms. The Company also has rapid development capabilities to produce "solution" dampers to correct driveline and powertrain noise vibration and harshness ("**NVH**") issues. The Company serves many of the largest automotive customers, suppliers, and platforms. The Company's major OEM customers include General Motors and Chrysler. Metavation's Tier I

3

supplier customers include American Axle, Dana Automotive, and J.G. Kern. These long-standing relationships have led the Company to a dominant market position in the U.S. crankshaft damper market. Metavation operates from four, modernized facilities located in central Michigan. The Company begins its manufacturing process by developing the rubber component at the Hillsdale, MI facility, and then sends the rubber component to Mt. Pleasant, MI or Vassar, MI facility for machining and/or assembly.

8.      The Debtor currently employs 270 full-time employees in hourly, salaried, supervisory, management, sales, administrative, and operational positions to perform the functions necessary to effectively and efficiently operate the Debtor's business (collectively, the "**Employees**"). As of the Petition Date, the Debtor employed approximately 57 salaried and 213 hourly Employees. To minimize the personal hardships that the Employees may suffer if their prepetition employment-related obligations are not paid or honored, to maintain Employee morale during this critical time, and to minimize disruptions to the Debtor's ongoing business operations, the Debtor, by this Motion, seeks authority (but not direction) to: (i) pay unpaid prepetition claims for wages, commissions and salaries to the Employees (the "**Unpaid Wages**"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below) offered by the Debtor; (iv) reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

9.      In addition, the Debtor is party to a collective bargaining agreement with the United Steelworkers International affiliated with American Federation of Labor Congress of Industrial Organizations ("**USW International**"). USW International Local Union 564 represents the 64 hourly Employees employed by the Debtor at the grey steel foundry located in

4

Vassar, Michigan. The Debtor requests the authority to continue to honor all obligations to these union Employees under the terms of the existing collective bargaining agreement to which the Debtor is a party.

10.    In addition to the Employees, the Debtor also relies on approximately 102 temporary or contract workers (the "**Temporary Workers**") to supplement critical needs in employee staffing. These Temporary Workers provide the Debtor with the flexibility to adjust their workforce to meet marketplace demand on a cost-effective basis. The Employees' and Temporary Workers' valuable skill sets, institutional knowledge, and understanding of the Debtor's operations make them essential to the Debtor's ability to preserve the value of its business. The Debtor requests the authority to honor its prepetition obligations to the Temporary Workers, whether paid to directly to such Temporary Workers or through an employment agency that employs such Temporary Workers.

11.    For the reasons set forth below, the Debtor respectfully submits that it is in the best interests of its estate for this Court to authorize the payments and honoring of the obligations requested herein. These obligations and benefits in respect of the Debtor's employees may include, without limitation, (a) unpaid prepetition wages, salaries and reimbursable business expenses earned or incurred prior to the Petition Date (collectively, the "**Prepetition Employee Obligations**"); and (b) employee health and welfare benefit claims arising before the Petition Date including, without limitation, (i) medical, dental, vision and prescription drug coverage; (ii) health savings accounts and flexible spending accounts for health and dependent care under Section 125 of the Internal Revenue Code; (iii) basic life, voluntary life insurance; (iv) accidental death and dismemberment ("**AD&D**") insurance; (v) short-term and long-term disability benefits; (vi) counseling, (vii) a 401(k) savings plan, (viii) voluntary accident injury insurance,

5

(ix) voluntary critical injury coverage and (x) paid time off ("**PTO**") (collectively, the "**Employee Benefits**").

## III.    THE DEBTOR'S COMPENSATION AND BENEFITS PROGRAMS

### A.    Wages, Salaries, and Compensation

12.    The Debtor's 270 Employees are located at Metavation's manufacturing facilities in Hillsdale, Vassar and Mt. Pleasant, Michigan.    All of the Employees are either salaried employees or hourly.    The Debtors employ at their Vassar, Michigan foundry approximately 64 hourly Employees who are members of the United Steelworkers International Union (the "**Union Employees**").    The Debtor pays its hourly non-union employees (the "**Hourly Non-Union Employees**") every two weeks and on alternate staggered weeks pays its salaried employees (the "**Salaried Employees**") every two weeks.    In the ordinary course of the Debtor's businesses, the Union Employees are paid their hourly compensation every week.

