# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| METAVATION, LLC, | ) | Case No. 13-_11831_(BLS) |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| | ) | |

Hearing Date: _____, 2013 at _:__ _.m. Eastern Time
Objection Deadline: _____, 2013 at _:__ _.m. Eastern Time

**METAVATION, LLC'S MOTION FOR ORDER: (A) APPROVING
BID PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
OPERATING ASSETS; (B) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER THE SALE AND APPROVE THE FORM AND MANNER OF NOTICE
RELATED THERETO; (C) ESTABLISHING PROCEDURES RELATING TO
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS,
INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (D) APPROVING
PAYMENT OF A BREAK-UP FEE AND EXPENSE REIMBURSEMENT;
AND (E) GRANTING RELATED RELIEF**

Metavation, LLC, a debtor and debtor in possession herein ("Metavation" or the

"Debtor"), files this motion (this "Bidding Procedures Motion" or "Motion") for entry of an

Order:  (a) approving bid procedures and certain overbid protections (including a break-up fee

and certain expense reimbursements) in connection with the sale of substantially all of the

Debtor's operating assets, as well as certain assets of a non-debtor affiliate as described below;

(b) scheduling an auction and hearing to consider the sale of the assets and approve the form and

---

[1]  The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

manner of notices related thereto; (c) establishing procedures for the assumption and assignment

of certain contracts of the Debtor that will be assumed and assigned as part of the sale; and

(d) granting related relief.

Concurrently herewith, the Debtor is filing the *Metavation, LLC's Motion for Order (A)*

*Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary*

*Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims,*

*Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b),*

*363(f) and 363(m); (C) Authorizing the Assumption, Assignment and Sale of Certain Executory*

*Contracts and Unexpired Leases Pursuant to Bankruptcy Code Sections 363 and 365; and*

*(D) Granting Related Relief* (the "Sale Motion"), which seeks approval of the sale of

substantially all of the Debtor's operating assets (the "US Acquired Assets") to (i) Dayco

Products, LLC ("US Dayco") and Dayco Products S.A. de C.V. (together with US Dayco, the

"Stalking Horse Bidder")[2] pursuant to that certain Asset Purchase Agreement between the

Debtor and Eptec S.A. de C.V. (the "Mexico Seller"),[3] a non-Debtor affiliate, on the one hand,

and the Stalking Horse Bidder on the other hand, with non-debtor entities Revstone

Transportation, LLC ("Revstone Transportation"), Metavation Vassar, LLC ("Metavation

Vassar") and Resource Technology Group ("RTG" and together with Revstone Transportation

and Metavation Vassar, the "Affiliate Parties") as parties solely for limited, enumerated purposes

-- a copy of which agreement, without schedules and exhibits, is attached to the Sale Motion as

---

[2] While both US Dayco and its foreign affiliate are purchasers under the Agreement, US Dayco will be acquiring the Debtor's assets pursuant to the Agreement.

[3] No Bankruptcy Court approval is being sought with respect to the actions of the Mexico Seller relating to the proposed sale and other transactions.

Exhibit A (the "Agreement"),[4] or (ii) the highest or otherwise best bidder or bidders for such assets determined in accordance with the proposed bid procedures. As discussed below and in the Sale Motion, the expedited sale process is in the best interests of the Debtor, its estate and creditors, and is necessary to meet the deadlines set forth in the Debtor's postpetition financing agreement. As set forth in the DIP Loan Documents (as described below), the Debtor is required to obtain an order approving the Bidding Procedures Motion (the "Bidding Procedures Order") by 16 days after the petition date and an order approving a sale transaction by 16 days after the entry of the Bidding Procedures Order, and to close such sale within four business days thereafter.[5] Further, the Debtor must adhere to certain sale milestones established by the Debtor's major OEM customers as part of their agreement to provide certain financial accommodations to the Debtor that will directly support the sale process.

In support of this Bidding Procedures Motion, the Debtor respectfully states as follows:

## Jurisdiction and Venue

1.    This Court has jurisdiction over this Bidding Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice

---

[4]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.
[5]  Additionally, under the Agreement with the Stalking Horse Bidder, the Debtor is required to, among other things, obtain the Bidding Procedures Order by August 8, 2013 and an order approving the Sale Motion by August 26, 2013.

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.        On December 3, 2012, Revstone Industries, LLC ("Revstone") and Spara, LLC ("Spara") commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 7, 2013, Greenwood Forgings, LLC ("Greenwood") and US Tool and Engineering, LLC ("US Tool" and together with Revstone, Spara and Greenwood, the "Original Debtors") commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Original Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        Pursuant to the *Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* (Docket No. 173) (the "Existing Joint Administration Order"), the Original Debtors' chapter 11 cases are jointly administered and are consolidated for procedural purposes.

6.        On December 18, 2012 the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Revstone Committee") in the case of Revstone.  No committee has been appointed in the cases of Spara, Greenwood and US Tool.  No trustee or examiner has been appointed in any of the Original Debtors' chapter 11 cases.

7.        On July 22, 2013 (the "Petition Date"), Metavation (together with the Original Debtors, the "Debtors") filed a voluntary petition in the Court for relief under chapter 11 of the Bankruptcy Code.  Metavation continues to operate its business and manage its properties as a

4

debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in Metavation's chapter 11 case (the "Metavation Case").  As of the date hereof, no creditors' committee has been appointed in the Metavation Case.

8.    The sole member of Metavation is non-debtor Revstone Transportation[6] – the sole member of which is debtor Revstone.  The Mexico Seller, a company organized under the laws of Mexico, is a sister company of Metavation and is owned by Metavation Mexico, LLC (holding a 99% interest) and Metavation Mexico II, LLC (holding the remaining 1% interest).  Revstone Transportation is the sole member of each of Metavation Mexico, LLC and Metavation Mexico II, LLC.  As noted above, Revstone Transportation is a party to the Agreement for limited purposes as set forth therein.  The Debtor is the sole member of non-debtor Metavation Vassar, another party to the Agreement for limited, specified purposes.  Resource Technology Group, the other party to the Agreement for limited purposes, is directly owned by the ultimate owners of Metavation.

