## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, et al.,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| METAVATION, LLC, | ) | Case No. 13- 11831 (BLS) |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| | ) | |

**Hearing Date:** _____, 2013 at __:__ _.m. Eastern Time
**Objection Deadline:** _____, 2013 at __:__ _.m. Eastern Time

**METAVATION, LLC'S MOTION FOR ORDER (A) APPROVING ASSET PURCHASE
AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OUTSIDE THE
ORDINARY COURSE OF BUSINESS; (B) AUTHORIZING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND
OTHER INTERESTS PURSUANT TO BANKRUPTCY CODE SECTIONS 105, 363(B),
363(F) AND 363(M); (C) AUTHORIZING THE ASSUMPTION, ASSIGNMENT AND
SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES
PURSUANT TO BANKRUPTCY CODE SECTIONS 363 AND 365;
AND (D) GRANTING RELATED RELIEF**

Metavation, LLC, a debtor and debtor in possession herein ("Metavation" or the

"Debtor"), files this motion (this "Sale Motion") for entry of an order:  (a) approving the Asset

Purchase Agreement dated July 19, 2013 between the Debtor and Eptec S.A. de C.V. (a non-

debtor Mexican affiliate) as sellers, and Dayco Products, LLC and Dayco Products S.A. de C.V.

as buyers, with non-debtor entities Revstone Transportation, LLC, Metavation Vassar, LLC and

Resource Technology Group as parties solely for limited, enumerated purposes (the

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool and Engineering, LLC (6450).  The location of the Debtors' headquarters and the service address for the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

"Agreement", a copy of which, without exhibits or schedules, is attached hereto as Exhibit A)[2] as it relates to the Debtor and its assets, and authorizing the sale of substantially all of the Debtor's operating assets outside the ordinary course of business; (b) authorizing the sale of the Debtor's assets free and clear of all liens, claims, rights, encumbrances and other interests pursuant to sections 105, 363(b), 363(f) and 363(m) of the Bankruptcy Code; (c) authorizing the assumption and assignment of certain executory contracts and unexpired leases of the Debtor pursuant to sections 363 and 365 of the Bankruptcy Code; and (d) granting related relief.  As discussed herein, the assets proposed to be sold also include certain assets (the "Mexico Assets") located in Mexico and held by a non-Debtor Mexican affiliate, Eptec S.A. de C.V. (the "Mexico Seller").[3]

Concurrently herewith, the Debtor is filing the *Metavation, LLC's Motion for Order (A) Approving Bid Procedures for the Sale of Substantially All of the Debtor's Operating Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Payment of a Break-Up Fee and Expense Reimbursement; and (E) Granting Related Relief* (the "Bidding Procedures Motion"), which seeks approval of certain sale and bidding procedures for the sale, as more particularly set forth therein (the "Bidding Procedures").

By this Sale Motion, the Debtor seeks approval of the sale of substantially all of the Debtor's operating assets to (i) Dayco Products, LLC ("US Dayco") and Dayco Products S.A. de C.V. (together with US Dayco, the "Stalking Horse Bidder")[4] pursuant to the Agreement

---

[2]  All capitalized terms not defined herein have the meaning ascribed to them in the Agreement.
[3]  No Bankruptcy Court approval is being sought with respect to the actions of the Mexico Seller relating to the proposed sale and other transactions.
[4]  While both US Dayco and its foreign affiliate are purchasers under the Agreement, US Dayco will be acquiring the Debtor's assets pursuant to the Agreement.

between the Debtor and the Mexico Seller on the one hand, and the Stalking Horse Bidder on the

other hand, with non-debtor entities Revstone Transportation, LLC ("Revstone Transportation"),

Metavation Vassar, LLC ("Metavation Vassar") and Resource Technology Group ("RTG" and

together with Revstone Transportation and Metavation Vassar, the "Affiliate Parties") as parties

solely for limited, enumerated purposes, or (ii) the highest or otherwise best bidder or bidders for

such assets at the auction provided for in the Bidding Procedures Motion and the Bid Procedures

(the "Auction"), to take place in accordance with the order to be entered by the Court on the

Bidding Procedures Motion (the "Bidding Procedures Order").

In support of this Sale Motion, the Debtor respectfully states as follows:

### Preliminary Statement

1.      By this Sale Motion, Metavation seeks authorization to sell (the "Sale")

substantially all of its operating assets related to its business of manufacturing precision

machined components and assemblies, including dampers, engine components, knuckles, and

driveline products for the automotive industry (the "US Acquired Assets"). The proposed

transaction documents contemplate that the Debtor's US Acquired Assets will be sold free and

clear of liens, claims, encumbrances, rights and other interests other than those liens and interests

expressly permitted under the Agreement.

2.      As discussed below, the Debtor's expedited sale process is in the best interests of

the Debtor, its estate and creditors, and is necessary to meet the deadlines set forth in the

Debtor's postpetition financing agreement with Wells Fargo Capital Finance, N.A., as lender and

as agent for certain lender parties (collectively, the "DIP Lenders"). Pursuant to the DIP Loan

3

Documents (as defined and described in the *Debtor's Motion Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2 for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Certain Related Relief*), the Debtor is required to obtain an order approving the Bidding Procedures by 16 days after the Petition Date and an order approving a sale transaction by 16 days after the entry of the Bidding Procedures order, and to close such sale within four business days thereafter.[5]   Additionally, the Debtor must adhere to certain sale milestones established by the Debtor's major OEM customers as part of their agreement to provide certain financial accommodations to the Debtor that will directly support the sale process

## Jurisdiction

3.      This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (M), (N) and (O).

4.      Venue of these proceedings and this Sale Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are sections 105, 362, 363, 364, 365, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[5]  Further, under the Agreement with the Stalking Horse Bidder, the Debtor is required to, among other things, obtain the Bidding Procedures Order by August 8, 2013 and an order approving the Sale Motion by August 26, 2013.

Rules"), and Rules 2002-1(b) and 6004-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules").

**Background**

6.        On December 3, 2012, Revstone Industries, LLC ("Revstone") and Spara, LLC

("Spara") commenced their cases by filing voluntary petitions for relief under chapter 11 of the

Bankruptcy Code.  On January 7, 2013, Greenwood Forgings, LLC ("Greenwood") and US Tool

and Engineering, LLC ("US Tool" and together with Revstone, Spara and Greenwood, the

"Original Debtors") commenced their cases by filing voluntary petitions for relief under chapter

11 of the Bankruptcy Code.  The Original Debtors have continued in the possession of their

property and have continued to operate and manage their business as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.        Pursuant to the *Order Authorizing Joint Administration of Related Chapter 11*

*Cases for Procedural Purposes Only* (Docket No. 173) (the "Existing Joint Administration

Order"), the Original Debtors' chapter 11 cases are jointly administered and are consolidated for

procedural purposes.

8.        On December 18, 2012 the United States Trustee appointed an Official

Committee of Unsecured Creditors (the "Revstone Committee") in the case of Revstone.  No

committee has been appointed in the cases of Spara, Greenwood and US Tool.  No trustee or

examiner has been appointed in any of the Original Debtors' chapter 11 cases.

