## Exhibit A

**Asset Purchase Agreement**

EXECUTION VERSION

---

ASSET PURCHASE AGREEMENT

By and Among

METAVATION, LLC, and

EPTEC S.A. DE C.V.

AS SELLERS

DAYCO PRODUCTS, LLC, and

DAYCO PRODUCTS S.A. DE C.V.

AS BUYERS

and for certain limited purposes,

REVSTONE TRANSPORTATION, LLC,

METAVATION VASSAR, LLC, and

RESOURCE TECHNOLOGY GROUP, LLC

Dated as of July 19, 2013

---

**THIS IS A DRAFT AGREEMENT FOR DISCUSSION PURPOSES ONLY, AND SHALL NOT BE BINDING ON ANY PARTY UNLESS AND UNTIL THE PARTIES EXECUTE A DEFINITIVE FINAL AGREEMENT.**

**TABLE OF CONTENTS**

**Page**

ARTICLE 1

PURCHASE AND SALE OF THE ACQUIRED ASSETS

| | | |
|---|---|---|
| 1.1 | Purchase, Sale and Transfer of Acquired Assets | 2 |
| 1.2 | Excluded Assets | 4 |
| 1.3 | Assumption of Liabilities | 5 |
| 1.4 | Excluded Liabilities | 6 |
| 1.5 | Assignment of Contracts and Rights of US Seller | 7 |
| 1.6 | Limitations on Assignability | 7 |
| 1.7 | Executory Contract Designation | 8 |
| 1.8 | Preservation of Existing Contract | 10 |
| 1.9 | Cooperation Regarding Shared Tangible Assets | 10 |
| 1.10 | Schedule 9.4 Adjustment | 10 |

ARTICLE 2

CONSIDERATION

| | | |
|---|---|---|
| 2.1 | Consideration | 10 |
| 2.2 | Purchase Price Adjustment | 10 |
| 2.3 | Deposit | 12 |
| 2.4 | Withholding Rights | 13 |

ARTICLE 3

CLOSING AND DELIVERIES

| | | |
|---|---|---|
| 3.1 | Closing | 13 |
| 3.2 | Sellers' Deliveries | 13 |
| 3.3 | Buyers' Deliveries | 15 |

ARTICLE 4

REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 4.1 | Organization | 15 |
| 4.2 | Authorization and Validity | 16 |
| 4.3 | No Conflict | 16 |
| 4.4 | Permits, Government Consents and Approvals | 16 |
| 4.5 | Law and Legal Proceedings | 17 |
| 4.6 | Environmental Matters | 17 |
| 4.7 | Product Liability; Recalls | 18 |
| 4.8 | Product Warranty | 18 |

i

4.9     Inventory...............................................................................................18
4.10    Product Returns.....................................................................................19
4.11    Labor Relations......................................................................................19
4.12    Employee Benefit Plans.........................................................................20
4.13    Material Contracts..................................................................................21
4.14    Intellectual Property..............................................................................22
4.15    Title to Assets........................................................................................23
4.16    Real Property.........................................................................................24
4.17    No Brokers or Finders............................................................................24
4.18    Taxes......................................................................................................24
4.19    No Other Representations or Warranties; Disclosure Schedules...........25
4.20    Customers and Suppliers........................................................................26
4.21    Board Approval and Recommendation....................................................26
4.22    Assets Necessary to Business.................................................................26
4.23    Compliance with Law............................................................................26
4.24    Absence of Changes or Events...............................................................26

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYERS

5.1     Company Organization............................................................................27
5.2     Authorization and Validity......................................................................27
5.3     Consents, Approvals, and Notifications...................................................27
5.4     Financial Ability.....................................................................................27
5.5     Law and Legal Proceedings....................................................................27
5.6     No Brokers or Finders.............................................................................28
5.7     Investigation by Buyer............................................................................28
5.8     Adequate Assurance................................................................................28

ARTICLE 6

COVENANTS

6.1     Actions Before Closing............................................................................28
6.2     Conduct of Business Prior to Closing......................................................29
6.3     Permits and Consents...............................................................................32
6.4     Buyers Access to Properties and Records................................................32
6.5     Sellers Payments, Revenues and Assets..................................................33
6.6     Name Change...........................................................................................33
6.7     Supplements to Disclosure Schedules......................................................34
6.8     Motions and Orders.................................................................................34
6.9     Availability of Business Records and Transferred Employees.................34
6.10    Buyers Payments, Revenues....................................................................34
6.11    Environmental Permits............................................................................35
6.12    Further Assurances..................................................................................35
6.13    Non-Competition.....................................................................................35
6.14    Non-Solicitation......................................................................................36
6.15    Phase II Investigations............................................................................36

ii

| 6.16 | Transition Services Agreement | 37 |
| 6.17 | License to Certain Intellectual Property Rights | 37 |
| 6.18 | Red Facility | 37 |
| 6.19 | Customer Contracts | 38 |
| 6.20 | New Business Contracts | 38 |
| 6.21 | Anti-Poaching | 38 |
| 6.22 | Fairfield Agreement | 39 |
| 6.23 | Updates to Schedules | 39 |

ARTICLE 7

EMPLOYEES AND EMPLOYEE BENEFITS; RELEASES

| 7.1 | Employees | 39 |
| 7.2 | Standard Procedure | 41 |
| 7.3 | WARN Act | 41 |

ARTICLE 8

COURT APPROVAL

| 8.1 | Court Approval | 42 |
| 8.2 | Certain Bankruptcy Undertakings | 42 |
| 8.3 | Break Up Fee; Expense Reimbursement | 43 |
| 8.4 | Alternative Transaction | 44 |
| 8.5 | Bid Procedures Order | 44 |
| 8.6 | Sale Order | 44 |

ARTICLE 9

TAXES

| 9.1 | Taxes Related to Purchase of Acquired Assets | 45 |
| 9.2 | Real Property, Personal Property and Similar Ad Valorem Taxes | 45 |
| 9.3 | Cooperation on Tax Matters and Exchange of Information | 46 |
| 9.4 | Purchase Price Allocation | 46 |

ARTICLE 10

CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

| 10.1 | Conditions Precedent to Performance by Sellers | 48 |
| 10.2 | Conditions Precedent to the Performance by Buyers | 50 |

## ARTICLE 11

### TERMINATION AND EFFECT OF TERMINATION

11.1     Right of Termination.................................................................................52
11.2     Termination Rights ..................................................................................52
11.3     Effect of Termination...............................................................................55
11.4     Specific Performance ...............................................................................55
11.5     Back-up Bidder Status..............................................................................55
11.6     Payment of Buyers' Expenses/PBGC Release ............................................56

## ARTICLE 12

### MISCELLANEOUS

12.1     Exclusivity ...............................................................................................56
12.2     Transition of Permits................................................................................56
12.3     Successors and Assigns.............................................................................57
12.4     Governing Law; Jurisdiction.....................................................................57
12.5     Waiver of Jury Trial.................................................................................57
12.6     No Survival of Representations and Warranties; Post-Closing .................57
12.7     Mutual Drafting .......................................................................................58
12.8     Expenses ..................................................................................................58
12.9     Severability ..............................................................................................58
12.10    Notices .....................................................................................................58
12.11    Amendments; Waivers...............................................................................59
12.12    Public Announcements .............................................................................59
12.13    Entire Agreement .....................................................................................60
12.14    Parties in Interest.....................................................................................60
12.15    Headings ..................................................................................................60
12.16    Construction.............................................................................................60
12.17    Currency...................................................................................................60
12.18    Time of Essence .......................................................................................61
12.19    Counterparts ............................................................................................61
12.20    Confidentiality Agreement........................................................................61
12.21    No Consequential or Punitive Damages ...................................................61
12.22    Non-Recourse ..........................................................................................61

## ARTICLE 13

### DEFINITIONS; SCHEDULES; EXHIBITS

13.1     Certain Terms Defined..............................................................................61
13.2     Schedules .................................................................................................71
13.3     Exhibits ...................................................................................................73

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "*Agreement*"), dated as of July 19, 2013 (the "*Agreement Date*"), among Metavation, LLC, a Delaware limited liability company ("*US Seller*"), Eptec S.A. de C.V., a company organized under the laws of Mexico ("*Mexico Seller*," and collectively with US Seller, "*Sellers*", and each individually, a "*Seller*"), Dayco Products LLC, a Delaware limited liability company ("*US Buyer*"), Dayco Products S.A. De C.V., a company organized under the laws of Mexico (or an affiliate, "*Mexico Buyer*" and collectively with US Buyer, the "*Buyers*", and each individually, a "*Buyer*"), solely for purposes of Sections 3.2(h), 3.2(i), 3.3(f), 3.3(g), 6.1, 6.4, 6.12, 6.13, 6.14, 6.16, 11.4 and Article 12 (but, as to each of the listed provisions, only with respect to the limited matters as to which it is a Party hereto), Revstone Transportation, LLC ("*Parent*"), and solely for purposes of Sections 3.2(h), 3.2(i), 3.3(f), 3.3(g), 6.1, 6.12, 6.16, 11.4 and Article 12 (but, as to each of the listed provisions, only as to the limited matters with respect to which they are Parties hereto), Metavation Vassar, LLC and Resource Technology Group, LLC (together with Parent, the "*TSA Parties*"). Sellers and Buyers, and where applicable, Parent and TSA Parties, are each referred to herein as a "*Party*" and collectively as the "*Parties*." Capitalized terms used in this Agreement are defined in Article 13.

## PREAMBLE

WHEREAS, Sellers are North America-based entities engaged in the Business (as defined herein);

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, Buyers desire to purchase from Sellers, and Sellers desire to sell to Buyers, the Acquired Assets (as defined below);

WHEREAS, US Seller intends to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "*Bankruptcy Code*") with the Bankruptcy Court (as defined below), which is expected to be jointly administered for procedural purposes under *In Re Revstone Industries, LLC* Case No. 12-13262 (the "*Bankruptcy Case*");

WHEREAS, subject to the terms of this Agreement, it is intended that the acquisition of the US Acquired Assets (as defined below) would be accomplished through the sale, transfer and assignment of the US Acquired Assets by Sellers to Buyers in a sale undertaken pursuant to Section 363 of the Bankruptcy Code and the executory contracts and unexpired leases will be assumed by US Sellers and assigned to Buyers pursuant to Section 365 of the Bankruptcy Code, in each instance, free and clear of any and all Liens or Claims to the extent provided in the US Sale Order, other than Permitted Liens and Assumed Liabilities related to the US Acquired Assets;

WHEREAS, it is intended that the acquisition of the Mexico Acquired Assets (as defined below) would be accomplished pursuant to the terms of this Agreement and the Bid Procedures, in each instance, free and clear of any and all Liens or claims, other than Permitted Liens and Assumed Liabilities related to the Mexico Acquired Assets;

WHEREAS, Sellers believe, following consultation with their financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of their

respective assets is necessary to maximize value and is in the best interest of Sellers, its estates and creditors;

WHEREAS, all of the transactions contemplated by this Agreement related to the US Acquired Assets will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the US Sale Order to be entered in the Bankruptcy Case and the applicable provisions of the Bankruptcy Code, and all of the transactions contemplated by this Agreement related to the Mexico Acquired Assets will be conditioned upon and occur concurrently with the consummation of the sale of the US Acquired Assets pursuant to the US Sale Order, but would not be a part of the US Sale Order;

WHEREAS, the Acquired Assets held by US Seller shall be sold, transferred, assigned, conveyed and delivered by US Seller to US Buyer (such Acquired Assets, the "*US Acquired Assets*"), and the Acquired Assets held by Mexico Seller shall be sold, transferred, assigned, conveyed and delivered by Mexico Seller to Mexico Buyer (such Acquired Assets, the "*Mexico Acquired Assets*");

WHEREAS, the Assumed Liabilities held by US Seller shall be sold, transferred, assigned, conveyed and delivered by US Seller to US Buyer, and the Assumed Liabilities held by Mexico Seller shall be sold, transferred, assigned, conveyed and delivered by Mexico Seller to Mexico Buyer; and

WHEREAS, US Buyer has entered into binding agreements, in form and substance satisfactory to US Buyer, with (i) General Motors Company and any applicable Affiliates ("*GM*") and (ii) Chrysler Group LLC and any applicable Affiliates ("*Chrysler*"), (such agreements in clauses (i) and (ii), collectively the "*New Customer Agreements*") dated as of the date hereof, which shall be effective only upon Closing.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyers hereby agree as follows:

