sells a substantial portion of the assets that are currently unrelated to the Business, Mexico Seller shall, as a condition to such sale, cause such buyer or buyers of such assets to assume all obligations under this Section 6.13. For the avoidance of doubt, nothing in this Section 6.13 shall be deemed to limit or restrict Sellers' or any of Sellers' subsidiaries' or Affiliates' continued operation of their respective businesses as currently operated and conducted so long as none of such entities, directly or indirectly, produces, sells, distributes, or owns, or manages a business producing, selling or distributing, crank shaft dampers or crank shaft damper components.

6.14    Non-Solicitation.    (a) Except as otherwise expressly contemplated by this Agreement, subject to the Closing, beginning on the Closing Date and ending twenty-four (24) months after the Closing Date, Sellers and Parent shall not directly or indirectly (including through any of their subsidiaries or Affiliates), solicit or attempt to induce any Transferred Employee or Mexico Seller Personnel to terminate his or her employment with either Buyer or any of Buyers' Affiliates or to accept employment with any Seller or any of Sellers' Affiliates or hire any Transferred Employee or Mexico Seller Personnel. Notwithstanding the foregoing, the restrictions set forth in this Section 6.14(a) shall not apply to bona fide public advertisements for employment placed by Sellers and not targeted at the Transferred Employees or Mexico Seller Personnel.

(b)    Except as otherwise expressly contemplated by this Agreement, the Mexico Transition Services Agreement and the US Transition Services Agreement, subject to the Closing, beginning on the Closing Date and ending twenty-four (24) months after the Closing Date, Buyers shall not directly or indirectly (including through any of their subsidiaries or Affiliates), solicit or attempt to induce any employees of Sellers or Parent to terminate his or her employment with Sellers, Parent or any respective Affiliates or to accept employment with any Buyer or any of Buyer's Affiliates or hire any such employees. Notwithstanding the foregoing, the restrictions set forth in this Section 6.14(b) shall not apply to (i) bona fide public advertisements for employment placed by Buyers and not targeted at such employees, (ii) Sellers' machine shop employees located at the facility in Vassar, Michigan who have been terminated after the date hereof and (iii) the individuals that are listed on Schedule 6.14(b)(iii)(A) and 6.14(b)(iii)(B). The Parties hereby agree that, (x) from and after the date hereof, Buyers shall have the right to interview, make offers to, and hire such individuals that are listed on Schedule 6.14(b)(iii)(A) and Sellers shall have the right to approve the start date of any such individuals that are hired by Buyers, with such approval not to be unreasonably withheld, conditioned or delayed, and (y) beginning on the Closing Date, Buyers shall have the right to interview, make offers to, and hire such individuals that are listed on Schedule 6.14(b)(iii)(B) and Sellers shall have the right to approve the interview date and start date of any such individuals that are solicited and/or hired by Buyers, with such approval not to be unreasonably withheld, conditioned or delayed.

6.15    Phase II Investigations. Between the date of this Agreement and the Closing Date, and subject to Buyers' execution and delivery to US Seller of an access and indemnity agreement in the form and content attached as Exhibit E hereto (the "**Access Agreement**"), Buyers shall have the right to conduct, at Buyers' sole cost and expense, only those Phase II Environmental Site Investigations (the "**Permitted Phase II Investigations**") of the type and scope and expressly described in and contemplated by Schedule 6.15 hereto. Provided that Buyers have executed and delivered the Access Agreement to Sellers, Sellers shall cooperate

with the Permitted Phase II Investigations and provide Buyers and their consultants with the required access to the properties, employees, books and records to complete the Permitted Phase II Investigations. With the exception of the Permitted Phase II Investigations, Buyers shall not have the right to conduct any other Phase II Environmental Site Investigations or any other 'invasive" testing of any of the Acquired Assets without first obtaining Sellers' prior written consent, which Sellers may grant or withhold in their sole discretion. Buyers' right to conduct the Phase II Investigations at Sellers' facility in Hillsdale, Michigan under this Section 6.15 is subject to Buyers securing permission from the owner of that facility. Sellers agree to fully cooperate with Buyers in securing such permission.

6.16    Transition Services Agreement.

(a)    The Parties will negotiate in good faith the terms of the Mexico Transition Services Agreement and US Transition Services Agreement, consistent with the term sheet attached hereto as Exhibit D and on other customary terms reasonably satisfactory to the Parties. On the Closing Date, each of the applicable Parties shall, and/or shall cause its applicable Affiliates to, enter into the Mexico Transition Services Agreement and US Transition Services Agreement to which it is intended to be a party.

(b)    In the event that Mexico Seller sells a substantial portion of the assets that are currently unrelated to the Business, Mexico Seller shall, as a condition to such sale, cause such buyer or buyers of such assets to assume all obligations, and perform all services, under the Mexico Transition Services Agreement.

6.17    License to Certain Intellectual Property Rights. To the extent that Sellers own or license any Intellectual Property Rights that are used or held for use in the Business and that are not Acquired Assets, Sellers hereby grant to Buyers, effective as of the Closing, a non-exclusive, royalty-free, fully paid-up, perpetual, irrevocable, worldwide, sublicensable license to use and otherwise exploit such Intellectual Property Rights. The foregoing license shall be freely assignable and transferable by Buyers.

6.18    Red Facility. (a) During the sixty (60) day period immediately following the Closing, Mexico Buyer may occupy the facility leased by Mexico Seller in the Tres Naciones Industrial Park in San Luis Potosí, México (the "***Red Facility***") rent-free, with Mexico Seller to retain any and all responsibility for rent arrearages or any other liabilities or obligations arising under or relating to Mexico Seller's occupancy of the Red Facility; provided that, on behalf of Mexico Buyer, Mexico Seller shall have obtained written consent from the landlord of the Red Facility (in form and content reasonably satisfactory to Mexico Buyer) that Mexico Buyer may occupy the Red Facility.

(b) In the event that Mexico Buyer is able to occupy the Red Facility rent-free during the sixty (60) day period immediately following the Closing pursuant to Section 6.18(a), effective as of the 61st day immediately following the Closing (the "***Transition Date***"), Mexico Seller shall use its commercially reasonable efforts to pay, resolve or extinguish all rent arrearages or past-due payments existing with the landlord and facilitate Mexico Buyer's negotiation of a new lease for the Red Facility with the landlord, with such lease being on substantially similar terms as Mexico Seller's lease and in form and content reasonably satisfactory to Mexico Buyer; provided that the landlord of the Red Facility releases Mexico Seller (by a writing in form and content

37

reasonably satisfactory to Mexico Seller) from any further liability or obligation with respect to its existing lease for the Red Facility (the "*Existing Red Facility Lease*"). If Mexico Buyer is either unable to enter into such new lease or obtain such release for Mexico Seller, Mexico Buyer shall be obligated, subject to landlord's written consent, to enter into a sublease arrangement with Mexico Seller (pursuant to documentation, reasonably satisfactory to Mexico Buyer and Mexico Seller) effective as of the Transition Date, whereby Mexico Buyer shall assume Mexico Seller's obligations with respect to the Existing Red Facility Lease relating to any period from and after the Transition Date; provided that Mexico Buyer shall not assume any obligation related to rent arrearages or past-due payments with respect to the Existing Red Facility Lease relating to the period prior to the Transition Date. In the event that Mexico Buyer subleases the obligations of the Existing Red Facility Lease as described above, Mexico Seller shall reasonably cooperate with Mexico Buyer to negotiate modification of such terms of the Existing Red Facility Lease as Mexico Buyer may reasonably request; provided that Mexico Buyer hereby acknowledges that Mexico Buyer's obligations to sublease the Existing Red Facility Lease (subject to landlord's written consent as provided above) in this Section 6.18(b) shall not be conditioned upon Mexico Buyer's achieving any such modifications of the terms of the Existing Red Facility Lease. For the avoidance of doubt, any and all rent arrearages or past-due payments paid pursuant to, or contemplated by, this Section 6.18 shall not constitute Cure Amounts for purposes of this Agreement.

6.19    Customer Contracts. US Buyer will not take any action, or fail to take any reasonable action, that would cause the failure of any condition precedent set forth in the New Customer Agreements or otherwise reasonably be expected to cause the New Customer Agreements not to be effective as of the Closing Date. Without limiting the foregoing, Buyers shall use their respective commercially reasonable efforts to cause the New Customer Agreements to become effective as of the Closing.

6.20    New Business Contracts. In the event that Buyers enter into new Contracts related to the Business (other than the New Customer Agreements), with third party customers, suppliers or vendors, in each case to be effective upon the Closing, Buyers shall use their commercially reasonable efforts to include provisions therein to the effect that such new Contracts are in full substitution for Sellers' existing Contracts with such counterparties and that upon execution of such new Contracts, the Contracts being so replaced shall automatically terminate, such that Sellers shall have no further liability or obligation thereunder.

6.21    Anti-Poaching. Subject to the Closing and without limiting Sellers' obligations under Section 6.13, beginning on the Closing Date and ending twenty-four (24) months after the Closing Date, (i) Sellers shall not, and shall cause their respective subsidiaries or Affiliates not to, solicit or enter into agreements or arrangements, in each case with respect to the Business, with any customers, vendors or suppliers of Buyers relating to the manufacture or distribution of any parts, goods or products comprising part of the Acquired Assets or currently manufactured or produced or used or held for use primarily in connection with the Business, and (ii) Buyers shall not, and shall cause their respective subsidiaries or Affiliates not to, solicit or enter into agreements or arrangements, in each case with respect to the Non-Damper Business (defined below), with any customers, vendors or suppliers of Sellers (or their Affiliates) relating to the manufacture or distribution of any parts, goods or products comprising part of the Excluded Assets or currently manufactured or produced or used or held for use primarily in connection

with the business operated by Mexico Seller, as of the date hereof, excluding the Business (the *"Non-Damper Business"*). For the avoidance of any doubt, (x) Sellers and Buyers shall have the right to assign, without the others' consent, their respective rights and obligations under this Section 6.21, but shall not assign their respective rights without also assigning their respective obligations under this Section 6.21 to any purchaser or other transferee of substantially all of the assets of the Non-Damper Business (in Sellers' case) or the Business (in Buyer's case) and such rights and obligations shall be enforceable by any such purchaser or transferee, or (y) nothing herein shall be deemed to limit or restrict in any way either Buyer's, or Buyers' Affiliates', right to continue doing business with any current or former vendor, supplier or customer of the Business or Sellers', or Sellers' Affiliates', right to continue doing business with any current or former vendor, supplier or customer of the Non-Damper Business (in each case, irrespective of whether they are also vendors, suppliers or customers of the others), so long as such dealings do not violate the restrictions set forth in clause (i) above (in the case of Sellers', or Sellers Affiliates', activities) or those set forth in clause (ii) above (in the case of Buyers', or Buyers Affiliates', activities).

6.22    Fairfield Agreement. US Buyer shall use its commercially reasonable efforts to enter into a duly executed Purchase Order with Fairfield Castings, LLC, which shall be satisfactory in form and substance to US Buyer in its sole discretion, with respect to parts to be manufactured and supplied to Buyers.

6.23    Updates to Schedules. Buyers and Sellers shall use their reasonable best efforts, in good faith, to finalize and agree upon, within three (3) Business Days following the date hereof, the final forms of (i) Schedule 1.7(a) and (ii) Appendices A-D, inclusive, of Schedule 2.2(a), in each case which shall be incorporated into the Disclosure Schedules to this Agreement at such time; provided that, if the obligations contemplated in this Section 6.23 are not agreed upon by Buyers and Sellers, the Released Deposit Funds shall be reduced by Two Hundred and Fifty Thousand Dollars ($250,000).

## ARTICLE 7

## EMPLOYEES AND EMPLOYEE BENEFITS; RELEASES

7.1    Employees.

(a)    The Parties recognize that the continued employment of the personnel of Sellers and their respective subsidiaries is significant to the business interests of both Buyers and Sellers. As a result, the orderly transfer of employment relationships is important to both Parties, and each Seller shall use its commercially reasonable efforts to accomplish the transition with as little disruption to the Business as possible.

