IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVSTONE INDUSTRIES, LLC, <u>et al.</u>,[1] | ) | Case No. 12-13262 (BLS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| METAVATION, LLC, | ) | Case No. 13-<u>11831</u>(BLS) |
| | ) | |
| Debtor. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105, 361, 362, 363 AND
507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001 AND
LOCAL RULE 4001-2 FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING
AND USE CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION, (III) SCHEDULING A FINAL HEARING,
<u>AND (IV) GRANTING CERTAIN RELATED RELIEF</u>**

Metavation, LLC, the above-captioned debtor and debtor in possession (the

"<u>Debtor</u>") submits this motion (the "<u>Motion</u>"), for entry of an interim order on an expedited

basis (the "<u>Interim Order</u>") substantially in the form attached hereto and, following a final

hearing to be set by the Court (the "<u>Final Hearing</u>"), entry of a final order (the "<u>Final Order</u>" and,

with the Interim Order, the "<u>DIP Orders</u>"), pursuant to sections 105, 361, 362, 363, 364 and

507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 4001 of the Federal

Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local

Rules of the United States Bankruptcy Court for the District of Delaware (the "<u>Local

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of each original Debtor's federal tax identification numbers are: Revstone Industries, LLC (7222); Spara, LLC (6613); Greenwood Forgings, LLC (9285); and US Tool & Engineering, LLC (6450). The location of the Debtors' headquarters and the service address for each of the Debtors is 2250 Thunderstick Dr., Suite 1203, Lexington, KY 40505.

Rules"), authorizing the <u>Debtor</u> to obtain secured postpetition superpriority financing and use

cash collateral (the "<u>DIP Facility</u>") on an interim and final basis pursuant to the terms and

conditions of that certain Ratification and Amendment Agreement dated as of July 22, 2013 (the

"<u>Ratification and Amendment Agreement</u>") by and among the Debtor, certain non-debtor

affiliates as co-borrowers[2] and guarantors that are parties to the existing prepetition Credit

Agreement (hereinafter defined), Wells Fargo Capital Finance, N.A., as lender and as agent

("<u>Wells</u>" or, in such capacity, the "<u>Agent</u>") for each Lender party thereto, including without

limitation the Existing Junior Participants and the DIP Junior Participants (collectively, the

"<u>Lenders</u>"), attached to the Interim Order as **Exhibit A** (together with the existing Credit

Agreement and other documents amended by the Ratification and Amendment Agreement, as set

forth therein, and as further amended, supplemented, restated or otherwise modified from time to

time in accordance therewith, the "<u>DIP Agreement</u>,[3]" and together with the other documents,

agreements and instruments delivered pursuant thereto or executed or filed in connection

therewith, all as may be reasonably requested by the Lenders, as the same may be amended,

supplemented, restated or otherwise modified from time to time, the "<u>DIP Loan Documents</u>).

   In support of this Motion, the Debtor relies on the *Declaration of John C.*

*DiDonato in Support of First Day Motions of Metavation, LLC* (the "<u>DiDonato</u>

<u>Declaration</u>"), and the Debtor further represents as follows:

---

[2] The non-debtor affiliates who are co-borrowers under the prepetition Credit Agreement, Contech Castings, LLC, MPI, LLC and MW Texas Diecasting, Inc. are not borrowers under the DIP Facility.
[3] A capitalized term used herein and not defined herein shall have the meaning given to such term in the DIP Agreement.

## OVERVIEW

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.

This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (M).  Venue is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105, 361,

362, 363(b), 364 and 507 of the Bankruptcy Code and Bankruptcy Rule 4001.

3.      By this Motion, the Debtor seeks the entry of the Interim Order, which:

a.      authorizes the Debtor to obtain the secured postpetition superpriority DIP Facility on an interim basis pursuant to the terms and conditions of the DIP Agreement and the DIP Loan Documents;

b.      authorizes the Debtor to execute the DIP Loan Documents, and to perform such other acts as may be necessary or desirable in connection therewith,

c.      grants to the Agent, for itself and for the ratable benefit of the Lenders, first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Loan Documents, as applicable, and the DIP Orders, as applicable, subject only to Permitted Encumbrances (collectively, the "DIP Obligations");

d.      grants allowed superpriority administrative expense claims to the Agent and the Lenders;

e.      authorizes the Debtor to use cash collateral ("Cash Collateral") in which (a) the Agent on behalf of the Lenders has or asserts an interest under that certain Credit Agreement, dated as of July 23, 2010  among (i) the Debtor, (ii) certain non-debtor affiliates of the Debtor, Contech Castings, LLC, MPI, LLC, and MW Texas Die Casting, Inc., as co-borrowers, (iii) certain non-debtor affiliates of the Debtor, as guarantors, (iv) the Lenders and (v) the Agent (as amended, supplemented or otherwise modified from time to time prior to execution of the Ratification and Amendment Agreement, the "Prepetition Credit Facility," and together with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith prior to execution of the Ratification and Amendment

