(u)    "Existing Junior Participants" means, collectively, Ford Motor Company, Chrysler Group, LLC and General Motors LLC, and their respective successors and assigns

(v)    "Existing Junior Participation Agreement" means the Amended and Restated Junior Participation Agreement, dated as of April 12, 2013, among Wells Fargo and the Existing Junior Participants, as amended by the First Amendment to Amended and Restated Junior Participation Agreement, dated as of June 27, 2013, the Existing Junior Participation Agreement Amendment No. 2, and otherwise as in effect immediately prior to the Petition Date.

(w)    "Existing Junior Participation Agreement Amendment No. 2" means the Second Amendment to Amended and Restated Junior Participation Agreement, dated as of July 22, 2013, among Wells Fargo and the Existing Junior Participants.

(x)    "Existing Loan Documents" means the Loan Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Credit Agreement, the Existing Security Agreement, the Existing Guarantor Documents, the Existing Junior Participation Agreement, in each case, as in effect immediately prior to the Petition Date.

(y)    "Existing Security Agreement" means the Security Agreement, dated as of July 23, 2010, by and among by and among Chapter 11 Borrower, Borrowers, Guarantors and Agent, as in effect immediately prior to the Petition Date.

(z)    "Financing Order" means the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Chapter 11 Borrower on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

(aa)    "GM/Chrysler Sale Support Agreement" means the Automotive Sale Transactions Support Agreement, dated as of July 18, 2013, among Industries, Transporation, Contech, Chapter 11 Borrower, Contech RE, Metavation Mexico, EPTEC, Aarkel Tool & Die Inc., Creative Lighting Solutions, LLC, Chrysler Group, LLC and General Motors LLC, as in effect immediately prior to the Petition Date.

(bb)    "Guarantor Documents" means, collectively, the Existing Guarantor Documents, as amended by this Ratification Agreement, in each instance, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(cc)    "Interim Financing Order" shall have the meaning set forth in Section 9.7 of the Ratification Agreement.

(dd)    "Non-Chapter 11 Borrowers" means, collectively, Contech and MW Texas Die, and their respective successors and assigns; each sometimes being referred to herein individually as a "Non-Chapter 11 Borrower".

(ee)    "Non-Chapter 11 Loan Parties" means, collectively, Non-Chapter 11 Borrowers, Transportation, Contech RE, MPI GA, MPI Knox, MPI Golf, MPI Mexico, Metavation Mexico, Metavation Mexico II, Metavation TC, Metavation 3, MPI International Mexico, EPTEC, MIDS, Metavation V and MPI, and their respective successors and assigns; each sometimes being referred to herein individually as a "Non-Chapter 11 Loan Party".

(ff)    "Omnibus Access and Security Agreement" means that certain Omnibus Access and Security Agreement, dated on or about the date of the Ratification Agreement, among General Motors, LLC, Chrysler Group LLC, Metavation, Contech, Metavation V, EPTEC and Creative Lighting Solutions, as may be amended from time to time.

(gg)    "Permanent Financing Order" shall have the meaning set forth in Section 9.8 of the Ratification Agreement.

(hh)    "Petition Date" means the date of the commencement of the Chapter 11 Case.

(ii)    "Post-Petition Collateral" means, collectively, all now existing and hereafter acquired real and personal property of Chapter 11 Borrower's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, pursuant to the Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation, all of the following property of Chapter 11 Borrower:

(i)    all of the Pre-Petition Collateral with respect to Chapter 11 Borrower;

(ii)    all Accounts (as such term is defined in the Existing Security Agreement);

(iii)    all Books (as such term is defined in the Existing Security Agreement);

(iv)    all Chattel Paper (as such term is defined in the Existing Security Agreement);

(v)    all Deposit Accounts (as such term is defined in the Existing Security Agreement);

(vi)    all Equipment and Fixtures (as such terms are defined in the Existing Security Agreement);

(vii)    all General Intangibles (as such term is defined in the Existing Security Agreement);

(viii)    all Inventory (as such term is defined in the Existing Security Agreement);

(ix)    all Investment Related Property (as such term is defined in the Existing Security Agreement);

(x)    all Negotiable Collateral (as such term is defined in the Existing Security Agreement);

(xi)    all Supporting Obligations (as such term is defined in the Existing Security Agreement);

(xii)    all Commercial Tort Claims (as such term is defined in the Existing Security Agreement);

(xiii)    all money, Cash Equivalents , or other assets of Chapter 11 Borrower that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee) or any other member of the Lender Group;

(xiv)    from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties (recovered by or on behalf of Chapter 11 Borrower or any trustee of Chapter 11 Borrower (whether in the Chapter 11 Case or any subsequent case to which any of the Chapter 11 Case is converted)), including, without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code (the "Avoidance Action Recoveries"); and

(xv)    all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Related Property, Negotiable Collateral, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds"). Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Related Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to Chapter 11 Borrower or Agent from time to time with respect to any of the Investment Related Property;

provided, that, notwithstanding the foregoing, the term "Post-Petition Collateral" shall not include any Excluded Property (as such term is defined in the Existing Security Agreement).

(jj)    "Post-Petition Obligations" means, as to Chapter 11 Borrower, all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before,

during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the Guarantor Documents, the other Loan Documents, a Financing Order, by operation of law or otherwise, and whether incurred by Chapter 11 Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(kk)    "Pre-Petition Collateral" means, collectively, (i) all "Collateral" as such term is defined in the Existing Security Agreement as in effect immediately prior to the Petition Date, and (ii) all other security for the Pre-Petition Obligations as provided in the Existing Credit Agreement, the Existing Security Agreement, the Existing Guarantor Documents and the other Existing Loan Documents immediately prior to the Petition Date.

(ll)    "Pre-Petition Obligations" means, as to Chapter 11 Borrower, all Obligations (as such term is defined in the Existing Credit Agreement, and including, without limitation, the Supplemental Advances) arising at any time before the Petition Date, whether incurred by Chapter 11 Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(mm)    "Ratification Agreement" means this Ratification and Amendment Agreement by and among Chapter 11 Borrower, Borrowers, Guarantors, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(nn)    "Stated Maturity Date" means August 30, 2013.

(oo)    "Supplemental Advances Limit" means the "Supplemental Advances Limit" as such term is defined in Amendment No. 5.

(pp)    "Supplemental Advances Obligations" means the "Supplemental Advances Obligations" as such term is defined in the Existing Junior Participation Agreement.

1.2    Amendments to Definitions.

(a)    Collateral. All references to the term "Collateral" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)    Borrowers. All references to the terms "Borrower", "Borrowers", "Loan Party" or "Loan Parties" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents shall be deemed, and

each such reference is hereby amended, to mean (i) Non-Chapter 11 Borrowers, and (ii) Chapter 11 Borrower, and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such company whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such company).

(c)     Credit Agreement. All references to the term "Credit Agreement" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by Chapter 11 Borrower and each Non-Chapter 11 Loan Party pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(d)     Loan Documents. All references to the term "Loan Documents" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement, the Existing Credit Agreement and all of the Existing Loan Documents, as ratified, assumed and adopted by Chapter 11 Borrower and each Non-Chapter 11 Loan Party pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(e)     Material Adverse Change. All references to the term "Material Adverse Change", "material adverse change" or "material adverse effect" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof: "provided, that, neither the events leading up to nor the commencement of the Chapter 11 Case shall constitute a Material Adverse Change".

(f)     Obligations. All references to the term "Obligations" in the Existing Credit Agreement, the other Existing Loan Documents, this Ratification Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(g)     Certain Modifications. Notwithstanding anything to the contrary contained in the Credit Agreement (including Section 14 thereof), the dates set forth in Sections 5.7 of this Ratification Agreement may be extended in the sole discretion of Agent.

