# EXHIBIT A

1                       UNITED STATES BANKRUPTCY COURT
                              DISTRICT OF DELAWARE
2
                                    .      Chapter 11
3     IN RE:                         .
                                     .      Case No. 12-13262 (BLS)
4     REVSTONE INDUSTRIES, LLC.,     .
      et al                          .
5                                    .      Office of the U.S. Trustee
                                     .      Wilmington, Delaware
6                 Debtors.           .
                                     .      February 14, 2013
7     . . . . . . . . . . . . . . .  .

8              TRANSCRIPT OF 341 MEETING OF CREDITORS
                        BEFORE JANE LEAMY
9                  OFFICE OF THE U.S. TRUSTEE


10
      APPEARANCES:
11
      For the Debtor:               Laura Davis Jones, Esq.
12                                   PACHULSKI, STANG, ZIEHL
                                      & JONES, LLP
13                                   919 North Market Street, 17th Floor
                                     Wilmington, Delaware 19801
14
      For the Official Committee
15    of Unsecured Creditors:       Matthew P. Ward, Esq.
                                     WOMBLE, CARLYLE, SANDRIDGE
16                                    & RICE, LLP
                                     222 Delaware Avenue, Suite 1501
17                                   Wilmington, Delaware 19801

18    For Boston Finance Group:     Sarah E. Castle, Esq.
                                     DLA PIPER
19                                   1251 Avenue of the Americas
                                     New York, New York 10020
20
      Audio Operator:               Electronically Recorded
21
      Transcription Company:        Reliable
22                                   1007 N. Orange Street
                                     Wilmington, Delaware 19801
23                                   (302)654-8080
                                     Email:  gmatthews@reliable-co.com
24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.

28

1          MS. JONES:   -- think they need.

2          MS. LEAMY:   All right.   Well, I was just referring to,

3    you know, the document itself, you know, notwithstanding that

4    it had a limitation of authority.

5          MS. JONES:   Right.   But you know, I would override

6    that --

7          MS. LEAMY:   Okay.

8          MS. JONES:   -- with bankruptcy.

9          MS. LEAMY:   All right.   That's fine.   Okay.

10          MS. JONES:   And I --

11          MS. LEAMY:   That's all I was trying --

12          MS. JONES:   I went through that.

13          MS. LEAMY:   -- to clarify, that you didn't think that

14   you were --

15          MS. JONES:   No.   I went through that life with Womble

16   Carlyle --

17          MS. LEAMY:   Okay.

18          MS. JONES:   -- as committee counsel, as well.

19          MS. LEAMY:   All right.   Let me move to the schedules.

20   Do you have a copy with you?

21          MS. JONES:   You do, in your notebook.

22          MS. LEAMY:   Okay.

23          MR. DIDONATO:   Mr. Lukenda will be responding to most

24   of the questions about the schedules.

25          MS. LEAMY:   All right.   Thank you.

1          MS. JONES:  And let me make a -- and let me say

2   something about this, first, too, Jane, if I may.

3          MS. LEAMY:  Oh, sure.

4          MS. JONES:  The schedules have been filed for Revstone

5   and for Spara.  Those were done prior to the CRO being

6   appointed; those were done other counsel.  And Mr. Lukenda can

7   go through whatever detail we might need to go through on

8   those.  But there will be amendments to these schedules.

9          MS. LEAMY:  Okay.

10          MS. JONES:  And he's working through those now.

11          As was also mentioned at the beginning of the meeting

12  with Mr. O'Malley, we have not filed the schedules for

13  Greenwood and U.S. Tool.  The company goes through kind of a

14  close, if you will; a year-end close that happens around

15  February 25, so it doesn't make sense for us to do the

16  schedules prior to that, and -- but we're going to accelerate

17  it as quickly as we can after that.

18          We also had been under quite a challenge at the U.S.

19  Tool level with respect to information, because we had one of

20  the committee members stole the server, who -- which has now

21  been returned, where our IT is going through it to see what may

22  have been changed or what had been done.  But we're catching up

23  with that, as well.

24          MS. LEAMY:  Which committee member?

25          MS. JONES:  Mr. O'Mara.

34

1    (indiscernible) -- are these all affiliates of the debtor?

2         MR. LUKENDA:  I believe they're all affiliates of the

3    debtor.

4         UNIDENTIFIED:  Yes.

5         MS. LEAMY:  Oh, they all are.

6         MR. LUKENDA:  Even the Four Slides and Arkel Tool.

7         MS. LEAMY:  All right.  What is "Four Slides," what's

8    the nature of that business.

9         MR. DIDONATO:  It is a -- this is John DiDonato.  Four

10   Slides is not within the Revstone Industries or Spara Holdings,

11   it's not a subsidiary of those entities.  It's actually, as I

12   understand it, owned directly by Ascalon.  It's an OEM -- it's

13   an automotive supplier, as I understand it.

14        MS. LEAMY:  Okay.  Is that the same for Arkel Tool.

15        MR. DIDONATO:  Arkel is a tooling shop.

16        MS. LEAMY:  Okay.  And for other affiliates, at the

17   end of this question, 5.8 million.  Is there a reason that

18   wasn't broken out?

19        MS. JONES:  Obviously, we have the schedules.

20      (Participants speak simultaneously.)

