# EXHIBIT 1

MEMBERSHIP INTEREST PURCHASE AGREEMENT

BY AND AMONG

DHJH HOLDINGS LLC

REVSTONE TRANSPORTATION, LLC,

AND

METAVATION, LLC

Dated as of January 7, 2013

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS .................................................................................. 1

   1.1   Definitions ................................................................................. 1

ARTICLE II SALE OF MEMBERSHIP INTERESTS AND CLOSING ................................. 11

   2.1   Purchase and Sale ....................................................................... 11

   2.2   Purchase Price ............................................................................ 11

   2.3   Allocation ................................................................................. 11

   2.4   Closing ...................................................................................... 12

   2.5   Withholding ............................................................................... 14

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER .............................. 14

   3.1   Due Formation ........................................................................... 14

   3.2   Due Authorization ...................................................................... 15

   3.3   No Violations ............................................................................. 15

   3.4   Consents and Approvals .............................................................. 16

   3.5   Capitalization ............................................................................. 16

   3.6   Financial Statements ................................................................... 17

   3.7   Absence of Changes .................................................................... 17

   3.8   Title to and Condition of Personal Property .................................... 17

   3.9   Intellectual Property ................................................................... 18

   3.10   Material Contracts ...................................................................... 19

   3.11   Employee Benefit Plans ............................................................... 21

   3.12   Employees ................................................................................. 23

   3.13   Taxes ........................................................................................ 24

   3.14   Litigation .................................................................................. 25

TABLE OF CONTENTS
(continued)

Page

3.15   Compliance with Laws ........................................................................... 25

3.16   Environmental Matters .......................................................................... 25

3.17   Real Property ........................................................................................ 27

3.18   Brokers and Finders .............................................................................. 28

3.19   Undisclosed Liabilities .......................................................................... 29

3.20   Accounts Receivable ............................................................................. 29

3.21   Inventory ............................................................................................... 29

3.22   Banking Relationships and Investments ............................................... 29

3.23   Insurance ............................................................................................... 30

3.24   Powers of Attorney ............................................................................... 30

3.25   Disclosure ............................................................................................. 30

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 30

4.1   Due Incorporation .................................................................................. 30

4.2   Due Authorization .................................................................................. 30

4.3   Consents and Approvals; No Violations ................................................ 31

4.4   Investigation; Limitation on Warranties ................................................ 31

4.5   Brokers and Finders ............................................................................... 31

ARTICLE V COVENANTS ............................................................................................. 31

5.1   Access to Information and Facilities ...................................................... 31

5.2   Preservation of Business ........................................................................ 32

5.3   Exclusivity ............................................................................................. 32

5.4   Efforts .................................................................................................... 32

5.5   Notice of Developments ......................................................................... 33

5.6   Preservation of Records; Post-Closing Access and Cooperation; Litigation Support ..... 33

5.7    Transition ................................................................................................ 34

5.8    Employees and Benefits ......................................................................... 34

5.9    Amendment to Indemnification Provisions ............................................ 35

5.10   Confidentiality ....................................................................................... 35

5.11   Non-Competition; Non-Solicitation ...................................................... 37

5.12   Public Announcements ........................................................................... 38

5.13   Filing of Tax Returns; Tax Matters ....................................................... 38

5.14   Transfer Taxes ....................................................................................... 40

5.15   Seller Release ........................................................................................ 40

5.16   Pension Plan Payments .......................................................................... 40

ARTICLE VI CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ............. 40

6.1    Warranties True as of Closing Date ....................................................... 41

6.2    Compliance with Agreements and Covenants ........................................ 41

6.3    No Prohibition ........................................................................................ 41

6.4    Deliveries ............................................................................................... 41

6.5    No Adverse Proceedings ........................................................................ 41

6.6    Adverse Change ..................................................................................... 41

6.7    Financing ................................................................................................ 41

6.8    GM Agreement ....................................................................................... 41

6.9    GM Pension Payments ........................................................................... 41

6.10   EBITDA Pro Forma ............................................................................... 42

ARTICLE VII CONDITIONS PRECEDENT TO OBLIGATIONS OF Seller .......................... 42

7.1    Warranties True as of Present Date ....................................................... 42

7.2    Compliance with Agreements and Covenants ........................................ 42

7.3    No Prohibition ........................................................................................ 42

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| 7.4 | Deliveries | 42 |
| 7.5 | No Adverse Proceeding | 42 |
| 7.6 | Contech Note and Payment Mortgage | 42 |
| **ARTICLE VIII TERMINATION** | | 43 |
| 8.1 | Termination | 43 |
| 8.2 | Expenses | 43 |
| 8.3 | Break-Up Fee | 44 |
| 8.4 | Effect of Termination | 44 |
| 8.5 | Enforcement | 44 |
| **ARTICLE IX SURVIVAL AND REMEDY; INDEMNIFICATION** | | 45 |
| 9.1 | Survival | 45 |
| 9.2 | Indemnification by Seller | 45 |
| 9.3 | Indemnification by Purchaser | 46 |
| 9.4 | Indemnification Exclusive Remedy | 47 |
| 9.5 | Third-Party Claims | 47 |
| 9.6 | Procedure for Other Claims | 48 |
| 9.7 | Indemnification Limits | 48 |
| **ARTICLE X MISCELLANEOUS** | | 49 |
| 10.1 | Amendment | 49 |
| 10.2 | Notices | 49 |
| 10.3 | Waivers | 50 |
| 10.4 | Interpretation | 50 |
| 10.5 | Applicable Law | 50 |
| 10.6 | Binding Agreement | 50 |

10.7   Assignment ..................................................................................................... 50

10.8   Third Party Beneficiaries ................................................................................ 51

10.9   Further Assurances .......................................................................................... 51

10.10 Entire Understanding ...................................................................................... 51

10.11 Enforceability .................................................................................................. 51

10.12 Jurisdiction of Disputes .................................................................................. 51

10.13 Construction..................................................................................................... 52

10.14 Counterparts..................................................................................................... 52

SCHEDULES

Schedule 5.8(h): Vassar Employees

DISCLOSURE SCHEDULE

Section 1.1: Permitted Liens

Section 2.4: Required Consents

Section 3.1(a): Jurisdictions

Section 3.1(b): Subsidiaries

Section 3.3: No Violations

Section 3.4: Consents

Section 3.6: Financial Statements

Section 3.7: Material Adverse Effect Since Balance Sheet Date

Section 3.8: Title to and Condition of Personal Property

Section 3.9: Intellectual Property

Section 3.10: Material Contracts

Section 3.11: Benefit Plans

Section 3.12: Employees

Section 3.13: Taxes

Section 3.14: Litigation

Section 3.15: Compliance with Laws

Section 3.16: Environmental Matters

TABLE OF CONTENTS
(continued)

Page

Section 3.17(a): Owned Real Property

Section 3.17(b): Leased Real Property

Section 3.17(c): Notices

Section 3.19: Undisclosed Liabilities

Section 3.20: Accounts Receivable

Section 3.22: Banking Relationships and Investments

Section 3.23: Insurance

MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT, made as of January 7, 2013, among DHJH HOLDINGS LLC, a Delaware limited liability company ("Purchaser"), REVSTONE TRANSPORTATION, LLC, a Delaware limited liability company ("Seller") and METAVATION, LLC a Delaware limited liability company ("Company"). Each of Purchaser, Seller and the Company are referred to herein as a "Party" and collectively as the "Parties",

W I T N E S S E T H:

WHEREAS, Seller owns all of the issued and outstanding membership interests of the Company (the "Membership Interests"); and

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, all of the issued and outstanding membership interests of the Company;

WHEREAS, Purchaser acknowledges that the Company has shared services in its Southfield, MI offices which are not part of the transaction contemplated herein, except to the extent they are covered in any Transition Services Agreement;

WHEREAS, Purchaser acknowledges that Company has foundry facilities at its Vassar location, 700 E. Huron St., Vassar, Tuscola County, MI 48768 ("Vassar Foundry") and that the assets and liabilities associated with the foundry facilities are not part of the transaction contemplated herein; and

WHEREAS, Purchaser acknowledges that immediately prior to the transaction contemplated herein, Company assigned its assets and liabilities associated with the Vassar Foundry and its membership interests in Metavation Vassar, LLC, Metavation Traverse City, LLC and Metavation Traverse City Building Three, LLC to Revstone Transportation, LLC pursuant to an Assignment and Assumption Agreement reasonably acceptable to Purchaser (the "Assignment Agreement") and Bill of Sale reasonably acceptable to Purchaser (the "Bill of Sale").

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, Purchaser and Seller hereby agree as follows:

ARTICLE I
DEFINITIONS

1.1    Definitions.  The following terms shall have the following meanings for the purposes of this Agreement:

"1060 Forms" shall have the meaning set forth in Section 2.4.

"Accounts Receivable" means any and all amounts owed in cash to the Company or any of its Subsidiaries by reason of a sale of a good or provision of a service in the Ordinary Course of the Business (in accordance with GAAP and net of any applicable reserves).

"Affiliate" shall mean, with respect to any specified Person, any other Person which, directly or indirectly, controls, is under common control with, or is controlled by, such specified Person.  The term "control" (including the terms "controlling", "under common control with" and "controlled by") means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" shall mean this Agreement, including the Disclosure Schedule and all other exhibits and schedules hereto, as it and they may be amended from time to time.

"Alternative Arrangements" shall have the meaning set forth in Section 9.7(c).

"Applicable Laws" shall mean all laws, statutes, orders, rules, and regulations of Governmental Authorities, and judgments, decisions or orders entered by any Governmental Authority applicable to Seller, the Company or any of the Company's Subsidiaries.

"Assignment Agreement" shall have the meaning set forth in the recitals.

"Audited Financial Statements" shall have the meaning set forth in Section 3.6(a).

"Balance Sheet Date" means November 30, 2012.

"Benefit Plans" shall have the meaning set forth in Section 3.11(a).

"Bill of Sale" shall have the meaning set forth in the recitals.

"Business" means the manufacturing of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry.

"Business Day" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in the State of New York are authorized or required by law or other action of a Governmental Authority to close.

"Cap" shall have the meaning set forth in Section 9.7.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS means the Comprehensive Environmental Response, Compensation and Liability Information System.

"Certificate of Formation" shall mean the certificate of formation of the Company.

"CIM" shall have the meaning set forth in Section 6.8.

"<u>Closing</u>" shall mean the consummation of the transactions contemplated herein.

"<u>Closing Date</u>" shall have the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended.

"<u>Company</u>" shall have the meaning set forth in the preamble.

"<u>Company Accounting Principles</u>"  means the accounting principles and procedures used by the Company in the preparation of the Financial Statements, applied on a basis consistent with past practice, using the same methods, practices, principles, policies and procedures, with consistent classifications, judgments and valuation and estimation methodologies except as otherwise provided herein.

"<u>Company Assumed Benefit Plans</u>" shall be as defined in <u>Section 3.11</u>.

"<u>Company Benefit Plans</u>" shall be as defined in <u>Section 3.11</u>.

"<u>Competing Transaction</u>" shall have the meaning set forth in <u>Section 5.3</u>.

"<u>Confidential Information</u>" shall have the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Consents</u>" means the consents of third parties necessary or advisable to consummate the transactions contemplated hereby, as more particularly set forth in <u>Section 3.4</u>.

"<u>Contamination</u>" or "<u>Contaminated</u>" shall mean the presence of Hazardous Materials in, on or under the soil, groundwater, surface water or other environmental media to an extent that any Response Action is legally required by any Governmental Authority under any Environmental Law with respect to such presence of Hazardous Materials.

"<u>Contech Note</u>" shall have the meaning set forth in <u>Section 5.16</u>.

"<u>Contract</u>" means any agreement, written or oral (including any amendment and other modification thereto), to which the Company or any of its Subsidiaries is a party or is bound.

"<u>Controlled Group</u>" shall have the meaning set forth in <u>Section 3.11(c)</u>.

"<u>Damper Business</u>" shall have the meaning set forth in <u>Section 5.11(b)</u>.

"<u>Designated Contacts</u>" shall have the meaning set forth in <u>Section 5.1(a)</u>.

"<u>Disclosing Party</u>" shall have the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Disclosure Schedule</u>" shall mean the Disclosure Schedule delivered by Seller to Purchaser on the date of this Agreement, as amended, modified or supplemented in accordance with this Agreement.

"<u>Employees</u>" shall have the meaning set forth in <u>Section 3.12(a)</u>.

"Environmental Claim" means any notice, claim, demand, action, suit inquiry, proceeding, or investigation by any Governmental Authority or other Person involving (i) the storage, treatment, generation, transportation, processing, handling, production or disposal or the presence of or prior to the Closing Date, of any Hazardous Material at the Facilities owned or operated by the Company and its Subsidiaries, or at a landfill or other waste disposal site which received Hazardous Materials generated by the Company or its Subsidiaries; (ii) personal injury arising out of exposure to any Releases of Hazardous Materials present at the Facilities which were attributable to operations of the Company or its Subsidiaries provided such exposure to Releases of Hazardous Materials occurs on or prior to the Closing Date; (iii) a violation or an allegation of a violation of, or liability or potential liability under or relating to, any applicable Environmental Law or non-compliance with any Environmental Permit relating to the ownership, operation or use of the Facilities or any site by the Company or its Subsidiaries on or prior to the Closing Date; or (iv) any requests for information, notices of claim, demand letters or other notification received by Purchaser after the Closing Date from any Governmental Authority in connection with any investigation or clean-up of Releases of Hazardous Materials at any site listed or formally proposed for listing on the NPL or CERCLIS or to any site listed on any state list of hazardous substances sites requiring investigation or clean-up provided such sites received Hazardous Materials generated by the Company or its Subsidiaries prior to the Closing date.

 "Environmental Law" shall mean any federal, state, local or foreign statute, order, rule, regulation or ordinance pertaining to the regulation or protection of the natural environment or the Release of Hazardous Materials into the outdoor environment, including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata, or otherwise relating to the manufacture, processing, distribution, use treatment, storage, disposal, transport or handling of Hazardous Materials, and any applicable orders, judgments, decrees, permits, licenses or other authorizations or mandates under such laws, each as in existence on the date hereof.

"Environmental Notice" shall mean any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" shall mean any Permit or registration required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean, with respect to the Company, any corporation, trade or business which, together with such Company, is a member of a controlled group of corporations or a group of trades or businesses under common control within the meaning of section 414(b) or (c) of the Code as determined prior to the Closing.

"Expenses" shall have the meaning set forth in Section 8.2.

"Facilities" means any real property, leaseholds, or other interests in real property currently owned or operated by the Company and its Subsidiaries, and any buildings, plants, or structures currently owned or operated by the Company and its Subsidiaries.

"Fiduciary" shall have the meaning set forth in Section 2.5(b).

"Financial Statements" shall have the meaning set forth in Section 3.6(a).

"GAAP" shall mean U.S. generally accepted accounting principles, as in effect from time to time.

"Governmental Authority" shall mean any federal, state, local or foreign governmental, regulatory or administrative body, agency or authority, any court or judicial authority or arbitration tribunal, whether national, Federal, state or local or otherwise, or any Person lawfully empowered by any of the foregoing to enforce or seek compliance with any applicable law, statute, regulation, order or decree.

"Hazardous Material" shall mean, collectively, petroleum, any petroleum-based product, flammable explosives, radioactive materials,  friable asbestos in any form, and any chemicals or other materials or substances defined as or listed as "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import under any Environmental Law.

"INA" shall have the meaning set forth in Section 3.12(b).

"Indemnification Period" shall have the meaning set forth in Section 9.1.

"Indemnitee" shall have the meaning set forth in Section 9.5.

"Indemnitor" shall have the meaning set forth in Section 9.5.

"Indebtedness" means outstanding principal of, and accrued and unpaid interest on, and any premiums, fees (including prepayment fees), penalties and other amounts due upon prepayment and full satisfaction of, or assignment of, all bank or other third party indebtedness for borrowed money, including the long-term and current portions of any indebtedness or amounts owed under any payable, debt line, bank credit agreement, capital lease, promissory note or other related agreement, instrument or document.

"Intellectual Property Right" means all rights arising in connection with any intellectual property or other proprietary rights and associated goodwill, including without limitation all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works; except rights arising from any "intent to use" trademark applications for which a statement of use has not been filed (but only until such statement is filed).

"Investments" shall have the meaning set forth in Section 3.22.

"IRS" means the U.S. Internal Revenue Service.

"Knowledge" shall mean, with respect to Seller or the Company, the actual knowledge, after reasonable due inquiry, of Michael Gluhanich, Terry Herzinger, Daniel V. Smith and George S. Hofmeister.

"Lease" shall have the meaning set forth in Section 2.5(b).

"Leased Real Property" shall have the meaning set forth in Section 3.17(b).

"Lien" shall mean all liens, encumbrances, mortgages, charges, claims, restrictions, pledges, security interests, title defects, easements, rights of way, covenants and encroachments.

"Licensed Intellectual Property" shall have the meaning set forth in Section 3.9(b).

