IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TPOP, LLC,[1] | ) | Case No. 13-11831 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | **Related to Docket No. 471** |

### DEBTOR'S PRELIMINARY OBJECTION TO
### THE MOTION TO COMPEL IMMEDIATE PAYMENT OF
### FIRST PRIORITY SECURED CLAIM OF GENERAL MOTORS LLC

Debtor TPOP, LLC ("***TPOP***"), the debtor and debtor in possession (the "***Debtor***")

in the above-captioned chapter case, files this preliminary objection (the "***Preliminary***

***Objection***") to General Motors LLC's ("***GM***") *Motion to Compel Immediate Payment of First*

*Priority Secured Claim* [Docket No. 471] (the "***Motion to Compel***"). In support of this

Preliminary Objection, the Debtor respectfully states as follows:

### Preliminary Statement

1.     The Debtor does not owe GM anything under the "Sale Support

Agreement."[2] The Sale Support Agreement required the Debtor and certain affiliates to sell their

assets by certain dates. The applicable sales closed as intended by the parties under the Sale

Support Agreement. As a result, GM agreed to forgive its claims against the Debtor. In short,

GM received its benefit under the Sales Support Agreement, the sale of the Debtor's assets. The

---

[1] The Debtor in this chapter 11 case is TPOP, LLC f/k/a Metavation, LLC and the last four digits of the Debtor's federal tax identification numbers is 5884.  The location of the Debtor's headquarters is 230 N. Limestone St., Ste. 100, Lexington, KY  40507.

[2] The "***Sale Support Agreement***" means the *Automotive Sale Transaction Support Agreement*, dated July 18, 2013, among GM, Chrysler Group, LLC, Revstone Industries, LLC, Revstone Transportation, LLC, Contech Castings, LLC, Contech Castings Real Estate Holdings, LLC, Metavation, LLC, Metavation Mexico, LLC, Eptec S.A. De C.V., Aarkel Tool & Die Inc., Creative Lighting Solutions, LLC, and Fairfield Casting, LLC. The Sale Support Agreement was previously filed under seal by *Order Authorizing Metavation, LLC and Revstone Industries, LLC to File Under Seal Motion of Metavation, LLC and Revstone Industries, LLC for Entry of Interim and Final Orders (A) Approving Automotive Sale Transactions Support Agreement, (B) Modifying the Automatic Stay, and (C) Scheduling a Final Hearing* [Docket No. 105] (the "***Sealing Order***"). As a result, the disclosure of the Sale Support Agreement is subject to the restrictions set forth by the Sealing Order.

Debtor should now receive the benefit of GM's claim forgiveness. GM's assertions to the contrary are wrong.

2.      In addition, the Debtor believes that discovery will show that GM might have interfered with the marketing process of certain asset sales required under the Sale Support Agreement. In particular, discovery is expected to show that GM tortiously interfered with the marketing and sale process by, among other things, manipulating the financial risk rating of an affiliate of the Debtor (the sale of which was required by the terms of the Sale Support Agreement), and unjustifiably refusing to qualify potential buyers. If so, GM's actions substantially harmed the Debtor and certain affiliates. Therefore, the Debtor and its affiliates might have significant damage claims against GM.

3.      As discussed in greater detail herein, the Motion to Compel should be denied for the most basic reason –GM does not have a claim against the Debtor. Immediately after filing this Preliminary Objection, the Debtor will seek discovery from GM. After discovery is complete, the Debtor will file a comprehensive objection to the Motion to Compel.

DOCS_DE:193190.1 73864/003

**The Motion to Compel Should be Denied Because GM's Claims Are
Disputed, Unreconciled, and Overstated and GM Might Be Liable to
The Debtor or its Affiliates in An Amount Greater than Any Claim GM Might Hold**

**A. Payment of GM's Claim Is Not Necessary Because the Claims of the
PBGC Are Only Being Allowed In Connection with the Pending Settlement,
Payment will be Through a Confirmed Plan or Further Order of the Court**

4.      As discussed above and in further detail below in Sections B and C, the

Debtor does not owe GM anything under the Sale Support Agreement. Nevertheless, GM is

seeking immediate payment because it contends that under the *Motion of TPOP, LLC for Order*

*Pursuant to 11 U.S.C. Section 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving*

*Settlement Agreement with Pension Benefit Guaranty Corporation* [Docket No. 402] (the

"***Settlement Motion***") the Debtor will

> use the encumbered proceeds to settle the claim of the Pension Benefit Guaranty
> Corporation ("***PBGC***") and other junior priority creditors. The proposed
> settlement earmarks $19.256 million of the encumbered $19.64 million of sale
> proceeds to be paid to the PBGC in direct contravention of this Court's final prior
> orders . . . .

