## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TPOP, LLC,[1] | ) Case No. 13-11831 (BLS) |
| | ) |
| Debtor. | ) **Objection Deadline: Nov. 10, 2014 at 4:00 p.m. (ET)** |
| | ) **Hearing Date: Dec. 4, 2014 at 12:00 p.m. (ET)** |

## AMENDED MOTION TO COMPEL IMMEDIATE PAYMENT OF FIRST PRIORITY SECURED CLAIM OF GENERAL MOTORS LLC

General Motors LLC ("GM"), by and through its undersigned counsel, files this *Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* (the "Motion").[2] In support of the Motion, GM respectfully states as follows:

### PRELIMINARY STATEMENT[3]

1.    As established by this Court's Final Financing Order,[4] GM holds undisputed, valid, properly perfected first priority liens and security interests in the assets and proceeds of TPOP, LLC f/k/a Metavation, LLC ("Metavation" or the "Debtor," and collectively with the debtors in jointly administered Case No. 12-13262, the "Debtors"). These liens and security interests, which no party has contested, secure critical financing extended by GM to Metavation

---

[1] The Debtor in this Chapter 11 Case is TPOP, LLC f/k/a Metavation, LLC and the last four digits of the Debtor's federal tax identification number is 5884. The location of TPOP, LLC's headquarters and the service address for the Debtor is 230 N. Limestone St., Suite 100, Lexington, KY 40507.

[2] Pursuant to the *Order Approving Stipulation* [Docket No. 684], this Motion amends Docket No. 471.

[3] Certain of the facts and circumstances surrounding this Motion are set forth in the *Declaration of Mark W. Fischer* (the "Fischer Declaration") attached hereto as Exhibit 1 and the Declaration of Steven Braithwaite, attached hereto as Exhibit 2 (the "Braithwaite Declaration").

[4] "Final Financing Order" means the *Final Order (A) Authorizing Debtor to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing Debtor to Enter Into Agreements With Wells Fargo Capital Finance, LLC, as Agent* [Docket No. 185]. The Final Financing Order incorporates as Exhibit A thereto the Ratification and Amendment Agreement (the "Ratification Agreement," attached hereto as Exhibit 3). All capitalized terms that are not otherwise defined in this Motion have the meaning provided in the Ratification Agreement.

7389995/

to support Metavation's continued operations at a time when no other sources of financing were available to Metavation. These loans enabled Metavation to maximize the value of its assets through a going-concern sale yielding more that $25 million in sale proceeds, in addition to substantial sale support incentive payments received from GM and Metavation's other major customer.

2.    GM's claims under the Final Financing Order exceed $13.2 million, and are secured by, among other assets, multiple restricted and segregated cash collateral accounts consisting of the sale proceeds of Metavation's assets and other proceeds. As interest accrues on the obligation owed to GM, and the cash necessary to satisfy GM's fully secured claim sits idle earning interest at historically low rates, the Debtor's estate is injured at an approximate rate of $50,000 per month. The Debtor's substantial and continuing delay in progressing toward a confirmable plan of reorganization without having satisfied GM's fully secured claim needlessly depletes the estate's assets.

3.    On July 18, 2013, GM, Chrysler Group LLC, Revstone Industries and certain of its subsidiaries (collectively, the "Revstone Group") executed the *Automotive Sale Transactions Support Agreement* (the "Sale Support Agreement") [filed under seal at Docket No. 19],[5] through which GM and Metavation's other major customer provided the financing described above. The Debtor described this agreement as an "integral part of a broader plan . . . that collectively will provide tangible, as well as indirect, substantial benefits and value to [the Metavation and Revstone] estates." *Amended Motion of Metavation, LLC and Revstone*

---

[5]  A copy of the Sale Support Agreement is attached hereto as Exhibit 4. Pursuant to this Court's August 7, 2013 *Order Authorizing Metavation, LLC and Revstone Industries, LLC to File Under Seal Motion of Metavation, LLC and Revstone Industries, LLC for Entry of Interim and Final Orders (A) Approving Automotive Sale Transactions Support Agreement, (B) Modifying the Automatic Stay, and (C) Scheduling a Final Hearing* [Docket No. 105], Exhibit 4 is being filed under seal, and an unredacted copy of Exhibit 4 is being served upon counsel for the Debtor, counsel for the Official Committee of Unsecured Creditors of Revstone Industries, LLC, et al. (the "Committee"), and the Office of the United States Trustee.

7389995/

*Industries, LLC Pursuant to Sections 105, 362, & 363 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9019 for Entry of Interim and Final Orders (A) Approving Automotive Sale Transactions Support Agreement, (B) Modifying the Automatic Stay, and (C) Scheduling a Final Hearing* [Docket No. 65] (the "Sale Support Motion") at p. 2. The parties negotiated the Sale Support Agreement for more than five months, and the Debtor's chief restructuring officer ("Mr. DiDonato") characterized the negotiations as "vigorous, and quite taxing and rather dynamic." Hr.'g Transcript, Aug. 22, 2013 at 27:15-20, attached hereto as Exhibit 5.

4.        In the Sale Support Motion, the Debtor acknowledged that the Sale Support Agreement reflects a reasonable balance of benefits and obligations on the Debtor. *See* Sale Support Motion at ¶31 ("While the Customers are granted certain remedies under the [Sale] Support Agreement, including, but not limited to, stay relief and the ability to seek a receivership in the event of default, the Debtors believe that providing for such remedies are appropriate given the alternative of protracted litigation, loss of sale support and other accommodations, and the potential, if not likely loss of significant value of the Businesses.").

5.        Among these obligations were the sales of certain businesses in accordance with an agreed schedule of deadlines. These milestone dates were important to GM because, among other reasons, every day that the businesses remained unsold continued a supply risk that GM desired to mitigate. Indeed, the Sale Support Agreement provided that GM would forgive certain (but not all) categories of GM's loans in return for the Debtors meeting these milestones. The importance of the milestones is reflected by the parties' agreement that the occurrence of a missed sale date, or any other "Event of Default" (as defined in the Sale Support Agreement), would relieve GM of its agreement to forgive certain of the loans GM made to the Debtor. After a contested evidentiary hearing, the Court entered the Sale Support Order (as defined below).