13.    As a general matter, one payroll account is used for paying the salaries and related employment benefits to hourly and salaried Employees (collectively, the "**Payrolls**").    In addition, the Debtor is required by law to (i) match Social Security and Medicare taxes, (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance and (iii) remit these payroll taxes to various taxing authorities (the "**Employer Payroll Taxes**").    The Debtor uses Ceridian Corporation ("**Ceridian**") as the Payroll processor.    The Debtor estimates that the Payrolls plus applicable Employer Payroll Taxes for earned salaries total approximately $195,000 per pay period for Salaried Employees and $225,000 per pay period for Non-Union Hourly Employees.    The Debtor estimates that the Payrolls plus applicable Employer Payroll Taxes for earned salaries total approximately $60,000 per pay period for Union Hourly Employees.

6

14.    As of the Petition Date, the Debtor owes an estimated $240,000 for the gross amount of salaries and hourly compensation earned by all Employees prior to the Petition Date (the "**Unpaid Wages**"). The Unpaid Wages are summarized below:

    a.    The last Hourly Non-Union Employee pay date was July 18, 2013, which included wages earned between July 1, 2013 and July 14, 2013. As of the Petition Date, Hourly Non-Union Employees are owed Unpaid Wages earned between July 15, 2013 and the Petition Date;

    b.    The last Salaried Employee pay date was July 12, 2013 which included wages earned between June 30, 2013 and July 13, 2013. As of the Petition Date, Salaried Employees are owed Unpaid Wages earned between July 14, 2013 and the Petition Date; and

    c.    The last Union Employee pay date was July 18, 2013 which included wages earned between July 8, 2013 and July 15, 2013. As of the Petition Date, Union Employees are owed Unpaid Wages earned between July 16, 2013 and the Petition Date.

15.    The Debtor requests authority to pay to its Employees all Unpaid Wages earned before the Petition Date. In addition, the Debtor requests the authority to continue to pay regularly scheduled Payrolls, including Employer Payroll Taxes, in the ordinary course of business, including any prepetition amounts that may have accrued but not become payable as of the Petition Date.

16.    In the ordinary course of business, the Debtor also causes certain Payroll deductions to be automatically made for Employee obligations, such as federal income taxes, Social Security and Medicare contributions, court-ordered garnishment and support payments, benefit plan insurance programs, and other similar programs (collectively, the "**Deductions**"). For a fee of approximately $2,600 a month, the Debtor outsources to Ceridian the task of making the Deductions and the Employer Payroll Taxes and remitting the amounts due to relevant governmental authorities or other proper third parties.

DOCS_DE:187218.8 73864/002

17.    To the extent that the Debtor is holding funds belonging to Employees that are collected from Employees and remitted to others, the Debtor maintains that such funds are not property of the bankruptcy estate.  The amounts deducted are generally held in trust by Ceridian until they are forwarded to third parties.  However, in an abundance of caution and to the extent that such funds relate to prepetition periods, the Debtor seeks authority to remit the applicable Deductions to appropriate governmental authorities and other third parties in accordance with the Debtor's regular policies and procedures.  Further, the Debtor seeks the authority, but not the direction, to continue using Ceridian to handle Payrolls and its related Deductions and Employer Payroll Taxes and to pay to Ceridian all amounts accrued both pre-petition and post-petition for such services.