9.    The factual background relating to the commencement of the chapter 11 case of Revstone is set forth in detail in the *Declaration of Jay N. Brown in Support of First Day Pleadings* (the "Brown Declaration") filed on December 3, 2012 and incorporated herein by reference.  The factual background relating to the commencement of the Metavation Case is set forth in detail in the *Declaration of John C. DiDonato in Support of First Day Motions of Metavation, LLC* (the "DiDonato Declaration" and together with the Brown Declaration, the "Declarations") filed concurrently and incorporated herein by reference.

---

[6]  For the ease of reference, references are made herein to the Debtor or Metavation making certain determinations or taking similar actions; however, as noted above, Metavation is controlled by Revstone Transportation, the sole member of Metavation.

## The Debtor's Operations and the Assets to Be Sold

10.     Metavation is a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry.  Metavation specializes in designing and manufacturing dampers that are included on original equipment manufacturers' ("OEMs") engine platforms.  The Debtor also has rapid development capabilities to produce "solution" dampers to correct driveline and powertrain noise vibration and harshness ("NVH") issues. The Debtor is an entrenched, fully-qualified supplier to North American OEMs.  In addition to its leading damper and engine component production capabilities, Metavation also maintains precision machining capabilities for powertrain, chassis, and other components.  The Debtor serves many of the largest automotive customers, suppliers, and platforms; the Debtor's major OEM customers include General Motors and Chrysler.  Metavation's Tier I supplier customers include American Axle, Dana Automotive, and J.G. Kern.  Such long-standing relationships have led the Debtor to a dominant market position in the U.S. crankshaft and driveline damper markets.

11.     Metavation's core competencies include the manufacture of precision machined components and assemblies; however, Metavation specializes in designing and manufacturing dampers that are included on OEM engine platforms.  The Debtor also has rapid development capabilities to produce "solution" dampers to correct driveline and powertrain NVH issues.   On average, Metavation produces three to four million dampers annually and  is the only North American damper manufacturer to offer in-house custom rubber compounding and manufacturing as well as in-house precision machining capabilities for virtually all damper components. Crankshaft dampers are placed in the front of the engine with the purpose of

6

reducing torsional twisting of the engine's crankshaft. Driveline dampers are "solution" dampers that correct driveline and powertrain NVH issues for customers and sometimes can be found in multiple locations within a vehicle. There are several different components that make up a damper assembly. Unique capabilities allow Metavation to be a "one-stop-shop" for precision machining and the rubber blends that make up the damper, strategically allowing it to complete the assembly in a single location at an effectiveness and efficiency that results in a superior end product.

12. Metavation operates from four, modernized facilities located in central Michigan. The Debtor begins its manufacturing process by developing the rubber component at the Hillsdale, MI facility, and then sends the rubber component to the Mt. Pleasant, MI or Vassar, MI facilities for machining and/or assembly. Metavation's manufacturing facilities are described below:

- **Rubber Plant and Tech Center** – 16,000 square foot production facility located in Hillsdale, Michigan; employs 20 non-union employees producing strip and rope rubber, molded assemblies and prototypes for distribution to other Metavation production facilities and other auto manufacturers in North America;

- **CNC Machining and Assembly Plant #1** – 80,000 square foot manufacturing facility located in Mt. Pleasant, Michigan; the facility's 177 non-union employees produce crankshafts, drivelines, dampers and steering knuckles distributed to other auto manufacturing facilities in North America and China;

- **CNC Machining and Assembly Plant #2** - 27,000 square foot production facility located in Vassar, Michigan; employs 16 non-union employees producing driveline dampers and crankshaft damper components for distribution to other auto manufacturers in North America; and

DOCS_LA:268618.12 73864/002

- **Vassar Foundry** – gray iron foundry facility located in Vassar, Michigan.[7]

13.    Further, Metavation's design and engineering capabilities are a core competency and competitive advantage for the Debtor.  Because every product is custom-engineered to meet the customer's specifications, the breadth and depth of Metavation's engineering expertise are a critical component of the Debtor's success.  Metavation's engineering staff is based in Southfield, Michigan.

14.    As detailed in the Declarations, the Original Debtors had been negatively impacted by a lack of liquidity in the credit market for middle market borrowers, and had only able to obtain one-off financings at relatively high interest rates to fund their operations.  The tight credit markets and restrictive financing covenants led to defaults and disputes with their key lenders, further exacerbating liquidity issues.  Accordingly, in late 2012, Revstone and its affiliated companies embarked on a comprehensive process of sales and financings in order to enable the companies to restructure in a thoughtful and deliberate manner, for the benefit of all of its constituents.  While Metavation did not experience the impact of the tight credit market to the same degree of its affiliates, the Debtor also joined in exploring the options presented by sales and financings.  As discussed further below, Metavation retained Huron in October 2012 to market its assets to strategic buyers in the automotive supplier industry.

15.    After the filing of the Original Debtors' chapter 11 cases, Metavation faced increased pressure from OEMs and its other customers to effectuate a change of control of the operating businesses of the Debtors and their affiliates.  In parallel with its efforts to market or

---

[7]  As described further in the Sale Motion and as set forth in the Agreement, the Vassar foundry facility is not proposed to be sold to the Stalking Horse Bidder and is an Excluded Asset under the Agreement.

restructure its Assets, Metavation established lines of communication with the OEMs and other customers, including negotiation of OEM funding accommodations and management of customer relationships. As a result of these negotiations, major customers agreed to pull forward payment terms from approximately 45 days to 10 days generating substantial liquidity, and customers agreed to provide up to $4.4 million of junior participation funding as detailed in the DiDonato Declaration.

16.    As a result of the marketing efforts and process undertaken by Metavation (discussed further below), as well as the business realities facing the business in light of the Debtor's relationship with its customers, Metavation has determined that an expedited process for the sale its Assets to the Stalking Horse Bidder or to another Successful Bidder, while the business is still operating as a going concern, will maximize the return to creditors.