DOCS_LA:268617.11 73864/002

9.    On July 22, 2013 (the "Petition Date"), Metavation (together with the Original

Debtors, the "Debtors") filed a voluntary petition in the Court for relief under chapter 11 of the

Bankruptcy Code.  Metavation continues to operate its business and manage its properties as a

debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or

examiner has been appointed in Metavation's chapter 11 case (the "Metavation Case").  As of

the date hereof, no creditors' committee has been appointed in the Metavation Case.

10.    The sole member of Metavation is non-debtor Revstone Transportation[6] – the sole

member of which is debtor Revstone.  The Mexico Seller, a company organized under the laws

of Mexico, is a sister company of Metavation and is owned by Metavation Mexico, LLC

(holding a 99% interest) and Metavation Mexico II, LLC (holding the remaining 1% interest).

Revstone Transportation is the sole member of each of Metavation Mexico, LLC and Metavation

Mexico II, LLC.  As noted above, Revstone Transportation is a party to the Agreement for

limited purposes as set forth therein.  The Debtor is the sole member of non-debtor Metavation

Vassar, another party to the Agreement for limited, specified purposes.  Resource Technology

Group, the other party to the Agreement for limited purposes, is directly owned by the ultimate

owners of Metavation.

11.    The factual background relating to the commencement of the chapter 11 case of

Revstone is set forth in detail in the *Declaration of Jay N. Brown in Support of First Day*

*Pleadings* (the "Brown Declaration") filed on December 3, 2012 and incorporated herein by

---

[6] For the ease of reference, references are made herein to the Debtor or Metavation making certain determinations
or taking similar actions; however, as noted above, Metavation is controlled by Revstone Transportation, the sole
member of Metavation.

reference. The factual background relating to the commencement of the Metavation Case is set

forth in detail in the *Declaration of John C. DiDonato in Support of First Day Motions of*

*Metavation, LLC* (the "DiDonato Declaration" and together with the Brown Declaration, the

"Declarations") filed concurrently and incorporated herein by reference.

## The Debtor's Operations and the Assets to Be Sold

12.     Metavation is a Michigan-based manufacturer of precision machined components

and assemblies, including dampers, engine components, knuckles, and driveline products for the

automotive industry.  Metavation specializes in designing and manufacturing dampers that are

included on original equipment manufacturers' ("OEMs") engine platforms.  The Debtor also

has rapid development capabilities to produce "solution" dampers to correct driveline and

powertrain noise vibration and harshness ("NVH") issues. The Debtor is an entrenched, fully-

qualified supplier to North American OEMs.  In addition to its leading damper and engine

component production capabilities, Metavation also maintains precision machining capabilities

for powertrain, chassis, and other components.  The Debtor serves many of the largest

automotive customers, suppliers, and platforms; the Debtor's major OEM customers include

General Motors and Chrysler.  Such long-standing relationships have led the Debtor to a

dominant market position in the U.S. crankshaft and driveline damper markets.

13.     Metavation's core competencies include the manufacture of precision machined

components and assemblies; however, Metavation specializes in designing and manufacturing

dampers that are included on OEM engine platforms.  The Debtor also has rapid development

capabilities to produce "solution" dampers to correct driveline and powertrain NVH issues.  On

average, Metavation produces three to four million dampers annually and is the only North American damper manufacturer to offer in-house custom rubber compounding and manufacturing as well as in-house precision machining capabilities for virtually all damper components. Crankshaft dampers are placed in the front of the engine with the purpose of reducing torsional twisting of the engine's crankshaft. Driveline dampers are "solution" dampers that correct driveline and powertrain NVH issues for customers and sometimes can be found in multiple locations within a vehicle. There are several different components that make up a damper assembly. Unique capabilities allow Metavation to be a "one-stop-shop" for precision machining and the rubber blends that make up the damper, strategically allowing it to complete the assembly in a single location at an effectiveness and efficiency that results in a superior end product.

14.     Metavation operates from four, modernized facilities located in central Michigan. The Debtor begins its manufacturing process by developing the rubber component at the Hillsdale, MI facility, and then sends the rubber component to the Mt. Pleasant, MI or Vassar, MI facilities for machining and/or assembly. Metavation's manufacturing facilities are described below:

- **Rubber Plant and Tech Center** – 16,000 square foot production facility located in Hillsdale, Michigan; employs 20 non-union employees producing strip and rope rubber, molded assemblies and prototypes for distribution to other Metavation production facilities and other auto manufacturers in North America;

- **CNC Machining and Assembly Plant #1** – 80,000 square foot manufacturing facility located in Mt. Pleasant, Michigan; the facility's 177 non-union employees produce crankshafts, drivelines, dampers and steering

8

knuckles distributed to other auto manufacturing facilities in North America and China;

- **CNC Machining and Assembly Plant #2** - 27,000 square foot production facility located in Vassar, Michigan; employs 16 non-union employees producing driveline dampers and crankshaft damper components for distribution to other auto manufacturers in North America; and

- **Vassar Foundry** – gray iron foundry facility located in Vassar, Michigan.[7]

15.    Further, Metavation's design and engineering capabilities are a core competency and competitive advantage for the Debtor.  Because every product is custom-engineered to meet the customer's specifications, the breadth and depth of Metavation's engineering expertise are a critical component of the Debtor's success.  Metavation's engineering staff is based in Southfield, Michigan.

16.    As detailed in the Declarations, the Original Debtors had been negatively impacted by a lack of liquidity in the credit market for middle market borrowers, and had only been able to obtain one-off financings at relatively high interest rates to fund their operations. The tight credit markets and restrictive financing covenants led to defaults and disputes with their key lenders, further exacerbating liquidity issues.  Accordingly, in late 2012, Revstone and its affiliated companies embarked on a comprehensive process of sales and financings in order to enable the companies to restructure in a thoughtful and deliberate manner, for the benefit of all of its constituents.  While Metavation did not experience the impact of the tight credit markets to the same degree of its affiliates, the Debtor also joined in exploring the options presented by

---

[7]  As described further in the Sale Motion and as set forth in the Agreement, the Vassar foundry facility is not proposed to be sold to the Stalking Horse Bidder and is an Excluded Asset under the Agreement.

sales and financings.  As discussed further below, Metavation retained Huron in October 2012 to market its assets to potential buyers.

17.     After the filing of the Original Debtors' chapter 11 cases, Metavation faced increased pressure from OEMs and its other customers to effectuate a change of control of the operating businesses of the Debtors and their affiliates.  In parallel with its efforts to market or restructure its Assets, Metavation established lines of communication with the OEMs and other customers, including negotiation of OEM funding accommodations and management of customer relationships.  As a result of these negotiations, major customers agreed to pull forward payment terms from approximately 45 days to 10 days generating substantial liquidity, and customers agreed to provide up to $4.4 million of junior participation funding.