## ARTICLE 1

## PURCHASE AND SALE OF THE ACQUIRED ASSETS

1.1    <u>Purchase, Sale and Transfer of Acquired Assets</u>.  At the Closing, and upon the terms and conditions herein set forth, US Seller, as to the US Acquired Assets, and Mexico Seller, as to the Mexico Acquired Assets, shall sell, transfer, assign, convey and deliver to the applicable Buyer or its designated Affiliates, and the applicable Buyer shall acquire, all of Sellers' right, title, and interest in, to and under (in each case, free and clear of any and all Liens or Claims, other than Permitted Liens) the Acquired Assets.  In accordance with <u>Section 1.9</u> below, "*Acquired Assets*" shall mean all property, assets and rights (whether idle or active) owned, leased or licensed that are used primarily, or held primarily for use, by Sellers in the Business of every kind, character and description, including all direct or indirect, right, title, and interests of Sellers in, to and under all the tangible and intangible, real and personal, assets, properties, rents, Claims and contracts of Sellers wheresoever located, whether carried on the books of Sellers or not carried on the books of Sellers, in each case, used primarily, or held

primarily for use, by Sellers in the Business, and shall also include the following; provided, however, that the Acquired Assets shall not include any Excluded Assets:

(a)     all Real Estates Leases and all rights of Sellers under the Real Estate Leases;

(b)     all (i) Improvements; (ii) Equipment (but, as to assets located at the Vassar, Michigan facility, only those pieces of machine shop equipment as are specifically described on Schedule 1.1(b)(ii) (the "*Vassar Shop Equipment*")); and (iii) rights of Sellers to any licenses received from manufacturers and sellers of the Equipment, Improvements or any component thereof;

(c)     all Contracts related to the Business and all rights of Sellers under such Contracts, only to the extent such Contracts are Assigned Contracts pursuant to Section 1.7;

(d)     all Contracts of Mexico Seller set forth on Schedule 1.1(d) (the "*Mexico Assigned Contracts*");

(e)     all assets held, leased or licensed, by Mexico Seller set forth on Schedule 1.1(e);

(f)     all Inventory;

(g)     all Acquired Intellectual Property;

(h)     all rights and interests of Sellers under any Permits (to the extent transferable) used primarily or held for use primarily in the Business;

(i)     all Business Records;

(j)     all rights, claims or causes of action of Sellers to the extent arising out of the Business or the Acquired Assets against third parties arising out of events occurring prior to the Closing Date, including arising out of events occurring prior to the Petition Date, and including (i) any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers, and contractors relating to products sold, or services provided, to Sellers, and (ii) causes of action, rights of recovery, rights of setoff and rights of recoupment in favor of any Seller, including any such rights of any Seller under any insurance policy, any insurance proceeds or condemnation award payable to any Seller or any transferable or assignable claim therefor, excluding only the rights, claims and causes of action that are identified as Excluded Assets in Section 1.2 (including in Section 1.2(f)); and

(k)     all security and other deposits (other than utility, prepaid tooling and rent deposits), credits, allowances, refunds, prepaid assets, or charges, rebates, setoffs, prepaid expenses, and other prepaid items (other than prepaid rent) to the extent related to the Acquired Assets or the Business;

(l)     all utility and rent deposits to the extent related to the Acquired Assets or the Business, and any additional utility deposits paid on or after the Petition Date as required pursuant to provisions of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court; and

(m)     all prepaid tooling deposits to the extent related to the Acquired Assets or the Business.

1.2    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the Acquired Assets are the only properties, rights and assets transferred to, or otherwise acquired by, Buyers under this Agreement.  Without limiting the generality of the foregoing, the Acquired Assets do not include (i) any right, title, or interest of any Person other than Sellers in any property or asset and (ii) the properties and assets of Sellers listed or described below in this Section 1.2 (all properties and assets not being acquired by Buyers are herein collectively referred to as the "*Excluded Assets*"):

(a)    the Closing Purchase Price, as adjusted pursuant to Sections 2.2 and 2.3, and all Cash held by or on behalf of Sellers;

(b)    all of Sellers' rights under Contracts that are not Acquired Assets pursuant to Sections 1.1(c) or 1.1(d);

(c)    all of Sellers' right, title and interest in or to (i) the facility and real property leases located in Southfield, Michigan, Vassar, Michigan and San Luis Potosi, Mexico and (ii) any assets located at the Vassar facility, other than the Vassar Shop Equipment;

(d)    all of US Seller's rights under Employee Benefit Plans and all assets held thereby or therein, and all Mexico Seller's rights under Employee Benefit Plans relating to the employees listed on Schedule 7.1(b)(ii);

(e)    all rights of Sellers arising under this Agreement, the Ancillary Agreements, and under any other agreement between Sellers and Buyers entered into in connection with this Agreement;

(f)    all current and prior insurance policies of Sellers and all rights of any nature with respect thereto;

(g)    all Avoidance Actions; provided that Sellers may not bring any Avoidance Actions against any suppliers or customers of the Business with whom Buyers continue to do business following the Closing, other than those against persons or entities identified on Schedule 1.2(g) (to be mutually agreed by Sellers and Buyers not later than three (3) business days prior to the hearing on bidding procedures as described below) and any "insider" (as defined in the Bankruptcy Code) or Affiliate of either Seller; provided that nothing herein shall be deemed to limit in any way any rights Sellers may wish to (a) exercise, pursue or assert with respect to suppliers or customers of Mexico Seller unrelated to Avoidance Actions that pertain to Mexico Seller's damper business or (b) use defensively with respect to any claims made against either Seller by customers and suppliers;

(h)    all good faith or other bid deposits submitted by any third party under the terms of the Bid Procedures Order including the sales procedures;

(i)    the stock and any other equity interests or securities, including promissory notes, issued by each of Sellers;

(j)    other than Cash received or receivable in connection with the items listed in Section 1.1(i), all Cash;

(k)    all Accounts Receivable;

(l)    all equity interests in other entities held by Sellers;

(m)    all bank accounts and lockboxes;

(n)     the company seals, minute books, charter documents, stock or equity records books and such other books and records as pertain to the organization, existence or capitalization of Sellers;

(o)     all claims that Sellers may have against any third party with respect to any Excluded Assets, claims or causes of action against former and current officers and directors of Sellers, any claims against auditors and other professional service providers of Sellers, and any claims against any Affiliates and/or "insiders" (as defined in the Bankruptcy Code) of either Seller;

(p)     Sellers' rights under or related to any debtor in possession loan facility entered into by Seller and the lenders party thereto;

(q)     all rights, claims, interests and assets of Sellers excluded from the Acquired Assets and reserved to Sellers pursuant to any other provision of this Agreement;

(r)     the name and Trademarks of Mexico Seller set forth on Schedule 1.2(r);

(s)     all of Sellers' rights and interests in and to the assets listed on Schedule 1.2(s);

(t)     the Foundry Agreements and such applicable assets related thereto;

(u)     all assets used or held by Sellers solely pursuant to a lease, license or other Contract where the associated lease, license or other Contract is not assigned to Buyers as an Assigned Contract at the Closing or subsequently assigned to Buyers pursuant to Section 1.6(b) hereof; and

(v)     any and all accommodations, security deposits, tooling and other deposits, credits, allowances, refunds, prepaid assets, or charges, rebates, setoffs, prepaid expenses, and other prepaid items to the extent related to or arising out of any of the agreements described on Schedule 1.2(v) hereto.

1.3     Assumption of Liabilities. Subject to the terms and conditions set forth in this Agreement, at the Closing, in consideration for the sale, assignment, conveyance, transfer and delivery of the Acquired Assets to Buyers, Buyers will assume and pay, perform and discharge when due and otherwise in accordance with the terms of this Agreement, only (i) with respect to US Seller, all Liabilities and executory obligations arising from and after the Closing under the Assigned Contracts which are US Acquired Assets (specifically excluding the Excluded Assets), and with respect to Mexico Seller, all Liabilities and obligations arising from and after the Closing under the Mexico Assigned Contracts which are Mexico Acquired Assets (specifically excluding the Excluded Assets), (ii) all Cure Amounts, (iii) all Liabilities of Sellers for all accrued unused vacation with respect to the Transferred Employees, other than the employees listed on Schedule 7.1(b)(ii), and, as to those Transferred Employees employed by US Seller, all short-term sick pay as of the Closing Date, each as described in Schedule 1.3(iii), provided that such Liabilities have been incurred in the Ordinary Course of Business, and (iv) all Liabilities related to Mexico Seller Personnel (as defined below) in accordance with Section 7.1(e) hereunder (collectively, the "*Assumed Liabilities*"). Sellers shall populate Schedule 1.3(iii) as of the date of this Agreement with the Liabilities described in Section 1.3(iii) relating to all Employees and shall update and deliver to Buyers Schedule 1.3(iii) two (2) days prior to the Closing. Within two days after the Closing, Sellers shall update Schedule 1.3(iii) to delete any Liabilities relating to Employees who are not Transferred Employees.

5

Notwithstanding anything in this Agreement to the contrary, Sellers hereby acknowledge and agree that Buyers are not assuming from Sellers, nor are in any way responsible for, the Excluded Liabilities. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyers or Sellers as compared to the rights and remedies that such third party would have had against Sellers absent the Bankruptcy Case had Buyers not assumed such Assumed Liabilities. Other than the Assumed Liabilities, Buyers are not assuming and shall not be liable for any liabilities or obligations of Sellers. Notwithstanding the foregoing, Buyers are liable for their portion of the Apportioned Obligations pursuant to, and only to the extent described in, Section 9.2.

    1.4    Excluded Liabilities. Except for the Assumed Liabilities, Buyers shall not assume or be liable for or bound by any Liability of Sellers (or any of Sellers' respective Affiliates), including any duties, responsibilities, liabilities, assessments, penalties or obligations of any kind or nature, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent or non-contingent, presently in existence or arising hereafter, disputed or undisputed, liquidated or unliquidated, at Law or in equity or otherwise, including any Liability based on successor liability theories (herein referred to as the "*Excluded Liabilities*"), including subject always to Section 1.3 above, the following specific Liabilities:

    (a)    any and all Liabilities of Sellers under any Contract of Sellers that is not an Assigned Contract or Mexico Assigned Contract whether accruing prior to, at, or after the Closing Date;

    (b)    any and all Liabilities for Taxes arising from or with respect to the Acquired Assets or the Business for any taxable period, or portion thereof, ending on or before the Closing Date;

    (c)    any and all Liabilities of either Seller or of either Seller's respective Affiliates for Taxes arising from or with respect to gain, if any, from the transfer of the Acquired Assets or the assumption of the Assumed Liabilities on the Closing Date;

    (d)    any and all Liabilities for Transaction Taxes to the extent any Seller is liable pursuant to Section 9.1 and any and all Liabilities for Apportioned Obligations for which any Seller is liable pursuant to Section 9.2;

    (e)    any and all Liabilities of any Seller resulting from the failure to comply with any applicable "bulk sales," "bulk transfer" or similar Law;

    (f)    any indebtedness or obligation for borrowed money of Sellers;

    (g)    any and all Liabilities arising under any Environmental Law or any other Liability in connection with any environmental, health, or safety matters arising from or related to (i) the operation of the Business or the Acquired Assets on or before the Closing Date, (ii) any action or inaction of Sellers or of any third party relating to the Business or Acquired Assets on or before the Closing Date or (iii) any condition first occurring or arising on or before the Closing Date with respect to the Business or Acquired Assets;

    (h)    any and all Liability for: (i) costs and expenses incurred by Sellers or owed in connection with the administration of the Bankruptcy Case (including the US Trustee fees, the fees and expenses of attorneys, accountants, financial advisors, consultants, and other professionals retained by Sellers, and any official or unofficial creditors' committee, the fees and expenses of the post-petition lenders or the pre-petition lenders incurred or owed in connection

6

with the administration of the Bankruptcy Case); (ii) all costs and expenses of Sellers incurred in connection with the negotiation, execution, and consummation of the transactions contemplated under this Agreement and (iii) all costs and expenses arising out of or related to any third party Claims against Sellers, pending or threatened, including any warranty or product Claims;

(i)      any and all Liabilities in any way attributable to (i) the employment or service of current or former employees or directors of Sellers or any current or former subsidiary of Sellers who is not a Transferred Employee, regardless of whether such Liability is attributable to the period before, on or after the Closing Date, (ii) except as provided in Section 1.3 above, the employment of Transferred Employees to the extent attributable to the period at or before the Closing, (iii) any Employee Benefit Plan or (iv) any advance employee notice obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 or any similar applicable state or local law;

(j)      any and all accounts payable of the Business arising prior to the Closing; and

(k)      any and all obligations or Liabilities owed or due to any of Sellers' Affiliates.

1.5      Assignment of Contracts and Rights of US Seller.  To the maximum extent permitted by the Bankruptcy Code, but subject to the provisions of Section 1.6 below, the US Acquired Assets, including Assigned Contracts, shall be assumed by Sellers and assigned to US Buyer pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in an Order of the Bankruptcy Court.