(b)    Buyers shall (i) offer employment to each Active Employee and each Qualified Leave Recipient who is located at Sellers' facilities in Mount Pleasant, Michigan and Hillsdale, Michigan as of immediately prior to the Closing Date, (ii) offer employment to each employee listed on Schedule 7.1(b)(ii) (which schedule may be updated by Mexico Buyer no later than five (5) days prior to the Closing Date in order to replace any listed employee whose employment with Mexico Seller has terminated, with another employee of Mexico Seller with skills and experience comparable to such terminated employee) and (iii) have the right (but not

the obligation) to offer employment to any and all other individuals employed by Sellers or their respective subsidiaries or Affiliates in connection with the Business as of immediately prior to the Closing Date, in each case excluding any individuals hired pursuant to or employed by a third party staffing agency or other outside entity with respect to their work for Sellers or their respective subsidiaries, (collectively, the "***Employees***"), in each case to commence immediately following the Closing, or in the case of a Qualified Leave Recipient, the date of his or her return to active employment, <u>provided</u> that such individual returns to active status within thirty (30) days following the Closing Date.  No later than five (5) days prior to the Auction, Buyers shall provide Sellers with a list of individuals to whom Buyers shall make offers of employment pursuant to <u>Section 7.1(b)(iii)</u>, <u>provided</u> that such individuals remain Employees through the time immediately prior to the Closing Date, and <u>provided</u> <u>further</u> that if any such individuals do not remain Employees through the time immediately prior to the Closing Date, Buyers shall have the ability to update such list no later than five (5) days prior to the Closing Date in order to replace any listed employee whose employment with Sellers has terminated with, to the extent such individual is engaged primarily in the Business, another employee of Sellers (to the extent such substituted employee is engaged primarily in the Business and continues to be employed by Sellers) with skills and experience comparable to such terminated employee.  Within ten (10) days prior to the anticipated Closing Date, Sellers shall provide Buyers with a list of any applicable individuals who are expected to be Qualified Leave Recipients as of the Closing Date and shall update that list from time to time through the Closing Date as necessary. Sellers shall cooperate with Buyers and, to the extent they remain employed by Sellers, make the Employees available to Buyers so Buyers can evaluate employment offers to the Employees. Sellers shall not discourage any Employees from accepting offers of employment with Buyers.

(c)     Each offer of employment made pursuant to <u>Section 7.1(b)</u> shall be (i) contingent upon the Closing and the issuance of the US Sale Order and (ii) based in Buyers' discretion on terms and conditions of employment substantially similar to those provided by Sellers prior to the Closing (with credit for past service with Sellers for purposes of eligibility and vesting under any employee benefit plans maintained by Buyers and also for benefit accrual purposes under any vacation programs maintained by Buyers).  For purposes of this Agreement, only Employees who accept Buyers' offer of employment and who commence employment with Buyers effective immediately following the Closing shall, effective as of such commencement of employment, be referred to herein as the "***Transferred Employees.***"  As of the Closing, Sellers agree to terminate the employment of any Employees who accept Buyers' offer of employment so that such Employees may commence employment with Buyers effective immediately following the Closing as Transferred Employees.

(d)     Nothing herein, express or implied, shall (i) create any third party beneficiary or other rights or confer upon any Employee or former employee of any Seller or their respective subsidiaries any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be deemed to constitute an amendment or other modification under any Employee Benefit Plan or any employee benefit plan maintained by the Parties, or (iii) limit the right of Buyers or their Affiliates to amend, terminate or otherwise modify any employee benefit plan maintained by Buyers following the Closing Date.  Buyers and Sellers agree that the provisions contained herein are not intended to be for the benefit of, or otherwise be enforceable by, any third party, including any employee or former employee of Sellers or their respective subsidiaries (including any beneficiary or dependent thereof).  Sellers shall retain and be solely

responsible for all employee liabilities and obligations relating to employees of Sellers who do not become Transferred Employees or Mexico Seller Personnel, and shall retain and be solely responsible for all employee liabilities and obligations relating to Transferred Employees and Mexico Seller Personnel except for those arising in respect of service with Buyers or their respective Affiliates after the Closing.

(e)    Mexico Employee Matters

(i)    Notwithstanding the foregoing, as of the Closing Date, Mexico Buyer will become the employer of the employees of Mexico Seller engaged in the Business as of the Closing Date (all such current workers are separately identified in Schedule 7.1(e), which may be updated by Mexico Buyer no later than five (5) days prior to the Closing Date in order to replace any listed employee whose employment with Mexico Seller has terminated, with another employee of Mexico Seller with skills and experience comparable to such terminated employee, who are referred to hereafter as *"Mexico Seller Personnel"*) and will do so by means of an "employer substitution" as provided for under the Mexico Federal Labor Law (the *"MFLL"*) and the Mexico Social Security Law.

(ii)    Accordingly, subject to the provisions of the MFLL, (i) no severance will be payable to Mexico Seller Personnel who are transferred by Mexico Seller pursuant to such employer substitution, (ii) Mexico Buyer will maintain the labor conditions and recognize the seniority of all Mexico Seller Personnel and agrees to pay them after the date of this Agreement upon the same basis as the salaries, fringe benefits and any other compensation, which they are receiving as of the date of the Closing Date, and (iii) Mexico Seller shall, at the time required by applicable Law, pay the mandatory Mexico profit sharing accrued to the Closing Date in accordance to the MFLL.

(iii)    Mexico Seller and Mexico Buyer agree to provide each other information and assistance, and execute such documents as are reasonably necessary and required by applicable Mexico Law related to the employer substitution, including agreements with the union and notices to each of Mexico Seller Personnel, as well as notices to IMSS, INFONAVIT, SAR and any other governmental agency, within the time periods established by applicable Mexico Law.

7.2    Standard Procedure. Pursuant to the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320, if applicable, (i) Buyers and Sellers shall report on a predecessor/successor basis as set forth therein, and (ii) Buyers will undertake to file (or cause to be filed) a Form W-2 for each Transferred Employee with respect to the portion of the year during which such Transferred Employees are employed by Buyers or their respective Affiliates that includes the Closing Date, excluding the portion of such year that such Transferred Employee was employed by Sellers or their respective Affiliates.

7.3    WARN Act. On or before the Closing Date, Sellers and their respective subsidiaries shall provide a list of the name and site of employment of any and all Employees who have experienced, or will experience, an employment loss or layoff - as defined by the Worker Adjustment and Retraining Notification Act of 1988 (the *"WARN Act"*) - within ninety

41

(90) days prior to the Closing Date. Sellers and their respective subsidiaries shall update this list up to and including the Closing Date. Provided that Sellers and their respective subsidiaries comply with the covenant set forth in the immediately preceding sentence: (a) for a period of ninety (90) days after the Closing Date, Buyers shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of Transferred Employees which, if aggregated with any such conduct on the part of Sellers and their respective subsidiaries prior to the Closing Date, would trigger the WARN Act and; (b) Buyers shall indemnify, defend (with counsel reasonably satisfactory to US Seller), protect and hold US Seller harmless of, from and against any claim, action, loss, cost, expense or other Liability (including, without limitation, all court costs and reasonable attorneys' fees) as US Seller may suffer or incur by reason of any breach by Buyers of the covenant set forth in Section 7.3(a).

## ARTICLE 8

## COURT APPROVAL

8.1    Court Approval.    The transactions contemplated herein between Sellers and Buyers with respect to the US Acquired Assets are subject to the Bankruptcy Court entering the Bid Procedures Order and the US Sale Order.

8.2    Certain Bankruptcy Undertakings.

(a)    Each of Sellers and Buyers agrees to use commercially reasonable efforts to do such further acts and things and to execute and deliver such additional agreements and instruments as may reasonably be required to consummate, evidence, confirm, or obtain the Bankruptcy Court approval of the sale of the US Acquired Assets, the assumption and/or assignment of such Assigned Contracts, or any other agreement contemplated hereby and to consummate the transactions contemplated hereby.

(b)    Sellers shall file a motion seeking entry of the Bid Procedures Order and the US Sale Order with the Bankruptcy Court on or prior to two (2) Business Days following the filing of the Bankruptcy Case and shall use commercially reasonable efforts after each filing to obtain entry of such orders. Prior to the filing by Sellers of the motion seeking entry of the Bid Procedures Order and/or the US Sale Order, Sellers will (i) provide a copy thereof to Buyers and their counsel, (ii) provide Buyers and their counsel a reasonable opportunity to review and comment on such document, and any amendment or supplement thereto, and (iii) incorporate any reasonable comments of Buyers and their counsel into such document and any amendment or supplement thereto that are consistent with the terms of this Agreement and the transactions contemplated thereby.

(c)    Sellers and Buyers acknowledge that (i) to obtain Bankruptcy Court approval of the transactions contemplated herein, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the US Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting the Auction, and (ii) Buyers must provide adequate assurances as required under the Bankruptcy Code with respect to Buyers' assumption of, and performance of, any Assigned Contracts along with payment of all Cure Amounts due thereunder in the ordinary course of business.

(d)     In the event an appeal is taken or a stay pending appeal is requested, from the US Sale Order, Sellers shall immediately notify Buyers of such appeal or stay request and shall provide to Buyers promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyers with written notice of any motion or application filed in connection with any appeal from such orders.

(e)     After entry of the US Sale Order, to the extent Buyers are the successful bidder at the Auction, Sellers shall not take any action that is intended to, or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification, or staying of the US Sale Order; provided, however, nothing herein shall be deemed to require Sellers to (i) incur any material cost or expense, or (ii) continue any efforts or actions required by this clause (e) beyond the earlier to occur of the (x) Closing, and (y) Termination Date.

(f)     Buyers will not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement or the consummation of the transactions contemplated hereby that is inconsistent with performing and carrying out the provisions of this Agreement in accordance with the terms and subject to the conditions herein; provided, however, that nothing contained in the foregoing will be construed to limit in any way Buyers' rights under this Agreement, or to limit Buyers' rights, if any, to advocate for the approval of this Agreement effectuating it and against any Alternative Transaction that does not effectuate this Agreement.

8.3     Break Up Fee; Expense Reimbursement. Subject to approval of the Bankruptcy Court, in consideration for Buyers having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Sellers and to compensate Buyers as a stalking-horse bidder, in the event that Sellers select an Alternative Transaction within the six (6) month period immediately following the Auction Sellers shall pay and Buyers shall receive, in addition to the refund of its Deposit, (a) a breakup fee equal to Six Hundred and Fifty Thousand Dollars ($650,000) (the "**Break Up Fee**") and (b) an amount equal to the reasonable and documented third party costs, fees and expenses incurred by Buyers and their Affiliates (including fees and expenses of legal, accounting and financial advisors) in connection with this Agreement and the transactions contemplated hereby up to a maximum of Three Hundred and Fifty Thousand Dollars ($350,000) (the "**Expense Reimbursement**"). The Bankruptcy Court shall have entered an order approving the Break Up Fee and the Expense Reimbursement, which shall have super-priority administrative claim status in the Bankruptcy Case pursuant to Section 507(b) of the Bankruptcy Code, senior to all administrative expense priority claims other than the administrative claims, if any, of Sellers' post-petition lending facility and/or any cash collateral arrangement, and which shall be subordinate to (i) any "carve-out" granted by such post-petition lenders in favor of the professionals retained by US Seller in the Bankruptcy Case, and (ii) any other professional fee funding arrangement that may be established in the Bankruptcy Case, and the Break Up Fee and Expense Reimbursement shall be paid to Buyers in full upon consummation of an Alternative Transaction (as defined herein) occurring within the six (6) month period immediately following the Auction. Sellers acknowledge and agree that (i) the approval of the Break Up Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of Sellers' obligation to pay the Break Up Fee and Expense Reimbursement, Buyers would not have entered into this Agreement, (iii) the entry of Buyers into this Agreement is necessary for the preservation of Sellers' estate and is beneficial to Sellers because, in Sellers' business judgment, it will enhance Sellers' ability to maximize the value of its assets for the

benefit of its creditors, (iv) the Break Up Fee and Expense Reimbursement are reasonable in relation to Buyers' efforts and to the magnitude of the transactions contemplated in this Agreement and Buyers' lost opportunities resulting from the time spent pursuing such transactions, and (v) time is of the essence with respect to entry of the Bid Procedures Order.