Agreement, the "Prepetition Loan Documents")[4], and (b) the Pension Benefit Guaranty Corporation (the "PBGC") has or asserts an interest under that certain Notice of Liens and Claims dated April 24, 2013 (the "PBGC Lien Notice"), which asserted interest has been consensually subordinated by agreement of the parties that provides for payment to the PBGC as set forth in such agreement;

f.    authorizes the Debtor to grant adequate protection to the Agent on behalf of the Lenders, for any decrease from and after the Petition Date in the value (such decrease being a "Diminution of Value") of its interest in the Debtor's property resulting from (i) the use, sale or lease of the Debtor's property (including the use of Cash Collateral), (ii) the Carve-Out (hereinafter defined), or (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code;

g.    modifies the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

h.    waives any applicable stays under the Bankruptcy Rules and provides for the immediate effectiveness of the Interim Order; and

i.    schedules a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order, inter alia, approving and authorizing the DIP Facility (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents.

## CONCISE STATEMENT OF RELIEF REQUESTED

4.    In accordance with Bankruptcy Rules 4001(b), (c), and (d) and Local Rule 4001-(2), below is a summary[5] of the terms of the proposed Postpetition Financing Arrangement:

a.    Borrower:    The Debtor, Metavation, LLC.

b.    Lenders.    Wells, as Lender and as Agent for the other Lenders, including without limitation the Existing Junior

---

[4] The Prepetition Loan Documents are listed in the Exhibit Supplement to this Motion that is being filed contemporaneously with this Motion, are voluminous, and are available on request.

[5] The summaries and descriptions of the terms and conditions of the for the DIP Facility and the DIP Orders set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the DIP Agreement and the Interim Order. In the event there is any conflict between this Motion and the Interim Order, the Interim Order will control in all respects.

|   | | Participants and the DIP Junior Participants. |
|---|---|---|
| c. | Closing Date. | "Interim Closing Date" means the date on which the "Conditions Precedent to the Interim DIP Facility" set forth under below are satisfied or waived by the Agent on behalf of the Lenders.

"Final Closing Date" means the date on which the conditions precedent to approval of the DIP Facility on a final basis (including, without limitation, entry of the Final Order) shall have been satisfied or waived. |
| d. | Type and Amount of DIP Facility. | A senior credit debtor-in-possession (a) revolving credit facility extended by the Agent on behalf of the Lenders in the amount of up to $3,554,750 and (b) term loan facility extended by the the Agent on behalf of the Lenders in the amount of up to $6,000,000 (all of which term loan facility is funded by loan participations purchased by the DIP Junior Participants), plus any interest, fees and other obligations accrued thereon. |
| e. | Availability. | The Debtor seeks authority pursuant to the DIP Facility to borrow up to the amounts set forth with respect to each week of the budget attached as **Exhibit B** to the Interim Order (the "Approved Budget") on an interim basis until entry of the Final Order, and thereafter to borrow up to balance of the amounts set forth in the Approved Budget. |
| f. | Purpose. | The DIP Facility will be used for (a) working capital and general corporate purposes of the Debtor, (b) bankruptcy-related costs and expenses including and subject to the Carve-Out, (c) costs and expenses related to the sale of the Debtor's property, and (d) for any other purpose agreed upon in the DIP Loan Documents, in accordance with the Approved Budget.

Under the DIP Agreement, none of the proceeds of the DIP Facility shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lenders (in any capacity), including in connection with the validity of the liens granted to the Lenders, except up to the amount of $25,000 for investigation as set forth in the DIP Orders. |
| g. | Budget and Projections. | Use of cash shall be subject to the Approved Budget for the period commencing on the Petition Date and ending on August 30, 2013 (the "Stated Maturity Date").

The Debtor is required, not later than 5:00 p.m. (Eastern |

time) on the Wednesday of each week commencing on
July 24, 2013, furnish to the Agent, in form and substance
satisfactory to the Agent, a report (the "<u>Budget
Compliance Report</u>") that sets forth, on a cumulative,
weekly roll-forward basis through the end of the
immediately preceding week, a comparison of (i) the actual
aggregate outstanding Advances to the projected
outstanding aggregate Advances set forth in the Approved
Budget for such period, and (ii) the actual aggregate
weekly disbursements in respect Allowed Professional
Fees (whether paid to the Allowed Professional Fee
Escrow Account or paid directly to professionals) to the
projected aggregate Allowed Professional Fees set forth in
the Approved Budget for such period, together with a
certification from the CRO.