1.3     Interpretation.

(a)     For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

(b)     All references to the term "Agent", "Lender", "Chapter 11 Borrower", "Non-Chapter 11 Borrower", "Borrower", "Guarantor", "Non-Chapter 11 Loan

Party" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.    ACKNOWLEDGMENT.

2.1    Pre-Petition Obligations.

(a)    Each Borrower hereby acknowledges, confirms and agrees that, as of the close of business on July 18, 2013, Borrowers are indebted to Agent, the Lender Group and each of the Bank Product Providers in respect of all Pre-Petition Obligations in the aggregate principal amount of not less than $17,040,973.45, consisting of (i) Advances in the aggregate principal amount of not less than $3,327,295.45, together with all interest accrued and accruing thereon, (ii) Supplemental Advances in the aggregate principal amount of not less than $12,230,986.00, together with all interest accrued and accruing thereon, (ii) Contech Supplemental Advances in the aggregate principal amount of not less than $1,482,692.00, together with all interest accrued and accruing thereon, (iv) Letter of Credit Usage in the aggregate amount of not less than $0, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses), and (v) other charges now or hereafter owed by Borrowers to Agent, the Lender Group and each of the Bank Product Providers, all of which are unconditionally owing by Borrowers to Agent, the Lender Group and each of the Bank Product Providers, without offset, defense or counterclaim of any kind, nature and description whatsoever.

(b)    Each Borrower hereby expressly assumes and agrees to be directly liable to Agent, the Lender Group and each of the Bank Product Providers, jointly and severally with the other Borrowers, for all Obligations under, contained in, or arising out of the Credit Agreement and the other Loan Documents applicable to all Borrowers and as applied to Borrowers.

2.2    Guaranteed Obligations.    Each Guarantor hereby acknowledges, confirms and agrees that:

(a)    all obligations of such Guarantor under the Guarantor Documents are unconditionally owing by such Guarantor to Agent, the Lender Group and each of the Bank Product Providers without offset, defense or counterclaim of any kind, nature and description whatsoever, and

(b)     the absolute and unconditional guarantee of the payment of the Pre-Petition Obligations by such Guarantor pursuant to the Guarantor Documents extends to all Post-Petition Obligations, subject only to the limitations set forth in the Guarantor Documents.

2.3     Acknowledgment of Security Interests.

(a)     Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby acknowledges, confirms and agrees that Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted by Chapter 11 Borrower to Agent pursuant to the Existing Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted by Chapter 11 Borrower to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, under the Financing Order or hereunder or under any of the other Loan Documents or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Existing Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent, the Lender Group and each of the Bank Product Providers.

(b)     Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby acknowledges, confirms and agrees that Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Collateral heretofore granted by Non-Chapter 11 Loan Parties to Agent pursuant to the Existing Loan Documents to secure all of the Obligations or under any of the other Loan Documents or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Existing Credit Agreement that may have priority over the liens in favor of Agent, the Lender Group and each of the Bank Product Providers.

2.4     Binding Effect of Documents.

(a)     Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby acknowledges, confirms and agrees that: (i) each of the Existing Loan Documents to which Chapter 11 Borrower is a party was duly executed and delivered to Agent, the Lender Group and each of the Bank Product Providers by Chapter 11 Borrower and each is in full force and effect as of the date hereof, (ii) the agreements and obligations of Chapter 11 Borrower contained in the Existing Loan Documents constitute the legal, valid and binding obligations of Chapter 11 Borrower enforceable against it in accordance with the terms thereof, and Chapter 11 Borrower has no valid defense, offset or counterclaim to the enforcement of such obligations, and (iii) as to Chapter 11 Borrower, Agent, the Lender Group and each of the Bank Product Providers are and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

(b)     Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby acknowledges, confirms and agrees that: (i) each of the Existing Loan Documents to which a

Non-Chapter 11 Loan Party is a party was duly executed and delivered to Agent, the Lender Group and each of the Bank Product Providers by such Non-Chapter 11 Loan Party and each is in full force and effect as of the date hereof, (ii) the agreements and obligations of each Non-Chapter 11 Loan Party contained in the Existing Loan Documents constitute the legal, valid and binding obligations of each such Non-Chapter 11 Loan Party enforceable against it in accordance with the terms thereof, and such Non-Chapter 11 Loan Party has no valid defense, offset or counterclaim to the enforcement of such obligations, and (iii) as to each Non-Chapter 11 Loan Party, Agent, the Lender Group and each of the Bank Product Providers are and shall be entitled to all of the rights, remedies and benefits provided for in the Loan Documents and the Financing Order.

    3.    <u>ADOPTION AND RATIFICATION</u>

    (a)    Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby (i) ratifies, assumes, adopts and agrees to be bound by all of the Existing Loan Documents (as amended by this Ratification Agreement) to which it is a party and (ii) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Loan Documents, as amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Existing Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Chapter 11 Borrower, as Debtor and Debtor-in-Possession, and considered as agreements between Chapter 11 Borrower, on the one hand, and Agent, the Lender Group and each of the Bank Product Providers, on the other hand.

    (b)    Chapter 11 Borrower hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Loan Documents, as amended and supplemented pursuant hereto and the Financing Order, and Chapter 11 Borrower agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Loan Documents (as amended and supplemented pursuant hereto and the Financing Order) to which Chapter 11 Borrower is a party.

    (c)    Each Non-Chapter 11 Loan Party hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Non-Chapter 11 Loan Party agrees to be fully bound by the terms of the Loan Documents (as amended and supplemented pursuant hereto and the Financing Order) to which such Non-Chapter 11 Loan Party is a party.

    4.    <u>GRANT OF SECURITY INTEREST.</u>

    (a)    As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), Chapter 11 Borrower, as Debtor and Debtor-in-Possession, hereby grants, pledges and assigns to Agent, for the benefit of each member of the Lender Group and each of the Bank Product Providers, and also confirms, reaffirms and restates the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

(b)      Each Non-Chapter 11 Loan Party hereby confirms, reaffirms and restates the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

## 5.      ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Chapter 11 Borrower and each Non-Chapter 11 Loan Party to Agent, the Lender Group and each of the Bank Product Providers, whether pursuant to the Loan Documents or otherwise, and not in limitation thereof, Chapter 11 Borrower and each Non-Chapter 11 Loan Party hereby represents, warrants and covenants to Agent, the Lender Group and each of the Bank Product Providers the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Advances or the issuance of Letters of Credit by Agent, the Lender Group and each of the Bank Product Providers:

5.1      Financing Order.  The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal, stay or motion for reconsideration as to which an effective stay exists.

5.2      Use of Proceeds.  All Advances and DIP Supplemental Advances provided by Agent or any Lender to Chapter 11 Borrower issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Chapter 11 Borrower for general operating and working capital purposes in the ordinary course of business of Chapter 11 Borrower and administration of the Chapter 11 Case (including, without limitation, the payment of Allowed Professional Fees with respect thereto) all in accordance with the Credit Agreement and the Budget pursuant to Section 5.3 of this Ratification Agreement.  Unless otherwise provided for in the Budget or authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim or other claim relating to the Chapter 11 Case shall be paid with the proceeds of such Advances provided or issued by (or on behalf of) Agent, the Lender Group and the Bank Product Providers to Chapter 11 Borrower.

5.3      Budget.

(a)      Chapter 11 Borrower has prepared and delivered to Agent, the Lender Group and each of the Bank Product Providers a nine (9) week post-petition Budget.  The Budget has been thoroughly reviewed by Chapter 11 Borrower and its management and sets forth, for the periods covered thereby, (i) projected aggregate weekly outstanding Advances and (ii) projected aggregate weekly disbursements made in respect of anticipated or actual Allowed Professional Fees for each week of the nine (9) consecutive week period commencing with the week ending July 13, 2013 and ending with the week ending September 7, 2013.