21        MS. JONES:  If you know the answer to that.

22        UNIDENTIFIED:  No, we don't know.

23        MS. LEAMY:  Well, in the process of doing the

24   amendments, if you could look back at those.

25        MR. LUKENDA:  Well, some -- this is a lot of the

35

1   primary focus of what we're looking at from the amendment side;

2   the intercompany listings, the investment listings, and so

3   forth.

4           MS. LEAMY:   All right.  And then the last question on

5   Schedule B, 35, other personal property already listed.

6   There's retainer balance of 55,000.  Does this relate to the

7   Mayer Brown prior representation?

8           UNIDENTIFIED:  Yes.

9           MS. LEAMY:  Is the company making any efforts to get

10  this money back?

11          MS. JONES:  As I mentioned at our initial debtor

12  interview, my understanding is the company, through its general

13  counsel, has reserved its rights as to that retainer.  The

14  company is -- knows that Mayer Brown and Richards Layton

15  resigned.  There was never an application to retain them or an

16  application to withdraw.  So I think the company is waiting to

17  see how things sort out, and then it's reserved -- it's

18  reserving its rights on that.

19          Under the initial MORs that were filed, there are

20  those showing of retainers that have been made to both firms.

21          MS. LEAMY:  Right.

22          MS. JONES:  And also balances on those retainers as of

23  the petition date.  I don't know anything further than that.

24  Mr. DiDonato, I don't think you've been charged with looking

25  into that any further at this point.

36

1          MR. DIDONATO:  No, I haven't.

2          MS. LEAMY:  Okay.  All right.  So moving to Schedule

3  D, creditors holding secured claims.  Wells Fargo is listed as

4  having an approximate seventeen-million-dollar claim.  The

5  contingent box is checked.  Do you know why that's listed as

6  contingent?

7          UNIDENTIFIED:  I (indiscernible) guarantee.

8          MR. DIDONATO:  (Not identified) No, we don't know why

9  it's marked as contingent.

10         MS. LEAMY:  All right.  Someone just said there was a

11 guarantee claim.  Is that --

12         MS. JONES:  If you -- if you know the answer of why

13 it's marked contingent.

14         MR. FISHER:  Yeah.  My understanding is that it was

15 marked contingent because it's a guarantee on obligations of

16 other debtors, or other companies.

17         MS. JONES:  All right.

18         MS. LEAMY:  Okay.

19         MR. LUKENDA:  That was Mr. Fisher responding.

20         MR. FISHER:  Yes.

21         MS. LEAMY:  All right.

22    (Pause in proceedings.)

23         MS. LEAMY:  All right.  I'm moving to Schedule F,

24 creditors holding unsecured claims.  I'm looking at Page 2 of

25 8.

1    The first question I have is with respect to Boston

2  Finance Group.  They're listed as having a contingent,

3  unliquidated, disputed claim of 21 million.  What's the basis

4  for listing it as contingent, unliquidated, disputed.  There is

5  a portion of this that must be liquidated, correct?

6    MR. FISHER:  This is Matt Fisher.  I would expect that

7  to be amended because there's a judgment that, you know, will

8  give us a basis to --

9    MS. LEAMY:  To fix the claim?  So you --

10    MR. FISHER:  -- to make it not an unliquidated amount

11  at this point.

12    MS. LEAMY:  All right.  Thank you.

13    On the next page, Page 3 of 8, there's a claim, but no

14  amount listed for (indiscernible) Virginia (indiscernible).  Do

15  you know what the nature of that claim is for?

16    MR. LUKENDA:  I do not.  Jim, looking at --

17    MR. FISHER:  I do not, either.  This is Matt Fisher.

18  Mr. Bagbee (phonetic) is the former CFO.  That's the only

19  knowledge I have.

20    MS. LEAMY:  All right.

21    (Pause in proceedings.)

22    MS. LEAMY:  I'm looking at Page 7 of the -- near the

23  bottom, there is an entry for Sheldon O. Toll with -- for

24  232,000.  Is that for services he provided for the company?  I

25  understand he's personal counsel for Mr. Hofmeister in the

1   bankruptcy case.

2           MS. JONES:   If you know.

3           MR. DIDONATO:   I don't know.   I do -- I am aware that

4   Sheldon prior and (indiscernible) time as me serving as CRO was

5   providing services to the company.   That has now concluded.

6           MS. LEAMY:   Okay.

7           MR. DIDONATO:   So I don't know -- have any knowledge

8   of the claim.   But I am aware that he had previously provided

9   services to the companies.

10          MS. LEAMY:   All right.   That's all I had on the

11  schedules for that entity.

12          I'm now looking at the statement of financial affairs

13  for Revstone.   Question No. 1 lists the income from employment

14  or operation of business, and it lists here management fee

15  revenue.   Are there written agreements that provide the terms

16  under which Revstone Industries is entitled to receive

17  management fees?

18      (Participants speak simultaneously.)

19          MR. FISHER:   This is Matt Fisher.   I'm not aware of

20  any.

21          MS. LEAMY:   Okay.

22          MR. FISHER:   That doesn't mean it doesn't -- they

23  don't exist.   I -- I'm just not aware of any.

24          MS. LEAMY:   The note here says:

25          "Amounts are accrued and not a statement of payments