"Loss" or "Losses" shall mean any and all actually incurred out-of-pocket losses, liabilities, deficiencies, fines, costs, provable damages, penalties, excise taxes, and reasonable and documented expenses (including incurred out-of-pocket reasonable and documented attorneys' fees and expenses and litigation, settlement and judgment and interest costs), and any reasonable and documented legal or other expenses reasonably incurred in connection with investigating or defending any claims or actions but not including special, speculative, indirect, incidental, or consequential damages or damages relating to business interruption or lost profits (even if advised of the possibility thereof), and, in particular, no "multiple of profits" or "multiple of cash flow" or similar valuation methodology shall be used in calculating the amount of any Losses, and all Losses shall be net of any other recoveries actually realized by an Indemnitee and its Affiliates, including pursuant to Alternative Arrangements"; provided, however, that Losses shall include (i) all amounts needed to correct a prohibited transaction, as determined pursuant to Section 4975 of the Code and the regulations and guidance promulgated by the Internal Revenue Service and the Department of Labor, and (ii) all liabilities incurred in connection with any breach of fiduciary obligations under ERISA; provided, further, that Losses shall not include any excise taxes, or portion thereof, that are imposed after the Closing Date solely as a result of any Remaining Note not being repaid as of the Closing Date, and that would not have been imposed after the Closing Date but for any Remaining Note not being repaid as of the Closing Date.

"Material Adverse Effect" shall mean a change, event or occurrence that has a material adverse effect on the Business, assets, condition (financial or otherwise), operating results or operations of Seller, taken as a whole, or to the ability of Seller to consummate the transactions contemplated hereby (regardless of whether or not such adverse effect or change can be or has been cured at any time or whether Purchaser has knowledge of such effect or change on the date hereof); provided, however, that in determining whether there has been a Material Adverse Effect or whether a Material Adverse Effect could or would occur, any change, event or occurrence principally attributable to, arising out of, or resulting from any of the following shall be disregarded:  (i) general economic, business, industry or credit, financial or capital market conditions (whether in the United States or internationally), other than those that have had a disproportionate adverse effect on Seller relative to the other industry participants; (ii) the taking of any action required or permitted by this Agreement or the Related Agreements; (iii) the announcement of this Agreement or pendency of the transactions contemplated hereby, including any suit, action or proceeding relating to the transactions contemplated hereby, (iv) the breach of

this Agreement or any Related Agreement by Purchaser, (v) the taking of any action with the prior written approval of Purchaser, (vi) pandemics, earthquakes, tornados, hurricanes, floods and acts of God, (vii) acts of war (whether declared or not declared), sabotage, terrorism, military actions or the escalation thereof; and (viii) any changes in Applicable Laws, regulations or accounting rules, including GAAP.

"Material Contracts" shall have the meaning set forth in Section 3.10(a).

"Membership Interests" shall have the meeting set forth in the recitals.

"Membership Interest Assignment" shall have the meeting set forth in Section 2.3(b)(i).

"Multiemployer Plan" shall have the meaning set forth in Section 3(37) of the Code.

"Net Working Capital" means (i) the sum of all cash, accounts receivable, advances, prepaid expenses (other than those expenses incurred in connection with the transaction contemplated by this Agreement), deposits and inventory of the Company, less (ii) the sum of all accounts payable of the Company, accrued expenses, deferred revenue, reserves, allowances for bad debt, taxes, rents due, debt and other liabilities determined in accordance with the Company Accounting Principles.

"NPL" means the National Priority List promulgated pursuant to CERCLA.

"Off-the-shelf Software" shall have the meaning set forth in Section 3.9(b).

"Operating Agreement" shall mean the limited liability company agreement of the Company.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Owned Intellectual Property" shall have the meaning set forth in Section 3.9(a).

"Owned Real Property" shall have the meaning set forth in Section 3.17(a).

"Party" and "Parties" shall have the meaning set forth in the preamble.

"Pay-Off Letters" shall have the meaning set forth in Section 2.5(b)(v).

"Payment Mortgage" shall have the meaning set forth in Section 5.16.

"Pending Proceeding" shall have the meaning set forth in Section 5.13.

"Permitted Liens" shall mean (a) Liens for Taxes, assessments and governmental charges or levies not yet delinquent or for which adequate reserves are maintained on the financial statements of the Company as of the Closing Date; (b) Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens and other similar liens arising in the Ordinary Course of Business securing obligations that are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings; (c)

Liens that are removed prior to or at the Closing; and (d) Liens listed on <u>Section 1.1</u> of the Disclosure Schedule.

"<u>Person</u>" shall mean an individual, corporation, partnership, joint venture, trust, association, estate, joint stock company, limited liability company, Governmental Authority or any other organization of any kind (other than the Company).

"<u>Personal Property</u>" means all of the interest of the Company and its Subsidiaries in all machinery, equipment, computer programs, computer software, tools, motor vehicles, furniture, leasehold improvements, office equipment, supplies, plant, spare parts and other tangible personal property which are owned by or leased to the Company or its Subsidiaries, or otherwise used or possessed by the Company or its Subsidiaries, together with any additions or deletions thereto expressly permitted by Purchaser or this Agreement between the date hereof and the Closing Date; provided, however, Personal Property shall not include any personal property at Vassar Foundry or used in the business of Vassar Foundry.

"<u>Pre-Closing Tax Period</u>" shall have the meaning set forth in <u>Section 5.13</u>.

"<u>Pre-Closing Taxes</u>" shall have the meaning set forth in <u>Section 5.13.</u>

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 2.2</u>.

"<u>Purchaser</u>" shall have the meaning set forth in the preamble.

"<u>Purchaser Acquired Benefit Plans</u>" shall be as defined in <u>Section 3.11</u>.

"<u>Purchaser Benefit Plans</u>" shall have the meaning set forth in <u>Section 5.8(a)</u>.

"<u>Receiving Party</u>" shall have the meaning set forth in <u>Section 5.10(a)</u>.

"<u>Real Property Leases</u>" shall have the meaning set forth in <u>Section 3.17(b)</u>.

"<u>Related Agreements</u>" shall mean the Assignment Agreement, Bill of Sale, the Transition Services Agreement and the Lease.

"<u>Release</u>" shall mean any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment or disposing into the environment, including without limitation, the movement of Hazardous Materials through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"<u>Remaining Notes</u>" means the six (6) secured investments made by the Hillsdale Hourly and Hillsdale Salaried Pension Plans, in the aggregate outstanding principal amount of approximately $21,081,000, the repayment obligations of which are guaranteed by MIDS, LLC.

"<u>Response Action</u>" shall mean any action taken to investigate, abate, remediate, remove or mitigate any violation of Environmental Law, any Contamination of any property owned, leased or occupied by the Company or its Subsidiaries or any release or threatened release of

Hazardous Material.  Without limitation, Response Action shall include any action that would be a response as defined by CERCLA.

"Restricted Party" shall be as defined in Section 5.11(b).

"Retained Employees" means the Employees, excluding the Vassar Employees.

"Seller" shall have the meaning set forth in the preamble.

"Seller Benefit Plans" shall be as defined in Section 3.11.

"Straddle Period" shall have the meaning set forth in Section 5.13.

"Subsidiary" shall mean, with respect to the Company, any other Person of which (i) the Company owns directly or indirectly more than 50% of the equity interest in the other Person, (ii) the Company or any other Subsidiary of the Company is a general partner, or (iii) securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions with respect to the other Person are at the time owned by the Company and/or one or more of the Company's Subsidiaries.

"Subsidiary Interests" shall have the meaning set forth in Section 3.5(b).

"Tax" (and, with correlative meaning, "Taxes," "Taxable" and "Taxing") means any net income, capital gains, gross income, gross receipts, sales, use, transfer, ad valorem, franchise, profits, license, capital, withholding, payroll, estimated, employment, excise, goods and services, severance, stamp, occupation, premium, property, social security, environmental (including Code section 59A), alternative or add-on, value added, registration, windfall profits or other taxes, duties, charges, fees, levies or other assessments imposed by any Governmental Authority, or any interest, penalties, or additions to tax incurred under Applicable Laws with respect to taxes.

"Tax Returns" shall mean any report, return (including any information return), declaration or other filing required or permitted to be supplied to any Taxing authority or jurisdiction with respect to Taxes, including any amendments or attachments to such reports, returns, declarations or other filings.

"Termination Date" shall have the meaning set forth in Section 8.1(a).

"Third-Party Claim" shall have the meaning set forth in Section 9.5.

"Threshold Amount" shall have the meaning set forth in Section 9.7.

"Transition Services Agreement" shall have the meaning set forth in Section 2.5(b)(ii).

"Unaudited Financial Statements" shall have the meaning set forth in Section 3.6(a).

"Vassar Employees" shall be as defined in Section 5.8.

"Vassar Foundry" shall have the meaning set forth in the recitals.

"<u>WARN Act</u>" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

ARTICLE II
SALE OF MEMBERSHIP INTERESTS AND CLOSING

2.1     <u>Purchase and Sale</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Membership Interests, free and clear of all Liens (other than restrictions on transfer imposed by federal and state and securities laws).

2.2     <u>Purchase Price</u>.  The purchase price of the Membership Interests is Thirty Million and 00/100 Dollars ($30,000,000.00) (the "Purchase Price").  At the Closing, the Purchase Price shall be paid as follows:

(a)     Purchaser shall deliver Thirteen Million Dollars ($13,000,000) to Seller in immediately available funds to an account designed by Seller at least two (2) Business Days prior to the Closing Date, which amount Seller shall use to satisfy outstanding indebtedness of the Company to paid at or prior to the Closing.

(b)     Purchaser shall deliver Seventeen Million Dollars ($17,000,000) to MIDS, LLC in immediately available funds, which amount shall be held as a reserve by MIDS, LLC to secure the guarantee obligations of MIDS, LLC with respect to certain loans made by the Hillsdale Hourly and Hillsdale Salaried Pension Plans.

2.3     <u>Allocation</u>.  Purchaser shall prepare and provide to Seller within ninety (90) days after the Closing, a schedule allocating the Purchase Price among the Company's assets (the "<u>Purchase Price Allocation Schedule</u>").  The Purchase Price Allocation Schedule shall be prepared in good faith and in accordance with applicable provisions of the Code and Treasury Regulations.  Seller shall have reasonable opportunity to review and comment on the Purchase Price Allocation Schedule.  Purchaser shall make such revisions to the Purchase Price Allocation Schedule as may be reasonably requested by Seller and approved by Purchaser.  After consideration of Seller's comments, the Purchaser's Purchase Price Allocation Schedule shall be binding on both Seller and Purchaser for all Tax purposes; provided, that if upon the advice of tax counsel reasonably acceptable to Purchaser, Seller believes that the Purchase Price Allocation Schedule (or any portion thereof) is materially incorrect, Seller may engage an independent accounting or appraisal firm to determine whether the Purchase Price Allocation Schedule or such portion is materially incorrect, and the determination of such an independent accounting or appraisal firm shall be final.  If the independent accounting or appraisal firm determines that the Purchase Price Allocation Schedule or such portion is not materially incorrect, Seller and Purchaser shall be bound by the Purchase Price Allocation Schedule.  If the independent accounting or appraisal firm determines that the Purchase Price Allocation Schedule (or any portion thereof) is materially incorrect, Seller and Purchaser shall be bound by the Purchase Price Allocation Schedule as adjusted by such independent accounting or appraisal firm.  Neither Purchaser nor Seller shall agree to any proposed adjustment to the Purchase Price Allocation Schedule by any Taxing authority without first giving the other prior written notice and the opportunity to challenge such proposed adjustment.  Seller and Purchaser each shall prepare mutually acceptable and substantially identical IRS Forms 8594 Asset Acquisition Statement Under Section 1060 consistent with the Purchase Price Allocation Schedule which the

-11-

Parties shall use to report the transactions contemplated by this Agreement to the applicable Taxing authorities. Each of Seller and Purchaser agrees to provide the other promptly with any other information required to complete Form 8594. The Purchase Price Allocation Schedule shall be revised to take into account subsequent adjustments to the Purchase Price, including any indemnification payments (which shall be treated for Tax purposes as adjustments to the Purchase Price), in accordance with the provisions of Section 1060 of the Code and the Treasury Regulations thereunder.

> 2.4    Closing.

> (a)    The Closing shall take place at the offices of Pryor Cashman LLP, 7 Times Square, New York, New York on the third Business Day after all the conditions to closing contained herein have been satisfied or waived or on such other date agreed by the parties. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date."

> (b)    At the Closing, Seller shall deliver the following to Purchaser:

> (i)    an assignment, in customary form, of all the Membership Interests purchased by Purchaser under this Agreement ("Membership Interest Assignment");

> (ii)    a duly executed counterpart signature page to a transition services agreement in a form reasonably acceptable to Purchaser (the "Transition Services Agreement");

> (iii)    a duly executed Bill of Sale;

> (iv)    a duly executed counterpart signature to the Assignment Agreement;

> (v)    a dully executed counterpart signature page to the lease agreement in a form reasonably acceptable to Purchaser (the "Lease");

> (vi)    a duly executed counterpart signature page to the Contech Note;

> (vii)    a dully executed counterpart signature page to the Payment Mortgage.

> (viii)    letters from each lender of any outstanding Indebtedness owed by the Company, evidencing the pay-off, release and discharge by such lender of all such Interest-Bearing Indebtedness in form and substance reasonably acceptable to Purchaser including, but not limited to, provisions regarding the filing of UCC-3 termination statements by the Purchaser or the lender upon confirmation of payment in full (the "Pay-Off Letters");

> (ix)    the original of each Consent listed on Section 2.4 of the Disclosure Schedule.

(x)    Release Letters, evidencing release of the Company from any obligations under any and all inter-company payables, including without limitation payables in the aggregate of approximately $7,000,000 payable to Fairfield Castings, LLC,  T Cast Holdings, LLC and Contech Castings, LLC.

(xi)    letters of resignation from each of the directors and/or managers of the Company and MIDS, LLC, and, as requested by Purchaser, each of the officers of the Company and MIDS, LLC;

(xii)    releases, in a form acceptable to Purchaser, from each of George S. Hofmeister, Bernard V. Tew, Bluegrass Investments Management, LLC and Tew Enterprises, LLC, (each, a "Fiduciary"), waiving and releasing the Company and its Subsidiaries from any and all obligations, whether by contract or otherwise, to indemnify such Fiduciary and its Affiliates for any Losses arising from acts or omissions taken by such Fiduciary as a fiduciary of the Benefit Plans.

(xiii)    the legal opinion of counsel to the Company and the Seller in a form to be mutually agreed upon by the parties hereto prior to Closing, dated as of the Closing Date, reasonably satisfactory to Purchaser's counsel;

(xiv)    A certificate, dated as of the Closing Date, executed by the Company, certifying (i) that the resolutions, as attached to such certificate, were duly adopted by the Company's board of directors and members, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect and (ii) as to the Certificate of Formation and Operating Agreement, each as attached to such certificate.

(xv)    A certificate, dated as of the Closing Date, executed by Seller, certifying that the resolutions, as attached to such certificate, were duly adopted by the Seller's board of directors, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect.

(xvi)    certificate of Seller, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 6.1 and 6.2;

(xvii)    a certificate of good standing of the Company and each Subsidiary issued by the secretary of state of the state of organization of the Company and each Subsidiary, and each foreign jurisdiction in which the Company and each Subsidiary is qualified to do business, each dated within five days prior to the Closing Date.

(xviii)    duly executed copies of all other deeds, endorsements, assignments, consents and instruments as, in the reasonable opinion of Purchaser's counsel, are necessary to transfer the Membership Interests and carry out all other transactions contemplated by this Agreement.

(c)    At the Closing, Purchaser shall deliver the following to Seller:

(i)     the portion of the Purchase Price payable to Seller at Closing pursuant to Section 2.2;

(ii)    a duly executed counterpart signature page to the Transition Services Agreement;

(iii)   a dully executed counterpart signature page to the Payment Mortgage.

(iv)    A Release Letter evidencing release by the Company of any claim, including but not limited to approximately $4,000,000 in payables, owed by EPTEC Sa. De. C.V. or any Affiliate of the Seller to the Company, as set forth on Schedule 2.4(c).

(v)     A certificate, dated as of the Closing Date, executed by Purchaser, certifying that the resolutions, as attached to such certificate, were duly adopted by Purchaser's members and managers, authorizing and approving the execution of this Agreement and the consummation of the transactions contemplated hereby and that such resolutions remain in full force and effect;

(vi)    a certificate of Purchaser, dated as of the Closing Date, as to the satisfaction of the conditions set forth in Sections 7.1 and 7.2.