Motion to Compel ¶ 4.

5.      The Settlement Motion does not earmark proceeds that are encumbered

nor does it provide for the payment of the PBGC's claim. Instead, the Settlement Motion does

nothing more than resolve the amount of the PBGC's claim and requests the Court's allowance

of the resolved claim. The PBGC's claim is not being paid under the Settlement Motion but will

be paid in accordance with a chapter 11 plan or by further order of the Court. Even if GM had a

claim, which it does not, the relief requested by the Settlement Motion does not put any such

claim at any risk.

DOCS_DE:193190.1 73864/003

**B. The Sales Under the Sale Support Agreement**
**<u>Were for GM's Benefit and in Exchange for GM's Forgiveness of Claims</u>**

6. The Debtor and certain affiliates entered into the Sale Support Agreement

with GM and Chrysler Group, LLC ("***Chrysler***" and together with GM, the "***Customers***") for the

benefit of the Customers. The Debtor did not have sufficient liquidity to manufacture parts sold

to the Customers. The Customers were funding the Debtor and certain affiliates because they

wanted to arrange quick asset sales so that they could (a) maintain the supply of parts that were

manufactured by the Debtor and its affiliates and (b) stop funding businesses that were not

sustainable.

7. Thus, the Debtor obtained interim support from the Customers so that it

could continue manufacturing and selling parts to the Customers. During this time, the Debtor

and certain affiliates marketed and sold their assets to buyers that the Customers deemed

suitable. The buyers were able to operate the businesses and continue selling parts to the

Customers without any financial accommodations from the Customers. The sales closed. As a

result, the terms of the Sale Support Agreement require GM to forgive claims against the Debtor.

**C. The Sale Milestones & Claim Forgiveness**
**<u>Requirements Under the Sale Support Agreement</u>**

8. The terms of the Sale Support Agreement required the "sale of

Metavation's Business and the Eptec Damper Business to Dayco . . . in accordance with the

following Milestones:" (a) the execution of an asset purchase agreement by July 22, 2013, (b) the

commencement of the Debtor's chapter 11 case by July 22, 2013 (the "***Filing Date***"), (c) entry of

a bidding procedures order no later than sixteen days after the Filing Date, (d) entry of an order

authorizing the sale of Metavation's Business within sixteen days after entry of the bidding

procedures order, (e) the sales must close within four business days after entry of the sale order,

and (f) the aggregate purchase price must be equal to or greater than a specified amount (collectively, the "*Section 2.3 Milestones*"). Sale Support Agreement § 2.3(a)-(f). As reflected in the Motion to Compel, GM does not dispute that the Section 2.3 Milestones were satisfied.

9.    In addition, the terms of the Sale Support Agreement also required the "sale and transfer of each of the Operating Contech Facilities to Shiloh in accordance with the following milestones and deadlines." Sale Support Agreement § 2.4. The applicable milestones include: (a) the sale must close no later than August 3, 2013, (b) the buyer must purchase certain equipment from Chrysler and other equipment as necessary, and (c) approval of the sale and consent from the Debtor to the extent necessary (collectively, the "*Section 2.4 Milestones*" and together with the Section 2.3 Milestones, the "*Milestones*"). As reflected in the Motion to Compel, GM does not dispute that the Section 2.4 Milestones were satisfied.

10.    By complying with the Milestones, the Debtor received certain incentives in the form of cash funding, the forgiveness of claims, and the release of other non-retained claims. As to the claim forgiveness provision, the Sale Support Agreement provides the following:

> Provided that no Event of Default has occurred, and subject to (i) closing and transfer of the assets of Metavation Business and Eptec Damper Business to a Qualified Buyer, and the Operating Contech Facilities to Shiloh prior to the deadlines set forth in Section 2 above, and (ii) subject to the terms of Section 5.6 below, the Customers and Agent will forgive (a) 100% of the Metavation Participations and the Contech Participations purchased by Customers prior to May 31, 2013 (excluding the Retained Participations) and (b) the first $4,000,000 of the Post-Petition Loans advanced by Customers (excluding the Retained Participations).