6.    Since entry of the Sale Support Order, the Debtors' actions (and inactions) have resulted in numerous of Events of Default, the non-occurrence of each of which was a specific condition precedent to GM's forgiveness of any of the loans.  For example, with respect to the Eptec Non-Damper Business, the Debtor missed each and every sale process milestone, failed to execute appropriate security documents, and when it did finally sell the business more than six months late, the Debtor failed to pay the excess proceeds of the sale to GM, all of which were expressly required by the Sale Support Agreement.  Similarly, with Aarkel, the Debtors failed to execute the required security documents, failed to sell the assets of the business, and did not pay the proceeds of the sale to GM.  In fact, not only did the Debtors fail to sell the Aarkel assets by the required deadline, but the Debtors undisputedly breached this requirement of the Sale Support Agreement when they instead sold the equity of Aarkel's parent, Revstone Wallaceburg Canada, Inc. ("RWCI"), and then subsequently sought to deprive GM of the proceeds relying, to GM's detriment, on the Debtors' own violation of the Sale Support Agreement.  By selling the RWCI equity, the Debtors made the required sale of the Aarkel assets impossible.

7.    The Debtors have unequivocally acknowledged many of these defaults.  At his deposition on February 11, 2014, Mr. DiDonato testified that, with respect to Eptec, "There were commitments made in a – the timeline with General Motors and Chysler to have that sold in an earlier period, and we violated that—that timeline," and that, as to Aarkel, ". . . I believe we violated the timeline there as well."  Deposition of John DiDonato, Feb. 11, 2014, 75:24 – 76:4; 76:5-8, attached hereto as Exhibit 6.  In addition, although the Debtors have acknowledged the now impossible-to-satisfy requirement in the Sale Support Agreement to sell Aarkel's assets, the Debtors instead sold the equity of RWCI (and failed to remit any proceeds to GM).  Preliminary Objection at p. 1.  For the Debtors to now, despite that testimony, take the position that "The

applicable sales closed as intended by the parties under the Sale Support Agreement," is shocking, directly contrary to their prior admissions, and contrary to undisputed facts. Preliminary Objection at p. 1.

8.      Even if, notwithstanding the mountain of irrefutable evidence of multiple Events of Default, this Court were to determine that GM is obligated to forgive certain of the loans, GM is still entitled to payment of at least $6.3 million. The Sale Support Agreement provides—and Mr. DiDonato confirmed in sworn testimony—that even if GM is obligated to forgive certain loans, a portion would nonetheless be retained and not forgiven.   These loans, defined as "Retained Participations," are also secured by the proceeds of the Metavation assets, and the Sale Support Agreement outlines in detail the method for calculating the Retained Participations.

9.      This Court has entered two final orders after contested evidentiary hearings, both of which were supported and advanced by the Debtors, and reflected many months of painstaking negotiations.   These orders contained a clear and unambiguous declaration of the parties' agreement.   The Debtors routinely breached their obligations under these agreements, and now—after reaping the benefits of both orders—seek to avoid the consequences of those breaches.   A court's final order is sacred, and this Court has spoken twice to approve and authorize the Debtors to enter into these agreements with GM. This Motion seeks nothing more than for this Court to enforce these orders and the underlying agreements in accordance with their terms.  Accordingly, as a matter of law, GM is entitled to a ruling that GM is not obligated to forgive any portion of the loans made pursuant to the Sale Support Agreement, GM is not obligated to make any further sale support payments, and GM should be repaid in full the entire loan amount of more than $13.2 million, plus all accrued interest and fees.

7389995/

### RELIEF REQUESTED

10.    GM requests that the Court order that Metavation immediately remit payment in full to GM on account of GM's valid and perfected first priority secured claim of at least $13,295,175, plus interest, fees and expenses.

### JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

12.    Pursuant to Local Rules 7008-1 and 9013-1(h), GM consents to the entry of a final order or judgment by the Bankruptcy Court, if it is determined that the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### PROCEDURAL BACKGROUND

13.    On December 3, 2012, Revstone Industries, LLC and its sister company, Spara, LLC each commenced their respective cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

14.    On July 22, 2013 (the "Metavation Petition Date"), Metavation filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

15.    On April 22, 2014, GM filed its *Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* [Docket No. 471].

16.    On May 9, 2014, the Debtor filed the *Debtor's Preliminary Objection to the Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* [Docket No. 490] (the "Preliminary Objection").

17.    On October 1, 2014, the Court entered the parties' *Stipulation Regarding Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* [Docket No. 684], which provided for GM to file this amended Motion, and pursuant to which the Debtor and GM agreed that the dispute over the Motion would take place in two stages, with (i) GM's contractual claims addressed at a preliminary hearing on December 4, 2014 following the conclusion of the briefing schedule set forth therein (the "Preliminary Hearing") and (ii) the Debtor's affirmative defenses to those contractual claims adjudicated at the Preliminary Hearing and all other matters in dispute adjudicated, if necessary, at a later date subject to a briefing schedule acceptable to the Debtor and GM.

## FACTUAL BACKGROUND

I.    **GM Holds Valid, Perfected Loans Exceeding $13.2 Million That Are Secured By All of the Assets of Metavation, Including the Escrowed Metavation Sale Proceeds**

A.    **GM's Participation in Pre-Petition Supplemental Advances**

18.    Prior to the Metavation Petition Date, Metavation was party to that certain Credit Agreement, dated as of July 23, 2010, by and among Metavation, the Non-Chapter 11 Loan Parties and the Non-Chapter 11 Borrowers, the lenders from time to time a party thereto (the "Lenders") and Wells Fargo Capital Finance, LLC, [6] as agent for the Lenders (as amended from time to time, the "Credit Agreement").[7]

19.    On April 12, 2013, Wells Fargo, GM and certain other customers of Metavation executed that certain Amended and Restated Junior Participation Agreement (the "Original Participation Agreement," attached hereto as Exhibit 7).

---

[6] Wells Fargo Capital Finance, LLC was both a lender under the Credit Agreement and agent for the Lenders. In its capacity as a lender under the Credit Agreement, Wells Fargo Capital Finance LLC is referred to herein as "Wells Fargo," and in its capacity as agent, together with any successor agent, Wells Fargo is referred to as "Agent."

[7] The Credit Agreement is too voluminous to attach to this Motion. A copy of the Credit Agreement can be obtained by request to the undersigned counsel to GM.

7389995/

20.    In accordance with the Original Participation Agreement, GM purchased a participation in Wells Fargo's interest in Supplemental Advances made to Metavation under the Credit Agreement.    Braithwaite Declaration at ¶3.    Supplemental Advances constitute Obligations (as defined in the Credit Agreement) of Metavation, the Non-Chapter 11 Borrowers and the Non-Chapter 11 Loan Parties, and are generally treated in the same manner as all other Advances (as defined in the Credit Agreement) under the Credit Agreement.