**B.    Temporary Workers**

18.    In addition to their full-time workforce, the Debtor retains the services of part-time, temporary workers who work on an hourly basis and provide temporary manufacturing support to permit the Debtor to meet its obligations to suppliers without the need to hire additional direct personnel.  The Temporary Workers are employed through agencies such as Peoplelink LLC, Central Michigan Staffing and Elwood Staffing, among others.  The Debtors remit compensation for the Temporary Workers' services directly to the applicable employment agencies, which in turn pay the Temporary Workers (collectively, the "**Temporary Workers' Compensation**").  As of the Petition Date, the Debtors estimate that they owe approximately $210,000 on account of Temporary Workers' Compensation.  The Debtor seeks authority, but not direction, to pay in the ordinary course of business the employment agencies for the benefit of the Temporary Workers' Compensation, as routinely done prior to the Petition Date.

8

## C.    Reimbursement Obligations

19.    Prior to the Petition Date and in the ordinary course of business, the Debtor reimbursed Employees for reasonable expenses incurred in performing their jobs, including, but not limited to, business-related travel expenses and cell phones (the "**Reimbursable Expenses**"). Reimbursable Expenses were incurred in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice. The Reimbursable Expenses also include amounts billed by Employees to corporate credit cards for the purchase of travel costs, supplies, inventory, and equipment on behalf of the Debtor and in support of the Debtor's business. It would be inequitable and would cause harm to the morale of Employees to deny reimbursement and/or payment of such expenses. Moreover, it is essential to the continued operation of the Debtor's businesses that the Debtor be permitted to continue to reimburse Employees or pay appropriate third parties for such business-related Reimbursable Expenses incurred in the ordinary course of the Debtor's businesses, whether incurred by an Employee prepetition or postpetition. As of the Petition Date, the Debtor estimates that unpaid Reimbursable Expenses total approximately $25,000.

## D.    Employee Benefits

20.    The Employees are each full-time employees scheduled to work more than thirty (30) hours per week, citizens or legal residents of the United States and, therefore, eligible for various standard employee health and welfare benefits, including, without limitation, the Employee Benefits described below.

21.    Medical, Dental, Vision and Prescription Drug Coverage: Employees are offered three (3) levels of voluntary medical plans administered by its affiliate, Ascalon Enterprises, LLC: Gold, Silver and Bronze (the "**Medical Plan**"). Medical Plan participants are also offered

DOCS_DE:187218.8 73864/002

prescription drug coverage. Voluntary vision coverage and dental insurance are provided through Guardian. For the standard medical benefits, the Debtor pays a portion of the cost (premiums are approximately $120,000 per month), and the Employee is responsible for paying the balance of the premium through payroll deductions. For the standard vision benefits, the Employee is responsible for paying the entire premium through payroll deductions. For the standard dental benefits, the Debtor pays premiums of approximately $4,600 per month, and the Employee is responsible for paying the balance of the premium through payroll deductions.

22.    Flexible Spending Accounts: Employees may elect to enroll in flexible spending accounts ("**FSAs**") for health and dependent care. FSAs permit employees to make pretax payroll contributions up to $2,500 per year for health care expenses for employees and eligible dependents and up to $5,000 per year per household for dependent care. The Employee's gross pay is reduced by an amount equal to the Employee's contributions, as elected annually during the open enrollment period. McGregor and Associates ("**McGregor**") is the third-party administrator for the FSA.

23.    Health Savings Accounts: Employees may elect to enroll in health savings accounts ("**HSAs**"). HSAs permit employees to make pretax payroll contributions of up to $3,250 per individual or $6,450 per family. The Debtor contributes $50 per month per employee and the Employee's gross pay is reduced by an amount equal to the Employee's contributions, as elected annually during the open enrollment period. McGregor is the third-party administrator for the HSA.