17.    The assets to be sold under the Agreement consist of, among other things, certain equipment, contracts, inventory, real property leases, intellectual property, and other assets that are utilized exclusively in Metavation's damper related non-foundry business, as well as certain assets of the Mexico Seller used in its damper business.

18.    Metavation believes that the proposed going concern Sale –a result of extensive prepetition marketing and negotiation that commenced several months before the filing of the Debtor's case, and subject to an overbidding process– is the best option to maximize value under all of the circumstances. In order to maximize the value of Metavation's business and Assets for all creditors, stakeholders and parties in interest, sound business decisions were made by Metavation to embark on the competitive sale process that was undertaken and to accept the Sale terms proposed by the Stalking Horse Bidder, which comprised the highest and best offer for the

9

Assets, subject to a reasonable overbidding process. When augmented by certain customer sale

support, consisting of additional consideration and accommodations, as well as debt forgiveness,

which is contingent upon the closing of a sale to a qualified buyer (the Stalking Horse Bidder is a

qualified buyer) within timeframes specified in the sale support agreement, the sale to the

Stalking Horse Bidder (or a successful qualified overbidder) clearly represents the highest and

best alternative for the Debtor and all of its constituents.

19.     Moreover, the expedited process proposed herein is necessary to meet the

deadlines set forth in the Debtor's postpetition financing agreement with Wells Fargo Capital

Finance, N.A., as lender and as agent for certain lender parties (collectively, the "DIP Lenders").

Pursuant to the DIP Loan Documents (as defined and described in the *Debtor's Motion Pursuant*

*to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local*

*Rule 4001-2 for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition*

*Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final*

*Hearing, and (IV) Granting Certain Related Relief),* the Debtor is required to obtain an order

approving the Bidding Procedures by 16 days after the Petition Date and an order approving a

sale transaction by 16 days after the entry of the Bidding Procedures order, and to close such sale

within four business days thereafter.[8] Additionally, the Debtor must adhere to certain sale

milestones established by the Debtor's major OEM customers as part of their agreement to

provide certain financial accommodations to the Debtor that will directly support the sale

process.

---

[8] As noted, the Debtor is also required under the Agreement to, among other things, obtain the Bidding Procedures Order by August 8, 2013 and an order approving the Sale Motion by August 26, 2013.

**Marketing Process**

20.     Significant efforts have been undertaken by Metavation to market its assets.  With Huron's assistance, Metavation formally commenced that process in October 2012.  As noted above, Metavation retained Huron in October 2012 to market its assets to potential buyers. Marketing materials, including a Summary Fact Sheet and a Confidential Informational Memorandum (the "CIM"), were prepared, an online data site with diligence materials was expanded, and potential buyers were identified.  Approximately 23 industry participants, strategic investors, financial investors and/or other potential buyers were contacted by Huron, with the approval and input of the Debtors' management.  Approximately 15 parties returned executed confidentiality agreements and were provided with the Summary Fact Sheet (distributed to applicable parties in November 2012), the CIM (distributed to applicable parties in December 2012), access to the online data site, and other materials and information.  By January 7, 2013, Metavation had received four expressions of interest, and subsequently Metavation negotiated with certain of the interested parties, with input from certain important customers.[9]  Based on various factors, including customer input, the Debtor ultimately focused on potential transactions with two of the parties that had submitted expressions of interest. During this process, Metavation provided additional, more detailed information, and scheduled facility tours and meetings with the Debtor's management.  One of the parties later discontinued its consideration of an acquisition.

---

[9]  Although around this time Revstone's management independently took steps toward a stock purchase acquisition by another party, such potential acquisition was discontinued after certain customers indicated they would not support the transaction.

21.     On June 4, 2013, the other potential buyer, the Stalking Horse Bidder, submitted

to Revstone Transportation, as the sole member of Metavation, a non-binding letter of intent

("LOI") (superseding its prior submitted LOIs which had been the subject of negotiation between

the parties).  Around this period, another third party delivered a non-binding expression of

interest to purchase certain assets; however, the Debtor concluded that the Stalking Horse

Bidder's offer was superior in important respects.  After further discussion between the parties,

the Stalking Horse Bidder's June 4th LOI was modified, and after extensive review and

consideration, the Debtor selected the Stalking Horse Bidder's offer as set forth in its June 10,

2013 LOI as the best alternative for Metavation to maximize the value of its US Acquired

Assets, and proceeded to negotiate with the Stalking Horse Bidder the terms and conditions of a

definitive purchase agreement.[10]  After extensive negotiations, Metavation entered into an Asset

Purchase Agreement with the Stalking Horse Bidder on July 19, 2013, a copy of which is

attached to the Sale Motion, without schedules or exhibits, as Exhibit A.

22.     The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor as those

terms are defined in the Bankruptcy Code.  As a matter of disclosure, the Debtor notes that that

Richard Newsted, one of the independent members of the board of managers of Revstone

Transportation (the parent of Metavation) (the "Board"), as well as of the board of managers of

Revstone (the ultimate parent of Metavation) serves on the board of managers of an affiliate of

the Stalking Horse Bidder – Mark IV, LLC, which is the ultimate parent of the Stalking Horse

---

[10]  The Debtor notes that the June 10th LOI contained an exclusivity provision, requiring the Debtor, upon the date of acceptance of the LOI (June 10th) for a certain period of time, to exclusively negotiate with the Stalking Horse Bidder on the potential sale of the Debtor's assets.  As discussed herein, the Debtor and its advisors engaged in extensive marketing/negotiation efforts prior to the LOI, and the Debtor will further solicit potential offers in connection with this Motion.

12

Bidder. Mr. Newsted has been screened from deliberations and information related to the

Debtor's sale process, and Mr. Newsted has not participated in any decisions relating to

Metavation, including any potential sale of the assets to the Stalking Horse Bidder or otherwise.