18.     As a result of the marketing efforts and process undertaken by Metavation (discussed further below), as well as the business realities facing the business in light of the Debtor's relationship with its customers, Metavation has determined that an expedited process for the sale its US Acquired Assets to the Stalking Horse Bidder or to an overbidder, while the business is still operating as a going concern, will maximize the return to creditors.  The assets to be sold under the Agreement consist of, among other things, certain equipment, contracts, inventory, real property leases, intellectual property, and other assets that are utilized exclusively in Metavation's damper related non-foundry business, as well as certain assets of the Mexico Seller used in its damper business.

19.     Metavation believes that the proposed going concern Sale –a result of extensive prepetition marketing and negotiation that commenced several months before the filing of the

10

Debtor's case, and subject to an overbidding process– is the best option to maximize value under all of the circumstances.  In order to maximize the value of Metavation's business and Assets for all creditors, stakeholders and parties in interest, sound business decisions were made by Metavation to embark on the competitive sale process that was undertaken and to accept the Sale terms proposed by the Stalking Horse Bidder, which comprised the highest and best offer for the assets, subject to a reasonable overbidding process.  When augmented by certain customer sale support, consisting of additional consideration and accommodations, as well as debt forgiveness, which is contingent upon the closing of a sale to a qualified buyer (the Stalking Horse Bidder is a qualified buyer) within timeframes specified in the sale support agreement, the sale to the Stalking Horse Bidder (or a successful qualified overbidder) clearly represents the highest and best alternative for the Debtor and all of its constituents.

### Marketing Process

20.    Significant efforts have been undertaken by Metavation to market its assets.  With Huron's assistance, Metavation formally commenced that process in October, 2012.  As noted above, Metavation retained Huron in October 2012 to market its Assets to potential buyers. Marketing materials, including a Summary Fact Sheet and a Confidential Informational Memorandum (the "CIM"), were prepared, an online data site with diligence materials was expanded, and potential buyers were identified.  Approximately 23 industry participants, strategic investors, financial investors and/or other potential buyers were contacted by Huron, with the approval and input of the Debtors' management.  Approximately 15 parties returned executed confidentiality agreements and were provided with the Summary Fact Sheet

11

(distributed to applicable parties in November 2012), the CIM (distributed to applicable parties in December 2012), access to the online data site, and other materials and information.  By January 7, 2013, Metavation had received four expressions of interest, and subsequently Metavation negotiated with certain of the interested parties, with input from certain important customers.[8]  Based on various factors, including customer input, the Debtor ultimately focused on potential transactions with two of the parties that had submitted expressions of interest. During this process, Metavation provided additional, more detailed information, and scheduled facility tours and meetings with the Debtors' management.  One of the parties later discontinued its consideration of an acquisition.

21.    On June 4, 2013, the other potential buyer, the Stalking Horse Bidder, submitted to Revstone Transportation, as the sole member of Metavation, a non-binding letter of intent ("LOI") (superseding its prior submitted LOIs which had been the subject of negotiation between the parties).  Around this period, another third party delivered a non-binding expression of interest to purchase certain assets; however, the Debtor concluded that the Stalking Horse Bidder's offer was superior in important respects.  After further discussion between the parties, the Stalking Horse Bidder's June 4th LOI was modified, and after extensive review and consideration, the Debtor selected the Stalking Horse Bidder's offer as set forth in its June 10, 2013 LOI as the best alternative for Metavation to maximize the value of its assets, and proceeded to negotiate with the Stalking Horse Bidder the terms and conditions of a definitive

---

[8]  Although around this time Revstone's management independently took steps toward a stock purchase acquisition by another party, such potential acquisition was discontinued after certain customers indicated they would not support the transaction.

DOCS_LA:268617.11 73864/002

purchase agreement.[9]  After extensive negotiations, Metavation entered into an Asset Purchase Agreement with the Stalking Horse Bidder on July 19, 2013, a copy of which is attached hereto, without schedules or exhibits, as Exhibit A.

22.    The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code.  As a matter of disclosure, the Debtor notes that Richard Newsted, one of the independent members of the board of managers of Revstone Transportation (the parent of Metavation) (the "Board"), as well as of the board of managers of Revstone (the ultimate parent of Metavation) serves on the board of managers of an affiliate of the Stalking Horse Bidder – Mark IV, LLC, which is the ultimate parent of the Stalking Horse Bidder.  Mr. Newsted has been screened from deliberations and information related to the Debtor's sale process, and Mr. Newsted has not participated in any decisions relating to Metavation, including any potential sale of the assets to the Stalking Horse Bidder or otherwise.

23.    While the prepetition marketing and sale process was thorough, as discussed above, additionally, the Debtors will send, or will have sent, notice of the Sale Motion and Bidding Procedures to all parties that the Debtors believe may be potentially interested in acquiring the US Acquired Assets.[10]  The Debtors also created an electronic data room with key documents and company-specific information in order to streamline the due diligence process, going forward.

---

[9] The Debtor notes that the June 10th LOI contained an exclusivity provision, requiring the Debtor, upon the date of acceptance of the LOI (June 10th) for a certain period of time, to exclusively negotiate with the Stalking Horse Bidder on the potential sale of the Debtor's assets.  As discussed herein, the Debtor and its advisors engaged in extensive marketing/negotiation efforts prior to the LOI, and the Debtor will further solicit potential offers in connection with this Motion.

[10] Pursuant to this service, notice will be sent to approximately sixty-seven (67) parties that have expressed or may have an interest in acquiring the assets.

24.     The material terms of the Agreement are set forth below.  Pursuant to the terms of

the Agreement and subject to entry by the Court of an order substantially in the form attached

hereto as Exhibit B (the "Sale Order"), the Stalking Horse Bidder, subject to higher or better

bids, will purchase the assets and assume certain contracts and leases.

25.     The Debtor believes that the consummation of the Sale to the Stalking Horse

Bidder or to a successful overbidder will provide its creditors and other stakeholders with the

best opportunity possible for maximizing value by realizing upon the assets through a sale as a

going concern.

### Agreement With Stalking Horse Bidder

26.     The key terms of the Agreement and the Sale Order are summarized below.  The

description below only summarizes certain provisions of the Agreement and the Sale Order as a

convenience to the Court and parties in interest, and the terms of the Agreement or Sale Order, as

applicable, control in the event of any inconsistency.

a.     **Purchase Price**.  The purchase price payable for all the Acquired Assets
(including the Mexico Assets) shall be $25,075,000 (the "Purchase Price"), subject to certain
adjustments provided for in Sections 2.1 and 2.2.  *See* Agreement, §§ 2.1, 2.2, 13.1 (definition of
"Purchase Price").  The amount of consideration provided under the Agreement attributable to
the US Acquired Assets will be done in accordance with Section 9.4.