1.6      Limitations on Assignability.

(a)      This Agreement and the instruments and documents executed and delivered herewith will constitute an assignment of all Acquired Assets; provided that neither this Agreement, nor any of the instruments or documents executed and delivered in connection herewith or contemplated hereby, shall constitute an assignment or assumption of any Acquired Asset, or an attempted assignment or an attempted assumption thereof, to the extent that, without the consent of a third party, such assignment or attempted assignment, or assumption or attempted assumption, would constitute a breach thereof or in any way adversely affect the rights of Buyers or Sellers thereunder, unless otherwise provided under the Bankruptcy Code or the US Sale Order.  If with respect to any Acquired Asset, such consent is not obtained or, with respect to any US Acquired Asset, such assignment is not attainable pursuant to the Bankruptcy Code or the US Sale Order (any such asset, a "*Non-Assigned Acquired Asset*"), then such Non-Assigned Acquired Asset shall not be transferred hereunder and the Parties shall reduce the Purchase Price or the Closing Purchase Price, as applicable, to be paid hereunder in amount equal to the fair market value of such Non-Acquired Assigned Asset pursuant to Section 2.1 or 2.2(g), as applicable, and the Closing shall proceed with respect to the remaining Acquired Assets and Sellers, at Sellers' sole cost and expense, shall use their commercially reasonable efforts, and Buyers shall cooperate with Sellers, to obtain any such consent and to resolve the impracticalities of assignment after the Closing.  In no event shall any reduction of the Purchase Price or the Closing Purchase Price, as applicable, made pursuant to this Section 1.6(a) exceed, in the aggregate, Two Hundred and Fifty Thousand Dollars ($250,000).

7

(b)      With respect to such Non-Assigned Acquired Assets that are Assigned Contracts, Buyers hereby appoint, effective as of the Closing Date, Buyers as Sellers' agent and attorney-in-fact, effective as of the Closing Date, to act for Sellers in obtaining the benefits and performing Sellers' obligations under such Contracts, but only to the extent any action to obtain such benefits and any such delegation of duties may be made without violation thereof and, in each case, at the sole cost and expense of Buyers.  In addition, until the impracticalities of assignment referred to in this Section 1.6 hereof are resolved, Sellers shall use their commercially reasonable efforts to (i) provide Buyers the benefits of any Non-Assigned Acquired Assets, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Buyers, and (iii) enforce, for the account and benefit of Buyers and at Buyers' sole cost and expense, any and all rights of Sellers arising from the Non-Assigned Acquired Assets against such issuer thereof and all other parties thereto (including the right to elect to terminate any Contract in accordance with the terms thereof on the advice of Buyers).  To the extent that Buyers are provided the benefits pursuant to this Section 1.6 of any Non-Assigned Acquired Asset, Buyers shall, at Buyers' sole cost and expense, perform, on behalf of Sellers, for the benefit of the issuer thereof and/or all other parties thereto, the obligations of Sellers thereunder or in connection therewith, but only to the extent that such action by Buyers would not result in any material default thereunder or in connection therewith. To the extent, after the Closing, Sellers are able to assign, in full, a Non-Assigned Acquired Asset to Buyers within twenty-four (24) months of the Closing, Buyers shall pay to Sellers, in full, substantially concurrently with such transfer or assignment, the amount by which the Purchase Price or the Closing Purchase Price, as applicable, was reduced pursuant to Section 1.6(a) above on account of such Non-Assigned Acquired Asset.

1.7      Executory Contract Designation.  Solely with respect to the US Acquired Assets:

(a)      Attached hereto as Schedule 1.7(a) is a true, correct and complete list (the "*Executory Contract List*") of all Contracts related to the US Acquired Assets or otherwise used, or held for use, in connection with the Business as it is conducted by US Seller. The Executory Contract List shall describe the monetary amounts that must be paid and nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyers to assume the Assigned Contracts pursuant to this Agreement ("*Undisputed Cure Costs*") and such other commercial information related to the Contracts listed thereon as shall be reasonably requested by Buyers.

(b)      Subject to the entry of the Bid Procedures Order and to the terms and provisions thereof, an appropriate cure notice, in a form satisfactory to Buyers, shall be served on the parties required pursuant to the Bid Procedures Order. Any counterparty to a Contract included on the Executory Contract List shall have the time period prescribed by the Bid Procedures Order, or if no such time period is given, a reasonable amount of time prior to the Auction, to object to the Cure Amounts listed on the Executory Contract List.

(c)      To the extent a counterparty to a Contract objects or otherwise challenges the Undisputed Cure Costs determined by Sellers and asserts a different monetary amount that must be paid and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyers to assume such Contract pursuant to this Agreement, the difference between the Undisputed Cure Costs determined by Sellers and such amounts and/or nonmonetary obligations determined by such counterparty shall be referred to as the "*Disputed Cure Costs*."

8

(d)     On or prior to the Designation Deadline (as defined herein), Buyers may designate in writing any Contract to be assumed as an Assigned Contract or remove any Contract previously designated by Buyers as an Assigned Contract. Buyers shall be obligated to pay at Closing any Undisputed Cure Costs associated with the assumption of such Assigned Contract. The Disputed Cure Costs shall only be paid pursuant to Order of the Bankruptcy Court or mutual agreement among Buyers, Sellers (but in the case of Sellers, this agreement is needed only if the aggregate Disputed Cure Costs are in excess of $200,000) and the counterparty to the applicable Assigned Contract. Notwithstanding anything contained herein to the contrary, Buyers shall only assume, and shall only be responsible for, Contracts designated by it as Assigned Contracts pursuant to this Section 1.7. As used herein, the "**Designation Deadline**" shall mean the date that is the Business Day preceding the Auction (as defined in the Bid Procedures Order) but no earlier than twenty-four (24) days subsequent to Sellers' delivery of Schedule 1.7(a).

(e)     Sellers shall use commercially reasonable efforts to reduce, and shall use commercially reasonable efforts to cooperate with Buyers in its efforts to reduce, the Disputed Cure Costs and negotiate rent reductions with respect to Real Estate Leases that are Assigned Contracts. Such efforts shall include providing Buyers with access to relevant business records, personnel, equipment, and Buyers' other reasonable requests in order to allow Buyers to assist with evaluating the Disputed Cure Costs, in each case, at Sellers' sole cost and expense prior to the Closing and at Buyers' sole cost and expense if such assistance, access and cooperation occurs during the post-Closing period.

(f)

(i)     In the event that the total aggregate amount of Cure Amounts (including all Disputed Cure Costs), exceeds $400,000 but is lower than $700,000 (the aggregate amount in excess of $400,000 up to $700,000 hereinafter referred to as the "**Excess Amount**"), Sellers shall agree to reduce from the Purchase Price 50% of the Excess Amount pursuant to Section 2.1(iii).

(ii)     In the event that the total aggregate amount of Cure Amounts (including all Disputed Cure Costs), equals or exceeds $700,000 (the aggregate amount equal to, or in excess of, $700,000 hereinafter referred to as the "**Added Excess Amount**"), Buyers shall have the right to exclude the Added Excess Amount from the Purchase Price reduction pursuant to Section 2.1(iii) by delivering written notice to Sellers no later than two (2) Business Days prior to the Closing Date (the "**Buyer's Election Notice**"). In the event that Buyers do not deliver a Buyer's Election Notice, Sellers shall have the right to (i) include the Added Excess Amount to the Purchase Price reduction pursuant to Section 2.1(iii) by delivering written notice to Buyers (the "**Seller's Election Notice**") no later than one (1) Business Day prior to the Closing Date; or (ii) terminate this Agreement pursuant to Section 11.2(d)(vi). In the event that Sellers do not deliver a Seller's Election Notice, Buyers shall have the right terminate this Agreement pursuant to Section 11.2(c)(xii). In the event that neither Buyers nor Sellers terminate this Agreement pursuant to Sections Section 11.2(d)(vi) or 11.2(c)(xii), as applicable, Buyers and Sellers will use their respective commercially reasonable efforts to resolve any dispute regarding the reduction from the Purchase Price in respect of the Added Excess Amount, pursuant to Section 2.1(iii).

9

1.8     Preservation of Existing Contract.    From the Agreement Date through and including the Designation Deadline, provided Sellers shall not reject Contracts while the same are designated by Buyers for assumption and which are actually thereafter assumed by Buyer at Closing or thereafter pursuant to Section 1.6(b) above, Sellers shall not reject any Contract so designated unless otherwise agreed to in writing by Buyers.

1.9     Cooperation Regarding Shared Tangible Assets.    A portion of the Mexico Acquired Assets, consisting of  material handling equipment, computer equipment,  office furniture and other items of de minimis value (the "*Shared Property*"), are shared between the Business, on the one hand, and the other businesses of Mexico Seller and its Affiliates, on the other hand.  Notwithstanding Sections 1.1 to 1.4, inclusive, the Parties will reasonably cooperate in good faith to allocate ownership of the Shared Property (or interests therein, to the extent the same are not owned outright by Mexico Seller) between the Business and the other businesses of Mexico Seller and its Affiliates and only such Shared Property designated to remain with the Business shall be deemed Mexico Acquired Assets, which allocation of such Shared Property shall be completed and mutually agreed between Mexico Seller and Mexico Buyer by no later than twenty-four (24) months following the Closing.

1.10     Schedule 9.4 Adjustment.    The Parties shall reduce the Purchase Price by the amount of incremental Mexico value added tax charged to or borne by Buyers as a result of any change to Schedules 9.4(a)(i) and (ii) after the date hereof pursuant to a request initiated by Sellers; provided that in no event shall the amount allocated to the Mexico Acquired Assets exceed Nine Million Dollars ($9,000,000).

## ARTICLE 2

## CONSIDERATION

2.1     Consideration.    In consideration for the purchase of the Acquired Assets and the assumption of the Assumed Liabilities, Buyers shall pay at the Closing an amount in cash equal to the Purchase Price, *minus* (i) the Deposit, *minus* (ii) any and all Cure Amounts that exceed $200,000 in the aggregate up to, and including $400,000, *minus* (iii) any amounts pursuant to Sections 1.7(f)(i) and (ii), *minus* (iv) any amount pursuant to Section 1.6(a), if applicable, *minus* (v) any amount pursuant to Section 1.10, if applicable, *plus* (vi) the amount equal to the portion of Acquired Assets set forth in Section 1.1(l) that exceeds $224,777.24, calculated as of the Closing, if any, *minus* (vii) the amount equal to the Acquired Assets set forth in Section 1.1(l) that is less than $224,777.24, calculated as of the Closing, if any (the "*Closing Purchase Price*"). The Closing Purchase Price will be paid by a wire transfer of immediately available funds to an account or accounts (including accounts owned by third parties, if so designated by Sellers) designated by Sellers.

2.2     Purchase Price Adjustment.

(a)     As promptly as practicable, but in no event later than twenty-five (25) Business Days following the Closing Date, Buyers shall, at their expense, (i) cause to be prepared a written statement (the "*Closing Inventory Statement*"), which shall (A) set forth the Closing Inventory and (B) be prepared using the specifications, inventory policies and valuation methods set forth on Schedule 2.2(a), and (ii) deliver to Sellers the Closing Inventory Statement,

10

together with a certificate of Buyers confirming that the Closing Inventory Statement was prepared in accordance with this Section 2.2(a).

(b)      Buyers and Sellers shall, and shall cause their respective Affiliates and representatives to, cooperate and assist in the preparation of the Closing Inventory Statement and the calculation of the Closing Inventory, and in the conduct of the review referred to in this Section 2.2. Without limiting the foregoing, from and after the Closing until the end of the Review Period (as defined herein), Buyers shall provide Sellers and Sellers shall provide Buyers with reasonable access to the books, records and employees of each such other respective party upon reasonable notice and during regular business hours, or provide such other party with true and complete copies of the requested documents, for the purposes of enabling Buyers to calculate, and for Sellers to review Buyers' calculation of, the Closing Inventory, and to review Buyers' preparation of the Closing Inventory Statement.

(c)      If Sellers dispute the preparation of the Closing Inventory Statement, the determination of any item shown thereon, or the omission of any item therefrom, or the calculation of the Closing Inventory, then Sellers shall deliver a written notice disagreeing with the preparation of the Closing Inventory Statement and/or the calculation of the Closing Inventory and setting forth Sellers' disagreement with respect thereto (a "***Dispute Notice***") to Buyers at any time during the thirty (30) day period commencing upon receipt by Sellers of the Closing Inventory Statement and the related certificate from Buyers, all as prepared by Buyers in accordance with the requirements of Section 2.2(a) (the "***Review Period***"). The Dispute Notice shall set forth the basis for the dispute of any related calculation, to the extent applicable, in reasonable detail.

(d)      If Sellers do not deliver a Dispute Notice to Buyers prior to the expiration of the Review Period, the Closing Inventory Statement, as delivered by Buyers and Buyers' calculation of the Closing Inventory set forth in the Closing Date Statement, shall be deemed final and binding on Sellers and Buyers for all purposes, except to the extent otherwise agreed in writing by Sellers and Buyers.