8.4     Alternative Transaction. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers and the Bankruptcy Court of higher or better competing bids with respect to any transaction (or series of transactions, but excluding any piecemeal non-going concern liquidation, including pursuant to a liquidating plan or reorganization) involving the sale, transfer or other disposition of all or some of the US Acquired Assets to a purchaser or purchasers other than Buyers or effecting any other transaction the consummation of which would be substantially inconsistent with this Agreement (such a transaction, an "*Alternative Transaction*").    Nothing contained herein shall be construed to prohibit Sellers and its representatives from soliciting, considering, negotiating, agreeing to, or otherwise taking action in furtherance of any such Alternative Transaction.

8.5     Bid Procedures Order.  Sellers agree to (i) file the Bankruptcy Case on or before July 22, 2013, (ii) file the Bid Procedures Motion and the Sale Approval Motion on or before two (2) Business Days after the Petition Date, and (iii) seek a hearing on such motions as soon as possible, with the orders on such motions to be entered no later than the dates set forth in Section 11. The Bid Procedures Order shall, among other things, (1) approve the Break Up Fee and Expense Reimbursement (as defined above), and provide that Buyers' claim to the Break Up Fee and Expense Reimbursement under this Article 8 shall be entitled to superpriority administrative claim treatment in the Bankruptcy Case, senior to all other superpriority claims other than the administrative claims, if any, pursuant to Sellers' post-petition lending facility and/or cash collateral order(s), and any "carve-out" granted or other professional fee funding arrangement provided for by such post-petition lenders and/or cash collateral arrangements in favor of the professionals retained by US Seller and other professionals retained in the Bankruptcy Case, and that the Break Up Fee and Expense Reimbursement must be paid to Buyers in full upon consummation of an Alternative Transaction within the six (6) months immediately following the Auction, (2) establish the bid deadline for the Auction, (3) approve the Bid Procedures for the solicitation of higher and otherwise better bids that, among other things, sets a date for the Auction, (4) set the auction baseline bid and overbid procedures, and (6) establish the date of the sale hearing. Sellers agree that it shall represent to the Bankruptcy Court that Sellers actively solicited this "stalking horse" bid from Buyers.  The Bid Procedures Order shall be in form and substance acceptable to Buyers.  The Parties agree that there is substantial risk that the value of the assets to be sold hereunder will deteriorate during the pendency of the Bankruptcy Case and that therefore time is of the essence with respect to the various deadlines set forth in this Section 8.5.

8.6     Sale Order. Subject to Section 8.4, Buyers agree that they will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the US Sale Order and the efforts required by Section 5.8 to assist in obtaining a finding of adequate assurance of future performance by Buyers, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyers under this Agreement and demonstrating that Buyers are a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code. In the

event the entry of the US Sale Order shall be appealed, Sellers and Buyers shall use their respective reasonable efforts to defend such appeal; provided, however, nothing herein shall be deemed to require Sellers to (i) incur any material cost or expense, or (ii) continue any efforts or actions required by this Section 8.6 beyond the earlier to occur of (x) the Closing, and (y) the Termination Date.

## ARTICLE 9

## TAXES

9.1    Taxes Related to Purchase of Acquired Assets.    All state, federal, foreign, provincial, and local sales, use, gross-receipts, transfer, gains, excise, stamp, or other similar Taxes in connection with the transfer of the Acquired Assets and the assumption of the Assumed Liabilities, and all recording and filing fees that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets (collectively, "*Transaction Taxes*"), shall be paid, or cause to be paid, by Sellers. Any Tax Returns that must be filed in connection with any such Transaction Taxes shall be prepared and filed when due by the Party primarily or customarily responsible under the applicable local Law for filing such Tax Returns, and such Party will use its reasonable efforts to provide such Tax Returns to the other Party at least 10 days prior to the date when such Tax Returns are due to be filed (taking into account any valid extension). If any Buyer is required under this Section 9.1 to file any such Tax Return, such Buyer shall notify Sellers of the amount of the Transaction Tax shown to be due on such Tax Return, and Sellers shall reimburse Buyers for 100% of the amount of such Transaction Tax by wire transfer of immediately available funds within ten (10) days of receipt of such notice to an account or accounts designated by Buyers. Notwithstanding the foregoing, the Parties agree that Mexico Buyer shall bear and be responsible for 100% of the Mexico value added tax and to otherwise comply with applicable Mexico tax Law in connection with Mexico value added tax.

9.2    Real Property, Personal Property and Similar Ad Valorem Taxes.    All real property, if any, personal property and similar ad valorem Taxes levied with respect to the Acquired Assets for a taxable period which includes (but does not end on) the Closing Date (collectively, the "*Apportioned Obligations*") shall be apportioned between Sellers and Buyers based on the number of days of such taxable period ending on the Closing Date (such portion of such taxable period, the "*Pre-Closing Tax Period*") and the number of days of such taxable period after the Closing Date (such portion of such taxable period, the "*Post-Closing Tax Period*"). Sellers shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period, and Buyers shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period. Apportioned Obligations and real property Taxes, if any, shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law. The paying Party shall be entitled to reimbursement from the non-paying Party in accordance with this Section 9.2. Upon payment of any such Apportioned Obligation, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under this Section 9.2, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed. The non-paying Party shall make such reimbursement by wire transfer in immediately available funds within ten (10) days of receipt of such statement to an account or accounts designated by Buyers or Sellers, as applicable; provided, however, to

the extent that the amount of any required reimbursement can be determined prior to the Closing, the amount to be so reimbursed shall be paid by the non-paying Party to the paying party concurrently with and as part of the Closing.

9.3    Cooperation on Tax Matters and Exchange of Information.  Sellers and Buyers shall (and shall cause their respective Affiliates to) (a) provide the other with such assistance as may reasonably be requested by the other in connection the  preparation of any Tax Return, audit or other examination by any taxing authority or judicial or administrative proceeding relating to Liability for Taxes in connection with the Business or the Acquired Assets or the Assumed Liabilities, (b) retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, proceeding or determination, (c) inform the other of any final determination of any such audit or examination, proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period, and (d) timely sign and deliver such certificates or forms to the other as may be necessary or appropriate to establish an exemption from (or otherwise reduce) Transaction Taxes.  No party shall be required to provide such assistance or information if doing so (i) is not permitted under Law or (ii) would reasonably be expected to adversely affect any attorney client, work product, or other legal privilege. The provisions contained in this Section 9.3 are intended to, and shall, supplement and not limit the generality of the provisions contained in Sections 1.1(h), 6.2(i)(iii) or 6.4 above.

9.4    Purchase Price Allocation.

(a)    The Parties hereto acknowledge and agree that, based on all relevant information available as of the date hereof, the portion of the Purchase Price and other relevant items (including, to the extent properly taken into account under applicable Law, the Assumed Liabilities) allocable to (i) the US Acquired Assets (the "*US Purchase Price*") and (ii) the Mexico Acquired Assets (the "*Mexico Purchase Price*") shall, in each case, be determined in accordance with all applicable Laws and shall be as set forth on Schedules 9.4(a)(i) and 9.4(a)(ii) respectively. The Parties further acknowledge and agree that in the event Buyers or Sellers obtain or become aware of additional or different relevant information, including information with respect to any Assumed Liability properly taken into account under applicable Law, that would, under any applicable Law, in the reasonable judgment of Buyers or Sellers require that the allocations set forth on Schedules 9.4(a)(i) or 9.4(a)(ii) be adjusted, Buyers will promptly provide written notice to Sellers (or Sellers will promptly provide written notice to Buyers, as applicable) of such proposed revised allocations, and Buyers and Sellers shall discuss in good faith whether and in what manner Schedules 9.4(a)(i) and 9.4(a)(ii) should be revised on account of such information.  In addition, the Parties acknowledge and agree that they will discuss in good faith whether and in what manner Schedules 9.4(a)(i) and 9.4(a)(ii) should be revised, in accordance with all applicable Laws, to enable Mexico Seller to remove any Liens encumbering the Mexico Acquired Assets required to be removed at the Closing.  If the Parties are unable to agree on such revised allocations within five (5) Business Days of any Party providing notice to any other Party pursuant to this Section 9.4(a), then the disputed item(s) of such allocations shall be submitted to the Accountant and (A) each of Buyers and Sellers shall have a reasonable opportunity to meet with the Accountant to provide their views to the Accountant as to any such disputed item(s) and (B) the Accountant shall determine the final US Purchase Price and final Mexico Purchase Price.  Upon resolution of the revised allocations, Schedules 9.4(a)(i) and/or

9.4(a)(ii) shall be adjusted to reflect such resolution. The Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed item(s) of the US Purchase Price and the Mexico Purchase Price as originally submitted to the Accountant in accordance with the example provided in the last sentence of Section 2.2(e).

(b)     The US Purchase Price, and any other relevant items, shall be allocated among the US Acquired Assets for purposes of this Agreement and for federal, state and local tax purposes in accordance with a statement to be delivered by US Buyer to US Seller as soon as reasonably practicable after the Closing Date (the "*US Allocation Statement*"). The US Allocation Statement shall be prepared by US Buyer in a manner consistent with the principles of Section 1060 of the Code and the Treasury Regulations promulgated thereunder and any corresponding requirements of state or local tax Laws. The US Allocation Statement, to the extent required under applicable Law, shall be adjusted by US Buyer in accordance with the principles set forth in this paragraph to account for any adjustment to the US Purchase Price (an "*Amended US Allocation Statement*"), and such Amended US Allocation Statement shall be delivered by US Buyer to US Seller as soon as reasonably practicable. The US Allocation Statement and any Amended US Allocation Statement shall be subject to US Seller's written approval (not to be unreasonably conditioned, withheld or delayed) prior to finalization. If US Seller disagrees with respect to any item in the US Allocation Statement, or in any Amended US Allocation Statement, if applicable, US Buyer and US Seller shall negotiate in good faith to resolve the dispute. If US Buyer and US Seller are unable to agree on the US Allocation Statement, or any Amended US Allocation Statement, if applicable, within five (5) Business Days after the commencement of such good faith negotiations (or such longer period as US Seller and US Buyer may mutually agree in writing), the disputed item(s) of the US Allocation Statement, or any Amended US Allocation Statement, if applicable, shall be submitted to the Accountant and (A) US Buyer and US Seller shall each have a reasonable opportunity to meet with the Accountant to provide its views to the Accountant as to any such disputed item(s) and (B) the Accountant shall determine the final US Allocation Statement or final Amended US Allocation Statement, as applicable. Upon resolution of the disputed item(s), the US Allocation Statement, or the Amended US Allocation Statement, as applicable, shall be adjusted to reflect such resolution. The Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed item(s) of the US Allocation Statement or the Amended US Allocation Statement, as applicable, as originally submitted to the Accountant in accordance with the example provided in Section 2.2(e).

(c)     The Mexico Purchase Price, and any other relevant items, shall be allocated among the Mexico Acquired Assets for purposes of this Agreement and for Mexico tax purposes in accordance with an allocation statement to be delivered by Mexico Buyer to Mexico Seller as soon as reasonably practicable after the date hereof but, in any event, not later than twenty (20) days prior to the Closing Date, (the "*Mexico Allocation Statement*"). The Mexico Allocation Statement shall be prepared by Mexico Buyer in a manner consistent with the relevant principles of Mexico Law and shall include the applicable Mexico value added tax, if any, on the Mexico Acquired Assets. The Mexico formal invoices (*facturas*) issued by Mexico Seller pursuant to Mexico tax Law and pursuant to Section 3.2(j) herein shall be consistent with the Mexico Allocation Statement. If the Mexico Purchase Price is adjusted (or if the Mexico

47

Allocation Statement needs to be amended for any other reason under applicable Law), Mexico Buyer shall deliver to Mexico Seller as soon as reasonably practicable an amended Mexico Allocation Statement in accordance with Mexico tax Law (an "*Amended Mexico Allocation Statement*"). Any Amended Mexico Allocation Statement shall be prepared by Mexico Buyer in a manner consistent with the relevant principles of Mexico Law and shall include any changes required to any Mexico value added tax on the Mexico Acquired Assets. Mexico Seller shall issue to Mexico Buyer any document necessary to reflect such changes in accordance with Mexico tax Law. The Mexico Allocation Statement and any Amended Mexico Allocation Statement shall be subject to Mexico Seller's written approval (not to be unreasonably conditioned, withheld or delayed) prior to finalization. If Mexico Seller disagrees with respect to any item in the Mexico Allocation Statement, or any Amended Mexico Allocation Statement, if applicable, Mexico Buyer and Mexico Seller shall negotiate in good faith to resolve the dispute. If Mexico Buyer and Mexico Seller are unable to agree on the Mexico Allocation Statement, or any Amended Mexico Allocation Statement, if applicable, within five (5) Business Days after the commencement of such good faith negotiations (or such longer period as Mexico Buyer and Mexico Seller may mutually agree in writing), the disputed portion(s) of the Mexico Allocation Statement, or the Amended Mexico Allocation Statement, if applicable, shall be submitted to the Accountant and (A) Mexico Buyer and Mexico Seller shall each have a reasonable opportunity to meet with the Accountant to provide its views to the Accountant as to any such disputed item(s) and (B) the Accountant shall determine the final Mexico Allocation Statement or final Amended Mexico Allocation Statement, as applicable; provided, however, that in no event shall the Mexico Allocation Statement be finalized after the Closing Date. Upon resolution of the disputed item(s), the Mexico Allocation Statement, or the Amended Mexico Allocation Statement, as applicable, shall be adjusted to reflect such resolution. The Accountant will determine the allocation of the cost of its review and report based on the inverse of the percentage its determination (before such allocation) bears to the total amount of the disputed item(s) of the Mexico Allocation Statement or the Amended Mexico Allocation Statement, as applicable, as originally submitted to the Accountant in accordance with the example provided in Section 2.2(e).