h.    <u>Priority</u>.          All DIP Obligations shall be:

(i)      pursuant to section 364(c)(1) of the Bankruptcy
Code, entitled to superpriority administrative
expense claim status in the chapter 11 case of
the Debtor (the "<u>Case</u>") with priority over any
and all administrative expenses, whether
heretofore or hereafter incurred, of the kind
specified in sections 503(b) or 507(b) of the
Bankruptcy Code, and in all cases subject to the
Carve-Out, provided that prior to entry of the
Final Order such claim shall not apply to the
proceeds of avoidance actions under chapter 5
of the Bankruptcy Code ("<u>Avoidance
Actions</u>"), and in all cases subject to the Carve-
Out (the "<u>Superpriority Claim</u>");

(ii)     pursuant to sections 364(c)(2), secured by a
perfected first-priority lien on the Post-Petition
Collateral (which excludes Avoidance Actions
and the proceeds thereof until entry of the Final
Order) to the extent  that such Post-Petition
Collateral is not subject to valid, perfected and
non-avoidable liens as of the Petition Date (but
in all cases subject to the Carve-Out);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy
Code, secured by a perfected second priority
lien on the Post-Petition Collateral (which
excludes Avoidance Actions and the proceeds
thereof until entry of the Final Order), to the

extent that such Post-Petition Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code, and to the extent such liens are expressly permitted in writing by the Agent on behalf of the Lenders in its sole and absolute discretion (but in all cases subject to the Carve-Out); and

(iv)    the liens granted to the Agent on behalf of the Lenders shall be subject in each case to existing liens that have priority over the prepetition liens of the Agent and the Lenders, and to exceptions to be expressly agreed upon in writing by the Agent, on behalf of the Lenders, in its sole and absolute discretion or imposed by applicable non-bankruptcy (collectively, the "Permitted Liens").

The Professional Fee Carve-Out (hereinafter defined) is being funded solely by the DIP Junior Participants,' General Motors ("GM") and Chrysler, purchasing participations in the DIP Facility. The Agent's and the Lenders' prepetition and postpetition liens, claims and security interests in the Collateral and their Superpriority Claim, including without limitation with respect to portions of the Pre-Petition Obligations and/or the DIP Facility that are subject to participations, shall be subject and subordinate to the right of payment of the following expenses (the "Carve-Out Expenses"): (a) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (b) fees payable to the Clerk of this Court; and (c) subject to the terms and conditions of the DIP Orders, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to Sections 327, 328, 330, or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtor and by any official committee of unsecured creditors (the "Committee") under Section 327 or 1103(a) of the Bankruptcy Code or by the Agent on behalf of the Lenders (collectively, the "Professionals"), in a cumulative, aggregate sum not to exceed $1,780,000

(which amount includes a 20% variance for each Professional as set forth in the Approved Budget) (the "Professional Fee Carve Out").  The DIP Junior Participants shall fund the amount set forth in the Approved Budget (A) for payment of Professional Fees weekly in advance to a segregated trust account held by Debtor's counsel (the "Trust Account"). The Trust Account and all trust funds in it shall be free and clear of liens and claims, other than the claims of Professionals, and may be released to Professionals in the amounts set forth with respect to each set forth in the Approved Budget, upon Court approval (in the case of the Debtor's and the Committee's advisors) of such fees and expenses.

i.    Adequate Protection.    As adequate protection, solely to the extent of any Diminution of Value and in consideration for the Agent's (on behalf of the Lenders) consenting to the Debtor's continuing to use Cash Collateral, the Agent as Lender and on behalf of the other Lenders having liens in the Debtor's assets shall receive replacement liens and adequate protection with respect to the Pre-Petition Obligations, on a *pari passu* basis as set forth in the DIP Orders pursuant to sections 361 and 363(e) of the Bankruptcy Code, which shall be junior only to (i)  the claims and liens of the DIP Lenders as described under "Priority" above, and (ii) payment of the Carve Out (the "Adequate Protection Liens").

j.    Collateral.    "Collateral" means, collectively, all now existing and hereafter acquired real and personal property of Debtor's estate, wherever located, of any kind, nature or description, including such property in which a lien is granted to the Agent, for the benefit of the Lenders, pursuant to the DIP Loan Documents, the DIP Orders or any other order entered or issued by the Bankruptcy Court, and shall include, as more particularly set forth in the DIP Agreement, excluding Excluded Property under the DIP Agreement and, prior to entry of the Final Order, excluding Avoidance Actions

k.    DIP Facility Fees.    A DIP Facility fee (the "DIP Fee") equal to $75,000.00, which is fully earned on the date of entry of the Interim Order and payable as set forth in the Approved Budget, together with the unused line fees, letter of credit fees, and other fees set forth in the DIP Loan Documents prior to execution of the Ratification and Amendment Agreement.