(b)    Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing on July 24, 2013, Chapter 11 Borrower shall furnish to Agent, in form and substance satisfactory to Agent, a report (the "Budget Compliance Report") that sets forth, on a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of (i) the actual aggregate outstanding Advances to the projected outstanding aggregate Advances set forth in the Budget for such period, and (ii) the actual aggregate weekly disbursements in respect Allowed Professional Fees (whether paid to the Allowed Professional Fee Escrow Account or paid directly to professionals) to the projected aggregate Allowed Professional Fees set forth in the Budget for such period, together with a certification from the CRO.

(c)    Chapter 11 Borrower acknowledges, confirms and agrees that, for each period measured in a Budget Compliance Report in accordance with Section 5.3(b) of this Ratification Agreement, (i) the actual weekly outstanding Advances for such week shall not be more than one hundred five (105%) percent of the projected weekly outstanding Advances for such week, and (ii) the actual aggregate weekly Allowed Professional Fees (whether paid to the Allowed Professional Fee Escrow Account or paid directly to professionals) during such week shall not be more than one hundred twenty (120%) percent of the projected aggregate weekly Allowed Professional Fees for such week.

(d)    Chapter 11 Borrower hereby confirms, acknowledges and agrees that, unless waived in writing by Agent and Lenders, the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default. Notwithstanding any approval by Agent and Lenders of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to, provide any Advances to Chapter 11 Borrower pursuant to the Budget, but shall only provide Advances in accordance with the terms and conditions set forth in the Credit Agreement, the other Loan Documents and the Financing Order. Agent and Lenders are relying upon Chapter 11 Borrower's delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)    Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and Lenders that are reimbursable by Chapter 11 Borrower or any other amounts owing by Chapter 11 Borrower to Agent and Lenders (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Loan Documents, such projections shall not limit, impair, modify or waive Chapter 11 Borrower's obligation to pay the actual amounts due to Agent and/or Lenders in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Loan Documents.

5.4    <u>Ratification of Blocked Account Agreements</u>. To the extent Agent deems it necessary in its discretion and upon Agent's request, Chapter 11 Borrower shall promptly provide Agent with evidence, in form and substance satisfactory to Agent, that the all deposit account arrangements provided for under Sections 6(c) and (k) of the Existing Security Agreement have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the

Chapter 11 Case, that Chapter 11 Borrower, as Debtor and Debtor-in-Possession, is the successor in interest to Chapter 11 Borrower, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for herein.

    5.5    <u>Chief Restructuring Officer.</u>

    (a)    Chapter 11 Borrower shall retain, at all times during which the Obligations remain outstanding, on terms and conditions acceptable to Agent and at the sole cost and expense of Chapter 11 Borrower, Huron Consulting Group or such other Person acceptable to Agent as its chief restructuring officer (the "CRO"). The CRO shall assume in all respects the management of the businesses and properties of Chapter 11 Borrower and shall, among other things, assist Chapter 11 Borrower in the preparation of and compliance with, on an ongoing basis, the Budget and compliance with the terms and conditions set forth in the Loan Documents. The CRO shall report directly to the Board of Directors of Chapter 11 Borrower.

    (b) Chapter 11 Borrower hereby irrevocably authorizes and directs the CRO to consult with Agent and to share with Agent and Lenders all budgets, records, projections, financial information, reports and other information prepared by or in the possession of the CRO relating to the Collateral, or the financial condition or operations of the businesses of Chapter 11 Borrower. Chapter 11 Borrower agrees to provide the CRO with complete access to and supervision over all of the books and records of Chapter 11 Borrower, all of the premises of Chapter 11 Borrower and to all management and employees of Chapter 11 Borrower as and when deemed necessary by the CRO.

    (c) Chapter 11 Borrower shall not amend, modify or terminate the retention agreement with the CRO without the prior written consent of Agent. Chapter 11 Borrower acknowledges and agrees that Chapter 11 Borrower shall cause the CRO to keep Agent and Lenders (i) fully informed of the progress of the business and operations of Chapter 11 Borrower and respond fully to any inquiries of Agent and Lenders regarding the business and operations of Chapter 11 Borrower, and (ii) communicate and fully cooperate with Agent and Lenders and share all information with Agent and Lenders regarding Chapter 11 Borrower, and the business and operations of Chapter 11 Borrower.

    (d) If the CRO resigns, Chapter 11 Borrower shall immediately notify Agent in writing and provide Agent with a copy of any notice of resignation immediately upon the sending of such notice by such CRO. Any replacement or successor CRO shall be acceptable to Agent and shall be retained pursuant to a new retention agreement on terms and conditions acceptable to Agent within five (5) Business Days immediately following the notice of resignation of the resigning CRO, or within such longer period of time as Agent may agree in writing. Failure to comply with the terms and conditions of this Section shall constitute an Event of Default.

    5.6    <u>Limit on Outstanding Advances</u>. Notwithstanding anything to the contrary contained in the Credit Agreement or the other Loan Documents, from and after the date hereof, Borrowers shall not permit the aggregate amount of outstanding Advances (a) from the date of this Ratification Agreement through and including the Contech Sale Date, (i) to Chapter

11 Borrower to exceed $3,500,000, (ii) to Contech to exceed $1,500,000, (iii) to MW Texas Die to exceed $1,000,000, and (iv) to all Borrowers to exceed $6,000,000, and (b) at all times after the Contech Sale Date, to all Borrowers to exceed $0.

     5.7    <u>Chapter 11 Borrower Sale Process</u>.

     (a)    (a)    Not later than the second (2nd) Business Day after the Petition Date, Chapter 11 Borrower shall have filed a motion seeking the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving bid procedures and the designation of a stalking horse bidder.

     (b)    Not later than the sixteenth (16th) calendar day after the Petition Date (or if such date does not fall on a Business Day, the next Business Day following such date), Chapter 11 Borrower shall have obtained the entry of an order, in form and substance satisfactory to Agent, approving bid procedures and designating a stalking horse bidder.

     (c)    Not later than the sixteenth (16th) calendar day after entry of such bid procedures order (or if such date does not fall on a Business Day, the next Business Day following such date), Chapter 11 Borrower shall have obtained the entry of an order, in form and substance satisfactory to Agent, approving the Chapter 11 Sale to the stalking horse bidder or a higher or better bidder.

     (d)    Not later than the earlier of (i) the fourth (4th) Business Day following entry of such sale order, or (ii) August 30, 2013, (A) the Chapter 11 Borrower Sale shall have closed, (B) all of the net cash proceeds generated by such Chapter 11 Borrower Sale shall be remitted to Agent for application to the Obligations in such order and manner as Agent shall elect in its sole discretion, and (C) all Obligations (other than in respect of the Supplemental Advances, the DIP Supplemental Advances and the Contech Supplemental Advances) of Borrowers to Agent, the Lender Group and each of the Bank Product Providers shall be repaid in full on terms and conditions acceptable to Agent, and any excess proceeds of the Chapter 11 Sale which are in excess of any then unfunded portion of the Cash Collateral Amount and any then outstanding Obligations (other than in respect of the Supplemental Advances, the DIP Supplemental Advances and the Contech Supplemental Advances) shall be remitted to Borrowers (to be wired to the Designated Account) or to such other account or person specified in the order approving the Chapter 11 Sale.

     (e)    Chapter 11 Borrower and Non-Chapter 11 Loan Parties confirm, acknowledge and agree that any failure to comply with the requirements set forth in this Section 5.7 shall constitute an additional Event of Default under the Loan Documents.

     5.8    <u>DIP Supplemental Advances</u>.