2.5     Withholding.   Notwithstanding any other provision of this Agreement, in the event Purchaser reasonably determines upon advice of counsel that amounts are required to be deducted or withheld from the Purchase Price under any applicable United States federal, state or local Applicable Law, it shall notify Seller of that fact three (3) Business Days prior to Closing, which notice shall include the amount and the reason for such withholding.  If Purchaser does not receive a legal opinion from counsel to Seller, in form and substance acceptable to Purchaser, stating that no such withholdings are required, Purchaser (including any agent of Purchaser) shall be entitled to deduct and withhold such taxes from any amount payable or deliverable pursuant to this Agreement to any Person.  Seller and Purchaser shall cooperate in ascertaining whether and such Tax withholding is required prior to the Closing Date, and will cooperate in good faith to mitigate any such withholding. To the extent any amounts are so deducted or withheld and paid over to the applicable Governmental Authority, such amounts shall be treated for all purposes under this Agreement as having been paid to Seller.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that, except as set for in the Disclosure Schedule:

3.1     Due Formation

(a)     The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Each of the Company's Subsidiaries is duly organized, validly existing and in good standing under the laws of its respective jurisdiction of formation. The Company and each of its Subsidiaries has all requisite

power and authority to own and operate its respective assets and properties as they are now being owned and operated. The jurisdictions in which the Company and each Subsidiary is qualified to do business as a foreign corporation are set forth in <u>Section 3.1(a)</u> of the Disclosure Schedule, and constitute all of the jurisdictions in which the conduct or nature of the Company's and each of its Subsidiaries' business makes such qualification necessary, except where the failure to qualify would not have a Material Adverse Effect.

(b)    <u>Section 3.1(b)</u> of the Disclosure Schedule identifies all of the Subsidiaries of the Company. Except as set forth in <u>Section 3.1(b)</u> of the Disclosure Schedule, the Company does not own any equity interest in any Person.

(c)    The Seller has delivered or made available to Purchaser an accurate and complete copy of the Certificate of Formation, the Operating Agreement and any other organizational documents of the Company and each Subsidiary, each agreement, trust, proxy or other arrangement among the members, manager, officer or directors of the Company and each Subsidiary, and each other agreement or document affecting any ownership rights or interests, or any management rights or economic rights, of the Company and each Subsidiary, or any rights to share in the profits of or to receive distributions or the return of capital from the Company or any Subsidiary. Seller has delivered or made available to Purchaser an accurate and complete copy of the contents of the minute book of the Company and each Subsidiary.

3.2    <u>Due Authorization</u>. Each of the Seller and the Company has full power and authority to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Seller and the Company of this Agreement and the Related Agreements have been duly and validly approved by the respective boards of directors of Seller and the Company and no other corporate actions or proceedings on the part of Seller or the Company are necessary to authorize this Agreement, the Related Agreements and the transactions contemplated hereby and thereby. Each of Seller and the Company has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) the Related Agreements. This Agreement constitutes the legal, valid and binding obligation of Seller and the Company, and the Related Agreements, upon execution and delivery by Seller and the Company, will constitute legal, valid and binding obligations of Seller and the Company, in each case, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

3.3    <u>No Violations</u>. Except as set forth in <u>Section 3.3</u> of the Disclosure Schedule, the execution, delivery and performance by Seller and the Company of this Agreement and the Related Agreements will not (i) conflict with or result in a breach of any provision of the certificate of formation or operating agreement (or equivalent organizational documents) of Seller, the Company or any of the Company's Subsidiaries, (ii) result in a violation or breach of or constitute a default (or an event which, with or without notice or lapse of time or both, would constitute a default) under, result in the termination, or give rise to any rights of termination, modification, amendment, acceleration or cancellation, of any Contract or other instrument of any kind to which the Seller, the Company or any of the Company's Subsidiaries is now a party

-15-

or by which any of their respective assets is bound, or (iii) to Seller's Knowledge, violate any order, writ, injunction, decree, statute, treaty, rule or regulation of any Governmental Authority applicable to Seller, the Company or any of the Company's Subsidiaries or any of their respective assets.

3.4    Consents and Approvals.  Except as set forth on Section 3.4 of the Disclosure Schedule, neither Seller, the Company nor any Subsidiary is required to obtain (i) any consent, authorization, approval, order, license, certificate or permit of or from any Governmental Authority, or (ii) any consent or waiver of any party to any Contract to (a) execute this Agreement or the Related Agreements, (b) consummate this Agreement or the Related Agreements and the transactions contemplated hereby and thereby, (c) permit Seller to transfer the Membership Interests to Purchaser as provided herein, or (d) enable Purchaser to operate the Business after the Closing Date in the same manner as it is presently operated.

3.5    Capitalization.

(a)    The Membership Interests constitute all of the issued and outstanding membership interests of the Company.  The Membership Interests are owned of record and beneficially by the Seller. The capitalization, including debt and equity, of the Company is accurately and completely described in the Financial Statements. The Membership Interests are duly authorized, validly issued, fully paid and nonassessable, and were not issued in violation of any preemptive, subscription or other right of any person to acquire securities, ownership interests or rights in the Company. The Membership Interests are uncertificated. There are no outstanding subscriptions, options, convertible or exchangeable securities, preemptive rights, warrants, calls or agreements relating to the issuance or transfer of the Membership Interests or any ownership interests in the Company to which the Company or the Seller is a party or by which the Company or the Seller is bound.  The Membership Interests, and any other ownership interests or rights in the Company, whether or not currently outstanding, were issued in compliance (and if reacquired or cancelled by the Company, reacquired or cancelled in compliance) with all Applicable Laws, including securities laws.  Except as set forth in the Operating Agreement, there are no voting trusts or other agreements, arrangements or understandings applicable to the exercise of voting rights, control, rights to share in profits and losses, rights to receive distributions or the return of capital to which the Company or the Seller is a party or by which the Company or the Seller is bound.  Except as set forth in the Operating Agreement and Applicable Laws, there are no restrictions affecting the transferability of the Membership Interests.

(b)    All of the issued and outstanding shares of the capital stock or membership interests of each Subsidiary (the "Subsidiary Interests") are owned of record and beneficially by the Company.  The capitalization, including debt and equity, of each Subsidiary is accurately and completely described in the Financial Statements.  The Subsidiary Interests are duly authorized, validly issued, fully paid and nonassessable, and were issued in compliance with all Applicable Laws.  There are no outstanding rights or agreements relating to the transfer or voting of the Subsidiary Interests, or relating to the issuance by any Subsidiary of any shares of capital stock to any Person.

3.6     <u>Financial Statements</u>.

(a)     Prior to the execution of this Agreement, the Seller has delivered to Purchaser a true and complete copy of the following consolidated financial statements of Revstone Transportation, LLC which reflect the following for the Company and the Company's Subsidiaries, on a consolidated basis: (i) the audited consolidated balance sheet of Revstone Industries, LLC for the fiscal year ending on December 31, 2011 and 2010, and the related income, cash flows and stockholders' equity of Revstone Industries, LLC for such period then ended and the audit papers from the auditing firm reflecting information related to the Company and its financial status (the "<u>Audited Financial Statements</u>"), and (ii) the historical financial information of to the Company provided by Seller to Purchaser as attached hereto as <u>Section 3.6(a)</u> of the Disclosure Schedule excluding any and all proforma, forecast or other future looking information on such schedules (collectively, the "<u>Unaudited Financial Statements</u>" and, together with the Audited Financial Statements, the "<u>Financial Statements</u>").

(b)     Except as set forth in the notes thereto, all such Financial Statements, insofar as they relate to the Company and its Subsidiaries, were prepared in accordance with GAAP and fairly present in all material respects the financial condition and results of operations of the Company and its Subsidiaries, on a consolidated basis, as of the respective dates thereof and for the respective periods covered thereby, and are consistent with the books and records of the Company and each of its Subsidiaries, except that the Unaudited Financial Statements are subject to normal year-end adjustments and any notes thereto.  The books and records of the Company and each of its Subsidiaries are complete and correct in all material respects, and fully and fairly reflect bona fide transactions set forth therein.  The Financial Statements reflect the consistent application of accounting principles throughout the periods involved, except as disclosed in the notes to such Financial Statements.

3.7     <u>Absence of Changes</u>.   Except as disclosed in <u>Section 3.7</u> of the Disclosure Schedule, since the Balance Sheet Date, neither the Company nor any of its Subsidiaries has sustained any Material Adverse Effect.  Since the Balance Sheet Date, the Company has operated the Business and managed its Net Working Capital in the Ordinary Course of Business.

3.8     <u>Title to and Condition of Personal Property</u>.  Except as disclosed in <u>Section 3.8</u> of the Disclosure Schedule, the Company and its Subsidiaries own and have good and marketable title to all Personal Property free and clear of any Liens, except Permitted Liens. Neither the Company nor any of its Subsidiaries is, and to the Knowledge of the Seller no other party is, in default under any of the leases, licenses and other agreements relating to the Personal Property. The Company has delivered to Purchaser an accurate and complete copy of each lease, license or other agreement relating to the Personal Property.  The Personal Property constituting tangible property is being acquired is being acquired AS IS WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR INTENDED USE OR OTHER EXPRESSED OR IMPLIED WARRANTY, provided, however that the Seller warrants that the Personal Property constituting tangible property that is used in conducting the Business is in operating condition without any immediate need for replacement.

3.9    <u>Intellectual Property</u>.

(a)    Set forth on <u>Section 3.9</u> of the Disclosure Schedule is a complete list of all issued patents, applications for patents, registered trademarks, applications to register trademarks, registered service marks, applications to register service marks, mask works, registered trade dress, applications to register trade dress, registered domain names, registered copyrights, and applications to register copyrights for which the Company or any Subsidiary is the owner or applicant of record (the "<u>Owned Intellectual Property</u>"), including a breakdown, if applicable, of any Owned Intellectual Property owned by any Subsidiaries. Except as set forth on <u>Section 3.9</u> of the Disclosure Schedule, (i) the Company or each Subsidiary, as applicable, owns the Owned Intellectual Property free and clear of all restrictions (including, without limitation, covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens, (ii) no Person other than the Company and its Subsidiaries owns or has been granted any right in the United States in the Owned Intellectual Property, (iii) all Owned Intellectual Property that is registered in the United States is valid, subsisting and enforceable, and (iv) the Company and each Subsidiary, as applicable, has taken all commercially reasonable action necessary to prosecute, maintain, enforce and defend the Owned Intellectual Property in the United States and all other jurisdictions where such Owned Intellectual Property is either registered or the subject of a pending application for registration.

(b)    Set forth on <u>Section 3.9</u> of the Disclosure Schedule is a complete list of all agreements under which the Company or any Subsidiary has licensed Intellectual Property Rights from another Person ("<u>Licensed Intellectual Property</u>") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks (collectively, the "<u>Off-the-shelf Software</u>"), includes a summary of any ongoing payments the Company or any Subsidiary is obligated to make with respect to Licensed Intellectual Property, and specifically identifies those agreements pursuant to which the Company or any Subsidiary has licensed Intellectual Property Rights on an exclusive basis. Except as set forth in the applicable licenses or in any other record, copies of which have been given to Purchaser, the Company's and each Subsidiary's licenses to use the Licensed Intellectual Property are free and clear of all contractual restrictions, Liens, court orders, injunctions, decrees, or writs. Except as set forth on <u>Section 3.9</u> of the Disclosure Schedule, neither the Company nor any Subsidiary is contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(c)    To Seller's Knowledge, no Person, nor any goods or services made, imported, offered for sale, sold, distributed or otherwise transferred or disposed of for value by any other Person, infringes or misappropriates Intellectual Property Rights in the Owned Intellectual Property or the Licensed Intellectual Property.  To Seller's Knowledge, no Intellectual Property Rights constituting trade secrets of the Company and its Subsidiaries used in the Business have been publicly disclosed or misappropriated by another Person, and to the extent any such trade secrets have been disclosed to another Person, they have only been disclosed subject to a written non-disclosure obligation in a form customary for Persons engaged in the Business.  The Company and each Subsidiary has taken all actions which a reasonably prudent person in the Business would take to maintain all Intellectual Property Rights constituting trade secrets of the Company and its Subsidiaries used in the Business as

confidential and proprietary, to protect against the loss, theft or unauthorized use of such Intellectual Property Rights, and to protect and preserve the confidentiality of all such Intellectual Property Rights.  Seller does not have any interest or claim with respect to, and after the Closing shall not retain any copies of, any Intellectual Property Rights constituting trade secrets of the Company and its Subsidiaries used in the Business.

(d)     Except as set forth on <u>Section 3.9</u> of the Disclosure Schedule, no filing fees, maintenance fees or other fees are required to be paid, and no action is required to be taken, at any time within ninety (90) days after the Closing Date, in connection with the application for, or the prosecution or maintenance of, any registration of Owned Intellectual Property or Licensed Intellectual Property exclusively licensed to Company or any Subsidiary.

(e)     Except for Off-the-shelf Software and as disclosed below, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct the Business as it is presently conducted by the Company and its Subsidiaries.

(f)     Except as set forth on <u>Section 3.9</u> of the Disclosure Schedule, Seller has no Knowledge of, and has not received notice either orally or in writing alleging, any infringement by the Company or any Subsidiary of another Person's Intellectual Property Rights (including, without limitation, any claim set forth in writing that the Company or any Subsidiary must license or refrain from using the Intellectual Property Rights of any Person) nor, to Seller's Knowledge, is there any threatened claim or any reasonable basis for any such claim.

3.10    <u>Material Contracts</u>.

(a)     <u>Section 3.10</u> of the Disclosure Schedule contains an accurate list as of the date of this Agreement of all the Contracts of the following types (the "<u>Material Contracts</u>"):

(i)     any Contract that obligates the Company or any Subsidiary not to compete with another Person in any material respect;

(ii)     any Contract entered into outside of the Ordinary Course of Business which involves the payment or receipt of an amount in excess of $25,000;

(iii)     any Contract of employment or severance or consulting agreement with any employee, officer or other Person on a full-time, part-time, consulting or other basis;

(iv)     any credit agreement, loan agreement, indenture, note, mortgage, security agreement, loan commitment or other Contract relating to the borrowing of Indebtedness by the Company or any Subsidiary, provided that such Contract will subsist after Closing;

(v)     any guaranty by the Company of any obligation of a third party;

(vi)     any Contract under which the Company or any Subsidiary has advanced or loaned any other Person any amounts;

-19-

(vii)    any lease or agreement under which the Company or any Subsidiary is lessee of or holds or operates any Personal Property owned by any other Person, requiring payments per annum in excess of $25,000;

(viii)   any lease or agreement under which the Company or any Subsidiary is lessor of or which permits any third party to hold or operate any property, real or personal, owned or controlled by the Company or any Subsidiary or any of the assets of the Company or any Subsidiary;

(ix)    any Contract granting to any Person a right of first refusal or option to purchase or acquire any assets of the Company or any Subsidiary valued at an amount in excess of $25,000;

(x)    any limited liability company, partnership or joint venture agreement;

(xi)    any Contract with any Affiliate of the Company, including without limitation, Fairfield Castings, LLC, Seller, EPTEC Sa. De. C.V.;

(xii)   any Contract for the future purchase of materials, supplies, services, merchandise or equipment in excess of normal operating requirements;

(xiii)  any collective bargaining agreement or Contract with a labor union or labor association;

(xiv)   any pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees or any other employee benefit plan or arrangement, or severance agreements, programs, policies or arrangements;

(xv)    any express warranties with respect to services rendered or products sold or leased;

(xvi)   any Contract with respect to any real property, Personal Property, Intellectual Property Rights or any intangible property not otherwise covered in this Section 3.10(a) with a value or obligation in an amount in excess of $25,000;

(xvii)  any active blanket buy or sell Contracts over $500,000 annually ; and

(xviii) any other Contract, excluding purchase orders, which involves the annual payment or receipt of an amount, or the provision of goods or services having a value, in excess of $100,000.

(b)    Seller has made available to Purchaser a true and complete copy of each Material Contract. Each Material Contract to which the Company or any of its Subsidiaries is a party is in full force and effect and constitutes a legal, valid and binding agreement, enforceable against the Company or any of its Subsidiaries, as applicable, in accordance with its terms (other

than payment timing violations). None of the Company, its Subsidiaries or, to the Knowledge of Seller, nor any other party to each such Material Contract is in violation or breach of, or in default under, nor has there occurred an event or condition that with the passage of time or giving of notice (or both) would constitute a default under, or permit the termination of, any Material Contract (other than payment timing violations).

3.11    Employee Benefit Plans.

(a)    Section 3.11(a) of the Disclosure Schedule contains a true and complete list of each "employee benefit plan" (within the meaning of section 3(3) of ERISA), including, without limitation, "multiemployer plans" within the meaning of ERISA section 3(37)), stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise), whether formal or informal, oral or written, legally binding or not, under which any employee or former employee of the Company or any of its Subsidiaries has any present or future right to benefits or under which the Company or any of its Subsidiaries has any present or future liability, contingent or otherwise (collectively, "Benefit Plans"). Except as set forth on Disclosure Schedule 3.11(a), neither the Company nor any Subsidiary has any express or implied commitment, whether legally enforceable or not, to (i) create, incur liability with respect to, or cause to exist any Benefit Plan (or any plan, program or arrangement which would be a Benefit Plan if in effect on the date hereof), (ii) to enter into any contract or agreement to provide compensation or benefits to any individual, or (iii) to modify, change or terminate any Benefit Plan, other than with respect to a modification, change or termination required by ERISA or by the Code. Any and all Benefit Plans qualified under Code Section 401(k), shall be defined as "Seller's 401k Plan".