Sale Support Agreement § 5.2.[3]

---

[3] Capitalized terms have the meanings used in the definition section of the Sale Support Agreement annexed hereto.

11.     In addition to the completion of the Milestones, the Debtor also complied with the distribution restrictions set forth in Section 5.6 of the Sale Support Agreement. GM does not dispute that the Debtor's performance of these conditions was completed on or prior to the deadlines set forth by the Milestones.

12.     Because the Milestones were satisfied, GM agreed that it would forgive the "Metavation Participations"[4] and $4,000,000 of the "Postpetition Loans"[5] "[p]rovided that no Event of Default has occurred" prior to the completion of the Milestones. Sale Support Agreement § 5.2. As required by Section 5.2, the Debtor was _not_ in default under the Sale Support Agreement at the time the Milestones were completed.

13.     The effectiveness of GM's forgiveness is conditioned on the closing of separate sales. Specially, the Sale Support Agreement provides that:

> The forgiveness will be effective upon the later to occur of (a) a closing of a sale of the last Business, and (b) satisfaction of the obligations in Section 7 below.

Sale Support Agreement § 5.2. Thus, GM's forgiveness was required upon the closing of the sales by the Debtor, the Eptec Damper business, and the Contech affiliate, and will become effective when the final sale closes (which is now pending). Because the Debtor was not in default at the time the Milestones were completed, GM's claims are waived when the sale of the last "Business" closes.

14.     Instead of applying the facts to the operative contractual provisions of the Sale Support Agreement, GM asserts that its claims should be paid now so that the Debtor's estate will not continue to accrue interest at a rate of $65,000 per month. GM's argument fails.

---

[4] "Metavation Participations" means participations purchased by GM and Chrysler from and after January 11, 2013 through and including the initiation of the Metavation Chapter 11 Case in accordance with the Metavation Participation Agreement.

[5] "Post-Petition Loans" means the Metavation Participations and Contech Participations purchased by Customers after June 1, 2013 and the out-of-formula portion of the financing provided under the DIP Financing Order.

6

When the final sale closes, the interest that is accruing will also be forgiven along with the underlying claims. Consequently, the harm to the Debtor's estate would be far greater by requiring the Debtor to pay a claim that is invalid or at best substantially overstated.

15.      In addition to the issues discussed above, GM contends there are other defaults under the Sale Support Agreement. However, it is not clear how GM can maintain that the Debtor did not obtain the PBGC's consent to the other sales or how a default under Section 9.1(j) of the Sale Support Agreement (PBGC's release of liens) could have occurred. The sales discussed above closed and could not have closed without the full cooperation of the PBGC. Accordingly, the Debtor was not in default under the provisions relating to the PBGC and the claim forgiveness incentives under Section 5.2 are enforceable because the Milestones were completed prior to any alleged default.

16.      GM also contends that it was entitled to $2.5 million in proceeds from the sale of the Eptec Non-Damper Business and Aarkel. Motion to Compel, n. 8. The Debtor disputes that GM was entitled to such a claim. If this claim was payable to GM, the Debtor submits there was not sufficient Eptec sale proceeds to satisfy such claim. As a result, any applicable default provision was not triggered (and in any event, would not impact the Debtor's right to forgiveness).

17.      Finally, both Chrysler and Ford (which funded Contech Castings, LLC under a separate agreement) forgave their claims in connection with the Debtor's overall settlement with them. Here, under the same facts, GM is attempting to avoid its obligations by mischaracterizing the Sale Support Agreement.

**D.  GM's Remedy Is, at most, Relief from**
   **Paying the Remaining Portion of the Sale Support Payment**

18.     GM contends that the alleged default under Section 9.1(a) (failure to comply with milestones under Section 2) relieves GM of all of the outstanding incentive obligations described in Sections 4.2, 5.2, and 10 of the Sale Support Agreement. GM is wrong. Nowhere in Section 9.1 does it say that a default relieves GM of its obligations under Section 5.2.

19.     Instead, the Sale Support Agreement expressly provides that

Upon the occurrence of an Event of Default, the Customers will have no continuing obligation to support any of the sales as provided for in Section 4 above or to provide any other funding or financial accommodations hereunder.

Sale Support Agreement§ 9.3 (emphasis added).