21.    As of the Metavation Petition Date, GM's participation interest in the Supplemental Advances was $8,371,444.  Braithwaite Declaration at ¶4.

**B.    GM's Participation in Post-Petition DIP Supplemental Advances**

22.    On the Metavation Petition Date, Metavation filed *Debtor's Motion Pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2 For Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing and Use Cash Collateral and (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Certain Related Relief* [Docket No. 21], which attached and incorporated the Ratification Agreement.  The Ratification Agreement amends and constitutes a part of the Credit Agreement.    Metavation and each of the Non-Chapter 11 Borrowers and the Non-Chapter 11 Loan Parties are party to the Ratification Agreement, and each such party acknowledged, ratified and confirmed:

    a.    the outstanding principal balances under the Credit Agreement as of the close of business on July 18, 2013 (Ratification Agreement § 2.1(a));

    b.    its respective obligation to be directly liable for all Obligations under the Credit Agreement (Ratification Agreement §§ 2.1(b), 2.2(a));

    c.    the valid, enforceable and perfected first priority security interests and liens upon all Pre-Petition Collateral that had previously been granted to Agent (Ratification Agreement § 2.3); and

       d.     Agent's valid, enforceable and perfected first priority security interests and liens upon all Post-Petition Collateral of Metavation (Ratification Agreement § 4).

*See* Exhibit 3.

23.     The Agent agreed under the Ratification Agreement to make DIP Supplemental Advances to Metavation. As the Debtor explained, the DIP Supplemental Advances were crucial to the Debtor's ability to sell Metavation. *Declaration of John C. DiDonato In Support of Metavation, LLC Petition and First Day Motions*, ¶ 80 [Docket No. 3] ("Without the DIP Facility . . . the Debtor [would] not have liquidity to operate its business, fund its ordinary expenditures, including paying its employees, or to pay the expenses necessary to administer the [c]hapter 11 case. Simply put, without the post-petition financing and continued use of Cash Collateral afforded by the DIP Facility, the Debtor [would] be required to cease operations and liquidate on a piecemeal basis, causing irreparable harm to the Debtor, and its estate and creditors.").

24.     Similar to the Supplemental Advances, the DIP Supplemental Advances also constitute Obligations under the Credit Agreement to be repaid by Metavation, the Non-Chapter 11 Borrowers and the Non-Chapter 11 Loan Parties. Just like the Supplemental Advances, DIP Supplemental Advances are treated in the same manner as all other Advances under the Credit Agreement. The DIP Supplemental Advances are secured by the Pre-Petition Collateral and Post-Petition Collateral owned by Metavation and its chapter 11 estate.

25.     On August 23, 2013, this Court entered the Final Financing Order. The Final Financing Order:

       a.     as to Metavation, validates the Pre-Petition Obligations as legal, binding enforceable obligations not subject to any defense (Final Financing Order ¶ D(ii));

b.    as to Metavation, validates the security interests of Agent in all of the Pre-Petition Collateral (excluding Avoidance Actions Recoveries) owned by Metavation (Final Financing Order ¶ 2.1.1);

c.    validates the security interests of Agent in all the Post-Petition Collateral (excluding Avoidance Action Recoveries) owned by Metavation (Final Financing Order ¶ 2.1.1);

d.    grants Agent allowed superpriority administrative claims pursuant to Section 364(c)(1) of the Bankruptcy Code for all post-petition obligations of Metavation under the Credit Agreement (Final Financing Order ¶ 2.2);

e.    releases all claims, demands, and liabilities against the Agent and Lenders under the Credit Agreement (Final Financing Order ¶ 4.5); and

f.    establishes a challenge deadline for any party other than Metavation to challenge the acknowledgements and findings described in subparagraphs (a), (b) and (e) of this Paragraph 17 (Final Financing Order ¶ 4.1).

### C.    Assignment of Supplemental Advances and DIP Supplemental Advances by Wells Fargo to GM

26.    Except for Supplemental Advances and DIP Supplemental Advances, all other advances under the Credit Agreement have been repaid in full, leaving the outstanding Supplemental Advances and DIP Supplemental Advances as the sole remaining unpaid advances due under the Credit Agreement. Braithwaite Declaration at ¶5.

27.    As described above, GM initially purchased a participation interest in Wells Fargo's interest in the Supplemental Advances and DIP Supplemental Advances. Effective as of October 1, 2013, Wells Fargo resigned as Agent under the Credit Agreement and contemporaneously assigned to GM all of Wells Fargo's interests in the Supplemental Advances and the DIP Supplemental Advances in the amount of $11,479,711.[8] *See Resignation of Agent Agreement and Assignment and Acceptance Agreement*, attached hereto collectively as <u>Exhibit 8</u>. Accordingly, after application of amounts received by GM subsequent to the loan assignment by

---

[8] GM has received payments of $830,098 and $534,921 subsequent to the assignment by Wells Fargo to GM.

7389995/

Wells Fargo to GM, Metavation and the Non-Chapter 11 Borrowers and the Non-Chapter 11

Loan Parties are directly indebted to GM, as of the date hereof, without defense, in the amount of

$13,295,175[9] plus accrued interest and fees permitted under the Credit Agreement.[10]

Braithwaite Declaration at ¶6.

>    **D.    Metavation Sale Proceeds Are Collateral for the Supplemental Advances and DIP Supplemental Advances**

28.    On August 30, 2014, this Court entered its *Order (I) Approving Asset Purchase*

*Agreement and Authorizing the Sale of Metavation LLC's Assets Outside of the Ordinary Course*

*of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights,*

*Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105(a), 363(b), 363(f),*

*363(m); and (III) Authorizing the Assumption, Assignment and Sale of Certain Executory*

*Contracts and Unexpired Leases Pursuant to Bankruptcy Code Sections 363 and 365; and (IV)*

*Granting Related Relief* [Docket No. 216] (the "Metavation Sale Order"), and the sale and

transfer of Metavation's assets closed on September 9, 2013.

29.    As set forth in Sections A, B and C above, in accordance with the Credit

Agreement and the Final Financing Order, the Agent held valid, first priority, properly perfected

---

9  The $13,295,175 amount consists of: (a) the $11,479,711 assigned by Wells Fargo to GM; less (b) the subsequent payments to GM of $830,098 and $534,921; plus (c) $680,484 in applicable interest; plus (d) the $2.5 million outstanding balance of Sale Support Indebtedness.  Due to rounding, the $13,295,175 amount is one dollar off from the total of the underlying amounts.