24.    Life, AD&D, Short-Term and Long-Term Disability Insurance: Employees are provided basic life and AD&D coverage and short-term and long-term disability benefits through the Debtor's Guardian Term Life, Short and Long Term Disability Plan. Salaried executives are

provided supplemental life and disability coverage through the Debtor's Guardian Supplemental Individual Disability Income Insurance. The life insurance coverage available to Employees is basic life insurance of up to $50,000 for all salaried employees. Basic short-term disability benefits is available to all Employees who are temporarily unable to work due to injury or illness up to 100% of base salary with a maximum of $5,000; basic long-term disability is up to 60% of base salary with a maximum of $8,000 per month. Two of the Employees are eligible for executive supplemental long-term disability which provides an addition potential coverage of $7,000 per month. The cost is paid in full by the Debtor.[2]

25.    Employee Assistance Program:  The Employee Assistance Program ("**EAP**") through Guardian provides free, confidential professional counseling to assist employees through difficult times of marital, family, financial or legal problems, drug or alcohol abuse, or other personal issues.

26.    The 401(k) Savings Plan:  All Employees may enroll in the Debtor's 401(k) plan. The plan is administered by Wells Fargo. Participating Employees may defer a portion of their annual compensation, subject to maximum limitations set by the Internal Revenue Service. The Debtor has discretion to match for the 401(k) plan of the Employees.

27.    PTO:  All Employees receive PTO as part of their overall compensation. On an annual basis, Employees accrue twenty (20) days of PTO if the Employee has ten (10) or more years of employment with the Debtor or if the Employee is an Executive, unless there is an

---

[2]    In addition, the Debtor offers certain voluntary elections that the Employees may opt into which may result in related deductions from the Employee's paycheck. These programs include, but are not limited to, (i) AFLAC Group Accident Injury Insurance (voluntary supplemental coverage), (ii) Guardian Critical Illness Coverage (voluntary supplemental coverage), (iii) Guardian Voluntary Term Life Insurance, (iv) Ascalon Enterprises Employee Medical Benefits Plan, (v) Revstone Industries Dental Care Plan, (vi) Revstone Industries Vision Coverage (vii) Revstone Industries Term Life, Short and Long Term Disability Plan (voluntary for hourly employees), (viii) Revstone Flexible Spending Accounts (Healthcare and Dependent Care), (ix) Revstone Health Savings Account.

employment agreement to the contrary.   If the Employee has one (1) to ten (10) years of employment with the Debtor, fifteen (15) days of annual PTO is provided unless there is an employment agreement to the contrary.  Employees with less than one (1) year of employment with the Debtor accrue PTO days monthly, up to fifteen (15) days, unless there is an employment agreement to the contrary.  Upon termination, Employees are paid for earned but unused PTO. The Debtor anticipates that Employees will utilize PTO post-petition, including certain PTO that may have accrued before the Petition Date.  The Debtor seeks authority (but not direction) to honor (but not cash out) all earned PTO in the ordinary course consistent with the existing guidelines and policies described in this paragraph, regardless of whether it accrued during the pre or postpetition period.

28.     As of the Petition Date, the Debtor was obligated to pay certain premium contributions to or provide benefits under the foregoing Employee Benefits programs, plans and policies.   The Debtor estimates the average monthly cost for Employee Benefits and related administrative fees is $148,100.  That total is calculated based upon the following summary of estimated monthly fees due by the Debtor: (i) Medical premiums ($120,000); (ii) Dental premiums ($4,600); (iii) HSA employer contribution ($1,600); and (iv) salaried and hourly basic life/AD&D/ Short-Term Disability/Long-Term Disability contributions ($11,400) and Short-Term Disability Claims of approximately $1,500 a month.

29.     By this Motion, the Debtor seeks authority to pay in the ordinary course of business all amounts owed for expenses and fees relating to Employee Benefits, including those incurred prior to the Petition Date, up to the following limits (a) contributions to the Employee medical plans (the "**Medical Plan Contributions**"): $150,000; (b) contributions to the Employee dental plans (the "**Dental Plan Contributions**"): $7,500; and (c) contributions to Employee Life

12

Insurance, AD&D Insurance, Disability Insurance and Voluntary Life Insurance Programs: $15,000.