23.     While the prepetition marketing and sale process was thorough, as discussed

above, additionally, the Debtors will send, or will have sent, notice of the Sale Motion and bid

procedures to all parties that the Debtors believe may be potentially interested in acquiring the

US Acquired Assets.[11]  The Debtors also created an electronic data room with key documents

and company-specific information in order to streamline the due diligence process, going

forward.

24.     The Debtor believes that the consummation of the Sale to the Stalking Horse

Bidder or other Successful Bidder will provide its creditors and other stakeholders with the best

opportunity possible for maximizing value by realizing upon the US Acquired Assets through a

sale as a going concern.

### Relief Requested

25.     Pursuant to this Bidding Procedures Motion, the Debtor requests that the Court,

among other things:

(a)     approve the Stalking Horse Bidder's status as the stalking horse

bidder;

(b)     approve the proposed bidding procedures (the "Bidding

Procedures"), including the overbid provisions, attached hereto as Exhibit A;

---

[11]  Pursuant to this service, notice will be sent to approximately 67 parties that have expressed or may have an interest in acquiring the US Acquired Assets.

13

(c)    approve, pursuant to the terms of the Agreement, the requested

break-up fee in the amount of $650,000 (or approximately 2.6% of the proposed $25,075,000

purchase price (the "Break-Up Fee")) and the requested expense reimbursement of up to

$350,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid

Protections"), which Bid Protections will (i) have super-priority administrative claim status in

the Debtor's case pursuant to Bankruptcy Code section 507(b), senior to all administrative

expense priority claims other than the administrative claims, if any, pursuant to the Debtor's

post-petition lending facility and/or cash collateral order(s), and which will be subordinate to any

carve-out granted or other professional fee funding arrangement provided for by such post-

petition lenders and/or cash collateral arrangements in favor of the professionals retained by the

Debtor and/or other professionals retained in the Debtor's case, and (ii) be paid to the Stalking

Horse Bidder in full upon consummation of an Alternative Transaction (as defined in the

Agreement) occurring within the six month period following the Auction, pursuant to the terms

and conditions set forth in the Agreement, including sections 8.3, 8.5 and 11.3 thereof;

(d)    approve the potential fee and expense reimbursement obligation of

the Debtor pursuant to section 11.6 of the Agreement; specifically, if the Debtor terminates the

Agreement pursuant to section 11.2(d)(vii) (in the event the Debtor does not receive in writing,

in a form reasonably acceptable to it, the PBGC Seller Release[12] or such condition is not waived

by the Debtor upon the Termination Date or the Debtor has received notice from the PBGC that

the Debtor will not obtain the PBGC Seller Release and such condition has not been waived by

---

[12]  The "PBGC Seller Release" is defined in the Agreement to mean an agreement between the PBGC and Sellers whereby PBGC agrees that it will not (i) seek to enjoin the consummation of the transactions contemplated by the Agreement or (ii) assert after the Closing against the Sellers or their ERISA Affiliates any claim over or otherwise in respect of the Acquired Assets.

the Debtor (but other conditions in sections 10.1 and 10.2 have been satisfied or waived), subject

to all other conditions set forth in section 11.2(d)(vii))), the Debtor and Mexico Seller shall pay

to an account designated in writing by the Stalking Horse Bidder a sum equal to the reasonable

fees and expenses incurred by the Stalking Horse Bidder and its Affiliates in connection with the

transactions contemplated by the Agreement and supported by written invoices, which amount

shall not exceed $1 million in the aggregate (subject to all the terms and conditions set forth in

section 11.6, the "§ 11.6 Fee and Expense Reimbursement");

      (e)    approve the procedures set forth herein for the assumption and

assignment of certain executory contracts and unexpired leases in connection with the sale (the

"Assumption and Assignment Procedures");

      (f)    establish a date for potentially holding an auction (the "Auction")

and approve certain procedures in connection therewith;

      (g)    schedule the hearing to approve any sale transaction(s) to the

Stalking Horse Bidder or to such other party that makes the highest or otherwise best offer for

the assets (the "Successful Bidder") and establish deadlines for objections and responses to the

relief requested in the Sale Motion; and

      (h)    approve the form and manner of notice to be served upon certain

parties, including: (i) the form of notice, substantially in the form attached hereto as Exhibit B,

to be served on the Sale and Bid Procedures Notice Parties (defined below); (ii) the form of

notice, substantially in the form attached hereto as Exhibit C, to be served on all known creditors

of the Debtor (the "Creditor Notice"); and (iii) the form of notice to the counterparties to the

contracts/leases of the Debtor that may potentially be Assigned Contracts in conjunction with the proposed Sale, in substantially the form attached hereto as Exhibit D (the "Cure Notice").

### Sale Hearing

26.    The Debtor requests that the Court schedule a Sale Hearing no later than 15 days after the entry of an order on the Bidding Procedures Motion in order to allow timely entry of the Sale Order and for completion of the closing transactions set forth in the Agreement, and that objections, if any, to the Sale Motion be filed no later than 4:00 p.m. prevailing Eastern Time within three (3) business days of the Sale Hearing (thus, for example, if the Sale Hearing were set for Wednesday, August 21, 2013, the objection deadline would be 4:00 p.m. on Friday, August 16).

### Proposed Bidding Procedures

27.    The Bidding Procedures are attached hereto as Exhibit A.  The Bidding Procedures are summarized as follows:[13]

(a)    Assets to be Sold:  Metavation is offering for sale in one or more transactions substantially all of its operating assets, which generally consist of the Debtor's operational and certain other assets related to its damper related non-foundry business.  The assets for sale do not include certain Excluded Assets of the Debtor as described in the Agreement.  As set forth in the Agreement, certain assets of the Mexico Seller, related to its damper business, are also proposed to be sold pursuant to the Agreement.

---

[13] Nothing in this summary shall be construed in any way to limit or alter any of the provisions of the Bidding Procedures, or to guide in the interpretation of the Bidding Procedures in any other proceeding.  This summary is provided merely as a convenience to the Court and parties in interest evaluating the Bidding Procedures.