b.     **Acquired Assets**. All property, assets and rights (whether idle or active)
owned, leased or licensed that are used primarily, or held primarily for use, by the Sellers in the
Business of every kind, character and description, including all direct or indirect, right, title, and
interests of Sellers in, to and under all the tangible and intangible, real and personal, assets,
properties, rents, Claims and contracts of Sellers wheresoever located, whether carried on the
books of Sellers or not carried on the books of Sellers, in each case, used primarily, or held
primarily for use, by Sellers in the Business, and shall also include the following: (a) all Real
Estates Leases and all rights of Sellers under the Real Estate Leases; (b) all (i) Improvements; (ii)
Equipment (but, as to assets located at the Vassar, Michigan facility, only those pieces of
machine shop equipment as are specifically described on Schedule 1.1(b)(ii); and (iii) rights of
Sellers to any licenses received from manufacturers and sellers of the Equipment, Improvements
or any component thereof; (c) all Contracts related to the Business and all rights of Sellers under

14

such Contracts, only to the extent such Contracts are Assigned Contracts (d) all Contracts of Mexico Seller set forth on Schedule 1.1(d); (e) all assets held, leased or licensed, by Mexico Seller set forth on Schedule 1.1(e); (f) all Inventory; (g) all Acquired Intellectual Property; (h) all rights and interests of Sellers under any Permits (to the extent transferable) used primarily or held for use primarily in the Business; (i) all Business Records; (j) all rights, claims or causes of action of Sellers to the extent arising out of the Business or the Acquired Assets against third parties arising out of events occurring prior to the Closing Date, including arising out of events occurring prior to the Petition Date, and including (i) any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers, and contractors relating to products sold, or services provided, to Sellers, and (ii) causes of action, rights of recovery, rights of setoff and rights of recoupment in favor of any Seller, including any such rights of any Seller under any insurance policy, any insurance proceeds or condemnation award payable to any Seller or any transferable or assignable claim therefor, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 1.2 (including in Section 1.2(f)); (k) all security and other deposits (other than utility, prepaid tooling and rent deposits), credits, allowances, refunds, prepaid assets, or charges, rebates, setoffs, prepaid expenses, and other prepaid items (other than prepaid rent) to the extent related to the Acquired Assets or the Business; (l) all utility and rent deposits to the extent related to the Acquired Assets or the Business, and any additional utility deposits paid on or after the Petition Date as required pursuant to provisions of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court; and (m) all prepaid tooling deposits to the extent related to the Acquired Assets or the Business. *See* Agreement, at § 1.1.

        c.    **Excluded Assets.** The assets that are excluded from the sale include, among other items: (a) the Closing Purchase Price, as adjusted, and all Cash held by or on behalf of Sellers; (b) all Sellers' rights under Contracts that are not Acquired Assets; (c) all of Sellers' right, title and interest in or to (i) the facility and real property leases located in Southfield, Michigan, Vassar, Michigan and San Luis Potosi, Mexico and (ii) any assets located at the Vassar facility, other than the Vassar Shop Equipment; (d) all of US Seller's rights under Employee Benefit Plans and all Mexico Seller's rights under Employee Benefit Plans; (e) all rights of Sellers arising under the Agreement, the Ancillary Agreements, and under any other agreement between Sellers and Buyers entered into in connection with the Agreement; (f) all current and prior insurance policies of Sellers and all rights of any nature with respect thereto; (g) all Avoidance Actions; provided that Sellers may not bring any Avoidance Actions against any suppliers or customers of the Business with whom Buyers continue to do business following the Closing, other than those against persons or entities identified on Schedule 1.2(g) and any "insider" (as defined in the Bankruptcy Code) or Affiliate of either Seller; provided that nothing herein shall be deemed to limit in any way any rights Sellers may wish to (a) exercise, pursue or assert with respect to suppliers or customers of Mexico Seller unrelated to Avoidance Actions that pertain to Mexico Seller's damper business or (b) use defensively with respect to any claims made against either Seller by customers and suppliers; (h) all good faith or other bid deposits submitted by any third party under the terms of the Bid Procedures Order including the sales procedures; (i) the stock and any other equity interests or securities, including promissory notes, issued by each of Sellers; (j) other than Cash received or receivable in connection with the items listed in Section 1.1(i), all Cash; (k) all Accounts Receivable; (l) all equity interests in other entities held by Sellers; (m) all bank accounts and lockboxes; (n) the company seals, minute

15

books, charter documents, stock or equity records books and such other books and records as pertain to the organization, existence or capitalization of Sellers; (o) all claims that Sellers may have against any third party with respect to any Excluded Assets, claims or causes of action against former and current officers and directors of Sellers, any claims against auditors and other professional service providers of Sellers, and any claims against any Affiliates and/or "insiders" (as defined in the Bankruptcy Code) of either Seller; (p) Sellers' rights under or related to any debtor in possession loan facility entered into by Seller and the lenders party thereto; (q) all rights, claims, interests and assets of Sellers excluded from the Acquired Assets and reserved to Sellers pursuant to any other provision of the Agreement; (r) the name and Trademarks of Mexico Seller; (s) all of Sellers' rights and interests in and to the assets listed on Schedule 1.2(s); (t) the Foundry Agreements and such applicable assets related thereto; (u) all assets used or held by Sellers solely pursuant to a lease, license or other Contract where the associated lease, license or other Contract is not assigned to Buyers as an Assigned Contract at the Closing or subsequently assigned to Buyers; and (v) any and all accommodations, security deposits, tooling and other deposits, credits, allowances, refunds, prepaid assets, or charges, rebates, setoffs, prepaid expenses, and other prepaid items to the extent related to or arising out of any of the agreements described on Schedule 1.2(v). *See* Agreement, at § 1.2.

While the Debtor's Avoidance Actions are Excluded Assets, under the Agreement, Sellers may not bring any Avoidance Actions against any suppliers or customers of the Business with whom Buyers continue to do business following the Closing, other than those against persons or entities identified in the Agreement's schedule(s) (to be mutually agreed by Sellers and Buyers not later than three business days prior to the hearing on the Bidding Procedures Motion) and any "insider" (as defined in the Bankruptcy Code) or Affiliate of either Seller; provided that nothing in the Agreement shall be deemed to limit in any way any rights Sellers may wish to (a) exercise, pursue or assert with respect to suppliers or customers of the Mexico Seller unrelated to Avoidance Actions that pertain to the Mexico Seller's damper business or (b) use defensively with respect to any claims made against either Seller by customers and suppliers. *See* Agreement, § 1.2(g); Sale Order, ¶ 36. The Debtor believes that such agreement to not bring Avoidance Actions is reasonable and appropriate under all of the circumstances, and that the potential litigation recovery value that may be waived by the Debtor (by not pursuing such actions) is speculative and relatively small as compared to the ultimate aggregate value to be gained by the Debtor under the Agreement and contemplated transactions.

d.    **Assumed Liabilities**. The Buyers shall assume all the following liabilities and obligations of the Sellers: (i) with respect to US Seller, all Liabilities and executory obligations arising from and after the Closing under the Assigned Contracts which are US Acquired Assets (specifically excluding the Excluded Assets), and with respect to Mexico Seller, all Liabilities and obligations arising from and after the Closing under the Mexico Assigned Contracts which are Mexico Acquired Assets (specifically excluding the Excluded Assets), (ii) all Cure Amounts, (iii) all Liabilities of Sellers for all accrued unused vacation with respect to the Transferred Employees, other than the employees listed on Schedule 7.1(b)(ii), and, as to those Transferred Employees employed by US Seller, all short-term sick pay as of the Closing Date, provided that such Liabilities have been incurred in the Ordinary Course of Business, and (iv) all Liabilities related to Mexico Seller Personnel. *See* Agreement, at § 1.3.