(e)      If Sellers deliver a Dispute Notice to Buyers prior to the expiration of the Review Period, then Sellers and Buyers shall use commercially reasonable efforts to reach agreement on the disputed matter. If Sellers and Buyers are unable to reach agreement on such disputed matter within thirty (30) days after the end of the delivery of the Dispute Notice, Sellers and Buyers shall refer such dispute to Grant Thornton LLP, or in the event of a conflict of interest, a "Big Four" accounting firm which has no such conflict (the "***Accountant***") for resolution, and (A) each of Buyers and Sellers shall have a reasonable opportunity to meet with the Accountant to provide its views to the Accountant as to any disputed issues with respect to such disputed matter, (B) the Accountant shall determine the final Closing Inventory Statement, in accordance with the terms of this Agreement within thirty (30) days of such referral, and upon reaching such determination shall deliver a copy of the final Closing Inventory Statement and its calculations of the Closing Inventory (the "***Final Calculations***") to Buyers and Sellers, and (C) the Final Calculations shall be final and binding on Sellers and Buyers for all purposes of this Agreement. In preparing the final Closing Inventory Statement and calculating the Closing Inventory, (x) the Accountant, acting as an expert and not an arbiter shall be limited to addressing any particular disputes referred to in the Dispute Notice and (y) any such calculation of the Closing Inventory shall, with respect to any disputed item, be no greater than the higher amount calculated by Sellers or Buyers, and no less than the lower amount calculated by Sellers

11

or Buyers, as the case may be. The Final Calculations shall reflect in detail the differences, if any, between the Closing Inventory reflected therein and the Closing Inventory set forth in the Closing Date Statement. The Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed portions of the Closing Inventory and the Closing Inventory Statement as originally submitted to the Accountant. For example, should the disputed portions total in amount to $1,000 and the Accountant awards $600 in favor of Sellers' position, 60% of the costs of its review would be borne by Buyers and 40% of the costs would be borne by Sellers.

(f)     (i) If the Closing Inventory, as finally determined in accordance with Section 2.2(e), is greater than the Target Inventory Amount, then Buyers shall pay (or cause to be paid) to Sellers, an amount, if a positive number, equal to the Closing Inventory *minus* the Target Inventory Amount *minus* the Collar Amount, and (ii) if the Target Inventory Amount is greater than the Closing Inventory, as finally determined in accordance with Section 2.2(e), then Sellers shall pay (or cause to be paid) to Buyers an amount equal to the difference between the Target Inventory Amount and the Closing Inventory.

(g)     Any amounts payable pursuant to Sections 1.6(a) (to the extent not already paid pursuant to Section 2.1) and/or 2.2(f) shall be paid in cash by Escrow Agent within two (2) Business Days following the final determination of the Closing Inventory (the "*Adjusted Payment Date*") by wire transfer of immediately available funds to an account or accounts designated by Sellers or Buyers, as applicable. Any amounts payable pursuant to Sections 1.6 (to the extent not already paid pursuant to Section 2.1) and/or 2.2(f) shall be treated as adjustments to the Purchase Price for all Tax purposes, unless otherwise required by applicable law.

2.3     Deposit.     On the date hereof, Sellers and Buyers shall enter into an escrow agreement substantially in the form of Exhibit A (the "*Escrow Agreement*"), with JP Morgan Chase as escrow agent (the "*Escrow Agent*"), and Buyers shall deposit into escrow with the Escrow Agent an amount equal to Two Million and Five Hundred and Seven Thousand and Five Hundred Dollars ($2,507,500) (the "*Deposit*") by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement. The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of Sellers or Buyers. The Deposit shall not be refunded to Buyers in the event of termination of this Agreement pursuant to Sections 11.2(d)(i) or 11.2(d)(v). If this Agreement is terminated for any reason other than pursuant to Sections 11.2(d)(i) or 11.2(d)(v), Buyers shall instruct the Escrow Agent, and the Escrow Agent shall, within two (2) Business Days after such instruction, return to Buyers the Deposit by wire transfer of immediately available funds. A portion of the Deposit in the amount of One Million and Six Hundred and Fifty-Seven Thousand and Five Hundred Dollars ($1,657,500), as adjusted, if applicable, pursuant to Section 6.23, *plus* the amount equal to the Acquired Assets set forth in Section 1.1(m), calculated as of the Closing (the "*Released Deposit Funds*"), shall be released to Sellers in accordance with the Escrow Agreement and credited and applied toward payment of the Purchase Price at the Closing. Upon any termination of this Agreement pursuant to Section 11.2(d)(i) or 11.2(d)(v), the Deposit shall be delivered to an account or accounts designated by Sellers by wire transfer of immediately available funds as payment of a portion of the Purchase Price. In the event that the Closing occurs, the balance of the Deposit in excess of the Released Deposit Funds (the "*Retained Deposit*") shall become payable to Sellers only in the event of the first to occur of (A) the Adjusted Payment Date or (B)

12

two (2) Business Days following the Parties' determination (which determination the Parties shall make in a reasonable manner) that no further amounts are required to be paid by Sellers as an adjustment to the Closing Purchase Price pursuant to Sections 1.6(a) (to the extent not already paid pursuant to Section 2.1) and/or 2.2(f), such that the Retained Deposit (or the balance thereof that has not theretofore been disbursed to Buyer in accordance with the terms and provisions of the Escrow Agreement) shall be delivered to an account or accounts designated by Sellers by wire transfer of immediately available funds as payment of a portion of the Purchase Price. Notwithstanding the above, in the event that Sellers become obligated to pay an amount to Buyers pursuant to Sections 1.6(a) (to the extent not already paid pursuant to Section 2.1) and/or 2.2(f), Buyers' sole and exclusive recourse for payment of such amount shall be the Retained Deposit. The Escrow Agent's escrow fees and charges shall be paid by Sellers and Buyers in equal parts. For purposes of this Section 2.3 and the Escrow Agreement, US Seller will act as representative for Sellers' interests pursuant to the Escrow Agreement and US Buyer will act as representative for Buyers' interests pursuant to the Escrow Agreement. Any portion of the Deposit paid by US Buyer in respect of any of the Mexico Acquired Assets will be paid by US Buyer on behalf of Mexico Buyer. Any portion of the Deposit received by US Seller in respect of any of the Mexico Acquired Assets will be received by US Seller on behalf of and for the account of Mexico Seller.

2.4    Withholding Rights.  Notwithstanding anything in this Agreement to the contrary, each Buyer and the Escrow Agent shall be entitled to deduct and withhold from the consideration otherwise payable to Sellers pursuant to this Agreement such Taxes as it is required to deduct and withhold with respect to the making of such payment under the Code or any other applicable provision of U.S. or foreign tax Law. To the extent that amounts are so deducted and withheld by Buyers or the Escrow Agent, as the case may be, such deducted and withheld amounts (i) shall be remitted by Buyers or the Escrow Agent, as applicable, to the applicable Government authority and (ii) shall be treated for all purposes of this Agreement as having been paid to Sellers in respect of whom such deduction and withholding was made by Buyers or the Escrow Agent, as the case may be.

## ARTICLE 3

## CLOSING AND DELIVERIES

3.1    Closing.   The consummation of the transactions contemplated hereby (the "*Closing*") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York 10036, on or before the second Business Day following the satisfaction or waiver by the appropriate Party or Parties of all the conditions contained in Article 10 (other than those to be satisfied at the Closing) or on such other date or at such other place and time as may be mutually agreed to by the Parties in writing (the date on which the Closing occurs, hereinafter, the "*Closing Date*"). Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title, and interest of Sellers to be acquired by Buyers hereunder shall be considered to have passed to Buyers as of 12:01 a.m. (prevailing eastern time) on the Closing Date.

3.2    Sellers' Deliveries.  The sale, transfer, assignment, and delivery by Sellers of the Acquired Assets to Buyers, as herein provided, shall be effected on the Closing Date. At the

13

Closing, Sellers (and in the case of subsections (j) and (k) in this Section 3.2, the appropriate Parties) will deliver or cause to be delivered:

(a)    to US Buyer, a duly executed assignment and assumption agreement (and other similar customary transfer instruments) in form and substance as agreed upon within three (3) Business Days following the date hereof (the "*US Assignment and Assumption Agreement and Bill of Sale*");

(b)    to Mexico Buyer, a duly executed Assignment and Assumption Agreement (and other similar customary transfer instruments) in form and substance as agreed upon within three (3) Business Days following the date hereof (the "*Mexico Assignment and Assumption Agreement*");

(c)    to US Buyer, a certificate of non-foreign status for US Seller (a "*FIRPTA Certificate*") in the form and manner that complies with the requirements of section 1445 of the Code and Treasury Regulation section 1.1445-2(b) and as set forth on Exhibit B. Notwithstanding anything to the contrary contained herein, if US Seller fails to provide a FIRPTA Certificate, US Buyer shall be entitled to proceed with the Closing and shall be entitled to withhold the requisite amounts in accordance with Section 1445 of the Code;

(d)    to Mexico Buyer, a certificate in the form set forth on Exhibit C for Mexico Seller. Notwithstanding anything to the contrary contained herein, if Mexico Seller fails to provide this certificate, Mexico Buyer shall be entitled to proceed with the Closing and shall be entitled to withhold the requisite amounts in accordance with Section 1445 of the Code;

(e)    to the applicable Buyer, a duly executed Intellectual Property Assignment Agreement in form and substance as agreed upon within three (3) Business Days following the date hereof (the "*Intellectual Property Assignment Agreement*");

(f)    to US Buyer, duly executed assignment and assumption agreements with respect to the Real Estate Leases in the U.S. being assigned hereunder in form and substance as agreed upon within three (3) Business Days following the date hereof (the "*US Assignment and Assumption of Leases and Related Agreements*");

(g)    to Buyers, a certified copy of the US Sale Order;

(h)    to Buyers, a duly executed Transition Services Agreement in connection with services provided at the Vassar, Michigan plant and such other U.S. based services as may be required in connection with the transition of the Business to Buyers, the material terms of which are attached hereto as Exhibit D (the "*US Transition Services Agreement*");

(i)    to Buyers, a duly executed Transition Services Agreement in connection with services provided at the San Luis Potosi, Mexico plant and such other Mexico based services as may be required in connection with the transition of the Business to Buyers, the material terms of which are attached hereto as Exhibit D (the "*Mexico Transition Services Agreement*");

(j)    to Buyers, a duly executed Access Agreement (as defined below);

(k)    to Mexico Buyer, the Mexico formal invoices (*facturas*) issued by Mexico Seller as owner of the Mexico Acquired Assets, in compliance with applicable Mexico tax Law and consistent with the Mexico Allocation Statement pursuant to Section 9.4(c) hereof;

(l)      to Buyers, certificates dated as of the Closing Date and signed by an executive officer of each Seller certifying the matters set forth in Sections 10.2(a) and 10.2(b) of this Agreement; and

(m)      all other documents, instruments or writings of conveyance and transfer, in form and substance reasonably acceptable to the applicable Buyer, as may be necessary or desirable to convey the Acquired Assets to such Buyer, such documents to be identified and provided by such Buyer to Sellers in a form acceptable to such Buyer three (3) Business Days before the Closing Date.

3.3      Buyers' Deliveries.  At the Closing Date, in consideration for the Acquired Assets, Buyers shall pay, deliver, or cause to be delivered:

(a)      to US Seller, from US Buyer, the portion of the Closing Purchase Price in accordance with Section 2.1 related to the US Acquired Assets as set forth on Schedule 3.3(a) hereto, and from Escrow Agent the Released Deposit Funds, in each case by wire transfer of immediately available funds to a bank account(s) designated by Sellers in writing to Buyers prior to the Closing Date;

(b)      to Mexico Seller, from Mexico Buyer, the portion of the Closing Purchase Price in accordance with Section 2.1 related to the Mexico Acquired Assets as set forth on Schedule 3.3(b) hereto, by wire transfer of immediately available funds to a bank account(s) designated by Sellers in writing to Buyers prior to the Closing Date;

(c)      to the applicable Seller, a duly executed US Assignment and Assumption Agreement and Bill of Sale;

(d)      to the applicable Seller, a duly executed Intellectual Property Assignment Agreement;

(e)      to the applicable Seller, duly executed US Assignment and Assumption of Leases and Related Agreements;

(f)      to the applicable Seller and other appropriate Parties, a duly executed US Transition Services Agreement;

(g)      to the applicable Seller and other appropriate Parties, a duly executed Mexico Transition Services Agreement;

(h)      to US Seller, a duly executed Access Agreement; and

(i)      to Sellers, certificates dated as of the Closing Date and signed by an executive officer of each Buyer, certifying the matters set forth in Sections 10.1(a) and 10.1(b) of this Agreement.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, each as to the portion of the Acquired Assets owned or held by them only, hereby represent and warrant to Buyers as follows:

4.1      Organization.  Each of Sellers is duly organized or formed and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation.  Each

15

of Sellers has all requisite corporate (or equivalent) power and authority to own, lease and operate its properties, to carry on its business as now conducted (including the Business), to own, lease and operate its properties, and to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be party. Each of Sellers is qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which the conduct of its Business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized, or in good standing is the result of the filing of US Seller's Bankruptcy Case.