(d)    Each Party agrees that it will not (and that it will use commercially reasonable efforts to cause its respective Affiliates not to), in its Tax Returns or elsewhere, take a position inconsistent with the allocations provided for in the US Allocation Statement, the Mexico Allocation Statement, or, if applicable, any Amended US Allocation Statement or Amended Mexico Allocation Statement. Each of the Parties shall (and shall cause its respective Affiliates to) notify the other if it receives notice that any Government authority proposes any allocation different from that set forth on the US Allocation Statement, the Mexico Allocation Statement, or, if applicable, any Amended US Allocation Statement or Amended Mexico Allocation Statement.

## ARTICLE 10

## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

10.1    <u>Conditions Precedent to Performance by Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on

or before the Closing Date, of the following conditions, any one or more of which may be waived by Sellers in their sole discretion:

(a)    <u>Representations and Warranties of Buyers</u>.  The representations and warranties of Buyers made in this Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date, and the representations and warranties of Buyers that are not so qualified shall be true and correct in all material respects as of the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time).

(b)    <u>Performance of the Obligations of Buyers</u>.  Buyers shall have, in all material respects, performed the obligations of, and complied with, this Agreement and the covenants hereunder, or any Ancillary Agreement, at or prior to the Closing.

(c)    <u>Buyers' Deliveries</u>.  Buyers shall have delivered, and Sellers shall have received, all of the items set forth in <u>Section 3.3</u>.

(d)    <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other Order that declares this Agreement or any Ancillary Agreements invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect.

(e)    <u>US Transition Services Agreement and Mexico Transition Services Agreement Prior to Bid Procedures Order</u>.  Buyers and Sellers shall have mutually agreed in writing upon the form and content of the US Transition Services Agreement and the Mexico Transition Services Agreement by no later than the day prior to the Bankruptcy Court hearing on US Seller's motion for entry of the Bid Procedures Order.

(f)    <u>US Transition Services Agreement and Mexico Transition Services Agreement Prior to Closing</u>.  The Parties and TSA Parties, as applicable, shall have entered into the US Transition Services Agreement and Mexico Transition Services Agreement, on or prior to Closing, substantially reflecting the terms in <u>Exhibit D</u>.

(g)    <u>Entry of Bid Procedures Order</u>.  The Bid Procedures Order shall have been entered by the Bankruptcy Court and shall not have been stayed pending appeal, reversed or modified, and is in full force and effect.

(h)    <u>Entry of US Sale Order</u>. The US Sale Order shall have been entered by the Bankruptcy Court and shall not have been stayed pending appeal, reversed or modified, and is in full force and effect.

(i)    <u>PBGC Release</u>.  Sellers have received in writing (in a form reasonably acceptable to Sellers) the PBGC Seller Release.

(j)    <u>Satisfaction of Accounts Receivable</u>.  Sellers shall have obtained arrangements satisfactory to Sellers with respect to payment in full, concurrently with the Closing, of the Accounts Receivable, originating from GM and Chrysler, and owed to Sellers, as described in <u>Schedule 10.1(j)</u>, as well as any additional Accounts Receivable owed to Sellers from the parties listed on <u>Schedule 10.1(j)</u> originating from GM or Chrysler, based upon dealings

among any Seller and such parties listed on Schedule 10.1(j) in the Ordinary Course of Business up to three (3) Business Days prior to the Closing.

If the Closing occurs, all conditions set forth in this Section 10.1 that have not been fully satisfied as of the Closing shall be deemed to have been fully waived by Sellers.

       10.2   Conditions Precedent to the Performance by Buyers. The obligations of Buyers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyers in its sole discretion:

       (a)   Representations and Warranties of Sellers. The representations and warranties of Sellers made in this Agreement that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date, and the representations and warranties of Sellers that are not so qualified shall be true and correct in all material respects as of the date hereof and on and as of the Closing Date, as though made on and as of the Closing Date, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time).

       (b)   Performance of the Obligations of Sellers. Sellers shall have, in all material respects, performed the obligations of, and complied with, this Agreement and the covenants hereunder, or any Ancillary Agreement, at or prior to the Closing.

       (c)   Sellers' Deliveries. Sellers shall have delivered, and Buyers shall have received, all of the items set forth in Section 3.2.

       (d)   No Violation of Orders. No preliminary or permanent injunction or other Order that declares this Agreement or any Ancillary Agreements invalid or unenforceable in any respect or that prevents the consummation of the transactions contemplated hereby or thereby shall be in effect.

       (e)   Entry of Bid Procedures Order. The Bid Procedures Order shall have been entered by the Bankruptcy Court and shall not have been stayed pending appeal, reversed or modified, and is in full force and effect.

       (f)   Entry of Sale Order. The US Sale Order shall have been entered by the Bankruptcy Court and shall not have been stayed pending appeal, reversed or modified, and is in full force and effect.

       (g)   Results of Phase II Investigations. The results of any Phase II Investigations conducted in accordance with the provisions of Section 6.15 above have been completed and shall not have identified any environmental conditions that, individually or in the aggregate, are reasonably likely (in the good faith estimation of Buyers' environmental consultant) to require material costs or expenditures to fully remediate such that Buyers have no potential liability for environmental remediation or compliance liabilities under applicable Environmental Laws; provided, however, that, with respect to the facility in Hillsdale, Michigan, this condition shall be deemed satisfied and the covenant in Section 6.15 deemed complied with if (i) if Buyers are given access for testing at locations that are substantially comparable to and as beneficial to Buyers' investigations as those specified in Schedule 6.15 or (ii) Buyers are given access to existing data that is substantially comparable to, and as beneficial to Buyers'

investigations as, the data that would have been collected under the work specified in <u>Schedule 6.15</u>.

(h)    <u>Transfer of Environmental Permits</u>. (i) All Environmental Permits shall either have transferred or been reissued to Buyers at Buyers' sole cost and expense, and such Environmental Permits shall be in full force and effect, or (ii) (x) an agreement shall have been reached to allow Buyers to operate under the existing Environmental Permits in full compliance with all applicable Laws, (y) such agreement shall have been disclosed to all relevant Governments and (z) such Governments shall not have objected to this agreement or otherwise indicated that it would be insufficient to allow the Acquired Assets to be operated in full compliance with all applicable Laws.

(i)    <u>New Customer Agreements</u>. The New Customer Agreements remain in effect, in each case conditioned only upon the effectiveness of the transactions contemplated hereby; provided, however, the condition set forth in this subpart (i) shall be of no force or effect and Buyers shall not be entitled to rely upon this condition in the event that the condition fails by reason of US Buyer's breach of its obligations pursuant to <u>Section 6.19</u>, above, where such breach was the cause of the failure to satisfy the condition set forth in this <u>Section 10.2(i)</u>.

(j)    <u>US Transition Services Agreement and Mexico Transition Services Agreement Prior to Bid Procedures Order</u>. Buyers and Sellers shall have mutually agreed in writing upon the form and content of the US Transition Services Agreement and the Mexico Transition Services Agreement by no later than the day prior to the Bankruptcy Court hearing on US Seller's motion for entry of the Bid Procedures Order.

(k)    <u>PBGC Release</u>. Buyers have received in writing (in a form reasonably acceptable to Buyers) the PBGC Buyer Release.

(l)    <u>Cure Amounts</u>. The total aggregate amount of Cure Amounts (including all Disputed Cure Costs) has been finally determined by Buyers and with the parties to the Assigned Contracts (as has been taken into account for purposes of determining the Closing Purchase Price pursuant to <u>Section 2.1</u>), or Sellers and Buyers have otherwise made provision for payment of any undetermined Cure Amounts, to their respective reasonable satisfaction; in each case no later than two (2) Business Days prior to the Closing.

(m)    <u>Mexico GE Agreements</u>.

(i)    All Consents, approvals and waivers required or necessary pursuant to the Mexico GE Agreements, for the sale of the Mexico Acquired Assets, shall have been obtained.

(ii)    Mexico Seller shall have all requisite authority to transfer good and valid title to or leasehold interest in all of the Mexico Acquired Assets free and clear of all Liens, Claims, interests, and encumbrances deriving from the Mexico GE Agreements.

(iii)    All Liabilities of Mexico Seller with respect to the Mexico Acquired Assets under the Mexico GE Agreements have been satisfied in full, and all of GE CF Mexico, S.A. de C.V's, GE Servicios Financieros, S.A. de C.V., SOFOM,

E.N.R.'s and their affiliates' security interests in, security titles to and other Liens on, all Mexico Acquired Assets have been fully terminated, satisfied, discharged and released.

(n)    Wells Fargo Agreements. Mexico Seller shall have obtained a full release as a guarantor, including release of all obligations related thereto, to the Wells Fargo Agreements.

(o)    US Transition Services Agreement and Mexico Transition Services Agreement Prior to Closing. The Parties and TSA Parties, as applicable, shall have entered into the US Transition Services Agreement and Mexico Transition Services Agreement, on or prior to the Closing Date, substantially reflecting the terms in Exhibit D.If the Closing occurs, all conditions set forth in this Section 10.2 that have not been fully satisfied as of the Closing shall be deemed to have been fully waived by Buyers.

## ARTICLE 11

### TERMINATION AND EFFECT OF TERMINATION

11.1    Right of Termination. Notwithstanding anything to the contrary contained herein, this Agreement may be terminated only as provided in this Article 11. In the case of any such termination that is not automatic pursuant to Section 11.2(b) below, the terminating Party shall give proper written notice to the other Party specifying the provision pursuant to which the Agreement is being terminated.

11.2    Termination Rights. This Agreement may be terminated at any time before Closing:

(a)    by mutual written consent of Sellers and Buyers;

(b)    automatically and without any action or notice by either Sellers to Buyers, or Buyers to Sellers, immediately upon the occurrence of any of the following events:

(i)    the issuance of a final and non-appealable Order by a Government authority to restrain, enjoin, or otherwise prohibit the transfer of the Acquired Assets contemplated hereby;

(ii)    US Seller's Bankruptcy Case being converted into cases under Chapter 7 of the Bankruptcy Code or dismissed; or

(iii)    Consummation of an Alternative Transaction.