l.    Interest Rate.    The interest rate (a) on the revolving credit facility shall be

the Base Rate plus 4.25% per annum, with LIBOR rate options (with a default rate per annum equal to 2.0% in excess of such interest rate), and (b) on the term loan facility, shall be 6% per annum, with such interest payable monthly in arrears on the monthly anniversary of the Petition Date, computed based on a 360 day year, with LIBOR rate options.

m.  <u>Maturity Date.</u>  The DIP Facility shall mature on the earliest to occur of the following (such date, the "<u>Maturity Date</u>"):

    (i)    August 30, 2013 (the "<u>Outside Date</u>"); or

    (ii)    the termination of the DIP Facility in accordance with the terms of the DIP Agreement, section 5.7 of which contains "Chapter 11 Borrower Sale Process." deadlines.

n.  <u>Representations and Warranties.</u>  Customary and appropriate for financings of this type.

o.  <u>Conditions Precedent to Interim DIP Facility.</u>  The obligations of the Agent on behalf of the Lenders to make the interim DIP Facility will be subject to satisfaction, or waiver by the Agent in its sole and absolute discretion, of the conditions precedent set forth in the DIP Agreement.

p.  <u>Covenants.</u>  As specified in the DIP Agreement and DIP Loan Documents.

q.  <u>Events of Default.</u>  As specified in the DIP Agreement, and subject to grace, notice and cure periods:

r.  <u>Remedies Upon Default.</u>  Upon the occurrence and during the continuance of any Event of Default under the DIP Agreement, subject to five (5) business days' notice to the Debtor and the Debtor's right to contest the determination that an Event of Default has occurred or is continuing and the Agent's exercising its default rights, the Agent on behalf of the Lenders may exercise its rights on default without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay.

s.  <u>Indemnification and Exculpation.</u>  The DIP Loan Documents prior to execution of the Ratification and Amendment Agreement contained, and as amended by the Ratification and Amendment Agreement continue to contain, customary provisions regarding the Debtor's indemnification and exculpation of the Debtor.

| t. | Validity, Perfection and Amount of Lenders' Prepetition Liens and Claims. | The Debtor in the Interim Order confirms the validity, perfection and amount of the Agent's and the Lender's prepetition liens and claims, subject to the right of challenge (a) by the Committee within sixty (60) calendar days from the date its appointment by the U.S. Trustee, or (b) in the event no Committee is appointed within the thirty (30) days following the Petition Date, by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of this Interim Order. |
|---|---|---|

## DISCLOSURES

5.      Pursuant to Bankruptcy Rule 4001(d) and Local Rule 4001-2, a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of such provisions. Set forth below are the disclosures required in accordance with such rules:

a.      Local Rule 4001-2(a)(i)(A) requires a debtor to disclose whether it has granted cross-collateralization to prepetition secured creditors in connection with the debtor's cash collateral usage or additional financing. The proposed Interim Order does not provide for the granting of cross-collateralization protection to any prepetition secured creditors.

b.      Local Rule 4001-2(a)(i)(B) and Bankruptcy Rule 4001(c)(1)(B)(iii) require the disclosure of provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or (ii) the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the Committee at least sixty (60) days from the date of its formation to investigate such matters. The proposed Interim Order, at ¶4.1, subjects those provisions to the right of challenge (a) by the Committee within sixty (60) calendar days from the date its appointment by the U.S. Trustee, or (b) in the event no Committee is appointed within the thirty (30) days following the Petition Date, by any party in interest with requisite standing within seventy-five (75) calendar days from the date of entry of this Interim Order.

DOCS_DE:188474.5 73864/002                                          10

c.    Local Rule 4001-2(a)(i)(C) and Bankruptcy Rule 4001(c)(1)(B)(x) require the disclosure of provisions that seek to waive a debtor's rights without notice under section 506(c) of the Bankruptcy Code. The proposed Interim Order, at ¶4.3, provides for a waiver of the Debtor's rights under section 506(c) of the Bankruptcy Code only on entry of the Final Order.

d.    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. The proposed Interim Order does not contain any provisions that immediately grant to the prepetition secured creditor liens on the Debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. Pursuant to the DIP Agreement at ¶1.1(a)(xiv), the adequate protection liens provided under the proposed Interim Order include Avoidance Actions only on entry of the Final Order.

e.    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor' prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code). The proposed Interim Order does not contain provisions that deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt (other than as provided in section 552(b) of the Bankruptcy Code).

f.    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. The proposed Interim Order does not provide for disparate treatment for the professionals retained by a Committee from those professionals retained by the Debtor, except that the Approved Budget projects Debtor professional fees to exceed Committee professional fees.