     (a)    So long as Agent shall have received on the date hereof the Existing Junior Participation Agreement Amendment No. 2, pursuant to which the DIP Junior Participants agree to purchase the DIP Junior Participation in an amount equal to one hundred (100%) percent of the DIP Supplemental Advances, all as more particularly set forth in the Existing Junior Participation Agreement Amendment No. 2, then, in addition to the post-petition Advances available to Chapter 11 Borrower under the Credit Agreement, Agent, on behalf of

Wells Fargo and for the sole account of Wells Fargo, hereby agrees from time to time to make post-petition supplemental advances (the "DIP Supplemental Advances") to Chapter 11 Borrower in an aggregate amount not to exceed $9,000,000 (the "DIP Supplemental Advances Limit"); provided, that, Chapter 11 Borrower acknowledges, confirms and agrees that it is a condition precedent to each DIP Supplemental Advance that Agent or Wells Fargo shall have received from the DIP Junior Participants, in accordance with the terms of the Existing Junior Participation Agreement, an amount equal to amount of the DIP Supplemental Advance requested by Chapter 11 Borrower (it being understood and agreed that if the DIP Junior Participants fail to fund an amount equal to the amount of the DIP Supplemental Advance requested by Chapter 11 Borrower, Agent and Wells Fargo shall have no obligation whatsoever to make such requested DIP Supplemental Advance to Chapter 11 Borrower).

(b)     The DIP Supplemental Advances: (i) shall be in addition to all post-petition Advances made to Chapter 11 Borrower under the Credit Agreement; (ii) shall constitute Obligations; and (iii) shall be secured solely by the Collateral now or hereafter owned by Chapter 11 Borrower.

(c)     Each DIP Supplemental Advance shall:

     (i)     bear interest at a per annum rate equal to six (6%) percent;

     (ii)     permanently reduce on a dollar-for-dollar basis the DIP Supplemental Advances Limit;

     (iii)     be repaid on the Maturity Date;

     (iv)     be in a minimum amount of not less than $100,000; and

     (v)     be used in accordance with the terms of the Credit Agreement.

(d)     It shall be a condition precedent to each DIP Supplemental Advance that, after giving effect to such DIP Supplemental Advance, the aggregate principal amount of the post-petition Advances and DIP Supplemental Advances to Chapter 11 Borrower outstanding at any time, including the requested DIP Supplemental Advance, shall not exceed $12,500,000 in the aggregate.

(e)     The DIP Supplemental Advances shall be requested, made and otherwise treated in the same manner as Advances under the Credit Agreement, except as otherwise provided for in this Section 5.8. The repayment of the outstanding DIP Supplemental Advances shall be in all respects subject to the terms, conditions and agreements set forth in the Existing Junior Participation Agreement.

5.9     Cash Collateral Amount. The Cash Collateral Amount shall be funded by Borrowers, and established and held by Agent, (a) on the Contech Sale Date, in the initial amount of $200,000, and (b) on the date of consummation of the Chapter 11 Borrower Sale in an additional amount of $300,000; provided, that, in all cases, by no later than the Maturity Date, the Cash Collateral Amount shall be funded by Borrowers, and established and held by Agent, in

the full amount of $500,000. Effective upon the funding and establishment of the Cash Collateral Amount, Borrowers and Guarantors shall be deemed to have assigned, pledged, hypothecated, transferred and set over to Agent, on behalf of Lenders, and granted to Agent, on behalf of Lenders, a security interest in and right to set off against, the Cash Collateral Amount, which Cash Collateral Amount shall be held by Agent pursuant to such terms and condition as the parties may hereafter agree. If, on or prior to the date that is ten (10) days after the investigation period(s) granted to the official committee of unsecured creditors or any other parties in accordance with Section 4.1 of the Financing Order has ended, no Objection (as defined in the Financing Order) is made, asserted, filed or otherwise raised by the official committee of unsecured creditors or any other parties, Agent agrees to release any remaining portion of the Cash Collateral Amount then held by Agent and remit such excess portion to such account of Borrowers as designated in writing by Administrative Loan Party to Agent.

      5.10   <u>Pension Benefit Guaranty Corporation Subordination Agreement</u>. On or before July 26, 2013, Borrowers shall deliver to Agent a subordination agreement, in form and substance satisfactory to Agent, duly authorized, executed and delivered by the Pension Benefit Guaranty Corporation ("PBGC") in favor of Agent; <u>provided</u>, <u>that</u>, Borrowers shall have no obligation to deliver such subordination agreement to the extent that Agent has received evidence, in form and substance satisfactory to Agent, that the PBGC has received the payment in full of all amounts due from the Loan Parties and their Subsidiaries and Affiliates to the PGBC and that any and all liens and security interests arising in favor of the PBGC as of July 26, 2013 have been released and are of no further force and effect.

      6.    <u>DIP FACILITY FEE</u>. Chapter 11 Borrower shall pay to Agent, for the account of Lenders on a pro rata basis according to their respective Commitments, a debtor-in-possession financing facility fee in the amount of $75,000 on account of the financing provided by Agent and Lenders to Chapter 11 Borrower in the Chapter 11 Case, which fee shall be fully earned on the date of entry by the Bankruptcy Court of the Interim Financing Order and shall be due and payable as follows: (a) on the date of entry by the Bankruptcy Court of the Interim Financing Order, in the amount of $50,000, and (b) on August 5, 2013, in the amount of $25,000; <u>provided</u>, <u>that</u>, with respect to this clause (b), such amount shall not be due and payable by Chapter 11 Borrower (or any other Loan Party) if, as of August 5, 2013, the outstanding principal amount of Advances are equal to $0. Such fee may be charged directly to any loan account of Chapter 11 Borrower maintained by Agent.

      7.    <u>AMENDMENTS</u>.

      7.1   <u>Revolver Advances; Letters of Credit; Supplemental Advances</u>. Notwithstanding anything to the contrary contained in the Credit Agreement or the other Loan Documents (including, without limitation, the Budget):

      (a)    Non-Chapter 11 Borrowers shall not have any right to request, and Agent and Lenders shall not make, any Supplemental Advances or DIP Supplemental Advances to Non-Chapter 11 Borrowers;

      (b)    Chapter 11 Borrower shall not have any right to request, and Agent and Lenders shall not make, any Supplemental Advances (it being understood and agreed, and

for the avoidance of doubt, Chapter 11 Borrower shall have the right to request, and Agent and Lenders shall make, Advances and DIP Supplemental Advances to Chapter 11 Borrower, subject to the terms of the Credit Agreement and this Ratification Agreement);

(c)     Borrowers shall not have any right to request, and Agent and Lenders shall not make, any Advances to Borrowers in respect of or for the purpose of funding or otherwise providing for a source of payment for any professional fees and any Allowed Professional Fees (including, without limitation, any retainers or interim payments in respect thereof); it being understood and agreed that any such professional fees and any Allowed Professional Fees shall be funded and paid solely from the DIP Supplemental Advances;

(d)     From and after the Contech Sale Date, Borrowers shall not have any right to request, and Agent and Lenders shall not make, any Advances to Borrowers; it being understood and agreed that, from and after such Contech Sale Date through and including the Maturity Date, Wells Fargo, whether in its capacity as Agent or as a Lender, shall only be responsible and/or obligated (i) to make any DIP Supplemental Advances in accordance with Section 5.8 of this Ratification Agreement and (ii) to remit to Borrowers (to be wired to the Designated Account) any excess proceeds of the Contech Sale and any Collections and other payments and amounts in respect of the Collateral received by Agent from time to time which are in excess of the Cash Collateral Amount and any then outstanding Obligations (other than in respect of the Supplemental Advances, the DIP Supplemental Advances and the Contech Supplemental Advances); and

(e)     Borrowers shall not have any right to request, and Agent and Lenders shall not issue, any Letters of Credit to or for the account of any Borrower or Guarantor.