(b)    Section 3.11(b) of the Disclosure Schedule contains a true and complete list of each of the Benefit Plans sponsored or maintained by the Seller or a member of its Controlled Group other than Purchaser Acquired Benefit Plans (collectively, "Seller Benefit Plans").

(c)    Section 3.11(c) of the Disclosure Schedule contains a true and complete list of each of the Benefit Plans (i) sponsored or maintained by the Company or any of its Subsidiaries or (ii) for which the Company or any of its Subsidiaries has any present or future liability, contingent or otherwise (collectively, "Company Benefit Plans").

(d)    Section 3.11(d) of the Disclosure Schedule lists all Benefit Plans to be assumed by the Company (collectively, "Company Assumed Benefit Plans", and together with the Company Benefit Plans and Company Assumed Benefit Plans, "Purchaser Acquired Benefit Plans"; provided, that the Purchaser Acquired Benefit Plans shall not include the item marked on Section 3.11(c) of the Disclosure Schedule).

(e)    With respect to each Benefit Plan, Seller has delivered or made available to Purchaser a current, accurate and complete copy (or, to the extent no such copy exists, an accurate description) thereof and, to the extent applicable in the case of Purchaser Acquired Benefit Plans and Seller's 401k Plan: (i) any related trust agreement or other funding instrument;

-21-

(ii) the most recent determination letter, if applicable; (iii) any summary plan description and other written communications (or a description of any oral communications) by the Company or any of its Subsidiaries to their employees concerning the extent of the benefits provided under a Benefit Plan; and (iv) for the three most recent years (A) the Form 5500 and attached schedules, (B) audited financial statements, (C) and actuarial valuation reports; and (iv) any agreement with Bernard V. Tew or his Affiliates relating to the assets of the Purchaser Acquired Benefit Plans.

(f)     Except as set forth in Section 3.11(f) of the Disclosure Schedule: (i) each Company Benefit Plan, Purchaser Acquired Benefit Plan and Seller's 401k Plan has been established and administered in accordance with its terms, and in material compliance with the applicable provisions of ERISA, the Code and other applicable laws, rules and regulations; (ii) each Company Benefit Plan, Purchaser Acquired Benefit Plan and Seller's 401k Plan which is intended to be qualified within the meaning of Code section 401(a) is so qualified and has received a favorable determination letter as to its qualification, and nothing has occurred, whether by action or failure to act, that could reasonably be expected to cause the loss of such qualification; (iii) no event has occurred and no condition exists that would subject the Company or any of its Subsidiaries, either directly or by reason of their affiliation with any member of their "Controlled Group" (defined as any organization which is a member of a controlled group of organizations within the meaning of Code sections 414(b), (c), (m) or (o)), to any tax, fine, lien, penalty or other liability imposed by ERISA, the Code or other applicable laws, rules and regulations; (iv) for each Company Benefit Plan, Purchaser Acquired Benefit Plan and Seller's 401k Plan with respect to which a Form 5500 has been filed, no material change has occurred with respect to the matters covered by the most recent Form since the date thereof; (v) no "reportable event" (as such term is defined in ERISA section 4043), nor "prohibited transaction" (as such term is defined in ERISA section 406 and Code section 4975) has occurred which would have a materially adverse effect upon Purchaser and there is no "accumulated funding deficiency" (as such term is defined in ERISA section 302 and Code section 412 (whether or not waived)) with respect to any Company Benefit Plan; (vi) no Company Benefit Plan provides retiree welfare benefits and neither the Company nor any of its Subsidiaries have any obligations to provide any retiree welfare benefits; (vii) all awards, grants or bonuses made pursuant to any Company Benefit Plan have been, or will be, fully deductible to the Company or any of its Subsidiaries notwithstanding the provisions of Section 162(m) of the Internal Revenue Code and the regulations promulgated thereunder.

(g)     Neither the Company nor any of its Subsidiaries has ever contributed to or been obligated to contribute to any multiemployer plan and neither the Company, its Subsidiaries, nor any member of their Controlled Group has incurred any withdrawal liability under Title IV of ERISA.

(h)     Except as set forth on Disclosure Schedule 3.11(h), neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement or the other transaction documents will (i) materially increase the amount of benefits otherwise payable under any Company Benefit Plan, Purchaser Acquired Benefit Plans or Seller's 401k Plan, (ii) result in the acceleration of the time of payment, exercisability, funding or vesting of any such benefits, (iii) result in any payment (whether severance pay or otherwise) becoming due to, or with respect to, any current or former employee or director of the Company or (iv) trigger any change of control plan or provision in any Purchaser Acquired Benefit Plan or employment

agreement.  No payment or series of payments that would constitute an "excess parachute payment" (within the meaning of Section 280G of the Code) has been made or will be made by the Company, directly or indirectly, to any employee in connection with the execution of this Agreement or as a result of the consummation of the transactions contemplated by this Agreement or the other transaction documents.   There is no plan or other contract by which the Company is bound to compensate any current or former employee for any excise tax paid pursuant to Section 4999 of the Code.

(i)        Any Purchaser Acquired Benefit Plan that is a "nonqualified deferred compensation plan" (as defined in Code Section 409A) that is subject to Code Section 409A has at all applicable times been operated in compliance with the requirements of Code Section 409A and neither the Purchaser, the Company, nor any of its Subsidiaries shall have liability for any taxes, fines or penalties with respect to any amounts includible under Code Section 409A.

3.12    Employees.

(a)        Compensation.   Section 3.12 of the Disclosure Schedule sets forth an accurate and complete list of all current officers and employees of the Company and its Subsidiaries ("Employees"), including, as to all employees, employer, name, title or position, the present annual compensation (including salary, bonuses, commissions and deferred compensation, each of which are separately delineated), current vacation accrual, the date of commencement of employment, years of service, and any interests in any incentive compensation plan, and indicates (i) whether such employee has an employment agreement or contract or any other type of agreement (whether written or oral) with the Company or any Subsidiary, (ii) whether such individuals are full-time or part-time and (iii) whether any such individuals are currently on short-term or long-term disability.   Section 3.12 of the Disclosure Schedule also sets forth an accurate and complete list of all current independent contractors of the Company and each Subsidiary, including name, compensation, a description of services performed for the Company and each Subsidiary, and an indication of whether such independent contractor has an agreement (whether written or oral) with the Company or any Subsidiary relating to such services.   Section 3.12 of the Disclosure Schedule also separately sets forth an accurate and complete list of the names of each executive with whom the Company has entered into a noncompetition or nonsolicitation arrangement of any kind.   No executive nor any Retained Employees has given or received notice of termination of his or her employment.

(b)        Compliance.

(i)        The Company and each of its Subsidiaries has complied in all material respects with all Applicable Laws relating to the employment of its employees, including provisions relating to recruiting, hiring, retaining and documenting prospective employees, wages, hours, equal opportunity, recordkeeping, occupational health and safety, severance, collective bargaining and the payment of social security and other taxes, and as of the date hereof neither the Company nor any of its Subsidiaries has received any notice alleging that it has failed to comply with any such Applicable Laws. Neither the Company nor any of its Subsidiaries is engaged in any unfair labor practice. None of the Retained Employees is the subject of any disciplinary action nor is any Retained Employee engaged in any grievance procedure.

-23-

(ii)    Neither the Company nor any of its Subsidiaries is in breach of any material terms of any employment relationship with any of its Retained Employees, nor to the Knowledge of the Company is any Retained Employee in breach of any material term of his or her employment relationship with the Company or any of its Subsidiaries. Except as set forth in <u>Section 3.12</u> of the Disclosure Schedule, all Retained Employees are "at will" employees, each of whom may be terminated at any time without penalty or premium.

(iii)    The Company and its Subsidiaries have complied in all material respects with the employment eligibility verification form requirements under the Immigration and Naturalization Act, as amended ("INA"), in recruiting, hiring, reviewing and documenting prospective employees for employment eligibility verification purposes and the Company and its Subsidiaries has complied in all material respects with the paperwork provisions and anti-discrimination provisions of the INA. With respect to all Employees, the Company and its Subsidiaries have obtained and maintained the employee records and Forms I-9 in proper order as required by United States law. Neither the Company nor any of its Subsidiaries employs any workers unauthorized to work in the United States.

(c)    <u>Labor Relations</u>.  Except as set forth in <u>Section 3.12(c)</u> of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is a party to, nor subject to, any collective bargaining agreements.  Except as set for forth in <u>Section 3.12(c)</u> of the Disclosure Schedule, none of the Employees are represented by a union or subject to a collective bargaining agreement, no union organizational campaign is in progress with respect to such employees and no question concerning representation exists respecting such employees.

3.13    <u>Taxes</u>.  Except as set forth in <u>Section 3.13</u> of the Disclosure Schedule:

(a)    All Tax Returns required to be filed by the Seller or the Company and its respective Subsidiaries have been timely filed.  Such Tax Returns were complete and correct in all respects and were prepared in substantial compliance with Applicable Law.

(b)    All Taxes owed by the Company, and its Subsidiaries (whether or not shown or required to be shown on any Tax Return) have been timely paid (other than those Taxes being actively contested by the Company, the Seller, or the Subsidiaries in good faith and by appropriate proceedings).  As of the Closing Date, the Company will not have any liability for Taxes in excess of amounts reserved for in the Financial Statements.

(c)    All Taxes required to be withheld by the Seller or the Company and its respective Subsidiaries have been withheld and, to the extent required, have been paid over to the proper Taxing authorities;

(d)    With respect to each Taxable period of the Company and its Subsidiaries ending on the date of this Agreement, (i) neither the Seller nor the Company and its Subsidiaries expects any authority to assess any additional Taxes, (ii) the Tax Returns filed by the Company and its Subsidiaries with respect to such period have either not been subject to a dispute or claim for additional Tax liability or have been audited and such audit has been completed without the

issuance of any notice of deficiency or similar notice of additional liability, or (ii) the time for assessing Taxes with respect to such Taxable period has closed and such Taxable period is not subject to review by any Taxing authority;

(e)     Neither the Seller nor the Company nor any of its respective Subsidiaries has waived any statute of limitations in respect of Taxes; agreed to any extension of time with respect to a Tax assessment or deficiency; or currently is the beneficiary of any extension of time within which to file any Tax Return.

(f)     No claim has ever been made by an authority in a jurisdiction where Seller or the Company or any of its respective Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to Tax in that jurisdiction.

(g)     There are no Liens on any of the assets of the Seller or the Company and any of its respective Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax.

(h)     Neither the Seller nor the Company nor any of its respective Subsidiaries is a member of any Tax allocation or Tax sharing agreement.

(i)     The Company has been since its formation a domestic eligible entity that is disregarded as an entity separate from its owner pursuant to Treasury Regulation Section 301.7701-3

3.14   Litigation.   Section 3.14 of the Disclosure Schedule sets forth each instance in which the Company or any Subsidiary (a) is subject to any unsatisfied judgment, order, decree, stipulation, injunction, or charge of any Governmental Authority, or (b) is a party to any charge, complaint, action, suit, arbitration, proceeding, hearing, or investigation of any Governmental Authority, or to the Knowledge of Seller, is threatened to be a party to any such action (each, a "Pending Proceeding").

3.15   Compliance with Laws. Except as set forth in Section 3.15 of the Disclosure Schedules, the Company and each of its Subsidiaries is operating in compliance with all Applicable Laws, except where the failure to be in such compliance would not have a Material Adverse Effect on the Company or the Business.  Except as set forth in Section 3.15 of the Disclosure Schedules, neither the Company nor any Subsidiary has been charged with or given notice of, and to the Knowledge of Seller, neither the Company nor any Subsidiary is under investigation with respect to, any material violation of, or any obligation to take material remedial action under, any Applicable Law.  Notwithstanding the foregoing, no provision of this Section 3.13 shall be deemed a representation or warranty by Seller or the Company as to compliance with any Environmental Laws.

3.16   Environmental Matters.  The Company's existing Phase I environmental reports (the "Environmental Reports") have been made available for inspection by Purchaser.  Except as described in Section 3.16 of the Disclosure Schedule or in the Environmental Reports:

(a)     The Company and its Subsidiaries have obtained all Environmental Permits required under all Environmental Laws to operate the Business. Each of the

Environmental Permits in full force and effect and are transferable in connection with the transaction contemplated hereby. The Company and its Subsidiaries are in material compliance with the terms and conditions of the Environmental Permits and are also in material compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in any applicable Environmental Law or in any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder.

(b)     No notice, notification, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending or threatened against the Company or its Subsidiaries by any Governmental Authority or any other Person, with respect to compliance with or any alleged violation of any Environmental Law;

(c)     Neither the Company nor its Subsidiaries own, operate or lease a treatment, storage or disposal facility requiring a permit under the Resource Conservation and Recovery Act of 1976, as amended, or under any comparable state or local statute;

(d)     Neither the Company nor its Subsidiaries own or operate any electrical equipment at any Facility which contains more than 50 parts per million of polychlorinated biphenyls (PCBs);

(e)     No friable asbestos-containing material is present at the Facilities or any sites now owned, operated or leased by the Company or its Subsidiaries;

(f)     There are no underground storage tanks or surface impoundments for Hazardous Materials owned or operated by the Company or its Subsidiaries, or, to the Knowledge of Seller, any such abandoned underground storage tanks or surface impoundments, at the Facilities or any sites now owned, operated or leased by the Company or its Subsidiaries;

(g)     No Hazardous Materials are being Released by the Company or its Subsidiaries at, on or under the Facilities or any sites now owned, operated or leased by the Company or, have been Released by the Company, its subsidiaries or Properties at, on or under any site or facility owned, operated or leased by the Company, its subsidiaries or Properties and, to the Knowledge of the Company, none of the Facilities or any sites now owned, operated or leased by the Company or Properties are adversely affected by any Release or disposal of Hazardous Materials originating or emanating from any other property;

(h)     The Seller has not received notice, and has no Knowledge, of any conditions or occurrences with respect to the Facilities or any sites now owned, operated or leased by the Company or its Subsidiaries which could form the basis for an Environmental Claim against the Company or its Subsidiaries;

(i)     Neither the Company nor its Subsidiaries has transported or arranged for the transportation of any Hazardous Material to any location that is listed on the NPL under CERCLA or listed for possible inclusion on the NPL by the Environmental Protection Agency or on any similar state or local list or that is the subject of federal, state or local enforcement actions

or other investigations that may lead to Environmental Claims against the Company or its Subsidiaries.

(j)    All Hazardous Materials currently or previously generated by the Company or its Subsidiaries have been handled and delivered to duly authorized and licensed carriers in material compliance with all applicable Environmental Laws relating to storage, treatment and disposal facilities permitted or authorized to handle such substances by the governmental agency with jurisdiction thereof;

(k)    There are no pending Response Actions, and no Governmental Authority has imposed any environmental liens under or pursuant to any Environmental Laws on any of the Facilities or any sites owned, operated or leased by the Company or its Subsidiaries and, to Seller's Knowledge, no government action has been taken or is in process that could subject the Facilities or any such sites to such liens;

(l)    No "jurisdictional wetlands" as defined for purposes of Section 404 of the Clean Water Act are located within any portion of the property owned, leased or operated by the Company or Properties; and

(m)    Seller has provided Purchaser with any environmental inspections, investigations, studies, audits, assessments, tests, reviews or other analyses in its possession in relation to the Facilities owned, operated or leased by the Company and its Subsidiaries.

3.17    <u>Real Property</u>.

(a)    <u>Section 3.17(a)</u> of the Disclosure Schedule sets forth all the real property owned by the Company and each of its Subsidiaries.  With respect to each parcel of real property listed on <u>Section 3.17(a)</u> of the Disclosure Schedule (the "<u>Owned Real Property</u>"), as of the date hereof, the Company and each Subsidiary, as the case may be, holds good and insurable fee simple title to such parcel of Owned Real Property, free and clear of all Liens, other than Permitted Liens.  With respect to each such parcel of Owned Real Property, except as set forth in <u>Section 3.17(a)</u> of the Disclosure Schedule (i) there are no pending or, to Seller's Knowledge, threatened, eminent domain, expropriation, administrative or condemnation proceedings or sales or dispositions in lieu thereof relating to, such Owned Real Property or any portion thereof or any other lawsuits or claims that materially affect and adversely impair the current use or value of such Owned Real Property, (ii) except for Permitted Liens, there are no currently effective assignments, transfers, conveyances, mortgages, deeds in trust, encumbrances, subleases, licenses, options, rights, concessions or other similar contract or agreement by the Company or any Subsidiary granting to any Person the right to use or occupy such Owned Real Property or any portion thereof, (iii) there are no outstanding options or rights of first refusal to purchase or lease the Owned Real Property, or any portion thereof, (iv) to the Knowledge of Seller such Owned Real Property is in material compliance with all Applicable Laws except where such noncompliance could not reasonably be expected to adversely affect the current use thereof, (v) neither the Company nor any Subsidiary has received written notice of violations of any building or zoning regulations or any other Applicable Laws relating to the operation of such Owned Real Property, except where such noncompliance could not reasonably be expected to materially and adversely affect the current use thereof, and (vi) all buildings, improvements and fixtures, and

components of the Owned Real Property are in good operating condition in all material respects, reasonable wear and tear and scheduled maintenance excepted.