20.     As discussed above in Section C, the Debtor was not in default at the time the Milestones were completed. However, if the Debtor is now in default under the Sale Support Agreement, at most GM's remedy is being relieved from having to fund its share of the final sale support payment under the Section 4.2 of the Sale Support Agreement. If the claim forgiveness requirements under Section 5.2 were limited by a default after the completion of the Milestones, GM should have required a similar provision.

21.     Regardless, the Debtor believes that GM's funding obligations are enforceable. Accordingly, the Debtor reserves all rights to enforce this and all other provisions under the Sale Support Agreement.

**E.  GM Has Failed to Show or Even Allege that It Has Been Damaged**

22.     While the sale of certain other businesses has taken longer than originally contemplated, GM has not provided any evidence to support that it has been harmed by this delay. GM received the benefit of its bargain: its funding obligations were stopped, the businesses were sold, and it has continuously received parts. If GM is permitted to avoid its

8

claim forgiveness obligations under the Sale Support Agreement, GM will receive a wind-fall

through the enforcement of a liquidated damages provision that benefits GM far in excess of any

damages that it might have. Consequently, the Debtor and its estate are entitled to receive the

bargained for benefit of GM's claim forgiveness upon the closing of the remaining sales just as

GM has benefited from the termination of its funding obligation, the sale of the businesses, and

its ability to purchase parts from a new supplier.

**F.  The Debtor Might Have Affirmative Claims
     Against GM on Account of GM's Tortious Conduct**

       23.     Discovery might show that GM caused the Debtor and certain affiliates

significant damages. For example, during the due diligence phase of the sale process for the

Eptec Non-Damper Business (required under Section 2.6 of the Sale Support Agreement), GM

stopped ordering certain parts previously produced by this affiliate. When GM stopped

purchasing parts from Eptec, revenues were adversely affected. These actions might have

resulted in a decrease in the ultimate closing price from the previously proposed price from the

ultimate purchaser for the Non-Damper Business. In other instances, GM also refused to qualify

other suitable bidders of the Debtor's affiliates. By not qualifying the potential buyers, the

bidding process was less competitive and the purchase price might have been driven down. In

addition, the Debtor believes that GM unjustifiably manipulated the financial risk rating of a

certain affiliate of the Debtor, which impaired the affiliate's ability to quote on future purchase

orders to supply product to GM. The Debtor believes that this too adversely affected the

marketing and sale process. Moreover, the results of discovery might show that GM engaged in

other tortious conduct.

DOCS_DE:193190.1 73864/003

## Conclusion

24.     While it is true that the closing of one sale has not occurred, the closing of such sale was not necessary to trigger GM's initial obligation to forgive its claims. Instead, GM's initial obligation to forgive the claims was conditioned on the completion of the Milestones, which occurred as discussed in Section C above. The closing of the remaining sale is necessary to make GM's claim forgiveness effective, nothing more. GM's attempt to conflate these distinct conditions is wrong.

25.     In the end, GM should not benefit from any of the delays when it was not damaged and received the benefit of its bargain. The Debtor believes it might have claims against GM as a result of its actions in an amount that exceeds anything that might be owed to GM. Consequently, the immediate payment of GM's claim is unwarranted under the circumstances.

DOCS_DE:193190.1 73864/003

## **Reservation of Rights**

26.     The Debtor reserves all rights to supplement this Preliminary Objection or
file a further objection to the Motion to Compel prior to the objection deadline (or such other
time as may be designated by the Court) and after the Debtor obtains the discovery responses
from GM.

Dated: May 9, 2014                    PACHULSKI STANG ZIEHL & JONES LLP

                                            _/s/ Laura Davis Jones_
                                            Laura Davis Jones (Bar No. 2436)
                                            Alan J. Kornfeld (CA Bar No. 130063)
                                            David M. Bertenthal (CA Bar No. 167624)
                                            Colin R. Robinson (Bar No. 5524)
                                            919 North Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE  19899-8705 (Courier 19801)
                                            Telephone:  (302) 652-4100
                                            Facsimile:  (302) 652-4400
                                            Email:  ljones@pszjlaw.com
                                                    akornfeld@pszjlaw.com
                                                    dbertenthal@pszjlaw.com
                                                    crobinson@pszjlaw.com

                                            Counsel for Debtor TPOP, LLC

DOCS_DE:193190.1 73864/003