10  Revstone Industries, LLC is also an obligor to the extent provided in Section 7.2 of the Final Financing Order, which provides:

>    Nothing in this Final Order shall be deemed to increase the liability if any of Guarantor, Revstone Industries, LLC, or the recourse of Agent, Lenders and Bank Product Providers under that certain Limited Recourse Guaranty, dated as of July 23, 2010, by Revstone Industries, LLC in favor of Agent for the ratable benefit of Lenders and Bank Product Providers, which liability and recourse shall remain limited solely to the Pledged Property consisting of the membership interests currently owned by Revstone Industries LLC in Revstone Transportation, LLC.

Final Financing Order, ¶7.2.

7389995/

security interests and liens in Metavation's assets that were no longer subject to challenge or defense by Metavation or by any other party. As set forth above, all such rights were assigned to GM by Wells Fargo.

30.     The Metavation Sale Order transferred Agent's liens and security interest in Metavation's assets to the proceeds of the sale. As set forth in the Metavation Sale Order:

> The sale and assignment of the US Acquired Assets to the Purchaser will be, as of the Closing, a legal, valid and effective transfer of such assets, and each such transfer and assignment vests or will vest the Purchaser with all right, title and interest of the Debtor to the US Acquired Assets free and clear of all Liens, Claims (as defined in section 101(5) of the Bankruptcy Code), interests and encumbrances (other than Assumed Liabilities and Permitted Liens and/or except as otherwise provided in the Agreement) (collectively, "Liens, Claims and Encumbrances")) *with any Liens, Claims and Encumbrances to attach to the consideration to be received by the Debtor in the same priority and subject to the same defenses and avoidability, if any, as of the Closing.*

*See*, Metavation Sale Order ¶ S (emphasis added).

31.     The proceeds of the sale of Metavation's assets were initially paid to and held by Agent. However, on or about October 1, 2013, in connection with Agent's resignation, GM, Chrysler, Agent and Metavation agreed that net sale proceeds of $18,002,270.79 would be transferred to a segregated account (the "Sale Proceeds Account") designated by Metavation with all liens, claims and encumbrances arising under the Credit Agreement transferring to the Sale Proceeds Account in the same priority, validity, and force as existed prior to the transfer. *See Instructions for Disbursement of Proceeds of Sale of Metavation, LLC and certain Assets of Eptec S.A., de C.V. and Collected Proceeds of Accounts Receivable of Metavation, LLC* attached hereto as Exhibit 9.

7389995/

II.     **The Sale Support Agreement Does Not Obligate GM to Forgive the Loans Because the Debtor Did Not Satisfy the Conditions Precedent to Forgiveness**

   A.     **Subject to the Satisfaction of Conditions Precedent, the Debtors Could Earn Incentives Under the Sale Support Agreement.**

32.     GM, Chrysler Group LLC, and the Revstone Group executed the Sale Support Agreement on July 18, 2013.  In seeking the approval of the Sale Support Agreement, the Debtor noted the critical nature of the agreement to the Debtor's chapter 11 cases, stating that "The continued support of the Customers is absolutely vital to preserving the going value of these businesses. . . .  The Customers' support is a critical element in maintaining the going concern value of Revstone's businesses, since, without the Customers, the value of such businesses (including Metavation) could be substantially reduced, if not eliminated."  Sale Support Motion at ¶30; *see also Answering Brief of Appellees Revstone Industries, LLC and TPOP, LLC*, Case No. 1:13-cv-01468-GMS (D. Del. Dec. 19, 2013) [Docket. No. 23] (the "Debtors' Answering Brief," attached hereto as Exhibit 10) at p. 6 ("The benefits of the [Sale] Support Agreement were immediate and substantial, including (i) OEM accommodations and funding valued in the tens of millions of dollars . . . (ii) satisfaction of creditor claims at subsidiary levels, (iii) preservation of OEM relationships and going concern value, and (iv) ultimately, the result of yielding maximum value for key assets of Metavation and Revstone's estates.").[11]  Not only did the benefits of the Sale Support Agreement apply to Metavation, but they applied to a number of the Debtors' businesses. *See* Hr.'g Transcript, Aug. 22, 2013 at 32:20 – 33:2 (Mr. DiDonato) ("They apply across the Revstone Automotive businesses.  So those same protections that we

---

[11] On August 23, 2013, the Committee filed a notice of appeal of the Sale Support Order.  The appeal, docketed as Case 1:13-cv-01468-GMS in the District Court for the District Court of Delaware (the "District Court"), was fully briefed by the Debtor and Committee (including the Debtors' Answering Brief), but before the Court could render a decision, on July 24, 2014, the Committee and the Debtors stipulated pursuant to Rule 8001(c)(2) of the Federal Rules of Civil Procedure to the voluntary dismissal of the appeal, with prejudice.  On July 25, 2014, the District Court entered an Order approving the stipulation of dismissal, and the District Court closed the case.
7389995/

enjoy at Metavation are enjoyed by Arkel [sic], and Creative Lighting Solutions and Eptec, which are an essential piece of stabilizing the business and allowing going concerns to happen, going concern sales to occur."); *see also* Debtors' Answering Brief at p. 5 ("The Support Agreement was integral to maximizing the value of Metavation, Contech, Eptec, CLS, and Aarkel."). On August 23, 2013, following a contested evidentiary hearing, this Court accepted the Debtor's representation as to the critical nature of these loans in its *Final Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (A) Approving Automotive Sale Transactions Support Agreement and (B) Modifying the Automatic Stay* ("Sale Support Order") [Docket No. 184], stating "I will not substitute my judgment for the considered judgment of the debtors in this matter." Hr.'g Transcript, Aug. 22, 2013 at 135:17-18 (Shannon, J.).