**E.    Workers' Compensation**

30.    Under the laws of Michigan where the Debtor conducts its business, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtor.   The Debtor, in conjunction with its non-Debtor affiliates, currently maintains an annual workers' compensation policy (the "**Workers' Compensation Policy**") with the Travelers Insurance Company ("**Travelers**") pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1,000,000 per occurrence for employer liability.  The Debtor pays no deductible or self-insured retention under its Workers' Compensation Policy, and is not subject to any retroactive adjustments to its current premiums.  The current term of the Workers' Compensation Policy runs through December 29, 2013, and costs $771,624 on an annual basis.[3]

31.    The Debtor submits that the continuance of its Workers' Compensation Policy is appropriate in the ordinary course of business, but out of an abundance of caution, seek authority to maintain their workers' compensation insurance in accordance with applicable law postpetition and to pay all premium installments to Travelers as they come due in the ordinary course of business for going forward coverage.

**F.    Pension Plans**

32.    The Debtor maintains two qualified defined benefit pension plans under the Internal Revenue Code (the "**IRC**") and the Employee Retirement Income Security Act of 1974 ("**ERISA**") (the "**Qualified Pension Plans**") for former employees.   The Qualified Pension

---

[3] The Debtor and its affiliates have paid Travelers a down payment of $129,606.61 and will make monthly payments of $71,335.25 to pay the annual premium in full.

Plans cover only current and former employees who (a) were terminated in connection with certain plant closures or who have otherwise retired or (b) who were employed as of January 31, 2009 and were eligible at that time to participate in the plans. As of January 31, 2009, the Qualified Pension Plans were frozen relative to future participation and benefit accruals. Under the IRC and ERISA, the Debtor makes minimum funding contributions to the Qualified Pension Plans based on annual actuarial calculations. In addition, the Qualified Pension Plans make annual premium payments to the Pension Benefit Guaranty Corporation. The Qualified Pension Plans are described below:

> a. **The Hillsdale Hourly Pension Plan (the "Hourly Plan")**: The Hourly Plan provides pension benefits to 396 retired or otherwise previously terminated former hourly employees of Metavation or its predecessors. The Hourly Plan also covers 43 current Employees and 719 former employees who have not yet reached the age for which benefits can be paid. In general, plan benefits are based upon a calculation of years of eligible service and final average pay. The cash balance portion of the benefit was frozen as of January 31, 2009, although the benefit increased annually due to an interest credit.

> b. **The Hillsdale Salaraied Pension Plan (the "Salaried Plan")**: The Salaried Plan provides pension benefits to 122 retired or otherwise previously terminated former hourly employees of Metavation or its predecessors. The Hourly Plan also covers 29 current Employees and 217 former employees who have not yet reached the age for which benefits can be paid. In general, plan benefits are based upon a calculation of years of eligible service and average annual final compensation. The cash balance portion of the benefit was frozen as of January 31, 2009, although the benefit increased annually due to an interest credit.

33.    The Debtor makes quarterly contributions to the Qualified Pension Plans. As of the Petition Date, the Debtor owes contributions of $1,610,632 to the Hourly Plan and contributions of $663,188 to the Salaried Plan. The Debtor is past-due on contributions to the Qualified Pension Plans it was scheduled to make in prior periods as follows:

14

| Estimated Outstanding | Hillsdale Salaried | Hillsdale Hourly | Total |
|---|---|---|---|
| Balance of Missed Contributions: | $612,134 | $1,475,632 | $2,087,776 |
| Accrued Interest: | $58,770 | $181,261 | $240,031 |
| Total Due as of Petition Date | $670,904 | $1,656,893 | $2,327,797 |

The next obligations that are scheduled due after the Petition Date are a contribution of $1,456,028 to the Hourly Plan due August 15, 2013 and a contribution of $559,139 to the Salaried Plan due August 15, 2013.