DOCS_LA:268618.12 73864/002

(b)    <u>Participation Requirements</u>:  Any person that may be interested in all or portions of the Acquired Assets (a "<u>Potential Bidder</u>") must deliver to the Debtor (unless a particular document has been previously delivered or the Debtor waives a particular requirement), not later than five business days before the Bid Deadline (defined below):

i.     An executed confidentiality agreement ("<u>Confidentiality Agreement</u>") in form and substance acceptable to the Debtor;

ii.    identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction;

iii.   written disclosure of any connections or agreements with the Debtor, the Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, and/or any officer, director, manager or direct or indirect equity security holder of the Debtor;

iv.    a letter of indication stating that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of such Acquired Assets on terms and conditions no less favorable in the aggregate to the Debtor than the terms and conditions contained in the Agreement, indicating (a) that such bidder will post the required Bid Deposit (defined below), and (b) total cash consideration expected to be provided to the Debtor at Closing; and

v.     sufficient information, as may be requested by the Debtor in its discretion (including upon consultation with its customers), to allow the Debtor to determine that the bidder has the operational and financial capability to close a sale of the applicable Acquired Assets (which may include, but is not limited to, a bank account statement showing the ability of a Potential Bidder to pay cash for the Acquired Assets, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Potential Bidder or those entities that will guarantee in full the payment obligations of the Potential Bidder, proof of any debt or equity funding commitments that are needed to close the contemplated transaction, and/or operational information).

As provided below, only Potential Bidders who satisfy the foregoing requirements may participate in the due diligence process.

A "Qualified Bidder" is a Potential Bidder that delivers the documents and information described in subparagraphs (i) – (v) above and who satisfies the following additional requirement, as to be determined by the Debtor in its discretion:

- Upon consultation with its customers, in its discretion, the Debtor has determined the Potential Bidder is reasonably likely (based on, among other things, operational and financial information submitted by the Potential Bidder, the Potential Bidder's operational and financial capability to close a sale of the Acquired Assets, experience, and other non-monetary considerations, such as ability to obtain any required regulatory approvals, including, if applicable, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR")), to submit a bona fide offer, and be able to consummate a sale if selected as the Successful Bidder (as defined below).

As set forth further below, only a Qualified Bidder may submit a Qualified Bid, and the Qualified Bidder's bid must meet certain requirements as described below to constitute a Qualified Bid.  The Stalking Horse Bidder shall be deemed a Qualified Bidder.  Not later than three (3) business days after a Potential Bidder delivers all of the materials and information that may be required by the Debtor in preceding subparagraphs (i) through (v) above, the Debtor shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.

(c)    Due Diligence:  Only Potential Bidders (who, among the other applicable requirements set forth above, execute and deliver a Confidentiality Agreement) are eligible to receive due diligence access and/or certain non-public information.  If the Debtor determines that a Potential Bidder does not constitute a Qualified Bidder, then such Potential Bidder's access to due diligence or other non-public information shall terminate.  The Debtor is not responsible for, and will bear no liability with respect to, any information obtained by Potential Bidders or Qualified Bidders in connection with the sale of the Acquired Assets.  Notwithstanding the foregoing, neither the Debtor nor its representatives shall be obligated to

18

furnish information of any kind to any person that the Debtor determines not to be a Qualified

Bidder.

           (d)      Bid Requirements: All bids, other than the Stalking Horse Bid,

shall be in writing and include the following terms, conditions, information and documents (the

"Required Bid Materials"):

i.     The bid must have similar or better terms and conditions as the Stalking Horse Bid (as determined by the Debtor in its business judgment), with higher or better consideration by having an aggregate value (as determined by the Debtor in its discretion) of not less than (x) the sum of (i) $25,075,000, and (ii) $1,000,000 (which amount is the Break-Up Fee and Expense Reimbursement (defined below)) plus an initial bid increment of $500,000, followed by additional bid increments of $250,000, and (y) the assumption of all Assumed Liabilities (as defined in the Stalking Horse Bid) or additional cash or other consideration of an equivalent value as determined by the Debtor in its business judgment; provided, however, that each Qualified Bid must provide for the payment of the Break-Up Fee in cash upon the closing of the applicable transaction; provided, however, in its discretion, the Debtor may aggregate bids and consider other value provided to the Debtor's estate in connection with a bid (including customer support) to determine the highest or otherwise best bid (the "Minimum Bid Amount"). A bid should propose a contemplated transaction involving all or substantially all of the Acquired Assets, provided, however, that the Debtor, in its discretion, may consider proposals for less than substantially all the Acquired Assets; provided further that the Debtor will evaluate all bids, in its sole discretion, to determine whether such bid or combination of bids maximizes the value of the Debtor's estate as a whole.

ii.     A letter stating and agreeing that the bidder's offer is irrevocable until the earlier of (i) the second business day after the Acquired Assets on which the Qualified Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales or (ii) up to and including the close of business on the date that is three (3) Business Days after the Termination Date, and that such offer will serve as a Back-Up Bid if so selected by the Debtor.

iii.     An executed copy of a purchase agreement and a redline of a Qualified Bidder's proposed purchase agreement reflecting variations from the Agreement (the "Marked Agreement"). All Qualified Bids must provide (a) a commitment to close within the same (or shorter) time period set forth in the Agreement; (b) a representation that the Qualified Bidder will, if applicable, (1) make all necessary filings under the HSR, and pay the fees associated with such filings and (2) submit all necessary filings under HSR within the same (or shorter) time period, if any, set forth in the Agreement.

iv.     A cash deposit in the amount of 10% of the purchase price before any reductions, including for assumed indebtedness, in the form of a wire transfer, certified check or such other form acceptable to the Debtor (the "Bid Deposit"), which shall be placed in an escrow account or other segregated account acceptable to the Debtor, the "Escrow Account").