16

e.    **Excluded Liabilities.**  The Buyers shall not assume all of the following liabilities and obligations of the Sellers, which includes any Liability based on successor liability theories: (a) any and all Liabilities of Sellers under any Contract of Sellers that is not an Assigned Contract or Mexico Assigned Contract whether accruing prior to, at, or after the Closing Date; (b) any and all Liabilities for Taxes arising from or with respect to the Acquired Assets or the Business for any taxable period, or portion thereof, ending on or before the Closing Date; (c) any and all Liabilities of either Seller or of either Seller's respective Affiliates for Taxes arising from or with respect to gain, if any, from the transfer of the Acquired Assets or the assumption of the Assumed Liabilities on the Closing Date; (d) any and all Liabilities for Transaction Taxes to the extent any Seller is liable pursuant to Section 9.1 and any and all Liabilities for Apportioned Obligations for which any Seller is liable pursuant to Section 9.2; (e) any and all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law; (f) any indebtedness or obligation for borrowed money of Sellers; (g) any and all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters arising from or related to (i) the operation of the Business or the Acquired Assets on or before the Closing Date, (ii) any action or inaction of Sellers or of any third party relating to the Business or Acquired Assets on or before the Closing Date or (iii) any condition first occurring or arising on or before the Closing Date with respect to the Business or Acquired Assets; (h) any and all Liability for:  (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Case (including the US Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Sellers, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under the Agreement and (iii) all costs and expenses arising out of or related to any third party Claims against Sellers, pending or threatened, including any warranty or product Claims; (i) any and all Liabilities in any way attributable to (i) the employment or service of current or former employees or directors of Sellers or any current or former subsidiary of Sellers who is not a Transferred Employee, regardless of whether such Liability is attributable to the period before, on or after the Closing Date, (ii) except as provided in Section 1.3 above, the employment of Transferred Employees to the extent attributable to the period at or before the Closing, (iii) any Employee Benefit Plan or (iv) any advance employee notice obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 or any similar applicable state or local law; (j) any and all accounts payable of the Business arising prior to the Closing; and (k) any and all obligations or Liabilities owed or due to any of Sellers' Affiliates. *See* Agreement, at § 1.4.

f.    **Closing and Related Deadlines.**  The closing shall be held on or before the second Business Day following the satisfaction or waiver by the appropriate Party or Parties of all the conditions contained in Article 10 in the Agreement (other than those to be satisfied at the Closing) or on such other date or at such other place and time as may be mutually agreed to by the Parties in writing. *See* Agreement, at §§ 3.1, Article 10.  The Agreement may be

17

terminated by the Buyers for certain reasons including the following: (a) upon the Termination Date (55 days after the Petition Date), if the Closing has not occurred and such failure to close is not due to Buyers' material breach of the Agreement; (b) if the Bid Procedures Order is not entered by the Court by August 8, 2013; (c) if the Auction (if required) has not occurred by August 22, 2013; and (d) if the US Sale Order has not been entered by August 26, 2013. *See* Agreement, at §§ 11.2, 11.3 (Sellers' termination rights).

      f.    **Deposit.** The Buyers deposited $2,507,500 into escrow in accordance with the terms of the Escrow Agreement. *See* Agreement, at § 2.3.

      g.    **Break Up Fee / Expense Reimbursements.** Subject to approval of the Bankruptcy Court, in consideration for Buyers having expended considerable time and expense in connection with the Agreement and the negotiation thereof and the identification and quantification of the assets of Sellers and to compensate Buyers as a stalking-horse bidder, in the event that Sellers select an Alternative Transaction within the six (6) month period immediately following the Auction Sellers shall pay and Buyers shall receive, in addition to the refund of its Deposit, (a) a breakup fee equal to $650,000 and (b) an amount equal to the reasonable and documented third party costs, fees and expenses incurred by Buyers and their Affiliates (including fees and expenses of legal, accounting and financial advisors) in connection with the Agreement and the transactions contemplated hereby up to a maximum of $350,000. See Agreement, § 8.3. Subject to Court approval, the Break Up Fee and the Expense Reimbursement shall have super-priority administrative claim status pursuant to section 507(b) of the Bankruptcy Code, senior to all administrative expense priority claims other than the administrative claims, if any, of Sellers' post-petition lending facility and/or any cash collateral arrangement, and which shall be subordinate to (i) any "carve-out" granted by such post-petition lenders in favor of the professionals retained by the Debtor in the Bankruptcy Case, and (ii) any other professional fee funding arrangement that may be established in the Bankruptcy Case, and the Break Up Fee and Expense Reimbursement shall be paid to Buyers in full upon consummation of an Alternative Transaction occurring within the 6 month period immediately following the Auction. See Agreement, §§ 8.3, 8.4, 8.5.

      In the event that Sellers terminate the Agreement pursuant to Section 11.2(d)(vii), Sellers shall promptly pay to an account designated in writing by Buyers a sum equal to the reasonable fees and expenses incurred by Buyers and their Affiliates in connection with the transactions contemplated by the Agreement and supported by written invoices, which amount shall not exceed $1,000,000 in the aggregate, with Buyers' rights under Section 11.6 constituting Buyers' sole and exclusive remedy by reason of any termination pursuant to (or deemed to be pursuant to) Section 11.2(d)(vii). Solely for purposes of Section 11.6, notwithstanding anything herein to the contrary, Sellers shall not be obligated to pay the Fee and Expense Reimbursement in the event that Buyers waive the condition set forth in Section 10.2(k) unless Buyers deliver to Sellers, concurrent with Buyers' delivery of a written waiver of Section 10.2(k), written notice from an executive officer that Buyers are ready, willing and able to close pursuant to Section 3.1. See Agreement, §§ 10.2(k), 11.2(d)(vii), 11.6.

h.    **Representations, Warranties and Covenants**. The Sellers have made various representations including, but not limited to, those relating to organization and good standing, authorization and validity, permits, government consents and approvals, environmental matters, product liability, product warranty, inventory, product returns, labor relations, employee benefit plans, material contracts, intellectual property, title to assets, taxes, customers and suppliers, board approval and compliance with law. *See* Agreement, at Article 4. The Buyers have made certain representations, among others, relating to organization and good standing, authorization and validity, consents, approval and notifications, financial ability, legal proceedings, and adequate assurance. *See* Agreement, at Article 5. The Sellers also agreed to various covenants including, but not limited to, actions before closing, conduct of business, permits and consents, access to properties and records, payments, revenues, and assets, name change, supplements to Disclosure Schedules, motions and orders, availability of business records and transferred employees, environmental permits, non-competition, non-solicitation, and anti-poaching. *See* Agreement, at Art. 6.