4.2     Authorization and Validity. Subject to Bankruptcy Court approval with respect to US Seller, each of Sellers has all requisite corporate (or equivalent) power and authority to enter into this Agreement and any Ancillary Agreement to which it is or will be a party and to carry out its obligations hereunder and thereunder. Subject to Bankruptcy Court approval with respect to US Seller, the execution and delivery of this Agreement and the Ancillary Agreements, and the performance by each of Sellers of their respective obligations hereunder and thereunder, have been duly authorized by all necessary corporate (or equivalent) action on behalf of each of Sellers, and no other proceedings on the part of each of Sellers are necessary to authorize such execution, delivery, and performance. This Agreement has been, and the Ancillary Agreements when delivered will be, duly executed by each of Sellers and, subject to Bankruptcy Court approval with respect to US Seller, constitute the valid and binding obligation, enforceable against each of Sellers in accordance with the terms herein and therein (subject to bankruptcy, insolvency, reorganization, and other laws of general applicability relating to or effecting creditors' rights and to general principles of equity, including principles of commercial reasonableness and good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity)).

4.3     No Conflict. Except as disclosed on Schedule 4.3, the execution and delivery by each of Sellers of this Agreement and each Ancillary Agreement to which each is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by each of Sellers with any of the provisions hereof do not conflict with, or result in any violation of or default or breach (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of each of Sellers; (ii) subject to Bankruptcy Court approval with respect to US Seller, any Contract, the Real Estate Leases or Permits to which any of Sellers is a party or by which any of the properties or assets of any of Sellers is subject; (iii) subject to Bankruptcy Court approval with respect to US Seller, any Order of any Government authority, applicable to such Seller or any of the properties or assets of such Seller as of the date hereof; or (iv) subject to Bankruptcy Court approval with respect to US Seller, any applicable law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, breaches, terminations or cancellations that would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect. No Seller is a party to, or subject to or bound by, any judgment, injunction or decree of any Government authority or agreement which may restrict or interfere with the performance by each of Sellers of this Agreement or Buyers' ability to operate the Business as currently operated.

4.4     Permits, Government Consents and Approvals.

(a)     Schedule 4.4(a) sets forth a true, complete and correct list of all material Permits relating to the Acquired Assets held by each of Sellers as of the date of this Agreement.

16

All such Permits (i) are valid and in full force and effect and no Seller is in default under or in violation of any such Permit, except for such defaults or violations which would not reasonably be expected, individually or in the aggregate, to materially restrict or interfere with Buyers' ability to operate the Business as currently operated and no suspension or cancellation of any such Permits is pending (other than pursuant to its terms) or, to Sellers' Knowledge, threatened and (ii) subject to entry of the US Sale Order, may be transferred or reissued to the appropriate Buyer in accordance with this Agreement and without the approval of any Person (other than the Bankruptcy Court).

(b)    Except as disclosed on Schedule 4.4(b) and subject to entry of the US Sale Order, the execution, delivery, and performance by each of Sellers of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby do not require the Consent of, or filing with, any Government, except for (a) Permits required in connection with the conduct of the Business, and (b) such Consents and filings, the failure to obtain or make which would not have a Material Adverse Effect.

4.5    Law and Legal Proceedings.  Except as disclosed on Schedule 4.5, for matters before the Bankruptcy Court involving Sellers or any of their Affiliates, and (b) for any matters that will otherwise be resolved by the US Sale Order without any Liability applicable to Buyers or the Acquired Assets, there are no Legal Proceedings pending or, to Sellers' Knowledge, threatened in writing against any Seller before any Government authority.

4.6    Environmental Matters.

(a)    Except as disclosed on Schedule 4.6(a), the Leased Real Property, the Business and the Acquired Assets are, as of the Agreement Date, in material compliance with all applicable Environmental Laws, which compliance includes the possession and compliance with the terms of all Permits required for the operation of the Business and Acquired Assets under Environmental Laws (such permits, the "*Environmental Permits*").

(b)    Except as disclosed on Schedule 4.6(b), no Seller has received written notice of any pending or, threatened claim, enforcement action or investigation by any Government authority or any other Person concerning any violation of, or material potential liability under, Environmental Laws in connection with the ownership or operation of the Acquired Assets or the Business.

(c)    Except as disclosed on Schedule 4.6(c), there are no actions, activities, circumstances, facts, conditions, events or incidents, including the presence of any Hazardous Material, which would be reasonably likely to form the basis of any material liability under any Environmental Law with respect to the Acquired Assets or Business.

(d)    Sellers have delivered or otherwise made available for inspection to Buyers true, complete and correct copies and results of any reports, data, investigations, audits, assessments (including Phase I Environmental Site Assessments and Phase II Environmental Site Assessments) studies, analyses, tests or monitoring in the possession of or reasonably available to Sellers pertaining to: (i) any unresolved Liabilities under Environmental Laws with respect to the Business or the Acquired Assets; (ii) any Hazardous Materials in, on, beneath or adjacent to the Leased Real Property; or (iii) compliance with applicable Environmental Laws with respect to the Acquired Assets or Business.

(e)     Neither the execution and delivery of this Agreement nor the consummation of the acquisition contemplated hereunder will result in the suspension, termination, revocation, cancellation, nonrenewal or modification of any Environmental Permit required for the continued operations of the Business or any Acquired Asset, nor give rise to a requirement or obligation under Environmental Laws to notify or make any filing with any Government authority.

4.7     Product Liability; Recalls.  As of the date hereof, no Seller has received written notice relating to, nor, to the Knowledge of Sellers, are there any facts or circumstances that would reasonably be expected to give rise to, any action, suit, demand, claim, hearing, notice of violation relating to or involving any product designed, manufactured, produced, modified, distributed, marketed, shipped or sold by or on behalf of any Seller, resulting from an alleged defect, hazard or impurity, whether in design, manufacture, processing, materials or workmanship, performance, or any failure to warn of the existence of any defect, impurity, or dangerous propensity associated with use of a product, or from any alleged breach of implied or express warranties or representations, or any alleged noncompliance with any applicable Laws in connection with the Business.  There is no pending or, to the Knowledge of Sellers, threatened, product recall or investigation of any product designed, manufactured, produced, modified, distributed, marketed, shipped, sold and/or otherwise introduced into the stream of commerce by or on behalf of any Seller in connection with the Business.

4.8     Product Warranty.  Each Seller has furnished or made available to Buyers complete and correct copies of standard product warranties and conditions of sale for each of the products currently being sold by each Seller (including any applicable guaranty and indemnity provisions) in connection with the Business.  Except for the written warranties furnished or made available to Buyers, or such warranties that are imposed by applicable Law, there are no legally binding warranties (written or oral) granted by any Seller with respect to the products sold, licensed or provided in the Business.

4.9     Inventory.  The Inventory listing of US Seller, as of June 1, 2013 and Mexico Seller as of May 31, 2013, as set out in Appendix A of Schedule 2.2(a) is of good merchantable quality, reasonably in balance, and readily saleable (in the case of finished Inventory held for sale) or currently usable (in the case of raw material and work-in-progress Inventory components) in the Ordinary Course of Business. The  inventory amounts as set out in Appendix A of Schedule 2.2(a) are valued at Sellers' 2013 standard costs in effect as of June 1, 2013 for US Seller and May 31, 2013 for Mexico Seller.  The excluded Inventory listed on Appendix B of Schedule 2.2(a) is obsolete inventory, and Sellers intend to scrap it, subject to confirmation of Buyers, that such Inventory shall be scrapped prior to Closing.  The unaudited balance sheet of US Seller, as of June 1, 2013 and of Mexico Seller, as of May 31, 2013 is set out on Appendix C of Schedule 2.2(a) was extracted from the accounting books and records of the Business, as included in the consolidated financial statements of Parent, without material changes and were prepared in accordance with GAAP, as in effect on the date of the five (5) months ended June 1, 2013 for US Seller and May 31, 2013 for Mexico Seller, including using assumptions, accounting methods, policies, bases, conventions, rules, practices and account categorization consistent with a month or year-end close, and sets forth a reconciliation of the inventory balances per the unaudited balance sheet of US Seller as of June 1, 2013 and Mexico Seller as of May 31, 2013, and inventory listing as of June 1, 2013 for US Seller and May 31, 2013, for

18

Mexican Seller as set out in Appendix A and Appendix B of Schedule 2.2(a). The Inventory amounts as set out in Appendix A of Schedule 2.2(a) do not consist of any items held on consignment. Sellers are not under any obligation or liability with respect to accepting returns of items of Inventory in the possession of their customers other than in the Ordinary Course of Business. Sellers have made available to Buyers a true, correct and complete copy of an Inventory report as of June 1, 2013 for US Seller and May 31, 2013 for Mexico Seller, set out in Appendix A, and shall have delivered at least one (1) day before the Closing Date to Buyers a true, correct and complete copy of an Inventory report for the week ending immediately prior to the Closing Date. Each such Inventory report has been or shall be prepared based upon the books and records of Sellers using assumptions, accounting methods, policies, bases, conventions, rules, practices and account categorization consistent with the gross inventory amounts per the Inventory listing set out in Appendix A to Schedule 2.2(a).

    4.10   Product Returns. Within the past three (3) years, other than those in the Ordinary Course of Business, Sellers have not experienced any material product returns and, to the Knowledge of Sellers, no facts or circumstances exist that would provide a basis for any material product returns with respect to products manufactured or sold prior to the Closing other than those in the Ordinary Course of Business.

    4.11   Labor Relations. Except with respect to US Seller's Vassar, Michigan foundry union and employees:

    (a)   Except as provided on Schedule 4.11(a), no Seller is party to or bound by any collective bargaining agreement or other labor related agreement or arrangement.

    (b)   There are no unfair labor practice charges, work stoppages, slowdowns, strikes, lockouts, grievances, picketings, or other similar activities relating to labor matters pending, or to Sellers' Knowledge, threatened against any Seller.

    (c)   No labor union, labor organization, or group of employees of any Seller has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to Sellers' Knowledge, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority. To Sellers' Knowledge, there are no labor union organizing activities with respect to any employees of any Seller.

    (d)   Except as provided on Schedule 4.11(d), to Sellers' Knowledge, each Seller is in compliance with all applicable laws respecting employment and employment practices, including all laws respecting terms and conditions of employment, wages, hours, equal employment opportunity, employment discrimination, worker classification (including the proper classification of workers as independent contractors and consultants and exempt or non-exempt for overtime pay), immigration, work authorization, occupational health and safety, workers' compensation, the payment of social security and other employment taxes, disability rights or benefits, plant closures and layoffs, affirmative action, labor relations, employee leave issues and unemployment insurance. There are no Legal Proceedings against any Seller pending, or to Sellers' Knowledge, threatened to be brought or filed, by or with any Government authority or arbitrator in connection with the employment of any current or former employee or independent contractor of any Seller.

(e)    Mexico Seller is in compliance with all of its obligations, including any and all payments, under any and all social security and labor Law (including their contribution obligations to the Mexico Social Security Institute ("IMSS") and/or contributions to the National Workers' Housing Fund Institute ("INFONAVIT") and the National Pension Fund System ("SAR")).

(f)    Schedule 4.11(f) contains a true and complete list and description of the following information for each employee of Mexico Seller engaged in the Business on the date hereof, categorized by function: (i) an identification number; (ii) current annual terms of compensation (identifying incentive or bonus compensation separately); (iii) employment status; (iv) years of service; and (v) identity of employer.

4.12    Employee Benefit Plans.

(a)    Schedule 4.12(a) contains (i) a true and complete list of each Business Benefit Plan and (ii) a true and complete list of each employee of Sellers and their respective subsidiaries who is engaged in the Business, and for each such employee includes (1) location of employment, (2) base salary or hourly base wage, (3) incentive compensation opportunity and (4) date of hire.  Sellers will, subject to the provisions of Section 6.2, update Schedule 4.12(a) as necessary to reflect any changes made after the date hereof and prior to the Closing Date.

(b)    Neither Seller nor any ERISA Affiliate has or could become subject to any Liability under Title I or Title IV of ERISA that could become a Liability of Buyers of their respective Affiliates.

(c)    To each Seller's Knowledge, except as set forth on Schedule 4.12(c), neither Seller nor any ERISA Affiliate is a party to any written agreement with the IRS or the Department of Labor.

(d)    Each Business Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is the subject of a favorable determination or opinion letter from the IRS as to its qualification and, to Sellers' Knowledge, no event has occurred that could reasonably be expected to result in disqualification of such Business Benefit Plan.

(e)    Except as provided on Schedule 4.12(e), each Business Benefit Plan has been operated and administered in all material respects in accordance with its terms and all applicable laws, including ERISA and the Code.  Except as provided on Schedule 4.12(e), there are no pending or, to Sellers' Knowledge, threatened claims by, on behalf of or against any Business Benefit Plan (other than routine claims for benefits).

(f)    Except as provided on Schedule 4.12(f), the consummation of the transactions contemplated by this Agreement, whether alone or together with any other event, will not (i) entitle any Transferred Employee or Mexico Seller Personnel to severance pay, unemployment compensation or any other payment or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any Transferred Employee or Mexico Seller Personnel.