(c)    by Buyers:

(i)    if Buyers are not in material breach of this Agreement and there has been a violation or breach by Sellers of any representation, warranty, or covenant contained in this Agreement that (A) has not been waived by Buyers, and (B) Sellers have failed to cure such violation or breach within ten (10) calendar days following receipt of notification thereof by Buyers;

(ii)    upon the Termination Date, if the Closing shall not have occurred and such failure to close is not caused by or the result of Buyers' material breach of this Agreement;

(iii)    if a Material Adverse Effect occurs;

(iv)    if the Bankruptcy Case is not filed by Sellers by the close of business on July 22, 2013;

(v)    if the notices of assumption of the Assigned Contracts, including designation of Cure Amounts, is not served on all necessary parties in accordance with the Bid Procedures Order;

(vi)    if the Bid Procedures Order, which inter alia approves the Bid Procedures, the Break Up Fee and the Expense Reimbursement, is not entered by the Bankruptcy Court by August 8, 2013, or such other date as specified in an Order of the Bankruptcy Court;

(vii)    if the Auction (if required) has not occurred by August 22, 2013, or such other date as specified in an Order of the Bankruptcy Court;

(viii)    if the US Sale Order has not been entered by August 26, 2013, or by such date as the Bankruptcy Court provides;

(ix)    Intentionally Omitted.

(x)    subject to the conditions in Section 10.1 and Section 10.2 having been satisfied (other than those conditions that by their nature are to be satisfied at the Closing) or waived, if the US Sale Order with respect to the transactions contemplated in this Agreement has been entered and (a) Buyers have provided Sellers with written notice that it is prepared to consummate the transactions and (b) the Closing Date does not occur within two (2) Business Days of Buyers providing Sellers with such notice;

(xi)    Notwithstanding the foregoing, in the event (1) a condition set forth in Section 11.2(c) is not satisfied by the deadline applicable thereto (a "**_Deadline_**") and (2) Sellers have used reasonable, good faith efforts to satisfy such condition by the applicable Deadline, such applicable Deadline shall automatically be extended to the date that is five (5) days after the date of such applicable Deadline as set forth in the relevant subsection of this Section 11.2(c), but in no event beyond the Termination Date; and

(xii)    provided that (i) Buyers have not exercised their option to provide a Buyer's Election Notice and (ii) Sellers have not exercised their option to provide a Sellers's Election Notice, in each case pursuant to Section 1.7(f), if the total aggregate amount of Cure Amounts (including all Disputed Cure Costs), as finally determined by Buyers, Sellers and the parties to the Assigned Contracts, has exceeded $700,000; and

(xiii)    in the event that:

(a) the condition set forth in Section 10.2(k) has not been satisfied or waived by Buyers upon the Termination Date, but all other conditions in Sections 10.1 and 10.2, inclusive (other than those conditions that by their nature must be satisfied at the Closing), have been satisfied or waived by the applicable party; or

(b) Buyers have received written notice from the PBGC that Buyers will not obtain the PBGC Buyer Release, thereby causing the condition in Section 10.2(k) not to be satisfied, and Buyers have not waived such

53

condition, but all other conditions in Sections 10.1 and 10.2, inclusive (other than those conditions that by their nature must be satisfied at the Closing), have been satisfied or waived by the applicable party; provided that the termination right contemplated by this clause (b) shall not be available to Sellers prior to five (5) Business Days following the sale hearing.

(d)    by Sellers:

(i)    if Sellers are not in material breach of this Agreement and there has been a material violation or breach by Buyers of any representation, warranty, or covenant contained in this Agreement that (A) has rendered the satisfaction of any condition to the obligations of Sellers set forth in Section 10.1 impossible, (B) has not been waived by Sellers, and (C) Buyers have failed to cure such violation or breach within ten (10) calendar days following receipt of notification thereof by Sellers; or

(ii)    upon the Termination Date, if the Closing shall not have occurred and such failure to close is not caused by or the result of Sellers' material breach of this Agreement, provided, that if the condition set forth in Section 10.1(i) has not been satisfied or waived by Sellers, but all other conditions in Sections 10.1 and 10.2, inclusive (other than those conditions that by their nature must be satisfied at the Closing), have been satisfied or waived by the applicable party prior to the Termination Date, such termination shall be deemed pursuant to Section 11.2(d)(vii)(a);

(iii)    if the Bid Procedures Order is not entered by the Bankruptcy Court by August 8, 2013, or such other date as specified in an Order of the Bankruptcy Court;

(iv)    if the US Sale Order has not been entered by August 26, 2013 or by such date as the Bankruptcy Court provides;

(v)    subject to the conditions in Section 10.1 and Section 10.2 having been satisfied (other than those conditions that by their nature are to be satisfied at the Closing) or waived, if the US Sale Order with respect to the transactions contemplated in this Agreement has been entered and (a) Sellers have provided Buyers with written notice that it is prepared to consummate the transactions and (b) the Closing Date does not occur within two (2) Business Days of Sellers providing Buyers with such notice;

(vi)    provided that Buyers have not exercised their option to provide a Buyer's Election Notice and Sellers have not exercised their option to provide a Sellers' Election Notice, in each case pursuant to Section 1.7(f), if the total aggregate amount of Cure Amounts (including all Disputed Cure Costs), as finally determined by Buyers, Sellers and the parties to the Assigned Contracts, has exceeded $700,000; and

(vii)    in the event that:

(a) the condition set forth in Section 10.1(i) has not been satisfied or waived by Sellers upon the Termination Date, but all other conditions in Sections 10.1 and 10.2, inclusive (other than those conditions that by their nature must be satisfied at the Closing), have been satisfied or waived by the applicable party; or

(b) Sellers have received written notice from the PBGC that Sellers will

not obtain the PBGC Seller Release, thereby causing the condition in Section 10.1(i) not to be satisfied, and Sellers have not waived such condition, but all other conditions in Sections 10.1 and 10.2, inclusive (other than those conditions that by their nature must be satisfied at the Closing), have been satisfied or waived by the applicable party; provided that the termination right contemplated by this clause (b) shall not be available to Sellers prior to five (5) Business Days following the sale hearing.

11.3    Effect of Termination.  If this Agreement is validly terminated pursuant to Section 11.2, this Agreement shall become null and void and have no effect (other than this Article 11, Section 2.3 and Article 12, which shall survive termination) and none of Sellers, Buyers, or any of their respective Related Persons shall have any liability or obligation arising under or in connection with this Agreement except for (a) any breach occurring prior to the termination and (b) the Deposit shall be refunded to Buyers or paid to Sellers, as applicable, in accordance with Section 2.3; provided, however, that the payment of the Break Up Fee and Expense Reimbursement to the extent required pursuant to Section 8.3 or the Fee and Expense Reimbursement (as defined below) pursuant to Section 11.6, this Article 11, and Article 12 shall survive any such termination and shall be enforceable hereunder. If this Agreement is terminated pursuant to Section 11.2(b)(iii), Buyers shall be entitled to and Sellers shall promptly pay to Buyers, as Buyers' sole and exclusive remedy by reason of such termination, the Break Up Fee and Expense Reimbursement from and out of the proceeds following consummation of an Alternative Transaction occurring within the six (6) month period immediately following the Auction. Notwithstanding anything to the contrary contained in this Agreement, if either Buyer shall default under or breach any of its obligations in this Agreement, the Deposit shall constitute Sellers' full and complete liquidated damages and sole and exclusive remedy. Sellers shall have no other remedy at law or in equity for any default by Buyers hereunder, and the Parties shall have no further obligation to each other hereunder.

11.4    Specific Performance.  Subject to the limitations contemplated by Sections 11.3 and 11.6 with respect to sole and exclusive remedies under the circumstances described in Sections 11.3 and 11.6, as applicable, each of the Parties acknowledges and agrees that the other Party would be damaged irreparably in the event any of the provisions of this Agreement is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any other remedy to which they may be entitled pursuant hereto, Buyers and Sellers each agree that the non-breaching Party shall be entitled to specific performance, and injunctive and other equitable relief, to prevent or restrain a breach of the terms of this Agreement by the other Party.

11.5    Back-up Bidder Status.  If an Alternative Transaction is selected by Sellers and approved by the Bankruptcy Court, this Agreement shall not automatically terminate, or if Buyers submitted another higher or otherwise better bid at the Auction that is accepted by Sellers as the highest or otherwise best bid (but is not ultimately the successful bid) (the "***Superseding Agreement***"), such Superseding Agreement shall not terminate, and this Agreement or the Superseding Agreement, as the case may be, shall constitute a "back-up bid" which shall remain open for acceptance by Sellers up to and including the close of business on the date that is three (3) Business Days after the Termination Date (as defined in Section 11.2(c)(viii)) (the "***Back-Up Period***"). Buyers' designation as "back-up" bidder shall not modify any terms of this Agreement

55

or the Superseding Agreement, as the case may be, including Buyers' ability to terminate such agreement pursuant to its terms, subject to this Section 11.5. Upon the lapse of the Back-Up Period, if Sellers do not elect to proceed with closing the transactions pursuant to this Agreement or the Superseding Agreement (as applicable), the Deposit shall be promptly returned to Buyers.

11.6    Payment of Buyers' Expenses/PBGC Release.  In the event that Sellers terminate this Agreement pursuant to Section 11.2(d)(vii), Sellers shall promptly pay to an account designated in writing by Buyers a sum equal to the reasonable fees and expenses incurred by Buyers and their Affiliates in connection with the transactions contemplated by this Agreement and supported by written invoices, which amount shall not exceed One Million Dollars ($1,000,000) in the aggregate (such fee, the *Fee and Expense Reimbursement*"), with Buyers' rights under this Section 11.6 constituting Buyers' sole and exclusive remedy by reason of any termination pursuant to (or deemed to be pursuant to) Section 11.2(d)(vii).  Solely for purposes of this Section 11.6, notwithstanding anything herein to the contrary, Sellers shall not be obligated to pay the Fee and Expense Reimbursement in the event that Buyers waive the condition set forth in Section 10.2(k) unless Buyers deliver to Sellers, concurrent with Buyers' delivery of a written waiver of Section 10.2(k), written notice from an executive officer that Buyers are ready, willing and able to close pursuant to Section 3.1.

## ARTICLE 12

## MISCELLANEOUS

12.1    Exclusivity.  From and after the date hereof until the date upon which Sellers file their petitions for relief under chapter 11 of the Bankruptcy Code (the "*Exclusive Period*"), neither Sellers nor any of their respective directors, officers, managers, employees, representatives or Affiliates shall, directly or indirectly, (i) initiate contact with, solicit, encourage or disclose any information concerning the Business or the Acquired Assets to, (ii) afford any access to its personnel, offices, facilities, properties, books and records of the Business to, or (iii) engage in or continue any discussion, negotiation or agreement with, any Person or entity (other than Buyers and their Affiliates and representatives), in connection with the acquisition of, or any proposal for the acquisition of, the Business or any of the Acquired Assets, whether directly or indirectly, by operation of law or otherwise (each, an "*Acquisition Transaction*").  During the Exclusive Period, Sellers shall immediately (i) advise Buyers, and communicate to Buyers the terms (unless expressly prohibited by the terms thereof) of, any proposal or other communication regarding an Acquisition Transaction that any Seller or any of their respective directors, officers, managers, employees, representatives or Affiliates may receive or has become aware of and (ii) furnish Buyers with a true, complete and correct copy of any such written proposal or communication and any document relating thereto, unless expressly prohibited by the terms thereof.

12.2    Transition of Permits.  To the extent that Buyers have not obtained all of the Permits that are necessary for Buyers to take title to all of the Acquired Assets at the Closing and thereafter to operate all aspects of the Business at the Closing, Sellers shall, to the extent permitted by applicable Laws, use reasonable best efforts to maintain after the Closing such Permits that Buyers reasonably request, at Buyers' sole expense, until Buyers have obtained such Permits.  Buyers shall indemnify Sellers for and hold Sellers harmless against any claim,

expense, or liability incurred without bad faith or willful misconduct on the part of Sellers in connection with Buyers' use of Sellers' Permits.

12.3    Successors and Assigns.   Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto, and any such attempted assignment without such prior written consent shall be void and of no force and effect.   This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the Parties hereto. Notwithstanding the foregoing, Buyers may, without obtaining the consent of any Party hereto, assign any of their rights and/or obligations under this Agreement to any of their Affiliates (provided that if Buyers so assign their rights or obligations hereunder, Buyers shall not be relieved of its obligations hereunder in respect of any such assignment).