g.    Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for the priming of any secured lien without the consent of that lienholder. The proposed Interim Order does not provide for the priming of any existing secured lien without the consent of that lienholder.

h.    Local Rule 4001-2(a)(i)(H) requires the disclosure of provisions that affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code. The proposed Interim

Order provides for a waiver of the Debtor's rights under section 552(b)(1) of the Bankruptcy Code only on entry of the Final Order.

i.      Bankruptcy Rule 4001(c)(1)(B)(ii) requires disclosure of the provision of adequate protection or priority for claims arising prior to the commencement of the case. The proposed Interim Order, at ¶2.6.2, describes the adequate protection liens provided to the Agent.

j.      Bankruptcy Rule 4001(c)(1)(B)(iv) requires disclosure of provisions that constitute a waiver or modification of the automatic stay. The proposed Interim Order, at ¶3.4, describes the modification of the automatic stay to the extent necessary to implement the Interim Order.

k.      Bankruptcy Rule 4001(c)(1)(B)(vii) requires disclosure of provisions that waive or modify the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate. The proposed Interim Order, at ¶2.1.3, includes provisions that provide for the automatic perfection and validity of the DIP Facility liens without the necessity of any further filing or recording under the laws of any jurisdiction.

## BACKGROUND

6.      On December 3, 2012, Debtors Revstone Industries, LLC and Spara, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On January 7, 2013, Debtors Greenwood Forgings, LLC and US Tool and Engineering, LLC commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Pursuant to the Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only (Docket No. 173) (the "Existing Joint Administration Order"), the chapter 11 cases of Revstone Industries, LLC, Spara, LLC, Greenwood Forgings, LLC and US Tool and Engineering, LLC (the "Original Debtors") are jointly administered and are consolidated for procedural purposes.

8.      On December 18, 2012, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") in the case of Revstone Industries, LLC. No committee has been appointed in the cases of Spara, LLC Greenwood Forgings, LLC and US Tool and Engineering, LLC.  No trustee or examiner has been appointed in any of the Original Debtors' chapter 11 cases.

9.      On the date hereof (the "Metavation Petition Date"), Metavation filed a voluntary petition in the Court for relief under chapter 11 of the Bankruptcy Code.  Metavation continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in Metavation's chapter 11 case.  As of the date hereof, no creditors' committee has been appointed in the Metavation chapter 11 case.

10.     The factual background relating to the commencement of the chapter 11 case of Revstone Industries, LLC is set forth in detail in the Declaration of Jay N. Brown in Support of First Day Pleadings (the "Brown Declaration") filed on December 3, 2012, and incorporated herein by reference.  The factual background relating to the commencement of the chapter 11 case of Metavation, LLC is set forth in detail in the Declaration of John C. DiDonato in Support of Metavation, LLC Petition and First Day Motions (the "DiDonato Declaration") filed concurrently herewith and incorporated herein by reference.

11.     Metavation, LLC (the "Company") is a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry. Metavation specializes in designing

and manufacturing dampers that are included on original equipment manufacturers' ("OEMs")

engine platforms. The Company also has rapid development capabilities to produce "solution"

dampers to correct driveline and powertrain noise vibration and harshness ("NVH") issues. The

Company serves many of the largest automotive customers, suppliers, and platforms. The

Company's major OEM customers include GM and Chrysler. Metavation's Tier I supplier

customers include American Axle, Dana Automotive, and J.G. Kern. These long-standing

relationships have led the Company to a dominant market position in the U.S. crankshaft damper

market. Metavation operates from four, modernized facilities located in central Michigan. The

Company begins its manufacturing process by developing the rubber component at the Hillsdale,

MI facility, and then sends the rubber component to Mt. Pleasant, MI or Vassar, MI facility for

machining and/or assembly.

## PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

12.     As of the Petition Date, the outstanding indebtedness under the Prepetition

Credit Facility was approximately $17.5 million, consisting of approximately (a) $3.6 million

owed to Wells, as Lender, by the Debtor, Contech and MW Texas Die, (b) $12.4 million of

outstanding unpaid advances made to the Debtor by the Existing Junior Participants, GM, Ford

and Chrysler, and (c) $1.5 million of outstanding unpaid advances made to Contech by the

Existing Junior Participants, Ford, Chrysler, JTEKT and Nexteer.