7.2     <u>Reserves</u>. Section 2.1(c) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"(c)     Anything to the contrary in this Section 2.1 notwithstanding, Agent shall have the right (but not the obligation) to establish, increase, reduce, eliminate, or otherwise adjust reserves from time to time against a Borrower's Borrowing Base or such Borrower's Revolver Loan Limit in such amounts, and with respect to such matters, as Agent in its Permitted Discretion shall deem necessary or appropriate, including (i) reserves in an amount equal to the Bank Product Reserve Amount, (ii) reserves with respect to (A) sums that any Borrower or any other Loan Party are required to pay under any Section of this Agreement or any other Loan Document (such as taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, and (B) amounts owing by any Borrower or any other Loan Party to any Person to the extent secured by a Lien on, or trust over, any of the Collateral (other than a Permitted Lien which is a permitted purchase money Lien or the interest of a lessor under a Capital Lease), which Lien or trust, in the Permitted Discretion of Agent likely would have a

priority superior to Agent's Liens (such as Liens or trusts in favor of landlords, warehousemen, carriers, mechanics, materialmen, laborers, or suppliers, or Liens or trusts for ad valorem, excise, sales, or other taxes where given priority under applicable law) in and to such item of the Collateral, (iii) reserves provided for in the Financing Order, including, without limitation, in respect of the Professional Fee Carve Out, the other Carve Out Expenses (as each term is defined in the Financing Order) and the professional fees and expenses set forth in the Budget (the "Budgeted Professional Fees"), (iv) reserves in the amount of any senior liens or claims in or against the Collateral that, in Agent's determination, have priority over the liens and claims of Agent, the Lender Group and the Bank Product Providers, and (v) the amount of any priority or administrative expense claims that, in Agent's determination, require payment during the Chapter 11 Case."

7.3    Limits and Sublimits. Section 2.1 of the Credit Agreement is hereby amended by adding the following new clause (e) at the end thereof:

"(e)    All limits and sublimits set forth in this Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Pre-Petition Obligations and the Post-Petition Obligations."

7.4    Apportionment and Application. Section 2.4(b)(ii) of the Credit Agreement is hereby amended as follows:

(a)    Section 2.4(b)(ii)(J) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"(J)    tenth, ratably (1) to pay the principal of all Advances until paid in full, and (2) to Agent, to be held by Agent in accordance with the Ratification Agreement, for the benefit of the Lenders, the Cash Collateral Amount,"

(b)    Section 2.4(b)(ii)(L) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"(L)    twelfth, either (1) with respect to outstanding Obligations solely related to Metavation (as determined by Agent in its Permitted Discretion), ratably to pay such Obligations in respect of the Supplemental Advances and the DIP Supplemental Advances, or (2) with respect to outstanding Obligations solely related to Contech (as determined by Agent in its Permitted Discretion), ratably to pay any such Obligations in respect of the Supplemental Contech Advances; in each case, subject to terms,

conditions and agreements set forth in the Existing Junior Participation Agreement Amendment No. 2 and the Contech Participation Agreement, as applicable,"

7.5    Payments. Section 2.4(b) of the Credit Agreement is hereby amended by adding the following new clause (vii) at the end thereof:

"(vii)  Without limiting the generality of the foregoing, Agent may, in its discretion, apply any such payments or proceeds received from Pre-Petition Collateral first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full."

7.6    Conditions Precedent to All Extensions of Credit. Section 3.2(a) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"(a)    the representations and warranties of the Loan Parties contained in this Agreement (other than those set forth in Sections 4.10(a) and 4.14 of this Agreement with respect to Chapter 11 Borrower) or in the other Loan Documents (including, without limitation, the Ratification Agreement with respect to Chapter 11 Borrower) shall be true and correct in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date); and"

7.7    Maturity. Section 3.3 of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

"(a)    This Agreement shall continue in full force and effect for a term ending on the earlier to occur of (i) the Stated Maturity Date, (ii) the confirmation of a plan of reorganization for any Loan Party in the Chapter 11 Case, (iii) the consummation of the sale or sales of all or substantially all of Chapter 11 Borrower's assets and properties or of all equity interests in Chapter 11 Borrower, or (iv) the last termination date set forth in the Interim Financing Order, unless the Permanent Financing Order has been entered prior to such date, and in such event, then the last termination date set forth in the Permanent Financing Order (the earlier to occur of clauses (i), (ii), (iii) and (iv) referred to herein as the "Maturity Date"); provided, that, this Agreement and all other Loan Documents must be terminated simultaneously.    The foregoing notwithstanding, the Lender Group, upon the election of

the Required Lenders, shall have the right to terminate its obligations under this Agreement immediately and without notice to Administrative Loan Party or any other Loan Party upon the occurrence and during the continuation of an Event of Default.

(b)     Effective on the Maturity Date and without notice to Administrative Loan Party or any other Loan Party, (i) any and all Commitments and obligations of Wells Fargo under this Agreement shall be terminated and (ii) Wells Fargo shall be deemed to have resigned as the Agent, Issuing Lender and Swingline Lender under the Credit Agreement and the other Loan Documents and shall have no further rights, powers, privileges and duties under the Loan Documents. The parties hereto agree that Wells Fargo, in its capacity as the resigning Agent, shall bear no responsibility or liability for (A) any actions taken or omitted to be taken by the successor Agent as Agent under the Credit Agreement and the other Loan Documents arising on or after the Maturity Date, or (B) any event, circumstance, condition, or action existing on or after the Maturity Date with respect to the Collateral, the Credit Agreement, any other Loan Document or the transactions contemplated thereby. Notwithstanding the resignation of the resigning Agent on the Maturity Date, all provisions of Section 9 and Section 15 of the Credit Agreement as in effect immediately prior to the Maturity Date, including, but not limited to, the indemnification provisions and all cost and expense provisions thereunder, shall, as to Borrowers, Guarantors, the successor Agent, the Lender Group and the Bank Product Providers, survive for the benefit of the resigning Agent and its Agent-Related Persons as to any actions taken or omitted to be taken by the resigning Agent or any of its Agent-Related Persons while it was the Agent, Issuing Lender or Swingline Lender."

7.8     <u>Additional Financial Reporting Requirements</u>. Section 5.1 of the Credit Agreement is hereby amended by adding the following new sentence at the end thereof:

"Borrowers shall also deliver to Agent (with copies to Agent and each Lender) copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of Chapter 11 Borrower to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or Chapter 11 Borrower's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

7.9     <u>Indebtedness</u>. Notwithstanding anything to the contrary contained in Section 6.1 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the

date hereof, to, create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness (other than (a) Permitted Indebtedness existing as of the Petition Date, (b) Indebtedness evidenced by the Credit Agreement and the other Loan Documents, and (c) such other Indebtedness specifically provided for in the Budget).

7.10   Liens. Notwithstanding anything to the contrary contained in Section 6.2 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any Lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) Permitted Liens existing on the Petition Date or otherwise permitted under this Ratification Agreement and (b) Liens securing the Obligations).

7.11   Disposal of Assets. Notwithstanding anything to the contrary contained in Section 6.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of any Loan Party's or its Subsidiaries' Collateral or other assets, including, without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise (other than (a) Permitted Dispositions within the meaning of clause (b) of the definition of Permitted Dispositions and (b) any other sales expressly consented to in writing by Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

7.12   Prepayments and Amendments. Notwithstanding anything to the contrary contained in Section 6.7(a) of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any payment on account of, or optionally prepay, redeem, defease, purchase, or otherwise acquire, any Permitted Intercompany Advances without, in each case, the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

7.13   Restricted Payments. Notwithstanding anything to the contrary contained in Section 6.9 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit any Subsidiary, after the date hereof, to make any Restricted Payments set forth in such Section 6.9 or otherwise, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

7.14   Investments; Controlled Investments. Notwithstanding anything to the contrary contained in Section 6.12 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Loan Documents, the Loan Parties will not, and will not permit

any Subsidiary, after the date hereof, to, directly or indirectly, make or acquire any Investment or incur any liabilities (including contingent obligations) for or in connection with any Investment.