(b)    <u>Section 3.17(b)</u> of the Disclosure Schedule sets forth each parcel of real property leased by the Company or any Subsidiary (together with all rights, title and interest of the Company and each Subsidiary in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "<u>Leased Real Property</u>"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which the Company and any Subsidiary holds any Leased Real Property (collectively, the "<u>Real Property Leases</u>"). Seller has delivered to Purchaser a true and complete copy of each Real Property Lease. With respect to each Real Property Lease:

(i)    such Real Property Lease is valid, binding, enforceable and in full force and effect, and the Company or such Subsidiary, as the case may be, enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)    the Company or such Subsidiary, as the case may be, is not in material breach or default under such Real Property Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a material breach or default, and the Company or such Subsidiary, as the case may be, has paid all rent due and payable under such Lease through the date hereof;

(iii)    neither the Company nor any Subsidiary has received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by the Company under any of the Real Property Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Real Property Lease has exercised any termination rights with respect thereto;

(iv)    Neither the Company nor any Subsidiary has subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)    Neither the Company nor any Subsidiary has pledged, mortgaged or otherwise granted a Lien on its leasehold interest in any Leased Real Property.

(c)    Except as listed on <u>Section 3.17(c)</u> of the Disclosure Schedule, neither the Company nor any Subsidiary has received any written notice of (i) material violations of building codes and/or zoning ordinances or other Applicable Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to adversely affect the operation of the Leased Real Property as currently operated.

3.18    <u>Brokers and Finders</u>.  No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Purchaser or any of its Affiliates could become liable in connection

with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Seller or any of its Affiliates.

3.19    <u>Undisclosed Liabilities</u>. Except as set forth on <u>Section 3.19</u> of the Disclosure Schedule or otherwise disclosed in this Agreement, neither the Company nor any Subsidiary has any liability, secured or unsecured (whether absolute, accrued, contingent or otherwise and whether due or to become due) of a nature required by GAAP to be reflected in a balance sheet or disclosed in the notes thereto except (i) as such liabilities and obligations are reflected in the Financial Statements, or (ii) for liabilities and obligations incurred after the Balance Sheet Date in the Ordinary Course of Business (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, claim or lawsuit), none of which individually or in the aggregate is materially adverse to the operations of the Business. Neither the Company nor any Subsidiary has any contingent liabilities or other liabilities outside the Ordinary Course of Business not reflected in the Financial Statements.

3.20    <u>Accounts Receivable</u>.  Except as set forth on <u>Section 3.20</u> of the Disclosure Schedule, all Accounts Receivable of the Company and each of its Subsidiaries are reflected properly on its books and records, are bona fide, due and valid receivables and, to the Knowledge of Seller, are subject to no defenses, setoffs or counterclaims, and are current and collectible.  All Accounts Receivable arose in the Ordinary Course of Business.  No Accounts Receivable are subject to prior assignment, claim or Liens.  Except as set forth on the Financial Statements, neither the Company nor any of its Subsidiaries has incurred any liabilities or obligations for discounts, returns, promotional allowances or otherwise. Except as set forth on the Financial Statements, neither the Company nor any of its Subsidiaries has any liability for any refunds, allowances or returns in respect of products manufactured, processed, distributed, shipped or sold by or for the account of the Company or any of its Subsidiaries; provided, however, all Accounts Receivable of the Company are potentially subject to debits related to quality rejects pursuant to standard industry practice.

3.21    <u>Inventory</u>.  All inventories reflected on the Financial Statements are (a) owned by the Company or its Subsidiaries and not subject to any Liens, (b) properly valued at the lower of cost or market value in accordance with GAAP, and (c) are not obsolete and are of good and merchantable quality and contain no material amounts that are not salable and usable for the purposes intended in the Ordinary Course of the Business and meet the current standards and specifications of the Business.

3.22    <u>Banking Relationships and Investments</u>.  <u>Section 3.22</u> of the Disclosure Schedule sets forth an accurate and complete list of all banks and financial institutions in which the Company and each of its Subsidiaries has an account, deposit, safe-deposit box, lock box or line of credit or other loan facility or relationship, including the names of all Persons authorized to draw on those accounts or deposits, or to borrow under such lines of credit or other loan facilities, or to obtain access to such boxes.  <u>Section 3.22</u> of the Disclosure Schedule sets forth an accurate and complete list of all certificates of deposit, debt or equity securities and other investments owned, beneficially or of record, by the Company and each of its Subsidiaries (the "<u>Investments</u>").  The Company and its Subsidiaries have good and marketable title to all of the Investments.

3.23    Insurance.    Section 3.23 of the Disclosure Schedule lists each insurance policy (including policies providing property, casualty, liability, and workers' compensation coverage and bond and surety arrangements) which is currently in force for the Company and each of its Subsidiaries has been party, named insured, or otherwise the beneficiary of coverage. With respect to each such insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) neither the Company nor any Subsidiary, nor to Knowledge of Seller, any other party to the policy, is in breach or default (including with respect to the payment of premiums or the giving of notices), and to Knowledge of Seller, no event has occurred that, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (C) to Knowledge of each Seller, no party to the policy has repudiated any provision thereof.  The Company and each of its Subsidiaries has been covered during the past four (4) years by insurance in scope and amount customary and reasonable for the business in which it has engaged during the aforementioned period.  There are no self-insurance arrangements (excluding any self-funded Benefit Plans) affecting either the Company or any of its Subsidiaries.

3.24    Powers of Attorney.    There are no outstanding powers of attorney executed on behalf of either the Company or any of its Subsidiaries.

3.25    Disclosure.    The representations and warranties contained in this Article III do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Article III not misleading.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

4.1    Due Incorporation.    Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware with all requisite power and authority to own and operate its assets and properties as they are now being owned and operated.

4.2    Due Authorization.    Purchaser has full power and authority to enter into this Agreement and the Related Agreements and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements have been duly authorized by all necessary company action of Purchaser.  Purchaser has duly and validly executed and delivered this Agreement and has duly and validly executed and delivered (or prior to or at the Closing will duly and validly execute and deliver) the Related Agreements.  This Agreement constitutes the legal, valid and binding obligation of Purchaser and the Related Agreements, upon execution and delivery by Purchaser, will constitute legal, valid and binding obligations of Purchaser enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable principles.

4.3    Consents and Approvals; No Violations.    The execution, delivery and performance by Purchaser of this Agreement and the Related Agreements will not: (i) violate any law, regulation or order of any Governmental Authority applicable to Purchaser; (ii) require any filing or registration by Purchaser with, or consent or approval with respect to Purchaser of, any Governmental Authority; (iii) violate or conflict with or result in a breach or default under any contract to which Purchaser is a party or by which Purchaser or any of its assets or properties are bound; or (iv) violate or conflict with the certificate of formation or operating agreement of Purchaser, except where any such filing, registration, consent or approval, if not made or obtained, or any such violation, conflict, breach or default, would not have a material adverse effect on Purchaser or its ability to perform its obligations under this Agreement and the Related Agreements.

4.4    Investigation; Limitation on Warranties. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties, express or implied, beyond those expressly given by Seller in Article III (as modified by the Disclosure Schedules thereto), and Purchaser acknowledges and agrees that, except for the representations, warranties and covenants contained herein, the Company is being acquired on a "where is" and, as to condition, "as is" basis.  Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article III (as modified by the Disclosure Schedules thereto).  Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Company and the Business, and, in making its determination to proceed with the transactions contemplated hereby, Purchaser has relied on the results of its own independent investigation.

4.5    Brokers and Finders.  No agent, broker, investment banker, financial advisor or other firm or person is entitled to any brokerage, finder's, financial advisor's or other similar fee or commission for which Seller could become liable in connection with the transactions contemplated by this Agreement as a result of any action taken by or on behalf of Purchaser or any of its Subsidiaries.

ARTICLE V
COVENANTS

5.1    Access to Information and Facilities.

(a)    From the date of this Agreement to the earlier of the Closing Date or the date this Agreement is terminated, Seller shall give Purchaser and Purchaser's representatives, upon reasonable notice, reasonable access during normal business hours to the offices, facilities, books and records of the Company and its Subsidiaries, and shall make the officers and employees of the Company and each of its Subsidiaries available to Purchaser and its representatives as Purchaser and its representatives shall from time to time reasonably request, in each case to the extent that such access and disclosure would not obligate the Company or any Subsidiary to take any actions that would unreasonably disrupt the normal course of its businesses or violate the terms of Contract or any Applicable Law; provided, that all requests for access shall be directed to Mikk Carr or Alex Smith in writing (the "Designated Contacts"); provided, further, that nothing herein shall require Seller, the Company or any Subsidiary to

provide access or to disclose any information to Purchaser if such access or disclosure would be in violation of Applicable Laws or regulations of any Governmental Authority or the provisions of any agreement to which Seller, the Company or any Subsidiary is a party.  Other than the Designated Contacts, Purchaser is not authorized to and shall not (and shall cause its employees, agents, representatives and Affiliates to not) contact any officer, director, manager, employee, franchisee, customer, supplier, distributor, lender or other material business relation of the Company or any Subsidiaries prior to the Closing without the prior written consent of a Designated Contact.

(b)    Purchaser and their representatives shall treat and hold strictly confidential any Confidential Information of Seller in accordance with Section 5.10.

5.2    Preservation of Business.  From the date of this Agreement until the Closing Date, other than as specifically contemplated by this Agreement or with the prior consent of Purchaser (such consent not to be unreasonably withheld or delayed), the Company and each of its Subsidiaries shall be operated in the ordinary and usual course of business and consistent with past practice.  Without limiting the generality of the foregoing, the Company and each Subsidiary shall not, other than as specifically contemplated by this Agreement or with the prior consent of Purchaser (such consent not to be unreasonably withheld or delayed), (a) amend their respective certificates of formation, operating agreements or other comparable organizational documents, (b) sell, lease, transfer, assign or otherwise dispose of any assets, other than the disposition of inventory in the Ordinary Course of Business consistent with past practice, or (c) manage its Net Working Capital in any manner outside the Ordinary Course of Business.

5.3    Exclusivity.  From the date of this Agreement until the earlier of the Closing Date or termination of this Agreement in accordance with its terms, neither Seller, the Company, nor any Subsidiary shall, directly or indirectly, through any officer, director, employee, agent, partner, Affiliate or otherwise, solicit, initiate or encourage the submission of any proposal or offer from any Person relating, with respect to the Company or any Subsidiary, to any acquisition or purchase of all or a significant portion of the assets of, or any material equity interest in, the Company or any Subsidiary or any similar transaction or business combination (a "Competing Transaction"), nor participate in any or continue any ongoing discussions or negotiations regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any person or entity to effect a Competing Transaction.  Each of Seller and the Company shall, and shall cause all Persons acting on behalf of it to immediately cease any existing activities, discussions and negotiations with any Persons with respect to any of the foregoing.

5.4    Efforts.  Subject to the terms and conditions hereof, each Party hereto shall use its commercially reasonable efforts to consummate the transactions contemplated hereby as promptly as practicable.  The "commercially reasonable efforts" of Seller shall not require Seller, the Company, their Affiliates or representatives to expend any money to remedy any breach of any representation or warranty hereunder, to expend any money to obtain any consent required for consummation of the transactions contemplated hereby or to provide financing to Purchaser for consummation of the transactions contemplated hereby.

5.5     Notice of Developments. From the date of this Agreement until the earlier of the Closing Date or termination of this Agreement in accordance with its terms, each Party will give prompt written notice to the other Party of any development, event, or occurrence causing any of its own representations and warranties in Articles III and IV above, as the case may be, to be untrue and such Party shall provide the other Parties with updated Disclosure Schedules to the extent necessary.  No disclosure by any Party pursuant to this Section 5.5, however, shall be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

5.6     Preservation of Records; Post-Closing Access and Cooperation; Litigation Support.

(a)     For a period of seven years after the Closing Date or such other period (if longer) required by applicable law, Purchaser shall cause the Company to preserve and retain, all corporate, accounting, legal, auditing, human resources and other books and records of the Company and each Subsidiary (including any documents relating to any governmental or non-governmental claims, actions, suits, proceedings or investigations) relating to the conduct of the business and operations of the Company prior to the Closing Date.

(b)     Purchaser shall, after the Closing Date, afford promptly to Seller and its representatives reasonable access during normal business hours to the offices, facilities, books, records, officers and employees of the Company to the extent and for a purpose reasonably requested by Seller.

(c)     Subject to Section 5.6(d), in the event and for so long as Purchaser, Seller the Company or any Subsidiary actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement, or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Company or any Subsidiary, the Seller shall cooperate in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending party.

(d)     Notwithstanding Section 5.6(c), Seller hereby agrees that it shall continue to actively defend and contest each Pending Proceeding and pay all costs associated in connection therewith.  The terms and conditions of Seller's continued assumption of the defense of the Pending Proceedings shall be in accordance with Section 9.5, treated as if each Pending Proceeding is a Third-Party Claim the defense of which is affirmatively assumed by Seller.

(e)     For a period of two (2) years after the Closing, Seller shall cooperate with, and provide commercially reasonable assistance to, Purchaser in connection with the preparation of the Company's audited financial statements, including without limitation, provide promptly to Purchaser and its representatives reasonable access during normal business hours to the offices, facilities, books, records, work papers, officers and employees of Seller to the extent reasonably requested by Purchaser in connection therewith.

-33-

5.7　　Transition. Seller will not take, and will cause the Company and its Subsidiaries not to take, any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, or other business associate of the Company or any Subsidiary from maintaining the same business relationships with the Company or any Subsidiary after the Closing as it maintained with the Company or such Subsidiary prior to the Closing.　Seller will refer all customer inquiries relating to the Company or its Subsidiaries to Purchaser from and after the Closing.

5.8　　Employees and Benefits.

(a)　　Upon Closing, the Purchaser agrees that the Retained Employees shall be eligible immediately to commence participation in the employee benefit plans of the Purchaser or Company, if any, including any group health plan of the Purchaser (the "Purchaser Benefit Plans"), without regard to any eligibility period, waiting period, elimination period, evidence of insurability requirements or pre-existing condition limitations.　Without limiting the foregoing, Purchaser shall use commercially reasonable efforts to take or shall cause the Company to use commercially reasonable efforts to take the following actions: provide each Retained Employee with credit under any Purchaser Benefit Plans for any co-payments and deductibles paid by each Retained Employee to any Benefit Plan prior to the Closing for the plan year in which the Closing occurs in satisfying any applicable deductible, co-payment, co-insurance or any other out-of-pocket requirements; and (iii) for all purposes (other than for purposes of benefit accruals under any defined benefit pension plan) under all compensation and benefit plans and policies applicable to the Retained Employees, including the Purchaser Benefit Plans, treat all service by the Retained Employees with the Company or its Subsidiaries before the Closing as service with Purchaser and its Subsidiaries.　Purchaser shall, on the Closing Date, cause the Company to establish healthcare coverage providing similar health care coverage to the Retained Employees Nothing herein shall require Purchaser or the Company to provide health care coverage or any specific level of health care coverage for any period of time following the Closing Date.

(b)　　As of the Closing, all Retained Employees shall cease participating in (and the Company shall no longer be a participating employer of) the Seller Benefit Plans. Seller shall retain all liabilities of and be responsible for the Seller Benefit Plans, including, but not limited to, continuing coverage with respect to short or long term disability with respect to Employees on short- or long-term disability on the Closing Date, and neither the Purchaser, the Company, nor any of its Subsidiaries shall have any obligations with respect to the Seller Benefit Plans.

(c)　　On and after the Closing, the Purchaser and the Company shall be responsible for the Purchaser Benefit Plans and all liabilities arising therefrom, and the Seller shall not have any obligations with respect to the Purchaser Benefit Plans.

(d)　　Seller shall be responsible for the provision of group health plan continuation coverage pursuant to COBRA with respect to (i) each Person currently covered on COBRA as of the day before the Closing Date, and (ii) each Vassar Employee.

(e)　　Purchaser shall be responsible for the provision of group health plan continuation coverage pursuant to COBRA with respect to each Retained Employee.

(f)     Seller shall cause all Retained Employees to become fully vested in their account balances under Seller's 401k Plan, as of the Closing, to the extent not already vested.

(g)     All provisions contained in this Agreement with respect to employee benefit plans or employee compensation are included for the sole benefit of the respective Parties hereto and do not and shall not create any right in any other person, including, but not limited to, any Employee, any participant in any benefit or compensation plan or any beneficiary thereof.