33.    In accordance with the Sale Support Agreement, members of the Revstone Group could earn financial incentives to be provided by the customers by, among other actions, satisfying certain conditions precedent such as complying with sale process milestones for the prompt sale of businesses that are suppliers to GM. The incentives would not be available if the Revstone Group violated the sale process milestones or otherwise defaulted under the Sale Support Agreement. Sale Support Agreement §§ 4.2, 5.2 and 10.1; *See also* Sale Support Motion at p. 3 ("[GM] will have certain rights and remedies upon default, as described in detail below and in the Support Agreement."); Sale Support Motion at ¶22 ("Failure to meet the sale milestones will result in default."); Debtors' Answering Brief at p. 6 ("The Debtors agreed that failure to meet certain sale milestones would result in default, upon which the OEMs could withdraw their financial support and obtain the appointment of receivers for the operating businesses."); Sale Support Agreement § 9.1(a) (Stating that it is an Event of Default under the

Sale Support Agreement if the Revstone Group fails, "for any reason whatsoever," to comply with the closing date milestone relating to the sale of any automotive business).

34.    The purpose of these incentives was to support and incentivize the prompt and timely sale of the automotive businesses in accordance with the milestones. Significantly, the Debtors recognized the importance of this to GM, and informed the Court that "[p]rior to and since the Original Debtors' petition date, [GM] and other customers have expressed their concern about the Companies' viability for reasons including, but not limited to, allegations of improper conduct, and inefficient operating and financial control by prior management of the Companies, that [GM contends] adversely impacted the Companies' performance." Sale Support Motion at ¶16. Therefore, until the time when these companies were sold, GM was exposed to the constant risk associated with a financially distressed insolvent supplier, including, as Mr. DiDonato acknowledged, the threat that the Debtor would "cease operations." *Declaration of John C. DiDonato In Support of Metavation, LLC Petition and First Day Motions*, ¶ 80 [Docket No. 3]. Though solely for purposes of adjudicating issues at the Preliminary Hearing, GM stipulated that GM did not suffer any monetary damages as a result of the Debtor's failure to meet the obligations set forth in the Sale Support Agreement,[12] GM was adversely impacted by the Debtor's failure to timely sell the businesses.

35.    Given the importance of these milestones to GM, the incentives for reaching such milestones included GM's agreement to: (a) pay to Metavation incentive-based payments referred to collectively as the Sale Support Payment; (b) forgive a portion of the Supplemental Advances and DIP Supplemental Advances; and (c) release all other claims by GM except

---

[12] GM's stipulation does not include damages incurred by GM as a result of the Revstone Group's alleged failure to repay the Supplemental Advances, DIP Supplemental Advances, Retained Participations, and/or Sale Support Indebtedness (and any alleged related interest or fees).

7389995/

certain retained claims.    Each milestone was an independent condition precedent to GM's agreement, and upon the occurrence of any Event of Default, GM was relieved of any obligation to provide the aforementioned incentives.  Sale Support Agreement at §5.2.

### B.    The Conditions Precedent Did Not Occur Because the Debtors Missed Milestones and Multiple Events of Default Occurred

36.    The Debtors defaulted on more than ten separate obligations under the Sale Support Agreement by materially and deliberately missing key milestone dates, including, but not limited to, the following, many of which have been acknowledged by the Debtors:

| Requirement/Milestone | Event of Default | Acknowledgement by Debtors |
|---|---|---|
| Delivery of written certification to GM by Revstone's Chief Restructuring Officer of certain information.    Sale Support Agreement §1.2(a). | Never delivered to GM.[13] | The Debtors knew that George Hofmeister had misappropriated funds from the employee health plan that had partially been funded by GM. |
| Obtaining certain loans from its lender on or around August 1, 2013. | Loans not obtained, thereby exceeding the Debtor's budget and forcing GM to permanently fund more than necessary. | Memorandum titled "Metavation – DIP Budget Update – Results through Week Ending 8/3/2013," attached hereto as Exhibit 11 (the "Budget Update") at p. 1 ("Metavation's inability to draw [REDACTED] has cause [sic] [REDACTED] to increase [REDACTED]."). |
| Compliance with DIP budget. | Budget violation during week of August 5, 2013 | *Id.* |
| Delivery to GM of a fully-executed security agreement and mortgage relating to the Eptec Non-Damper business.    Sale Support Agreement §1.2(b). | Never delivered to GM.[14] | |

---

[13] Fischer Declaration at ¶3.

[14] Fischer Declaration at ¶4.
7389995/

| | | |
|---|---|---|
| Closing the sale of the Eptec Non-Damper Business by September 6, 2013. Sale Support Agreement §2.5(f). | Sale closed on March 6, 2014, more than six months after the deadline. | "There were commitments made in a – the timeline with General Motors and Chysler to have that sold in an earlier period, and we violated that—that timeline . . ." Deposition of John DiDonato, Feb. 11, 2014, at 75:24 – 76:4 |
| Payment to GM of the proceeds of the Sale of the Eptec Non-Damper Business. Sale Support Agreement §5.4. | Never paid to GM.[15] | |
| Obtain the PBGC's consent to the sale of the Eptec Non-Damper Business free and clear of any liens and interests of the PBGC by August 16, 2013.    Sale Support Agreement §2.9. | Consent not timely obtained.[16] | |
| Delivery to GM of a fully-executed security agreement and mortgage relating to the Aarkel business.    Sale    Support Agreement §1.2(b). | Never delivered to GM.[17] | |
| Execute a binding Asset Purchase Agreement to sell the Aarkel assets by no later than August 7, 2013.  Sale Support Agreement §2.7(c) | The Debtors sold the equity of Aarkel's parent, RWCI.  Thus, the Debtor did not, and now cannot, sell the assets of Aarkel. | "The Sale Support Agreement required the Debtor and certain affiliates to sell their assets by certain dates."    Preliminary Objection at p. 1.<br><br>"So [GM] knew this transaction, they knew that it was an equity transaction."    Hr'g Transcript, Oct. 1, 2014 at 9:4-5 (Ms. Davis Jones), attached hereto as Exhibit 12. |
| Closing the sale of the Aarkel Business by September 6, 2013. Sale Support Agreement §2.7(e). | Sale of the RWCI equity closed on July 4, 2014. | ". . . I believe we violated the timeline there as well." Deposition of John DiDonato, Feb. 11, 2014, at p. 76:5-8. |

---

[15] Fischer Declaration at ¶5.

[16] Fischer Declaration at ¶6.

[17] Fischer Declaration at ¶7.