34.     The Debtor believes that performing its obligations under the Qualified Pension Plans is essential to maintaining employee morale.  Any disruption in benefits payable under the Qualified Pension Plans will undoubtedly call into question the Debtor's commitment to its Employees.  Further, failure to pay contributions to the Qualified Pension Plans will result in additional amounts subject to statutory liens, further eroding the Debtor's financial position.  The Debtor seeks the authority, but not direction, (a) to pay all contributions due pre-petition to the Qualified Pension Plans and (b) to continue the Qualified Pension Plans and honor obligations thereunder in the ordinary course.[4]

## G.     Incentive and Bonus Plans

35.     In the ordinary course of business, the Debtor maintains various incentive plans to encourage their Employees to maximize the value of the Debtors' enterprise (collectively, the "Incentive Plans").    These Incentive Plans are an important component of employee compensation and provide substantial value to the Debtor's estate because they encourage

---

[4]  By requesting authority to continue the Qualified Pension Plans, the Debtor is not assuming or affirming any contracts, agreements, programs, or applicability of any law related to the Qualified Pension Plans and the Debtor reserves all of its rights with regard to the Qualified Pension Plans.

Employees to achieve important financial performance and quality goals.  Given that no payments under the Incentive Plans are currently due, the Debtor is not seeking authority to honor obligations under the Incentive Plans at this time and will seek further relief from the Court, as appropriate, before making any payment to any Employee on account of the Incentive Plans.

## IV.    RELIEF REQUESTED[5]

36.    By this Motion, the Debtor seeks an order (i) authorizing payment or honoring of the various prepetition obligations to, or for the benefit of, the Debtor's current Employees (described below), (ii) authorizing the Debtor to continue postpetition the employee benefit plans and programs in effect immediately prior to the filing of these cases, and (iii) directing all banks to honor prepetition checks for payment of the prepetition obligations to the Debtor's Employees.

37.    The Debtor represents that (i) it will not distribute any amounts over $12,475 directly to any individual Employee on account of pre-petition amounts due to its Employees as described by Bankruptcy Code sections 507(a)(4) and (a)(5) and (ii) it will not pay any amounts in excess of the estimated outstanding amounts for each category of prepetition claim identified herein without further order from this Court.  To enable the Debtors to accomplish the foregoing, the Debtor requests that the Court authorize the Debtor's banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

38.    Notwithstanding the authority requested in this Motion, the Debtor, in the ordinary course of business, sometimes modify, change and discontinue employee programs and

---

[5] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

implement new employee programs and will continue to do so during these Chapter 11 Cases, and will provide notice thereof as required by applicable rules and law.

## V.    **APPLICABLE AUTHORITY**

### A.    **Priority Wage Claims**

39.    Under subsections (a)(4) and (a)(5) of Section 507 of the Bankruptcy Code, claims against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date, and claims against a debtor for contributions to employee benefit plans arising from services rendered within 180 days before the Petition Date, are afforded priority status to the extent of $12,475 per individual.  The Debtor believes that the Prepetition Employee Obligations that they seek to pay, per Employee, do not exceed the $12,475 cap, are thus entitled to priority under subsections (a)(4) and (a)(5) of Section 507 of the Bankruptcy Code, and, as such, will be paid in full as a condition to confirmation of a plan pursuant to Section 1129 of the Bankruptcy Code.  *See* 11 U.S.C. § 1129(a)(9).  Payment of the Prepetition Employee Obligations and Employee Benefits in the ordinary course of business, therefore, will simply accelerate the timing of payment of obligations that will have to be paid in any event, and will not upset the priority scheme set forth in the Bankruptcy Code.

40.    In addition, the Debtor seeks authority to pay the associated prepetition processing costs, such as program administration charges to the extent that they are entitled to priority under Section 507 of the Bankruptcy Code.  *See Allegheny Int'l, Inc. v. Metropolitan Life Ins. Co.*, 145 B.R. 820, 822 (W.D. Pa. 1992) (holding that the prepetition claims for administrative services in connection with a debtor's medical benefits plans were entitled to priority under Section 507(a)(5) of the Bankruptcy Code); *see also In re Lummus Indus. Inc.*, 193

17

B.R. 615, 619 (Bankr. M.D. Ga. 1996) (holding that prepetition administrative fees of debtors'

health plan administrator were entitled to priority under Section 507(a)(4)).