v.      A representation of the bidder and written evidence acceptable to the Debtor that the bidder has the financial wherewithal to consummate the proposed transaction, which may include, without limitation, executed copies of any guarantees of the payment obligations of the proposed purchaser, and which the Debtor believes to be sufficient to satisfy the standards to provide adequate assurance of future performance of any contracts and leases to be assumed and assigned under Bankruptcy Code section 365 and to consummate the transaction contemplated by the Marked Agreement; provided further that if a bid is based partly or completely on financing, written evidence of the commitment for financing and the appropriate contact information for such financing source must be provided unless waived by the Debtor.

vi.     The bid shall not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, termination or similar type of fee or payment, and shall include an acknowledgement and representation of the bidder that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its offer, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guarantees, express, implied, statutory or otherwise, regarding the Acquired Assets, the financial performance of the Acquired Assets or the physical condition of the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or the Marked Agreement.

vii.    The bid shall not contain any due diligence, financing, or regulatory contingencies of any kind (other than a condition that any applicable waiting period under HSR (if applicable) shall have expired or been terminated), though the bid may be subject to the satisfaction of specific conditions in all material respects at Closing.

viii.   The bid shall identify each executory contract and unexpired lease to be assumed and assigned to the bidder.

ix.     The bid shall fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid, and the complete terms of any such participation.

x.      The bid shall state that the offering party consents to the core jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of the bidder's contemplated transaction documents.

xi.    The bid shall provide that the offering party shall be bound as a "Back-Up Bidder" to the same extent provided for in the Stalking Horse Bid.

xii.    The bid shall include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted purchase agreement of the bidder.

A bid received from a Qualified Bidder that includes all of the Required Bid Materials to the satisfaction of the Debtor in its discretion and is received by the Bid Deadline is a "Qualified Bid." The Debtor reserves the right to determine the value of any Qualified Bid, and which Qualified Bid (or combination of Qualified Bids) constitutes the highest or best offer (subject to Bankruptcy Court approval). The Debtor shall notify the Stalking Horse Bidder within 24 hours after the Bid Deadline if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids, and shall provide the Stalking Horse Bidder with a copy of any Marked Agreement constituting a Qualified Bid.

(e)    Bid Deadline: The deadline for submitting Qualified Bids by a Qualified Bidder shall be the date that is the two business days before the Auction or three calendar days before the Auction, whichever is later (the "Bid Deadline").[14]

(f)    Auction: If a Qualified Bid other than that submitted by the Stalking Horse Bidder has been received by the Debtor by the Bid Deadline, the Debtor may conduct an auction (the "Auction") of the Acquired Assets. The Debtor shall provide Qualified Bidders that submitted Qualified Bids with a copy of the asset purchase agreements relating to the other Qualified Bids at least 24 hours prior to the Auction. The Auction shall be conducted

---

[14] For example, if the Auction is scheduled for a Monday, the Bid Deadline would be at 4:00 p.m. Eastern on the preceding Friday (three calendar days before the scheduled Auction).

21

at the offices of Pachulski, Stang, Ziehl & Jones LLP, 919 North Market Street, 17th Floor,

Wilmington, Delaware 19899 at 10:00 a.m. (prevailing Eastern time) two business days prior to

the Sale Hearing, or such other place and time as the Debtor shall notify all Qualified Bidders

who have submitted Qualified Bids and expressed their intent to participate in the Auction as set

forth above.  The Auction will be governed by various procedures, as proposed in the attached

Bidding Procedures.

      (g)   Acceptance of Qualified Bids: The Debtor shall sell the US

Acquired Assets to any Successful Bidder (or the party(ies) who submitted the Back-Up Bid(s)

("Back-Up Bidder(s)") should such bidder become the Successful Bidder as described further in

the Bidding Procedures) only upon the approval of such bidder's bid by the Bankruptcy Court

after the Sale Hearing.  The Debtor's presentation of a particular Qualified Bid to the Bankruptcy

Court for approval does not constitute the Debtor's acceptance of the bid.  The Debtor will be

deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at

the Sale Hearing.

      (h)   Return of Bid Deposits:  The Bid Deposits shall not be subject to

the claims, liens, security interests, or encumbrances of Debtor's creditors.  The Bid Deposits of

Qualified Bidders (others than the Stalking Horse Bidder) shall be disbursed from the Escrow

Account only as follows: (i) if the Qualified Bidder becomes the Successful Bidder, its Bid

Deposit will be released to the Debtor or applied as provided under any asset purchase agreement

between the Debtor and such Successful Bidder, and (ii) if such Qualified Bidder is not the

Successful Bidder at the Auction, then its Bid Deposit shall treated as set forth below.  The Bid

Deposit of the Stalking Horse Bidder shall be disbursed as provided for under the Agreement and

the Escrow Agreement governing such Bid Deposit.  Other than the Bid Deposits of the

Successful Bidder(s) and the Back-Up Bidder(s), Bid Deposits of all other Qualified Bidders

shall be returned as soon as practicable after entry of the order approving the sale of the US

Acquired Assets.  In addition to any other remedies available to the Debtor, the Debtor may

retain the Bid Deposit of any Qualified Bidder who breaches or fails to perform any of its

obligations pursuant to these Bidding Procedures or its Qualified Bid.  The treatment of the

Stalking Horse Bidder's Bid Deposit by the Debtor shall be in accordance with the terms of the

Agreement and the Escrow Agreement governing such Bid Deposit.

## Notice of Sale Hearing

28.     As noted above, based on, among other circumstances, the DIP Lenders'

requirement that a sale order be entered by 16 days after entry of the Bidding Procedures Order,

the Debtor requests that the Court schedule the Sale Hearing no later than 15 days after entry of

an order on the Bidding Procedures Motion, which date will be two business days after the

proposed Auction.  The Debtor proposes that objections, if any, to the Sale Motion be filed on or

before 4:00 p.m. within three business days of the Sale Hearing.