i.    **Record Retention.** After the Closing Date, Buyers shall provide to Sellers and Related Persons (after reasonable notice and during normal business hours and without charge to Sellers) access to (a) Buyers' personnel, Transferred Employees and Mexico Seller Personnel and (b) all Business Records for periods prior to the Closing and shall preserve such Business Records, subject to compliance with applicable Laws, until the later of (i) the sixth anniversary of the Closing or (ii) the date the Bankruptcy Court enters an Order closing the Bankruptcy Case. Such access to Business Records shall include access to any such information in electronic form to the extent reasonably available. For a period of two (2) years following the Closing, prior to destroying any Business Records for periods prior to the Closing, Buyers shall notify Sellers, no less than thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyers will permit Sellers to retain such Business Records at Sellers' sole expense. *See* Agreement, at § 6.9. The Debtor believes that the proposed access period for the Debtor to retain access to books and records that are transferred in the sale is sufficient for the Debtor to administer and close the case.

j.    **Releases.** In the Sale Order, it is proposed that the Debtor will release and forever discharge the Purchaser and its affiliates and their respective successors, assigns, members, partners, principals and shareholders (or equivalent) from any and all claims, causes of action, and obligations of any kind, known or unknown, fixed or contingent, relating to the Transactions and the sale and assignment of the US Acquired Assets and the Assigned Contracts except for any and all liabilities and obligations under the Agreement and any and all rights and claims of the Debtor thereunder. The Buyers have required such provision, and the Debtor believes it is reasonable, appropriate and sufficiently limited (relating to the Transactions and other specified matters) under the circumstances, in order to facilitate a Sale that, as discussed herein, is the best alternative for the Debtor to maximize the going concern value of its assets. See Sale Order, ¶¶ U, 36.

k.    **Successor Liability.** The Sale Order and Agreement contain certain provisions relating to the Purchaser not having any successor liability. The Buyers have required such provisions as part of the Sale. See, e.g., Sale Order ¶¶ U, V, 21-22; Agreement, §1.4.

l.    **Rules 6004/6006 Waiver.**   The proposed Sale Order provides that, upon entry, the Sale Order will be immediately enforceable, notwithstanding Bankruptcy Rules 6004 and 6006.  As discussed herein, the Sale and prompt consummation thereof are in the best interest of the Debtor and its estate in order to maximize the going concern value of the Debtor's assets for the benefit of the estate, its creditors and stakeholders and to comply with certain timing deadlines as discussed above.

27.    The Debtor seeks authority to sell its US Acquired Assets to the Stalking Horse Bidder, or to a higher or otherwise better bidder or bidders, pursuant to the terms of the Agreement and the Sale Order.

28.    The Debtor believes that the Sale of the US Acquired Assets as a going concern to the Stalking Horse Bidder or a higher or otherwise better bidder determined in accordance with the Bidding Procedures ("Successful Bidder") is far preferable to a piecemeal liquidation of the Debtor's US Acquired Assets.  The Debtor further believes that obtaining the Stalking Horse Bidding as a stalking horse bidder, marketing its assets with the assistance of its other professionals since last fall, and holding the Auction of such US Acquired Assets on the date specified by the Court, will result in the highest or otherwise best consideration for the US Acquired Assets.

29.    The Debtor has examined the alternatives to a going concern sale of the US Acquired Assets and has determined that, in light of the Debtor's financial situation, liquidity needs, and value of the US Acquired Assets as an operating unit, a more viable alternative to such a Sale does not exist.

30.    For the reasons stated above, and in light of the obvious benefits to the estate, the Debtor has determined, in the exercise of its business judgment, to consummate the proposal

20

submitted under the Agreement with the Stalking Horse Bidder or, if applicable, another bidder in the event that the Debtor receives a higher or otherwise better bid to the transaction set forth in the Agreement.

### Relief Requested

31.     The Debtor is requesting that this Court, *inter alia*, (a) authorize the sale of the Debtor's US Acquired Assets to the Stalking Horse Bidder pursuant to the Agreement, or, alternatively, to the other Successful Bidder(s) pursuant to such competing agreement(s) with such other Successful Bidder(s) entered into in accordance with the Bidding Procedures Order, (b) authorize such Sale of the Debtor's US Acquired Assets to be free and clear of all liens, claims, rights, encumbrances or other interests (other than Assumed Liabilities and and/or except as otherwise provided in the Agreement) pursuant to sections 105, 363(b), 363(f) and 363(m) and 365 of the Bankruptcy Code, with such liens, claims, rights, encumbrances and interests (collectively, the "Liens, Claims and Encumbrances") attaching to the sale proceeds of the US Acquired Assets (the "Sale Proceeds")[11] with the same validity (or invalidity), priority and perfection as existed immediately prior to such Sale; (c) approve the assumption and assignment of the Assigned Contracts (as hereinafter defined) under Bankruptcy Code sections 363 and 365, subject to, and at the time of, closing under the Agreement; and (d) grant such other relief as may be necessary or appropriate.

---

[11]  The Liens, Claims and Encumbrances will not attach to proceeds of the Sale that are attributable to the assets of the Mexico Seller.

**Basis for Relief**

32.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

33.    A sale of the debtor's assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991). The *Delaware & Hudson Railway* court rejected the pre-Code "emergency" or "compelling circumstances" standard, finding the "sound business purpose" standard applicable and, discussing the requirements of that test under *McClung* and *Lionel*, observing:

> A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the Property; and whether the asset is decreasing or increasing in value. 124 B.R. at 176.

22

34.     The *Delaware & Hudson Railway* court further held that "[o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the Buyer is proceeding in good faith." *Id.*

35.     The Debtor has proposed the sale of the US Acquired Assets after thorough consideration of all viable alternatives and has concluded that the sale is supported by many sound business reasons.  The Debtor has extensively marketed the US Acquired Assets as described above and has proposed Bidding Procedures designed to maximize the purchase price realized from the sale of the US Acquired Assets.

36.     The Debtor's need for an expedited sale process is also necessary to meet the deadlines set forth in the Debtor's postpetition financing agreement.  As set forth in the DIP Loan Documents, the Debtor is required to obtain an order approving the Bidding Procedures by 16 days after the Petition Date and an order approving a sale transaction by 16 days after the entry of the Bidding Procedures order, and to close such sale within four business days thereafter.  Additionally, the Debtor must adhere to certain sale milestones established by the Debtor's major OEM customers as part of their agreement to provide certain financial accommodations to the Debtor that will directly support the sale process

37.     The Debtor has articulated sound business reasons, set forth above, for a sale of the US Acquired Assets on the proposed schedule.  *See, e.g.*, *In re Tempo Tech.*, 202 B.R. 363, 369-70 (D. Del. 1996) (approving a sale of all of the debtor's assets, within a month after the

DOCS_LA:268617.11 73864/002

petition date, where the debtor faced a cash shortfall, operated in an industry where there were few potential buyers, and anticipated continuing losses and a decline in value of the bankruptcy estates); *Delaware & Hudson Railway*, 124 B.R. at 177 (affirming the bankruptcy court's approval of a sale of substantially all of the debtor's assets where the debtor would have been "in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan"); *Titusville Country Club*, 128 B.R. at 400 (granting an expedited hearing on a motion to approve a sale as a result of "deterioration" of the debtor's assets); *Coastal Indus., Inc. v. Internal Revenue Service (In re Coastal Indus., Inc.)*, 63 B.R. 361, 366-69 (Bankr. N.D. Ohio 1986) (approving an expedited sale pursuant to section 363(b) five weeks after the petition date where the debtor was suffering operating losses).