(g)    No Business Benefit Plan provides benefits, including death or medical benefits (whether or not insured), with respect to any employee of Sellers or their respective subsidiaries engaged in the Business beyond their retirement or other termination of service, other than (i) coverage mandated solely by applicable Law, (ii) death benefits or retirement

20

benefits under any "employee pension benefit plan" (as defined in Section 3(2) of ERISA), (iii) deferred compensation benefits accrued as liabilities on the books of any Seller, or (iv) benefits the full costs of which are borne by the current or former employee or his or her beneficiary.

(h)    With respect to each Business Benefit Plan established or maintained outside of the United States of America primarily for benefit of current or former employees of Sellers or any of their respective subsidiaries residing outside the United States of America (a "*Foreign Benefit Plan*"): (i) all employer and employee contributions to each Foreign Benefit Plan required by law or by the terms of such Foreign Benefit Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Benefit Plan, the liability of each insurer for any Foreign Benefit Plan funded through insurance or the book reserve established for any Foreign Benefit Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Foreign Benefit Plan and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; and (iii) each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

4.13    Material Contracts.

(a)    Schedule 4.13 sets forth, as of the Agreement Date, a true, correct and complete list of the following Contracts to which any of Sellers is a party in connection with the Business, but as to Mexico Seller, only such Contracts as relate primarily to the Business (collectively with the Real Estate Leases that are Assigned Contracts, the "*Material Contracts*").

(i)    Contracts with any Affiliate or current or former officer or director of any Seller;

(ii)    Contracts relating to the acquisition by any of Sellers of any operating business or the capital stock of any other Person (other than any of Sellers);

(iii)    Contracts containing a covenant that restricts any of Sellers from engaging in any line of business, conducting the Business in any geographic area, or competing with any Person;

(iv)    Contracts which are capital leases as determined pursuant to GAAP and involve annual payments by any of Sellers in excess of $25,000;

(v)    Contracts relating to a joint venture of the Business or any of Sellers;

(vi)    Contracts with customers (other than Contracts under which all work to be provided by Sellers has been completed) requiring the receipt by any of Sellers of an amount in excess of $50,000;

(vii)    Contracts with suppliers requiring the payment by any of Sellers of an annual amount in excess of $50,000;

(viii)    Contracts for the employment of any individual on a full-time, part-time or consulting or other basis providing annual, or other compensation, severance or bonus arrangements providing for annual payments in excess of $25,000;

21

(ix)    Any Contract to lease personal property which has future liability in excess of $15,000 per annum;

(x)    Any Contract or group of related Contracts, other than purchase orders entered into in the Ordinary Course of Business, which involve commitments to make capital expenditures or which provide for the purchase of goods or services by any Sellers from any one Person under which the undelivered balance of such goods or services has a purchase price in excess of $15,000;

(xi)    Any non-competition agreement with any employee, officer, consultant or management advisor of the Business;

(xii)    Any material nondisclosure, confidentiality or standstill arrangement with any Person;

(xiii)    Any Contract regarding any special pricing arrangement;

(xiv)    Any Contract providing for the sale, transfer or other disposition of any material asset or other property owned, leased or held for use by any Seller or its Affiliates and utilized primarily in the Business, that but for such Contract, would constitute an Acquired Asset pursuant to this Agreement; and

(xv)    Any Contract entered into within the last twelve (12) months, not in the Ordinary Course of Business, in the nature of a settlement or a conciliation agreement arising out of any claim or series of claims asserted by any Person (including any Government) providing for aggregate payments in excess of $15,000.

(b)    Sellers have made available to Buyers a true, correct and complete copy of each Contract listed on Schedule 4.13 as amended to date. To Sellers' Knowledge, each of the Material Contracts is, as of the Agreement Date, in full force and effect and, as of the Agreement Date, is the valid and binding obligation of such applicable Seller, enforceable against it in accordance with its terms in all material respects (subject to payment of any applicable Cure Amounts), subject to applicable bankruptcy, insolvency, reorganization, moratorium, and similar Laws now or hereafter in effect affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). No Affiliate of Sellers is party to any Assigned Contract or Mexico Assigned Contract.

4.14    Intellectual Property.

(a)    Schedule 4.14 sets forth a correct and complete list of all (i) issued Patents and Patent applications, (ii) Trademark registrations and applications and material unregistered Trademarks, (iii) Copyright registrations and applications and material unregistered Copyrights, and (iv) material Software, in each case, which is owned by a Seller and is used or held for use in the conduct of the Business. Sellers are the sole and exclusive beneficial and, with respect to applications and registrations, record owner of all of the Intellectual Property Rights set forth in Schedule 4.14, and all such Intellectual Property Rights are subsisting, valid and enforceable. Except as set forth in Schedule 4.14, there is no action that must be taken within four (4) months from the date of this Agreement, including the payment of fees or the filing of documents, for the purposes of obtaining, maintaining, perfecting or renewing any rights in such registered or applied for Intellectual Property Rights.

(b)    As of the Agreement Date, (i) to Sellers' Knowledge, there are no infringements, misappropriations or other violations by any third party of any of the Intellectual Property Rights owned or purported to be owned by each of Sellers (collectively, the "*Seller Intellectual Property*") and (ii) neither the use of Seller Intellectual Property nor the conduct of the Business infringes, misappropriates or otherwise violates the Intellectual Property Rights of any third party.

(c)    No Seller has granted any license of any kind relating to any Seller Intellectual Property or the marketing or distribution thereof.  No Seller is bound by or a party to any license or agreement of any kind relating to the Intellectual Property Rights of any other Person for the use of such Intellectual Property Rights in the conduct of the Business, except as set forth in Schedule 4.14 and except for generally commercially available Software.

(d)    As of the Agreement Date, there is no pending Action to which any Seller is a party claiming that any Seller has, in the conduct of the Business, infringed, misappropriated or otherwise violated any Intellectual Property Rights of a third party.  To Sellers' Knowledge, there is no valid basis for a claim of infringement, misappropriation or other violation of any third party's Intellectual Property Rights against Sellers in the conduct of the Business.

(e)    There has been no claim asserted or, to Sellers' Knowledge, threatened challenging the scope, validity or enforceability of any applications or registrations for Patents or Trademarks owned by Sellers and used or held for use in the conduct of the Business, and to Sellers' Knowledge, there is no valid basis for such a claim.

(f)    Each Seller takes reasonable measures to protect the confidentiality of material Trade Secrets used or held for use in the conduct of the Business, including requiring all Persons having access thereto to execute written non-disclosure agreements.

(g)    The Intellectual Property Rights owned by or licensed to Sellers and used or held for use in the operation or conduct of the Business are sufficient to conduct the Business in the same manner as the Business has been conducted prior to the date hereof, and after giving effect to the transactions contemplated by this Agreement, Buyers will own or be licensed to use all Intellectual Property Rights used or held for use in the operation or conduct of the Business in the same manner as the Business has been conducted prior to the date hereof.  The Intellectual Property Rights included in the Acquired Assets constitute all Intellectual Property Rights owned, used, or held for use in the conduct of the Business.  Sellers own, or have a valid right to use, free and clear of all Liens (other than Permitted Liens), all Intellectual Property Rights used or held for use in the conduct of the Business.

4.15    Title to Assets.  Except as set forth on Schedule 4.15, each Seller has good and valid title to and interest in (as applicable) all of its personal property which constitute Acquired Assets, in each case free and clear of Liens, except Permitted Liens.  In addition:

(a)    Subject to the entry of the US Sale Order, US Buyer will be vested with good title to the US Acquired Assets, free and clear of all Liens, Claims, interests and encumbrances, other than Assumed Liabilities.  Subject to the entry of the US Sale Order, US Seller will have all requisite authority to transfer good and valid title to or leasehold interest in all of the US Acquired Assets free and clear of all Liens, Claims, interests, and encumbrances including Permitted Liens.

23

(b)    Mexico Buyer will be vested with good title to the Mexico Acquired Assets, free and clear of all Liens, Claims, interests and encumbrances, other than Assumed Liabilities. Mexico Seller will have all requisite authority to transfer good and valid title to or leasehold interest in all of the Mexico Acquired Assets free and clear of all Liens, Claims, interests, and encumbrances including Permitted Liens.

4.16    Real Property. Schedules 13.1(c) and 13.1(d) set forth a complete list of all leases of real property leased by Sellers and used or held for use in the Business. Sellers have provided Buyers with, or access to, true, correct, accurate and complete copies of all leases and other instruments and agreements (together with all amendments, modifications, supplements, and restatements thereto, if any) in each Seller's possession pertaining to the Real Estate Leases. Such Real Estate Leases have not been amended, modified, restated or otherwise supplemented. With respect to each of the aforementioned Real Estate Leases: (i) except as results from the pendency of the Bankruptcy Case, Sellers have a valid and subsisting leasehold estate in and the right to quiet enjoyment of such Leased Real Property for the full term of such Real Estate Lease, and such Real Estate Lease is legal, valid, binding and enforceable against the applicable Seller and in full force and effect; (ii) except as results from the pendency of the Bankruptcy Case, there are no disputes and Sellers have not received written notice of any default thereunder (or condition or event, which, after notice or a lapse of time or both, would constitute a default thereunder); (iii) no security deposit or portion thereof deposited with respect to such Real Estate Lease has been applied in respect of a breach or default under such Real Estate Lease which has not been redeposited in full; (iv) Sellers do not owe, nor will they in the future owe, any brokerage commissions or finder's fees with respect to such Real Estate Lease; (v) except as set forth on Schedule 4.16, the other party to such Real Estate Lease is not an Affiliate of, and otherwise does not have any economic interest in, Sellers; (vi) no Seller and, to the Knowledge of Sellers, no other party to such Real Estate Lease has assigned the same or sublet any part of the premises covered thereby or exercised any option or right thereunder; (vii) no material penalties are accrued or unpaid under any Real Estate Lease; (viii) except as set forth on Schedule 4.16, no consent of landlord or any third party under such Real Estate Lease is necessary with respect to Buyers' acquisition of the Acquired Assets, nor will such Real Estate Lease be terminable or in default as a result of the consummation of the transactions contemplated thereby; (ix) no Seller has given any notice to any landlord indicating that it will not be exercising any extension or renewal options; and (x) Sellers have non-disturbance agreements with their respective landlord's lender.

4.17    No Brokers or Finders. Except as relates to Sellers' retention and engagement of Huron Consulting Group or as set forth on Schedule 4.17, no agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Sellers in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

4.18    Taxes.

(a)    (i) All income and other Tax Returns relating to the Acquired Assets and the Business that are required to be filed have been timely filed, and all such Tax Returns were true, correct and complete in all material respects, and (ii) except as set forth on Schedule 4.18(a)(ii) and subject to any obligation of Sellers under the Bankruptcy Code, all Taxes relating

24

to the Business or the Acquired Assets have been paid or adequate provision in accordance with GAAP for the payment of all Taxes required to be paid has been made;

(b)    All material Taxes relating to the Business or the Acquired Assets required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or third party have been so withheld and paid to the appropriate Government authority;

(c)    There is no action, suit, claim, assessment, or audit, pending, proposed in writing, or, to Sellers' Knowledge, threatened with respect to Taxes relating to the Business or the Acquired Assets.  No governmental authority has made a claim in writing that the Business and/or the Acquired Assets may be subject to Tax in a jurisdiction where Tax Returns relating to the Acquired Assets or the Business are not currently filed;

(d)    There are no Liens for Taxes upon the Acquired Assets other than Permitted Liens;

(e)    No property relating to the Business or the Acquired Assets of any US Seller is "tax-exempt use property" within the meaning of Section 168(h) or property that US Buyers will be required to treat as being owned by another Person pursuant to Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986;

(f)    No waiver, extension, or comparable consent regarding the application of the statute of limitations with respect to any Taxes or Tax Return relating to the Business or the Acquired Assets is outstanding, nor is any request for any such waiver or consent pending;

(g)    US Seller (or, in the event that US Seller is a disregarded entity for US federal income tax purposes, the owner of such US Seller) is not a "foreign person" as defined by Section 1445 of the Code; and

(h)    Mexico Seller is not a transferor of a "United States real property interest" (as defined in Section 897(c) of the Code).