12.4    Governing Law; Jurisdiction.   This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware in accordance with the laws applicable to contracts executed in such state (without giving effect to the principles of conflicts of Laws thereof), provided that the validity and enforceability of all conveyance documents or instruments executed and delivered pursuant to this Agreement insofar as they affect title to real property shall be governed by and construed in accordance with the Laws of the jurisdiction in which such property is located.   Without limiting any Party's right to appeal any Order of the Bankruptcy Court, the Parties agree that (a) the Bankruptcy Court shall retain sole jurisdiction over any legal action or proceeding with respect to this Agreement and Sellers. Each of the Parties irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or the transactions contemplated hereby; provided, however, that if the Bankruptcy Case has been fully and finally dismissed and/or the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court sitting in Wilmington, DE.

12.5    Waiver of Jury Trial.   THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).   EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 12.5.

12.6    No Survival of Representations and Warranties; Post-Closing.   Except for the fraud or willful misconduct of a party, both Buyers and Sellers acknowledge and agree that Sellers' representations and warranties set forth in this Agreement shall expire on the Closing Date or upon the earlier termination of this Agreement pursuant to its terms, and no Person shall have any liability for any breach thereof from and after such termination, other than payment of

the Break Up Fee and Expense Reimbursement to the extent required pursuant to <u>Section 8.3</u> of this Agreement or the Fee and Expense Reimbursement to the extent required pursuant to <u>Section 11.6</u> of this Agreement, or the performance of any other obligations, expressly provided herein, which by their terms survive termination of this Agreement.  The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder and each party hereto shall be liable to the other after the Closing for any breach thereof.

      12.7   <u>Mutual Drafting</u>.  This Agreement is the result of the joint efforts of Buyers and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the Parties, and there is to be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

      12.8   <u>Expenses</u>.  Except as otherwise provided herein or in any Order of the Bankruptcy Court with respect to Buyers, each of the Parties shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees, whether or not the transactions contemplated hereby are consummated, except as provided in <u>Sections 8.3</u> and <u>11.6</u>. Each Party shall pay its own fees if any claim is made by a broker or finder. Buyers and Sellers shall share equally the cost of all filing fees with respect to any Government Consents payable upon or in connection with, and all surveys, title insurance policies and title reports obtained in connection with, this Agreement and the transactions contemplated hereby.

      12.9   <u>Severability</u>.  If any term or provision of this Agreement is found by any governmental entity to be illegal, invalid or unenforceable, then the Parties hereby waive such term or provision to the extent that it is found to be illegal, invalid or unenforceable and to the extent that to do so would not deprive one of the Parties of the substantial benefit of its bargain. Such term or provision will, to the extent allowable by law and the preceding sentence, not be voided or canceled but will instead be modified by such governmental entity so that it becomes enforceable and, as modified, will be enforced as any other term or provision hereof. All other terms and provisions hereof will remain in full force and effect and are to be construed in accordance with the modified term or provision as if such illegal, invalid or unenforceable term or provision had not been contained in this Agreement.

      12.10   <u>Notices</u>.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (a) on the day of service if served personally on the Party to whom notice is to be given; (b) on the day of transmission if sent via facsimile transmission to the facsimile number given below, and confirmation of receipt is obtained during regular business hours on a Business Day and, if not, then on the following Business Day; (c) on the day of transmission if sent via e-mail transmission to the e-mail address given below during regular business hours on a Business Day and, if not, then on the following Business Day; (d) on the Business Day after delivery to Federal Express or similar overnight courier for overnight delivery; or (e) on the fifth day after mailing, if properly addressed and mailed to the Party to whom notice is to be given by first class, registered, or certified mail, with postage prepaid, to the Party as follows:

      If to Sellers, Parent and/or TSA Parties:

              c/o Huron Consulting
              900 Wilshire Dr, Suite 270,

Troy, MI 48084
Attention: Mr. John Didonato
Facsimile: (248) 244-2411
E-mail: jdidonato@huronconsulting.com

With a copy to:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19899
Attn: Laura Davis Jones, Esq.
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com

If to Buyers:

c/o Mark IV LLC
One Towne Centre
Amherst NY 14228
Attention:  Edward R Steele
Facsimile: (716) 689-6098
E-mail:    Ed_steele@mark-iv.com

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Attention:  J. Eric Ivester
Attention:  Allison R. Schneirov
Facsimile: (212) 735-2000
E-mail:    Eric.Ivester@skadden.com
E-mail:    Allison.Schneirov@skadden.com

Any Party may change its address for the purpose of this Section 12.10 by giving the other Party written notice of its new address in the manner set forth above.

12.11  Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties, or conditions hereof may be waived, only by a written instrument executed by the Parties, or in the case of a waiver, by the Party waiving compliance.  Any waiver by any Party of any condition, or of the breach of any provision, term, covenant, representation, or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation, or warranty of this Agreement.

12.12  Public Announcements.  Prior to the Closing, no Party shall make any press release or public announcement concerning the transactions contemplated by this Agreement (other than with respect to the filing of the motions and related materials contemplated by Article 8, above) without the prior written approval of the other Parties, unless a press release or public announcement is required by Law or Order of the Bankruptcy Court, or is reasonably necessary

for approval of the transactions contemplated by this Agreement by the Bankruptcy Court. If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing Party shall give the nondisclosing Party or Parties prior notice and approval of the proposed disclosure.

12.13    Entire Agreement.

(a)    This Agreement, the Confidentiality Agreement and the Ancillary Agreements contain the entire understanding among the Parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

(b)    All exhibits, Disclosure Schedules, and schedules referenced herein are incorporated herein and expressly made a part of this Agreement as though completely set forth herein. All references to this Agreement herein or in any of the exhibits, Disclosure Schedules, or schedules shall be deemed to refer to this entire Agreement, including all exhibits, Disclosure Schedules, and schedules. Any item or matter required to be disclosed on a particular section of the Disclosure Schedules pursuant to this Agreement shall be deemed to have been disclosed with respect to all other schedules and sections and any representations, warranties, covenants, or agreements where the applicability of such item or matter to such other schedules, sections, representations, warranties, covenants, and/or agreements is reasonably apparent, regardless of whether a cross-reference to the applicable schedule and/or section is actually made. The information contained in the Disclosure Schedules is disclosed solely for the purposes of this Agreement, and no information contained therein shall be deemed to be an admission by any Party to any third party of any liability or obligation whatsoever, including of any violation of law or breach of any agreement. Capitalized terms used in the Disclosure Schedules and not otherwise defined therein shall have the meanings given to such terms in this Agreement.

12.14    Parties in Interest. Nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers and Buyers and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligations or liability of any third Persons to Sellers or Buyers. No provision of this Agreement shall give any third Persons any right of subrogation or action over or against Sellers or Buyers.

12.15    Headings. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

12.16    Construction. Unless the context of this Agreement otherwise requires, (a) words of any gender include the other gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement as a whole and not to any other particular article, section or other subdivision, (d) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (e) "shall," "will," or "agrees" are mandatory, and "may" is permissive, and (f) "r" is not exclusive.

12.17    Currency. Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in United States currency.

60

12.18  <u>Time of Essence</u>.  Time is of the essence of this Agreement.  When calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

12.19  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement.  This Agreement and any signed agreement entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by facsimile (or equivalent electronic transmission), shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.

12.20  <u>Confidentiality Agreement</u>.  Each Party acknowledges that the terms of the confidentiality agreement between the Parties dated September 17, 2012 (the "***Confidentiality Agreement***") shall remain in full force and effect until the Closing, at which time the Confidentiality Agreement shall terminate.  To the extent that any conflict exists, or is deemed to exist, between this Agreement and the Confidentiality Agreement, the provisions of this Agreement shall govern. If, for any reason, the Closing does not occur, the Confidentiality Agreement shall nonetheless continue in full force and effect in accordance with its terms.

12.21  <u>No Consequential or Punitive Damages</u>.  NO PARTY (OR ITS AFFILIATES OR RELATED PERSONS) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR RELATED PERSONS) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

12.22  <u>Non-Recourse</u>.  The Parties acknowledge and agree that no past, present or future Affiliate or Related Person of the Parties to this Agreement, in such capacity, shall have any liability for any obligations or liabilities of Buyers or Sellers, as applicable, under this Agreement or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby except with respect to fraud or willful misconduct.

## ARTICLE 13

## DEFINITIONS; SCHEDULES; EXHIBITS

13.1  <u>Certain Terms Defined</u>.  As used in this Agreement, the following terms shall have the following meanings:

"***Access Agreement***" is defined in <u>Section 6.15</u>.

"***Accountant***"  is defined in <u>Section 2.2(e)</u>.

"***Accounts Receivable***" means, as of the Closing Date, all accounts receivable, trade receivables, notes receivables and all other receivables, whether current or overdue, of Sellers.

"*Acquired Assets*" is defined in Section 1.1.

"*Acquired Intellectual Property*" means Intellectual Property Rights owned or purported to be owned, licensed or primarily used, or held for use, by Sellers in connection with the Business, including those related to the Trademark "Metavation" and the Software programs known as "MADDO" and "FREQ", and the contents of Schedule 13.1(f).

"*Acquisition Transaction*" is defined in Section 12.1.

"*Action*" means any demand, claim, action, suit or proceeding, arbitral action, inquiry, criminal prosecution or investigation by or before any Government authority.

"*Active Employee*" means an individual employed by Sellers or their respective subsidiaries in the Business who is (i) actively at work as of immediately prior to the Closing Date or (ii) absent from work as of immediately prior to the Closing Date as a result of vacation, personal day or other similar approved short-term absence.

"*Added Excess Amount*" is defined in Section 1.7(f)(ii).

"*Adjusted Payment Date*" is defined in Section 2.2(g).

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such first Person where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through the ownership of voting securities, by contract, as trustee, executor or otherwise.

"*Agreement*" is defined in the Introduction.

"*Agreement Date*" is defined in the Introduction.

"*Alternative Transaction*" is defined in Section 8.4.

"*Amended Mexico Allocation Statement*" is defined in Section 9.4(c).

"*Amended US Allocation Statement*" is defined in Section 9.4(b).

"*Ancillary Agreements*" means, collectively, the agreements to be executed in connection with the transactions contemplated by this Agreement, including the US Assignment and Assumption Agreement and Bill of Sale, the Mexico Assignment and Assumption Agreement, the US Assignment and Assumption of Leases and Related Agreements, the US Transition Services Agreement, the Mexico Transition Services Agreement, the Escrow Agreement, the Intellectual Property Assignment Agreement and the Access Agreement.

"*Apportioned Obligations*" is defined in Section 9.2.

"*Assigned Contracts*" means all Contracts and Real Estate Leases assigned to Buyers pursuant to Section 1.7.

"*Assumed Liabilities*" is defined in Section 1.3.

"*Auction*" means the auction conducted pursuant to the Bid Procedures Order.

"*Avoidance Actions*" means any and all claims and causes of action of Sellers, arising under the Bankruptcy Code or similar state law claims, including under Chapter 5 of the Bankruptcy Code or similar state or provincial law claims.

62

"*Back-Up Period*" is defined in Section 11.5.

"*Bankruptcy Case*" is defined in the Preamble.

"*Bankruptcy Code*" is defined in the Preamble.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or such other court having jurisdiction over the Bankruptcy Case originally administered in the United States Bankruptcy Court for the District of Delaware.

"*Bid Procedures*" means bid procedures and bid protections substantially in the forms attached as Attachment 1 to the Bid Procedures Order, which shall be satisfactory in form and substance to Buyers in their sole discretion.

"*Bid Procedures Motion*" means the motion to be filed no later than two (2) Business Days subsequent to the Petition Date seeking approval of the Bid Procedures.

"*Bid Procedures Order*" means an order, substantially in the form attached as Exhibit E hereto, which shall be satisfactory in form and substance to Buyers in their sole discretion.

"*Break Up Fee*" is defined in Section 8.3.

"*Business*" means collectively the damper related non-foundry business engaged in by US Seller and the damper business engaged in by Mexico Seller.

"*Business Benefit Plan*" means each Employee Benefit Plan in which any employee of Sellers or their respective subsidiaries engaged in or providing services to the Business is eligible to participate.

"*Business Day*" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York and in Mexico City, Mexico are authorized by Law or other Government action to close.

"*Business Records*" means all books, files and records (whether on paper, electronic storage, tape or other media) to the extent they relate to the Acquired Assets, the Business or the Assumed Liabilities, including property records, marketing, advertising and promotional materials, personnel and payroll records of employees, customer lists, historical customer files, reports, plans, data, accounting and Tax records, financial reports, healthcare records, product specifications, drawings, diagrams, training manuals, safety and environmental reports and documents, maintenance schedules, inventory records, fixed asset lists, business plans and marketing and all other studies, documents and records regardless of location, but excluding the Corporate Records.