13.     The Debtor's indebtedness to the Existing Junior Participants under the

Prepetition Credit Facility arose under that certain *Junior Participation Agreement* dated January

11, 2013, as amended by that certain *Amended and Restated Junior Participation Agreement*

dated as of April 12, 2013, pursuant to which Wells as Lender sold to the Existing Junior

Participants a junior participation in certain supplemental advances to the Debtor under the

Prepetition Credit Facility. The approximately $12.4 million owed by the Debtor for advances

made by the Existing Junior Participants GM, Ford and Chrysler, is secured solely by the

Debtor's assets and not by the assets of any of the Debtor's affiliated co-borrowers or guarantors

under the Prepetition Credit Facility.   Similarly, the approximately $1.1 million owed by the

Debtor's non-debtor affiliate, Contech, for advances made by the Existing Junior Participants is

secured solely by Contech's assets and not by any of the Debtor's assets. The Debtor's

obligations to the Existing Junior Participants under the Prepetition Credit Facility are, in all

instances, subordinate to the Debtor's obligations to Wells as Lender.

14.    The Debtor also owes approximately $2.3 million for overdue payments to

the Hillsdale Hourly Pension Plan and Hillsdale Salaried Pension Plan, with respect to

approximately $1.6 million of which the PBGC has asserted a lien in the Debtor's assets.  The

PBGC has asserted in addition an approximately $23.0 million claim, that is contingent and

unliquidated, on account of the Debtor's alleged pension liabilities.

15.    The Debtor also has approximately $9.1 million of other, unsecured

indebtedness, including approximately $800,000 to GM for advances made to the Debtor on an

unsecured basis.

## NEED FOR THE DIP FACILITY AND CONTINUED USE OF CASH COLLATERAL

16.    As more fully set forth in the DiDonato Declaration, the Debtor has an

urgent and immediate to obtain DIP Facility.  The Debtor does not have sufficient funds on hand

or generated from its business to fund its operations, without the postpetition financing and the use of Cash Collateral that the DIP Facility will provide, the Debtor will not be able to continue operations.

17.     Specifically, without the DIP Facility, including both the financing and the use of Cash Collateral derived from the Debtor's operations which is subject to the Agent's and the PBGC's liens and security interests and comprises Cash Collateral, the Debtor will not have any liquidity to operate its business, fund its ordinary course expenditures, including paying its 270 employees, or to pay the expenses necessary to administer the chapter 11 Case. Simply put, without the postpetition financing and continued use of Cash Collateral afforded by the DIP Facility, the Debtor will be required to cease operations and liquidate on a piece meal basis, causing irreparable harm to the Debtor, and its estate and creditors. Accordingly, the Debtor has an urgent and immediate need for the DIP Facility.

18.     The Debtor has sought and was unable to obtain financing from another lender on terms preferable the DIP Facility.

19.     For the above reasons, the Debtor has determined, in the exercise of its sound business judgment, that the Debtor requires the DIP Facility and hereby requests authority to obtain the DIP Facility in compliance with the proposed Interim Order, Final Order and Approved Budget.

**BASIS FOR RELIEF**

**A.**    **The Debtor Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

20.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section, 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> > (A)    the [debtor] is unable to obtain credit otherwise; and
> >
> > (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

21.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

> a.    unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> b.    the credit transactions are necessary to preserve assets of the estate;

        c.      the terms of the credit agreement are fair, reasonable, and adequate;

        d.      the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

        e.      the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

        22.      For the reasons discussed below, the Debtor satisfies the standards required to obtain postpetition financing on a secured superpriority and priming lien basis under sections 364(c)(1), (2) and (3) of the Bankruptcy Code.

**B.**      **The Debtor Was Unable to Obtain Financing on More Favorable Terms.**

        23.      The Debtor faces severe liquidity restraints and was forced to file this chapter 11 Case to preserve the value of its assets. The Debtor is not able to obtain alternative financing from outside parties and the current proposal was on the terms that were most beneficial to the estate. Indeed, without the agreement of the Lenders to provide the Debtor with postpetition financing, the Debtor's liquidation would have to be conducted in chapter 7, and rather than an orderly liquidation, without the possibility of a going concern sale, the assets would be abandoned, without security. Instead, with the DIP Facility, the Debtor intends to implement an orderly sale process that will maximize the value of its estate assets in a responsible manner.

24.     The Debtor respectfully submits that its efforts to obtain postpetition

financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.

*See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim

financing stipulation where debtor's best business judgment indicated financing was necessary

and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y.

1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their

basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R.

107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a

debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an

exhaustive search for financing").

**C.     The DIP Facility Is Necessary to Preserve the Assets of the Debtor's Estate.**

25.     The Debtor requires the DIP Facility to provide the Debtor with the

necessary capital with which to operate its business, including funding the Debtor's obligations

to employees, and to preserve its business as a going concern for the benefit of its estate and

creditors.

26.     Cash is necessary for working capital and capital expenditures, and

operating costs and expenses incurred during this case.  The Debtor does not have sufficient

sources of working capital, financing or Cash Collateral to carry on the operation of its business

without the DIP Facility.  The Debtor's ability to maintain its business is dependent on its ability

to continue to operate, and the Debtor cannot operate unless it can fund payments for postpetition

goods, services and other operating expenses.  The DIP Facility thus is essential to the Debtor's

continued viability and the value of its business as a going concern and will provide the Debtor

with the opportunity to preserve its business as a going concern for the benefit of its estate and

creditors.