7.15    Events of Default. Section 8 of the Credit Agreement is hereby amended as follows:

(a)    Section 8.4 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"8.4    If an Insolvency Proceeding is commenced by a Loan Party or any of its Subsidiaries (other than Chapter 11 Borrower or Industries);"

(b)    Section 8.5 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"8.5    If an Insolvency Proceeding is commenced against a Loan Party (other than Chapter 11 Borrower) and any of the following events occur: (i) such Loan Party (other than Chapter 11 Borrower) consents to the institution of such Insolvency Proceeding against it, (ii) the petition commencing the Insolvency Proceeding is not timely controverted, (iii) the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) calendar days of the date of the filing thereof, (iv) an interim trustee is appointed to take possession of all or any substantial portion of the properties or assets of, or to operate all or any substantial portion of the business of, such Loan Party (other than Chapter 11 Borrower), or (v) an order for relief shall have been issued or entered therein;"

(c)    Section 8.6 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"8.6    If a Loan Party or Industries suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Industries or such Loan Party and its Subsidiaries that are Loan Parties or Industries, taken as a whole, or a trustee, receiver or custodian is appointed for Industries or any Loan Party, or any of their respective properties;"

(d)    Section 8 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "or" at the end of Section 8.11, (ii) replacing the period appearing at the end of Section 8.12 with a semicolon, and (iii) adding the following:

"8.13    The occurrence of any condition or event which permits Agent and Lenders to exercise any of the remedies set

forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

8.14    The termination or non-renewal of the Loan Documents as provided for in the Financing Order;

8.15    Any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Change upon the assets of any Loan Party, or the Collateral, or the ability of Chapter 11 Borrower to perform under and comply with the Budget in accordance with the terms and conditions hereof, or the rights and remedies of the Lender Group under the Credit Agreement or any other Loan Documents or the Financing Order;

8.16    Conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

8.17    Dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

8.18    The grant of a lien on or other interest in any property of any Loan Party, other than a Permitted Lien or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

8.19    The grant of an administrative expense claim in any Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or this Ratification Agreement, which is superior to or ranks in parity with Agent's Superpriority Claim (as defined in the Financing Order);

8.20    The Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender);

8.21    The appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

8.22    The appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

8.23    The filing of a plan of reorganization or liquidation by or on behalf of any Loan Party, to which Agent has not consented in writing, which does not provide for payment in full in

cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

8.24    The confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Loan Party, to which Agent has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

8.25    Entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of Chapter 11 Borrower without the prior written consent of Agent and the Required Lenders;

8.26    The filing of a motion by Chapter 11 Borrower (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Lenders directly) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

8.27    If, for whatever reason and at any time, the Board of Managers of Chapter 11 Borrower that has a Board of Managers as of the Petition Date should fail to have the full and exclusive right and control over the business and affairs of Chapter 11 Borrower and all decisions affecting the business and affairs of Chapter 11 Borrower, in each case subject only to (a) the power and authority of the CRO, (b) the power and authority of the Bankruptcy Court in the Chapter 11 Case and (c) any provision of applicable law or the operating agreement of Chapter 11 Borrower that provides the member or members of Chapter 11 Borrower any such right or control;

8.28    (a) The failure of Chapter 11 Borrower to comply with the terms and provisions of Section 5.5(d) or (b) the failure of Non-Chapter 11 Borrowers to retain the CRO;

8.29    The Pension Benefit Guaranty Corporation ("PBGC") shall obtain a lien or security interest which (a) is not subject to the terms of a subordination agreement, in form and substance satisfactory to Agent, executed and delivered by the PBGC in favor of Agent, or (b) is not otherwise junior and subordinate to the liens and security interests of Agent, the Lender Group and the Bank Product Providers; or

8.30   If, on or before the date that is seven (7) days after the date of the hearing in the Chapter 11 Case to approve the Interim Financing Order, the GM/Chrysler Sale Support Agreement shall not have been approved on an interim basis by the Bankruptcy Court; provided, that, such failure to approve the GM/Chrysler Sale Support Agreement shall not constitute an Event of Default if, on or prior to the seventh (7th) day after the date of the hearing to approve the GM/Chrysler Sale Support Agreement on an interim basis, Agent shall have received notice in writing from General Motors, LLC and Chrysler Group, LLC that each has waived their respective requirements that the GM/Chrysler Sale Support Agreement be approved on or prior to such seventh (7th) day."

7.16   Choice of Law and Venue; Jury Trial Waiver. Section 12(a) of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof: "EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING."

7.17   Amendments to Definitions.

(a)   Definition of Maximum Revolver Amount. The definition of "Maximum Revolver Amount", as set forth in Schedule 1.1 of the Credit Agreement, is hereby amended and restated in its entirety as follows:

""Maximum Revolver Amount" means $6,000,000."

(b)   Definition of Permitted Liens. Clause (t) of the definition of "Permitted Liens", as set forth on Schedule 1.1 to the Credit Agreement, is hereby amended and restated in its entirety as follows:

"(t)   Liens upon (i) the Collateral of Contech securing the Landstar Indebtedness pursuant to the Landstar Documents in an amount not to exceed $1,100,000, as permitted under subparagraph (q) of the definition of Permitted Indebtedness, (ii) the Operating Assets and Real Estate (as each such term is defined in the GM Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto); provided, that, any such Lien secures only General Motors, LLC's Right of Access (as such term is defined in the GM Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto) and does not secure any other Indebtedness to General Motors, LLC, and such Lien attaches only to the Operating Assets and Real Estate, (iii) the Operating Assets (as such term is defined in the Chrysler Access and Security Agreement as in effect on the date of the Ratification Agreement

without giving effect to any amendments thereto) owned by Metavation; provided, that, any such Lien secures only Chrysler Group, LLC's Right of Access (as defined in the Chrysler Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto) and does not secure any other Indebtedness to Chrysler Group, LLC, and such Lien attaches only to the Operating Assets, (iv) the Operating Assets (as such term is defined in the Contech Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto); provided, that, any such Lien secures only the Contech Customers' Right of Access (as defined in the Contech Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto) and does not secure any other Indebtedness to the Contech Customers, and such Lien attaches only to the Operating Assets, (v) the Operating Assets and Real Estate (as each such term is defined in the Omnibus Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto); provided, that, any such Lien secures only General Motors, LLC's and Chrysler Group, LLC's Right of Access (as defined in the Omnibus Access and Security Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto) and does not secure any other Indebtedness to General Motors, LLC or Chrysler Group, LLC, and such Lien attaches only to the Operating Assets and Real Estate, and (vi) the Sale Support Collateral (as such term is defined in the GM/Chrysler Sale Support Agreement as in effect on the date of the Ratification Agreement without giving effect to any amendments thereto); provided, that, such Liens shall at all times and in all ways be subordinate and junior in right of payment and priority to the Liens of Agent in the Collateral, and in no circumstances shall General Motors LLC or Chrysler Group, LLC take any action whatsoever to foreclose upon or otherwise enforce any rights and remedies against any Loan Party or any of its assets in respect of any such Lien, and"

7.18    Authorized Persons. As of the date hereof, Schedule A-2 to the Credit Agreement is hereby deleted and the Schedule A-2 annexed to this Ratification Agreement as Exhibit 7.18 is substituted therefor.

7.19    Commitments. As of the date hereof, Schedule C-1 to the Credit Agreement is hereby deleted and the Schedule C-1 annexed to this Ratification Agreement as Exhibit 7.19 is substituted therefor.