(h)     In any termination or layoff of any Retained Employee by the Company on or after the Closing Date, the Purchaser and the Company will comply fully, if applicable, with the WARN Act and all other applicable foreign, Federal, state and local laws, including those prohibiting discrimination and requiring notice to employees.  Purchaser shall not, and shall cause the Company to not, at any time prior to 60 days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act affecting in whole or in part any facility, site of employment, operating unit or employee of the Company without complying fully with the requirements of the WARN Act.  Purchaser will bear the cost of compliance with (or failure to comply with) any such laws.

(i)     On and after the Closing Date, the Company and the Purchaser shall have no obligations of any kind with respect to the Employees related to the Vassar Foundry set forth on Schedule 5.8 hereto (the "Vassar Employees").  On the Closing Date, the Vassar Employees shall not be employees of the Company.

(j)     The Company may assume, at the option of Purchaser, the liability and obligations of the executive life policy as set forth on Section 3.11(d) of the Disclosure Schedule and Seller shall assign said executive life policy to the Company.  If Purchaser does not elect this option, the liability and obligations of the executive life policy shall remain with Seller, though Seller shall have no obligation to continue coverage under the executive life policy.

5.9     Amendment to Indemnification Provisions.   For six (6) years from and after the Closing Date, the Purchaser shall not, and shall not permit the Company to, amend, repeal or modify any provision in the Company's Operating Agreement in any way that would adversely affect the ability of the officers and directors of the Company prior to Closing to make a claim for indemnification against the insurance carrier providing such coverage to the Company prior to Closing.

5.10    Confidentiality.

(a)     General.  Pursuant to the terms of this Agreement, each of Purchaser and Seller (in such capacity, the "Disclosing Party") has disclosed and will be disclosing to the other Party, and to its Affiliates and to their respective officers, directors, employees, agents and/or representatives (in such capacity, the "Receiving Party") certain secret, confidential or proprietary data, trade secrets, know-how, intellectual property and related information, including, without limitation, operating methods and procedures, marketing, manufacturing, distribution and sales methods and systems, sales figures, pricing policies and price lists and other business information ("Confidential Information").  The Receiving Party shall make no use of any Confidential Information of the Disclosing Party except in the exercise of its rights and

the performance of its obligations set forth in this Agreement or the Related Agreements.  The Receiving Party (i) shall keep and hold as confidential, and shall cause its officers, directors, managers, employees, agents and representatives to keep and hold as confidential, all Confidential Information of the Disclosing Party, and (ii) shall not disclose, and shall cause its officers, directors, managers, employees, agents and representatives not to disclose, any Confidential Information of the Disclosing Party.  Confidential Information disclosed by the Disclosing Party shall remain the sole and absolute property of the Disclosing Party, subject to the rights granted in this Agreement or the Related Agreements.

(b)     Exceptions.  The restrictions set forth in Section 5.10(a) above on the use and disclosure of Confidential Information shall not apply to any information which (i) is already known to the Receiving Party at the time of disclosure by the Disclosing Party (other than Confidential Information which forms a part of the Purchased Assets), as demonstrated by competent proof (other than as a result of prior disclosure under any agreement between the Parties with respect to confidentiality), (ii) is or becomes generally available to the public other than through any act or omission of the Receiving Party in breach of this Agreement or the Related Agreements or (iii) is acquired by the Receiving Party from a third party who is not, directly or indirectly, under an obligation of confidentiality to the Disclosing Party with respect to same.  In addition, nothing in this Section 5.10 shall be interpreted to limit the ability of either Party to use or disclose its own Confidential Information in any manner to or any other Person.

(c)     Permitted Disclosures.  It shall not be a breach of Section 5.10(a) if a Receiving Party discloses Confidential Information of a Disclosing Party (i) pursuant to a binding requirement of Applicable Law or a Governmental Authority, or (ii) in a judicial, administrative or arbitration proceeding to enforce such Party's rights under this Agreement.  In such event, the Receiving Party shall (A) provide the Disclosing Party with as much advance written notice as possible of the required disclosure, (B) reasonably cooperate with the Disclosing Party in any attempt to prevent or limit the disclosure, and (C) limit disclosure, if any, to the specific purpose at issue.

(d)     Confidential Terms.  Each Party acknowledges and agrees that the terms and conditions of this Agreement shall be considered Confidential Information of each Party and shall be treated accordingly.  Notwithstanding the foregoing, each Party acknowledges and agrees that the other may be required to disclose some or all of the information included in this Agreement in order to comply with its obligations under securities laws or the rules or regulations of any securities exchange or market on which the disclosing Party's or its Affiliate's stock is traded, and hereby consents to such disclosure to the extent deemed necessary by its respective counsel (but only after consulting with the other to the extent practicable).

(e)     Equitable Remedies.  Each Party specifically recognizes that any breach by it of this Section 5.10 may cause irreparable injury to the other Parties and that actual damages may be difficult to ascertain, and in any event, may be inadequate.  Accordingly (and without limiting the availability of legal or equitable, including injunctive, remedies under any other provisions of this Agreement), each Party agrees that in the event of any such breach, notwithstanding the provisions of Section 9.4, the other Parties shall be entitled to seek, by way of private litigation in the first instance, injunctive relief and such other legal and equitable remedies as may be available.

5.11    Non-Competition; Non-Solicitation.

(a)    For good and valuable consideration and in furtherance of the sale of the Membership Interests to Purchaser hereunder, in order to induce Purchaser to enter into and perform this Agreement, to ensure that Purchaser obtains the benefits it reasonable expects to obtain hereunder and to more effectively protect the value and goodwill of the Company and its Subsidiaries, Seller hereby agrees that, for the period commencing on the Closing Date and ending on the third (3rd) anniversary of the Closing Date, Seller and each Restricted Party shall not directly or indirectly:

(i)    participate or have any interest in, own, manage, operate, control, be connected with as a stockholder, director, officer, employee, partner or consultant, or otherwise engage, invest or participate in any business located in the United States that is competitive, directly, with the Damper Business;

(ii)    do any intentional act injurious to the reputation of the Company or persuade, or attempt to persuade, customers or suppliers of the Damper Business to terminate their business relationship with the Company; or

(iii)    induce, or attempt to induce, any employee or consultant to terminate his or her relationship with the Company except with the prior written consent of the Company.

(b)    For purposes of this Section 5.11, the "Damper Business" means that portion of the Business relating to the sale and manufacture of dampers for the automotive industry.  For purposes of this Section 5.11, "Restricted Party" means George S. Hofmeister, Megan G. Hofmeister Irrevocable Trust, Scott R. Hofmeister Irrevocable Trust, and Jamie S. Hofmeister Irrevocable Trust (collectively, the "Hofmeister Parties"), and any Person in which the Hofmeister Parties collectively, directly or indirectly, (i) own more than 50% of the outstanding equity interests of such Person, or (ii) have the power to appoint a majority of the board of directors or managers of such Person.

(c)    The provisions of this Section 5.11 shall not apply to prevent Seller from collectively being holders of up to five percent (5%) in the aggregate of any class of securities of any corporation engaged in the prohibited activities described above, provided that such securities are listed on a national securities exchange or registered under securities laws of the United States.

(d)    If, at the time of enforcement of this Section 5.11, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable, Seller agrees that reasonable maximum duration, scope, area or other restrictions may be substituted by such court for the stated duration, scope, area or other restrictions and upon substitution by such court, this Agreement shall be automatically modified without further action by the parties hereto.

(e)    Seller hereby agrees that damages at law, including, but not limited to, monetary damages, will be an insufficient remedy to Purchaser in the event that this Section 5.11 is violated and that, in addition to any remedies or rights that may be available to Purchaser, all

-37-

of which other remedies or rights shall be deemed to be cumulative, retained by Purchaser and not waived by the enforcement of any remedy available hereunder, including, but not limited to, the right to sue for monetary damages, Purchaser shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including, but not limited to, a temporary restraining order or temporary, preliminary or permanent injunction, to enforce this Section 5.11, all of which shall constitute rights and remedies to which Purchaser may be entitled.

5.12   Public Announcements.   Purchaser and Seller will consult with each other before issuing any press release or otherwise making any public statements or disclosures with respect to the transactions contemplated by this Agreement, including the terms hereof, and no Party shall, without the prior written consent of the other Parties, issue any such press release or make any such public statement, except as may be required by Applicable Law.

5.13   Filing of Tax Returns; Tax Matters.

(a)   For purposes of this Agreement, "Straddle Period" means any Taxable period that includes, but does not end on, the Closing Date.  "Pre-Closing Tax Period" means any taxable period or portion thereof ending on or before the Closing Date. "Pre-Closing Taxes" means (i) Taxes of or imposed on or with respect to any Seller; (ii) Taxes of or imposed on or with respect to the Company for a Pre-Closing Tax Period or the portion of any Straddle Period ending on the Closing Date, (iii) Taxes of any Person (other than the Company) imposed on the Company as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing.

(b)   Seller shall cause the Company and its Subsidiaries to prepare and file in a timely manner all Tax Returns required to be filed by the Company and its Subsidiaries after the date hereof and on or before the Closing Date with respect to any Tax.  Purchaser shall cause the Company to prepare and file in a timely manner, all Tax Returns to be filed for the Straddle Period required to be filed after the Closing Date with respect to any Tax.  All such Tax Returns shall be prepared, and any positions and elections relating thereto made, in a manner consistent with the prior practice of the Company to the extent permitted by law.  Purchaser shall deliver or cause to be delivered to Seller copies of each such material Tax Return at least fifteen (15) days before filing, and shall accept all reasonable comments made by Seller with respect thereto, to the extent such comments relate to the portion of such Straddle Period ending on the Closing Date.

(c)   Seller shall timely pay or shall cause to be timely paid all Taxes shown on any Tax Return for any Taxable period ending on or prior to the Closing Date and shall pay over to Purchaser the amount of Taxes shown on a Tax Return for any Straddle Period that are allocable to the Pre-Closing Tax Period (as determined pursuant to the following sentence) at least five (5) days before the due date thereof.  For purposes of this Section 5.13 and Section 9.2(vii), in the case of any Straddle Period, Taxes allocable to a Pre-Closing Tax Period shall include (i) in the case of any property Taxes and similar ad valorem Taxes, the product of such Taxes multiplied by a fraction the numerator of which is the number of days in such taxable period from the beginning of the period through and including the Closing Date and the denominator of which is the number of days in the entire period and (ii) in the case of any other

Taxes, the portion of such Taxes allocable to the portion of such period ending on and including the Closing Date, as determined on the basis of a deemed closing at the end of the Closing Date of the books and records of the Company.

(d)     Seller shall be responsible for causing to be filed any amended Tax Returns of the Company or any Subsidiary for any Pre-Closing Tax Period that are required as a result of an examination or adjustments made by any Taxing authority, and for causing to be paid by the parties responsible therefor under Section 5.13(c) when due any Taxes resulting therefrom.

(e)     Neither Purchaser, the Purchaser's subsidiaries, the Company nor any of its Subsidiaries shall, unless required by Applicable Law, retroactively apply any changes or alterations in the Tax positions or elections taken by the Company on or prior to the Closing Date to any Taxable periods ending on or prior to the Closing Date in any manner that would result in a breach of any of Seller's representations or warranties contained herein.

(f)     Seller shall be entitled to any refund (whether in the form of a direct payment or an offset or credit to Taxes payable) of Pre-Closing Taxes together with any interest received from the Taxing authority.  Purchaser or the Company shall be entitled to any refund of Taxes attributable to that portion of the Straddle Period ending after the Closing Date, together with any interest received from the Taxing authority.  If Purchaser or Seller receives a refund (whether in the form of a direct payment or an offset or credit to Taxes payable) of Taxes to which the other Party is entitled under this Section 5.13(f), it shall pay the refund to the other Party within fifteen (15) days of its receipt from the Taxing authority (or in the case of offsets or credits, promptly upon the use of such offsets or credits to reduce Taxes otherwise payable).

(g)     Seller, Purchaser and the Company will cooperate fully with each other, as to the extent reasonably requested by the other Party, in connection with (i) the preparation and filing of any U.S. federal, state, local or foreign Tax Returns pursuant to this Section 5.13 and (ii) any audit, litigation, or other proceeding with respect to Taxes.  Such cooperation shall include, without limitation, the furnishing or making available of employees on a mutually convenient basis and records, books of account or other materials of the Company and its Subsidiaries necessary or helpful for the defense against assertions of any Taxing authority as to any Taxes. Purchaser and Seller agree to retain all books and records with respect to Tax matters pertinent to the Company and each Subsidiary relating to any Taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the other party, any extensions thereof) of the respective Taxable periods, and to abide by all record retention agreements entered into with any Taxing authority. Purchaser and Seller further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Taxing authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated by this Agreement).  Neither Seller nor Purchaser shall compromise or settle any Tax deficiency related to another party hereto in connection with the Company or any Subsidiary for which any other Party would be liable without the prior written consent of such Party (which consent shall not be unreasonably withheld or denied).

(h)    On or prior to the Closing, Seller shall deliver to Purchaser a certificate of non-foreign status, in the form provided in Treasury Regulation section 1.1445-2(b)(2)(iv), issued pursuant to and in compliance with (including making of any required filings with the IRS) Treasury Regulation section 1.1445-2(b)(2), certifying that Seller is not a foreign person within the meaning of Treasury Regulation section 1.1445-2(b)(2)

5.14    <u>Transfer Taxes</u>.    Notwithstanding any other provision of this Agreement, all federal, state, local, non-U.S. transfer, excise, sales, use, value added, registration, stamp, recording, property and similar Taxes or fees applicable to, imposed upon, or arising out of any transaction contemplated by this Agreement shall be paid by Seller.

5.15    <u>Seller Release</u>. In consideration of the payment of the Purchase Price and the consummation of the transactions contemplated hereby, Seller hereby irrevocably and unconditionally, fully and forever acquits, releases and discharges and agrees to hold harmless the Company, its Subsidiaries and Purchaser, their respective Affiliates, and their respective members, managers, officers, directors, employees, agents, representatives, successors and assigns from any and all currently existing  claims, actions, causes of action, suits, charges, complaints, promises, damages, judgments, liabilities or obligations of any kind whatsoever in law or in equity which Seller or its Affiliates, heirs, beneficiaries, successors and assigns in any capacity can, shall or may have against the Company, its Subsidiaries or their respective Affiliates, with respect to the Company's or its Subsidiaries' ownership or use of the Company's assets or operation of the Business prior to Closing. Notwithstanding  the foregoing, nothing in this <u>Section 5.15</u> shall be construed in having released any claims by the Seller against the Company, its Subsidiaries and Purchaser, their respective Affiliates, and their respective members, managers, officers, directors, employees, agents, representatives, successors and assigns for any matters relating to this Agreement or any future claims based on acts or omissions by the Company, its Subsidiaries and Purchaser, their respective Affiliates, and their respective members, managers, officers, directors, employees, agents, representatives, successors and assigns after the Closing.

5.16    <u>Pension Plan Payments</u>.    Seller hereby agrees to cause Contech Castings Real Estate Holdings, LLC at Closing to issue a promissory note in favor of MIDS, LLC, in a form reasonably satisfactory to Purchaser (the "<u>Contech Note</u>"), in the original principal amount of Five Million Nine Hundred Eighty-Seven Thousand Dollars ($5,987,000), which shall be payable on December 31, 2013 and shall accrue interest at the rate of eight percent (8%) per annum compounded annually. The payment obligations under the Contech Note shall be secured by a mortgage on certain real properties of Seller or its Affiliates in Auburn, IN and Clarksville, TN (the "<u>Payment Mortgage</u>"), or such other properties or collateral as agreed by Purchaser, such mortgage to be in a form reasonably acceptable to Purchaser and delivered at the Closing.

ARTICLE VI
CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser at Closing under this Agreement are subject to the satisfaction (or waiver by Purchaser) of the following conditions precedent on or before the Closing Date:

6.1    <u>Warranties True as of Closing Date</u>.  Each of the representations and warranties of Seller contained in <u>Article III</u> shall be true and correct in all material respects, disregarding for this purpose any qualification or exception for, or reference to, materiality or Material Adverse Effect in any such representation or warranty, at and as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement.

6.2    <u>Compliance with Agreements and Covenants</u>.  Seller shall have in all material respects performed and complied with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date.

6.3    <u>No Prohibition</u>.  No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit the consummation of the transactions contemplated hereby.  All consents required under the terms of this Agreement to be obtained by Purchaser shall have been obtained.

6.4    <u>Deliveries</u>.  Seller shall have made or cause to be made, or stand willing and able to make or cause to be made, all the deliveries to Purchaser set forth in <u>Section 2.5(b)</u> hereof.

6.5    <u>No Adverse Proceedings</u>.  No action, suit, proceeding or investigation before any court, administrative agency or other governmental authority shall be pending or, to the Knowledge of Seller, threatened against the Seller, the Company or any Subsidiary wherein an unfavorable judgment, decree or order would prevent the carrying out of this Agreement or any of the transactions contemplated hereby, declare unlawful the transactions contemplated hereby or cause such transactions to be rescinded, or which could reasonably be expected to materially adversely affect the right of Purchaser to own and exercise all rights under the Membership Interests, or to materially adversely affect the assets of the Company, its Subsidiaries or the Business operations (financial or otherwise) of the Company and its Subsidiaries.