7389995/

| | | |
|---|---|---|
| Payment to GM of the proceeds of the Sale of the Aarkel Business.[18] Sale Support Agreement §5.4. | Never paid to GM.[19] | ". . . GM had no liens that attached to the [proceeds from the sale of the RWCI Shares];"[20] *see also Order Approving Debtor Revstone Industries, LLC's Motion for Order (A) Authorizing Release of Segregated Sale Proceeds Resulting from Sale of the Debtor's Equity Interest in Revstone Wallaceburg Canada, Inc. Outside the Ordinary Course of Business; (B) and Granting Related Relief* [Docket No. 1781]. |
| Obtain the PBGC's consent to the Aarkel sale by September 22, 2013.   Sale Support Agreement §2.9. | Consent not timely obtained.[21] | |

The Revstone Group did not obtain from GM a waiver or extension of any of the deadlines or requirements that led to the Events of Default set forth above, and GM did not waive any such Events of Default.  To the contrary, GM notified the Revstone Group on several occasions of the occurrence of the Events of Default.  *See* Aug. 10, 2013 e-mail from Mark Fischer to Laura Marcero and others, attached hereto as Exhibit 11; Oct. 21, 2013 correspondence attached hereto as Exhibit 13; March 18, 2014 correspondence attached hereto as Exhibit 14.

37.     Because of the Events of Default, under the plain terms of the Sale Support Agreement GM is not obligated to forgive any of the Supplemental Advances or the DIP Supplemental Advances, GM is not obligated to make any further Sale Support Payments to

---

18 The Sale Support Agreement defines "Business" as "the business and operations and *all assets* whether now owned or hereafter acquired of each of Metavation, the Eptec Damper Business, the Eptec Non-Damper Business, Contech, CLS, and Aarkel."  Sale Support Agreement at Appendix of Defined Terms ¶I (emphasis added).

19 Fischer Declaration at ¶8.

20 *Debtor Revstone Industries, LLC's Motion for Order (A) Authorizing Release of Segregated Sale Proceeds Resulting from Sale of the Debtor's Equity Interest In Revstone Wallaceburg Canada, Inc. Outside the Ordinary Course of Business; (B) And Granting Related Relief* [Revstone Docket No. 1750] at ¶18.

21 Fischer Declaration at ¶9.

7389995/

Metavation, and GM is not obligated to release claims against the Revstone Group.    Mr.

DiDonato admitted in sworn testimony that the Debtors violated the conditions precedent:

> Q: Mr. DiDonato, under the sale support agreements that you have with
> the customers or that Metavation has with its customer General Motors
> and Chrysler, are there obligations by General Motors and Chrysler to
> provide additional funding to Metavation?
>
> A: There are conditional obligations.
>
> Q: What are the conditions to those obligations?
>
> A: There is a multitude of conditions which needed to be satisfied.  Some
> of which were delivering sales at certain milestones, which the debtor has
> not complied with.

Deposition of John DiDonato, Feb. 11, 2014, at 107: 21 – 108:9.  *See also* Sale Support Motion

at p. 17 ("Upon an Event of Default, Customers are no longer obligated to support sales of

Businesses or provide any other funding or financial accommodations and are entitled to enforce

the Receivership Order.") (*citing* Sale Support Agreement at §§ 9.3, 9.5).  Mr. DiDonato echoed

this at the hearing to approve the Sale Support Motion, when he testified (in response to a

question about the second sale support payment) that "[The Customers] are not going to release a

significant portion of the customer support consideration indeed until all the sales are

accomplished." Hr.'g Transcript, Aug. 22, 2013 at 41:1-3.

**III.    Even if GM Is Obligated to Forgive the Loans, the Sale Support Agreement
Obligates the Debtor to Pay to GM the Retained Participations**

38.    The Sale Support Agreement also provided that certain payments made by GM

were not subject to forgiveness under any circumstances.  At the hearing to approve the Sale

Support Motion, Mr. DiDonato made this clear:

> Q: With respect to GM and Chrysler, how much are they funding in the
> tens of millions of dollars' range post-Metavation filing?
>
> A: Approximately $10 million.

7389995/

Q: And how much of that is being forgiven?

A: Approximately $5 million.

Q: How is the rest of it being treated?

A: As a junior participation that would be retained.  I think it's referred to as a retained participation in the agreement.

Hr.'g Transcript, Aug. 22, 2013 at 65:1-10.

39.    Section 5.3 of the Sale Support Agreement provides that notwithstanding anything in the Sale Support Agreement to the contrary, the Retained Participations will not be forgiven.  As of the date hereof, $6,302,130[22] in Retained Participations remain owing by the Debtors to GM as follows:

| Section | Retained Participation | Amount Outstanding[23] |
|---------|------------------------|------------------------|
| 5.3(a) | Participation interests purchased by either Customer from Agent under the Credit Agreement or any other funding provided to Metavation or Contech necessitated by any change made at any time after January 11, 2013 in the Borrowing Base or as a result of the exercise of discretion afforded to Agent under the Credit Agreement that, directly or indirectly, reduces or eliminates the amount of any Advances or Revolver Commitments that are available under the Credit Agreement, including by way of example only, changes in definitions, interpretation or application of Eligible Accounts, Eligible Inventory, Availability Block, Overadvance, or reserves under Section 2.1(c) of the Credit Agreement. | $1,706,500 |
| 5.3(d) | The outstanding balance of the Post-Petition Loans that are not forgiven under Section 5.2 of the Sale Support Agreement. | $1,848,765 |
|  | Interest applicable to the above amounts. | $246,864 |
| 5.3(d) | The outstanding balance of GM's share of the Sale Support Indebtedness. | $2,500,000 |

Sale Support Agreement §5.3.

---

22  Due to rounding, the $6,302,130 amount is one dollar off from the total of the underlying amounts.

23  Braithwaite Declaration at ¶7.

7389995/

40.     GM demanded payment in full from the Revstone Group of all amounts due under the Credit Agreement, but GM has not received payment. *See* March 18, 2014 correspondence attached hereto as Exhibit 14.

41.     Based on the foregoing, GM is the sole holder of a properly perfected, first priority lien, claim and security interest in the Sale Proceeds Account securing the outstanding balance of Supplemental Advances, DIP Supplemental Advances and all other Obligations under the Credit Agreement equal to at least $13.2 million, plus interest, fees and expenses.