## B.    Trust Fund Obligations

41.    Certain of the Prepetition Employee Obligations should be paid because they

constitute "trust fund taxes" such that the funds withheld from Employee paychecks are held in

trust and are not property of the Debtor's estate. *See* 11 U.S.C. § 541; *Begier v. I.R.S.,* 496 U.S.

53, 59 (1990).  Even if the funds in question were part of the Debtor's estate, the withholdings

likely would constitute priority claims of the relevant taxing authorities.  *See* 11 U.S.C. §

507(a)(8).

42.    In addition, many federal, state and local taxing authorities impose personal

liability on certain of the officers, directors or both of entities responsible for collecting taxes

from employees if such taxes are not remitted.   Accordingly, if such obligations remained

unpaid, the Debtor's officers and directors could be subject to claims or lawsuits during this

Chapter 11 case, which would constitute a significant distraction for such individuals when their

efforts should instead be focused on the Debtor's efforts to complete the restructuring.  For these

reasons, the Debtor, its estate and its creditors would benefit from payment of the withholding

obligations in the ordinary course of business.

## C.    Payment of Prepetition Employee Obligations and Employee Benefits

43.    Sections 363(b) and 105(a) of the Bankruptcy Code further authorizes the

requested relief.  Under Section 363(b) of the Bankruptcy Code, a debtor in possession may,

after notice and a hearing, use property of the estate outside of the ordinary course of business.

*See* 11 U.S.C. § 363(b).  Further, Section 105(a) of the Bankruptcy Code, which codifies the

equitable powers of bankruptcy courts, authorizes the Court to "issue any order, process, or

18

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The Debtor submits that this Court should authorize the proposed payment and honoring of the Prepetition Employee Obligations and Employee Benefits under Sections 105(a) and 363(b)(1) of the Bankruptcy Code.

44.     Section 363(b)(1) of the Code authorizes a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." *See* 11 U.S.C. § 363(b)(1). Although stated various ways, courts generally hold that a debtor's decision to enter into a transaction outside of the ordinary course of business is governed by the business judgment standard. *3* Collier on Bankruptcy ¶363.01[1][g] (Resnick & Sommer eds., 15th ed. rev. 2002); *see e.g., In re US Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) ("The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company [. . .].'" (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))).

45.     When applying the "business judgment" rule, courts show great deference to the debtor's decision making. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1986); *In re Castre*, 312 B.R. 426, 430 (Bankr. D. Colo. 2004); *Austin Assocs. v. Howison (In re Murphy)*, 288 B.R. 1, 5 (D. Me. 2002); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); *Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assoc.)*, No. 89-593, 1989 WL 165028, at *1 (N.D. Ill. Dec. 28, 1989); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981). The Debtor submits that, because the Prepetition

Employee Obligations and Employee Benefits are entitled to priority status, and because the retention of the Debtor's workforce is vital to the Debtor's businesses and its prospects for successfully restructuring, it is in the best interest of the Debtor's estate and indeed is critical for the successful rehabilitation of the Debtor, to permit the payment of such claims in the ordinary course of business during this Chapter 11 case.

46.     In case law construing Sections 363 and 105(a) of the Bankruptcy Code, it is well-established that bankruptcy courts have the equitable power to authorize the payment of prepetition claims where such payments are necessary to preserve the going concern value of a debtor's business, thereby facilitating its reorganization. *See, e.g., Miltenberger v. Logansport, Crawfordsville & Sw. Ry. Co.*, 106 U.S. 286, 311 (1882) (holding that "[m]any circumstances may exist which may make it necessary and indispensable to . . . the preservation of the property, for the receiver to pay preexisting debts of certain classes, out of the earnings of the receivership . . . ."); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (noting that the "'necessity of payment' doctrine . . . permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid" (citations and internal quotations omitted)).