29.     The Debtor requests that the Court approve the manner of notice of the Sale

Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form

attached hereto as Exhibit B (the "Sale and Bid Procedures Notice"), which the Debtor will serve

on the following parties:

(a)     the U.S. Trustee;

(b)     counsel to the Committee in Revstone's chapter 11 case;

23

(c)     counsel to any statutory committee that may be appointed in the Debtor's case;

(d)     all parties known by the Debtor to assert a lien on any of the US Acquired Assets;

(e)     all entities who executed non-disclosure agreements with the Debtor in connection with a potential acquisition of any or all of the US Acquired Assets or whom the Debtor believes may have an interest in bidding

(f)     all counterparties to contracts/leases that may potentially be designated as Assigned Contracts;

(g)     the United States Attorney's office

(h)     all state attorneys general in state(s) in which the Debtor does business;

(i)     state taxing authorities in the state(s) in which the Debtor does business and the Internal Revenue Service;

(j)     environmental authorities in the state(s) or smaller applicable jurisdictions in which the Debtor does business;

(k)     the Stalking Horse Bidder and its counsel; and

(l)     all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the date of entry of the Bidding Procedures Order (collectively, the "Sale and Bid Procedures Notice Parties").

30.     Additionally, the Debtor proposes to serve the Creditor Notice substantially in the form attached hereto as Exhibit C on all other creditors of the Debtor known by the Debtor.

24

31.     The Debtor proposes to serve the Sale and Bid Procedures Notice and the Creditor Notice within three (3) business days from the date of entry of the Bidding Procedures Order, by first-class mail, postage prepaid, on the appropriate parties.  Both the Sale and Bid Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn: Timothy Cairns or by email to tcairns@pszjlaw.com.

## Sale Hearing

32.     At the Sale Hearing, the Debtor will seek Bankruptcy Court approval of the Sale of the US Acquired Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims and interests to attach to the proceeds of the Sale of the US Acquired Assets,[15] except as otherwise provided with the same validity and in the same order of priority as they attached to the US Acquired Assets prior to the Sale, including the assumption by the Debtor and assignment to the Successful Bidder of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code.  The Debtor will present additional evidence, as necessary, at the Sale Hearing and submit that the relief sought herein, including the Sale and related assumption and assignment of contracts and leases, is fair, reasonable and in the best interest of its estate.

---

[15]  Such liens and interest will not attach to proceeds of the sale that are attributable to the assets of the Mexico Seller.

## Closing

33.    The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Approval of Bid Protections Is Appropriate

34.    As indicated above, the Debtor hereby requests that the Court approve the Bid Protections and Bidding Procedures in their entirety, as is customary in similar circumstances. To compensate the Stalking Horse Bidder whose bid will be subject to higher or better offers, the Debtor seek approval of the Bid Protections, as well as the § 11.6 Fee and Expense Reimbursement (if applicable pursuant to the terms of the Agreement), in accordance with the terms of the Agreement.

35.    The Debtor and Stalking Horse Bidder believe that the amounts of the Break-Up Fee and Expense Reimbursement are reasonable, given the benefits to the Debtor's estate of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Stalking Horse Bidder, and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Agreement (including the super-priority administrative claim status thereof) are necessary to preserve and enhance the value of the Debtor's estate.  The Debtor believes that the agreement to pay the Bid Protections on the terms of the Agreement is necessary to induce the Stalking Horse Bidder to enter into the transactions encompassed by the Agreement and thus to enable the Debtor to obtain the highest and best possible price for the US Acquired Assets.

26

DOCS_LA:268618.12 73864/002

36.     Further, the Debtor believes that the § 11.6 Fee and Expense Reimbursement is a fair and reasonable provision under all the circumstances.  This provision is triggered if the Debtor elects to terminate the Agreement pursuant to the applicable Agreement provisions.[16] Further, the Stalking Horse Bidder, pursuant to the Agreement, would be reimbursed only for its reasonable fees and expenses supported by written invoices, with the Stalking Horse Bidder's rights under section 11.6 constituting its sole remedy by reason of any termination pursuant to (or deemed to be pursuant to) section 11.2(d)(vii).

37.     The Bid Protections and the Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Bid Protections and Bidding Procedures will encourage competitive bidding, and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

38.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtor and perform the necessary due diligence attendant to the acquisition of the Debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process.  Historically, bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and the Expense Reimbursement, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to

---

[16] The Pension Benefit Guaranty Corporation asserts substantial claims against the Debtor and its affiliates (based on controlled group liability).

convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

39.    The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtor's estate. *See id.* at 533.

40.    The *O'Brien* court identified at least two instances in which bidding incentives may provide benefit to an estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induces a bidder to research the value a debtor's assets and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

41.    Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Break-Up Fee and Expense Reimbursement pass muster. The Agreement and the Debtor's agreement to pay the Break-Up Fee and Expense Reimbursement pursuant to the terms thereunder are the product of good faith, arm's-length negotiations between the Debtor and the Stalking Horse Bidder. The Break-Up Fee and Expense

28

Reimbursement are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Bidder of being used as a stalking horse bidder.

42.     Further, the Break-Up Fee and the Expense Reimbursement have already encouraged competitive bidding in that the Stalking Horse Bidder would not have entered into the Agreement without these provisions. The Break-Up Fee and the Expense Reimbursement thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, the Stalking Horse Bidder's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Property will be] sold will reflect [its] true worth." *Id.*

43.     Finally, the Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Break-Up Fee and the Expense Reimbursement will permit the Debtor to insist that competing bids for the assets, made in accordance with the Bidding Procedures, be materially higher or otherwise better than the Agreement (or competing agreement), which is a clear benefit to the Debtor's estate.

44.     Furthermore, the Break-Up Fee and the Expense Reimbursement, which at maximum would together total $1 million, or approximately 4% of the Purchase Price under the Agreement, are within the spectrum of termination fees approved by bankruptcy courts in chapter 11 cases. *See, e.g., In re Global Motorsport Group, Inc., et al.*, (Case No. 08-10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break-up fee of approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or $700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del., September

29

27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection with $110,000,000 sale); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893 (PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Bros. Stores. Inc., et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del., Sept. 11, 2008) (Court approved break-up fee of 3%, or $240,000.00 in connection with sale of debtor's assets for purchase price of $8,000,000); *In re Champion Enterprises, et al.*, Case No. 09-14019 (KG) (Bankr. D. Del., Feb. 8, 2010) (Court approved break-up fee of less than credit bid or $3,000,000.00 in connection with sale of debtor's assets for purchase price of approximately $80,000,000); *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (Court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (Court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); and *In re Point Blank Solutions, Inc., et al.*, Case No. 10-11255 (PJW) (Bankr. D. Del,

Oct. 5, 2011) (Court approved break-up and expense reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000).