38.     The Debtor believes that, as a result of the marketing efforts that have been undertaken and that it will continue to undertake, the highest or otherwise best offer(s) obtained through the proposed Bidding Procedures and Auction will provide maximum value to the Debtor under the current circumstances.  Other potential buyers will be served with this Sale Motion and/or notice thereof.  The fairness and reasonableness of the consideration to be paid by the Successful Bidder(s) is demonstrated by the marketing efforts that the Debtor has undertaken, and will continue to undertake, followed by a fair and reasonable sale process including a potential auction, and culminating in the sale of the US Acquired Assets.  As noted herein, notice of this Sale Motion, as well as of the Bidding Procedures Motion, will be served by the Debtor on or shortly after the Petition Date on potential bidders, as well as known putative lienholders, Counterparties (defined below) to potential Assigned Contracts (defined below) and other parties

in interest, adequately apprising them of the proposed Sale and proposed timetable; such parties

will also be served with applicable notices and documents after the Court has considered the

Bidding Procedures Motion.

39.    The sale of the US Acquired Assets is supported by sound business reasons and is

in the best interests of the Debtor and its estate.  Accordingly, the Debtor requests approval under

Bankruptcy Code section 363(b) of the Sale to the Stalking Horse Bidder or other Successful

Bidder(s), as set forth herein.

**The Proposed Sale Satisfies the Requirements of Section 363(f) of the
Bankruptcy Code For a Sale Free and Clear of Liens, Claims, and Interests**

40.    Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell Property under subsection (b) or (c) of this section
> free and clear of any interest in such Property of an entity other than the
> estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such Property free and
> clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such Property is to be sold
> is greater than the aggregate value of all liens on such Property;
>
> (4) such interest is in a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to
> accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

41.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and

clear of any interests."  The term "any interest," as used in section 363(f), is not defined

anywhere in the Bankruptcy Code.  *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209

F.3d 252, 259 (3d Cir. 2000).  In *Folger Adam*, the Third Circuit specifically addressed the scope

of the term "any interest."  209 F.3d at 258.  The Third Circuit observed that while some courts

have "narrowly interpreted that phrase to mean only *in rem* interests in Property," the trend in

modern cases is toward "a broader interpretation which includes other obligations that may flow

from ownership of the Property."  *Id.* at *258* (citing 3 *Collier on Bankruptcy* ¶ 363.06[1]).  As

determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-582 (4th

Cir. 1996), a case cited approvingly and extensively by the Third Circuit in *Folger Adam*, the

scope of 11 U.S.C. § 363(f) is not limited to *in rem* interests.  Thus, the Third Circuit in *Folger

Adam* made clear that debtors "could sell their assets under §363(f) free and clear of successor

liability that otherwise would have arisen under federal statute."  *Folger Adam*, 209 F.3d at 258.

42.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the sale of the US Acquired Assets free

and clear of all of the applicable Liens, Claims and Encumbrances, except with respect to any

Liens, Claims and Encumbrances that constitute Assumed Liabilities under the Agreement.  *See

Citicorp Homeowners Services, Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).  The Debtor

submits that each Lien, Claim and Encumbrance that is not an Assumed Liability satisfies at least

one of the five conditions of section 363(f) of the Bankruptcy Code, and that any such Lien,

Claim or Encumbrance will be adequately protected by either being paid in full at the time of

closing, or by having it attach to the Sale Proceeds, subject to any claims and defenses the

Debtor may possess with respect thereto.  The Debtor accordingly requests authority to convey

the US Acquired Assets to the Stalking Horse Bidder or other Successful Bidder(s), free and

26

clear of all Liens, Claims and Encumbrances except for the Liens, Claims and Encumbrances that are Assumed Liabilities under the express terms of the Agreement (or any other Liens, Claims and Encumbrances expressly permitted under the Agreement), with such Liens, Claims and Encumbrances to attach to the Sale Proceeds, with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Agreement and the Sale Order.

43.     The Debtor has conducted a UCC search and other lien searches of purported lienholders of the US Acquired Assets in conjunction with the proposed Sale of the US Acquired Assets.  The Debtor has served such purported lienholders with notice of this Sale Motion, and will serve notice of the Sale Order if and when such order is entered by the Court.

44.     Accordingly, this Court should approve the sale of the US Acquired Assets to the Successful Bidder(s) free and clear of Liens, Claims and Encumbrances under Bankruptcy Code section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

### Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In Violation of Section 363(n) of the Bankruptcy Code

45.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders as the sale. *See* 11 U.S.C. § 363(n). Although the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

46.     The Agreement is a negotiated, arms' length transaction, in which the Stalking Horse Bidder has acted in good faith, without collusion or fraud of any kind, and in compliance with the *Abbotts Dairies* standards. The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code. Neither the Debtor nor the Stalking Horse Bidder (to the best of the Debtor's knowledge) has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or otherwise implicate section 363(n) of the Bankruptcy Code with respect to the consummation of the Sale or the transfer of the US Acquired Assets and the Assigned Contracts to the Stalking Horse Bidder. In addition, if a party other than the Stalking Horse Bidder is the Successful Bidder, the Debtor intends to make an appropriate showing at the Sale Hearing that the purchase agreement with the other Successful Bidder is a negotiated, arms' length transaction, in which the Successful Bidder at all times has acted in good faith under and otherwise in accordance with such standards.

28

47.     The Debtor thus requests that the Court find that the Stalking Horse Bidder or the Successful Bidder has purchased the US Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

**B.    Authorization of Assumption and Assignment of Assigned Contracts**

48.     As part of the Sale, for the benefit of the Debtor's estate, the Debtor requests approval of the sale, assumption and assignment of the executory contracts and unexpired leases of the Debtor as identified in the Agreement (the "Assigned Contracts")[12] to the Successful Bidder(s) upon the closing of the transactions contemplated under the Agreement and payment of the cure costs (the "Cure Amounts"), which amounts, if any, are what the Debtor believes are owed to each counterparty (each a "Counterparty," and collectively, the "Counterparties") to an Assigned Contract in order to cure any defaults that exist under such contract or lease.

49.     If a contract or lease is assumed and assigned pursuant to the Court's order approving same, then unless the affected Counterparty properly files and serves an objection to the Cure Amount and satisfies all its burdens on any such objection, the Counterparty will (if its contract is assumed and assigned at the closing of the Sale) receive at the time of the closing (or as soon as reasonably practicable thereafter), the Cure Amount, with payment made pursuant to the terms of the Agreement or other applicable asset purchase agreement entered into with the Successful Bidder.

---

[12] The inclusion of any agreement as an Assumed Contract does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included as an Assumed Contract.