4.19    No Other Representations or Warranties; Disclosure Schedules.  Except for the representations and warranties contained in this Article 4 (as modified or supplemented by the Disclosure Schedules) (which may be relied upon by Buyers), neither Sellers nor any other Person makes any express or implied representation or warranty with respect to Sellers, the Business, the Acquired Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Sellers hereby disclaim any other representations or warranties, whether made by Sellers, any Affiliate of Sellers or any of their respective officers, directors, managers, employees, attorneys, investment bankers, accountants, trustees, or other agents or representatives.  Except for the representations and warranties contained in this Article 4 (as modified or supplemented by the Disclosure Schedules), Sellers hereby expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or express warranty of merchantability or fitness for a particular purpose).  Sellers have not made, do not make, and have not authorized anyone else to make any representations or warranties to Buyers

25

regarding the probable success or profitability of the Business.  Except for the representations and warranties contained in this Article 4 (in each case as modified by the Disclosure Schedules hereto), Sellers have not made, do not make, and have not authorized anyone else to make any representations or warranties to Buyers regarding the accuracy, reliability or completeness of any of the Review Documents.  In connection with investigation by Buyers, Buyers have received or may receive from Sellers certain projections, forward-looking statements and other forecasts and certain business plan information.  Buyers acknowledge that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyers are familiar with such uncertainties, that Buyers are taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyers shall have no claim against anyone with respect thereto.  Accordingly, Buyers acknowledge that Sellers have not made, do not make, and have not authorized anyone else to make any representations or warranties with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

4.20    Customers and Suppliers.  Schedule 4.20 sets forth a true, complete and correct list of the Business' ten (10) largest customers by product volume and ten (10) largest suppliers by volume of purchases for the period beginning January 1, 2013 and ending June 1, 2013.  Schedule 4.20 contains true and complete copies of the Business' current standard purchase order form and standard supply order form.

4.21    Board Approval and Recommendation.    The board of directors, board of managers or applicable governing body of each US Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of Alternative Transactions, a sale, assignment and assumption of the US Acquired Assets, including the Assigned Contracts, pursuant to this Agreement under Sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of each such Seller.

4.22    Assets Necessary to Business.  The Acquired Assets constitute all of the assets, (real or personal) properties, licenses, in each case, used, or held for use, in, and Contracts related to, the Business (other than Excluded Assets), and, along with the assets utilized by Sellers to provide the services to Buyers contemplated by the Mexico Transition Services Agreement and US Transition Services Agreement include all assets, properties, licenses and Contracts necessary to conduct the Business in substantially the same manner as the Business has been conducted prior to the date hereof since January 17, 2013 , subject to ordinary wear and tear.  None of the Excluded Assets are necessary, individually or in the aggregate, to conduct the Business in substantially the same manner as the Business has been conducted since January 17, 2013.

4.23    Compliance with Law.  Except as provided on Schedule 4.23 hereto, Sellers have in all material respects complied, and are in material compliance, with all applicable Laws relating to the operation of the Business and the Acquired Assets.

4.24    Absence of Changes or Events.  Except as set forth on Schedule 4.24 hereto, since January 17, 2013, no Seller has taken any action which, if taken after the execution and delivery of this Agreement, would constitute a breach of Section 6.2(b), (c), (f), (g), (h), (i)(iv), (i)(v),

(i)(vi), (i)(vii), (i)(ix), (i)(xiii), (i)(xiv), (i)(xv), or (i)(xx) (or has authorized or proposed or entered into any agreement for taking any such action).

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF BUYERS

Buyers hereby represent and warrant to Sellers as of the date hereof as follows:

5.1   Company Organization.  Each Buyer is duly organized or formed and validly existing and in good standing under the Laws of the jurisdiction of its incorporation or formation. Each Buyer has all requisite corporate power and authority to own, lease, and operate its properties, to carry on its business as now conducted, and to perform its obligations hereunder and under any Ancillary Agreement to which it is or will be party and to perform the Business after the Closing.  Each Buyer is in good standing under the laws of its jurisdiction of formation and each other jurisdiction in which the conduct of its businesses or the ownership of its properties requires such qualification or authorization, except where failure to be so qualified would not materially delay or impair the ability of each Buyer to perform its obligations under this Agreement or any of the Ancillary Agreements.

5.2   Authorization and Validity.  Each Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which it is a party and to carry out its obligations hereunder and thereunder.   The execution and delivery of this Agreement and the Ancillary Agreements and the performance of each Buyer's obligations hereunder and thereunder have been duly authorized by all necessary corporate action on behalf of such Buyer, and no other proceedings on the part of such Buyer are necessary to authorize such execution, delivery, and performance. This Agreement and the Ancillary Agreements have been duly executed by each Buyer and constitute its valid and binding obligation, enforceable against it in accordance with the terms herein and therein (subject to bankruptcy, insolvency, reorganization, and other laws of general applicability relating to or effecting creditors' rights and to general principles of equity).

5.3   Consents, Approvals, and Notifications.   The execution, delivery, and performance of this Agreement and the Ancillary Agreements by each Buyer do not require the Consent of, or filing with or notification of, any Government or any other Person, the failure of which to obtain, file, or notify would materially delay or impair the ability of such Buyer to perform its obligations under this Agreement.

5.4   Financial Ability.  On the Agreement Date and the Closing Date, Buyers have and will have, sufficient funds available to consummate the transactions contemplated by this Agreement and to provide adequate assurance of future performance by Buyers under this Agreement, the Mexico Assigned Contracts and the Assigned Contracts.

5.5   Law and Legal Proceedings.  There are no Legal Proceedings pending or, to each Buyer's knowledge, threatened in writing against either Buyer before any Government authority, which, if adversely determined, would reasonably be expected to prohibit the consummation of the transactions contemplated by this Agreement or materially delay or impair the ability of either Buyer to perform its obligations under this Agreement or any of the Ancillary Agreements it is party to.

27

5.6    No Brokers or Finders. No agent, broker, finder, or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Buyers in connection with the negotiation, execution, or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

5.7    Investigation by Buyer. Buyers have conducted their own independent review and analysis of the Acquired Assets, the Assumed Liabilities, and the Business and acknowledge that Sellers have provided Buyers with reasonable access to the personnel, properties, premises, and records of the Business for this purpose. In entering into this Agreement, Buyers have relied solely upon their own investigation and analysis, and Buyers acknowledge that neither Sellers nor any of their Affiliates or Related Persons make or have made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyers or their Affiliates or Related Persons, except for the representations and warranties contained in this Agreement (which are subject to the limitations and restrictions contained in this Agreement). Further, and notwithstanding anything to the contrary herein, Buyers expressly acknowledge and agree that, as of the Closing, they will acquire and accept the Acquired Assets "AS IS," "WHERE IS," and "WITH ALL FAULTS."

5.8    Adequate Assurance. Buyers shall provide such commercially reasonable information and assurances as the Bankruptcy Court may determine is necessary to provide "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to Assigned Contracts.

## ARTICLE 6

## COVENANTS

6.1    Actions Before Closing. (a) Each Party shall use commercially reasonable efforts to perform and satisfy all of its obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by such Party under this Agreement prior to the Closing. In addition, each Party shall use its commercially reasonable efforts to take, agree to take, or cause to be taken, any and all actions and to do, or cause to be done, any and all things necessary, proper or advisable under applicable Law or otherwise, so as to, as promptly as practicable, consummate the transactions contemplated by this Agreement, and each shall, and shall cause its respective Affiliates to, cooperate fully in connection therewith.

(b)    During the period commencing on the date hereof and terminating upon the earlier to occur of the Closing or the termination of this Agreement, (i) Sellers will, upon obtaining actual knowledge thereof, give Buyers prompt written notice of any material development that would make the satisfaction of any of the conditions set forth in Section 10.1 on the Closing Date impossible or reasonably unlikely. No such notification, or failure to give any notice required by this Section 6.1(b), shall be given any effect for purposes of determining the accuracy of the representations and warranties made by Sellers pursuant to this Agreement, determining whether the conditions set forth in Section 10.1 have been satisfied or subjecting Sellers to liability for breach following termination of this Agreement; and (ii) Buyers will, upon obtaining actual knowledge thereof, give Sellers prompt written notice of any material development that would make the satisfaction of any of the conditions set forth in Section 10.2 on the Closing Date impossible or reasonably unlikely. No such notification, or failure to give

any notice required by this Section 6.1(b), shall be given any effect for purposes of determining the accuracy of the representations and warranties made by Buyers pursuant to this Agreement, determining whether the conditions set forth in Section 10.2 have been satisfied or subjecting Buyers to liability for breach following termination of this Agreement.

6.2    Conduct of Business Prior to Closing.  Except as expressly contemplated by this Agreement, or as required by the Bankruptcy Code, or with Buyers' prior written consent, during the period from the date of this Agreement to and through the Closing Date, Sellers shall;

(a)    conduct the Business only in the Ordinary Course of Business;

(b)    use their commercially reasonable efforts to (A) preserve their present business operations, organization and goodwill, and (B) preserve their present relationships with customers, suppliers and employees;

(c)    except as otherwise consented to by Buyers in writing, and without making any commitment on Buyers' behalf, use commercially reasonable efforts to preserve intact their current business operations, organization and goodwill of the Acquired Assets;

(d)    otherwise report periodically to Buyers concerning the status of their business, operations and finances;

(e)    promptly upon obtaining Knowledge thereof, notify Buyers of any change, occurrence or event not in the Ordinary Course of Business, or of any change, occurrence or event which, individually or in the aggregate with any other changes, occurrences and events, would reasonably be expected to be materially adverse to the Business or cause any of the conditions to closing set forth in Article 10 not to be satisfied;

(f)    maintain the Acquired Assets in a state of repair and condition that complies with Law and is consistent with the Ordinary Course of Business; provided that nothing herein shall be deemed to require Sellers to upgrade the condition of the Acquired Assets relative to their condition on the date hereof;

(g)    use commercially reasonable efforts to keep in full force and effect, without amendment, all rights related to the Acquired Assets;

(h)    except as set for on Schedule 6.2(h), comply in all material respects with all Laws and contractual obligations applicable to the operations of the Acquired Assets;

(i)    except with the prior written consent of Buyers or as otherwise required by the Bankruptcy Code or other applicable Law, Sellers shall not, shall not permit their respective subsidiaries to (and in the case of subsection (iii) of this Section 6.2(i), shall not permit their respective Affiliates to), and shall not file with the Bankruptcy Court a request or motion, or support any other request or motion relating to the Acquired Assets or the Business (but nothing in this Section 6.2 shall be deemed to in any way dictate, restrict or otherwise affect in any way the manner in which Sellers operate any Excluded Assets or deal with any employees who are not employees of the Business), to:

(i)    make any promise or representation, oral or written, to, or otherwise (1) increase the annual level of compensation payable or to become payable by Sellers or any of their respective subsidiaries to any of their respective directors, executive officers or employees to the extent such individuals are directly involved in the Business, (2) grant, or establish or modify any targets, goals, pools or similar provisions

29

in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, executive officer or employee to the extent such individuals are Employees or are directly involved in the Business, (3) increase the coverage or benefits available under any (or create any new) Business Benefit Plan to the extent such individuals are Employees or are directly involved in the Business, (4) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller or their respective subsidiaries is a party or involving a director, executive officer or employee of any Seller or their respective subsidiaries to the extent such individuals are Employees or are directly involved in the Business, except, in each case, as required by any of the Business Benefit Plans, (5) hire any employees at the exempt salaried level or above, to the extent such individuals are Employees or are directly involved in the Business, (6) hire any new employees at Sellers' facilities in Mount Pleasant, Michigan or Hillsdale, Michigan, other than non-exempt hourly employees in replacement of any non-exempt hourly employees at those facilities whose employment terminates in the Ordinary Course of Business, (7) hire any new employees in connection with the Business at Mexico Seller's facility in San Luis Potosi, Mexico or (8) transfer any current employees into or out of Sellers' facilities in Mount Pleasant, Michigan, Hillsdale, Michigan or, if in connection with the Business, San Luis Potosi, Mexico;

(ii)     negotiate or enter into any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability or other obligation to any labor organization;

(iii)     to the extent it may affect or relate to the Business or any of the Acquired Assets or the Assumed Liabilities, make or rescind any election relating to Taxes, file any amended Tax Return, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, except as may be required by the Code or GAAP, make any change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent audited financial statements or Tax Returns, as applicable, or omit to take any further action if any such action or omission could reasonably have the effect, with respect to the Business or the Acquired Assets or the Assumed Liabilities, of increasing any Tax Liability or reducing any Tax Asset, in each case, of Buyers or any Affiliate of Buyers;

(iv)     to the extent it may affect or relate to the Business or any of the Acquired Assets, (i) commence a lawsuit other than for the routine collection of bills or (ii) settle or agree to settle any pending or threatened lawsuit or other dispute; excluding, in each case, the settlement of trade creditor lawsuits over $150,000 in the aggregate;

(v)     other than in the Ordinary Course of Business, subject any of the Acquired Assets to any Lien or Claim (other than Permitted Liens) to the extent that such Lien or Claim would continue to encumber or affect the Acquired Assets post-Closing or would not otherwise be removed by the effect of the Sale Order;

(vi)     cancel or compromise any material debt or claim or waive or release any right of Sellers, to the extent, in each case, that such debt, claim or right

constitutes an Acquired Asset other than customer Accounts Receivable compromised in the Ordinary Course of Business of Sellers;

(vii)    change the manner in which it extends warranties, discounts or credits to customers of the Business;

(viii)    make any loans or advances to, or any investments in or capital contributions to, any Person that could affect the Business or any of the Acquired Assets;

(ix)    enter into any commitment for or make any capital expenditures in excess of $100,000 related to the Business;

(x)    except in the Ordinary Course of Business, enter into any joint marketing or marketing support agreement related to the Business;