"*Buyer*" is defined in the Introduction.

"*Buyer's Election Notice*" is defined in Section 1.7(f)(ii).

"*Buyers*" is defined in the Introduction.

"*Cash*" means cash and cash equivalents, including wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

"*Chrysler*" is defined in the Preamble.

"*Claim*" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"*Closing*" is defined in <u>Section 3.1</u>.

"*Closing Date*" is defined in <u>Section 3.1</u>.

"*Closing Inventory*" shall mean the Inventory as actually delivered to Buyers on the Closing Date.

"*Closing Inventory Statement*" is defined in <u>Section 2.2(a)</u>.

"*Closing Purchase Price*" is defined in <u>Section 2.1</u>, subject to the adjustments provided for in this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collar Amount*" means Five Hundred Thousand Dollars ($500,000).

"*Confidentiality Agreement*" is defined in <u>Section 12.20</u>.

"*Consent*" means any consent, approval, authorization, qualification, waiver, or notification of a Government or third party if required to effect the transactions contemplated hereby after giving effect to applicable bankruptcy Law or the US Sale Order.

"*Contract*" means any loan or credit agreement, bond, debenture, note, mortgage, indenture, lease or sublease (other than a Real Estate Lease), supply agreement, license agreement, development agreement, purchase order, customer agreement, or other contract, agreement, obligation, commitment or instrument, including all amendments thereto.

"*Copyrights*" is defined under the definition of Intellectual Property Rights.

"*Corporate Records*" means company seals, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence, or capitalization of Sellers, as well as any other records or materials relating to Sellers generally and not involving or related to the Acquired Assets or the operations of the Business.

"*Cure Amounts*" means those amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Section 365(b) of the Bankruptcy Code, in connection with the assumption and/or assignment of any Assigned Contract.

"*Deadline*" is defined in <u>Section 11.2(c)(xi)</u>.

"*Deposit*" is defined in <u>Section 2.3</u>.

"*Designation Deadline*" is defined in <u>Section 1.7(d)</u>.

"*Disclosure Schedules*" means the disclosure schedules accompanying this Agreement.

"*Dispute Notice*" is defined in <u>Section 2.2(c)</u>.

"*Disputed Cure Costs*" is defined in <u>Section 1.7(c)</u>.

"*Employee Benefit Plan*" means: (a) any employee benefit plan (within the meaning of Section 3(3) of ERISA and whether or not it is subject to ERISA and any "multi-employer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA and each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option, and other equity related compensation plan, program, agreement or arrangement; each medical, surgical, hospitalization, life insurance, and other "welfare" plan, fund or program (within the meaning of Section 3(1) of

ERISA and whether or not it is subject to ERISA); (b) each profit-sharing, stock bonus, or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA and whether or not it is subject to ERISA); (c) each employment, termination, change in control, or retention agreement or arrangement; (d) and each other employee benefit plan, fund, program, agreement, or arrangement, in each case, that is sponsored, maintained or contributed to, or required to be contributed to, by Sellers or an ERISA Affiliate or to which Sellers or an ERISA Affiliate is party, whether written or oral.

"*Employees*" is defined in Section 7.1(b).

"*Environmental Law*" means any Law, Order or other requirement of Law relating to the protection of the environment or human health or safety, including relating to the manufacture, use, transport, treatment, storage, disposal, release, or threatened release of Hazardous Materials.

"*Environmental Permits*" is defined in Section 4.6(a).

"*Equipment*" means Sellers' equipment, security devices, furniture, fixtures, tools, computer equipment, and other personal property, whether idle or active, now or hereafter owned, leased or held by Sellers, primarily used or useful in, or held for use in, the Business and the items listed on Schedules 13.1(a)(i) and (ii).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" means any entity that with any Seller is treated as a single employer pursuant to Section 4001(b) of ERISA) or:  (a) member of a controlled group of corporations within the meaning of Section 414(b) of the Code; (b) a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code; (c) a member of an affiliated service group within the meaning of Section 414(m) of the Code; or (d) a member of a group of organizations required to be aggregated under Section 414(o) of the Code.

"*Escrow Agent*" is defined in Section 2.3.

"*Escrow Agreement*" is defined in Section 2.3.

"*Excess Amount*" is defined in Section 1.7(f)(i).

"*Excluded Assets*" is defined in Section 1.2.

"*Excluded Liabilities*" is defined in Section 1.4.

"*Exclusive Period*" is defined in Section 12.1.

"*Executory Contract List*" is defined in Section 1.7(a).

"*Existing Red Facility Lease*" is defined in Section 6.18(b).

"*Expense Reimbursement*" is defined in Section 8.3.

"*Fee and Expense Reimbursement*" is defined in Section 11.6.

"*Final Calculations*" is defined in Section 2.2(e).

"*FIRPTA Certificate*" is defined in Section 3.2(c).

"*Foreign Benefit Plan*" is defined in Section 4.12(h).

"*Foundry Agreements*" means the agreements set forth on Schedule 13.1(g).

"*GAAP*" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"*GM*" is defined in the Preamble.

"*Government*" means any agency, division, subdivision, audit group, procuring office, or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States or any state thereof, of Mexico or of any state thereof, or of any foreign government.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes, and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"*Improvements*" means all of Sellers' rights and interests to all equipment, machinery, fixtures, furniture and other tangible property, whether idle or active, owned, leased, primarily used or held for use by Sellers or used or useful in, or held for use primarily in the Business (including all such property that is damaged), including all attachments, appliances, lighting fixtures, signs, doors, partitions, plumbing, heating, air conditioning, wiring, telephones, security systems, carpets, floor coverings, wall coverings, office equipment, combinations, codes and keys, and any other furniture, fixtures, equipment, and improvements.

"*Intellectual Property Assignment Agreement*" is defined in Section 3.2(g).

"*Intellectual Property Rights*" means all intellectual property and industrial property rights of every kind, including all (a) patents, patent applications, invention disclosures and all related continuations, divisionals, continuations-in-part, reissues, re-examinations, substitutions and extensions ("*Patents*"); (b) trademarks, service marks, trade names, service names, brand names, trade dress, logos, Internet domain names, and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof ("*Trademarks*"); (c) copyrights, copyrightable subject matter ("*Copyrights*"); (d) rights in computer programs (whether in source code, object code or other form), algorithms, databases, compilations and data ("*Software*"); (e) trade secrets and all other confidential information, ideas, know-how, inventions, proprietary processes, formulae, models and methodologies ("*Trade Secrets*"); (f) rights in the foregoing and in other similar intangible assets; (g) applications and registrations for the foregoing; and (h) rights and remedies against past, present and future infringement, misappropriation or other violation thereof.

"*Inventory*" means all goods held for sale or lease or furnished under contracts of service, raw materials, work in process or materials used or held for use in the Business.

"*IRS*" means the Internal Revenue Service and any similar foreign Government agency.

"*Knowledge*" of Sellers with respect to a given matter means the actual knowledge of Bob Carney, John Didonato, Mike Gluhanich, Brian Linscott, Myra Moreland and Dan Smith after due inquiry.

"*Law*" means any federal, state, provincial, local or foreign law, statute, code, ordinance, rule or regulation.

"*Leased Real Property*" means the real property leased by Sellers pursuant to the Real Estate Leases.

"*Legal Proceeding*" means any judicial, administrative or arbitral actions, suits, proceeds (public or private), or claims of any proceedings by or before a court or other Government authority.

"*Liability*" means any debt, liability, commitment, or obligation of any kind (whether direct or indirect, known or unknown, fixed, absolute or contingent, matured or unmatured, asserted or not asserted, accrued or unaccrued, liquidated or unliquidated).

"*Lien*" means any liabilities, obligations, claims, charges, encumbrances, leases, mortgages, covenants, security interests, liens, options, pledges, rights of others, or restrictions (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, law, equity or otherwise.

"*Material Adverse Effect*" means any event or condition in respect of the operation of the Business, the Acquired Assets, and the Assumed Liabilities that individually or in the aggregate results in or is reasonably likely to (a) result in a material adverse effect on the properties, liabilities, business, condition (financial or otherwise), operations or prospects of the Acquired Assets taken as a whole, or (b) materially impair Sellers' ability to timely perform their obligations or consummate the transactions contemplated by this Agreement and the Ancillary Agreements on a timely basis, in each case other than any event or condition that results from (i) changes in general economic, financial market or geopolitical conditions, (ii) general changes or developments in the industries and markets in which the Business operates, (iii) the announcement and performance of this Agreement and the other transactions contemplated by this Agreement, (iv) changes in any applicable accounting regulations or principles or interpretations thereof, or (v) changes in any applicable laws; or (vi) the filing of the Bankruptcy Case and any actions taken in the Bankruptcy Case in furtherance of the transactions contemplated by this Agreement; provided, however, that changes or developments set forth in clause (ii) may be taken into account in determining whether there has been or is a Material Adverse Effect if such changes or developments have a disproportionate impact on the Acquired Assets, taken as a whole, relative to the other participants in the industries and markets in which the Business operates.

"*Material Contracts*" is defined in Section 4.13(a).

"*Mexico Acquired Assets*" is defined in the Preamble.

"*Mexico Allocation Statement*" is defined in Section 9.4(c).

"*Mexico Assigned Contracts*" is defined in Section 1.1(d).

"*Mexico Assignment and Assumption Agreement*" is defined in Section 3.2(b).

"*Mexico Buyer*" is defined in the Introduction.

"*Mexico GE Agreements*" means each and all of the agreements set forth on Schedule 13.1(b).

"*Mexico Purchase Price*" is defined in Section 9.4(a).

"*Mexico Seller*" is defined in the Introduction.

"*Mexico Seller Personnel*" is defined in <u>Section 7.1(e)(i)</u>.

"*Mexico Transition Services Agreement*" is defined in <u>Section 3.2(i)</u>.

"*MFLL*" is defined in <u>Section 7.1(e)(i)</u>.

"*New Customer Agreements*" is defined in the Preamble.

"*Non-Assigned Acquired Asset*" is defined in <u>Section 1.6(a)</u>.

"*Non-Damper Business*" is defined in <u>Section 6.21</u>.

"*Order*" means any order, injunction, judgment, decree, ruling, endorsement, writ, and assessment, or arbitration award of the Government.

"*Ordinary Course of Business*" means the conduct of the Business in substantially the same manner as conducted since January 17, 2013, consistent in nature, scope and magnitude with past practice and taken in the ordinary course of normal, day-to-day operations in compliance with applicable Law in all material respects, after taking into consideration changes that are expressly required or appropriate as a result of the Bankruptcy Case.

"*Parent*" is defined in the Introduction.

"*Party*" or "*Parties*" is defined in the Introduction.

"*Patents*" is defined under the definition of Intellectual Property Rights.

"*PBGC*" shall mean and refer to the Pension Benefit Guaranty Corporation.

"*PBGC Buyer Release*" means an agreement between the PBGC and Buyers that the PBGC will not assert liability, under Title IV of ERISA or otherwise, against Mexico Buyer, US Buyer or any of their respective subsidiaries or any other entity that, together with Mexico Buyer, US Buyer or any of their respective Subsidiaries would be treated as a single employer pursuant to Section 4001(b) of ERISA, in any event arising out of or in any way attributable to any Employee Benefit Plans.

"*PBGC Seller Release*" means an agreement between PBGC and Sellers whereby PBGC agrees that it will not (i) seek to enjoin the consummation of the transactions contemplated by this Agreement or (ii) assert after the Closing against Sellers or their ERISA Affiliates any claim over or otherwise in respect of the Acquired Assets.

"*Permits*" means any permits, authorizations, approvals, consents, registrations, certificates and licenses relating to the Business issued by any Government (and pending applications for the foregoing).

"*Permitted Liens*" means:  (a) statutory Liens for current Taxes, assessments and other Government charges that are not yet due and payable;  (b) mechanics', materialmen's, warehouseman's and similar Liens that relate to Assumed Liabilities;  (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances, or any other state of facts, that do not materially interfere with the present occupancy of the Leased Real Property or the Leased Real Property as it has been used by Sellers in the Business prior to the Closing Date;  (d) zoning, building codes and other land use Laws regulating the use or occupancy of real property or the activities conducted thereon which are imposed by any Government having jurisdiction over real property; or (e) a lessor's interest in, and any mortgage, pledge, security

interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any of the Real Estate Leases.