27.    Furthermore, the alternative in this case is "to force the debtors to close

down their operations and thus doom any effort at reorganization which will hopefully extract the

maximum value of the assets involved to the benefit of *all* classes of creditors and other

constituencies involved in this case." *In re Dynaco Corp.*, 162 B.R. 389, 396 (Bankr. D.N.H.

1993). Because this result would be at fundamental odds to the rehabilitative purposes of chapter

11, approval of the Motion is warranted. *Id.* at 394 (noting that "it is apparent that the Congress

intended business under reorganization to proceed in as normal a fashion as possible") (*quoting*

*In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo. 1981)).

28.    As debtor in possession, the Debtor has a fiduciary duty to protect and

maximize its estate's assets. *See Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325,

339 (3d Cir. 2004). As noted above, the Debtor requires postpetition financing and the use of

Cash Collateral in the form of the DIP Facility to continue its operations, preserve its going

concern value, and piecemeal conduct a sale process. Absent the working capital, the Debtor

would be forced to a hard-stop liquidation to the detriment of the Debtor its estate and creditors.

**D.    The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate Given the Circumstances.**

29.    In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003);

*see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re*

*Ellingsen MacLean Oil Co.),* 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter

into hard bargains to acquire funds).

        30.    The DIP Facility was negotiated in good faith and at arm's-length between

the Debtor and its secured lenders, resulting in an agreement designed to permit the Debtor to

maximize the value of its assets through an orderly sale process. *See, e.g., Bray v. Shenandoah*

*Fed. Sav. and Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) (stating

that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every

possible lender, particularly when "time is of the essence to preserve a vulnerable seasonal

enterprise"); *In re Western Pacific Airlines, Inc.,* 223 B.R. 567 (Bankr. D. Colo. 1997)

(authorizing postpetition financing to preserve value of aircraft leaseholds where to hold

otherwise would result in the elimination of their value and the "immediate collapse of the

Debtor as a going concern").

**E.**      <u>**Entry Into the DIP Facility Reflects the Debtor's Sound Business Judgment.**</u>

        31.    A debtor's decision to enter into a postpetition lending facility under

section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.,*

*Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.),* 163 B.R. 964,

974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility

"reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34,

38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must

reflect a debtor's business judgment).

32.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

**F.**     **Section 363 of the Bankruptcy Code Authorizes the Debtor's Use of Cash Collateral**

        34.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in

possession may not use cash collateral unless (A) each entity that has an interest in such cash

collateral provides consent, or (B) the court approves the use of cash collateral after notice and a

hearing.  See 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used . . . by the

[debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to

provide adequate protection of such interest." 11 U.S.C. § 363(e).

        35.     Neither section 361 nor any other provision of the Bankruptcy Code

defines the nature and extent of the "interest in property" of which a secured creditor is entitled to

adequate protection under section 361.  However, the statute plainly provides that a qualifying

interest demands protection only to the extent that the use of the creditor's collateral will result in

a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see*

*also General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R.

987, 989-90 & n.4 (Bankr. D. Utah 1982).

        36.     The phrase "value of such entity's interest," although not defined in the

Bankruptcy Code, was addressed by the Supreme Court in the landmark *Timbers* decision,

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs, Ltd.*, 484 U.S. 365, 108 S.Ct.

626 (1988).  For the meaning of "value of such entity's interest," the Supreme Court was guided

by section 506(a), which defines a creditor's allowed secured claim:

> The phrase 'value of such creditor's interest' in § 506(a) means
> 'the value of the collateral.' H.R. Rep. No. 950-595, pp. 181, 356

(1977); *see also* S. Rep. No. 95-989, p. 68 (1978), U.S. Code
Cong. & Admin. News, 1978 pp. 5787, 5854, 6141, 6312. <u>We
think the phrase 'value of such entity's interest' in § 361(1) and
(2), when applied to secured creditors, means the same.</u>

*Id.* at 630 (emphasis added).

37.     *Timbers* teaches that a secured creditor is entitled to "adequate protection"
only against diminution in the value of the collateral securing the creditor's allowed secured
claim.  Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use,
sale, or lease, the creditor's interest is adequately protected.  This conclusion flows directly from
the equivalency of "value of such entity's interests" with "value of the collateral."

38.     Here, the interests of the Agent, the Lenders and the PBGC are adequately
protected under Section 363(c)(2)(B) for the following reasons.