8.    RELEASE.

8.1    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of the Lender Group contained herein and the making of any Advances and DIP Supplemental Advances by Agent and Lenders, each Loan Party, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each member of the Lender Group and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (each member of the Lender Group and all such other parties, in their capacities as such, being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Loan Party, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Loan Documents.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Loan Party pursuant to this Section 8.1. If any Loan Party violates the foregoing covenant, Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2    Release of Post-Petition Claims. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Loan Documents, and (b) the termination of the Loan Documents (the "Payment Date"), in consideration of the agreements of the Lender Group contained herein and the making of any Loans by Agent and Lenders, each Loan Party hereby covenants and agrees to execute and deliver in favor of each member of the Lender Group a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Loan Party violates such covenant, the Loan Parties agree to pay, in

addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

      8.3    <u>Releases Generally</u>.

      (a)    Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

      (b)    Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

      9.    <u>CONDITIONS PRECEDENT</u>.

      In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Advances and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Advances and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend further loans, advances or other financial accommodations to Borrowers pursuant to the Credit Agreement:

      9.1    Borrowers and Guarantors shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time;

      9.2    as of the Petition Date, the Existing Loan Documents shall not have been terminated;

      9.3    no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to any Loan Party, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

      9.4    the execution and delivery of this Ratification Agreement and all other Loan Documents by the Loan Parties, Agent and Lenders, including, without limitation, the Existing Junior Participation Agreement Amendment No. 2 and the satisfaction of all conditions set forth in Section 5.8 hereof;

      9.5    the execution or delivery to Agent and Lenders of all other Loan Documents, and other agreements, documents and instruments which, in the good faith judgment of Agent, are necessary or appropriate, and the implementation of the terms of this Ratification Agreement and the other Loan Documents, as modified pursuant to this Ratification Agreement, all of which contains provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

9.6     the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the deposit account arrangements of the Loan Parties to reflect the commencement of the Chapter 11 Case, that Chapter 11 Borrower, as Debtor and Debtor-in-Possession, is the successor in interest to such Loan Party, as the case may be, that the Obligations include both the Pre-Petition Obligations and the Post-Petition Obligations, that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

9.7     each Loan Party shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") authorizing the secured financing under the Loan Documents as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the senior security interest in liens in favor of Agent described in this Ratification Agreement and in the Financing Order, and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders. The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount consistent with the Budget, and it shall contain such other terms or provisions as Agent and its counsel shall require;

9.8     with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent (for the benefit of the Lender Group and the Bank Product Providers) the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Agent and its counsel ("Permanent Financing Order"). Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order with respect to which an effective stay exists;

9.9     other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date; and

9.10    no Event of Default shall have occurred or be existing under any of the Existing Loan Documents, as modified pursuant hereto, and assumed by Borrowers and Guarantors.

10.    <u>MISCELLANEOUS</u>.

10.1    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

10.2    <u>Effect of this Amendment</u>.  This Ratification Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior oral or written communications, memoranda, proposals, negotiations, discussions, term sheets and commitments with respect to the subject matter hereof.  Except as expressly amended pursuant hereto, no other changes or modifications to the Loan Documents are intended or implied, and in all other respects the Loan Documents are hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof.  To the extent that any provision of the Credit Agreement or any of the other Loan Documents are inconsistent with the provisions of this Ratification Agreement, the provisions of this Ratification Agreement shall control.

10.3    <u>Further Assurances</u>.  Each Loan Party shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Loan Documents, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other  Loan Documents or the Financing Order.  Upon the request of Agent, at any time and from time to time, each Loan Party shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

10.4    <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

10.5    <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this

Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

10.6    Additional Events of Default. The parties hereto acknowledge, confirm and agree that the failure of any Loan Party to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Loan Party in connection herewith shall constitute an immediate Event of Default under the Loan Documents.

10.7    Costs and Expenses. Borrowers shall pay to Agent and Lenders on demand all costs and expenses that Agent or Lenders pay or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, defense (whether in connection with any adversary proceeding or otherwise) and termination of this Ratification Agreement and the other Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Loan Parties under the Loan Documents or the Financing Order that Loan Parties fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including reasonable travel, lodging, and meals for inspections of the Collateral and Chapter 11 Borrower's and each Non-Chapter 11 Loan Party's operations by Agent or their agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Chapter 11 Borrower's and each Non-Chapter 11 Loan Party's operations, plus a per diem charge at the rate of $1,000 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, defend against, or respond in connection with, any action or proceeding relating to Chapter 11 Borrower, Non-Chapter 11 Loan Parties, the Loan Documents or the Financing Order, and otherwise enforce the provisions of this Ratification Agreement, the other Loan Documents and the Financing Order, or to defend any claims made or threatened against member of the Lender Group arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the Loan Documents regarding costs and expenses to be paid by Borrowers. All sums provided for in this Section 10.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the Loan Documents. Agent is hereby

irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Loan Party.

10.8   _Effectiveness_.  This Ratification Agreement shall become effective upon the execution hereof by Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

CHAPTER 11 BORROWER:

METAVATION, LLC, as Debtor and Debtor-in-Possession

By: _____
Name: Laura Marcero
Title:  Deputy CRO


NON-CHAPTER 11 BORROWERS:

CONTECH CASTINGS, LLC
MW TEXAS DIE CASTING, INC.

By: _____
Name: Laura Marcero
Title:  Deputy CRO


[Signatures Continued on Following Page]

*[Signature Page to Ratification and Amendment Agreement - Metavation]*

[Signatures Continued from Previous Page]

GUARANTORS:

REVSTONE TRANSPORTATION, LLC
CONTECH CASTINGS REAL ESTATE HOLDINGS, LLC
CERION MPI GRAND AVENUE LLC
CERION MPI KNOX LLC
CERION MPI GOLF ROAD LLC
CERION MPI MEXICO LLC
METAVATION MEXICO, LLC
METAVATION MEXICO II, LLC
METAVATION TRAVERSE CITY, LLC
METAVATION TRAVERSE CITY BUILDING THREE, LLC
METAVATION VASSAR, LLC
MIDS, LLC
MPI, LLC

By: _____
Name: Laura Marcero
Title:  Deputy CRO


MPI INTERNATIONAL MEXICO, S. DE R.L. DE C.V.

By: _____
Name: Laura Marcero
Title:  Deputy CRO


EPTEC, S.A. DE C.V.

By: _____
Name: Laura Marcero
Title:  Deputy CRO

[Signatures Continued on Following Page]

*[Signature Page to Ratification and Amendment Agreement - Metavation]*

[Signatures Continued from Previous Page]

AGENT:

WELLS FARGO CAPITAL FINANCE, LLC,
  as Agent and Lender

By: _____
Name: _____
Title: _____

Exhibit A
to
Ratification and Amendment Agreement

<u>Budget</u>


[See Attached]

Exhibit 7.18
to
Ratification and Amendment Agreement

<u>Schedule of Authorized Persons</u>

SCHEDULE A-2
to
CREDIT AGREEMENT

Authorized Persons

[BORROWERS TO PROVIDE]

Exhibit 7.19
to
Ratification and Amendment Agreement

Schedule C-1 to Credit Agreement

**SCHEDULE C-1**
**to**
**CREDIT AGREEMENT**
**Commitments**

| Lender | Revolver Commitments |
|---|---|
| Wells Fargo Capital Finance, LLC | $6,000,000 |
| Total: | $6,000,000 |