6.6    <u>Adverse Change</u>.  During the period from the date of this Agreement to the Closing Date, the Company shall not have suffered a Material Adverse Effect.

6.7    <u>Financing</u>. Purchaser shall have obtained sufficient financing to pay the Purchase Price in an amount and on terms and conditions satisfactory to Purchaser in its sole discretion.

6.8    <u>GM Agreement</u>. Purchaser shall have received a written copy of the Company's agreement with General Motors, Ford and Chrysler to certain price increases on the Company's products of at least $3,860,000, effective January 2013, as set forth in the Confidential Information Memorandum dated November 2012 prepared by Huron Consulting Group (the "<u>CIM</u>").

6.9    <u>GM Pension Payments</u>.  Purchaser shall have received confirmation satisfactory to Purchaser in its sole discretion of the commitment of General Motors, Ford and Chrysler to make cash payments to the Company's Benefit Plans, as directed pursuant to the mutual agreement of Purchaser and Seller, in the aggregate of at least $20,000,000 on or prior to the Closing Date.

6.10    EBITDA Pro Forma.  Purchaser shall have received confirmation satisfactory to Purchaser in its sole discretion that of the Company's expense reductions reflected in the 2013 pro-form EBITDA (earnings before interest, tax, depreciation and amortization expense) as set forth in the CIM.

ARTICLE VII
CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller at Closing under Article II of this Agreement are subject to the satisfaction (or waiver by Seller) of the following conditions precedent on or before the Closing Date:

7.1    Warranties True as of Present Date.  Each of the representations and warranties of Purchaser contained in Article IV shall be true and correct in all material respects at and as of the Closing Date as if made anew as of such date (except to the extent such representations and warranties expressly relate to an earlier date (in which case, as of such earlier date)), except to the extent of changes or developments contemplated by the terms of this Agreement.

7.2    Compliance with Agreements and Covenants.  Purchaser shall have in all material respects performed and complied with all of its covenants, obligations and agreements contained in this Agreement to be performed and complied with by it on or prior to the Closing Date, in all material respects.

7.3    No Prohibition.  No law or injunction shall have been adopted, promulgated or entered by any Governmental Authority which prohibits, and no lawsuit, proceeding or investigation shall be pending, which would be reasonably expected to prohibit the consummation of the transactions contemplated hereby.  All consents required under the terms of this Agreement to be obtained by Purchaser shall have been obtained.

7.4    Deliveries.  Purchaser shall have made or cause to be made, or stand willing and able to make or cause to be made, all the deliveries set forth in Section 2.5(c) hereof.

7.5    No Adverse Proceeding.  No action, suit, proceeding or investigation before any court, administrative agency or other governmental authority shall be pending or, to the Knowledge of Purchaser, threatened against Purchaser wherein an unfavorable judgment, decree or order would prevent the carrying out of this Agreement or any of the transactions contemplated hereby, declare unlawful the transactions contemplated hereby or cause such transactions to be rescinded.

7.6    Contech Note and Payment Mortgage.  Waiver by Purchaser of the covenants of Seller set forth in Section 5.16, or modification of such covenants in a manner acceptable by Seller.

-42-

ARTICLE VIII
TERMINATION

8.1     Termination.

(a)     This Agreement may be terminated at any time on or prior to the Closing Date:

(i)     with the mutual written consent of Purchaser and Seller;

(ii)     by either Purchaser or Seller if the Closing shall not have occurred on or before January 31, 2013 (the "Termination Date"); provided, that the right to terminate this Agreement under this Section 8.1(a)(ii) shall not be available to any Party whose failure to fulfill any obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before the Termination Date;

(iii)     by Seller, if Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Article VII and (B) has not been or is incapable of being cured by Purchaser prior to 10 days after its receipt of written notice thereof from Seller;

(iv)     by Purchaser, if Seller shall have breached or failed to perform any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of a condition set forth in Article VI and (B) has not been cured by Seller prior to 10 days after receipt of written notice thereof from Purchaser; and

(v)     by either Purchaser or Seller if any Governmental Authority (i) shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the right to terminate this Agreement under this Section 8.1(a)(v) shall not be available to any Party whose failure to comply with Section 5.4 has caused or resulted in such action or inaction.

(b)     Notwithstanding anything else contained in this Agreement, the right to terminate this Agreement under this Section 8.1 shall not be available to any Party (a) that is in material breach of its obligations hereunder, or (b) whose failure to fulfill its obligations or to comply with its covenants under this Agreement has been the cause of, or resulted in, the failure to satisfy any condition to the obligations of either Party hereunder.

8.2     Expenses.  Subject to Section 8.3, whether or not the Closing occurs, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such Expenses.  As used in this Agreement, "Expenses" means the out-of-pocket fees and expenses of the Party's independent advisor, counsel and accountants, incurred or paid by the Party or on its behalf in connection with this Agreement and the transactions contemplated hereby.

-43-

8.3     Break-Up Fee.

(a)     Notwithstanding Section 8.2, if this Agreement is terminated by any Party hereto for any reason other than (i) Purchaser's breach of this Agreement, or (ii) provided that the requirements of Section 6.8 and 6.9 are satisfied, Purchaser's failure to meet the conditions set forth in Section 6.7, Seller shall reimburse Purchaser for all its Expenses.

(b)     Notwithstanding Section 8.2, if Seller is unable or unwilling to consummate the transactions contemplated by this Agreement (except as a result of the non-satisfaction of Section 7.6) after Purchaser, or such third party as the case may be, has performed, or is willing and able to perform, the closing conditions set forth in Sections 6.7, 6.8 and 6.9, Seller shall pay Purchaser a break-up fee in the amount of $250,000 plus Purchaser's Expenses.

(c)     All payments under this Section 8.3 shall constitute liquidated damages to the Purchaser for the failure of the Parties to consummate the transactions completed hereby.

8.4     Effect of Termination.   In the event of termination of this Agreement by either Purchaser or Seller as provided in Section 8.1, this Agreement will forthwith become void and have no further force or effect, without any liability (other than as set forth in Sections 8.2 and 8.3 or this Section 8.4) on the part of Purchaser or Seller; provided, however, that the provisions of this Section 8.4 and Sections 5.1(b), 8.2, 8.3, 8.4, 10.6, 10.7, 10.12 and 10.13 will survive any termination hereof; provided, further, however, that subject to the terms of this Section 8.4, nothing in this Section 8.4 shall relieve any Party of any liability for any breach by such Party of this Agreement prior to the Closing.

8.5     Enforcement.

(a)     The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that any breach of this Agreement could not be adequately compensated in all cases by monetary damages alone.   Except as otherwise set forth in this Section 8.5, the Parties acknowledge and agree that, prior to the valid termination of this Agreement pursuant to Section 8.1, the Parties shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof.

(b)     Each Party hereby agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by such Party, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement all in accordance with the terms of this Section 8.5. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to provide any bond or other security in connection with such order or injunction all in accordance with the terms of this Section 8.5.

(c)     To the extent any Party hereto brings any action to enforce specifically the performance of the terms and provisions of this Agreement (other than an action to specifically enforce any provision that expressly survives termination of this Agreement pursuant to Section 8.4 hereof) when expressly available to such Party pursuant to the terms of this Agreement, the Termination Date shall automatically be extended by (i) the amount of time during which such action is pending, plus 20 Business Days, or (ii) such other time period established by the court presiding over such action.

ARTICLE IX
SURVIVAL AND REMEDY; INDEMNIFICATION

9.1     Survival.  All of the terms and conditions of this Agreement, together with the warranties, representations, agreements and covenants contained herein or in any instrument or document delivered or to be delivered pursuant to this Agreement, shall survive the execution of this Agreement and the Closing Date; provided, however, that  except with respect to covenants that, by their terms, are to be performed for a longer period, all covenants, representations and warranties of Seller, and the related agreements to indemnify Purchaser set forth in this Article IX, shall survive and continue for, and all indemnification claims with respect thereto, shall be made prior to the end of two (2) years after the Closing Date; provided, further, that the representations and warranties contained in Section 3.2 ("Due Authorization"), Section 3.3 ("No Violations"), Section 3.11 ("Employee Benefit Plans"), Section 3.12 ("Employees"), Section 3.13 ("Taxes"), Section 3.16 ("Environmental Matters") and Section 3.19 ("Undisclosed Liabilities") shall survive until 90 days after the expiration of the applicable statute of limitations period; and provided, further, that the representations and warranties contained in Section 3.4 ("Capitalization") shall survive indefinitely.  Any claim for indemnification asserted in writing before the second anniversary of the Closing Date or the other applicable survival period set forth in this Section 9.1 shall survive until resolved or judicially determined (as applicable, the "Indemnification Period").  Thereafter, neither Seller nor Purchaser shall be under any obligation or liability whatsoever with respect to any such representation, warranty, covenant or agreement or any certificate in respect thereto, except for those covenants and agreements which, by their terms, expressly extend for a longer period than the Indemnification Period.

9.2     Indemnification by Seller.  Seller shall indemnify Purchaser, the Company and their respective Affiliates, and each of their respective officers, directors, managers, partners, trustees, employees, stockholders, members, representatives and agents, against, and agrees to hold them harmless from, any and all Losses incurred or suffered by Purchaser, the Company or any of the foregoing Persons (or any combination thereof) arising out of:

(i)     any misrepresentation, breach of any representation or warranty, or failure to fulfill any covenant or agreement contained in this Agreement or in any Related Document by Seller;

(ii)     third party claims arising in breach of contract, breach of warranty, product liability, unfair competition, personal or other injury, tort or infringement of property rights of others or other third party claims, in each case which claim is with respect to any and all activities of the Company, any Subsidiary, the Seller or any Affiliate thereof in connection with

the conduct of the Business on or before the Closing Date, regardless of any disclosure of such claims on the Disclosure Schedule;

(iii)    notwithstanding any disclosure on the Disclosure Schedule, violations by Seller, the Company or any Subsidiary of any Environmental Laws occurring or resulting from events occurring prior to the Closing Date, including, without limitation, Losses from any Environmental Claims or Response Actions and defending any actions or proceedings associated therewith;

(iv)    notwithstanding any disclosure on the Disclosure Schedule, Losses arising as a result of act or omissions of the Fiduciaries on or prior to the Closing Date including, but not limited to, excise taxes that may accrue after the Closing Date (subject to the proviso below), in relation to the Purchaser Acquired Benefit Plans and any actions, investigations, proceedings or litigations related thereto, including without limitation, the proceedings currently pending with the Department of Labor and any obligation of the Company or any Subsidiary to indemnify the Fiduciaries or any other Person in connection with any Losses arising as a result of their actions or omissions with respect to the Purchaser Acquired Benefit Plans; provided, however, that Seller shall have no indemnification obligations with respect to any excise taxes, or portion thereof, that are imposed after the Closing Date solely as a result of any Remaining Note not being repaid as of the Closing Date, and that would not have been imposed after the Closing Date but for any Remaining Note not being repaid as of the Closing Date.

(v)    any of the assets or liabilities transferred by the Company or any Subsidiary to Seller pursuant to the Bill of Sale and Assignment Agreement, including any Losses incurred in relation to (i) the Company's prior ownership of the membership interests in Metavation Vassar, LLC, Metavation Traverse City LLC or Metavation Traverse City Building Three, LLC, (ii) the Vassar Foundry Assets (as defined in the Bill of Sale and Assignment Agreement), or (iii) the Assumed Contracts (as defined in the Bill of Sale and Assignment Agreement);

(vi)    any matter or obligation relating to the Vassar Employees;

(vii)    any Pre-Closing Taxes; and

(viii)    any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including reasonable legal fees, in enforcing this indemnity against Seller.

9.3    Indemnification by Purchaser.  Purchaser shall, and shall cause the Company to, indemnify Seller and its Affiliates, and each of their respective officers, directors, managers, partners, trustees, employees, stockholders, members, representatives and agents, against, and agrees to hold them harmless from, any and all Losses incurred or suffered by Seller or any of the foregoing Persons (or any combination thereof) arising out of (i) any misrepresentation, breach of any representation or warranty, or failure to fulfill any covenant or agreement contained in this Agreement or in any Related Document by Purchaser; and (ii) any and all liabilities and obligations of the Company and its Subsidiaries, or arising out of or related to the ownership of the Company's assets, or operation of the Business, on or after the Closing Date.

9.4     Indemnification Exclusive Remedy.  From and after the date hereof, except in the event of fraud (in which case the Parties shall be entitled to exercise all of their rights, and seek all damages available to them, under law or in equity), the sole and exclusive remedy for any breach or failure to be true and correct, or alleged breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement or any Related Agreement, shall be indemnification in accordance with this Article IX.  Notwithstanding the foregoing, this Section 9.4 shall not operate to limit the rights of the parties to seek equitable remedies (including specific performance or injunctive relief).

9.5     Third-Party Claims.  If any third party notifies a Party (the "Indemnitee") with respect to any matter (a "Third-Party Claim") that may give rise to a claim for indemnification against the other Party (the "Indemnitor") under this Article IX, then the Indemnitee shall promptly (and in any event within ten (10) Business Days) after receiving notice of the Third-Party Claim) notify the Indemnitor thereof in writing.  The Indemnitor shall have the right at its own cost and expense and upon written notice to Indemnitee of its intent to do so delivered within ten (10) Business Days of the date it receives notice from Indemnitee, to participate in or assume control of the defense of the Third-Party Claim with counsel reasonably satisfactory to the Indemnitee; provided, however, that the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnitee, unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnitee.  If Indemnitor assumes control of the defense of a Third-Party Claim, Indemnitee shall have the right to employ counsel to represent it in connection with such Third-Party Claim at its own expense if, in Indemnitee's reasonable judgment, it is advisable for it to be represented by separate counsel; provided, however, that Indemnitee shall be entitled to participate in any such defense with separate counsel at the expense of Indemnitor if (i) so requested by Indemnitor to participate, (ii) in the reasonable opinion of counsel to Indemnitee a conflict or potential conflict exists between Indemnitor and Indemnitee that would make such separate representation advisable, or (iii) the Third-Party Claim seeks injunctive or other equitable relief that in the reasonable opinion of Indemnitee may adversely affect the Company or the Business.  Indemnitee shall have the right to control the defense of any Third-Party Claim, notwithstanding Indemnitor's election to control the defense, if it notifies Indemnitor that it is assuming the defense of, and that Indemnitor is relieved of its obligations with respect to, such Third-Party Claim, including Indemnitor's obligations under this Article IX.  Unless and until the Indemnitor assumes the defense of the Third Party Claim as provided in this Section 9.5, the Indemnitee shall use its commercially reasonable efforts to diligently pursue the defense of the Third-Party Claim.  Except as provided above, if Indemnitor does not elect to assume control of the defense of any Third-Party Claim, Indemnitee may assume control of the defense of such Third-Party Claim, and Indemnitor shall be liable for its obligations under this Article IX, and shall be bound by the results obtained by Indemnitee, with respect to such Third-Party Claim.  Indemnitor and Indemnitee each agrees to render such assistance as may reasonably be requested in order to insure the proper and adequate defense of any Third-Party Claim.  It is expressly agreed and understood that any defense by Indemnitor of any Third-Party Claims affecting or involving the Business shall not be conducted in a manner that adversely affects or impairs the operation of the Business.

9.6     Procedure for Other Claims.  In the event that any Indemnitee believes that it is entitled to claim indemnification from an Indemnitor under this Article IX and such claim is not subject to Section 9.5, the Indemnitee shall notify the Indemnitor of such claim, the amount or estimated amount thereof and the specific factual and legal basis for such claim (which will be described in reasonable detail).  The Indemnitor and Indemnitee will proceed, in good faith, to agree on the amount of such indemnification claim.  If they are unable to agree on the amount of such indemnification claim within thirty (30) days after such notice, then the Indemnitee may proceed with any remedies available to enforce such claim.

9.7     Indemnification Limits.

(a)     Purchaser shall not be entitled to indemnification pursuant to clause (i) of Section 9.2 with respect to any breach or misrepresentation of any representation or warranty until such time as its respective aggregate right to such indemnification exceeds $100,000 (the "Threshold Amount"), provided that in the event such Threshold Amount is reached and exceeded, Seller will be liable for all Losses including such Threshold Amount.  Seller's obligation to indemnify Purchaser pursuant to Section 9.2(i) shall not exceed [$5,000,000] in the aggregate (the "Cap").  Notwithstanding the foregoing, the Threshold Amount and the Cap shall not apply: (i) in the event of fraud or willful misrepresentation by Seller; (ii) to breach of the representations and warranties contained in Section 3.2 ("Due Authorization"), Section 3.3 ("No Violations"), Section 3.5 ("Capitalization"), Section 3.11 ("Employee Benefit Plans"), Section 3.12 ("Employees"), Section 3.13 ("Taxes"), Section 3.16 ("Environmental Matters") and Section 3.19 ("Undisclosed Liabilities"), or (ii) to the indemnification obligations set forth in Sections 9.2(ii) through (viii).