## LEGAL BASIS FOR RELIEF

**A.      The Plain Language of the Sale Support Agreement Requires Payment of GM's Secured Claims**

42.     Pursuant to the Sale Support Agreement, as approved by a final order of this Court, GM is not required to forgive its loans if any Event of Default occurs.   Section 5.2 of the Sale Support Agreement makes this clear, stating that the non-occurrence of any event of default is a condition precedent to GM's forgiveness:

> *Provided that no Event of Default has occurred*, and subject to (i) closing and transfer of the assets of Metavation Business and Eptec Damper Business to a Qualified Buyer, and the Operating Contech Facilities to Shiloh prior to the deadlines set forth in Section 2 above, and (ii) subject to the terms of Section 5.6 below, the Customers and Agent will forgive (a) 100% of the Metavation Participations and the Contech Participations purchased by Customers prior to May 31, 2013 (excluding the Retained Participations) and (b) the first $4,000,000 of the Post-Petition Loans advanced by Customers (excluding the Retained Participations). Notwithstanding anything herein to the contrary, Customers will have no obligation to fund more than $9,000,000 of Post-Petition Loans through the expiration of the Funding Period, excluding the Vassar Operating Budget and Vassar Wind-Down Budget. *The forgiveness will be effective upon the later to occur of (a) a closing of the sale of the last Business,* and (b) satisfaction of the obligations in Section 7 below. All in-formula loans, if any, made under the DIP Financing Order will be repaid in full at the closing of the Metavation Sale.

Sale Support Agreement at §5.2 (emphasis added).

43.     As set forth in the chart in paragraph 36 herein, the Debtor's actions (or inactions) have resulted in more than ten Events of Default under the Sale Support Agreement. Under the plain language of the Sale Support Agreement, the non-occurrence of any Event of Default is a condition precedent to GM's forgiveness of its loans, and therefore GM is not required to forgive such loans, and is entitled to payment in full of its secured claims

44.     Finally, because the Debtor sold the RWCI shares instead of the assets of Aarkel, it is impossible for the Debtor to close a sale of the Aarkel Business, as "Business" is defined as "the business and operations and *all assets* whether now owned or hereafter acquired of . . . Aarkel." Sale Support Agreement at Appendix of Defined Terms ¶I (emphasis added). The Debtor recognized this in the Preliminary Objection, stating that "The Sale Support Agreement *required the Debtor and certain affiliates to sell their assets by certain dates*." Preliminary Objection at ¶1 (emphasis added). Despite this requirement, the Debtor made clear to this Court that it sold the RWCI Shares and not the Aarkel assets:

> So [GM] knew this transaction, they knew that it was an equity transaction. Your Honor, the fact that people are now, after the fact, having a little buyers' remorse that they don't have a lien, and I really don't wanted (sic) to keep harping on that, but it's not our issue here, Your Honor, and not one that I can fix.

Hr'g Transcript, Oct. 1, 2014 at 9:4-10 (Ms. Davis Jones). By admittedly selling the RWCI equity, the Debtor is now unable to sell the Aarkel assets, and even if there were no other Events of Default by the Debtor under the Sale Support Agreement, GM's forgiveness of its loans could never be effective.

7389995/

**B.    Distributions to a Secured Creditor Outside of a Plan Are Permissible**

45.    Proceeds from the sale of a secured creditor's collateral are routinely distributed to the secured creditor *outside of a plan*, where, as is the case here, such distribution will not impact the debtor's reorganization. *In re San Jacinto Glass Indus., Inc.,* 93 B.R. 934, 942-43 (Bankr. S.D. Tex. 1988) (finding no reason shown to delay secured creditor's receipt of proceeds of sale of assets in which it has undisputed priority claim and noting that disbursement of funds to secured creditor would not "materially dictate the terms of the debtor's reorganization nor otherwise endanger the creditor protections available to" the objecting unsecured creditor); *In re Industrial Office Bldg. Corp.,* 171 F.2d 890, 892-93 (3d Cir. 1949) (case under Chapter X of former Bankruptcy Act, holding that statute did not preclude "giving creditors the benefit of their contract rights to the extent that this may be accomplished consistently with the preservation of the going concern value of the real estate when reorganization is contemplated" and objecting parties "failed to show either that the payment contemplated would render reorganization impractical or not feasible").

46.    In other cases, including several in the Delaware bankruptcy court, the authority of *San Jacinto Glass* and *Industrial Office Bldg. Corp.* has been followed to permit secured lenders to be paid from the proceeds of the sale of their collateral in advance of confirmation of a plan. *See e.g., In re: Flying J, Inc., et al.,* Case No. 08-13384(MFW) (Bankr. D. Del July 27, 2009; Docket No. 1578]; *In re Avado Brands, Inc.,* No. 07-11276 (MFW), 2007 WL 4994670, ¶5 (Bankr. D. Del. Dec. 10, 2007) (order approving 363 sale and directing, upon closing of sale, immediate payment according to terms of prior order approving debtor-in-possession financing); *In Re Decora Indus., Inc.,* No. 00-4459 (JJF), 2002 WL 32332377, at *7, ¶9 (Bankr. D. Del. May 17, 2002) (order approving 363 sale and directing immediate payment of debtor-in-possession

financing obligations upon closing). *See also In re Kellstrom Indus., Inc.,* 282 B.R. 787, 794 (Bankr. D. Del. 2002) (while approving debtor's sale of certain goods free and clear of a secured creditor's reclamation rights under 11 U.S.C. § 363(f)(5), the court conditioned such approval on adequate protection to the secured creditor in the form of payment in full in cash); *In re: Whittemore,* 37 B.R. 93 (Bankr. D. Or. 1984) (proceeds of sale could not be used to pay off second priority secured position before paying first priority position in full).

47.    The same factual background and legal reasoning that has previously supported payment of secured creditors outside of a plan of reorganization, in instances where their collateral has been sold free and clear of liens with such liens transferring to proceeds, is present in the Metavation chapter 11 case. In particular, GM, has an undisputed valid, enforceable and perfected first priority security interest in the Sale Proceeds Account that is subject to a written subordination agreement with the PBGC.

48.    Substantially all of Metavation's assets have been sold, this case is a liquidation, and this Court has already prohibited the Debtor's use of Cash Collateral or other proceeds from the sale or disposition of any assets of the Debtor. Final Financing Order at ¶2.6.1. Further, the Debtor has irrevocably waived any right that it may have otherwise had to seek authority "to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full in satisfaction of all Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the Ratification Agreement." Final Financing Order at ¶4.2(iv). Therefore, the sale proceeds are not necessary to the Debtor's continued operations or to an effective reorganization and no party is harmed by the immediate distribution to GM.