47.     The relief requested in this Motion is appropriate and should be authorized under Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code. Courts in this district and elsewhere routinely recognize that payment of employee obligations is essential to a debtor's reorganization efforts and authorize full payment of prepetition wage, salary, commission, expense, severance, and benefit claims based on the foregoing justifications. *See, e.g., In re Conexant Sys., Inc.*, 13-10367 (MFW) (Bankr. D. Del. Mar. 1, 2013) (stating that relief requested

is in the "best interests" of the debtors); *In re Monitor Co. Grp. Ltd. P'ship*, No. 12-13042 (CSS) (Bankr. D. Del. Dec. 4, 2012) (same); *In re Coach Am Grp. Holdings Corp.*, No. 12-10010 (KG) (Bankr. D. Del. Jan. 5, 2012) (same); *In re PTL Holdings LLC*, Case No. 11-12676 (BLS) (Bankr. D. Del. Aug. 25, 2009) (same); *In re Point Blank Systems, Inc.*, Case No. 10-11255 (PJW) (Banks. D. Del. Apr. 14, 2010) (same).

48.    Although the Debtor seeks authority for the payment of the Prepetition Employee Obligations and Employee Benefits and to continue postpetition the Employee Benefits in effect immediately prior to the Petition Date, such action, if authorized, should not be deemed to constitute the postpetition assumption of any executory contract pursuant to Section 365 of the Bankruptcy Code.  The Debtor is in the process of reviewing these matters and reserves all of its rights under the Bankruptcy Code with respect thereto.  Moreover, authorization to pay should not affect the Debtor's right to contest the amount or validity of any such charges, in whole or in part.  Based on the foregoing, the Debtor submits that the relief requested is necessary and appropriate, in the best interests of its estate and creditors, and should be granted in all respects.

## VI.    NO ASSUMPTION OR ASSIGNMENT OF EMPLOYEE BENEFITS

49.    To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtor does not, at this time, seek to assume any such contract.  Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code.  Moreover, authorization to pay all amounts on account of Unpaid Wages and Employee Benefits shall not affect the Debtor's right to contest the amount or validity of these obligations.

21

## VII.    REQUEST FOR IMMEDIATE RELIEF AND WAIVER OF STAY

50.    The Debtor believes that it is entitled to immediate authorization for the relief contemplated by this Motion.    Pursuant to Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: ...(b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001." To the extent that the requirements of Bankruptcy Rule 6003 are applicable to the relief requested in the Motion, the Debtor submits that for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.    Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rule 6003.

51.    The Debtor seeks a waiver of any stay of the effectiveness of the order approving this Motion.    Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth in the Motion, the payments proposed herein are essential to prevent immediate and irreparable harm to the Debtor's business operations.    Accordingly, the Debtor submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## VIII.    NOTICE AND PRIOR MOTIONS

52.    Notice of this Motion has been given to the following or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtor's prepetition and postpetition secured lenders; (iii) the Pension Benefit Guaranty Corporation; (iv) the Debtor's major OEM customers: General Motors, Chrysler, and Ford; (v) Dayco Products, LLC and

22

Dayco Products S.A. de C.V., the stalking horse purchaser for the Debtor's assets; and (vi) the Official Committee of Unsecured Creditors in the case of Revstone Industries, LLC. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtor will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

53. No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court enter orders substantially in the form attached hereto as **Exhibit A** granting the relief requested by this Motion and such further relief as may be just and necessary under the circumstances.

Dated: July 22, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Colin R. Robinson (Bar No. 5524)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        tcairns@pszjlaw.com
        crobinson@pszjlaw.com

[Proposed] Counsel for Debtor and Debtor-in-Possession

DOCS_DE:187218.8 73864/002