### Procedures for the Assumption and Assignment of Certain Contracts

45.    At closing, the Debtor intends to assume, assign and sell to the Successful Bidder, certain of its executory contracts and unexpired leases as to be identified by the Successful Bidder (*i.e.*, the "Assigned Contracts").[17] The Debtor proposes to serve the proposed Cure Notice, in substantially the form annexed hereto as Exhibit D, upon each counterparty (a "Counterparty") whose agreement may potentially be assumed and assigned to the Successful Bidder within one business day after entry of the Bidding Procedures Order. The Cure Notice also will identify the amounts, if any, that the Debtor believes are owed to each Counterparty to an Assigned Contract in order to cure any defaults that exist under such contract (the "Cure Amount"). The Debtor has proposed that the Cure Notice will state the date by which any objection to the Cure Amounts or the assumption and assignment of the Assigned Contract on any other ground other than adequate assurance of future performance must be filed and served, which will be ten (10) days after service of the Cure Notice ("Counterparty Objection Deadline"). If a contract or lease is assumed and assigned pursuant to the Bankruptcy Court's order approving same, then unless the affected Counterparty properly files and serves an objection to the Cure Amount contained in the Cure Notice, the Counterparty will receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Amounts as set forth in the Cure Notice, with payment made pursuant to the terms of the Agreement or the

---

[17] The inclusion of any agreement in the list of Assigned Contracts does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included in the list of Assigned Contracts up until the time of the Sale Hearing.

agreement with the Successful Bidder.  If an objection is filed by a Counterparty to an Assigned

Contract with respect to the Cure Amount set forth in the Cure Notice, the Debtor proposes that

such objection must set forth a specific default under the Assigned Contract and claim a specific

monetary amount that differs from the amount (if any) specified by the Debtor in the Cure Notice

or, alternatively, state why the Counterparty believes any Cure Amount is owing, and state the

basis for any other objection to the assumption and assignment of the Assigned Contract.  The

Cure Notice also will state such objection deadline and the date, time and place of the Sale

Hearing.

      46.     As set forth in the proposed order on the Bidding Procedures Motion, the Debtor

further proposes that all objections of any Counterparty to the assignment and assumption of its

applicable contract with respect to the adequate assurance of future performance ("Adequate

Assurance Objection"), be filed and served by the Counterparty Objection Deadline; provided,

however, if the Stalking Horse Bidder is not the Successful Bidder, any Counterparty may raise

at the Sale Hearing an objection to the assumption and assignment of the applicable Assigned

Contract solely with respect to the Successful Bidder's ability to provide adequate assurances of

future performance under the Assigned Contract.

      47.     The Successful Bidder shall assume and be responsible for payment of any Cure

Amounts that may be owed to any Counterparty to the Assigned Contracts in accordance with

the terms of the applicable asset purchase agreement, other than those Cure Amounts which are

to be paid by the Debtor pursuant to such agreement.  The Successful Bidder shall be responsible

for satisfying any requirements regarding adequate assurances of future performance that may be

imposed under section 365(b) of the Bankruptcy Code in connection with the proposed

32

assignment of any Assigned Contracts. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assigned Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assigned Contracts not assumed and assigned to the Successful Bidder at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assigned Contracts. The Debtor further proposes that Cure Amounts disputed by any Counterparty will be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant lease or contract.

48.     Except to the extent otherwise provided in the Agreement or the agreement entered into with the Successful Bidder(s), subject to the payment of any Cure Amount, the purchaser will not be subject to any liability to the Assigned Contract Counterparty that accrued or arose before the closing date of the sale of the US Acquired Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to 11 U.S.C. § 365(k).

49.     For the reasons set forth above, the Debtor respectfully requests approval of: (a) the proposed Bid Protections; (b) the Bidding Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the Assumption and Assignment Procedures set forth herein for notice to Counterparties under executory contracts and leases that may be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Amounts to the Counterparties to the Assigned Contracts; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

**<u>No Prior Request</u>**

33

50.    No prior request for the relief sought in this Bidding Procedures Motion has been made to this or any other court.

### Notice

51.    Notice of this Motion and a copy of this Motion will be provided to (a) the Office of the United States Trustee; (b) counsel to the Revstone Committee; (c) counsel to any statutory committee that may be appointed in the Debtor's case; (d) all parties who are known by the Debtor to assert liens with respect to the US Acquired Assets; (e) all entities who executed non-disclosure agreements with the Debtor in connection with a potential acquisition of any or all of the US Acquired Assets or whom the Debtor believes may have an interest in bidding; (f) all Counterparties to contracts/leases that may potentially be designated as Assigned Contracts; (g) the United States Attorney's office; (h) all state attorneys general in state(s) in which the Debtor does business; (i) state taxing authorities in the state(s) in which the Debtor does business and the Internal Revenue Service; (j) environmental authorities in the state(s) or smaller applicable jurisdictions in which the Debtor does business; (k) the Stalking Horse Bidder and its counsel; and (l) all parties who have timely filed requests for notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure.  Upon approval of this Motion, the Debtor will serve notice of the Sale Hearing, Bidding Procedures and related matters on all of the foregoing service parties and all other creditors of the Debtor known by it (as proposed herein, subject to Court approval). The Debtor respectfully submits that such notice is sufficient, and request that the Court find that no further notice of the relief requested herein is required.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order,

substantially in the form filed contemporaneously with this Bidding Procedures Motion, granting

the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: July 22, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email: *ljones@pszjlaw.com*
       *dbertenthal@pszjlaw.com*
       *tcairns@pszjlaw.com*

[Proposed] Counsel for the Debtor and Debtor in
Possession

35