29

50.     The Stalking Horse Bidder or other Successful Bidder(s), on behalf of the Debtor, shall promptly pay or cause to be paid the Cure Amount with respect to the Assigned Contracts, other than those Cure Amount, if any, which are to be paid by the Debtor pursuant to the Agreement (or, if applicable, the agreement with another Successful Bidder(s)). The Successful Bidder(s) shall be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assigned Contracts. The Debtor proposes that the Court make its determinations concerning adequate assurance of future performance under the Assigned Contracts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing or in the case of any Assigned Contracts not assumed and assigned to the Successful Bidder(s) at the Sale Hearing, at such other hearing to approve assumption and assignment of such Assigned Contract to the Successful Bidder(s). The Debtor requests that Cure Amounts disputed by any Counterparty be resolved by the Court at the Sale Hearing or at such other hearing to approve assumption and assignment of the relevant contract or lease.

51.     Except to the extent otherwise provided in the agreement(s) entered into with the Successful Bidder(s), subject to the payment of any Cure Amount, the assignee of any Assigned Contracts will not be subject to any liability to the assigned contract or lease Counterparty that accrued or arose before the closing date of the sale of the US Acquired Assets and the Debtor shall be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

52.     The Debtor further requests that the Sale Order provide that the Assigned

Contracts will be assigned to, and remain in full force and effect for the benefit of, the applicable

Successful Bidder, notwithstanding any provisions in the Assigned Contracts, including those

described in sections 365(b)(2) and (f)(1) and (f)(3) of the Bankruptcy Code, that prohibit such

assignment.

53.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under section 365(a), a debtor "subject to the court's approval, may

assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or

executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

DOCS_LA:268617.11 73864/002

54.     Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a debtor in possession's decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Taylor*, 913 F.2d 102 (3d Cir. 1990); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36 (3d Cir. 1989). Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate. *Sharon Steel*, 872 F.2d at 40. The assumption, assignment and sale of the Assigned Contracts, or any of them, is a necessary part of the proposed Sale and, as stated above, will benefit the estate of the Debtor.

55.     With respect to Assigned Contracts to be assumed and assigned pursuant to the Sale, the Debtor will have sent a copy of both a "Sale and Bid Procedures Notice" and "Cure Notice" (as further described in the Bidding Procedures Motion) to all Counterparties to the Assigned Contracts, notifying such Counterparties of the potential assumption by the Debtor and assignment to the Successful Bidder(s) of the Assigned Contracts at the closing of the Sale.

56.     The Counterparties will have sufficient opportunity to file an objection to the proposed Cure Amounts set forth on the Cure Notice. To the extent no objection is filed with regard to a particular Cure Amount set forth on a Cure Notice, such Cure Amount shall be binding on the applicable contract or lease Counterparty. The payment of the Cure Amounts set forth in the Cure Notice (or a different amount either agreed to by the Debtor or resolved by the Court as a result of a timely-filed objection filed by a contract or lease Counterparty) will be in

full and final satisfaction of all obligations to cure defaults and compensate the Counterparties

for any pecuniary losses under such contracts or leases pursuant to section 365(b)(1) of the

Bankruptcy Code, unless the Debtor determines that a particular contract is not truly executory,

and does not need to be cured to transfer the US Acquired Assets to the Successful Bidder or,

alternatively, the Successful Bidder subsequently elects not to have any Assigned Contracts

assumed or assigned to it.

57.    The Stalking Horse Bidder or other Successful Bidder is responsible for providing

evidence of "adequate assurance of future performance" to the extent required in connection with

the assumption and assignment of any Assigned Contracts.  The meaning of "adequate assurance

of future performance" for the purpose of the assumption of executory contracts and unexpired

leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of

each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v.*

*Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also, e.g., In re*

*Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future

performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon*

*Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).  If necessary, the

Stalking Horse Bidder or other Successful Bidder shall provide evidence of its ability to provide

adequate assurances to Counterparties at the Sale Hearing.

## Notice

58.    Notice of this Sale Motion and a copy of this Sale Motion will be provided to (a)

the Office of the United States Trustee; (b) counsel to the Revstone Committee; (c) counsel to

any statutory committee that may be appointed in the Debtor's case; (d) all parties who are

known by the Debtor to assert liens with respect to the US Acquired Assets; (e) all entities who

executed non-disclosure agreements with the Debtor in connection with a potential acquisition of

any or all of the US Acquired Assets or whom the Debtor believes may have an interest in

bidding; (f) all Counterparties to contracts/leases that may potentially be designated as Assigned

Contracts; (g) the United States Attorney's office; (h) all state attorneys general in states in

which the Debtor does business; (i) state taxing authorities in the states in which the Debtor does

business and the Internal Revenue Service; (j) environmental authorities in the states or smaller

applicable jurisdictions in which the Debtor does business; (k) the Stalking Horse Bidder and its

counsel; and (l) all parties who have timely filed requests for notice under Rule 2002 of the

Federal Rules of Bankruptcy Procedure.  Upon approval of the Bidding Procedures Motion, the

Debtor will serve notice of this Sale Motion (as proposed in the Bidding Procedures Motion,

subject to Court approval) on all other creditors of the Debtor known by it, and serve

supplemental notice including of applicable deadlines and hearing dates to the parties previously

served with notice of the Sale Motion (as proposed in the Bidding Procedures Motion, subject to

Court approval). The Debtor respectfully submits that such notice is sufficient, and request that

the Court find that no further notice of the relief requested herein is required.

59.     The Debtor requests, pursuant to Bankruptcy Rules 6004(h) and 6006(d), that the

order approving this Sale Motion become effective immediately upon its entry.

34

## Conclusion

60.     The Debtor's proposed sale of the US Acquired Assets as described in this Sale Motion, including the assumption and assignment of the Assigned Contracts, is in each case supported by sound business reasons, as set forth herein.  The proposed sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors and all parties in interest.  The Debtor thus requests that the Court approve the proposed Sale of the US Acquired Assets free and clear of all interests, liens, claims, and encumbrances including successor liabilities, as requested, including, without limitation, the assumption and assignment of the Assigned Contracts, to the Stalking Horse Bidder or other Successful Bidder.

## No Prior Request

61.     No prior request for the relief sought in this Sale Motion has been made to this or any other court.


[Remainder of Page Intentionally Left Blank]

35

DOCS_LA:268617.11 73864/002

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Sale Motion and authorize the sale of the US Acquired Assets to the Stalking Horse Bidder or other Successful Bidder and approve the Agreement or other agreement that is in substantially the form attached to this Sale Motion as Exhibit A (as such agreement relates to the Debtor and its Assets), pursuant to the attached proposed order; (ii) approve the assumption and assignment of the Debtor's Assigned Contracts; (iii) approve the form and manner of notice of this Sale Motion, and of the proposed sale and assumptions and assignments; and (iv) grant such other and further relief as is just and proper.

Dated: July 22, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone:  302/652-4100
Facsimile:  302/652-4400
Email:  ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         tcairns@pszjlaw.com

[Proposed] Counsel for the Debtor and Debtor in Possession

DOCS_LA:268617.11 73864/002