(xi)    enter into any joint venture agreement that involves a sharing of profits, cash flows, expenses or losses with other Persons (other than reseller agreements) related to or affecting the Business or the Acquired Assets;

(xii)    except in the Ordinary Course of Business, engage in any transaction with any officer, director or Affiliate of Sellers or affiliate of any such individual;

(xiii)    enter into or materially modify any currency exchange, commodities or other hedging transactions or arrangements, or other investment or cash management transactions or arrangements related to or affecting the Business or the Acquired Assets;

(xiv)    sell, dispose of, transfer title, lease, license or permit to lapse or authorize the sale, pledge, disposition, transfer title, lease, license, or encumbrance of, any Acquired Assets, other than Inventory sold in the Ordinary Course of Business;

(xv)    transfer, dispose of, permit to lapse (except in accordance with the terms thereof) or grant any right or licenses under, or enter into any settlement regarding the breach or infringement of, any Intellectual Property Rights, or modify any existing rights with respect thereto or enter into any licensing or similar agreements or arrangements;

(xvi)    enter into, assume or terminate any Material Contract or enter into or permit any amendment, supplement, waiver or other modification in respect thereof without Buyers' prior consent; provided, however, nothing herein shall be deemed to restrict Sellers from entering into any Contract, without Buyer's consent, the entry into which is expressly contemplated by this Agreement;

(xvii)    declare, set aside, or pay any dividend or other distribution with respect to any shares of its capital stock or interests, or split, combine, or reclassify any of its capital stock or interests, or repurchase, redeem, or otherwise acquire any shares of its capital stock or interests;

(xviii)    to the extent it may relate to the Business or any of the Acquired Assets, except in the Ordinary Course of Business, acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, association or other

31

business organization or division thereof, or otherwise acquire or agree to acquire any assets which are material, individually or in the aggregate, to the Business, or enter into any contract with respect to a joint venture, strategic alliance or partnership;

(xix)    fail to maintain the current levels of insurance coverage afforded Sellers under existing insurance policies related to the Business or the Acquired Assets;

(xx)    enter into contracts or commitments for the purchase of raw materials, products, services, and supplies outside of the Ordinary Course of Business or maintain their Inventory, at prices and on terms inconsistent with the prior operating practices of Sellers;

(xxi)    except to the extent it is part of Sellers' practice in the Ordinary Course of Business as of the execution of this Agreement, agree to do anything prohibited by this Section 6.2 or do or agree to do anything that would cause Sellers' representations and warranties herein to be false; and

(xxii)    take or agree in writing or otherwise to take any action which would reasonably be expected to make any of Sellers' representations or warranties untrue or incorrect or prevent Sellers from performing one or more covenants required hereunder to be performed by Sellers; or commit to do anything prohibited by this Section 6.2(i).

6.3    Permits and Consents.

(a)    Sellers shall use their commercially reasonable efforts (which shall exclude the obligation to pay any costs or fees other than de minimis costs and fees) to assist Buyers in their efforts to obtain the Permits set forth on Schedule 6.3(a), which such Permits are material and necessary for Buyers to take title to all of the Acquired Assets at the Closing and thereafter to operate the Business, including making filings with the Government agencies, issuing power of attorneys to Buyers, as necessary, and providing access to personnel and books and records.

(b)    Sellers shall use their commercially reasonable efforts (which shall exclude the obligation to pay any costs or fees other than de minimis costs and fees) to assist Buyers in their efforts to obtain the Consents set forth on Schedule 6.3(b), which shall set forth all Consents and approvals of all Governments (except those set forth on Schedule 6.3(a)), and all Persons, required and provide notifications to all Persons required to, in each case, expeditiously close the transactions contemplated by this Agreement.

(c)    Subject to Section 6.3(a) and 6.3(b), the costs and expenses of obtaining any and all Permits and Consents pursuant to Section 6.3 shall be borne by Buyers.

6.4    Buyers Access to Properties and Records. Subject to the limitation set forth in Section 6.15, Sellers shall (and shall cause their respective Affiliates to) afford to Buyers, and to the accountants, counsel, and representatives of Buyers, reasonable access during normal business hours throughout the period from the Agreement Date to the Closing Date (or the earlier termination of this Agreement pursuant to Article 11) to make such investigation of the properties, business and operations of Sellers and such examination of the books and records

32

(including Tax records) and financial and operating data of Sellers (and, in the case of Tax records, to the extent applicable to the Acquired Assets or the Assumed Liabilities, their respective Affiliates) and access to all the officers, key employees, accountants and other representatives of Sellers, as it reasonably requests and to make extracts and copies of such books and records if (a) permitted under Law, and (b) disclosing such books and records would not adversely affect any attorney client, work product, or other legal privilege. Subject to the foregoing and to the limitations set forth in Section 6.15 below, and upon reasonable prior notice, Sellers shall (and shall cause their respective Affiliates to) also afford Buyers reasonable access, during normal business hours, to the Business, to all operations of the Business, and to all Acquired Assets and Assumed Liabilities throughout the period from the Agreement Date to the Closing Date.

      6.5    <u>Sellers Payments, Revenues and Assets</u>.

      (a)    If, after the Closing, Sellers shall receive any payment or revenue that belongs to Buyers pursuant to this Agreement, Sellers shall promptly remit or cause to be remitted the same to Buyers.

      (b)    In the event that, after the Closing Date, (x) either Party reasonably believes Sellers or any their Affiliates have retained ownership of an asset intended to be conveyed to Buyers as an Acquired Asset as contemplated by this Agreement, for no additional consideration to Sellers or any of their Affiliates or cost and expense to Buyers, Sellers shall and shall cause their Affiliates to convey, assign or transfer promptly such Acquired Asset to Buyers, and the Parties hereto shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Acquired Asset to Buyers or their designee, or (y) either Party reasonably believes an Excluded Asset has been conveyed to Buyers, at the cost and expense of Sellers, Buyers shall convey, assign or transfer promptly such Excluded Asset to Sellers, and the Parties shall execute all other documents and instruments, and take all other lawful actions reasonably requested, in order to assign and transfer such Excluded Asset to Sellers or their designee. In either case, the provisions of Section 9.1 shall apply.

      6.6    <u>Name Change</u>. Sellers shall, as promptly as practicable (but in no event later than thirty (30) Business Days) after the Closing, cease using and displaying any of the Trademarks that are included in the Acquired Assets, and in accordance with such requirement, Sellers shall, no later than thirty (30) Business Days after the Closing, legally change their corporate and business names (to the extent such names include such Trademarks or a confusingly similar Trademark) to names that are not confusingly similar to such Trademarks, and file notices of such name changes with the Bankruptcy Court. Subject to the approval of the Bankruptcy Court to change US Seller's name for purposes of the Bankruptcy Case (which approval US Seller shall seek and use commercially reasonable efforts to obtain promptly following the Closing), under no circumstance shall Sellers, after the Closing, use or otherwise exploit the Trademarks included in the Acquired Assets or any other indicia confusingly similar to the Trademarks included in the Acquired Assets, Copyrights included in the Acquired Assets, or any work substantially similar to the Copyrights included in the Acquired Assets, as a source identifier in connection with any Seller product, service or corporate, business or domain name.

6.7    Supplements to Disclosure Schedules.  Sellers may, by written notice to Buyers from time to time prior to the Closing Date, supplement or amend the Disclosure Schedules provided pursuant to Article 4.  With Buyers' written consent, such supplements or amendments shall be effective to cure and correct, for all purposes, any breach of any representation or warranty that would have existed if Sellers had not made such supplements or amendments; provided, however, that the new disclosures made in any supplement or amendment to the Disclosure Schedules shall not prevent Buyers from terminating this Agreement pursuant to Section 11.2(c)(i), if applicable, in respect of any such supplement or amendment.  All references to Schedules that are supplemented or amended pursuant to this Section 6.7, with Buyers' written consent, shall be deemed to be a reference to such Disclosure Schedule as supplemented or amended.

6.8    Motions and Orders.  Sellers shall provide Buyers with the proposed drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court which relate to the approval of this Agreement, the acquisition of the Acquired Assets, the assignment of the Assigned Contracts, or the consummation of the transactions contemplated by this Agreement, or any provision therein or herein, and shall provide Buyers and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

6.9    Availability of Business Records and Transferred Employees.  After the Closing Date, Buyers shall provide to Sellers and Related Persons (after reasonable notice and during normal business hours and without charge to Sellers) access to (a) Buyers' personnel, Transferred Employees and Mexico Seller Personnel and (b) all Business Records for periods prior to the Closing and shall preserve such Business Records, subject to compliance with applicable Laws, until the later of (i) the sixth anniversary of the Closing or (ii) the date the Bankruptcy Court enters an Order closing the Bankruptcy Case.  Such access to Business Records shall include access to any such information in electronic form to the extent reasonably available.  For a period of two (2) years following the Closing, prior to destroying any Business Records for periods prior to the Closing, Buyers shall notify Sellers, no less than thirty (30) days in advance of any such proposed destruction of its intent to destroy such Business Records, and Buyers will permit Sellers to retain such Business Records at Sellers' sole expense.  With respect to any litigation and claims that are related to Excluded Assets or Excluded Liabilities, Buyers shall, at Sellers' sole expense, render all reasonable assistance that Seller may request in defending such litigation or claim and shall make available to Sellers, for and at reasonable times, Buyers' personnel, Transferred Employees or Mexico Seller Personnel most knowledgeable about the matter in question.  Buyers shall be permitted, as a condition to granting Sellers or any of their Related Persons the access to the information afforded by this Section 6.9, to require such party to execute and deliver to Buyers a confidentiality agreement in form and substance satisfactory to Buyers if any such party would, as a result of the foregoing rights, have access to confidential information relating to Buyers' business.

6.10    Buyers Payments, Revenues.  If, after the Closing, Buyers (or any Affiliate of Buyers) shall receive any payment or revenue that belongs to Sellers pursuant to this Agreement, Buyers shall promptly remit or cause to be remitted the same to Sellers, without set-off or deduction of any kind or nature.

6.11    Environmental Permits. Sellers and Buyers shall cooperate with each other and, as promptly as practicable after the date of this Agreement, use commercially reasonable efforts to obtain the transfer or reissuance to Buyers of all Environmental Permits. The Parties shall respond promptly to any requests for additional information made by such agencies, use their respective commercially reasonable efforts to participate in any hearings, settlement proceedings or other proceedings ordered with respect to applications to transfer or reissue such Environmental Permits, and use their respective commercially reasonable efforts to cause regulatory approval to be obtained at the earliest possible date after the date of filing. Each Party will bear its own costs of the preparation and review of any such filing. Sellers and Buyers shall have the right to review in advance all characterizations of the information relating to the transactions contemplated by this Agreement which appear in any filing made in connection with any filings to transfer the Environmental Permits, and the filing Party shall consider in good faith any revisions reasonably requested by the non-filing Party.

6.12    Further Assurances. Subject to the terms and conditions herein provided, each of the Parties agrees to use its commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to give effect to this Agreement and the transactions contemplated hereby and to confirm Buyers' ownership of the Acquired Assets, including using its commercially reasonable efforts to obtain all necessary waivers, Consents and approvals and effecting all necessary registrations and filings, including all necessary waivers and releases, including, for Sellers, the PBGC Seller Release, and for Buyers, the PBGC Buyer Release, Consents and approvals from customers and other parties related to the Business. Each of the Parties will use its commercially reasonable efforts, and act in good faith from and after the signing of this Agreement, to establish an acceptable protocol for resolution of any Disputed Cure Costs prior to, and after, the Closing. Each of the Parties will use its commercially reasonable efforts to cause all of the obligations imposed upon it in this Agreement to be duly complied with and to cause all conditions precedent to such obligations to be satisfied.  In case at any time after the Closing Date any further action is reasonably necessary, proper or advisable to carry out the purposes of this Agreement, as soon as reasonably practicable, each Party shall use its or cause its proper officers, managers and/or directors to take all such necessary action, including the execution and delivery at the reasonable request of the other Party of such additional documents and instruments (including any assignments, bills of sale, assumption agreements, Consents and other similar instruments in addition to those required by this Agreement) as may be reasonably required to give effect to this Agreement and the transactions contemplated hereby, and to provide whatever documents or other evidence of ownership as may be reasonably requested by Buyers to confirm Buyers' ownership of the Acquired Assets.

6.13    Non-Competition. Notwithstanding Section 6.21 hereof, for a period of thirty-six (36) months after the Closing Date, without US Buyer's prior written consent, Sellers and Parent shall not, and shall cause their subsidiaries and Affiliates not to, engage in, whether directly or as owner or as a controlling partner, shareholder, lender, investor, consultant, agent or co-venturer, or directly manage Persons engaged in, the manufacturing, marketing, sale and distribution of dampers and damper-related solutions.  The restrictions of this Section 6.13 shall apply to Sellers and their subsidiaries and Affiliates in each and every country, province, state, city or other political subdivision of the world, including those in which any Seller is currently engaged in business or otherwise distributes, licenses, or sells any products.  In the event that Mexico Seller

35