*"Permitted Phase II Investigations"* is defined in Section 6.15.

*"Person"* means an individual, a partnership, a corporation, an association, a limited or unlimited company, a joint stock company, a trust, a joint venture, an unincorporated organization or other entity or Government authority.

*"Petition Date"* means the date that US Seller commences the Bankruptcy Case.

*"Post-Closing Tax Period"* is defined in Section 9.2.

*"Pre-Closing Tax Period"* is defined in Section 9.2.

*"Purchase Price"* means Twenty-Five Million and Seventy-Five Thousand Dollars ($25,075,000), subject to the adjustments provided for in Section 2.1, as same may be modified at the Auction.

*"Qualified Leave Recipient"* means an individual, other than an Active Employee, who is employed by Sellers or their respective subsidiaries in the Business and who is absent from work as of immediately prior to the Closing Date as a result of an approved short-term leave of absence (including military leave with reemployment rights under United States federal law and leave under the Family and Medical Leave Act of 1993).

*"Real Estate Leases"* means all of Sellers' rights and interests under leases of real property leased by Sellers and used or useful in, or held for use in, the Business, including but not limited to the leases set forth on Schedule 13.1(c) but not including the leases set forth on Schedule 13.1(d).

*"Red Facility"* is defined in Section 6.18(a).

*"Related Person"* means, with respect to any Person, all past, present and future Affiliates, directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

*"Released Deposit Funds"* is defined in Section 2.3.

*"Required Additional Deposits"*  is defined in Section 1.1(j).

*"Retained Deposit"* is defined in Section 2.3.

*"Review Documents"* means any documents, title information, assessments, surveys, plans, specifications, reports and studies, or other information made available to Buyers by Sellers including any other material made available to Buyers in any "data rooms," "data sites," responses to inquiries, confidential information memoranda or management presentations.

*"Review Period"*  is defined in Section 2.2(c).

*"Sale Approval Motion"* means the motion to be filed no later than two (2) Business Days subsequent to the Petition Date seeking approval of US Seller's sale of the US Acquired Assets either to US Buyer or to another buyer in an Alternative Transaction.

*"Seller"* is defined in the Introduction.

*"Seller's Election Notice"* is defined in Section 1.7(f)(ii).

"*Sellers*" is defined in the Introduction.

"*Seller Intellectual Property*" is defined in Section 4.14(b).

"*Shared Property*" is defined in Section 1.9.

"*Software*" is defined under the definition of Intellectual Property Rights.

"*Superseding Agreement*" is defined in Section 11.5.

"*Target Inventory Amount*" means Three Million and Three Hundred Thousand Dollars ($3,300,000).

"*Tax Asset*" means any net operating loss, net capital loss, Tax credit or any other Tax attribute which could reduce Taxes (including deductions and credits related to alternative minimum Taxes).

"*Tax Return*" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"*Taxes*" means (a) all taxes, however denominated, and all like charges, levies, duties, imposts or other assessments, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes capital, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, minimum, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other obligations of the same or a similar nature, (b) any transferee, successor or other liability in respect of Taxes of another (whether by contract or otherwise) and any liability in respect of any Taxes as a result of any company being a member of any "affiliated group" as defined in Section 1504 of the Code, or any analogous combined, consolidated or unitary group defined under state, federal, provincial, local or foreign tax Law and (c) any interest or penalties imposed with respect to any amounts described in (a) or (b).

"*Termination Date*" means a date that is fifty-five (55) days after the Petition Date.

"*Trademarks*" is defined under the definition of Intellectual Property Rights.

"*Trade Secrets*" is defined under the definition of Intellectual Property Rights.

"*Transaction Taxes*" is defined in Section 9.1.

"*Transferred Employees*" is defined in Section 7.1(c).

"*Transition Date*" is defined in Section 6.18(b).

"*TSA Parties*" is defined in the Introduction.

"*Undisputed Cure Costs*" is defined in Section 1.7(a).

"*US Acquired Assets*" is defined in the Preamble.

"*US Allocation Statement*" is defined in Section 9.4(b).

"*US Assignment and Assumption Agreement and Bill of Sale*" is defined in <u>Section 3.2(a)</u>.

"*US Assignment and Assumption of Leases and Related Agreements*" is defined in <u>Section 3.2(f)</u>.

"*US Buyer*" is defined in the Introduction.

"*US Purchase Price*" is defined in <u>Section 9.4(a)</u>.

"*US Sale Order*" means an order, substantially in the form attached as <u>Exhibit F</u> hereto, which shall be satisfactory, in form and substance to Buyers in their sole discretion.

"*US Seller*" is defined in the Introduction.

"*US Transition Services Agreement*" is defined in <u>Section 3.2(h)</u>.

"*Vassar Shop Equipment*" is defined in <u>Section 1.1(b)</u>.

"*WARN Act*" is defined in <u>Section 7.3</u>.

"*Wells Fargo Agreements*" means each and all of the agreements set forth on <u>Schedule 13.1(e)</u>.

13.2    <u>Schedules</u>.  The following is a list of the Schedules to this Agreement:

<u>Schedule 1.1(b)(ii)</u> ........................................................................Vassar Shop Equipment

<u>Schedule 1.1(d)</u> ...........................................................................Mexico Assigned Contracts

<u>Schedule 1.1(e)</u> ...........................................................................................Mexico Assets

<u>Schedule 1.2(g)</u> ...............................................................................................Avoidance Actions

<u>Schedule 1.2(r)</u> ...........................................................................Mexico Trademarks

<u>Schedule 1.2(s)</u>.............................................................................Other Excluded Assets

<u>Schedule 1.2(v)</u> .......................................................................Other Tooling Excluded Assets

<u>Schedule 1.3(iii)</u>.........................................................................Employee Accruals

<u>Schedule 1.7(a)</u> ...........................................................................Executory Contract List

<u>Schedule 2.2(a)</u> ............................................................................Inventory Adjustment

<u>Schedule 3.3(a)</u> ...........................................................................US Closing Purchase Price

<u>Schedule 3.3(b)</u> ...........................................................................Mexico Closing Purchase Price

<u>Schedule 4.3</u>.............................................................................................No Conflicts

<u>Schedule 4.4(a)</u> ............................................Permits, Government Consents and Approvals

<u>Schedule 4.4(b)</u> ..........................................................................................Consents

<u>Schedule 4.5</u>...........................................................................Law and Legal Proceedings

<u>Schedule 4.6(a)</u> ...........................................................................Environmental Matters

<u>Schedule 4.6(b)</u> ...........................................................................Environmental Matters

<u>Schedule 4.6(c)</u> ...........................................................................Environmental Matters

71

Schedule 4.11(a) ..........................................................................Labor Relations

Schedule 4.11(d) ..........................................................................Labor Relations

Schedule 4.11(f) ..........................................................................Labor Relations

Schedule 4.12(a) ................................................................Employee Benefit Plans

Schedule 4.12(c) ................................................................Employee Benefit Plans

Schedule 4.12(e) ................................................................Employee Benefit Plans

Schedule 4.12(f) ................................................................Employee Benefit Plans

Schedule 4.13 ......................................................................Material Contracts

Schedule 4.14 ....................................................................Intellectual Property

Schedule 4.15 ........................................................................ Title to Assets

Schedule 4.16 ........................................................................ Real Property

Schedule 4.17 ..................................................................No Brokers or Finders

Schedule 4.18(a)(ii) ....................................................................................Taxes

Schedule 4.20 ................................................................Customers and Suppliers

Schedule 4.23 ................................................................Compliance with Law

Schedule 4.24 ........................................................ Absence of Changes or Events

Schedule 6.2(h) ........................................Conduct of Business Prior to Closing

Schedule 6.3(a) ..........................................................Permits and Consents

Schedule 6.3(b) ..........................................................Permits and Consents

Schedule 6.14(b)(iii)(A) ....................................................................Non-Solicitation

Schedule 6.14(b)(iii)(B) ....................................................................Non-Solicitation

Schedule 6.15 ..................................................................Environmental Matters

Schedule 7.1(b)(ii) ..........................................................Mexico Employee Matters

Schedule 7.1(e) ..........................................................Mexico Employee Matters

Schedule 9.4(a)(i) ..........................................................US Purchase Price

Schedule 9.4(a)(ii) ..........................................................Mexico Purchase Price

Schedule 9.6 ..........................................................Purchase Price Allocation

Schedule 10.1(j) ........................................ Satisfaction of Accounts Receivable

Schedule 13.1(a)(i) ..........................................................US Equipment

Schedule 13.1(a)(ii) ..........................................................Mexico Equipment

Schedule 13.1(b) ..........................................................Mexico GE Agreements

Schedule 13.1(c) ..........................................................Real Estate Leases

Schedule 13.1(d) ..........................................................Real Estate Leases

Schedule 13.1(e) ................................................................Wells Fargo Agreements

Schedule 13.1(f) ...............................................................Acquired Intellectual Property

Schedule 13.1(g) ...............................................................Foundry Agreements

13.3   <u>Exhibits</u>.  The following is a list of the Exhibits to this Agreement:

Exhibit A ................................................................................Escrow Agreement

Exhibit B ................................................................................FIRPTA Certificate

Exhibit C ................................................................................Section 3.2(d) Certificate

Exhibit D ................................................................................US Transition Services Agreement

Exhibit D ................................................................................Mexico Transition Services Agreement

Exhibit E ................................................................................Access Agreement

Exhibit F ................................................................................Bid Procedures Order

Exhibit G ................................................................................US Sale Order

*     *     *     *     *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYERS**

DAYCO PRODUCTS, LLC

By: *James C. Orchard*
Name: James C. Orchard
Title:  Chief Executive Officer


DAYCO PRODUCTS S.A. DE C.V.


By:_____
Name: Joseph Martino
Title:  Director de Finanzas

*[Buyers Signature Page to the Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYERS**

DAYCO PRODUCTS, LLC

By:_____
Name: James C. Orchard
Title:   Chief Executive Officer


DAYCO PRODUCTS S.A. DE C.V.

By:_____
Name: Joseph Martino
Title:   Director de Finanzas


*[Buyers Signature Page to the Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**SELLERS:**

Metavation LLC, a
Delaware limited liability company

*REVSTONE TRANSPORTATION, LLC*
*ITS SOLE MEMBER*

By: _Jomn C. DiDonato_
Name: _____
Title: _CHIEF RESTRUCTURING OFFICER_

Eptec S.A. de C.V., a company
organized under the laws of Mexico

By: _____
Name: _____
Title: _____

**OTHER SELLER PARTIES:**

*The undersigned hereby join in the Asset Purchase Agreement to which this signature page is attached solely for the limited purposes expressly set forth in the preamble to such Asset Purchase Agreement:*

Revstone Transportation, LLC,
a Delaware limited liability company

By: _____
Name: _JOHN C. DiDONATO_
Its: _CHIEF RESTRUCTURING OFFICER_

Metavation Vassar, LLC,
a Delaware limited liability company

*REVSTONE TRANSPORTATION, LLC*
*ITS: SOLE MEMBER*

By: _____
Name: _JOHN C. DiDONATO_
Its: _CHIEF RESTRUCTURING OFFICER_

Resource Technology Group, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

SELLERS:

Merevention LLC, a
Delaware limited liability company

By:_____
Name:_____
Title:_____

Emce S.A. de C.V., a company
organized under the laws of Mexico

By:_____
Name:_____
Title:_____

OTHER SELLER PARTIES:

*The undersigned hereby join in the Asset Purchase Agreement to which this signature page is attached solely for the limited purposes expressly set forth in the preamble to such Asset Purchase Agreement.*

Keystone Fulfillment, LLC,
a Delaware limited liability company

By:_____
   Name:_____
   Its:_____

Merevention Vessel, LLC,
a Delaware limited liability company

By:_____
   Name:_____
   Its:_____

Keystone Technology Group, LLC,
Delaware limited liability company

By:_____
   Name: Rubens Perdomo
   Its: Chief Information Officer