39.     First, as reflected in the Approved Budget, the Debtor is generating
positive cash flow.  Hence, there will be no diminution in the value of any Cash Collateral
because, by maintaining operations in the ordinary course, the Debtor will generate even more
Cash Collateral under the Approved Budget than it currently has on hand.

40.     Second, there is a significant equity cushion in this case.  The Agent is
owed less than $17.5 million, inclusive of amounts owed to the Existing Junior Participants, and
the PBGC's secured claim is less than $1.7 million, but the value of the Debtor's assets is
significantly above those amounts.  Under these circumstances, there can be no question that the
Agent and the Lenders including the Existing Junior Participants and the PBGC will be
adequately protected by the Debtor's proposed use of Cash Collateral.

41.    Third, notwithstanding that the Agent, the Lenders and the PBGC are adequately protected for the reasons noted above, the Debtor has proposed further adequate protection in the form of the Adequate Protection Liens to the Agent on behalf of the Lenders, and payments to the PBGC, pursuant to its subordination agreement with the Debtor, upon the sale of the assets of the Debtor or its affiliated borrowers.  Section 361 of the Bankruptcy Code authorizes a debtor to provide adequate protection by granting replacement liens, making periodic cash payments, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." *See* 11 U.S.C. § 361.

42.    The Debtor believes that the proposed adequate protection described above is fair and reasonable and compensate the Agent, the Lenders and the PBGC for any possible Diminution in Value of the Debtor's assets securing the obligations under the Prepetition Credit Facility.  Given the significant value that the Debtor stands to lose in the event it is denied access to continued use of Cash Collateral, such protections are wholly appropriate and justified.

43.    Authority for the Debtor to use Cash Collateral also should be given because the Agent, the Lenders have consented to such use on the term contained in the DIP Orders and the DIP Facility pursuant to Section 363(c)(2)(B) of the Bankruptcy Code.

## INTERIM ORDER AND FINAL HEARING

44.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the final hearing for parties to file objections to the Motion.

45.     The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the Debtor's estate, makes it imperative that the Debtor be authorized to obtain the postpetition financing and use the Cash Collateral as of the Petition Date, pending the Final Hearing, in order to continue its operations and administer the Debtor's Chapter 11 Case. Without the ability to obtain the postpetion financing and use Cash Collateral, the Debtor would be unable to meet its postpetition obligations and would be unable to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's estate and ending the Debtor's efforts to preserve its business as a going concern. Accordingly, the Debtor respectfully requests that, pending the hearing on a Final Order, the Interim Order be approved in all respects and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

## NOTICE OF MOTION

46.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee; (b) counsel to Wells as Agent; (c) respective counsel to each of the Existing Junior Participants; (c) the PBGC or its counsel; (d) Dayco Products, LLC and  Dayco Products S.A. de C.V., the stalking horse purchaser for the Debtor's assets; (e) the Official Committee of

Unsecured Creditors in the case of Revstone Industries, LLC; and (f) the twenty largest unsecured creditors of the Debtor. Because of the nature of the relief requested, the Debtor respectfully submits that no other or further notice of the relief requested in this Motion need be given.

## NOTICE WITH RESPECT TO FINAL HEARING

47.     No trustee, examiner or statutory committee has been appointed in the Debtor's case. Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that it be authorized to provide notice of the Final Hearing by serving a copy of this Motion, together with the Interim Order, by hand or overnight mail or courier service (or for those set up to receive electronic transmissions, by electronic transmission), upon (a) the Office of the United States Trustee; (b) counsel to Wells as Agent; (c) respective counsel to each of the Existing Junior Participants; (c) the PBGC or its counsel; (d) Dayco Products, LLC and Dayco Products S.A. de C.V., the stalking horse purchaser for the Debtor's assets; (e) the Official Committee of Unsecured Creditors in the case of Revstone Industries, LLC; (f) the twenty largest unsecured creditors of the Debtor or any statutory committee of unsecured creditors (or, if retained, its counsel) if and when one is appointed, and (g) all parties that have filed notices of appearance and requests for notices in the chapter 11 Case. The Debtor respectfully requests that such notice is sufficient and request that this Court find that no further notice of the Final Hearing and Final Order is required.

## NO PRIOR REQUEST

48.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, based upon the foregoing, the Debtor requests entry of the Interim Order and the Final Order under sections 105, 361, 362, 363, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, (i) authorizing the Debtor to (a) use Cash Collateral and (b) provide adequate protection to the Prepetition Agent; and (ii) scheduling the final hearing.

Dated: July 22, 2013       PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (Bar No. 3583)
Timothy P. Cairns (Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
email:  ljones@pszjlaw.com
        dbertenthal@pszjlaw.com
        bgrohsgal@pszjlaw.com
        tcairns@pszjlaw.com

[Proposed] Counsel for Debtor and Debtor in Possession