# EXHIBIT B

**Metavation**
**Cash Forecast**

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | |
|---|---|---|---|---|---|---|---|---|---|
| Accounting Period | 7 | 7 | 7 | 7 | 8 | 8 | 8 | | Period |
| | 7/13/2013 | 7/20/2013 | 7/27/2013 | 8/3/2013 | 8/10/2013 | 8/17/2013 | 8/24/2013 | | Total |
| **Available Funds:** | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | | Total |
| Beginning Cash | $ 414,301 | $ 480,274 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ | 414,301 |
| Wells Borrowings | 1,342,488 | 999,111 | 1,008,384 | 1,008,384 | 1,090,284 | 1,089,435 | 535,840 | | 7,073,925 |
| Customer Advances | 1,150,000 | 319,029 | 429,442 | 600,875 | 328,310 | 346,873 | 470,154 | | 3,644,682 |
| **Cash Available:** | $ 2,906,789 | $ 1,798,414 | $ 1,487,825 | $ 1,659,258 | $ 1,468,594 | $ 1,486,308 | $ 1,055,994 | $ | 11,132,908 |
| **DIP Scenario Professional Fee Budget** | | | | | | | | | |
| Production Disbursements | $ 1,671,952 | $ 514,613 | $ 943,457 | $ 943,457 | $ 984,055 | $ 984,055 | $ 626,217 | $ | 6,667,806 |
| Payroll/ Taxes | 182,032 | 251,377 | 182,032 | 251,377 | 189,865 | 262,194 | 94,932 | | 1,413,808 |
| Benefits (Hlth, Dis, Life, 401K) | 63,097 | 63,097 | 63,097 | 63,097 | 65,812 | 65,812 | 32,906 | | 416,920 |
| Facilities | 84,548 | 84,548 | 84,548 | 84,548 | 88,186 | 88,186 | 44,093 | | 558,658 |
| Other SG&A | 29,779 | 29,779 | 29,779 | 161,779 | 31,060 | 31,060 | 7,957 | | 321,193 |
| Management Fee | 54,615 | - | 54,615 | - | 54,615 | - | 54,615 | | 218,460 |
| Property Taxes | - | - | - | - | - | - | 62,155 | | 62,155 |
| Interest | - | - | 75,297 | - | - | - | 78,118 | | 153,415 |
| Pension Expense | - | - | - | - | - | - | - | | - |
| General CapEx | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 35,000 |
| DIP Fees and Related Charges | - | 100,000 | - | 100,000 | - | - | - | | 200,000 |
| Material Supplier Deposits | - | 700,000 | - | - | - | - | - | | 700,000 |
| Friday Avail Adjustment | 335,492 | | | | | | | | 335,492 |
| **Total Disbursements:** | 2,426,514 | 1,748,414 | 1,437,825 | 1,609,258 | 1,418,594 | 1,436,308 | 1,005,994 | | 11,082,908 |
| **Ending Cash Balance** | 480,274 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | | 50,000 |
| **Revolver Calculations** | | | | | | | | | |
| Beg A/R Balance | $ 8,559,467 | $ 8,374,634 | $ 8,335,422 | $ 8,242,616 | $ 8,149,811 | $ 8,170,406 | $ 8,197,588 | $ | 8,559,467 |
| Sales | 1,018,037 | 967,135 | 967,135 | 967,135 | 1,080,783 | 1,080,763 | 455,066 | | 6,536,075 |
| A/R Collections | (1,157,775) | (968,383) | (1,019,048) | (1,019,048) | (1,019,036) | (1,012,588) | (417,959) | | (6,613,838) |
| Adjustments | (45,095) | (37,965) | (40,892) | (40,892) | (41,151) | (41,013) | (43,803) | | (290,811) |
| Ending A/R Balance | 8,374,634 | 8,335,422 | 8,242,616 | 8,149,811 | 8,170,406 | 8,197,588 | 8,190,893 | | 8,190,893 |
| Ineligible | 4,366,881 | 4,291,519 | 4,211,260 | 4,131,001 | 4,067,775 | 4,004,550 | 3,859,170 | | 3,859,170 |
| Eligible A/R @ 85% | 3,406,590 | 3,437,318 | 3,426,653 | 3,415,988 | 3,487,236 | 3,564,083 | 3,681,964 | | 3,681,964 |
| Inventory @ Advance Rate | 897,442 | 897,442 | 897,442 | 897,442 | 897,442 | 897,442 | 897,442 | | 897,442 |
| Reserves/ Blocks | - | - | - | - | - | - | - | | - |
| Availability Before Loan | $ 4,304,032 | $ 4,334,760 | $ 4,324,095 | $ 4,313,430 | $ 4,384,678 | $ 4,461,525 | $ 4,579,406 | $ | 4,579,406 |
| Additional Reserves/ Blocks | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | | 2,500,000 |
| Beginning Revolver Balance | $ 1,619,320 | $ 1,804,032 | $ 1,834,760 | $ 1,824,095 | $ 1,813,430 | $ 1,884,678 | $ 1,961,525 | $ | 1,619,320 |
| Draws | 1,342,488 | 999,111 | 1,008,384 | 1,008,384 | 1,090,284 | 1,089,435 | 535,840 | | 7,073,925 |
| A/R Collections | (1,157,775) | (968,383) | (1,019,048) | (1,019,048) | (1,019,036) | (1,012,588) | (417,959) | | (6,613,838) |
| Additional Cash Receipts | | | | | | | | | |
| Ending Revolver balance | $ 1,804,032 | $ 1,834,760 | $ 1,824,095 | $ 1,813,430 | $ 1,884,678 | $ 1,961,525 | $ 2,079,406 | $ | 2,079,406 |
| Net Availability | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| **Scenario Assuming Wells Payoff:** | | | | | | | | | |
| Customer in Formula Adv not Subject to Cap | | $ 30,728 | | | $ 49,919 | $ 76,847 | $ 117,882 | | 275,374 |
| Total Customer Operating Adv | $ 1,150,000 | $ 349,757 | $ 429,442 | $ 600,875 | $ 378,228 | $ 423,720 | $ 588,035 | | 3,920,056 |
| Total Customer Professional Fee Adv | $ 500,000 | $ 280,000 | $ 402,500 | $ 292,500 | $ 175,000 | $ 175,000 | $ 175,000 | | 2,000,000 |
| Total Jr. Participation | $ 1,650,000 | $ 629,757 | $ 831,942 | $ 893,375 | $ 553,228 | $ 598,720 | $ 763,035 | | 5,920,056 |

*Note that BBC is shown for calculating customer Participations. Wells will provide 100% of cash receipts and participations remitted.

**Metavation**
**Professional Fee Budget**

| | Pre File Prep Retainer Week 1 7/13 | Week 2 7/20 | Week 3 7/27 | Week 4 8/3 | Week 5 8/10 | Week 6 8/17 | Week 7 8/24 | Period Total |
|---|---|---|---|---|---|---|---|---|
| **Debtor's Advisors** | | | | | | | | |
| Counsel - Pachulski | 250,000 | 100,000 | 150,000 | 100,000 | 50,000 | 50,000 | 50,000 | 750,000 |
| Special Counsel - McDonald Hopkins | | 20,000 | 37,500 | 37,500 | 20,000 | 20,000 | 20,000 | 155,000 |
| Claims Agent | | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 95,000 |
| Huron | 250,000 | 100,000 | 150,000 | 100,000 | 50,000 | 50,000 | 50,000 | 750,000 |
| | | | | | | | | |
| **Lender's Advisors** | | | | | | | | |
| Counsel | | 40,000 | 20,000 | 10,000 | 10,000 | 10,000 | 10,000 | 100,000 |
| | | | | | | | | |
| **Creditors Committee Advisors** | | | | | | | | |
| Committee Counsel | | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 75,000 |
| Committee FA | | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 75,000 |
| **Total** | 500,000 | 280,000 | 402,500 | 292,500 | 175,000 | 175,000 | 175,000 | 2,000,000 |

Note:
Any part of an advisor's amount that is unused in any week may be used in any prior or later week for which that advisor exceeds its budgeted amount. In addition, advisors are subject to a 20% variance by advisory firm.
Any individual advisor's unused variance at the end of the
Post Close/Wind Down Period may be reallocated by the debtor to increase another advisor's total at that time.