(b)     Any amounts payable under Section 9.2 or Section 9.3 shall be calculated after giving effect to (i) any proceeds actually received from insurance policies covering the damage, loss, liability or expense that is the subject to the claim for indemnity, and (ii) any proceeds actually received from third parties, through indemnification, counterclaim, reimbursement arrangement, contract or otherwise in compensation for the subject matter of an indemnification claim by such Indemnitee.  For the sole purpose of calculating the amount of monetary damages that Purchaser may be entitled to under this Article IX (as opposed to determining if there has been a breach of a representation or warranty), the representations and warranties of Seller shall not be deemed qualified by any references to materiality or to Material Adverse Effect.  All indemnification payments under Section 9.2 or Section 9.3 shall be deemed adjustments to the Purchase Price.

(c)     Any amounts payable under Section 9.2 or Section 9.3 shall be calculated after giving effect to (i) any proceeds actually received from insurance policies covering the damage, loss, liability or expense that is the subject to the claim for indemnity, (ii) any proceeds actually received from third parties, through indemnification, counterclaim, reimbursement arrangement, contract or otherwise in compensation for the subject matter of an indemnification claim by such Indemnitee (such arrangements referenced in clauses (i) and (ii) in this Section 9.7(c), collectively, "Alternative Arrangements").

(d)     If any such proceeds, benefits or recoveries are actually received by Purchaser or the Company with respect to any Losses after Purchaser has received any

indemnification payments from Seller, Purchaser shall promptly, but in any event no later than ten (10) Business Days after the receipt, realization or recovery of such proceeds, benefits or recoveries, pay such proceeds, benefits or recoveries to Seller. Upon making a payment to Purchaser or the Company in respect of any Losses, Seller will, to the extent of such payment and to the extent permissible, be subrogated to all rights of Purchaser or the Company pursuant to Alternative Arrangements or against any third party in respect of the Losses to which such payment relates. Purchaser shall, and shall cause the Company to, execute upon request all instruments reasonably necessary to evidence or further perfect such subrogation rights.

ARTICLE X
MISCELLANEOUS

10.1    Amendment.  This Agreement may be amended, modified or supplemented only in a writing signed by Purchaser and Seller.

10.2    Notices.  Any notice, request, instruction or other document to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given, (i) when received if given in person or by courier or a courier service, (ii) on the date of transmission if sent by confirmed facsimile, (iii) on the next Business Day if sent by an overnight delivery service, or (iv) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

If to Seller, addressed as follows:

> Revstone Transportation, LLC
> 2250 Thunderstick, Ste. 1203
> Lexington, KY 40505
> Attention: George Hofmeister
> Facsimile No.: 859-294-9568

> with a copy to:

> Revstone Transportation, LLC
> 2250 Thunderstick, Ste. 1203
> Lexington, KY 40505
> Attention: Office of General Counsel
> Facsimile No.: 859-294-9568

If to Purchaser, addressed as follows:

> DHJH Holdings LLC
> 1111 Superior Avenue, Suite 1400
> Attention: Douglas Q. Holmes and John B. Hollister III
> Facsimile No.: [_____]

> with a copy to:

-49-

Pryor Cashman LLP
7 Times Square
New York, NY
Attention: H. Lawrence Remmel
Facsimile No.:  212-798-6365

or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

10.3   <u>Waivers</u>.  The failure of a Party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

10.4   <u>Interpretation</u>.  The headings preceding the text of Articles and Sections included in this Agreement and the headings to Sections of the Disclosure Schedule are for convenience only and shall not be deemed part of this Agreement or the Disclosure Schedule or be given any effect in interpreting this Agreement or the Disclosure Schedule.  The use of the masculine, feminine or neuter gender herein shall not limit any provision of this Agreement.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.   Underscored references to Articles, Sections, Exhibits or Schedules shall refer to those portions of this Agreement.  Time is of the essence of each and every covenant, agreement and obligation in this Agreement.  Neither Purchaser nor Seller shall be deemed to be in breach of any covenant contained in this Agreement if such Party's deemed breach is the result of any action or inaction on the part of the other.

10.5   <u>Applicable Law</u>.   THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICTS OF LAW THEREOF.

10.6   <u>Binding Agreement</u>.   This Agreement and the Related Agreements shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

10.7   <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns; provided that, except as otherwise permitted by this <u>Section 10.7</u>, neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (including by operation of law) by Purchaser or, from and after Closing, the Company without the prior written consent of Seller.  For all purposes hereof, a transfer, sale or disposition of a majority of the capital stock or other voting interest of Purchaser or the Company (whether by contract or otherwise) shall be deemed an assignment hereunder.  Any purported assignment in contravention of this <u>Section 10.7</u> shall be null and void.  Each of Seller and the Company

acknowledge and consent to the collateral assignment by Purchaser of its right, title and interests in this Agreement, and acknowledge and consent to the foreclosure by any such assignee upon the membership interests purchased herewith and the exercise of the other security interests granted by Purchaser with respect to this Agreement, and any assignment of the rights and benefits of Purchaser under this Agreement to such collateral assignee or to any third party purchaser of the membership interests of Purchaser or the Company or of substantially all of the business and assets of the Company taking place in connection with the exercise of the security interests granted by Purchaser or the Company to such collateral assignee shall be permitted without the consent of Seller.

10.8    Third Party Beneficiaries.  This Agreement is solely for the benefit of the Parties hereto and no provision of this Agreement shall be deemed to confer upon third parties, either express or implied, any remedy, claim, liability, reimbursement, cause of action or other right.

10.9    Further Assurances.  Upon the reasonable request of Purchaser or Seller, each Party will on and after the Closing Date execute and deliver to the other Parties such other documents, assignments and other instruments as may be reasonably required to effectuate completely the transactions contemplated hereby, and to effect and evidence the provisions of this Agreement and the Related Agreements and the transactions contemplated hereby.

10.10    Entire Understanding.  The Exhibits and Disclosure Schedule identified in this Agreement are incorporated herein by reference and made a part hereof.  This Agreement and the Related Agreements set forth the entire agreement and understanding of the Parties hereto and supersedes any and all prior agreements, arrangements and understandings among the Parties.

10.11    Enforceability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

10.12    Jurisdiction of Disputes.    IN THE EVENT ANY PARTY TO THIS AGREEMENT COMMENCES ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION IN CONNECTION WITH OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENT OR ANY MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, WITH RESPECT TO ANY OF THE MATTERS DESCRIBED OR CONTEMPLATED HEREIN OR THEREIN, THE PARTIES TO THIS AGREEMENT HEREBY (A) AGREE THAT ANY LITIGATION, PROCEEDING OR OTHER LEGAL ACTION SHALL BE INSTITUTED IN A COURT OF COMPETENT JURISDICTION LOCATED WITHIN THE STATE OF NEW YORK, COUNTY OF NEW YORK, WHETHER

A STATE OR FEDERAL COURT; (B) AGREE THAT IN THE EVENT OF ANY SUCH LITIGATION, PROCEEDING OR ACTION, SUCH PARTIES WILL CONSENT AND SUBMIT TO PERSONAL JURISDICTION IN ANY SUCH COURT DESCRIBED IN CLAUSE (A) OF THIS SECTION 10.12 AND TO SERVICE OF PROCESS UPON THEM IN ACCORDANCE WITH THE RULES AND STATUTES GOVERNING SERVICE OF PROCESS (IT BEING UNDERSTOOD THAT NOTHING IN THIS SECTION 10.12 SHALL BE DEEMED TO PREVENT ANY PARTY FROM SEEKING TO REMOVE ANY ACTION TO A FEDERAL COURT IN THE STATE OF NEW YORK); (C) AGREE TO WAIVE TO THE FULL EXTENT PERMITTED BY LAW ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH LITIGATION, PROCEEDING OR ACTION IN ANY SUCH COURT OR THAT ANY SUCH LITIGATION, PROCEEDING OR ACTION WAS BROUGHT IN AN INCONVENIENT FORUM; WAIVER OF JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.12.

10.13  Construction.    The Parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, the language shall be construed as mutually chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

10.14  Counterparts.    This Agreement may be executed in counterparts and such counterparts may be delivered in electronic format (including by fax and email).  Such delivery of counterparts shall be conclusive evidence of the intent to be bound hereby and each such counterpart and copies produced therefrom shall have the same effect as an original.  To the extent applicable, the foregoing constitutes the election of the Parties to invoke any law authorizing electronic signatures.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**DHJH HOLDINGS LLC**

By: _____
Name: Douglas Q. Holmes
Title: Member

By: _____
Name: John B. Hollister III
Title: Member

**REVSTONE TRANSPORTATION, LLC**

By: _____
Name:
Title:

**METAVATION, LLC**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**DHJH HOLDINGS LLC**

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**REVSTONE TRANSPORTATION, LLC**

By:_____
    Name: George Hofmeister
    Title: Chairman

**METAVATION, INC.** LLC

By:_____
    Name: George Hofmeister
    Title: Chairman

**Schedule 2.4(c)**

**Excluded Receivables List**

Eptec receivables of approximately $4,000,000.

{*}●

## Schedule 5.8(d)

### Vassar Employees/ Non Transferring Employees

**Vassar Foundry Employees / Not Transferring**

| | |
|---|---|
| Carney, Robert A. | President |
| Bujalski, Paul A. | Plant Manager |
| Gilkey, Charles G. | Controller |
| Kirt, William L. | Mechanical/Continuous Improvement Engineer |
| Gosman, Vasile | Metallurgy Engineer |
| Matuszak, Eric J. | Maintenance Supervisor |
| Batoha, Joseph M. | Operations Manager |
| Cunningham, Jeffery M. | Melt/Pour Supervisor |
| Rogers, Peggy S. | HR Manager |
| Viele, David A. | Plant Supervisor |
| Porter, James J. | Layout/CAD Engineer |
| King, Richard W. | Production Control Supervisor |
| Quarles, Lesley J. | Production Supervisor |
| King, Gary L. | Supervisor |
| Keinath, Brenda S. | Materials Coordinator |
| Schaub, William P. | Electricians (facilities) |
| Elston, Douglas W. | Electricians (facilities) |
| Jones, Jason | Electricians (facilities) |
| Klouse, Aaron G. | Maint. & Repair (general) |
| Labean, Scott E. | Maint. & Repair (general) |
| Lewis, Mark E. | Maint. & Repair (general) |
| Nelson, Arnold C. | Maint. & Repair (general) |
| Sowden, Rayford D. | Maint. & Repair (general) |
| Waldie, Kurt D. | Maint. & Repair (general) |
| Phillips, Mark F. | Maint. & Repair (general) |
| Manus, Matthew J. | Furnace and Kiln Op (metals) |
| Nelson, Allan B. | Molding Machine-Set/Op/Tend |
| Hoover, Danny W. | Furnace and Kiln Op (metals) |
| Noyce, Douglas W. | Furnace and Kiln Op (metals) |
| Zarazua, Brian L. | VSR layout /gages/spc HVNP |
| Willson, Edward D. | Janitors & Building Cleaners |
| Alcala, Florentino | Furnace and Kiln Op (metals) |
| Cunningham, Jason A. | Furnace and Kiln Op (metals) |
| Decoster, Dirk M. | Furnace and Kiln Op (metals) |
| Decoster, Sidney R. | Furnace and Kiln Op (metals) |
| Reyna, Francisca C. | Security Guards |
| Morley, Nicholas S. | Furnace and Kiln Op (metals) |
| Noyce, Johnathon D. | Furnace and Kiln Op (metals) |
| Rogers, Andrew T. | Furnace and Kiln Op (metals) |
| Worden, Jeffery E. | Furnace and Kiln Op (metals) |
| Arends, Michael C. | Molding Machine-Set/Op/Tend |
| Briggs, Clark T. | Molding Machine-Set/Op/Tend |
| Clark, Brian L. | Molding Machine-Set/Op/Tend |

| | |
|---|---|
| Diggs, Reginald G. | Molding Machine-Set/Op/Tend |
| Ewald, Clinton N. | Molding Machine-Set/Op/Tend |
| Griffis, Douglas E. | Molding Machine-Set/Op/Tend |
| Gronowski, Kenneth F. | Molding Machine-Set/Op/Tend |
| Hobkirk, Kenneth A. | Molding Machine-Set/Op/Tend |
| Marr, Larry A. | Molding Machine-Set/Op/Tend |
| Roles, Harvey C. | Molding Machine-Set/Op/Tend |
| Stein, Fred W. | Molding Machine-Set/Op/Tend |
| Stein, Ryan M. | Molding Machine-Set/Op/Tend |
| Urbanowski, Edward F. | Molding Machine-Set/Op/Tend |
| Allen, Kirk L. | Molding Machine-Set/Op/Tend |
| McBride, Chris L. | Furnace and Kiln Op (metals) |
| Cox, Elwin E. | Molding Machine-Set/Op/Tend |
| Berry, Scott W. | Molding Machine-Set/Op/Tend |
| Abell, Brian | Molding Machine-Set/Op/Tend |
| Williams, Allan G. | Molding Machine-Set/Op/Tend |
| Schram, Daniel L. | Molding Machine-Set/Op/Tend |
| Elliott, Mark A. | Molding Machine-Set/Op/Tend |
| Sharko, Thomas R. | Molding Machine-Set/Op/Tend |
| Royer, Michael J. | Molding Machine-Set/Op/Tend |
| Alma, Gerald L. | Molding Machine-Set/Op/Tend |
| Foster, Rolland L. | Ind. Truck/Tractor Operators |
| Gross, Robin K. | Ind. Truck/Tractor Operators |
| Mason, Lajauana G. | Grind/Lap/Polish-Set/Op/Tend |
| Regalado, Francisco | Ind. Truck/Tractor Operators |
| Cunningham, Melvin J. | Stock Clerks |
| Kreil, Todd W. | Grind/Lap/Polish-Set/Op/Tend |
| Slosser, Christopher A. | Grind/Lap/Polish-Set/Op/Tend |
| Cunningham, Jeff R. | Grind/Lap/Polish-Set/Op/Tend |
| Geisenhaver, Todd A. | Furnace and Kiln Op (metals) |
| King, David W. | Furnace and Kiln Op (metals) |
| Kern, Joseph E. | Grind/Lap/Polish-Set/Op/Tend |
| Davis, Edward W. | Molding Machine-Set/Op/Tend |
| Zarko, Leo G. | Molding Machine-Set/Op/Tend |
| Colberg, Garth E. | Molding Machine-Set/Op/Tend |
| Sobeck, Christopher P. | Grind/Lap/Polish-Set/Op/Tend |
| Morrison, Perry | Grind/Lap/Polish-Set/Op/Tend |
| Cunningham, Deanna | Grind/Lap/Polish-Set/Op/Tend |
| King, Michael S. | Grind/Lap/Polish-Set/Op/Tend |
| Porath, Fredrick F. | Security Guards |
| McIntire, Suzanne M. | Security Guards |
| McIntire, Jessica N. | Security Guards |

DISCLOSURE SCHEDULE

TO THE

MEMBERSHIP INTEREST PURCHASE AGREEMENT

BY AND AMONG


DHJH HOLDINGS LLC

REVSTONE TRANSPORTATION, LLC


AND


METAVATION, LLC


DATED AS OF JANUARY 7, 2013

## DISCLOSURE SCHEDULE

This Disclosure Schedule accompanies and forms a part of that certain Membership Interest Purchase Agreement, dated as of January 7, 2013, by and among DHJH HOLDINGS LLC, REVSTONE TRANSPORTATION, LLC a Delaware limited liability company ("Seller") and METAVATION, LLC, a Delaware limited liability company ("Company") (the "Agreement").  Capitalized terms used herein shall have the meanings ascribed to them in the Agreement.  The information set forth in this Disclosure Schedule is subject to the following qualifications:

1. This Disclosure Schedule is qualified in its entirety by reference to the specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting, representations, warranties, covenants or agreements of Seller or Company, except as and to the extent provided in the Agreement.

2. This Disclosure Schedule and the information and disclosures contained in this Disclosure Schedule are intended only to qualify and limit the representations and warranties of Seller and Company contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any such representations, warranties or any covenants or agreements of Seller or Company.

3. No reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that (a) such item or other matter is material, (b) such item or other matter is required to be referred to or disclosed in this Disclosure Schedule, or (c) any breach or violation of applicable law or any contract, agreement, arrangement or understanding to which Seller, the Company or any of its Subsidiaries is a party exists or has actually occurred.

4. References in this Disclosure Schedule to any agreement or document include references to the exhibits, schedules, attachments and annexes to such agreement or document.

5. Disclosure of any item in any section of this Disclosure Schedule shall be deemed disclosure with respect to all other sections of the Agreement to the extent the relevance of such disclosure to such other section is reasonably apparent.

6. Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected herein.  Any additional matters are set forth for informational purposes only and this Disclosure Schedule does not necessarily include other matters of a similar nature.