49.     Any further delay would only increase the interest to be paid to GM and thereby further deplete assets of the estate. *See, e.g., Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.)*, 356 B.R. 585, 597 (S.D.N.Y. 2007) (upholding order authorizing debtors to prepay First Priority Senior Secured Notes over objections of indenture trustee on the principal ground that "repayment of the outstanding principal of the Notes stopped the unnecessary loss of funds from debtors' estates"); *United States ex rel. Rural Electrification Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n)*, 167 B.R. 885, 889 (S.D. Ind. 1994) (finding that bankruptcy court directly determined that substitution of secured debt under section 363 would benefit debtor by lowering its debt service obligations).

50.     In this case, the Debtor should want to repay GM as quickly as possible.  Interest is accruing on the Debtor's obligations to GM at a rate of $50,000 per month, while the cash necessary to satisfy GM's fully secured claim is earning interest at historically low rates.[24] Accordingly, the Debtor's substantial and continuing delay in progressing toward a confirmable plan of reorganization without having satisfied GM's fully secured claim is needlessly depleting the estate's assets.

**C.     GM's Secured Claims are Not Subject to Set-Off or Counterclaims**

51.     None of GM's secured claims for which repayment is sought through this Motion are subject to set-off or counterclaim.

52.     Section 2.1(a) of the Ratification Agreement establishes that certain amounts are unconditionally due and owing by the Debtor to GM, without offset, defense or counterclaim of any kind, nature and description whatsoever:

---

[24] Meanwhile, the Debtor's (and Committee's) efforts to litigate a straightforward obligation have caused, and continue to cause, GM to incur legal fees and expenses, all of which are obligations to be paid by the Debtor to GM.
7389995/

> Each Borrower hereby acknowledges, confirms and agrees that, as of the close of business on July 18, 2013, Borrowers are indebted to Agent, the Lender Group and each of the Bank Product Providers in respect of all Pre- Petition Obligations in the aggregate principal amount of not less than $17,040,973.45, consisting of . . . (ii) Supplemental Advances in the aggregate principal amount of not less than $12,230,986.00, together with all interest accrued and accruing thereon . . . and (v) other charges now or hereafter owed by Borrowers to Agent, the Lender Group and each of the Bank Product Providers, *all of which are unconditionally owing* by Borrowers to Agent, the Lender Group and each of the Bank Product Providers, *without offset, defense or counterclaim of any kind, nature and description whatsoever.*

Ratification Agreement at §2.1(a) (emphasis added).

53.    Further, Section 4.5 of the Final Financing Order takes this a step further, with the Debtor releasing GM from any and claims that may have existed on or before the date of such order:

> Subject to the rights of other parties as expressly set forth in Section 4.1 above, in consideration of Agent, Lenders and Bank Product Providers making post-petition loans, advances and providing other credit and financial accommodations to the Debtor pursuant to the provisions of the Loan Documents and this Final Order, Debtor, on behalf of itself and its successors and assigns, (collectively, the *"Releasors"*), shall forever release, discharge and acquit each Agent, each Lender, each Bank Product Provider and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (collectively, the *"Releasees"*) of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, *of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses,* that Releasors had, have or hereafter can or may have against Releasees *as of the date hereof, in respect of events that occurred on or prior to the date hereof* with respect to the Debtor, the Obligations, the Loan Documents and any Advances, DIP Supplemental Advances, Letters of Credit or other financial accommodations made by Agent, Lenders and Bank Product Providers to Debtor pursuant to the Loan Documents. . . .

Final Financing Order at §4.5 (emphasis added).[25]

---

[25] Section 4.1 of the Final Financing Order, as referenced in Section 4.5 of the Final Financing Order, pertains to any objections timely filed and pursued by any Committee, making that provision inapplicable to this analysis as no such objections are pending.

7389995/

54.    Finally, the Resignation of Agent Agreement again confirms the release of all

claims against GM:

> Effective on the date on which each of the conditions set forth in Section 7 has
> been satisfied, the Resigning Agent hereby resigns as the Agent, Issuing Lender
> and Swingline Lender under the Credit Agreement and the other Loan Documents
> and, except as otherwise provided in Sections 3 and 5 hereof, shall have no further
> rights, powers, privileges and duties under the Loan Documents. The parties
> hereto agree that (a) New Lenders shall bear no responsibility or liability for (i)
> any liabilities or obligations arising from any act or omission of the Resigning
> Agent on or prior to the effective date of this Resignation Agreement or (ii) any
> event, circumstance, condition, or action, *existing on or prior to the effective date
> of this Resignation Agreement*, with respect to the Collateral, the Credit
> Agreement, or any other Loan Document, or the transactions contemplated
> thereby . . .

Resignation of Agent Agreement at §2 (emphasis added).

55.    These court-approved provisions make clear that the Debtor has no good-faith

basis to allege claims, defenses, or offsets in an attempt to impede GM's right to immediate

repayment of its first priority secured claim.  If, however, the Debtor alleges any counterclaims

or affirmative defenses that would give rise to such a set-off, the Final Financing Order precludes

such claims from being raised in response to this Motion.[26]

## NOTICE

56.    Notice of this Motion has been provided by first-class mail or electronically, as

appropriate, to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office

of the United States Trustee; (b) counsel for the Debtor; (c) counsel to the Committee in the

Revstone case; (d) the PBGC; and (e) those parties that have requested service under Bankruptcy

Rule 2002.

---

[26] If the Debtor ultimately alleges any affirmative claims against the GM, there may be issues regarding the appropriate forum for such claims.  GM expressly reserves the right to separately address all issues of jurisdiction, venue, and other applicable defenses.

7389995/

## CONCLUSION

WHEREFORE, for the foregoing reasons, GM respectfully requests that this Court enter an Order substantially in the form of attached Exhibit 15: (i) ordering and directing immediate payment in full to GM from the Metavation Sale Proceeds Account in an amount sufficient to fully pay and satisfy the secured claim of GM, in the amount of at least $13,295,175, together with interest thereon accruing to the date of payment in full of GM's secured claim, fees and expenses; and (ii) granting to GM such further and other relief as may be just and appropriate in the circumstances.

Dated:  October 20, 2014

MORRIS JAMES

Jeffrey R. Waxman (DE Bar No. 4159)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
Telephone: (302) 888-6800
Email: jwaxman@morrisjames.com

-and-

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Lawrence J. Murphy (admitted *pro hac vice*)
Scott B. Kitei (admitted *pro hac vice*)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
Telephone:  (313) 465-7560
Facsimile:  (313) 465-7561
Email:  lmurphy@honigman.com

*Counsel for General Motors LLC*

15783398.12