IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TPOP, LLC,[1] | ) | Case No. 13-11831 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

_____

**DISCLOSURE STATEMENT IN RESPECT OF DEBTOR'S
CHAPTER 11 PLAN OF LIQUIDATION**
_____

**IMPORTANT DATES**

- Date by which Ballots must be received: **February 20, 2015 at 5:00 p.m. (prevailing Eastern time)**

- Date by which objections to Confirmation of the Plan must be filed and served: **February 20, 2015 at 4:00 p.m. (prevailing Eastern time)**

- Hearing on Confirmation of the Plan: **March 5, 2015 at 10:00 a.m. (prevailing Eastern time)**

Dated: January 20, 2015

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400

Counsel for the Debtor and Debtor in Possession

---

[1] The last four digits of the Debtor's federal tax identification numbers is 5884.  The location of the Debtor's headquarters is Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084.

# TABLE OF CONTENTS

<div align="right"><strong>Page</strong></div>

I. PREFATORY STATEMENT AND DEFINITIONS ................................................................. 1
II. INTRODUCTION AND OVERVIEW ................................................................................... 1
    A.      Introduction ................................................................................................................... 1
    B.      Disclaimers ................................................................................................................... 2
    C.      An Overview of the Chapter 11 Process ...................................................................... 3
    D.      Plan Overview ............................................................................................................... 3
    E.      Voting on the Plan ........................................................................................................ 7
            1.      Who May Vote .................................................................................................. 7
            2.      How to Vote ...................................................................................................... 8
    F.      Confirmation of the Plan .............................................................................................. 8
            1.      Generally ........................................................................................................... 8
            2.      Objections to Confirmation .............................................................................. 8
            3.      Hearing on Confirmation .................................................................................. 9
III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTOR .............................. 9
    A.      General Description of Debtor's Operations and Assets .............................................. 9
    B.      Corporate/Organizational Structure ........................................................................... 10
    C.      Debtor's Liabilities .................................................................................................... 11
            1.      In General ........................................................................................................ 11
            2.      Prepetition Credit Facility Obligations .......................................................... 11
            3.      Pension Related Obligations ........................................................................... 12
    D.      Circumstances Prior to the Commencement of the Chapter 11 Case ......................... 13
            1.      In General ........................................................................................................ 13
            2.      Negotiations with OEMs ................................................................................ 13
            3.      Entry into APA with Stalking Horse Purchaser and Commencement of the
                    Case ................................................................................................................. 14
    E.      Significant Events Since the Petition Date ................................................................ 14
            1.      First Day / Initial Motions .............................................................................. 14
            2.      Sale/Auction Procedures and Approval/Consummation of Sale .............. 18
            3.      Sale Support Agreement ................................................................................. 19
            4.      Retention/Employment Matters ..................................................................... 20
            5.      Revstone Committee's Motion to Prosecute Certain Claims .................. 22
            6.      No Committee Formation ................................................................................ 22
            7.      Motions to Convert Debtor's Case ................................................................. 22
            8.      Initial PBGC Settlement and Subsequent Global Settlement .................. 22
            9.      Motion for Approval of Plant Closing Agreement and Non-Union
                    Employee Agreements, and Sale of Vassar Foundry Machinery/Equipment
                    ......................................................................................................................... 24
            10.      Hofmeister Children's Trusts' Motion for Responsible Person in Debtors'
                    Cases ............................................................................................................... 24
            11.      Sale of De Minimis Assets ............................................................................. 25
            12.      General Motors Motion for Payment .............................................................. 25
            13.      Fee Examiner .................................................................................................. 26

<div align="center">i</div>

14.     Bar Date for Filing Proofs of Claim and Administrative Expense Requests ................................................................................................................... 27
15.     Filing of Schedules and Statements of Financial Affairs......................... 27
16.     Extension of Debtor's Exclusivity Periods ................................................ 27
17.     Rejection of Executory Contracts; Extension of Time to Assume/Reject Real Property Leases.................................................................................. 28
18.     Removal of Actions .................................................................................... 28

IV. DESCRIPTION OF THE PLAN .................................................................................... 29

A.     Treatment of Administrative Expenses, Tax Claims and DIP Financing Claims. 29
     1.     Introduction................................................................................................ 29
     2.     DIP Financing Claims................................................................................ 29
     3.     Administrative Expenses ........................................................................... 30
     4.     Tax Claims ................................................................................................. 30

B.     Classification and Treatment of Classified Claims and Interests ........................ 31
     1.     Summary .................................................................................................... 31
     2.     Classification and Treatment of Claims and Interests ............................... 31

C.     Acceptance or Rejection of Plan......................................................................... 34
     1.     Identification of Unimpaired Classes......................................................... 34
     2.     Identification of Impaired Classes ............................................................. 34
     3.     Classes Permitted and Not Permitted to Vote........................................... 34
     4.     Effect of Non-Voting ................................................................................. 35
     5.     Nonconsensual Confirmation..................................................................... 35
     6.     Postpetition Interest ................................................................................... 35

D.     Means for Implementation of the Plan................................................................ 35
     1.     PBGC Settlement ....................................................................................... 35
     2.     Continued Corporate Existence and Vesting of Assets ............................. 35
     3.     Corporate Action; Winding Up of Affairs ................................................ 36
     4.     Plan Administrator ..................................................................................... 37
     5.     Source of Funding...................................................................................... 38
     6.     Retained Rights of Action of the Debtor ................................................... 39
     7.     Interests in Affiliates and Subsidiaries ..................................................... 39
     8.     Payment of Plan Expenses ......................................................................... 39
     9.     Ultimate Dissolution of Debtor; Final Decree .......................................... 39
     10.    Records ...................................................................................................... 40

E.     Treatment of Executory Contracts and Unexpired Leases ................................. 40
     1.     Rejection of Executory Contracts and Unexpired Leases.......................... 40
     2.     Bar Date for Rejection Damages ............................................................... 40

F.     Distributions and Related Matters ...................................................................... 41
     1.     Dates of Distribution.................................................................................. 41
     2.     Cash Distributions...................................................................................... 41
     3.     Rounding of Payments ............................................................................... 41
     4.     Disputed Claims......................................................................................... 41
     5.     Undeliverable and Unclaimed Distributions............................................. 42
     6.     Compliance with Tax Requirements.......................................................... 42
     7.     Record Date in Respect to Distributions.................................................... 42
     8.     Reserves .................................................................................................... 43

ii

G.     Litigation, Objections to Claims, and Determination of Taxes ............................ 43
     1.     Litigation, Objections to Claims, and Objection Deadline ....................... 43
     2.     Temporary or Permanent Resolution of Disputed Claims ....................... 43
     3.     Setoffs .................................................................................................. 44
     4.     Preservation of Retained Rights of Action ............................................ 44
H.     Releases, Injunctions and Exculpation Provisions ............................................. 45
     1.     Injunctions ............................................................................................ 45
     2.     Exculpation ........................................................................................... 45
     3.     Debtor's Release of CRO, Independent Managers, and Other Parties ..... 46
     4.     Release by Creditors ............................................................................. 46
     5.     Release by Debtor's Non-Debtor Affiliates of the Released Debtor Parties
                                  ........................................................................................................... 47
     6.     No Discharge ......................................................................................... 47
I.     No Regulated Rate Change Without Government Approval ................................. 47
J.     Exemption from Certain Transfer Taxes ........................................................... 47
K.     Retention of Jurisdiction .................................................................................. 48
L.     Services By and Fees for Professionals and Certain Parties; Bar Date for
     Administrative Expenses .................................................................................. 48
M.     Non-Voting Equity Securities ........................................................................... 49
N.     Subordination Agreements ................................................................................ 49
O.     No Waiver ......................................................................................................... 49
P.     U.S. Trustee Fees .............................................................................................. 49
Q.     Preservation of Insurance .................................................................................. 49
R.     Waiver of Stay .................................................................................................. 50
S.     Conditions to Effective Date and Effects of Confirmation ................................. 50
T.     Modification or Withdrawal of Plan and Disclosure Statement .......................... 50
V. REQUIREMENTS FOR CONFIRMATION ................................................................. 51
A.     Acceptances Necessary to Confirm Plan ........................................................... 51
B.     Best Interest of Creditors Test ........................................................................... 51
     1.     Chapter 7 ............................................................................................... 52
     2.     Liquidation Alternative ......................................................................... 52
     3.     Feasibility of Plan ................................................................................. 53
     4.     Classification ......................................................................................... 53
     5.     Confirmation of Plan Without Necessary Acceptances; Cramdown ........ 54
     6.     No Unfair Discrimination ...................................................................... 54
     7.     Fair and Equitable Test .......................................................................... 54
VI. EFFECTS OF CONFIRMATION .............................................................................. 55
     1.     Binding Effect of Confirmation ............................................................. 55
     2.     Good Faith ............................................................................................. 55
     3.     No Limitations on Effect of Confirmation .............................................. 56
VII. RISK FACTORS ..................................................................................................... 56
VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................... 56
A.     Federal Taxation Issues Related to Pass-Through Entities in General ................. 58
B.     Consequences to Creditors ................................................................................ 59
     1.     Holders of Claims ................................................................................. 59
     2.     Non-United States Persons ..................................................................... 60

iii

   C.  Importance of Obtaining Professional Tax Assistance ......................................... 60
IX. ALTERNATIVES TO PLAN AND MISCELLANEOUS MATTERS ................................. 60
   A.  Alternatives to Debtor's Proposed Plan ...................................................... 60
      1.  Liquidation Under Chapter 7 ................................................ 60
      2.  Dismissal ............................................................................... 61
   B.  No *Res Judicata* Effect ............................................................................ 61
X. CONCLUSION ........................................................................................................ 62

EXHIBITS
1 - Debtor's Chapter 11 Plan of Liquidation
2 - Disclosure Statement Order
3 - Plan Recovery Analysis
4 - Corporate/Organizational Chart

DOCS_SF:85951.5 73864/002

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), TPOP, LLC (the "Debtor" or "TPOP") hereby submits this disclosure statement (the "Disclosure Statement") in support of the *Debtor's Chapter 11 Plan of Liquidation* (as may be amended or modified, the "Plan").  The definitions contained in the Bankruptcy Code are incorporated herein by this reference.  The definitions set forth in Article II of the Plan will also apply to capitalized terms used herein that are not otherwise defined.

# II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On July 22, 2013 (the "Petition Date"), the Debtor commenced the above-referenced bankruptcy case (the "Chapter 11 Case") by filing a voluntary petition under chapter 11 of the Bankruptcy Code.  On December 3, 2012, the Debtor's affiliates, Revstone Industries, LLC ("Revstone") (the indirect corporate parent of the Debtor) and Spara, LLC ("Spara"), commenced chapter 11 bankruptcy cases before the Bankruptcy Court.  Subsequently, on January 7, 2013, two other affiliates, Greenwood Forgings, LLC ("Greenwood") and US Tool & Engineering, LLC ("US Tool" and together with Revstone, Spara and Greenwood, the "Original Debtors"), commenced their own chapter 11 cases before the Bankruptcy Court.  The Plan applies solely as to Debtor TPOP, LLC, and does not involve or effect Revstone, Spara, Greenwood, or US Tool.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtor.  A copy of the Plan is attached to the Disclosure Statement as Exhibit 1.  The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement contains information concerning, among other matters:  (1) the Debtor's background; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan.  The Debtor strongly urges you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan.  Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

Following a hearing on January 15, 2015, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan.  A copy of the order approving the Disclosure Statement is attached hereto as Exhibit 2 (the "Disclosure Statement Order").  Under section 1125 of the Bankruptcy Code, this approval enabled the Debtor to send you this Disclosure Statement and solicit your acceptance of the Plan.  The Bankruptcy Court has not considered for

1

approval the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important.  Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation.  These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan.  Accordingly, the Debtor urges you to accept the Plan by completing and returning the enclosed ballot(s) no later than **February 20, 2015 at 5:00 p.m. (prevailing Eastern time)**.

## B.   Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTOR AND THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  YOU SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED.  MOREOVER, BECAUSE OF THE DEBTOR'S FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTOR, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE.  HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") SERVES AS GENERAL BANKRUPTCY COUNSEL TO THE DEBTOR.  PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.  ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS

DISCLOSURE STATEMENT, PSZ&J HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE.  EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

**C.**    **An Overview of the Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties.  The filing of a chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor.  Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in this Chapter 11 Case), a debtor remains in possession and control of all its assets as a "debtor in possession."  The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval.  Bankruptcy Court approval is only required for various statutorily enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business.  The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a chapter 11 case.  The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders.  The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate.  Although an Official Committee of Unsecured Creditors was appointed in Revstone's chapter 11 case (the "Revstone Committee") (to represent the collective interests of the general unsecured creditors of Revstone), no committee has been appointed in the Debtor's Chapter 11 Case.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization.  Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation.  A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants.  The provisions of the Debtor's Plan are summarized below.

**D.**    **Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan.

The Plan is a plan of liquidation which, among other things, provides for a Plan Administrator to liquidate or otherwise dispose of the Estate's remaining assets, if and to the

extent such assets were not previously monetized to Cash or otherwise transferred by the Debtor prior to the Effective Date, and to distribute all net proceeds to creditors generally in accordance with the priority scheme under the Bankruptcy Code.  The Debtor previously sold substantially all of its operating assets.  The Plan incorporates the Bankruptcy Court-approved settlement between the Debtor and its affiliates, the Pension Benefit Guaranty Corporation (the "PBGC"), and certain creditor constituents of the Debtor's ultimate parent, Revstone.

Under the Plan, all holders of allowed administrative expenses and allowed priority claims against the Debtor will be paid in full on the Effective Date out of cash on hand (unless, as provided in the Plan, the Debtor elects to provide payment over time as to Allowed Tax Claims).  Holders of secured claims will either be paid in cash or will receive the benefit of their collateral.

Holders of allowed non-priority general unsecured claims, including intercompany claims and the PBGC Claims, will receive their respective pro rata share of available net proceeds of the Debtor's assets (after the payment of or reserve for higher priority claims) after the Effective Date.  Holders of Allowed PBGC Claims will receive the treatment provided by and in accordance with the PBGC Settlement Agreement.

All membership interests in the Debtor, and any associated management rights held by interest holders, will be suspended and of no force and effect as of the Effective Date; interest holders will have a contingent interest in any remaining cash (if any) after all allowed claims and administrative expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable creditor) in accordance with the Plan.

On and after the Effective Date, a Plan Administrator will act for the Liquidating Debtor in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under the Plan, subject to the provisions of the Plan, and will, among other powers, wind up the affairs of the Liquidating Debtor; use, manage, sell, abandon and/or otherwise dispose of the remaining property of the Estate; prosecute objections to Claims and any litigation on behalf of the Liquidating Debtor; cause distributions to be made to Creditors pursuant to the Plan; and take such other actions required under or consistent with the Plan.  The initial Plan Administrator will be John C. DiDonato, the Debtor's current Chief Restructuring Officer.

The Debtor currently has $25,812 million in cash constituting proceeds of the liquidation of substantially all of the Debtor's operating assets.  Under the Plan, the Debtor will promptly and efficiently distribute available assets to Creditors.  Exhibit 3 attached hereto contains projections for estimated recoveries by Creditors.

The Plan provides for the classification and treatment of Claims and Interests in the Debtor.  The Plan designates five (5) Classes of Claims and one (1) Class of Interests.  These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

4

The following chart briefly summarizes the treatment of Creditors and Interest Holders under the Plan.[2]  Amounts listed below are estimated.[3]  Actual Claims and distributions will vary depending upon, among other things, recoveries on Distributable Assets.

      a.     <u>Unclassified Claims</u>

| Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|
| DIP Financing Claims | $0-$13,750,000 | 100% | To the extent Allowed, paid in full in Cash on the Effective Date.  The Debtor reserves any and all rights to dispute or otherwise challenge the DIP Financing Claims on any available grounds, or to assert affirmative claims against any appropriate parties.  **As addressed further in Article III.E.12 below, GM (as defined below) asserts various DIP Financing Claims.  The Debtor disputes such Claims in their entirety.** |
| Administrative Expenses | $6,334,000 - $7,784,000 | 100% | Paid in full in Cash on the Effective Date or as soon thereafter as the Administrative Expense is Allowed.  Notwithstanding any of the foregoing, if an Administrative Expense represents an obligation incurred in the ordinary course of business, such Administrative Expense will be paid in the ordinary course by the Liquidating Debtor in accordance with the terms of the particular transaction and/or applicable agreement. |
| Tax Claims | $10,000 | 100% | On or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim will receive Cash equal to the Allowed Tax Claim; provided, however, the Liquidating Debtor may in its discretion elect to make regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date. |

---

[2] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan.  References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

[3] The claim estimates set forth in the chart below are the Debtor's best estimate of allowed claims as of the Effective Date.  The claims against the Debtor ultimately could be allowed in amounts that are materially higher or lower.

b.      Classified Claims

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | $0 | 100% | **Unimpaired; deemed to accept.** At the election of the Liquidating Debtor, the Holder of each Priority Non-Tax Claim will receive on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor. |
| 2 | Prepetition Credit Agreement Secured Claims | $0 | 100% | **Unimpaired; deemed to accept.** At the election of the Liquidating Debtor, the Holder of each Prepetition Credit Agreement Secured Claim will receive on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor. **The Debtor believes that all Prepetition Credit Agreement Secured Claims have been incorporated into the DIP Financing Claims. As addressed further in Article III.E.12 below, GM asserts various DIP Financing Claims that the Debtor disputes.** |
| 3 | Miscellaneous Secured Claims[4] | $100,000 | Value of collateral | **Unimpaired; deemed to accept.** Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtor, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtor, (i) each Allowed Miscellaneous Secured Claim will be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the Holder and the Debtor or Liquidating Debtor. **The Debtor is not aware of any Miscellaneous Secured Claims.** |

---

[4] Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtor different from that securing any other Miscellaneous Secured Claim, will be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

| Class No. | Description | Estimated Allowed Claims | Estimated Recovery Percentage | Treatment |
|---|---|---|---|---|
| 4 | General Unsecured Claims | $4,000,000 - $5,000,000, plus Department of Labor claims of $32,100,000 | 4.3% - 16.0% | **Impaired; entitled to vote.** On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim will receive a Pro Rata share (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) of the Net Distributable Assets of the Debtor up to the full Allowed amount of such General Unsecured Claim. |
| 5 | PBGC Claims | $95,000,000 | 4.3% - 16.0% | **Impaired; entitled to vote.** On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim will receive the treatment provided by the PBGC Settlement Agreement. Specifically, subject to the terms of the PBGC settlement Agreement, each Holder of an Allowed PBGC Claim will share on a Pro Rata basis in the distributions to be made to Holders of Allowed General Unsecured Claims in Class 4. |
| 6 | Interests in Debtor | N/A | N/A | **Impaired; deemed to reject.** The Holders of Interests will receive no distributions under the Plan, and on the Effective Date, all Interests will be deemed suspended. As of the Effective Date, the Holders of Interests will receive a contingent interest in the Net Distributable Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan. |

## E.    Voting on the Plan

### 1.    Who May Vote

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is Impaired if legal, equitable or contractual rights attaching to the Claims or Interests in the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote. Classes 1 through 3 are Unimpaired and are therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and are not entitled to vote on the Plan. Classes 4 and 5 are Impaired and entitled to vote to accept or reject the Plan. Class 6 is Impaired and deemed to reject the Plan. Only those votes cast by Holders of Allowed Claims will be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation. If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtor may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

2.    **How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of ballot. No votes other than ones using such ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of ballot is being provided to Holders of Claims in Classes 3 through 5 by which members in such Classes may vote their acceptance or rejection of the Plan. The ballot for voting on the Plan gives Holders of Claims in Classes 3 through 5 an important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the ballot (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) you reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. Rust Consulting / Omni Bankruptcy ("Rust Omni"), as the Balloting Agent, will count the ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE BALLOTING AGENT, RUST OMNI, NO LATER THAN **February 20, 2015** AT THE FOLLOWING ADDRESS:

<div style="text-align:center">

TPOP, LLC f/k/a Metavation, LLC
c/o Rust Consulting / Omni Bankruptcy
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

</div>

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

F.    **Confirmation of the Plan**

1.    **Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article V below.

2.    **Objections to Confirmation**

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtor and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such objection.

3.        **Hearing on Confirmation**

The Bankruptcy Court has set **March 5, 2015 at 10:00 a.m. (prevailing Eastern time)** for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied.  The Confirmation Hearing will be held before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 6th Floor, Courtroom 1, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

<div align="center">

**III.**

**HISTORY, ORGANIZATION AND
ACTIVITIES OF THE DEBTOR**

</div>

A.       **General Description of Debtor's Operations and Assets**

Prior to the Petition Date, the Debtor was a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry.  The Debtor specialized in designing and manufacturing dampers that are included on original equipment manufacturers' ("OEMs") engine platforms.  It also had rapid development capabilities to produce "solution" dampers to correct driveline and powertrain noise vibration and harshness ("NVH") issues. The Debtor was an entrenched, fully-qualified supplier to North American OEMs.  In addition to its leading damper and engine component production capabilities, TPOP also maintained precision machining capabilities for powertrain, chassis, and other components.  The Debtor served many of the largest automotive customers, suppliers, and platforms.  The Debtor's major OEM customers included General Motors and Chrysler.  TPOP's Tier I supplier customers included American Axle, Dana Automotive, and J.G. Kern.  These long-standing relationships led the Debtor to a dominant market position in the U.S. crankshaft and driveline damper markets.

The Debtor's core competencies included the manufacture of precision machined components and assemblies; however, the Debtor specialized in designing and manufacturing dampers that are included on OEM engine platforms.  The Debtor also had rapid development capabilities to produce "solution" dampers to correct driveline and powertrain NVH issues.  On average, the Debtor produced three to four million dampers annually and was the only North American damper manufacturer to offer in-house custom rubber compounding and manufacturing as well as in-house precision machining capabilities for virtually all damper components.

Prior to the Petition Date, the Debtor operated from four modernized facilities located in central Michigan.  The Company began its manufacturing process by developing the rubber component at the Hillsdale, Michigan facility, and then sent the rubber component to the Mt. Pleasant, Michigan or Vassar, Michigan facility for machining and/or assembly.  The Debtor's manufacturing facilities, as of the Petition Date, are described below:

<div align="center">

9

</div>

- <u>Rubber Plant and Tech Center</u> – 16,000 square foot production facility located in Hillsdale, Michigan; employed 20 non-union employees producing strip and rope rubber, molded assemblies and prototypes for distribution to other TPOP production facilities and other auto manufacturers in North America;

- <u>CNC Machining and Assembly Plant #1</u> – 80,000 square foot manufacturing facility located in Mt. Pleasant, Michigan; the facility's 177 non-union employees produced crankshafts, drivelines, dampers and steering knuckles distributed to other auto manufacturing facilities in North America and China;

- <u>CNC Machining and Assembly Plant #2</u> - 27,000 square foot production facility located in Vassar, Michigan; employed 16 non-union employees producing driveline dampers and crankshaft damper components for distribution to other auto manufacturers in North America; and

- <u>Vassar Foundry</u> – gray iron foundry facility located in Vassar, Michigan.

The Debtor listed in its Schedules (the filing of which is discussed below), as of the Petition Date, approximately $23 million in personal property, comprised primarily of cash, deposits, equity interests in certain entities, accounts receivable (approximately $10.6 million), machinery, fixtures and equipment (approximately $7.3 million), and inventory (approximately $3.6 million). A substantial portion of such personal property was sold to third party buyers under Bankruptcy Code section 363 (as discussed below).

**B.**      <u>**Corporate/Organizational Structure**</u>

The Debtor is a Delaware limited liability company, and its principal place of business is presently located in Richmond, Kentucky. The sole member of TPOP is Revstone Transportation, LLC ("<u>Revstone Transportation, LLC</u>"), of which the sole member is Revstone, a Debtor Affiliate. TPOP is also an affiliate of Debtors Greenwood, US Tool and Spara, and an indirect subsidiary of Ascalon Enterprises, LLC ("<u>Ascalon</u>"). Upon information, Ascalon is directly or indirectly controlled by George Hofmeister (who is or was the chairman of Ascalon's board of managers). Mr. Hofmeister has been the subject of various litigation claims.

On January 17, 2013, Debtor Affiliate Revstone and non-debtor Revstone Transportation formally effectuated governance changes. Two independent managers (Richard E. Newsted and James B. Shein) were appointed to the three member boards of Revstone and Revstone Transportation, among other affiliates, and John C. DiDonato was appointed as Chief Restructuring Officer ("<u>CRO</u>") of the same companies. The independent managers together constitute a majority of the managers on the boards of Revstone and Revstone Transportation. The independent managers also were appointed to a restructuring committee of the boards (the "<u>Restructuring Committee</u>"), which was specifically charged with the task of overseeing the CRO and all bankruptcy-related actions of the Original Debtors and their subsidiaries, including TPOP (the Original Debtors and TPOP are referred to herein collectively as the "<u>Debtors</u>").

Attached hereto as <u>Exhibit 4</u> is a chart that sets forth TPOP's corporate relationship to the Original Debtors and other non-debtor affiliates.  The current officers of TPOP are: (a) John C. DiDonato, Chief Restructuring Officer; (b) David Jaeger, President; (c) Daniel V. Smith, Secretary and General Counsel; (d) James O'Toole, Assistant Secretary and Deputy General Counsel; (e) James M. Lukenda, Deputy CRO; (f) Laura A. Marcero, Deputy CRO; (g) Brian M. Linscott, Interim CFO; (h) Geoffrey S. Frankel, Vice President; (i) John M. Owens, Interim Treasurer; and (j) John A. Hemingway, Interim Assistant Treasurer.

## C.    **Debtor's Liabilities**

### 1.    **In General**

The Debtor listed in its Schedules, as amended, as of the Petition Date, approximately $17.9 million in secured claims; approximately $703,000 in priority claims; and approximately $46 million in general unsecured claims.

### 2.    **Prepetition Credit Facility Obligations**

On or about July 23, 2010, TPOP and three affiliates, Contech Castings, LLC ("Contech"), MPI, LLC and MW Texas Die Casting, Inc. (the "Primary Wells Obligors"), entered into a Credit Agreement (as amended, modified and supplemented from time to time, the "Prepetition Credit Agreement") with Wells Fargo Capital Finance, N.A. ("Wells") that provided revolving credit facilities in the original aggregate principal amount of up to $45 million (as amended, modified or supplemented from time to time, the "Prepetition Credit Facility").  The obligations of the Primary Wells Obligors under the Prepetition Credit Facility were purportedly secured by (i) certain guarantees of 11 other affiliates (the "Wells Guarantors" and together with the Primary Wells Obligors, the "Wells Obligors") and (ii) that certain Security Agreement, originally entered into on or about July 23, 2010, by the Wells Obligors, which purportedly created liens on, and security interests in, substantially all of the unencumbered assets of the Wells Obligors.  To further secure the Prepetition Credit Facility, on or about July 23, 2010, Revstone entered into (i) that certain Limited Recourse Guaranty and (ii) Pledge and Security Agreement in which Revstone pledged its membership interest in its subsidiary, Revstone Transportation.

As of the Petition Date, the outstanding indebtedness under the Prepetition Credit Facility was approximately $17.5 million, consisting of approximately (a) $3.6 million owed to Wells, as a lender, by the Debtor and certain non-debtor affiliates; (b) $12.4 million of outstanding unpaid advances made to the Debtor by the Prepetition Junior Participants (GM, Ford and Chrysler); and (c) $1.5 million of outstanding unpaid advances made to Contech by the Prepetition Junior Participants and certain other parties.

The Debtor's indebtedness to the Prepetition Junior Participants under the Prepetition Credit Facility arose under that certain Junior Participation Agreement dated January 11, 2013, as amended and restated by that certain Amended and Restated Junior Participation Agreement dated as of April 12, 2013, pursuant to which Wells as lender sold to the Prepetition Junior Participants a junior participation in certain supplemental advances to the Debtor under the

Prepetition Loan Documents. The approximately $12.4 million owed by the Debtor, as of the Petition Date, for advances made by the Prepetition Junior Participants was secured by, among other collateral, the Debtor's assets. The approximately $1.5 million owed as of the Petition Date by the Debtor's non-debtor affiliate, Contech, for advances made by the Prepetition Junior Participants was secured solely by Contech's assets and not by any of the Debtor's assets. The Debtor's obligations to the Prepetition Junior Participants under the Prepetition Loan Documents were subordinate to the Debtor's obligations to Wells as lender.

**As addressed further below, the Debtor believes that there are no remaining outstanding obligations under the Prepetition Credit Facility. *See* Article III.E.12 below.**

3.       **Pension Related Obligations**

As of the Petition Date (as calculated at the time), the Debtor owed approximately $2.3 million for overdue payments to the Hillsdale Hourly Pension Plan and Hillsdale Salaried Pension Plan (the "Pension Plans") (plans sponsored by TPOP), with respect to approximately $1.6 million of which the PBGC has asserted a lien in the Debtor's assets. The PBGC also asserted a claim in the approximate amount of $56.3 million on account of the Debtor's alleged pension liabilities.

Certain non-debtor affiliates of the Debtor are sponsors of other pensions plans – namely, Fairfield Castings, LLC, sponsors the Revstone Casting Fairfield GMP Local 359 Pension Plan, and Fourslides, Inc. sponsors the Fourslides, Inc. Pension Plan. The PBGC has asserted that under 29 U.S.C. § 1082, the sponsor of a pension plan and members of its controlled group are financially responsible for the pension plan. The PBGC further asserted that the responsibilities of the plan sponsor and controlled-group members to a pension plan include, *inter alia*: (1) paying the statutorily required minimum funding contributions to the pension plan; (2) paying insurance premiums to the PBGC; and (3) paying any unfunded benefit liabilities to the PBGC if the pension plan terminates. The PBGC has asserted that liabilities of the plan sponsor and controlled-group members with regard to the pension plan are joint and several.

On August 23, 2013, the PBGC filed a complaint in the United States District Court for the Eastern District of Kentucky seeking to terminate the Hillsdale Hourly Pension Plan, the Hillsdale Salaried Pension Plan, and the Revstone Casting Fairfield GMP Local 359 Pension Plan.

Pursuant to the that certain Subordination Agreement dated June 27, 2013, the PBGC, Wells and the borrowers under the Prepetition Credit Facility, including TPOP, agreed that the PBGC's asserted liens ("PBGC Liens") that may arise prior to July 31, 2013 (regardless of whether such PBGC Liens are recorded) will be subordinate and junior in right of payment and priority to the liens of Wells related to the Prepetition Credit Facility.

The PBGC filed proof of claim numbers 110 through 121 against the Debtor, and the Department of Labor ("DOL") filed proof of claim numbers 196 and 197 against the Debtor. As discussed below, the Debtor, the Original Debtors, certain other affiliates, the Revstone Committee, and Boston Finance Group, LLC ("BFG") reached a comprehensive global

settlement with the PBGC, which was approved by the Bankruptcy Court.  *See* Article III.E.8 below.

**D.    Circumstances Prior to the Commencement of the Chapter 11 Case**

1.    **In General**

The credit profile of Revstone and its affiliated companies, including TPOP and the Original Debtors, required additional capital to be raised to continue to fund operations in a market that would only provide such financing in one-off situations at relatively high interest rates.  Poor operating results, high capital costs, and restrictive financing covenants led to defaults and disputes with key lenders, further exacerbating liquidity issues as evidenced by a failure to make timely payment on obligations such as employer health plan premiums and required pension plan contributions.  As a result, in late 2012, Revstone and its affiliated companies including TPOP embarked on a comprehensive process of sales and financings in order to enable the companies to restructure in a thoughtful and deliberate manner, for the benefit of all of its constituents.  TPOP retained Huron Consulting Services LLC ("Huron") in October 2012 to market its assets to strategic buyers in the automotive supplier industry.

On December 3, 2012, Debtors Revstone and Spara commenced their cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On January 7, 2013, Debtors Greenwood and US Tool commenced their own cases by filing voluntary petitions for relief with the Bankruptcy Court.  After the filing of the Original Debtors, TPOP faced increased pressure from OEMs and its other customers to effectuate a change of control of the operating businesses of the Debtor and its affiliates.

In parallel with its efforts to market or restructure its assets, TPOP established lines of communication with the OEMs and other customers, including negotiation of OEM funding accommodations and management of customer relationships.  As a result of these negotiations, major customers agreed to pull forward payment terms from approximately 45 days to 10 days generating substantial liquidity, and customers agreed to provide up to $4.4 million of junior participation funding.

2.    **Negotiations with OEMs**

Prior to, and following the bankruptcy filing of Revstone, Revstone and its affiliates, including TPOP (the "Revstone Group"), faced significant pressure from the OEMs to effectuate a change of control of the operating businesses of Revstone and each of its affiliates.  As a result of the pressure, among other things, the Revstone Group engaged in a process of marketing its assets in an effort to preserve going concern value and maximize recovery to all constituents.  These efforts led to, among other sales, the sale of TPOP's assets as described further below.

3.    **Entry into APA with Stalking Horse Purchaser and Commencement of the Case**

Concurrent with and proceeding from the Revstone Group's ongoing negotiations with the OEMs, TPOP undertook significant efforts to market substantially all of its assets. With Huron's assistance, TPOP formally commenced that process in October, 2012. Marketing materials were prepared, an online data site with diligence materials was expanded, and potential buyers were identified. By January 7, 2013, TPOP received four expressions of interest, and subsequently TPOP negotiated with certain of the interested parties, with input from certain important customers. Based on various factors, including customer input, the Debtor ultimately focused on potential transactions with two of the parties that had submitted expressions of interest.

On June 4, 2013, Dayco Products, LLC and Dayco Products S.A. de C.V. ("Dayco"), submitted to Revstone Transportation, as the sole member of TPOP, a non-binding letter of intent ("LOI"). After further discussion between the parties, the June 4th LOI was modified, and after extensive review and consideration, the Debtor selected Dayco's offer as set forth in its June 10, 2013 LOI as the best alternative for TPOP to maximize the value of its non-foundry assets, and proceeded to negotiate with Dayco the terms and conditions of a definitive purchase agreement. After extensive negotiations, TPOP entered into an Asset Purchase Agreement with Dayco on July 19, 2013. The Debtor filed its chapter 11 case to facilitate and implement the proposed sale to Dayco (or other higher or better bidder) under section 363 of the Bankruptcy Code.

E.    **Significant Events Since the Petition Date**

1.    **First Day / Initial Motions**

The Debtor sought approval from the Bankruptcy Court of certain motions and applications, which the Debtor filed simultaneously with, or shortly after, its voluntary petition. The Debtor sought such relief to minimize disruption of the Debtor's business as a result of the bankruptcy filing, and to facilitate the Debtor's Chapter 11 Case. These motions addressed the following issues, among others:

a.    Cash Collateral / DIP Financing

On July 23, 2013, the Debtor filed a motion seeking entry of an order authorizing it to obtain debtor-in-possession (DIP) financing on a secured and superpriority basis and use cash collateral pursuant to that certain Ratification and Amendment Agreement between the Debtor, certain non-debtor affiliates and Wells Fargo and related documents [Docket No. 21]. Prepetition, the Debtor faced severe liquidity restraints and was forced to file its chapter 11 case to preserve the value of its assets. The Debtor was not able to obtain alternative financing from outside parties and the proposed DIP financing was on the terms that were most beneficial to the estate. The Debtor required the DIP facility to provide the Debtor with the necessary capital with which to operate its business, including funding the Debtor's obligations to employees, and to successfully consummate its proposed sale.

The DIP facility consisted of (a) a revolving credit facility extended by the Wells, as agent, on behalf of the DIP lenders in the amount of up to $3,554,750 and (b) a term loan facility extended by the agent on behalf of the lenders in the amount of up to $6,000,000 (all of which term loan facility is funded by loan participations purchased by the DIP Junior Participants (as defined in the DIP facility documents)), plus interest, fees and other obligations accrued thereon. As set forth in the motion, all DIP obligations would be, pursuant to section 364(c)(1), entitled to superpriority administrative expense claim status in the Chapter 11 Case, subject to a specified carve-out for professional fees and other items; pursuant to section 364(c)(2), secured by a first-priority lien on the Post-Petition Collateral (as defined in the DIP facility documents, which is comprised of substantially all of the Debtor's assets, but excludes, *inter alia*, avoidance actions and the proceeds thereof until entry of the final order) to the extent  that such Post-Petition Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date, subject to the carve-out; pursuant to section 364(c)(3), secured by a second priority lien on the Post-Petition Collateral (which excludes avoidance actions and the proceeds thereof until entry of the final order), to the extent that such Post-Petition Collateral is subject to valid, perfected and non-avoidable liens in favor of third parties in existence as of the Petition Date and other permitted liens.  As adequate protection, Wells, as agent under the Prepetition Loan Documents, for the benefit of itself and the prepetition lenders under the Prepetition Loan Documents, was granted replacement liens and section 507(b) superpriority claims.

The Revstone Committee objected to the Debtor's motion, and BFG and the PBGC filed joinders thereto.  On July 24, 2013, the Bankruptcy Court entered an order authorizing the use of cash collateral and approving the DIP facility on an interim basis [Docket No. 50].  On August 23, 2013, the Bankruptcy Court entered an order granting the Debtor's motion on a final basis (the "Final Financing Order") [Docket No. 185].

      b.    Employee Wages/Benefits

On July 22, 2013, the Debtor filed the *Motion of Debtor TPOP, LLC for Order Under Sections 105, 363 and 507 of the Bankruptcy Code (I) Authorizing Payment of Prepetition Wages, Salaries, Employee Benefits and Reimbursable Expenses, (II) Authorizing Continuation of Employee Benefit Plans and Programs Postpetition, and (III) Authorizing All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations* [Docket No. 13], seeking authorization to honor/pay prepetition employee wages and various benefits and certain related relief.  As of the Petition Date, the Debtor employed approximately 270 full-time employees to conduct its business, in addition to temporary or contract workers whom the Debtor hired to supplement staffing.  Further, as of the Petition Date, the Debtor was party to a collective bargaining agreement with the United Steelworkers International affiliated with American Federation of Labor Congress of Industrial Organizations (the "Union"); the Union represents 64 employees employed by the Debtor at the grey steel foundry located in Vassar, Michigan.  By the motion, the Debtor sought authority to continue to honor all obligations to these union employees under the terms of the existing collective bargaining agreement.

On July 24, 2013, the Bankruptcy Court entered an order granting the Debtor's motion (subject to certain payment caps) [Docket No. 46].  On August 23, 2013, the Revstone Committee filed a motion for reconsideration or amendment of this order.  The July 24th order

allowed TPOP to pay Ascalon up to $150,000 in unpaid contributions to TPOP's employee health benefit plans. The Revstone Committee sought an amendment requiring certain monitoring measures on a go-forward basis in respect to payments by TPOP to Ascalon. Although TPOP believed such measures are duplicative of information already being provided by the Debtor, TPOP agreed to the proposed amendment, and an amended order was entered on September 16, 2013 [Docket No. 247].

<div align="center">c.    Cash Management System</div>

On the Petition Date, the Debtor filed the *Motion of TPOP, LLC for Order Under 11 U.S.C. §§ 105, 363, 503(b), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Continued Performance of Intercompany Transactions, and (V) Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 6], seeking an order authorizing, among other things, the maintenance of existing bank accounts, the continued use of TPOP's existing cash management system, the continued performance of intercompany transactions, and a limited waiver of Bankruptcy Code section 345(b) deposit and investment guidelines. The Bankruptcy Court entered an order on July 24, 2013 granting the motion [Docket No. 43]. On August 23, 2013, the Revstone Committee filed a motion seeking reconsideration or amendment of the cash management order; the Revstone Committee sought, among other things, all intercompany claims against TPOP by a Debtor affiliate arising after the Petition Date be accorded superpriority administrative status under sections 364(b) and 364(c)(1), and that prior notice and other information be given to the Revstone Committee's advisors of any payments by TPOP or its subsidiaries to or for the benefit of George Hofmeister, Ascalon, and/or various affiliates or related parties and certain other transfers. Although TPOP believed the requested measures were duplicative or otherwise unnecessary, TPOP agreed to the proposed amendment, and an amended order was entered on September 16, 2013 [Docket No. 246].

On September 27, 2013, the Revstone Committee moved for further amendments of the cash management order, as well as the cash management orders in the chapter 11 cases of Revstone and Greenwood. In its motion, the Revstone Committee alleged George Hofmeister misappropriated certain funds for the Ascalon health and dental plans, for his personal and familial expenses; modifications of the cash management orders (including provisions that neither Mr. Hofmeister nor his family members should receive any compensation or other payments from the debtors until Mr. Hofmeister were to return the misappropriated funds) would be necessary to prevent further harm to the applicable debtors. TPOP, Revstone and Greenwood did not oppose the reconsideration motion, and had demanded from Mr. Hofmeister repayment of the misappropriated funds and had taken various other related actions to address this issue. On October 28, 2013, the Bankruptcy Court entered an order [Docket No. 284] further amending the cash management order to restrict the Debtor and its direct or indirect subsidiaries from making any payments to or for the benefit of George Hofmeister and/or his family members.

       d.     Utility Providers

On the Petition Date, the Debtor filed the *Motion of the Debtor for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 16], seeking the establishment of certain, routine procedures in respect to the Debtor's utility providers.  The Bankruptcy Court entered an interim order on July 24, 2013 [Docket No. 48], and then a final order on this motion on August 19, 2013 [Docket No. 161].

       e.     Prepetition Tax Claims

On July 22, 2013, the Debtor filed the *Motion of Debtor TPOP, LLC for an Order (I) Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Taxes in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto* [Docket No. 8], seeking authority to pay prepetition real property and personal property taxes (assessed by taxing authorities in Michigan) in the ordinary course, up to $272,000 in the aggregate (subject to the DIP financing arrangements).  This motion was approved by an order entered on July 24, 2013 [Docket No. 45].

       f.     Shipping Obligations

On July 22, 2013, the Debtor filed the *Motion of Debtor TPOP, LLC for an Order Authorizing, But Not Directing, Payment of Certain Prepetition Shipping Obligations in the Ordinary Course of Business* [Docket No. 7], seeking authority to pay prepetition obligations owed to Automated Logistics System for shipping charges, up to $264,000 (subject to the DIP financing arrangements).  This motion was approved by an order entered on July 24, 2013 [Docket No. 44].

       g.     Insurance Program

On July 22, 2013, the Debtor filed the *Motion for Authorization to (I) Continue Prepetition Insurance Program and (II) Pay Any Prepetition Premiums and Related Obligations* [Docket No. 15], seeking authority to pay prepetition obligations under certain identified policies (including general liability, umbrella coverage, workers' compensation, executive risk management, employed lawyers professional liability, and d&o liability policies) to the extent the Debtor determines it necessary to avoid cancellation, alteration or other impairment to the coverage, benefits, or other rights provided under these policies, and pay any fees owed to brokers necessary to continue administration of the insurance programs.  The Bankruptcy Court entered an order (subject to a $25,000 aggregate cap for prepetition claims) on July 24, 2013 [Docket No. 47].

2.    **Sale/Auction Procedures and Approval/Consummation of Sale**

On July 22, 2013, the Debtor filed *TPOP, LLC's Motion for Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests Pursuant to Bankruptcy Code Sections 105, 363(b), 363(f) and 363(m); (C) Authorizing the Assumption, Assignment and Sale of Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Sections 363 and 365; and (D) Granting Related Relief* [Docket No. 18], seeking the entry of an order (i) approving the sale of substantially all of the Debtor's operating assets related to its business of manufacturing precision machined components and assemblies, including dampers, engine components, knuckles and driveline products for the automotive industry (the "US Acquired Assets"), free and clear of liens, claims, and interests other than certain permitted liens, which together with certain damper-business related assets held by a non-debtor Mexican affiliate, Eptec S.A. de C.V. ("Eptec"), would be sold to Dayco for $25,075,000, subject to certain adjustments set forth in the parties' asset purchase agreement (the "APA"), in addition to Dayco's assumption of certain liabilities, (ii) approving the Debtor's entry into the Agreement with Dayco, (iii) authorizing the assumption/assignment of certain executory contracts/leases to Dayco pursuant to sections 363 and 365 and in accordance with the APA, and (iv) granting related relief. On the Petition Date, the Debtor also filed its related motion for the approval of certain sale, bidding and auction procedures, approving a break-up fee and expense reimbursement for Dayco, and granting related relief [Docket No. 17] (the "Bid Procedures Motion"). The US Acquired Assets exclude, and the "Excluded Assets" under the APA include, without limitation, all cash held by or on behalf of the Debtor; all of the Debtor's rights under contracts that are not assumed/assigned; all of the Debtor's rights and interests in or to facilities and leases located in Southfield, Michigan and Vassar, Michigan; any assets located at the Vassar facility (other than the Vassar Shop Equipment as defined in the APA); all avoidance actions, provided that the Debtor may not bring any avoidance actions against any suppliers or customers of the sold business with whom Dayco continues to do business following the closing, other than those against parties identified in the applicable APA schedule and any insider or affiliate of the Debtor; the stock and any other equity interests or securities, including promissory notes, issued by the Debtor; all accounts receivable; all equity interests in other entities held by the Debtor; and all claims that the Debtor may have against any third party with respect to any Excluded Assets, claims or causes of action against former and current officers and directors of the Debtor, any claims against auditors and other professional service providers of the Debtor, and any claims against any affiliates and/or insiders.

After a hearing, the Bankruptcy Court entered an order approving the proposed bidding/auction procedures (subject to certain modifications) on August 9, 2013 [Docket No. 113], among other things, setting a bidding deadline of August 27, 2013. No other viable offers were timely submitted, and no auction was held. After a hearing held on August 30, 2013, the Bankruptcy Court entered an order approving the sale of the US Acquired Assets to Dayco and granting related relief [Docket No. 216]. The sale was consummated on or about September 9, 2013, and, among other things, net proceeds were used or distributed in accordance with the final DIP financing order.

3.      **Sale Support Agreement**

Pursuant to the Automotive Sale Transactions Support Agreement (the "Sale Support Agreement"), General Motors, LLC ("GM") and Chrysler Motors, LLC ("Chrysler", together with GM, the "Supporting Customers"), agreed to support the proposed sale of certain of Revstone's subsidiaries and affiliates, including TPOP, Contech, Eptec, Aarkel Tool & Die Inc. and Creative Lighting Solutions, LLC, by agreeing to continue providing necessary funding that would allow the companies to continue to produce component parts for the Supporting Customers and enable the closing of proposed sales.  In turn, the sale of such entities would maximize the value of the estates.  Additionally, the Supporting Customers agreed to purchase participation interests in TPOP's proposed DIP financing and to forgive portions of prior financial accommodations provided to TPOP and Contech.  TPOP believes that the Supporting Customers agreed to the provisions of the Sale Support Agreement so that they could avoid the catastrophic costs of production line shut-downs and resourcing while preserving going concern operations pending the sales referenced above.

In consideration of the accommodations summarized above, subject to and limited by the terms and conditions of the Sale Support Agreement, the applicable members of the Revstone Group (i) were required to repay only (a) certain retained participation interests which include loans previously provided that are not being forgiven, and (b) a portion of the sale support payments provided by the Supporting Customers secured by proceeds of the asset sales and certain equipment and real estate interests, and (ii) agreed to provide the Supporting Customers various supply protection assurances.  TPOP believes each of the foregoing obligations has been satisfied and/or the applicable members of the Revstone Group have no further obligation to repay any amounts to the Supporting Customers.

TPOP and Revstone filed a motion to approve the Sale Support Agreement on July 22, 2013 (the "Sale Support Motion") [Docket No. 19].  The Sale Support Motion and Sale Support Agreement were filed under seal.  The Sale Support Motion sought an interim order approving the Sale Support Agreement as to TPOP.  Following entry of the interim order [Docket No. 49], the Bankruptcy Court scheduled a final hearing on the Sale Support Agreement for August 21, 2013.  At the initial hearing on the Sale Support Motion, the Bankruptcy Court also instructed TPOP and Revstone to file an amended Sale Support Motion that provided a comprehensive summary of the Sale Support Agreement and set forth a process by which interested parties could receive an unsealed copy of the Sale Support Agreement upon the execution of an acceptable confidentiality agreement.  The amended Sale Support Motion was filed on July 29, 2013 [Docket No. 65].  The Revstone Committee, BFG and U.S. Trustee objected to the amended Sale Support Motion.  The U.S. Trustee's objection was resolved and reflected in a revised final order approving the Sale Support Agreement.

After testimony over a period of two days, the Bankruptcy Court overruled the Revstone Committee and BFG objections and issued a ruling approving the Sale Support Agreement as to TPOP and Revstone on August 22, 2013.  Immediately following the Bankruptcy Court's ruling, the Revstone Committee sought a stay pending appeal, which requested relief was denied by the Bankruptcy Court.  On August 23, 2013, following the entry of the final order on the Bankruptcy

Court's docket [Docket No. 184], the Revstone Committee appealed the final order to the District Court.  The Revstone Committee's appeal was later withdrawn.

On March 28, 2014, TPOP filed a motion under Bankruptcy Code section 363 and Bankruptcy Rule 9019 [Docket No. 440] for approval of a Settlement and Release Agreement (attached to the motion) by and among TPOP, Revstone, certain of Revstone's non-debtor affiliates, and Chrysler.  In order to resolve the outstanding financial and other accommodations remaining under the Customer Support Agreement, the foregoing parties agreed to enter into the settlement agreement that globally resolves and terminates the parties' remaining obligations.  Among other things, as described in the motion, (i) purported events of default that Chrysler may assert exist and for which members of the Revstone Group may be liable under the Sale Support Agreement will be resolved, and (ii) contingent upon the implementation of that certain Termination of Loan Documents Agreement by and among Chrysler, GM and Revstone Transportation, potentially millions of dollars in indebtedness on account of postpetition and other financing provided by Chrysler to TPOP and certain indirect non-debtor subsidiaries of Revstone will be forgiven.  After a hearing, the Bankruptcy Court entered an order granting the Debtor's motion and approving the settlement on May 13, 2014 [Docket No. 497].

**As addressed further below, the Debtor believes that, pursuant to the Sale Support Agreement, GM has relinquished any and all claims against the Debtor.  *See* Article III.E.12 below.  GM disputes the Debtor's characterization of the terms of the Sale Support Agreement.**

4.    **Retention/Employment Matters**

a.    Retention of CRO and Huron Personnel

On July 22, 2013, the Debtor filed the *Motion of TPOP, LLC to Employ and Retain Huron Consulting Services LLC to Provide a Chief Restructuring Officer, Other Officers, and Additional Personnel for the Debtor Pursuant to 11 U.S.C. § 363(b), Nunc Pro Tunc to the Petition Date* [Docket No. 11], seeking an order authorizing TPOP to retain Huron to provide John C. DiDonato as the Debtor's Chief Restructuring Officer, certain other Huron personnel as other officers, and additional personnel to provide restructuring support to the Debtor.  The Revstone Committee and BFG objected, asserting, among other things, that TPOP's retention of Huron was an *ultra vires* act and that Mr. DiDonato is allegedly conflicted from serving as CRO for both TPOP and Revstone. The Debtor filed a response explaining that the retention of Huron was validly approved pursuant to TPOP's operating agreement and applicable law, and that Mr. DiDonato has no conflict barring employment as TPOP's CRO.  On May 22, 2014, following a resolution of the parties' disputes as addressed further below, the Bankruptcy Court entered an order granting the Debtor's motion subject to certain terms and conditions [Docket No. 512].

b.    Retention of Debtor's Bankruptcy Counsel

On July 22, 2013, the Debtor sought to employ PSZ&J as its bankruptcy counsel by its *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for Authorization to Employ and Retain*

*Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 9]. The Revstone Committee and BFG objected to the employment application (alleging, among other things, that PSZ&J is not disinterested because of potential or actual interdebtor conflict issues and that the retention of PSZ&J was an ultra vires act), and the U.S. Trustee filed a limited objection. The Debtor disputed the allegations; among other things, the bankruptcy filing and the retention of PSZ&J and other professionals were validly approved by TPOP and the CRO and Restructuring Committee of TPOP's sole member, Revstone Transportation, under its operating agreement and Delaware law. On May 22, 2014, following a resolution of the parties' disputes as addressed further below, the Bankruptcy Court entered an order granting the Debtor's application [Docket No. 510].

### c.    Retention of Special Counsel

On July 22, 2013, the Debtor filed a motion seeking entry of an order authorizing the retention and employment of McDonald Hopkins PLC as its special counsel [Docket No. 14]. The Revstone Committee filed a limited objection and reservation of rights, asserting, among other things, the retention of the firm was an ultra vires act. On May 22, 2014, following a resolution of the parties' disputes as addressed further below, the Bankruptcy Court entered an order granting the Debtor's motion [Docket No. 514].

### d.    Ordinary Course Professionals

On July 22, 2013, the Debtor filed the *Motion of Debtor TPOP, LLC Pursuant to Section 105(a), 327, 328 and 330 of the Bankruptcy Code for Order Authorizing the Debtor to Retain, Employ and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business* [Docket No. 10], seeking entry of an order establishing the orderly and regular process for: (i) the retention of professionals on an "as needed" basis without the submission of separate, formal retention applications; and (ii) for the allowance and payment of compensation and reimbursement of expenses for such ordinary course professionals. The Revstone Committee filed a limited objection, and the Debtor revised the proposed order to reduce the number of ordinary course professionals and represented, among other things, that such professionals will be paid by the Debtor only for work that benefits the Debtor. On May 22, 2014, following a resolution of the parties' disputes as addressed further below, the Bankruptcy Court entered an order granting the Debtor's motion subject to certain terms and conditions [Docket No. 512].

### e.    Noticing and Claims Agent

On July 22, 2013, because of the size of this Chapter 11 Case, the Debtor filed the *Application of TPOP, LLC Pursuant to 28 U.S.C. § 156(c) and Local Rule 2012-1(f) for an Order Authorizing the Retention of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent for the Debtor* [Docket No. 5]. This application was approved by the Bankruptcy Court by order entered on July 24, 2013 [Docket No. 42]. In addition, on July 31, 2013, the Debtor filed the *Application for Order Authorizing the Debtor to Employ and Retain Rust Consulting/Omni Bankruptcy to Provide Administrative Services to the Debtor Pursuant to Sections 327(e), 328 and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014* [Docket No. 72] to seek

approval for Rust Omni to serve as balloting agent and to provide other administrative services in the Chapter 11 Case.  The Revstone Committee objected to this application.  Following a resolution of the parties' disputes as addressed further below, the Bankruptcy Court entered an order on May 22, 2014 granting the motion [Docket No. 513].

5.      **Revstone Committee's Motion to Prosecute Certain Claims**

On July 29, 2013, the Revstone Committee filed an emergency motion for authorization to prosecute certain purported estate claims, consisting of intercompany claims, held by Revstone against TPOP, alleging that the professionals retained by Revstone, because they are proposed to be employed by TPOP and thus conflicted, cannot pursue such claims.  The Bankruptcy Court denied the Revstone Committee's request to have the motion heard on shortened notice, and thereafter, the Revstone Committee filed a motion on normal notice on August 2, 2013.  TPOP objected to the motion, asserting, among other things, that the intercompany claims between TPOP and Revstone are common in affiliated cases of this size and will be addressed in the ordinary course, and that the Revstone Committee has not met the standard for derivative standing.  Subsequently, the Revstone Committee withdrew this motion.

6.      **No Committee Formation**

The U.S. Trustee conducted a formation meeting on August 1, 2013.  The U.S. Trustee declined to appoint a creditors' committee in TPOP's Chapter 11 Case.

7.      **Motions to Convert Debtor's Case**

The U.S. Trustee filed a motion on November 19, 2013 [Docket No. 306], requesting the Debtor's Chapter 11 Case to be converted to a chapter 7 proceeding on the asserted grounds that there was continuing diminution of the Debtor's estate and the absence of a reasonable likelihood of rehabilitation, and because the Debtor had failed to file certain monthly operating reports. The Debtor subsequently filed its monthly operating reports.  On March 17, 2014, the U.S. Trustee withdrew its motion without prejudice [Docket No. 429].

On November 20, 2013, the PBGC filed its *Motion of Pension Benefit Guaranty Corporation for the Entry of an Order Pursuant to 11 U.S.C. § 1112(B) Converting the Bankruptcy Case of TPOP, LLC from Chapter 11 of the Bankruptcy Code to a Case Under Chapter 7 of the Bankruptcy Code* [TPOP Docket No. 307] (the "TPOP Conversion Motion"). On February 10, 2014, following a resolution of the parties' disputes as addressed further below, the PBGC withdrew the TPOP Conversion Motion.

8.      **Initial PBGC Settlement and Subsequent Global Settlement**

On February 14, 2014, the Debtor filed the *Motion of TPOP, LLC for Order Pursuant to 11 U.S.C. §§ 105 & 363 and Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement With Pension Benefit Guaranty Corporation* (the "PBGC Settlement Motion") [Docket No. 402; *see also* Docket No. 403], seeking approval of that certain Settlement Agreement dated as of February 11, 2014 (the "Initial PBGC Settlement Agreement", a copy of

which is attached to the PBGC Settlement Motion) by and among TPOP, the Original Debtors, non-Debtor Fairfield Castings, LLC ("Fairfield"), TPOP, and certain other non-debtor subsidiaries of Revstone and Spara (collectively, the "PBGC Obligors"), and the PBGC.  As described in the PBGC Settlement Motion, after several months of extensive negotiation, the Debtors and the PBGC reached agreement on a global resolution of the PBGC's substantial claims in excess of $95 million against each of the Debtors and their non-debtor affiliates within the control group (which claims dwarf the other claims against the estates) that would provide for the release of funds from subsidiary levels to the Revstone and Spara estates and a path to a confirmable chapter 11 plan (or plans) that is expected to yield meaningful recoveries by unsecured creditors.  PBGC's claims are structurally senior to other claims asserted at the Revstone and Spara parent levels, and given the size of these claims, the PBGC swamps the creditor pool at every level of Revstone's and Spara's organizational structure, including TPOP.  Along with addressing the PBGC's claims and related non-bankruptcy pension litigation, the PBGC Settlement resolved pension-related claims asserted by the DOL against TPOP and Fairfield, and provided the framework for the payment of allowed administrative expenses and priority claims, and the means for distributions to be made to unsecured creditors in the Revstone and Spara bankruptcy cases pursuant to a chapter 11 plan.

Objections to the PBGC Settlement Motion were filed by the Revstone Committee [Docket No. 421], BFG [Docket No. 420], and Ascalon [Docket No. 1375 in the Revstone case], and the Debtor filed an omnibus reply [Docket No. 451].  After negotiations among the parties, on May 1, 2014, TPOP and the Original Debtors filed with the Bankruptcy Court and sought approval of certain modifications to the Initial PBGC Settlement Agreement as set forth in a *Global Resolution Term Sheet* that includes and incorporates the *Consensual Resolution of Terms to Global Resolution Term Sheet* and the *Modified Funding Schedule* related thereto (collectively, the "Term Sheet") [TPOP Docket No. 471; Revstone Docket No. 1477].  After many months of contested proceedings, TPOP, the Original Debtors, the Creditors' Committee, BFG and the PBGC reached a settlement finally resolving the principal pending litigation in the Debtors' chapter 11 cases and providing a definite exit strategy for TPOP and the original Debtors and their estates.  With the assistance and agreement of the PBGC, this settlement enhanced creditor recoveries beyond those contemplated by the Initial PBGC Settlement Agreement, while at the same time addressing BFG's claims through a combination of claim allowance and distribution of certain available assets at non-Debtor subsidiary levels.

After a hearing held on May 9, 2014, the Bankruptcy Court entered an order granting TPOP's and the Original Debtors' respective motions, as modified, and approving the Initial PBGC Settlement Agreement as modified by the Term Sheet (the "Global Settlement") [Docket No. 476; Revstone Docket No. 1494].  The Global Settlement went into effect on the same day.

As to TPOP, the Global Settlement provides that the PBGC will have an allowed general unsecured, non-priority claim in the amount of $95 million and the DOL will have a claim in the range of $32 million pursuant to a consent judgment to be entered.  The PBGC and the DOL will share in distributions to all general unsecured creditors of TPOP.

The Debtor's Plan conforms to the terms of the Global Settlement.

9.      **Motion for Approval of Plant Closing Agreement and Non-Union Employee Agreements, and Sale of Vassar Foundry Machinery/Equipment**

On January 3, 2014, the Debtor filed a motion [Docket No. 366] seeking approval of that certain Plant Closing Agreement by and between the Debtor and Local #564 of the United Steel Workers International Affiliated with American Federation of Labor Congress of Industrial Organizations (the "Union") and a form of Severance Agreement and Release of Claims by and between the Debtor and certain non-union, non-insider hourly employees.  As of the Petition Date, the Debtor was the owner/operator of a foundry located in Vassar, Michigan and the owner of an affiliated machine shop (together with the Vassar foundry, the "Vassar Facility").  As discussed above, postpetition, the Debtor completed the sale of certain of its assets, including the assets utilized in the Vassar machine shop, to a third party buyer.  Subsequent to this sale, the Debtor continued to operate the Vassar foundry and produce component parts in connection with a sale support agreement entered into with its two largest customers; the Debtor also continued to operate the Vassar machining as part of a transition services agreement with the buyer.  To encourage the continued cooperation of the employees following the sale through the wind-down and cessation of operations at the Vassar Facility, the Debtor negotiated agreements to resolve the payment of severance and other related benefits to the employees following termination.  The Union represents all regular full time hourly production and maintenance employees employed at the Vassar foundry.  Negotiations with the Union resulted in a Plant Closing Agreement that, among other things, provides for certain severance payments to Union employees.  As set forth in the Plant Closing Agreement, all existing Union employee grievances will be deemed resolved, and the Debtor unconditionally released; the Debtor will not be obligated to continue to provide health and welfare benefits; and the collective bargaining agreement will be terminated, with the Debtor and Union to exchange mutual releases.  The Debtor also reached agreements with non-Union employees as to severance payments and related matters.  The Debtor has substantially shuttered the Vassar Facility, and all employees were terminated as of late December 2013.  The Bankruptcy Court granted this motion pursuant to an order entered on January 29, 2014 [Docket No. 386].

Upon the Debtor's motion [Docket No. 413], after a focused marketing effort by the Debtor and Huron, the Bankruptcy Court entered an order on March 20, 2014 [Docket No. 434] approving the sale, free and clear of all liens and encumbrances, certain machinery and equipment located at the Debtor's Vassar, Michigan foundry to Myron Bowling Auctioneers, Inc. and Maynard Industries (1991) Inc., for a purchase price of $460,000, subject to the terms of the parties' Asset Purchase Agreement dated as of March 19, 2014.

10.      **Hofmeister Children's Trusts' Motion for Responsible Person in Debtors' Cases**

In November 2013, Homer McClarty, trustee for the "Hofmeister Children's Trusts" – allegedly equity security holders owning 100% of Revstone and Spara– filed a motion ("Responsible Person Motion") [Docket No. 311] requesting the employment of Ramaekers Group, LLC to provide a person responsible for the Debtors and the termination of Huron's employment.  Among other objecting parties including the Revstone Committee, the Debtors

24

objected to the Responsible Person Motion [Docket No. 332], contending that the motion was a transparent attempt by George Hofmeister to try to improperly reassert control over the Debtors and pointing out various infirmities including the Trusts' lack of standing, the lack of disinterestedness of the Ramaekers Group, and the lack of legal basis to vacate the Huron employment order.  The Responsible Person Motion was later withdrawn by Homer McClarty.

11.    **Sale of De Minimis Assets**

Upon the Debtor's motion filed on November 20, 2013 [Docket No. 310], the Bankruptcy Court entered an order on December 9, 2013 [Docket No. 341] approving procedures for the sale, transfer and abandonment of surplus, obsolete, non-core or burdensome assets of the Debtor.  The Debtor has been implementing sales in accordance with this order.

12.    **General Motors Motion for Payment**

On April 22, 2014, GM filed its *Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* (the "GM Motion") [Docket No. 471], pursuant to which GM sought the immediate payment of its asserted first priority secured claims granted pursuant to the Final Financing Order.  As discussed above, GM purchased certain participation interests in TPOP's prepetition credit facility and the DIP financing facility.  Subsequently, Wells Fargo resigned as agent and assigned to GM all of Wells Fargo's interests in "Supplemental Advances" under the prepetition credit agreement (as modified) and "DIP Supplemental Advances" under the Bankruptcy Court-approved DIP facility.  GM asserts that its claims under the Final Financing Order exceed $10.3 million.  Pursuant to the letter dated October 1, 2013 from the Debtor to Wells Fargo (the "Disbursement Instruction Letter"), the proceeds from the sale of TPOP's assets were placed in the account designated on Schedule 3 to the Disbursement Instruction Letter (the "Segregated Account").  To the extent that GM has allowed secured claims, GM asserts its claims are secured by, among other assets, the Segregated Account.  GM contends that the cash necessary to pay GM's secured claim earns low rates while sitting in the Segregated Account, while TPOP's obligations to GM continue to accrue interest; according to GM, "[t]he Debtor's substantial and continuing delay in progressing toward a confirmable plan of reorganization without having satisfied GM's fully secured claim needlessly depletes the estate's assets.  GM also asserts that immediate payment of GM's claim is necessary to protect it from the Debtor's purported proposal to use the encumbered proceeds to settle the PBGC's claims pursuant to the now-approved global settlement.

On May 9, 2014, the Debtor filed a preliminary objection to the GM Motion [Docket No. 490], wherein the Debtor raised various defenses and issues including the following:  First and foremost, the Debtor owes nothing to GM under the Sale Support Agreement.  The Sale Support Agreement required the Debtor and certain affiliates to sell the assets of TPOP and Contech by certain dates, at which time TPOP's obligations to GM would be forgiven, with the exception of certain retained loan participations.  This forgiveness became effective when Eptec, CLS and Aarkel were sold.  The retained participations, to the extent owed, were satisfied by certain of the proceeds of TPOP's assets and certain unused assets of Contech that were paid to GM.  In addition, the Debtor believes that discovery will show that GM might have interfered with the marketing process of certain asset sales required under the Sale Support Agreement.  If so, GM's

actions substantially harmed the Debtor and certain affiliates, and thus, the Debtor and its affiliates may have significant damage claims against GM, which would exceed anything that might be owed to GM (as noted, the Debtor believes nothing is owed given GM's express forgiveness of debt under the Sale Support Agreement).  Further, GM's contention that immediate payment is required in order for GM's interests to be protected in light of the PBGC settlement is false.  Proceeds are not earmarked for the PBGC.  By the approved settlement, PBGC's claim amount has been resolved; the settlement does not provide for any payment to the PBGC from the Segregated Account.  Instead, such claim will be paid in accordance with a confirmed plan (or other further Court order).  In addition to the preliminary objection to the GM Motion, TPOP also served its First Set of Requests for Production to General Motors, LLC and notices of deposition for certain employees of GM.  GM has refused to the respond to TPOP's discovery requests or schedule the depositions of its employees.  GM disputes the Debtor's characterization of the litigation.

On July 31, 2014, the Bankruptcy Court directed that TPOP and GM meet and confer to develop a procedure to enable the Bankruptcy Court to conduct a preliminary hearing on the Payment Motion.  TPOP and GM entered into a stipulation that divides the dispute over the Payment Motion into two stages with (i) GM's contractual claims addressed at the preliminary hearing on a date acceptable to the Bankruptcy Court following the conclusion of the briefing schedule set forth in the stipulation and (ii) TPOP's affirmative defenses to those contractual claims adjudicated at the preliminary hearing and all other matters in dispute adjudicated, if necessary, at a later date subject to an acceptable briefing schedule.  On October 20, 2014, GM filed its *Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* [Docket No. 689].  On November 10, 2014, TPOP filed its *Objection to Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors, LLC* [Docket No. 704] (the "Objection to Motion to Compel").  GM filed its reply to the Objection to Motion to Compel on November 25, 2014 [Docket No. 721].  The preliminary hearing on the Amended GM Motion was held on December 4, 2014 and the Bankruptcy Court reserved decision.

This matter is pending before the Bankruptcy Court.

13.    **Fee Examiner**

Pursuant to an order entered on August 26, 2013, the Bankruptcy Court directed TPOP, the Original Debtors, and the Revstone Committee to meet and confer to select a fee examiner. Pursuant to an order entered on October 22, 2013 (the "Fee Examiner Order"), Mr. Stuart Maue was appointed as the fee examiner, with his examination to cover all of the professionals employed under Bankruptcy Code sections 327, 328 and 1103 in the chapter 11 cases of TPOP and the Original Debtors, members of the Revstone Committee, and any claims for reimbursement of professional fees/expenses under section 503(b), subject to certain other terms as set forth in the Bankruptcy Court's order.  The Fee Examiner has been filing reports regarding the subject fee applications pursuant to the Fee Examiner Order.

Upon the request of TPOP, the Original Debtors, the Revstone Committee and BFG following consummation of the Global Settlement, the Bankruptcy Court entered an order on May 12, 2014 [Docket No. 492] staying the activities and duties of the Fee Examiner pending the

filing and the Bankruptcy Court's consideration of a motion to terminate the Fee Examiner's services. On July 18, 2014, the Original Debtors and TPOP filed a joint *Motion to Terminate Appointment of Fee Examiner and Related Procedures for Compensation and Reimbursement of Expenses for Professionals and Consideration of Fee Applications* (the "Fee Examiner Motion") [Docket No. 1636]. The Bankruptcy Court granted Fee Examiner Motion pursuant to an order entered on July 31, 2014.

14.     **Bar Date for Filing Proofs of Claim and Administrative Expense Requests**

On September 30, 2013, the Debtor filed a motion requesting an order establishing December 17, 2013 as the deadline for filing claims against the Debtor that arose prior to the Petition Date (the "General Bar Date"), January 20, 2014 as the bar date for Governmental Units, December 17, 2013 as the deadline for filing administrative claims arising between the Petition Date and November 30, 2013 and section 503(b)(9) claims, and December 17, 2013 as the deadline for filing administrative expenses as of November 30, 2013 arising under the WARN Act or any similar state law worker notification statute. The Bankruptcy Court granted this motion pursuant to an order entered on October 17, 2013.

15.     **Filing of Schedules and Statements of Financial Affairs**

On July 24, 2013, the Debtor filed its Schedules and Statements with the Bankruptcy Court, which set forth, *inter alia*, the assets of the Debtor and the prepetition claims against the Debtor as of the Petition Date, based on the Debtor's books and records [Docket Nos. 36 & 37]. The Debtor subsequently amended certain Schedules on August 6, 2013 [Docket No. 98] and on September 6, 2013 [Docket No. 231]. On May 20, 2014, the Debtor filed an amended Schedule F [Docket No. 507]. The Debtor reserves its right to make further amendments to the Schedules and Statements.

16.     **Extension of Debtor's Exclusivity Periods**

Upon the Debtor's motion filed on November 18, 2013 [Docket No. 305], the Bankruptcy Court entered an order on February 11, 2014 [Docket No. 399], extending the exclusive time period for the Debtor to file a plan until February 28, 2014 and the Debtor's exclusive solicitation period until April 30, 2014.

Upon the Debtor's motion filed on February 27, 2014 [Docket No. 414], the Bankruptcy Court entered an order on May 13, 2014 [Docket No. 498], further extending the Debtor's exclusive filing period until June 27, 2014 and exclusive solicitation period until August 26, 2014.

Upon the Debtor's motion filed on June 27, 2014 [Docket No. 563], the Bankruptcy Court entered an order on July 29, 2014 [Docket No. 618], further extending the Debtor's exclusive filing period until September 25, 2014 and exclusive solicitation period until November 24, 2014.

The Debtor filed a motion on September 25, 2014 [Docket No. 679], seeking to further extend the Debtor's exclusive filing period until January 22, 2015 and exclusive solicitation period until March 22, 2015.  The Bankruptcy Court entered an order on October 27, 2014 [Docket No. 699] further extending the Debtor's exclusive filing period until January 22, 2015 and exclusive solicitation period until March 22, 2015.

17.   **Rejection of Executory Contracts; Extension of Time to Assume/Reject Real Property Leases**

Upon the Debtor's motion filed on October 23, 2013 [Docket No. 280], the Bankruptcy Court entered an order on November 12, 2013 [Docket No. 296], authorizing the rejection of various executory contracts as identified in the Debtor's motion.  The Debtor filed a motion to reject another executory contract and an unexpired nonresidential real property lease (as identified in the motion) on February 14, 2014 [Docket No. 404], which motion was granted by the Bankruptcy Court pursuant to an order entered on March 18, 2014 [Docket No. 432].

Upon the Debtor's motion filed on October 23, 2013 [Docket No. 281], the Bankruptcy Court entered an order on November 12, 2013 [Docket No. 295], extending the time for the Debtor to assume or reject its nonresidential real property leases until February 14, 2014.

18.   **Removal of Actions**

On October 18, 2013, the Debtor filed the *Debtor's Motion for Order Further Extending the Period Within Which Debtor May Remove Actions Pursuant to 28 U.S.C. § 1452 and Federal Rule of Bankruptcy Procedure 9027* [Docket No. 272], seeking an extension of time by which civil actions pending as of the Petition Date can be removed to the Bankruptcy Court's jurisdiction, from October 21, 2013 to December 31, 2013, and an extension of time to remove civil actions initiated after the Petition Date to the later of December 31, 2013 and the time period specified in Bankruptcy Rule 9027(a)(3)(A) and (B).  On November 12, 2013, the Bankruptcy Court entered an order granting the Debtors' requested extensions [Docket No. 298].  Upon subsequent motion by the Debtor [Docket No. 365], the Bankruptcy Court entered an order further extending these deadlines to June 30, 2014 in respect to prepetition civil actions and the later of June 30, 2014 and the time period specified in Bankruptcy Rule 9027(a)(3)(A) and (B) in respect to civil actions initiated postpetition [Docket No. 387].  Upon subsequent motion by the Debtor [Docket No. 564], the Bankruptcy Court entered an order further extending these deadlines to December 31, 2014 in respect to prepetition civil actions and the later of December 31, 2014 and the time period specified in Bankruptcy Rule 9027(a)(3)(A) and (B) in respect to civil actions initiated postpetition [Docket No. 617].

19.   **Debtor's Adversary Proceeding**

TPOP commenced an adversary proceeding against JPMorgan Chase Bank, N.A. and George S. Hofmeister on January 27, 2014 (Adv. Pro. No. 15-50032), seeking, *inter alia*, the recovery of fraudulent transfers and damages for breaches of fiduciary duty.  On July 7, 2014, filed an amended complaint adding Homer W. McClarty, trustee of the Megan G. Hofmeister Irrevocable Trust, the Scott R. Hofmeister Irrevocable Trust, and the Jamie S. Hofmeister

Irrevocable Trust (collectively, the "Children's Trusts") as a defendant [Docket No. 36]. Generally, TPOP seeks to recover for the benefit of the estate various cash transfers that were made by its former manager Hofmeister for his personal purposes or for the benefit of entities owned ultimately by trusts established for his children.

On August 21, 2014, defendant JPMorgan Chase Bank, N.A. filed a motion to dismiss the adversary proceeding [Docket No. 38].  TPOP filed its opposition to the motion to dismiss on September 22, 2014 [Docket No. 40].  This matter is pending in the Bankruptcy Court.

<div align="center">IV.</div>

<div align="center">

## DESCRIPTION OF THE PLAN

</div>

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN THE FOLLOWING SECTIONS.  THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES.  YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT THE DEBTOR'S PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL.  ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

**A.**    **Treatment of Administrative Expenses, Tax Claims and DIP Financing Claims**

1.    **Introduction**

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims, together with DIP Financing Claims, are not placed into voting Classes.  Instead, they are left unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment specified by statute or agreement of the parties.  All postpetition payments by or on behalf of the Debtor in respect of an Administrative Expense, Tax Claim or DIP Financing Claim will either reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of any Allowed amount thereof; provided that the method of application that is most beneficial to the Debtor's Estate will be employed.

2.    **DIP Financing Claims**

Except to the extent the DIP Lenders agree to less favorable treatment, any and all unpaid DIP Financing Claims (to the extent Allowed) will be paid in full or otherwise satisfied by the earlier of (i) the Effective Date and (ii) such other maturity date(s) as set forth in the DIP Loan Documents and the DIP Financing/Cash Collateral Orders.  The DIP Financing Claims may be paid out of any Cash in which the DIP Lenders hold a security interest pursuant to the DIP Loan Documents and the DIP Financing/Cash Collateral Orders.  The Debtor reserves any and all rights to dispute or otherwise challenge the DIP Financing Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

<div align="center">29</div>

As addressed further in Article III.E.12 above, GM asserts various DIP Financing Claims.  The Debtor disputes such Claims in their entirety.

3.     **Administrative Expenses**

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense against the Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash from the Liquidating Debtor equal to the full amount of such Allowed Administrative Expense, unless such Holder and the Debtor have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that, unless otherwise agreed by the Liquidating Debtor, (a) requests for payment of all Administrative Expenses (including Postpetition Sale Support Claims) must be Filed and served as described in Article XIII.B.3 of the Plan, and (b) certain different and additional requirements will apply to the Administrative Expenses of Professional Persons as set forth in Article XIII.B.2 and 3 of the Plan; provided further, however, that no interest or penalties of any nature will be paid in respect of an Allowed Administrative Expense.

Notwithstanding any of the foregoing, if an Administrative Expense represents an obligation incurred in the ordinary course of business, such Administrative Expense will be paid in the ordinary course by the Liquidating Debtor in accordance with the terms of the particular transaction and/or applicable agreement.

Based on various assumptions, as set forth in <u>Exhibit 3</u> attached hereto, the Debtor estimates that Allowed Administrative Expenses will total approximately $6,334,000 to $7,784,000 million as of the projected Effective Date.

4.     **Tax Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as practicable after the Effective Date, each Holder of an Allowed Tax Claim against the Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax Claim, Cash from the Liquidating Debtor equal to the portion of the Allowed Tax Claim due and payable on or prior to the Effective Date according to applicable non-bankruptcy law; provided, however, the Liquidating Debtor may in its discretion elect to make, pursuant to section 1129(a)(9)(C), regular quarterly installment payments in Cash of a total value, as of the Effective Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five years after the Petition Date together with interest for the period after the Effective Date at the rate determined under non-bankruptcy law as of the calendar month in which the Plan is confirmed, subject at the sole option of the Liquidating Debtor to prepay the entire amount of the Allowed Tax Claim.  Any Allowed Tax Claim (or portion thereof) against the Debtor not yet due and payable as of the Effective Date will be paid by the Liquidating Debtor no later than when due and payable under applicable non-bankruptcy law without regard to the commencement of the Chapter 11 Case; provided that upon request of the Liquidating Debtor, the Bankruptcy Court will determine the amount of any Disputed Claim for, or issues pertaining to, a Tax.  Any Holder of a Tax Claim

may agree to accept different treatment as to which the Liquidating Debtor and such Holder have agreed upon in writing.

Based on various assumptions, as set forth in <u>Exhibit 3</u> attached hereto, the Debtor estimates that Allowed Tax Claims will total approximately $10,000 as of the projected Effective Date.

**B.**     **Classification and Treatment of Classified Claims and Interests**

1.     **Summary**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes only to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims and/or Interests as set forth below.  Administrative Expenses and Tax Claims, together with DIP Financing Claims, have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

2.     **Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtor will determine whether a postpetition payment by or on behalf of the Estate in respect of a Claim either (x) will reduce the Allowed amount thereof or (y) will reduce the amount to be paid under the Plan in respect of any Allowed amount thereof by considering which method is most advantageous to the Debtor's Estate.

a.     <u>Class 1 – Priority Non-Tax Claims</u>

(1)     <u>Classification</u>:  Class 1 consists of all Priority Non-Tax Claims against the Debtor.  **Based on various assumptions, as set forth in <u>Exhibit 3</u> attached hereto, the Debtor estimates that Allowed Priority Non-Tax Claims will total approximately $0 as of the projected Effective Date.**

(2)     <u>Treatment</u>:  At the election of the Liquidating Debtor, the Holder of each Priority Non-Tax Claim against the Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor

equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor.

(3)     Impairment/Voting:  Class 1 is Unimpaired.  Class 1 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

b.     Class 2 – Prepetition Credit Agreement Secured Claims

(1)     Classification:  Class 2 consists of any Prepetition Credit Agreement Secured Claims against the Debtor that are treated as prepetition Claims.  **The Debtor believes that all Prepetition Credit Agreement Secured Claims have been incorporated into the DIP Financing Claims.  As addressed further in Article III.E.12 above, GM asserts various DIP Financing Claims totaling up to $13,750,000 that the Debtor disputes.**

(2)     Treatment:  At the election of the Liquidating Debtor, the Holder of each Prepetition Credit Agreement Secured Claim against the Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Prepetition Credit Agreement Secured Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor.  The Debtor reserves any and all rights to dispute or otherwise challenge the Prepetition Credit Agreement Secured Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

(3)     Impairment/Voting:  Class 2 is Unimpaired.  Class 2 therefore is conclusively presumed to have accepted the Plan, and Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

c.     Class 3 – Miscellaneous Secured Claims

(1)     Classification:  Class 3 consists of all Miscellaneous Secured Claims (if any such Claims exist) against the Debtor.  Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtor different from that securing any other Miscellaneous Secured Claim, will be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.  **The Debtor does not expect Miscellaneous Secured Claims to exceed $100,000.**

(2)     Treatment:  Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtor, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtor, (i) each Allowed Miscellaneous Secured Claim will be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim will receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous

Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the Holder of such Claim and the Debtor or Liquidating Debtor.  Prior to the Confirmation Hearing, the Debtor will inform each Holder of a Miscellaneous Secured Claim if such Creditor's Secured Claim will be treated as Unimpaired under the Plan.

(3)    Impairment/Voting: Class 3 is Unimpaired.  Class 3 therefore is conclusively presumed to have accepted the Plan, and Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

d.    Class 4 – General Unsecured Claims

(1)    Classification:  Class 4 consists of all General Unsecured Claims against the Debtor.  **Based on various assumptions, as set forth in <u>Exhibit 3</u> attached hereto, the Debtor estimates that Allowed General Unsecured Claims will total approximately $4,000,000 to $5,000,000 million as of the projected Effective Date, plus $32,100,000 of claims asserted by the DOL.**

(2)    Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim will receive, as the sole distribution by the Liquidating Debtor or its Estate under the Plan on account of such General Unsecured Claim, a Pro Rata share (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) of the Net Distributable Assets of the Debtor up to the full Allowed amount of such General Unsecured Claim.  Holders of Allowed General Unsecured Claims will not be entitled to the payment of postpetition interest under the Plan, unless excess Net Distributable Assets remain after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  In such case of excess Net Distributable Assets, then Holders of Allowed General Unsecured Claims will receive on a Pro Rata basis (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) postpetition interest at the Federal Judgment Rate, to the extent that sufficient excess Net Distributable Assets (once all liquidated to Cash) exist and as required under the Bankruptcy Code.

(3)    Impairment/Voting: Class 4 is Impaired.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

e.    Class 5 – PBGC Claims

(1)    Classification:  Class 5 consists of all PBGC Claims against the Debtor.  **Pursuant to the PBGC Settlement Agreement, the PBGC Claims total $95 million and will participate in distributions to Holders of General Unsecured Claims.**

(2)    Treatment:  On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim will receive, as the sole distribution by the Liquidating Debtor or its Estate under the Plan on account of such PBGC Claim, the treatment provided by the PBGC Settlement Agreement.  Specifically, subject to the terms of the PBGC settlement

Agreement, each Holder of an Allowed PBGC Claim will share on a Pro Rata basis in the distributions to be made to Holders of Allowed General Unsecured Claims in Class 4.

(3)    <u>Impairment/Voting</u>: Class 5 is Impaired.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

f.    <u>Class 6 – Interests in the Debtor</u>

(1)    <u>Classification</u>:  Class 6 consists of all Interests in the Debtor.

(2)    <u>Treatment</u>:  The Holders of Interests will receive no distributions under the Plan, and on the Effective Date, all Interests will be deemed suspended.  As of the Effective Date, the Holders of Interests will receive a contingent interest in the Net Distributable Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  For the avoidance of doubt, no distribution of Net Distributable Assets (once all liquidated to Cash) will be made to Holders of Interests until and unless all Holders of Allowed General Unsecured Claims receive payment in full of such Allowed Claims, plus all accrued postpetition interest at the Federal Judgment Rate.

(3)    <u>Impairment/Voting</u>: Class 6 is Impaired.  Holders of Class 6 Interests are deemed to reject the Plan.

**C.    Acceptance or Rejection of Plan**

1.    **Identification of Unimpaired Classes**

The following Classes of Claims are Unimpaired under the Plan:

Class 1 – Priority Non-Tax Claims

Class 2 – Prepetition Credit Agreement Secured Claims

Class 3 – Miscellaneous Secured Claims

2.    **Identification of Impaired Classes**

The following Classes of Claims and Interests are Impaired under the Plan.

Class 4 – General Unsecured Claims

Class 5 – PBGC Claims

Class 6 – Interests in the Debtor

3.    **Classes Permitted and Not Permitted to Vote**

Class 1 through Class 3 are Unimpaired.  Holders of Claims in these Classes are conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the Plan and therefore will not be entitled to vote to accept or reject the Plan.  Classes 4 through 6 are Impaired.  Holders of Claims in Classes 4 and 5 are permitted to vote to accept or reject the Plan.  Holders of Interests in Class 6 are deemed to reject the Plan.  The Debtor reserves all of its rights with respect to all Claims classified by the Debtor.

An Impaired Class of Claims that votes will have accepted the Plan if (a) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

4.    **Effect of Non-Voting**

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtor may seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

5.    **Nonconsensual Confirmation**

In the event any Class of Claims votes to reject the Plan and given the deemed rejection of the Plan by the Holders of Interests, the Debtor requests that the Bankruptcy Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate unfairly as to the Holders of any Class of Claims or Interests.

6.    **Postpetition Interest**

Nothing in the Plan or the Disclosure Statement will be deemed to entitle the Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent that the Holder of a Claim has the benefit of a Lien on assets that exceed the value of such Claim or the Plan expressly provides for postpetition interest on account of such Claim.

**D.    Means for Implementation of the Plan**

1.    **PBGC Settlement**

The provisions of the Plan incorporate the terms of the PBGC Settlement Agreement and the PBGC Settlement Order pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  From and after the Effective Date, each and every provision of the PBGC Settlement Agreement will be binding on the Liquidating Debtor.

2.    **Continued Corporate Existence and Vesting of Assets**

On and after the Effective Date, subject to the requirements of the Plan, the Liquidating Debtor will continue to exist as a separate limited liability company and will retain all of the powers of limited liability companies under applicable non-bankruptcy law, and without prejudice to any right to amend its operating agreement, dissolve, merge or convert into another form of business entity, or to alter or terminate its existence.  The existing membership interests

of the Debtor will be deemed to be held by the Plan Administrator, and the Plan Administrator will be deemed to have been admitted as the sole member of the Debtor under applicable nonbankruptcy law and will be authorized to exercise all of the rights and powers of a sole member as provided by the Plan.  Further, the Debtor's operating agreement will be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.

Except as otherwise provided in the Plan, on and after the Effective Date, all Distributable Assets and property of the Debtor and its Estate, including any interests in subsidiaries and affiliates and any Retained Rights of Action of the Debtor, will vest in the Liquidating Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  Neither the occurrence of the Effective Date, nor the effectiveness of the Plan, nor any provision of applicable non-bankruptcy law will cause a dissolution of the Debtor, which will be continued as a limited liability company following the Effective Date subject to the terms of the Plan.

On and after the Effective Date, subject to the requirements of the Plan, the Liquidating Debtor will be permitted to conduct its business, reconcile Claims, use and dispose of assets, prosecute litigation, and otherwise take any and all actions reasonably necessary to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Liquidating Debtor will be authorized, without limitation, to use and dispose of the Distributable Assets of the Debtor and its Estate, to investigate and pursue any Retained Rights of Action of the Debtor as the representative of the Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs.

3.    **Corporate Action; Winding Up of Affairs**

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the Debtor, including but not limited to actions requiring a vote or other approval of the board of managers, members or other equity holders of the Debtor or the execution of any documentation incident to or in furtherance of the Plan, will be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members or officers of the Debtor.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing member of the Board of Managers and officers of the Debtor will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator will be deemed the sole manager, officer and representative of the Liquidating Debtor to exercise the rights, power and authority of the Liquidating Debtor under applicable provisions of the Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court.  The Confirmation Order will act as an order modifying the Debtor's operating agreement such that the provisions of the Plan can be effectuated.  The Plan will be administered by the Plan Administrator, and all actions taken thereunder in the name of the Liquidating Debtor will be taken through the Plan Administrator.  All corporate governance

activities of the Liquidating Debtor will be exercised by the Plan Administrator in his or her discretion, subject to the terms of the Plan.

Following the Confirmation Date, the Debtor will not engage in any business activities or take any actions, except those necessary to (i) effectuate the Plan and (ii) wind up the affairs of the Debtor as soon as reasonably practicable. On and after the Effective Date, the Plan Administrator may, in the name of the Liquidating Debtor, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Plan Administrator may, without application to or approval of the Bankruptcy Court, pay, from the proceeds of Distributable Assets, the charges that he or she incurs after the Effective Date for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Administrative Expenses.

From and after the Effective Date, (i) the Debtor, for all purposes, will be deemed to have withdrawn its business operations from any state in which it was previously conducting or is registered or licensed to conduct its business operations, and the Debtor will not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtor will not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

4.   **Plan Administrator**

On the Effective Date, the Plan Administrator will begin acting for the Liquidating Debtor in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under the Plan, subject to the provisions of the Plan. The Plan Administrator will serve in such capacity through the earlier of the date the Debtor is dissolved in accordance with the Plan and the date such Plan Administrator resigns, is terminated or otherwise unable to serve; provided, however, that, any successor Plan Administrator appointed pursuant to the Plan, will serve in such capacities after the effective date of such persons appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding the Plan Administrator will be set forth in a notice to be Filed with the Bankruptcy Court as part of the Plan Supplement; such compensation may be paid from the Liquidating Debtor's Cash on hand without further notice or order of the Bankruptcy Court. Further, the Plan Administrator will be entitled to reimbursement, from the Liquidating Debtor's Cash on hand, for his or her actual, reasonable, and necessary expenses incurred in connection with the performance of his or her duties, without the need for further notice or Bankruptcy Court approval. All distributions to be made to Creditors and, if applicable, Interest Holders under the Plan will be made by the Plan Administrator (or his or her designated agent). The Plan Administrator will deposit and hold all Cash in trust for the benefit of Creditors (including Professional Persons) and Holders of Interests receiving distributions under the Plan. The duties and powers of the Plan Administrator will include, without limitation, the following (without need of further Court approval):

(i)     To exercise all power and authority that may be exercised, to commence all proceedings (including the power to continue any actions and proceedings that may have been

commenced by the Debtor prior to the Effective Date) that may be commenced, and to take all actions that may be taken by any officer or manager of the Liquidating Debtor with like effect as if authorized, exercised, and taken by unanimous action of such officers and managers, including consummating the Plan and all transfers thereunder on behalf of the Liquidating Debtor;

      (ii)    To wind up the affairs of the Liquidating Debtor and any or all of its subsidiaries and affiliates to the extent necessary as expeditiously as reasonably possible;

      (iii)    To maintain all accounts, make distributions, and take other actions required under or consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Liquidating Debtor;

      (iv)    To use, manage, sell, abandon, convert to Cash and/or otherwise dispose of the Distributable Assets, for the purpose of liquidating all remaining property of the Estate, making distributions and fully consummating the Plan Stipulation;

      (v)    To take all steps necessary to terminate the corporate existence of the Debtor;

      (vi)    To prosecute objections to Claims and Administrative Expenses and compromise or settle any Claims and Administrative Expenses (disputed or otherwise);

      (vii)    To prosecute any and all Retained Rights of Action and compromise or settle any Retained Rights of Action;

      (viii)    To prepare and file tax returns to the extent required by law;

      (ix)    To employ and compensate any and all such professionals and agents as the Plan Administrator, in his or her sole discretion, deems reasonably necessary to perform his or her duties under the Plan without further order of the Bankruptcy Court; and

      (x)    To take all other actions not inconsistent with the provisions of the Plan that the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan, including, without limitation, filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 Case.

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation, removal, death, or incapacity of the Plan Administrator, the Bankruptcy Court will appoint another Person to become Plan Administrator, with notice thereof provided to the Post-Effective Date Service List.  The successor Plan Administrator without any further act will become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor

    5.    **<u>Source of Funding</u>**

The source of all distributions and payments under the Plan will be the Distributable Assets and the proceeds thereof, including, without limitation, the Debtor's Cash on hand and

proceeds from the sale or other disposition of the remaining property of the Debtor and prosecution of Retained Rights of Action.

     6.     **Retained Rights of Action of the Debtor**

Unless a Right of Action of the Debtor (including the right to object to any Claim asserted against the Estate) is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights of the Estate from and after the Effective Date with respect to the Retained Rights of Action are expressly preserved for the benefit of, assigned to, and fully vested in, the Liquidating Debtor.

The Liquidating Debtor will have standing as the representative of the Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of the Debtor.  The Liquidating Debtor, acting through the Plan Administrator, may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court.

     7.     **Interests in Affiliates and Subsidiaries**

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, the Liquidating Debtor will retain any stock or interests that it may hold in its non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests.  After the Effective Date, the Liquidating Debtor may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

     8.     **Payment of Plan Expenses**

The Liquidating Debtor may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

     9.     **Ultimate Dissolution of Debtor; Final Decree**

Once the Plan Administrator determines that the Final Resolution Date has occurred, the Liquidating Debtor will be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtor or payments to be made in connection therewith; provided, however, without the need of any further approval, the Plan Administrator in his or her discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the Liquidating Debtor under the laws of Delaware and/or any other applicable states, and in such event, all applicable regulatory or governmental agencies will take all steps necessary to allow and effect the prompt dissolution of the Liquidating Debtor as provided in the Plan, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates.

At any time following the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtor, will be authorized to file a motion for the entry of a final decree closing the Chapter 11 Case pursuant to section 350 of the Bankruptcy Code

10.    **Records**

The Liquidating Debtor and Plan Administrator will maintain reasonably good and sufficient books and records of accounting relating to the Distributable Assets, the Liquidating Debtor's Cash, the management thereof, all transactions undertaken by such parties, all expenses incurred by or on behalf of the Debtor and Plan Administrator, and all distributions contemplated or effectuated under the Plan. Upon the entry of a final decree closing the Chapter 11 Case, unless otherwise ordered by the Bankruptcy Court, the Liquidating Debtor and Plan Administrator may destroy or otherwise dispose of all records maintained by the Liquidating Debtor and/or Plan Administrator. Notwithstanding anything to the contrary, the Plan Administrator may, upon notice to the Post-Effective Date Service List and without Bankruptcy Court approval, destroy any documents that he or she believes are no longer required to effectuate the terms and conditions of the Plan.

E.    **Treatment of Executory Contracts and Unexpired Leases**

1.    **Rejection of Executory Contracts and Unexpired Leases**

Except for any executory contracts or unexpired leases: (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtor as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtor or the Estate; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date. Without limiting the foregoing, the indemnification obligations in favor of the Debtor's independent managers and applicable Huron Parties will be assumed as of the Effective Date, and all other pre-Effective Date indemnification obligations of the Debtor will be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations. The Confirmation Order will constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

2.    **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtor or its Estate unless a proof of Claim is Filed and served on the Debtor and its counsel within thirty (30) days after the earlier of (a) Effective Date or (b) service of a notice that the executory contract or unexpired lease has been rejected. All such Claims for which proofs of Claim are required to be Filed, if Allowed, will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

**F.**    **Distributions and Related Matters**

1.    **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and Interests specify the times for distributions.  Whenever any payment or distribution to be made under the Plan will be due on a day other than a Business Day, such payment or distribution will instead be made, without interest, by the Liquidating Debtor (or its agent) on the immediately following Business Day.  Distributions due on the Effective Date will be paid on such date or as soon as practicable thereafter, provided that if other provisions of the Plan require the surrender of securities or establish other conditions precedent to receiving a distribution, the distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim (*e.g.*, it is Disallowed) entitles other Holders of Claims to a further distribution, either (a) the Liquidating Debtor may make such further distribution as soon as practicable after the resolution of the Disputed Claim or (b) if the further distribution is determined in good faith by the Liquidating Debtor to be less than $100 for any Creditor, then, in order to afford an opportunity to minimize costs and aggregate such distributions, the Liquidating Debtor may make such further distribution any time prior to sixty (60) days after the Final Resolution Date or with the next distribution, in the discretion of the Liquidating Debtor.

2.    **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Liquidating Debtor, except that Cash payments made to foreign Creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

3.    **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding down of such fraction to the nearest whole cent.  To the extent Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash will be treated as "Unclaimed Property" under the Plan.

4.    **Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for the purpose of calculating the amount or number of distributions to be made on account of Allowed Claims or Allowed Administrative Expenses under the Plan, such calculations will be made as if each Disputed Claim were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Liquidating Debtor), such amount or number as determined by the Bankruptcy Court will be used for calculations as to such Disputed Claim.

All distributions due in respect of a Disputed Claim will be held and not made pending resolution of the Disputed Claim.

If an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim or Allowed Administrative Expense will be made by the Liquidating Debtor.  Such distribution will be made within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense or as soon thereafter as reasonably practicable.  No interest will be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

## 5. **Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Liquidating Debtor as undeliverable or the check or other similar instrument or distribution by the Liquidating Debtor remains uncashed or unclaimed, as applicable, for ninety (90) days, such Cash will be deemed to be Unclaimed Property.  Upon property becoming Unclaimed Property, it immediately will be revested in the Liquidating Debtor.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

## 6. **Compliance with Tax Requirements**

The Liquidating Debtor will comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtor will file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received, the Liquidating Debtor may, in its sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however, that Liquidating Debtor will not be obligated to liquidate any securities to perform such withholding.

## 7. **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, will be the same as the Record Date.

8.     **Reserves**

In making any distributions in respect of Claims under the Plan, the Liquidating Debtor will reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims. The Liquidating Debtor will make a corrective distribution following the successful resolution of any Disputed Claim on the next regularly scheduled distribution date.

**G.**     **Litigation, Objections to Claims, and Determination of Taxes**

1.     **Litigation, Objections to Claims, and Objection Deadline**

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtor, through the Plan Administrator, will be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtor will have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims; provided, however, parties in interest may file objections to Claims to the extent permitted by Bankruptcy Code section 502(a). Unless another date is established by the Bankruptcy Court *sua sponte* (which may so act without notice or hearing) or is established by other provisions of the Plan, any objection to a Claim or Interest will be filed with the Bankruptcy Court and served on the Person holding such Claim or Interest within one hundred eighty (180) days after the Effective Date (as may be extended pursuant to this section, the "Objection Deadline"), provided that the Liquidating Debtor may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.

In addition to any other available remedies or procedures with respect to Tax issues or liabilities or rights to Tax refunds, the Liquidating Debtor, at any time, may utilize (and receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or liability or right to a Tax refund relating to an act or event occurring prior to the Effective Date; or (2) any Tax liability or right to a Tax refund arising prior to the Effective Date. If the Liquidating Debtor utilizes section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court will determine the amount of the subject Tax liability or right to a Tax refund in the event that the appropriate governmental entity timely determines a Tax to be due in excess of the amount indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtor will be entitled to such discharge which will apply to any and all Taxes relating to the period covered by such return.

2.     **Temporary or Permanent Resolution of Disputed Claims**

The Debtor and the Liquidating Debtor may request, at any time prior to the Effective Date (in the case of the Debtor) or on and after the Effective Date (in the case of the Liquidating Debtor), that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning

any objection to the Disputed Claim.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtor may elect from and after the Effective Date to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtor may resolve or adjudicate any Disputed Claim from and after the Effective Date in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Case had not been commenced.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### 3.    <u>Setoffs</u>

The Liquidating Debtor may, but will not be required to, setoff against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against the Holder of such Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Liquidating Debtor of any such claim that the Liquidating Debtor may have against such Holder, unless otherwise agreed to in writing by such Holder and the Liquidating Debtor.

### 4.    <u>Preservation of Retained Rights of Action</u>

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Debtor and its successors, any assigns hereunder and future assigns will retain and may exclusively enforce any Retained Rights of Action and the Confirmation Order will be deemed a *res judicata* determination of such rights to retain and exclusively enforce such Retained Rights of Action. Absent such express waiver or release, the Liquidating Debtor, acting through the Plan Administrator, or its successors or assigns will have standing as the representative(s) of the Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue Retained Rights of Action, as appropriate, in accordance with the best interests of the Liquidating Debtor (or its successors or future assigns).  The Retained Rights of Action may be asserted or prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan will (or is intended to) prevent, estop or be deemed to preclude the Liquidating Debtor from utilizing, pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such Retained Rights of Action upon or after Confirmation or Consummation.

**H.**    **Releases, Injunctions and Exculpation Provisions**

1.    **Injunctions**

a.    <u>Generally</u>

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Case pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, will remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Liquidating Debtor or its Estate, or (ii) the property of the Debtor or its Estate, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

b.    <u>Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests</u>

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability against or in the Debtor  are permanently enjoined from taking any of the following actions against property of the Debtor or its Estate or the Liquidating Debtor on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.*

2.    **Exculpation**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, (i) the Debtor, (ii) the independent managers of Revstone Transportation, Messrs. James B. Shein and Richard E. Newsted (including in their respective role as members of the Restructuring Committee) (the "<u>Independent Managers</u>") , (iii) the Debtor's attorneys and other professionals (solely in their respective capacity as professionals of the Debtor) (the "<u>Debtor Retained Professionals</u>"), (iv) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (v) the Huron Parties (solely with respect to services rendered for the Debtor, including as officers, representatives, professionals for, and/or agent of the Debtor), and (vi) the respective successors or assigns of the foregoing parties, will neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver, release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Case up to and

including the Effective Date; provided, however, that the foregoing provisions of this subsection will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the scope of the exculpation provided under Article X.B of the Plan does not cover any of the George Hofmeister Parties or the former and current officers, managers and representatives of the Debtor (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly exculpated above).

Notwithstanding anything in the Plan to the contrary, no Person serving as Plan Administrator will have or incur any personal liability as the manager, member or officer of the Debtor or Liquidating Debtor for any act taken or omission made in connection with the wind-up or dissolution of the Liquidating Debtor or any nondebtor subsidiary or affiliate; provided, however, that the foregoing will have no effect on the liability of the Plan Administrator that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.

### 3.     **Debtor's Release of CRO, Independent Managers, and Other Parties**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, the Debtor, for itself and the Estate, irrevocably, unconditionally and generally releases (i) the Independent Managers, (ii) the Debtor Retained Professionals, (iii) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (iv) the Huron Parties (solely with respect to services rendered for the Debtor, including as officers, representatives, professionals for, and/or agent of the Debtor), and (v) the respective successors or assigns of the foregoing parties (collectively, the "Released Parties"), from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, which the Debtor or its Estate ever had, now have or hereafter can, will or may have against any of the Released Parties from the beginning of time to the Effective Date that in any way relates to the Debtor, the Estate or the Chapter 11 Case.  For the avoidance of doubt, the scope of the release provided under Article X.C of the Plan does not cover any of the George Hofmeister Parties or the former and current officers, managers and representatives of the Debtor (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above).

### 4.     **Release by Creditors**

**As of and subject to the occurrence of the Effective Date, for good and valuable consideration, each holder of a Claim that votes to accept the Plan (the "Creditor-Releasors"), for itself and its respective present or former officers, directors, managers, shareholders, trustees, partners and partnerships, members, agents, employees, representatives, attorneys, accountants, professionals, and successors or assigns, in each case solely in their capacity as such, shall be deemed to have completely, conclusively, unconditionally and irrevocably released (i) the Debtor, (ii) the Estate, (iii) the Independent Managers, (iv) the Debtor Retained Professionals, (v) the attorneys and professionals**

retained by the Restructuring Committee (solely in their capacity as such), (vi) the Huron Parties (solely with respect to services rendered for the Debtor, including as officers, representatives, professionals for, and/or agent of the Debtor), and (vii) the respective successors or assigns of the foregoing parties (the "<u>Released Debtor Parties</u>"), from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, in law or equity or otherwise, which the Debtor or its Estate ever had, now have or hereafter can, will or may have against any of the Released Parties from the beginning of time to the Effective Date that in any way relates to the Debtor, the Estate or the Chapter 11 Case.  For the avoidance of doubt, the Released Debtor Parties do not include any of the George Hofmeister Parties or the former and current officers, managers or representatives of the Debtor, other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly released above.

5.       **Release by Debtor's Non-Debtor Affiliates of the Released Debtor Parties**

Except as otherwise specifically provided in the Plan, for good and valuable consideration, as of the Effective Date, all of the non-debtor, direct or indirect corporate subsidiaries of the Debtor (the "<u>Releasor Affiliates</u>") will conclusively, absolutely, unconditionally, irrevocably and forever release and discharge the Released Debtor Parties from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities whatsoever, which the Releasor Affiliates ever had, now have or hereafter can, will or may have against any of the Released Debtor Parties from the beginning of time to the Effective Date that in any way relates to the Debtor, the Estate or the Chapter 11 Case.  For the avoidance of doubt, the Releasor Affiliates do not include Debtors Revstone Industries, LLC, Spara, LLC, Greenwood Forgings, LLC, and US Tool & Engineering, LLC.

6.       **No Discharge**

Nothing contained in the Plan will be deemed to constitute a discharge of the Debtor under Bankruptcy Code section 1141(d)(3).

I.       **No Regulated Rate Change Without Government Approval**

The Debtor does not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

J.       **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtor pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

**K.**     **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Case and any of the proceedings related to the Chapter 11 Case pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court will retain jurisdiction for the purposes specifically identified in Section XIII.A of the Plan.

**L.**     **Services By and Fees for Professionals and Certain Parties; Bar Date for Administrative Expenses**

Notwithstanding any other provision herein or in the Plan, Professional Fee Claims will be paid in accordance with the terms of the order(s) authorizing such payments as promptly as possible on the Effective Date for any outstanding amounts due as of the Effective Date, and as soon as practicable thereafter as such obligation to pay becomes due unless otherwise agreed upon by the applicable Professional.

From and after the Effective Date, the Liquidating Debtor will in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professionals thereafter incurred by the Liquidating Debtor.

Requests for payment of all Administrative Expenses, other than for those for which a Bar Date was previously set (including the Bar Date set by the Bar Date Order) or for which a request and/or proof of Claim has previously been filed, must be Filed and served on the Liquidating Debtor and the United States Trustee by no later than thirty (30) days after the Effective Date.  The Liquidating Debtor will have until ninety (90) days after the Effective Date to bring an objection to a Timely Filed request for payment of an Administrative Expense (as may be extended pursuant to this section, the "Administrative Expense Objection Deadline"), provided that the Liquidating Debtor may seek extension(s) thereof subject to Bankruptcy Court approval and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule 2002.  Nothing in the Plan will prohibit the Liquidating Debtor from paying Administrative Expenses in the ordinary course in accordance with applicable law during or after the Chapter 11 Case, but after the Effective Date, the Liquidating Debtor's obligation to pay an Administrative Expense will depend upon the claimant's compliance with this section and such Administrative Expense being Allowed under the provisions of the Plan.

Notwithstanding the foregoing provisions of Article XIII.B.3 of the Plan, but except as may be expressly provided in other sections of the Plan, Professional Persons requesting compensation or reimbursement of expenses incurred after the Petition Date and prior to the Effective Date must file and serve, on all parties entitled to notice thereof, a Fee Application for final allowance of compensation and reimbursement of expenses in accordance with the various orders of the Bankruptcy Court establishing procedures for submission and review of such applications; provided that, if no last date is set in such procedures for filing such applications,

they must be filed no later than sixty (60) days after the Effective Date and any objections to such applications must be made in accordance with applicable rules of the Bankruptcy Court.

**M.**    **Non-Voting Equity Securities**

If and to the extent applicable, the Debtor will comply with the provisions of section 1123(a)(6) of the Bankruptcy Code.

**N.**    **Subordination Agreements**

Pursuant to section 510(a) of the Bankruptcy Code, to the extent there is any subordination agreement in place between creditors that is enforceable under nonbankruptcy law, the Debtor will honor such subordination agreement and turn over any distributions required to be turned over pursuant to the terms of such agreements and the Bankruptcy Code.

**O.**    **No Waiver**

Neither the failure of the Debtor to list a Claim in the Debtor's Schedules, the failure of the Debtor to object to any Claim or Interest for purposes of voting, the failure of the Debtor to object to a Claim, Administrative Expense or Interest prior to Confirmation or the Effective Date, the failure of the Debtor to assert a Retained Right of Action prior to Confirmation or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim, nor any action or inaction of the Debtor or any other party with respect to a Claim, Administrative Expense, Interest or Retained Right of Action other than a legally effective express waiver or release will be deemed a waiver or release of the right of the Liquidating Debtor or its successors, before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim, Administrative Expense or Interest, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

**P.**    **U.S. Trustee Fees**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtor on or before the Effective Date.  From and after the Effective Date, the Liquidating Debtor will pay the fees assessed against its Estate until such time as the particular Chapter 11 Case is closed, dismissed or converted.  In addition, the Liquidating Debtor will file post-confirmation quarterly reports in conformity with the U.S. Trustee guidelines until entry of an order closing or converting the Chapter 11 Case.

**Q.**    **Preservation of Insurance**

The Debtor's release from and payment of Claims as provided in the Plan will not diminish or impair the enforceability any insurance policy that may cover any Claims, including, without limitation, any Claims on account of the Debtor's officers or managers.

### R.    Waiver of Stay

The Debtor requests as part of the Confirmation Order a waiver from the Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

### S.    Conditions to Effective Date and Effects of Confirmation

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Debtor; (B) all documents to be provided in the Plan Supplement are in form and substance acceptable to the Debtor; (C) the Confirmation Order will be a Final Order; (D) the Debtor determines in its reasonable business judgment that it has sufficient Cash to pay all Allowed Administrative Expenses, Allowed Tax Claims and Allowed Priority Non-Tax Claims, as of the Effective Date, to the extent the holders thereof are entitled to payment as of such date under the Plan and unless otherwise agreed by such holders, and (E) the Debtor determines in its reasonable business judgment that the Debtor has sufficient Cash to pay all asserted, accrued and estimated Administrative Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective Date but which such Administrative Expenses are anticipated to be later Allowed or otherwise payable and the holders of any such Administrative Expenses have not agreed to alternative treatment.  Any of the foregoing conditions, other than conditions (D) and (E), may be waived by the Debtor and such waiver will not require any notice, Bankruptcy Court order, or any further action.

Confirmation will bind the Debtor, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.  Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

### T.    Modification or Withdrawal of Plan and Disclosure Statement

The Debtor may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth in the Plan, the Debtor reserves the right to amend the terms of the Plan or waive any conditions to its Confirmation, effectiveness or consummation, if the Debtor determines that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Debtor may, pursuant to section 1127 of the Bankruptcy Code, seek to modify the Plan.  After the Effective Date, the

Liquidating Debtor may apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

The Debtor reserves the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.  If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan will be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (if any), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (iii) nothing contained in the Plan will:  (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtor against any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

## V.

## REQUIREMENTS FOR CONFIRMATION

### A.    Acceptances Necessary to Confirm Plan

Voting rights are set forth as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 2 – Prepetition Credit Agreement Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 3 – Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 4 – General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 – PBGC Claims | Impaired | Entitled to Vote |
| Class 6 – Interests in the Debtor | Impaired | Deemed to Reject |

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept or reject the Plan, the Debtor will seek to have the Plan deemed **accepted** by the Holders of such Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

### B.    Best Interest of Creditors Test

Confirmation requires, among other things, that each Holder of a Claim in an Impaired Class and each Holder of an Interest either:  (a) accepts the Plan; or (b) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "best interests test."

1.      **Chapter 7**

To determine the value that the Holders of Impaired Claims and Interests would receive if the Debtor was liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  Section 704 of the Bankruptcy Code requires a chapter 7 trustee to collect and reduce to money the property of the estate as expeditiously as is compatible with the best interests of parties in interest.

Here, the Cash available in a chapter 7 case for satisfaction of Allowed Claims would consist of the Cash proceeds resulting from the liquidation of the Debtor's remaining assets, augmented by the Cash, if any, held by the Debtor at the time of the commencement of the chapter 7 case.  Any such Cash amount would then be reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation of any remaining assets, including the costs of prosecution of any pending litigation and Avoidance Claims, and such additional administrative claims and other priority claims that may be incurred during the chapter 7 case.

The costs of liquidation under chapter 7 would include fees payable to the chapter 7 trustee and his or her attorneys and other professionals and agents, plus any unpaid expenses incurred by the Debtor during the Chapter 11 Case that would be entitled to priority in the chapter 7 case (such as compensation for Professional Persons and costs and expenses of the Debtor).  Such Administrative Expenses arising during the chapter 7 and 11 cases would have to be paid in Cash in full from the liquidation proceeds before the balance of those proceeds could be made available to pay prepetition claims.

2.      **Liquidation Alternative**

The Plan satisfies the best interest of creditors test.  The Plan provides a greater recovery to the holders of Allowed General Unsecured Claims and Allowed PBGC Claims than such Holders would receive under a liquidation under chapter 7, primarily because the Plan avoids additional administrative expenses and commissions associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtor's remaining relatively few assets for the benefit of Creditors.

In this case, the Debtor has already liquidated or otherwise disposed of a substantial portion of its assets (including through the sale of assets to Dayco discussed above).  With respect to the Debtor's remaining assets, the Liquidating Debtor and the Plan Administrator (the Debtor's CRO) will be in the best position to liquidate the Debtor's remaining assets, if any, resolve claims, and make distributions to Creditors.

The recovery to general unsecured creditors under the Plan is expected to be more than such creditors' recovery in a chapter 7 case.  Among other things, if the Chapter 11 Case were converted to a chapter 7 case, the Debtor's estate would incur the costs of payment of a statutorily allowed sliding-scale commission to the chapter 7 trustee, as well as the additional costs of replacement counsel and other professionals retained by the trustee to get up to speed

and assist with the liquidation.[5]  Such amounts, together with other wind-down costs, would likely exceed the amount of Plan Expenses that are expected to be incurred by the Plan Administrator and his or her professionals and agents in completing the liquidation of the remaining assets and otherwise winding up the affairs of the Debtor.  Further, some residual value resulting from the Debtor's efforts prior to the chapter 7 trustee's appointment may be subsequently transferred to the Estate, and the chapter 7 trustee may be able to assert a commission for such funds although these may have primarily been the result of prior efforts.  Additionally, the Debtor's estate would likely suffer additional delays, as a chapter 7 trustee and his/her counsel needs time to develop a necessary learning curve in order to complete the administration of the estate.  The Debtor's estate would continue to be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for professionals) which will constitute Allowed Claims in any chapter 7 case.  Moreover, a chapter 7 case would trigger a new bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7.  Fed. R. Bankr. P. 3002(c).  Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional claims that were not asserted in the Chapter 11 Case.   In short, given most of the Debtor's assets have already been liquidated, the primary consequence of liquidating the Debtor under chapter 7 of the Bankruptcy Code would be to incur additional administrative expenses and other costs and reduce the amounts payable to holders of General Unsecured Claims.

Based upon these reasons, the Debtor believes that the Plan provides an opportunity to bring the highest return for Creditors.

3.    **Feasibility of Plan**

Under section 1129(a)(11) of the Bankruptcy Code, the Debtor must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan).  The Plan clearly complies with this requirement because all of the Debtor's remaining assets will be distributed to Creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the Estate will no longer exist to be subject to future reorganization or liquidation.  On the Effective Date, the Debtor believes it will have sufficient funds to satisfy Claims pursuant to the treatment set forth in the Plan as well as to implement the Plan.

4.    **Classification**

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims.  Section 1122(a) permits a plan to place a claim or equity interest in a particular class only if the claim or equity interest is substantially similar to the other claims or interests in that class.  The Debtor believes that the classification of Claims and Interests under the Plan is appropriate and consistent with applicable law.

---

[5] The chapter 7 trustee would likely engage his own advisors and professionals that would add more professional fees and expenses that would have to be paid prior to any distributions to holders of Allowed General Unsecured Claims and Allowed PBGC Claims.

5.       **Confirmation of Plan Without Necessary Acceptances; Cramdown**

A COURT MAY CONFIRM A PLAN, EVEN IF IT IS NOT ACCEPTED BY ALL IMPAIRED CLASSES, IF THE PLAN HAS BEEN ACCEPTED BY AT LEAST ONE IMPAIRED CLASS OF CLAIMS, AND THE PLAN MEETS THE "CRAMDOWN" REQUIREMENTS SET FORTH IN SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) OF THE BANKRUPTCY CODE REQUIRES THAT THE BANKRUPTCY COURT FIND THAT A PLAN IS "FAIR AND EQUITABLE," AND DOES NOT "DISCRIMINATE UNFAIRLY" WITH RESPECT TO EACH NON-ACCEPTING IMPAIRED CLASS OF CLAIMS OR INTERESTS.  IN THE EVENT THAT ANY IMPAIRED CLASS REJECTS THE PLAN, IN ACCORDANCE WITH SECTION 1129(a)(8) OF THE BANKRUPTCY CODE, AND AT LEAST ONE IMPAIRED CLASS HAS VOTED TO ACCEPT THE PLAN, THE DEBTOR INTENDS TO REQUEST THAT THE BANKRUPTCY COURT CONFIRM THE PLAN IN ACCORDANCE WITH THE "CRAMDOWN" PROVISION OF SECTION 1129(b) OF THE BANKRUPTCY CODE, OR MODIFY THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF.

The Plan provides for the possibility of invoking the "cramdown" provisions as defined in section 1129(a) of the Bankruptcy Code.  Under this provision, the Bankruptcy Court has the authority to confirm the Plan even though a Class of Claims that is Impaired does not vote to accept the Plan, if another Class of Claims, which is also Impaired, votes to accept the Plan. This provision takes into account the possibility that one large claimant or several claimants may arbitrarily vote not to accept the Plan and that those arbitrary votes could be detrimental to other Creditors.  In this instance the Bankruptcy Court, notwithstanding the negative vote of an Impaired Class, in the interest of being "fair and equitable," may confirm the Plan if another Impaired Class has accepted the Plan.  Such determination, if necessary, would be addressed at the Confirmation Hearing.

6.       **No Unfair Discrimination**

The Debtor believes that under the Plan:  (i) all Impaired Classes of Claims and Interests are treated in a manner that is consistent with the treatment of other Classes of Claims and Interests with which their legal rights are intertwined, if any; and (ii) no Class of Claims or Interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims or Allowed Interests in such Class.  The Debtor believes that the Plan does not discriminate unfairly as to any Impaired Class.

7.       **Fair and Equitable Test**

With respect to a dissenting class of Claims and Interests, the "fair and equitable" standard requires that the Plan provide that either the Claims or Interests in each Class received everything to which they are legally entitled or that Classes junior in priority to the Class receive nothing.  The strict requirement of the allocation of full value to dissenting classes before any junior class can receive distribution is known as the "absolute priority rule."

The Bankruptcy Code establishes different "fair and equitable" tests for holders of secured claims, unsecured claims and interests as follows:

### (i)  Secured Claims

Either:  (i) each holder of a secured claim (x) retains the lien securing its secured claim and receives on account of its allowed secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, or (y) realizes the "indubitable equivalent" of its allowed secured claim; or (ii) the property securing the claim is sold free and clear of liens, with such liens attaching to the proceeds, and the liens against such proceeds are treated in accordance with clause (i).

### (ii)  Unsecured Claims

Either:  (i) each holder of an unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims or the non-accepting class do not receive any property under the plan on account of such claims and interests.

### (iii)  Equity Interests

Either:  (i) such holder of an interest receives or retains property of a value equal to the greater of any fixed liquidation preference or fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of any interests junior to the interests in the impaired class will not receive or retain any property under the plan.

The cramdown provisions of the Bankruptcy Code are complex and this summary is not intended to be a complete statement of the law in this area.

## VI.

## EFFECTS OF CONFIRMATION

### 1.  Binding Effect of Confirmation

Confirmation will bind the Debtor, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

### 2.  Good Faith

Confirmation of the Plan will constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

3.    **No Limitations on Effect of Confirmation**

Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

## VII.

## RISK FACTORS

There is a risk under the Plan that Allowed Administrative Expenses, Tax Claims and Priority Non-Tax Claims will materially exceed the Debtor's estimates.  The process of reconciling all such Claims has not been completed and outstanding disputes remain that will need to be litigated or otherwise resolved, including GM's asserted secured and administrative claims.

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all such conditions will be satisfied (or waived).   Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

Further, there is a risk that the Plan may not be confirmed by the Bankruptcy Court, either because the requisite votes in favor of the Plan are not received or the Bankruptcy Court decides not to confirm the Plan on some other basis.

Notwithstanding the risks, however, the Debtor believes that the same risks described herein are present in and greater to Creditors in a chapter 7 case.  Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Finally, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

## VIII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the Plan to Holders of Claims against the Debtor.  This discussion is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated and proposed thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof.  Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class), the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties.  No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be

requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtor and the Holders of Claims.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or the Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, traders that mark-to-market their securities, mutual funds, insurance companies, other financial institutions, real estate investment trusts, tax-exempt organizations, small business investment companies, regulated investment companies, foreign taxpayers, persons whose functional currency is not the U.S. dollar, persons subject to the alternative minimum tax, and persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments). This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

The U.S. federal income tax consequences of the distributions contemplated by the Plan to the Holders of Claims that are U.S. Persons will depend upon a number of factors. For purposes of the following discussion, a "U.S. Person" is any person or entity (1) who is a citizen or resident of the United States, (2) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof, (3) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source or (4) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more U.S. persons have the authority to control; or (b) that has in effect a valid election to continue to be treated as a U.S. Person for U.S. federal income tax purposes. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. U.S. Persons who are partners in a partnership should consult their tax advisors. A "Non-U.S. Person" is any person or entity that is not a U.S. Person. For purposes of the following discussion and unless otherwise noted below, the term "Holder" will mean a Holder of a Claim that is a U.S. Person.

Except where otherwise indicated, this discussion assumes that the Claims are held as capital assets within the meaning of section 1221 of the Tax Code.

THE FOLLOWING SUMMARY IS NOT INTENDED TO CONSTITUTE ADVICE TO ANY PARTY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM, AS WELL AS EACH HOLDER OF AN INTEREST, IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

***IRS Circular 230 Notice. To ensure compliance with IRS Circular 230, Holders of Claims and Interests are hereby notified that: (a) any discussion of federal tax issues***

*contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims and Interests for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) Holders of Claims and Interests should seek advice based on their particular circumstances from an independent tax advisor.*

## A.    Federal Taxation Issues Related to Pass-Through Entities in General

For U.S. federal income tax law purposes, an entity can be organized as a corporation, a partnership, or a hybrid entity (otherwise known as S corporations and limited liability companies).  The two primary differences between corporations and partnerships are how the entity's earnings are taxed and whether or not the shareholder/owners are shielded from the liabilities of the entity.  Generally, corporations are treated as independent tax-paying entities, unaffected by the personal characteristics of their shareholders or changes in their composition as a result of transfers of stock from old shareholders to new ones, giving rise to the potential for double taxation.  Because corporations are treated independently, corporate income is taxed to a corporation as it is received or accrued, and is taxed at the shareholder level when and if the corporation distributes earnings to the shareholders or they sell their stock.  Partnerships, however, are not entities subject to income tax.  Instead, the partners are taxed directly on partnership income whether or not it is actually distributed to them.

Hybrid entities, on the other hand, combine the two primary differences between corporations and partnerships.  As to S corporations, shareholders are shielded from entity level liability similar to that of a corporation; however, generally, the earnings of the entity are taxed at the ownership level similar to that of a partnership.  As to limited liability companies, member-owners are shielded from entity level liability similar to that of a corporation; however, unique to the LLC, an option exists to be taxed as a corporation or taxed as a partnership, provided that the LLC has at least two member-owners, as set forth under Treasury Regulations Section 301.7701-3.

The Debtor has only one member-owner (Revstone Transportation).  An LLC wholly-owned by a single member (single member LLC, or "SMLLC") may also elect to be classified and taxed as a corporation.  Absent an election to be taxed as a corporation, however, a SMLLC will be classified as a "disregarded entity", the assets, obligations and operations of which are the direct rights of the single member owner and will be reported with and taxed similarly to, the single member owner's items of income, deductions, gains, losses and other information.

Generally, pass-through entities are subject to a single layer of tax on their earnings at the ownership level (partner, member, or shareholder depending on entity type).  Taxable income of pass-through entities is computed at the entity level (generally each type of entity will file a tax return showing no tax liability at the entity level); however, each owner is taxed separately on his, her, or its distributive share of income, gain, loss, deduction, and/or credit, as applicable. The character of the items included in taxable income is determined at the entity level with no regard to the owners' individual characteristics.  With respect to tax attributes, pass-through entities are generally not allowed to maintain certain tax attributes, such as net operating losses,

given such entities are not directly taxable.  These tax attributes pass-through to the owners, and usage, carryback, or carryforward of these attributes is determined at the ownership level.

BECAUSE THE FINAL TAX TREATMENT OUTCOME DEPENDS ON EACH PARTY'S SPECIFIC SITUATION, PARTIES IN INTEREST ARE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE TAX IMPLICATIONS TO THEM WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED UNDER OR IN CONNECTION WITH THE PLAN AND THEIR SPECIFIC SITUATION, AND NOTHING HEREIN IS INTENDED TO CONSTITUTE ADVICE TO ANY PARTY.

**B.**      **Consequences to Creditors**

     1.      **Holders of Claims**

Generally, a holder of a Claim should in most, but not all circumstances, recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim.  The tax basis of a holder in a Claim will generally be equal to the holder's cost therefore. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A Holder who received Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for United States federal income tax purposes as interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  A Holder who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, certain Creditors may receive only a partial distribution of their Allowed Claims.  Whether the Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims.  Creditors should consult their own tax advisors.

2.    **Non-United States Persons**

A Holder of a Claim that is a Non-U.S. Person generally will not be subject to United States federal income tax with respect to property (including money) received in exchange for such Claim pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for United States federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

C.    **Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

IX.

**ALTERNATIVES TO PLAN AND MISCELLANEOUS MATTERS**

A.    **Alternatives to Debtor's Proposed Plan**

The Debtor believes that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) conversion of the Chapter 11 Case to chapter 7; (b) dismissal of the Debtor's case; or (c) an alternative plan of reorganization or liquidation which, in the Debtor's view, would offer less favorable treatment to creditors than that proposed under the Plan.

1.    **Liquidation Under Chapter 7**

If no plan can be confirmed, the Debtor's Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtor's assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code.  For the reasons previously discussed above, the Debtor believes that Confirmation of the Plan will provide Creditors with a recovery that is expected to be substantially more than could be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

2.    **Dismissal**

Dismissal of the Chapter 11 Case would result in each individual creditor having to protect its own rights through legal action, likely resulting in, among other things, numerous suits and other proceedings being commenced and actions being taken by secured creditors to protect or foreclose upon their collateral, requiring the Debtor to expend substantial time and resources to respond to and address such matters.  The Debtor believes that dismissal of the Chapter 11 Case would result in disparate, delayed and potentially smaller recoveries by creditors.

**B.**    **No *Res Judicata* Effect**

Notwithstanding anything to the contrary in the Plan, or in this Disclosure Statement, the provisions of this Disclosure Statement and the Plan which permits the Debtor to enter into settlements and compromises of any potential litigation, will not have and are not intended to have any *res judicata* effect with respect to any prepetition Claims and causes of action that are not otherwise treated under the Plan, and will not be deemed a bar to asserting such Claims and causes of action.

*[Remainder of Page Intentionally Left Blank]*

## X.

## CONCLUSION

The Debtor believes that the Plan is in the best interest of Creditors and urges Creditors to vote to accept the Plan.

January 20, 2015

_____

John C. DiDonato
Chief Restructuring Officer of TPOP, LLC

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:        ljones@pszjlaw.com
                   dbertenthal@pszjlaw.com
                   mlitvak@pszjlaw.com

Counsel to TPOP, LLC,
Debtor and Debtor in Possession

## **Exhibit 1**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TPOP, LLC f/k/a METAVATION, LLC,[1] | ) Case No. 13-11831 (BLS) |
| | ) |
| Debtor. | ) |
| | ) **Hearing Date:  March 5, 2015 at 10:00 a.m.** |
| | ) **prevailing Eastern time** |

## <u>DEBTOR'S CHAPTER 11 PLAN OF LIQUIDATION</u>

<div style="border:1px solid black; text-align:center;">

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Counsel to Debtor TPOP, LLC f/k/a Metavation, LLC

</div>

Dated:  January 20, 2015

---

[1]  The Debtor in this Chapter 11 Case is TPOP, LLC f/k/a Metavation, LLC and the last four digits of the Debtor's federal tax identification numbers is 5884.  The location of the Debtor's headquarters is Revstone Industries, LLC, et al., c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND
    GOVERNING LAW ................................................................................................ 3

    A.     Rules of Interpretation, Computation of Time, and Governing Law .................... 3

    B.     Defined Terms ..................................................................................................... 4

III. TREATMENT OF ADMINISTRATIVE EXPENSES, TAX CLAIMS AND DIP
     FINANCING CLAIMS ........................................................................................ 24

    A.     Introduction ...................................................................................................... 24

    B.     DIP Financing Claims ...................................................................................... 25

    C.     Administrative Expenses ................................................................................. 25

    D.     Tax Claims ....................................................................................................... 26

IV. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS 27

    A.     Summary .......................................................................................................... 27

    B.     Classification and Treatment of Claims and Interests ......................................... 28

V. ACCEPTANCE OR REJECTION OF PLAN ......................................................... 33

    A.     Identification of Unimpaired Classes ................................................................ 33

    B.     Identification of Impaired Classes ..................................................................... 33

    C.     Classes Permitted and Not Permitted to Vote .................................................... 33

    D.     Effect of Non-Voting ....................................................................................... 34

    E.     Nonconsensual Confirmation ........................................................................... 34

    F.     Postpetition Interest ......................................................................................... 35

VI. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 35

    A.     PBGC Settlement ............................................................................................. 35

    B.     Continued Corporate Existence and Vesting of Assets ....................................... 35

    C.     Corporate Action; Winding Up of Affairs ......................................................... 37

    D.     Plan Administrator ........................................................................................... 38

    E.     Source of Funding ............................................................................................ 41

F.    Retained Rights of Action of the Debtor ................................................... 41

G.    Interests in Affiliates and Subsidiaries .................................................... 42

H.    Payment of Plan Expenses ...................................................................... 42

I.    Ultimate Dissolution of Debtor; Final Decree ......................................... 42

J.    Records ................................................................................................... 43

VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............. 44

A.    Rejection of Executory Contracts and Unexpired Leases......................... 44

B.    Bar Date for Rejection Damages ............................................................. 45

VIII. DISTRIBUTIONS AND RELATED MATTERS ............................................... 45

A.    Dates of Distribution.............................................................................. 45

B.    Cash Distributions.................................................................................. 46

C.    Rounding of Payments............................................................................ 46

D.    Disputed Claims..................................................................................... 46

E.    Undeliverable and Unclaimed Distributions............................................ 47

F.    Compliance with Tax Requirements......................................................... 48

G.    Record Date in Respect to Distributions.................................................. 49

H.    Reserves ................................................................................................. 49

IX. LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES ........ 49

A.    Litigation; Objections to Claims; Objection Deadline.......................... 49

B.    Temporary or Permanent Resolution of Disputed Claims...................... 51

C.    Setoffs ................................................................................................... 52

D.    Preservation of Retained Rights of Action ........................................... 52

X. RELEASES, INJUNCTIONS, EXCULPATION AND RELATED PROVISIONS ............. 53

A.    Injunctions............................................................................................. 53

B.    Exculpation ............................................................................................ 54

C.    Debtor's Release of CRO, Independent Managers, and Other Parties ................ 55

D.    Release by Creditors .............................................................................. 56

ii

E.      Release by Debtor's Non-Debtor Affiliates of the Released Debtor Parties ........ 57

F.      No Discharge ...................................................................................... 58

XI. NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL .............. 58

XII. EXEMPTION FROM CERTAIN TRANSFER TAXES ........................................ 58

XIII. RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS .................... 59

A.      Retention of Jurisdiction ..................................................................... 59

B.      Miscellaneous Matters ........................................................................ 62

XIV. CONDITIONS TO EFFECTIVENESS ............................................................ 68

XV. EFFECT OF CONFIRMATION ..................................................................... 68

A.      Binding Effect of Confirmation ............................................................ 68

B.      Good Faith ......................................................................................... 69

C.      No Limitations on Effect of Confirmation ............................................. 69

XVI. MODIFICATION OR WITHDRAWAL OF PLAN ............................................... 69

A.      Modification of Plan ........................................................................... 69

B.      Withdrawal of Plan ............................................................................. 70

XVII. CONFIRMATION REQUEST ..................................................................... 71

DOCS_SF:85015.7 73864/002

Debtor and debtor in possession TPOP, LLC f/k/a Metavation, LLC hereby proposes the following *Debtor's Chapter 11 Plan of Liquidation* pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* Capitalized terms used in this Plan shall have the meanings set forth in Article II hereof.

## I.

## <u>INTRODUCTION</u>

The Plan is a plan of liquidation which, among other things, provides for a Plan Administrator to liquidate or otherwise dispose of the Estate's remaining assets, if and to the extent such assets were not previously monetized to Cash or otherwise transferred by the Debtor prior to the Effective Date, and to distribute all net proceeds to creditors generally in accordance with the priority scheme under the Bankruptcy Code. The Plan incorporates the Court-approved settlement between the Debtor and its affiliates, the PBGC, and certain creditor constituents of the Debtor's ultimate parent, Revstone Industries, LLC.

Under the Plan, all holders of allowed administrative expenses and allowed priority claims against the Debtor will be paid in full on the Effective Date out of cash on hand (unless, as provided in the Plan, the Debtor elects to provide payment over time as to Allowed Tax Claims). Holders of secured claims will either be paid in cash or will receive the benefit of their collateral.

Holders of allowed non-priority general unsecured claims, including intercompany claims and the PBGC Claims, will receive their respective pro rata share of

available net proceeds of the Debtor's assets (after the payment of or reserve for higher priority claims) after the Effective Date.

Holders of Allowed PBGC Claims will receive the treatment provided by and in accordance with the PBGC Settlement Agreement.

All membership interests in the Debtor, and any associated management rights held by interest holders, will be suspended and of no force and effect as of the Effective Date; interest holders will have a contingent interest in any remaining cash (if any) after all allowed claims and administrative expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable creditor) in accordance with the Plan.

On and after the Effective Date, a Plan Administrator will act for the Liquidating Debtor in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under this Plan, subject to the provisions hereof, and shall, among other powers, wind up the affairs of the Liquidating Debtor; use, manage, sell, abandon and/or otherwise dispose of the remaining property of the Estate; prosecute objections to Claims and any litigation on behalf of the Liquidating Debtor; cause distributions to be made to Creditors pursuant to the Plan; and take such other actions required under or consistent with the Plan.  The initial Plan Administrator will be John C. DiDonato, the Debtor's current Chief Restructuring Officer.

The Disclosure Statement, distributed with this Plan, contains a discussion of the Debtor's history, a summary of the Debtor's assets and liabilities, a summary of what Holders of Claims will receive under the Plan, a discussion of certain alternatives to the Plan, and a

2

summary of the procedures and voting requirements necessary for Confirmation of the Plan.  The

Disclosure Statement is intended to provide Holders of Claims with information sufficient to

enable such Holders to vote on the Plan.  All Claim Holders entitled to vote on this Plan are

encouraged to carefully read the Disclosure Statement and this Plan before voting to accept or

reject this Plan.  No solicitation materials, other than the Disclosure Statement and related

materials transmitted therewith and approved by the Bankruptcy Court, have been authorized for

use in soliciting acceptance or rejection of this Plan.

## II.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

## A.    Rules of Interpretation, Computation of Time, and Governing Law

For purposes of the Plan: (a) whenever from the context it is appropriate, each

term, whether stated in the singular or the plural, shall include both the singular and the plural,

and pronouns stated in the masculine, feminine or neuter gender shall include the masculine,

feminine and neuter gender; (b) any reference in the Plan to a contract, instrument, release,

indenture, or other agreement or document being in a particular form or on particular terms and

conditions means that such document shall be substantially in such form or substantially on such

terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to

be Filed, shall mean such document or exhibit, as it may have been or may be amended,

modified or supplemented; (d) unless otherwise specified, all references in the Plan to sections

and exhibits are references to sections and exhibits of or to the Plan; (e) the words "herein" and

"hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions

3

and headings to sections are inserted for convenience of reference only and are not intended to be

a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section

102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form in the Plan

that is not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules,

shall have the meaning set forth in the Bankruptcy Code or the Bankruptcy Rules, as the case

may be.

      In computing any period of time prescribed or allowed by the Plan, the provisions

of Bankruptcy Rule 9006(a) shall apply.

      Except to the extent that the Bankruptcy Code, Bankruptcy Rules or other federal

law is applicable, and subject to the provisions of the Plan or any contract, instrument, release,

indenture or other agreement or document entered into in connection with the Plan, the rights and

obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of Delaware, without giving effect to the principles of

conflict of laws thereof.

**B.**    **<u>Defined Terms</u>**

      The following definitions shall apply to capitalized terms used in the Plan:

      1.    "Administrative Expense" means an unpaid administrative expense of the

kind described in sections 503(b) and 507(a)(2) of the Bankruptcy Code against the Debtor,

including, without limitation, (i) the actual, necessary costs and expenses of preserving the Estate

of the Debtor, including wages, salaries, or commissions for services rendered after the

commencement of the Chapter 11 Case, (ii) compensation and reimbursement of expenses of

4

professionals to the extent allowable under sections 327, 328, 330(a), 331, 503(b) and/or 1103 of

the Bankruptcy Code and Allowed or otherwise payable pursuant to orders of the Court, and (iii)

all fees and charges assessed against the Estate under 28 U.S.C. § 1930, including the fees, if

any, due to the United States Trustee.

       2.    "Administrative Expense Objection Deadline" has the meaning set forth in

Article XIII.B.3 of this Plan.

       3.    "Allowed" means with respect to any Claim, Administrative Expense or

Interest, except as otherwise provided herein:  (a) a Claim that has been scheduled by the Debtor

in its Schedules as other than disputed, contingent or unliquidated which has not been superseded

by a filed proof of claim and which scheduled Claim has not been amended; (b) a Claim or

Administrative Expense that has been allowed by a Final Order; (c) a Claim that is allowed by

the Liquidating Debtor, as the case may be, on or after the Effective Date and, if and to the extent

necessary, approved by the Bankruptcy Court; (d) a Claim or Administrative Expense that has

been timely filed by the applicable Bar Date for which no objection has been filed by the

applicable Objection Deadline or the Administrative Expense Objection Deadline; or (e) a Claim

or Administrative Expense that is allowed pursuant to the terms of this Plan.

       4.    "Avoidance Claims" means any Rights of Action for the recovery of

avoidable transfers arising under chapter 5 of the Bankruptcy Code or applicable federal or state

law and the proceeds thereof.

5.    "Ballot" means the form distributed to each Holder of an Impaired Claim entitled to vote on the Plan, on which is to be indicated, among other things, acceptance or rejection of the Plan.

6.    "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended, as set forth in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as now in effect or hereafter amended.

7.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or such other court of competent jurisdiction as may be administering the Chapter 11 Case or any part thereof.

8.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated pursuant to 28 U.S.C. § 2075, as now in effect or hereinafter amended, together with the Local Rules of the Bankruptcy Court.

9.    "Bar Date" means (i) December 17, 2013, for General Unsecured Claims, (ii) December 17, 2013, for those Administrative Expenses covered by the Bar Date Order (*i.e.*, Administrative Expenses arising between the Petition Date and November 30, 2013, Administrative Expenses under section 503(b)(9) of the Bankruptcy Code, and Administrative Expenses as of November 30, 2013 arising under the Worker Adjustment and Retraining Notification Act and/or any similar state law worker notification statutes), (iii) January 20, 2014, for Claims of Governmental Units, or (iv) such other date as the Bankruptcy Court may set by Order for other Administrative Expenses or any other Claims not covered in the Bar Date Order.

6

10.     "Bar Date Order" means the Order of the Bankruptcy Court at docket number 268 in the Chapter 11 Case.

11.     "Business Day" means any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

12.     "Cash" means currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

13.     "Chapter 11 Case" means the case commenced under chapter 11 of the Bankruptcy Code by the Debtor on the Petition Date and pending before the Bankruptcy Court.

14.     "Chrysler" means Chrysler Group, LLC and any successor(s) thereto or assign(s) thereof.

15.     "Claim" means any claim against the Debtor within the meaning of section 101(5) of the Bankruptcy Code that is not an Administrative Expense, including, without limitation, claims of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.

16.     "Claims Agent" means Rust Consulting/Omni Bankruptcy in its capacity as claims agent for the Debtor.

17.     "Class" means each category of Claims or Interests classified in Article IV of the Plan pursuant to section 1122 of the Bankruptcy Code.

18.     "Confirmation" means the approval by the Bankruptcy Court of the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, as effectuated by the Confirmation Order.

19.     "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

20.     "Confirmation Hearing" means the hearing(s) on Confirmation of the Plan, to be held on the date or dates established by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code, as it may be adjourned or continued from time to time.

21.     "Confirmation Order" means the order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code, in form and substance reasonably acceptable to the Debtor.

22.     "Consummation" means substantial consummation of the Plan as that term is used in section 1127(b) of the Bankruptcy Code.

23.     "Creditor" means any Person who is the Holder of a Claim or an Administrative Expense against the Debtor.

24.     "Creditor-Releasor" has the meaning set forth in Article X.E of this Plan.

25.     "Debtor" means TPOP, LLC f/k/a Metavation, LLC, either in its capacity as debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code in the Chapter 11 Case or otherwise from and after the Effective Date.

26.     "Debtor Retained Professionals" has the meaning set forth in Article X.B of this Plan.

27.    "DIP Financing/Cash Collateral Orders" means the Interim DIP Financing/Cash Collateral Order and the Final DIP Financing/Cash Collateral Order.

28.    "DIP Financing Claims" means any Secured Claims and/or Administrative Expenses, including any superpriority claims, of the DIP Lenders against the Debtor under or evidenced by the DIP Financing/Cash Collateral Orders and the DIP Loan Documents, if and to the extent that such Secured Claims and Administrative Expenses have not been paid, forgiven, released or otherwise satisfied prior to the Effective Date.  The Debtor reserves any and all rights to dispute or otherwise challenge the DIP Financing Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

29.    "DIP Lenders" means Wells, Chrysler, GM and any other postpetition lender to the Debtor under the DIP Financing/Cash Collateral Orders and the DIP Loan Documents.

30.    "DIP Loan Documents" means that certain *Ratification and Amendment Agreement* dated as of July 22, 2013 by and among the Debtor, certain non-debtor affiliates as co-borrowers and guarantors, Wells Fargo Capital Finance, N.A., as lender and as agent for each lender party thereto, including, without limitation, the "Existing Junior Participants" and the "DIP Junior Participants" (as these terms are defined in the aforementioned Ratification and Amendment Agreement), together with the Prepetition Credit Agreement and other documents amended by the aforementioned Ratification and Amendment Agreement, as set forth therein, and as further amended, supplemented, restated or otherwise modified from time to time in accordance therewith, and together with the other documents, agreements and instruments

9

delivered pursuant thereto or executed or filed in connection therewith, as the same may be

amended, supplemented, restated or otherwise modified from time to time, all of which

documents are subject to the DIP Financing/Cash Collateral Orders.

31.     "Disallowed" means, with respect to a Claim, Interest, Administrative

Expense, or portion thereof, that is either a Disputed Claim, or it is determined that the Claim,

Interest, Administrative Expense, or portion thereof is not allowed under the Bankruptcy Code

by any of a Final Order, the Plan, or a stipulation or settlement with the Debtor.

32.     "Disclosure Statement" means the *Disclosure Statement in Respect of*

*Debtor's Chapter 11 Plan of Liquidation*, as it may be amended, modified or supplemented from

time to time, submitted pursuant to section 1125 of the Bankruptcy Code in connection with the

solicitation of acceptances of the Plan.

33.     "Disputed Claim" means (i) a Claim, Interest or Administrative Expense

that is subject to a pending objection filed by the Objection Deadline or the Administrative

Expense Objection Deadline, as applicable, or for which the Bankruptcy Court's order allowing

or disallowing such Claim, Interest or Administrative Expense is on appeal; (ii) a Claim, on

account of which a proof of Claim was filed or which has been otherwise asserted, (a) for which

a corresponding Claim has not been listed in the Debtor's Schedules or for which the

corresponding Claim is listed in the Debtor's Schedules with a lower amount, with a differing

classification, or as disputed, contingent, or unliquidated, and (b) which has not been allowed

either by a Final Order, the Plan, or under a stipulation or settlement with the Debtor or the

10

Liquidating Debtor; (iii) any contingent or unliquidated Claim; or (iv) a Claim that is not Allowed.

34.    "Distributable Assets" means, except as otherwise noted below, any and all real or personal property of the Debtor of any nature, including, without limitation, any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses, goods, materials, supplies, furniture, fixtures, equipment, work in process, inventory, accounts, chattel paper, Cash (including Cash that may be upstreamed or paid to the Debtor or the Liquidating Debtor by the Debtor's subsidiaries and other corporate affiliates, derived from the sale or other disposition of such entities' assets), deposit accounts, reserves, deposits, contractual rights, intellectual property rights, Claims, Retained Rights of Action, books and records, any other general intangibles of the Debtor, and any and all proceeds of the foregoing, as the case may be, of any nature whatsoever (whether liquidated or unliquidated, matured or unmatured, or fixed or contingent), including, without limitation, property of the Estate within the scope of section 541 of the Bankruptcy Code.  Notwithstanding the foregoing, the term "Distributable Assets" does not include any property that has been abandoned by the Estate pursuant to a Final Order of the Bankruptcy Court.

35.    "Effective Date" means the first Business Day after the Confirmation Date immediately following the first day upon which all of the conditions to the occurrence of the Effective Date have been satisfied or waived in accordance with the Plan.

36.    "Entity" and "Entities" mean an entity as defined in section 101(5) of the Bankruptcy Code or more than one thereof.

11

37.    "Equity Security" means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

38.    "Estate" means the estate created pursuant to section 541(a) of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

39.    "Federal Judgment Rate" means the interest rate on federal judgments, in effect for the calendar week of the Petition Date, and is based on the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System.

40.    "Fee Applications" mean applications of Professional Persons under sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Case.

41.    "File" or "Filed" means filed of record and entered on the docket in the Chapter 11 Case or, in the case of a proof of claim, delivered to the Claims Agent.

42.    "Final DIP Financing/Cash Collateral Order" means the *Final Order (A) Authorizing Debtor to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing Debtor to Enter into Agreements with Wells Fargo Capital Finance, LLC, as Agent* [Docket No. 185].

43.    "Final Order" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal which judgment, order, ruling or other decree has not been reversed, stayed, revoked, modified,

supplemented or amended and as to which (a) the time to appeal or petition for review, rehearing or certiorari has expired and as to which no appeal or petition for review, rehearing or certiorari is pending, or (b) any appeal or petition for review, rehearing or certiorari has been finally decided and no further appeal or petition for review, rehearing or certiorari can be taken or granted.

44.    "Final Resolution Date" means the date on which all Disputed Claims of Creditors shall have been resolved by Final Order or otherwise finally determined.

45.    "Final Sale Support Agreement" means the *Final Order Pursuant to Sections 105, 362 & 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (A) Approving Automotive Sale Transactions Support Agreement and (B) Modifying the Automatic Stay* [Docket No. 184].

46.    "General Unsecured Claim" means a Claim against the Debtor other than (a) an Administrative Expense, (b) a Tax Claim, (c) a Priority Non-Tax Claim, (d) a DIP Financing Claim, (e) a Prepetition Credit Agreement Secured Claim, (f) a Miscellaneous Secured Claim, and (g) a PBGC Claim.  For the avoidance of doubt, a General Unsecured Claim includes any prepetition intercompany claims asserted against the Debtor by any affiliates of the Debtor."George Hofmeister Parties" means (i) George Hofmeister, (ii) George Hofmeister's immediate and extended family members, (iii) The Megan G. Hofmeister Irrevocable Trust, (iv) The Scott R. Hofmeister Irrevocable Trust, (v) The Jamie S. Hofmeister Irrevocable Trust, (vi) Ascalon Enterprises, LLC, and (vii) each of the foregoing party's respective trustees, managers, affiliates, successors, or assigns (other than the Debtor and its direct and indirect subsidiaries).

13

49.    "GM" means General Motors, LLC and any successor(s) thereto or assign(s) thereof.

50.    "GM Capex Loan" means that certain capital expenditure loan made by GM to the Debtor on or about January 11, 2013, which was secured by certain assets of the Debtor pursuant to the applicable loan/security agreements and related documents.

51.    "GM Capex Loan Secured Claim" means any Secured Claim of GM against the Debtor arising under or relating to the GM Capex Loan, subject to the terms of the DIP Financing/Cash Collateral Orders, the DIP Loan Documents, the Postpetition Sale Support Documents and/or the Sale Support Orders, as applicable, to the extent that such Secured Claims have not been paid, forgiven, released or otherwise satisfied prior to the Effective Date.

52.    "Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

53.    "Holder" means the beneficial owner of any Claim, Interest, or Administrative Expense.

54.    "Huron" means Huron Consulting Services LLC.

55.    "Huron Parties" means those employees and other personnel of Huron, who have been or may be provided by Huron prior to the Effective Date to provide services and support to the Debtor, including, without limitation, John C. DiDonato in his capacity as Chief Restructuring Officer of the Debtor, Laura A. Marcero in her capacity as Deputy Chief Restructuring Officer, James M. Lukenda as Deputy Chief Restructuring Officer, Brian M.

14

Linscott as Interim Chief Financial Officer, Geoffrey S. Frankel as Vice President, John M. Owens as Interim Treasurer, and John A. Hemingway as Interim Assistant Treasurer.

56.     "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

57.     "Independent Managers" has the meaning set forth in Article X.B of this Plan.

58.     "Interest" means (i) any Equity Security, including all membership interests, shares or similar securities, whether or not transferable or denominated "stock" and whether issued, unissued, authorized or outstanding; (ii) any warrant, option, or contractual right to purchase, sell, subscribe or acquire such Equity Securities at any time and all rights arising with respect thereto; and (iii) any similar interest in the Debtor.

59.     "Interim DIP Financing/Cash Collateral Order" means the *Order (A) Authorizing Debtor to Obtain Interim Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (C) Authorizing Debtor to Enter into Agreements with Wells Fargo Capital Finance, LLC, as Agent; and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket No. 50], subject to the terms of the Final DIP Financing/Cash Collateral Order.

60.     "Interim Sale Support Agreement Order" means the *Interim Order Pursuant to Sections 105, 362 & 363 of the Bankruptcy Code and Bankruptcy Rule 9019 (A)*

15

*Approving Automotive Sale Transactions Support Agreement, (B) Modifying the Automatic Stay,*

*and (C) Scheduling a Final Hearing* [Docket No. 49]."IRS" means the Internal Revenue Service.

63.    "Junior Participation Secured Claims" means any Secured Claims of

Prepetition Junior Participants against the Debtor under the Prepetition Loan Documents, subject

to the terms of the DIP Financing/Cash Collateral Orders, the DIP Loan Documents, the

Postpetition Sale Support Documents and/or the Sale Support Orders, as applicable, to the extent

that such Secured Claims have not been paid, forgiven, released or otherwise satisfied prior to

the Effective Date.

64.    "Lien" means any charge against or interest in property to secure payment

or performance of a Claim, debt, or obligation.

65.    "Liquidating Debtor" means the Debtor on and after the Effective Date.

66.    "Miscellaneous Secured Claim" means any Secured Claim other than a

DIP Financing Claim or a Prepetition Credit Agreement Secured Claim.

67.    "Net Distributable Assets" means the Distributable Assets of the Debtor

from and after the Effective Date, once such assets have been reduced to Cash, net of amounts

necessary to fund the payment of Allowed Administrative Expenses, Tax Claims, Priority Non-

Tax Claims, Miscellaneous Secured Claims, DIP Financing Claims and Prepetition Credit

Agreement Secured Claims, and Plan Expenses of the Debtor and/or reserves established for any

of the foregoing, and excluding those Distributable Assets of the Debtor that are subject to any

Liens until such time that such Liens are satisfied or otherwise addressed in full.

68.     "Objection Deadline" means the deadline to object to Claims and/or Interests specified in Article IX.A of the Plan, as may be extended pursuant thereto.

69.     "PBGC" means the Pension Benefit Guaranty Corporation, and any successors thereto or assigns thereof.

70.     "PBGC Claims" means any Claim asserted by PBGC against the Debtor in accordance with the terms of the PBGC Settlement Agreement.  The PBGC Claims consist of a non-priority, unsecured claim in the amount of $95 million against the Debtor.

71.     "PBGC Modification Agreement" means that certain *Modification of PBGC Settlement Agreement and Global Resolution of Disputes* dated as of May 1, 2014, between the Debtor and its affiliates, the PBGC, the Official Committee of Unsecured Creditors of Revstone Industries, LLC, and Boston Finance Group, LLC.

72.     "PBGC Settlement Agreement" means that certain *Settlement Agreement* dated as of February 11, 2014 between the Debtor, certain affiliates of the Debtor, and the PBGC, as modified by the PBGC Modification Agreement, which was approved by the Bankruptcy Court pursuant to the PBGC Settlement Order.

73.     "PBGC Settlement Order" means the order of the Bankruptcy Court dated May 9, 2014 at docket number 485, approving the PBGC Settlement Agreement.

74.     "Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, governmental unit or other entity of whatever nature.

17

75.    "Petition Date" means July 22, 2013, the date on which the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

76.    "Plan" means this *Debtor's Chapter 11 Plan of Liquidation*, as it may be amended or modified from time to time.

77.    "Plan Administrator" means John C. DiDonato, who currently serves as the Debtor's Chief Restructuring Officer, or any duly selected successor.

78.    "Plan Expenses" means the expenses incurred or payable by the Liquidating Debtor following the Effective Date (including the reasonable fees and costs of attorneys and other professionals) relating to implementation of the Plan, for the purpose of (i) prosecuting the Retained Rights of Action, (ii) resolving Claims and effectuating distributions to Creditors under the Plan, (iii) otherwise implementing the Plan and closing the Chapter 11 Case, or (iv) undertaking any other matter relating to the Plan.  Reserves for Plan Expenses may be created in the discretion of the Plan Administrator.

79.    "Plan Supplement" means the supplement to the Plan to be Filed by the Debtor with the Bankruptcy Court, which supplement shall contain forms of certain substantially final documents required for the implementation of the Plan, no later than ten (10) days prior to the Confirmation Hearing.

80.    "Post-Effective Date Service List" means a service list comprised of the Plan Administrator and his or her counsel, the Office of the United States Trustee, and any other party that specifically requests in writing that the Plan Administrator add such party's name to the list.

81.   "Postpetition Sale Support Agreement" means that certain *Automotive Sale Transactions Support Agreement* by and among the Debtor, Revstone, certain of Revstone's non-debtor affiliates, GM and Chrysler, together with that certain *Omnibus Access and Security Agreement* by and among the Debtor, certain non-debtor affiliates, GM, and Chrysler, with all such documents subject to the Sale Support Agreement Orders.

82.   "Postpetition Sale Support Claims" means any Administrative Expenses of GM and Chrysler arising under or relating to the Postpetition Sale Support Agreement and the Sale Support Agreement Orders, to the extent that such Claims have not been paid, forgiven, released or otherwise satisfied prior to the Effective Date.  The Debtor reserves any and all rights to dispute or otherwise challenge the Postpetition Sale Support Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

83.   "Prepetition Credit Agreement" means the *Credit Agreement*, dated as of July 23, 2010, by and among the Debtor, certain affiliates as borrowers and/or guarantors, Wells Fargo Capital Finance, N.A., as lender and as agent for each lender party thereto, as amended and otherwise as in effect immediately prior to the Petition Date.

84.   "Prepetition Credit Agreement Secured Claims" means any Secured Claims under the Prepetition Loan Documents, including any Junior Participation Secured Claims and GM Capex Loan Secured Claims, subject to the terms of the DIP Financing/Cash Collateral Orders, the DIP Loan Documents, the Postpetition Sale Support Documents and/or the Sale Support Orders, as applicable, to the extent that such Secured Claims have not been paid, forgiven, released or otherwise satisfied prior to the Effective Date.  The Debtor reserves any and

19

all rights to dispute or otherwise challenge the Prepetition Credit Agreement Secured Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

85.     "Prepetition Junior Participants" means Chrysler, GM, and Ford Motor Company, and their respective successors and assigns.

86.     "Prepetition Junior Participation Agreement" means the *Amended and Restated Junior Participation Agreement*, dated as of April 12, 2013, among Wells and the Prepetition Junior Participants, as amended and otherwise as in effect immediately prior to the Petition Date.

87.     "Prepetition Loan Documents" means the "Loan Documents" as defined in the Prepetition Credit Agreement, including, without limitation, the Prepetition Credit Agreement, the Prepetition Junior Participation Agreement, and the *Security Agreement* dated as of July 23, 2010 by and among by and among the Debtor, certain affiliates as borrowers and/or guarantors, Wells as agent, as in effect immediately prior to the Petition Date.

88.     "Priority Non-Tax Claim" means any Claim, other than a Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

89.     "Pro Rata" means proportionately, so that with respect to any distribution, the ratio of (a) (i) the amount of property to be distributed on account of a particular Claim or particular group of Claims to (ii) the amount of such particular Claim or group of Claims, is the same as the ratio of (b) (i) the amount of property to be distributed on account of all Claims or groups of Claims sharing in such distribution to (ii) the amount of all Claims or groups of Claims sharing in such distribution.

90.    "Professional Fee Claim" shall mean an Administrative Expense of a Professional Person for compensation for services rendered and reimbursement of costs, expenses or other charges incurred on or after the Petition Date and on or before the Effective Date.

91.    "Professional Person" shall mean Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b), and/or 1103 of the Bankruptcy Code.

92.    "Record Date" means the Effective Date.

93.    "Released Parties" has the meaning set forth in Article X.C of this Plan.

94.    "Releasor Affiliates" has the meaning set forth in Article X.E of this Plan.

95.    "Released Debtor Parties" has the meaning set forth in Article X.D of this Plan.

96.    "Restructuring Committee" means the Restructuring Committee of the Board of Managers of Revstone Transportation, currently comprised of James B. Shein and Richard E. Newsted, who are the two independent managers of the Board of Managers of Revstone Transportation.

97.    "Retained Rights of Action" means all Rights of Action belonging to the Debtor as of the Effective Date, including, without limitation, Avoidance Claims (including those disclosed in the Schedules), but excluding those Rights of Action specifically released under the Plan.  The Retained Rights of Action include, without limitation, any and all rights of the Debtor to pursue any Rights of Action against third parties disclosed or referenced in the Schedules.

21

98.    "Revstone" means Revstone Industries, LLC, the debtor and debtor in possession in Case No. 12-13262 (BLS) pending before the Bankruptcy Court.

99.    "Revstone Transportation" means Revstone Transportation, LLC, the sole member of the Debtor.

100.    "Rights of Action" means any and all claims, demands, rights, defenses, actions, causes of action (including, without limitation, Avoidance Claims), suits, contracts, agreements, obligations, accounts, defenses, offsets, powers and privileges of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by any Person against any other Person, and any proceeds thereof, including but not limited to (1) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law; (2) the right to object to Claims or Interests; (3) claims pursuant to section 362 of the Bankruptcy Code; (4) such claims and defenses as fraud, negligence, breach of fiduciary duty, corporate waste, unlawful dividends, mistake, duress and usury; (5) all claims or rights under Bankruptcy Code sections 542, 543, 544, 547, 548, 549, 550, 551, 552, and 553, all fraudulent-conveyance and fraudulent-transfer laws, all non-bankruptcy laws vesting in creditors' rights to avoid, rescind, or recover on account of transfers, all preference laws, the Uniform Fraudulent Transfer Act (as it may have been codified in any particular jurisdiction), the Uniform Fraudulent Conveyance Act (as it may have been codified in any particular jurisdiction), and all similar laws and statutes; (6) claims for tax refunds; and (7) any other claims which may be asserted against affiliates, insiders and/or any other third parties.

101.    "Sale Support Agreement Orders" means the Interim Sale Support

Agreement Order and the Final Sale Support Agreement Order.

102.    "Schedules" means the schedules of assets and liabilities and statement of

financial affairs filed by the Debtor with the Bankruptcy Court pursuant to Bankruptcy Rule

1007, as they have been or may be amended from time to time.

103.    "Secured Claim" means any Claim of any Person (i) that is secured by a

Lien on property in which the Debtor or its Estate has an interest, which Lien is valid, perfected

and enforceable and not subject to avoidance under applicable law or by reason of a Final Order

but only to the extent of the value, as determined by the Bankruptcy Court pursuant to section

506(a) of the Bankruptcy Code, of any interest of the claimant in the property of the Estate

securing such Claim or (ii) to the extent that such Person has a valid right of setoff under section

553 of the Bankruptcy Code.

104.    "Tax" means any tax, charge, fee, levy, impost or other assessment by any

federal, state, local or foreign taxing authority, including, without limitation, income, excise,

property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or

additions attributable to, imposed on or with respect to such assessments.

105.    "Tax Claim" means any Claim for any Tax to the extent that it is entitled

to priority in payment under section 507(a)(8) of the Bankruptcy Code.

106.    "Timely Filed" means, with respect to a Claim, Interest, or Administrative

Expense, that a proof of such Claim or Interest or request for payment of such Administrative

Expense was filed with the Bankruptcy Court or the Claims Agent, as applicable, within such

applicable period of time fixed by the Plan, statute, or pursuant to both Bankruptcy Rule

3003(c)(3) and a Final Order (including the Bar Date Order), or has otherwise been deemed

timely filed by a Final Order of the Bankruptcy Court.

107.    "Unclaimed Property" means all Cash deemed to be "Unclaimed

Property" pursuant to Article VIII.E of the Plan.

108.    "Unimpaired" means, with respect to a Class of Claims or Interests, a

Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the

Bankruptcy Code.

109.    "Wells" means Wells Fargo Capital Finance, LLC, and any successor(s)

thereto or assign(s) thereof.

# III.
# TREATMENT OF ADMINISTRATIVE EXPENSES, TAX CLAIMS AND DIP FINANCING CLAIMS

**A.    <u>Introduction</u>**

As required by the Bankruptcy Code, Administrative Expenses and Tax Claims,

together with DIP Financing Claims, are not placed into voting Classes.  Instead, they are left

unclassified, are not considered Impaired, do not vote on the Plan, and receive treatment

specified by statute or agreement of the parties.  All postpetition payments by or on behalf of the

Debtor in respect of an Administrative Expense, Tax Claim or DIP Financing Claim shall either

reduce the Allowed amount thereof or reduce the amount to be paid under the Plan in respect of

any Allowed amount thereof; provided that the method of application that is most beneficial to the Debtor's Estate shall be employed.

**B.**    **DIP Financing Claims**

Except to the extent the DIP Lenders agree to less favorable treatment, any and all unpaid DIP Financing Claims (to the extent Allowed) shall be paid in full or otherwise satisfied by the earlier of (i) the Effective Date and (ii) such other maturity date(s) as set forth in the DIP Loan Documents and the DIP Financing/Cash Collateral Orders.  The DIP Financing Claims may be paid out of any Cash in which the DIP Lenders hold a security interest pursuant to the DIP Loan Documents and the DIP Financing/Cash Collateral Orders, including the Segregated Account (as defined in the Disclosure Statement), to the extent GM has Allowed DIP Financing Claims.  The Debtor reserves any and all rights to dispute or otherwise challenge the DIP Financing Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

**C.**    **Administrative Expenses**

Under the Plan, on or as soon as practicable after the Effective Date (to the extent payable on the Effective Date), each Holder of an Allowed Administrative Expense against the Debtor will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Administrative Expense, Cash from the Liquidating Debtor equal to the full amount of such Allowed Administrative Expense, unless such Holder and the Debtor have mutually agreed in writing to other terms, or an order of the Bankruptcy Court provides for other terms; provided, however, that, unless otherwise agreed by the Liquidating Debtor, (a) requests for payment of all

Administrative Expenses (including Postpetition Sale Support Claims) must be Filed and served

as described in Article XIII.B.3 of the Plan, and (b) certain different and additional requirements

shall apply to the Administrative Expenses of Professional Persons as set forth in Article

XIII.B.2 and 3 of the Plan; provided further, however, that no interest or penalties of any nature

shall be paid in respect of an Allowed Administrative Expense.

Notwithstanding any of the foregoing, if an Administrative Expense represents an

obligation incurred in the ordinary course of business, such Administrative Expense will be paid

in the ordinary course by the Liquidating Debtor in accordance with the terms of the particular

transaction and/or applicable agreement.

**D.      Tax Claims**

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Tax Claims are not to be

classified and thus Holders of Tax Claims are not entitled to vote to accept or reject the Plan.

As required by section 1129(a)(9) of the Bankruptcy Code, on or as soon as

practicable after the Effective Date, each Holder of an Allowed Tax Claim against the Debtor

will receive, in full satisfaction, settlement, release, and extinguishment of such Allowed Tax

Claim, Cash from the Liquidating Debtor equal to the portion of the Allowed Tax Claim due and

payable on or prior to the Effective Date according to applicable non-bankruptcy law; provided,

however, the Liquidating Debtor may in its discretion elect to make, pursuant to section

1129(a)(9)(C), regular quarterly installment payments in Cash of a total value, as of the Effective

Date, equal to the amount of the Allowed Tax Claim over a period ending not later than five

years after the Petition Date together with interest for the period after the Effective Date at the

rate determined under non-bankruptcy law as of the calendar month in which the Plan is

confirmed, subject at the sole option of the Liquidating Debtor to prepay the entire amount of the

Allowed Tax Claim.  Any Allowed Tax Claim (or portion thereof) against the Debtor not yet due

and payable as of the Effective Date will be paid by the Liquidating Debtor no later than when

due and payable under applicable non-bankruptcy law without regard to the commencement of

the Chapter 11 Case; provided that upon request of the Liquidating Debtor, the Bankruptcy Court

shall determine the amount of any Disputed Claim for, or issues pertaining to, a Tax.  Any

Holder of a Tax Claim may agree to accept different treatment as to which the Liquidating

Debtor and such Holder have agreed upon in writing.

## IV.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

### A.    Summary

The categories of Claims and Interests listed below classify Claims and Interests

for all purposes, including voting, confirmation and distribution pursuant to the Plan and

pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is

classified in a particular Class only to the extent that the Claim or Interest qualifies within the

description of that Class and is classified in other Classes only to the extent that any remainder of

the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest

is also classified in a particular Class only to the extent that such Claim or Interest is an Allowed

Claim or Allowed Interest in that Class and has not been paid, released or otherwise satisfied

prior to the Effective Date.

27

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for the classification of Claims and/or Interests as set forth below.  Administrative Expenses and Tax Claims, together with DIP Financing Claims, have not been classified and are excluded from the following Classes in accordance with section 1123(a)(1) of the Bankruptcy Code.

**B.      Classification and Treatment of Claims and Interests**

The treatment of each Class of Claims and/or Interests is set forth below.  Unless the Bankruptcy Court has specified otherwise prior to Confirmation, the Debtor shall determine whether a postpetition payment by or on behalf of the Estate in respect of a Claim either (x) shall reduce the Allowed amount thereof or (y) shall reduce the amount to be paid under the Plan in respect of any Allowed amount thereof by considering which method is most advantageous to the Debtor's Estate.

**1.      Class 1 – Priority Non-Tax Claims**

a.      <u>Classification</u>:  Class 1 consists of all Priority Non-Tax Claims against the Debtor.

b.      <u>Treatment</u>:  At the election of the Liquidating Debtor, the Holder of each Priority Non-Tax Claim against the Debtor shall receive, in full satisfaction, settlement, release, and extinguishment of such Priority Non-Tax Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor.

        c.     <u>Impairment/Voting</u>:  Class 1 is Unimpaired.  Class 1 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

        **2.**        **<u>Class 2 – Prepetition Credit Agreement Secured Claims</u>**

        a.     <u>Classification</u>:  Class 2 consists of any Prepetition Credit Agreement Secured Claims against the Debtor that are treated as prepetition Claims.

        b.     <u>Treatment</u>:  At the election of the Liquidating Debtor, the Holder of each Prepetition Credit Agreement Secured Claim against the Debtor shall receive, in full satisfaction, settlement, release, and extinguishment of such Prepetition Credit Agreement Secured Claim, on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, (a) a Cash payment from the Liquidating Debtor equal to the Allowed amount of such Claim, or (b) such other treatment as otherwise agreed by the Holder of such Claim and the Debtor or Liquidating Debtor.  The Debtor reserves any and all rights to dispute or otherwise challenge the Prepetition Credit Agreement Secured Claims on any available grounds, or to assert affirmative claims against any appropriate parties.

        c.     <u>Impairment/Voting</u>:  Class 2 is Unimpaired.  Class 2 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**3.**    **Class 3 – Miscellaneous Secured Claims**

a.    Classification:  Class 3 consists of all Miscellaneous Secured Claims (if any such Claims exist) against the Debtor.  Although all Miscellaneous Secured Claims have been placed in one Class for the purposes of nomenclature, each Miscellaneous Secured Claim, to the extent secured by a Lien on any property or interest in property of the Debtor different from that securing any other Miscellaneous Secured Claim, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

b.    Treatment:  Except to the extent that a Holder of an Allowed Miscellaneous Secured Claim has been paid by the Debtor, in whole or in part, prior to the Effective Date, on the Effective Date, at the option of the Debtor, (i) each Allowed Miscellaneous Secured Claim shall be reinstated and Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed Miscellaneous Secured Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Miscellaneous Secured Claim, (x) payment in full in Cash of the unpaid portion of such Allowed Miscellaneous Secured Claim, (y) surrender of the collateral securing such Claim or (z) such other treatment as may be agreed to by the Holder of such Claim and the Debtor or Liquidating Debtor.  Prior to the Confirmation Hearing, the Debtor shall inform each Holder of a Miscellaneous Secured Claim if such Creditor's Secured Claim shall be treated as Unimpaired under the Plan.

c.    <u>Impairment/Voting</u>:  Class 3 is Unimpaired.  Class 3 therefore is conclusively presumed to have accepted the Plan and Holders of Claims in Class 3 are not entitled to vote to accept or reject the Plan.

**4.    <u>Class 4 – General Unsecured Claims</u>**

a.    <u>Classification</u>:  Class 4 consists of all General Unsecured Claims against the Debtor.

b.    <u>Treatment</u>:  On or as soon as practicable after the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, as the sole distribution by the Liquidating Debtor or its Estate under this Plan on account of such General Unsecured Claim, a Pro Rata share (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) of the Net Distributable Assets of the Debtor up to the full Allowed amount of such General Unsecured Claim.  Holders of Allowed General Unsecured Claims will not be entitled to the payment of postpetition interest under the Plan, unless excess Net Distributable Assets remain after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  In such case of excess Net Distributable Assets, then Holders of Allowed General Unsecured Claims shall receive on a Pro Rata basis (calculated as a percentage of all Allowed General Unsecured Claims and all Allowed PBGC Claims) postpetition interest at the Federal Judgment Rate, to the extent that sufficient excess Net Distributable Assets (once all liquidated to Cash) exist and as required under the Bankruptcy Code.

c.    <u>Impairment/Voting</u>:  Class 4 is Impaired.  Holders of Claims in Class 4 are therefore entitled to vote to accept or reject the Plan.

5.    <u>**Class 5 – PBGC Claims**</u>

a.    <u>Classification</u>:  Class 5 consists of all PBGC Claims against the Debtor.

b.    <u>Treatment</u>:  On or as soon as practicable after the Effective Date, each Holder of an Allowed PBGC Claim shall receive, as the sole distribution by the Liquidating Debtor or its Estate under this Plan on account of such PBGC Claim, the treatment provided by the PBGC Settlement Agreement.  Specifically, subject to the terms of the PBGC settlement Agreement, each Holder of an Allowed PBGC Claim shall share on a Pro Rata basis in the distributions to be made to Holders of Allowed General Unsecured Claims in Class 4.

c.    <u>Impairment/Voting</u>:  Class 5 is Impaired.  Holders of Claims in Class 5 are therefore entitled to vote to accept or reject the Plan.

6.    <u>**Class 6 – Interests in the Debtor**</u>

a.    <u>Classification</u>:  Class 6 consists of all Interests in the Debtor.

b.    <u>Treatment</u>:  The Holders of Interests shall receive no distributions under the Plan, and on the Effective Date, all Interests shall be deemed suspended.  As of the Effective Date, the Holders of Interests shall receive a contingent interest in the Net Distributable Assets remaining, if any, after all Allowed Claims and Administrative Expenses have been paid or otherwise satisfied in full (unless otherwise agreed to by the applicable Creditor) in accordance with the Plan.  For the avoidance of doubt, no distribution of Net Distributable

32

Assets (once all liquidated to Cash) shall be made to Holders of Interests until and unless all

Holders of Allowed General Unsecured Claims receive payment in full of such Allowed Claims,

plus all accrued postpetition interest at the Federal Judgment Rate.

    c. <u>Impairment/Voting</u>:  Class 6 is Impaired.  Holders of Claims in

Class 6 are deemed to reject the Plan.

<div align="center">

**V.**

**<u>ACCEPTANCE OR REJECTION OF PLAN</u>**

</div>

**A.**  **<u>Identification of Unimpaired Classes</u>**

    The following Classes of Claims are Unimpaired under the Plan:

    Class 1 – Priority Non-Tax Claims

    Class 2 - Prepetition Credit Agreement Secured Claims

    Class 3 – Miscellaneous Secured Claims

**B.**  **<u>Identification of Impaired Classes</u>**

    The following Classes of Claims and Interests are Impaired under the Plan:

    Class 4 – General Unsecured Claims

    Class 5 – PBGC Claims

    Class 6 – Interests in the Debtor

**C.**  **<u>Classes Permitted and Not Permitted to Vote</u>**

    Classes 1, 2, and 3 are Unimpaired.  Holders of Claims in these Classes are

conclusively presumed pursuant to section 1126(f) of the Bankruptcy Code to have accepted the

Plan and therefore shall not be entitled to vote to accept or reject the Plan.  Classes 4 through 6

<div align="center">33</div>

are Impaired.  Holders of Claims in Classes 4 and 5 are permitted to vote to accept or reject the

Plan.  Holders of Interests in Class 6 are deemed to reject the Plan.  The Debtor reserves all of its

rights with respect to all Claims classified by the Debtor.

An Impaired Class of Claims that votes shall have accepted the Plan if (a) the

Holders of at least two-thirds in amount of the Allowed Claims actually voting in such Class

have voted to accept the Plan and (b) the Holders of more than one-half in number of the

Allowed Claims actually voting in such Class have voted to accept the Plan.

**D.**      **Effect of Non-Voting**

If no Holder of a Claim eligible to vote in a particular Class timely votes to accept

or reject the Plan, the Debtor may seek to have the Plan deemed **accepted** by the Holders of such

Claims in such Class for purposes of section 1129(b) of the Bankruptcy Code.

**E.**      **Nonconsensual Confirmation**

In the event any Class of Claims or Interests votes to reject the Plan and given the

deemed rejection of the Plan by the Holders of Interests, the Debtor requests that the Bankruptcy

Court confirm the Plan notwithstanding such rejection pursuant to section 1129(b) of the

Bankruptcy Code on the basis that the Plan is fair and equitable and does not discriminate

unfairly as to the Holders of any Class of Claims or Interests.

**F.**    **Postpetition Interest**

Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the

Holder of a Claim to receive postpetition interest on account of such Claim, except to the extent

that the Holder of a Claim has the benefit of a Lien on assets that exceed the value of such Claim

or the Plan expressly provides for postpetition interest on account of such Claim.

## VI.

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**    **PBGC Settlement**

The provisions of the Plan incorporate the terms of the PBGC Settlement

Agreement and the PBGC Settlement Order pursuant to section 1123(b)(3)(A) of the Bankruptcy

Code.  From and after the Effective Date, each and every provision of the PBGC Settlement

Agreement shall be binding on the Liquidating Debtor.

**B.**    **Continued Corporate Existence and Vesting of Assets**

On and after the Effective Date, subject to the requirements of the Plan, the

Liquidating Debtor will continue to exist as a separate limited liability company and shall retain

all of the powers of limited liability companies under applicable non-bankruptcy law, and

without prejudice to any right to amend its operating agreement, dissolve, merge or convert into

another form of business entity, or to alter or terminate its existence.  The existing membership

interests of the Debtor shall be deemed to be held by the Plan Administrator, and the Plan

Administrator shall be deemed to have been admitted as the sole member of the Debtor under

applicable nonbankruptcy law and shall be authorized to exercise all of the rights and powers of

a sole member as provided by the Plan.  Further, the Debtor's operating agreement shall be deemed to include a provision prohibiting the issuance of nonvoting equity securities and such other provisions as may be required pursuant to section 1123(a)(6) of the Bankruptcy Code.

Except as otherwise provided in the Plan, on and after the Effective Date, all Distributable Assets and property of the Debtor and its Estate, including any interests in subsidiaries and affiliates and any Retained Rights of Action of the Debtor, will vest in the Liquidating Debtor free and clear of all Claims, Liens, charges, other encumbrances and Interests.  Neither the occurrence of the Effective Date, nor the effectiveness of this Plan, nor any provision of applicable non-bankruptcy law shall cause a dissolution of the Debtor, which shall be continued as a limited liability company following the Effective Date subject to the terms of the Plan.

On and after the Effective Date, subject to the requirements of the Plan, the Liquidating Debtor shall be permitted to conduct its business, reconcile Claims, use and dispose of assets, prosecute litigation, and otherwise take any and all actions reasonably necessary to implement the Plan without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code or the Bankruptcy Rules.  The Liquidating Debtor shall be authorized, without limitation, to use and dispose of the Distributable Assets of the Debtor and its Estate, to investigate and pursue any Retained Rights of Action of the Debtor as the representative of the Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, to acquire and dispose of other property, and to otherwise administer its affairs.

36

## C.      Corporate Action; Winding Up of Affairs

On the Effective Date, the matters under the Plan involving or requiring limited liability company action of the Debtor, including but not limited to actions requiring a vote or other approval of the board of managers, members or other equity holders of the Debtor or the execution of any documentation incident to or in furtherance of the Plan, shall be deemed to have been authorized by the Confirmation Order and to have occurred and be in effect from and after the Effective Date without any further action by the Bankruptcy Court or the managers, members or officers of the Debtor.

Without limiting the generality of the foregoing, on the Effective Date and automatically and without further action, (i) any existing member of the Board of Managers and officers of the Debtor will be deemed to have resigned on the Effective Date without any further corporate action, (ii) the Plan Administrator shall be deemed the sole manager, officer and representative of the Liquidating Debtor to exercise the rights, power and authority of the Liquidating Debtor under applicable provisions of this Plan and bankruptcy and non-bankruptcy law, and (iii) all matters provided under this Plan shall be deemed to be authorized and approved without further approval from the Bankruptcy Court.  The Confirmation Order shall act as an order modifying the Debtor's operating agreement such that the provisions of this Plan can be effectuated.  The Plan shall be administered by the Plan Administrator, and all actions taken thereunder in the name of the Liquidating Debtor shall be taken through the Plan Administrator. All corporate governance activities of the Liquidating Debtor shall be exercised by the Plan Administrator in his or her discretion, subject to the terms of this Plan.

Following the Confirmation Date, the Debtor shall not engage in any business activities or take any actions, except those necessary to (i) effectuate the Plan and (ii) wind up the affairs of the Debtor as soon as reasonably practicable.  On and after the Effective Date, the Plan Administrator may, in the name of the Liquidating Debtor, take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Plan Administrator may, without application to or approval of the Bankruptcy Court, pay, from the proceeds of Distributable Assets, the charges that he or she incurs after the Effective Date for professional fees and expenses that, but for the occurrence of the Effective Date, would constitute Allowed Administrative Expenses.

From and after the Effective Date, (i) the Debtor, for all purposes, shall be deemed to have withdrawn its business operations from any state in which it was previously conducting or is registered or licensed to conduct its business operations, and the Debtor shall not be required to file any document, pay any sum or take any other action, in order to effectuate such withdrawal, and (ii) the Debtor shall not be liable in any manner to any taxing authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

## D.    <u>Plan Administrator</u>

On the Effective Date, the Plan Administrator shall begin acting for the Liquidating Debtor in the same fiduciary capacity as applicable to a board of directors of a Delaware corporation implementing such liquidation and wind-down as contemplated under this

Plan, subject to the provisions hereof.  The Plan Administrator shall serve in such capacity

through the earlier of the date the Debtor is dissolved in accordance with this Plan and the date

such Plan Administrator resigns, is terminated or otherwise unable to serve; provided, however,

that, any successor Plan Administrator appointed pursuant to the Plan, shall serve in such

capacities after the effective date of such persons appointment as Plan Administrator.

The qualifications and proposed compensation of and other disclosures regarding

the Plan Administrator shall be set forth in a notice to be Filed with the Court as part of the Plan

Supplement; such compensation may be paid from the Liquidating Debtor's Cash on hand

without further notice or order of the Bankruptcy Court.  Further, the Plan Administrator shall be

entitled to reimbursement, from the Liquidating Debtor's Cash on hand, for his or her actual,

reasonable, and necessary expenses incurred in connection with the performance of his or her

duties, without the need for further notice or Bankruptcy Court approval.  All distributions to be

made to Creditors and, if applicable, Interest Holders under the Plan shall be made by the Plan

Administrator (or his or her designated agent).  The Plan Administrator shall deposit and hold all

Cash in trust for the benefit of Creditors (including Professional Persons) and Holders of

Interests receiving distributions under the Plan.  The duties and powers of the Plan Administrator

shall include, without limitation, the following (without need of further Court approval):

(i)	To exercise all power and authority that may be exercised, to commence

all proceedings (including the power to continue any actions and proceedings that may have been

commenced by the Debtor prior to the Effective Date) that may be commenced, and to take all

actions that may be taken by any officer or manager of the Liquidating Debtor with like effect as

if authorized, exercised, and taken by unanimous action of such officers and managers, including consummating the Plan and all transfers thereunder on behalf of the Liquidating Debtor;

(ii)     To wind up the affairs of the Liquidating Debtor and any or all of its subsidiaries and affiliates to the extent necessary as expeditiously as reasonably possible;

(iii)     To maintain all accounts, make distributions, and take other actions required under or consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Liquidating Debtor;

(iv)     To use, manage, sell, abandon, convert to Cash and/or otherwise dispose of the Distributable Assets, for the purpose of liquidating all remaining property of the Estate, making distributions and fully consummating this Plan Stipulation;

(v)     To take all steps necessary to terminate the corporate existence of the Debtor;

(vi)     To prosecute objections to Claims and Administrative Expenses and compromise or settle any Claims and Administrative Expenses (disputed or otherwise);

(vii)     To prosecute any and all Retained Rights of Action and compromise or settle any Retained Rights of Action;

(viii)     To prepare and file tax returns to the extent required by law;

(ix)     To employ and compensate any and all such professionals and agents as the Plan Administrator, in his or her sole discretion, deems reasonably necessary to perform his or her duties under the Plan without further order of the Bankruptcy Court; and

40

(x)      To take all other actions not inconsistent with the provisions of the Plan that the Plan Administrator deems reasonably necessary or desirable in connection with the administration of the Plan, including, without limitation, filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 Case.

The Plan Administrator may be removed by the Bankruptcy Court upon application for good cause shown.  In the event of the resignation, removal, death, or incapacity of the Plan Administrator, the Bankruptcy Court shall appoint another Person to become Plan Administrator, with notice thereof provided to the Post-Effective Date Service List.  The successor Plan Administrator without any further act shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor.

## E.    Source of Funding

The source of all distributions and payments under this Plan will be the Distributable Assets and the proceeds thereof, including, without limitation, the Debtor's Cash on hand and proceeds from the sale or other disposition of the remaining property of the Debtor and prosecution of Retained Rights of Action.

## F.    Retained Rights of Action of the Debtor

Unless a Right of Action of the Debtor (including the right to object to any Claim asserted against the Estate) is, in writing, expressly waived, relinquished, released, assigned, compromised, or settled in the Plan, or in a Final Order, all rights of the Estate from and after the Effective Date with respect to the Retained Rights of Action are expressly preserved for the benefit of, assigned to, and fully vested in, the Liquidating Debtor.

41

The Liquidating Debtor shall have standing as the representative of the Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue, or decline to pursue, the Retained Rights of Action and objections to Claims, as appropriate, in the business judgment of the Debtor.  The Liquidating Debtor, acting through the Plan Administrator, may settle, release, sell, assign, otherwise transfer, or compromise, Retained Rights of Action and/or objections to Claims without need for notice or order of the Bankruptcy Court.

**G.      Interests in Affiliates and Subsidiaries**

As of the Effective Date, except as expressly provided in the Plan or by separate order of the Bankruptcy Court, the Liquidating Debtor shall retain any stock or interests that it may hold in its non-Debtor affiliates or subsidiaries and retain any rights to which such stock or interests may be entitled under applicable law with respect to such shares or other interests. After the Effective Date, the Liquidating Debtor may sell, transfer, assign or otherwise dispose of such shares or interests as permitted by applicable law.

**H.      Payment of Plan Expenses**

The Liquidating Debtor may pay all reasonable Plan Expenses without further notice to Creditors or Holders of Interests or approval of the Bankruptcy Court.

**I.       Ultimate Dissolution of Debtor; Final Decree**

Once the Plan Administrator determines that the Final Resolution Date has occurred, the Liquidating Debtor shall be dissolved for all purposes by the Plan Administrator without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtor or payments to be made in connection therewith; provided, however, without

42

the need of any further approval, the Plan Administrator in his or her discretion may execute and file documents and take all other actions as he or she deems appropriate relating to the dissolution of the Liquidating Debtor under the laws of Delaware and/or any other applicable states, and in such event, all applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Liquidating Debtor as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates.

At any time following the Effective Date, the Plan Administrator, on behalf of the Liquidating Debtor, shall be authorized to file a motion for the entry of a final decree closing the Chapter 11 Case pursuant to section 350 of the Bankruptcy Code.

**J.     Records**

The Liquidating Debtor and Plan Administrator shall maintain reasonably good and sufficient books and records of accounting relating to the Distributable Assets, the Liquidating Debtor's Cash, the management thereof, all transactions undertaken by such parties, all expenses incurred by or on behalf of the Debtor and Plan Administrator, and all distributions contemplated or effectuated under this Plan.  Upon the entry of a final decree closing the Chapter 11 Case, unless otherwise ordered by the Court, the Liquidating Debtor and Plan Administrator may destroy or otherwise dispose of all records maintained by the Liquidating Debtor and/or Plan Administrator.  Notwithstanding anything to the contrary, the Plan Administrator may, upon notice to the Post-Effective Date Service List and without Bankruptcy Court approval, destroy

any documents that he or she believes are no longer required to effectuate the terms and conditions of this Plan.

## VII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Rejection of Executory Contracts and Unexpired Leases

Except for any executory contracts or unexpired leases:  (i) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to section 365 of the Bankruptcy Code; (ii) that are listed for assumption by the Debtor as of the Effective Date in a Plan Supplement to be filed and served on affected non-Debtor counterparties; (iii) as to which a motion for approval of the assumption or rejection of such contract or lease has been Filed and served prior to the Effective Date; (iv) that constitute contracts of insurance in favor of, or that benefit, the Debtor or the Estate; or (v) that were previously sold, conveyed or otherwise assigned pursuant to Final Order, each executory contract and unexpired lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code as of the Effective Date.  Without limiting the foregoing, the indemnification obligations in favor of the Debtor's independent managers and applicable Huron Parties shall be assumed as of the Effective Date, and all other pre-Effective Date indemnification obligations of the Debtor shall be deemed rejected as of the Effective Date to the extent that such obligations are contained in executory contracts within the meaning of section 365 of the Bankruptcy Code, but only to the extent not inconsistent with any existing insurance obligations.  The Confirmation Order shall

44

constitute an order of the Bankruptcy Court approving such assumptions or rejections, pursuant

to section 365 of the Bankruptcy Code, as of the Effective Date.

**B.**      **Bar Date for Rejection Damages**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or

otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim

shall be forever barred and shall not be enforceable against the Debtor or its Estate unless a proof

of Claim is Filed and served on the Debtor and its counsel within thirty (30) days after the earlier

of (a) Effective Date or (b) service of a notice that the executory contract or unexpired lease has

been rejected.  All such Claims for which proofs of Claim are required to be Filed, if Allowed,

will be, and will be treated as, General Unsecured Claims, subject to the provisions of the Plan.

## VIII.

## DISTRIBUTIONS AND RELATED MATTERS

**A.**      **Dates of Distribution**

The sections of the Plan on treatment of Administrative Expenses, Claims, and

Interests specify the times for distributions.  Whenever any payment or distribution to be made

under the Plan shall be due on a day other than a Business Day, such payment or distribution

shall instead be made, without interest, by the Liquidating Debtor (or its agent) on the

immediately following Business Day.  Distributions due on the Effective Date will be paid on

such date or as soon as practicable thereafter, provided that if other provisions of the Plan require

the surrender of securities or establish other conditions precedent to receiving a distribution, the

distribution may be delayed until such surrender occurs or conditions are satisfied.

If, under the terms of the Plan, the resolution of a particular Disputed Claim (*e.g.*,

it is Disallowed) entitles other Holders of Claims to a further distribution, either (a) the

Liquidating Debtor may make such further distribution as soon as practicable after the resolution

of the Disputed Claim or (b) if the further distribution is determined in good faith by the

Liquidating Debtor to be less than $100 for any Creditor, then, in order to afford an opportunity

to minimize costs and aggregate such distributions, the Liquidating Debtor may make such

further distribution any time prior to sixty (60) days after the Final Resolution Date or with the

next distribution, in the discretion of the Liquidating Debtor.

**B.**     **Cash Distributions**

Distributions of Cash may be made either by check drawn on a domestic bank or

wire transfer from a domestic bank, at the option of the Liquidating Debtor, except that Cash

payments made to foreign Creditors may be made in such funds and by such means as are

necessary or customary in a particular foreign jurisdiction.

**C.**     **Rounding of Payments**

Whenever payment of a fraction of a cent would otherwise be called for, the

actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  To the

extent Cash remains undistributed as a result of the rounding of such fraction to the nearest

whole cent, such Cash shall be treated as "Unclaimed Property" under the Plan.

**D.**     **Disputed Claims**

Notwithstanding all references in the Plan to Claims that are Allowed, solely for

the purpose of calculating the amount or number of distributions to be made on account of

Allowed Claims or Allowed Administrative Expenses under the Plan, such calculations shall be made as if each Disputed Claim were an Allowed Claim or Allowed Administrative Expense, except that if the Bankruptcy Court estimates the likely portion of a Disputed Claim to be Allowed or authorized or otherwise determines the amount or number which would constitute a sufficient reserve for a Disputed Claim (which estimates and determinations may be requested by the Liquidating Debtor), such amount or number as determined by the Bankruptcy Court shall be used for calculations as to such Disputed Claim.

All distributions due in respect of a Disputed Claim shall be held and not made pending resolution of the Disputed Claim.

If an objection to a Disputed Claim is withdrawn, resolved by agreement, or determined by Final Order, the distributions due on account of any resulting Allowed Claim or Allowed Administrative Expense shall be made by the Liquidating Debtor.  Such distribution shall be made within forty-five (45) days of the date that the Disputed Claim becomes an Allowed Claim or Allowed Administrative Expense or as soon thereafter as reasonably practicable.  No interest shall be due to a Holder of a Disputed Claim based on the delay attendant to determining the allowance of such Claim, Interest or Administrative Expense.

E.      **Undeliverable and Unclaimed Distributions**

If any distribution under the Plan is returned to the Liquidating Debtor as undeliverable or the check or other similar instrument or distribution by the Liquidating Debtor remains uncashed or unclaimed, as applicable, for ninety (90) days, such Cash shall be deemed

to be Unclaimed Property.  Upon property becoming Unclaimed Property, it immediately shall be revested in the Liquidating Debtor.

Once there becomes Unclaimed Property for a Holder, no subsequent distributions for such Holder which may otherwise be due under the Plan will accrue or be held for such Holder, provided that, if the applicable agent is notified in writing of such Holder's then-current address and status as a Holder under the Plan, thereafter, the Holder will become entitled to its share of distributions, if any, which first become due after such notification.

### F.    Compliance with Tax Requirements

The Liquidating Debtor shall comply with all withholding and reporting requirements imposed by federal, state or local taxing authorities in connection with making distributions pursuant to the Plan.

In connection with each distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Liquidating Debtor shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such distribution, or effect any such withholding and deposit all moneys so withheld to the extent required by law.  With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received, the Liquidating Debtor may, in its sole option, withhold the amount required and distribute the balance to such Person or decline to make such distribution until the information is received; provided, however,

48

that Liquidating Debtor shall not be obligated to liquidate any securities to perform such withholding.

**G.**    **Record Date in Respect to Distributions**

Except as set forth below, the record date and time for the purpose of determining which Persons are entitled to receive any and all distributions on account of any Allowed Claims or Interests, irrespective of the date of or number of distributions, shall be the same as the Record Date.

**H.**    **Reserves**

In making any distributions in respect of Claims under this Plan, the Liquidating Debtor shall reserve an appropriate and adequate amount of Cash on account of any unresolved Disputed Claims.  The Liquidating Debtor shall make a corrective distribution following the successful resolution of any Disputed Claim on the next regularly scheduled distribution date.

## IX.

**LITIGATION, OBJECTIONS TO CLAIMS, AND DETERMINATION OF TAXES**

**A.**    **Litigation; Objections to Claims; Objection Deadline**

Except as may be expressly provided otherwise in the Plan, the Liquidating Debtor, through the Plan Administrator, shall be responsible for pursuing Retained Rights of Action, any objection to the allowance of any Claim, and the determination of Tax issues and liabilities.

As of the Effective Date, the Liquidating Debtor shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims;

49

provided, however, parties in interest may file objections to Claims to the extent permitted by

Bankruptcy Code section 502(a).  Unless another date is established by the Bankruptcy Court

*sua sponte* (which may so act without notice or hearing) or is established by other provisions of

the Plan, any objection to a Claim or Interest shall be filed with the Bankruptcy Court and served

on the Person holding such Claim or Interest within one hundred eighty (180) days after the

Effective Date (as may be extended pursuant to this section, the "Objection Deadline"), provided

that the Liquidating Debtor may seek extension(s) thereof subject to Bankruptcy Court approval

and with notice only to parties that have requested such notice pursuant to Bankruptcy Rule

2002.

In addition to any other available remedies or procedures with respect to Tax

issues or liabilities or rights to Tax refunds, the Liquidating Debtor, at any time, may utilize (and

receive the benefits of) section 505 of the Bankruptcy Code with respect to: (1) any Tax issue or

liability or right to a Tax refund relating to an act or event occurring prior to the Effective Date;

or (2) any Tax liability or right to a Tax refund arising prior to the Effective Date.  If the

Liquidating Debtor utilizes section 505(b) of the Bankruptcy Code: (1) the Bankruptcy Court

shall determine the amount of the subject Tax liability or right to a Tax refund in the event that

the appropriate governmental entity timely determines a Tax to be due in excess of the amount

indicated on the subject return; and (2) if the prerequisites are met for obtaining a discharge of

Tax liability in accordance with section 505(b) of the Bankruptcy Code, the Liquidating Debtor

shall be entitled to such discharge which shall apply to any and all Taxes relating to the period

covered by such return.

50

**B.**       **Temporary or Permanent Resolution of Disputed Claims**

The Debtor and the Liquidating Debtor may request, at any time prior to the Effective Date (in the case of the Debtor) or on and after the Effective Date (in the case of the Liquidating Debtor), that the Bankruptcy Court estimate any contingent or unliquidated Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, irrespective of whether any party has previously objected to such Disputed Claim.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Disputed Claim at any time during litigation concerning any objection to the Disputed Claim.  If the Bankruptcy Court estimates any contingent or unliquidated Disputed Claim, that estimated amount would constitute either the Allowed amount of such Disputed Claim or a maximum limitation on such Disputed Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Disputed Claim, the Liquidating Debtor may elect from and after the Effective Date to pursue any supplemental proceedings to object to any ultimate payment on account of such Disputed Claim. In addition, the Liquidating Debtor may resolve or adjudicate any Disputed Claim from and after the Effective Date in the manner in which the amount of such Claim, Interest or Administrative Expense and the rights of the Holder of such Claim, Interest or Administrative Expense would have been resolved or adjudicated if the Chapter 11 Case had not been commenced.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

51

**C.**     **Setoffs**

The Liquidating Debtor may, but shall not be required to, setoff against any

Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such

Claim, claims of any nature whatsoever that the Debtor may have against the Holder of such

Claim; provided, however, neither the failure to do so nor the allowance of any Claim hereunder

shall constitute a waiver or release by the Liquidating Debtor of any such claim that the

Liquidating Debtor may have against such Holder, unless otherwise agreed to in writing by such

Holder and the Liquidating Debtor.

**D.**     **Preservation of Retained Rights of Action**

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating

Debtor and its successors, any assigns hereunder and future assigns will retain and may

exclusively enforce any Retained Rights of Action and the Confirmation Order shall be deemed a

*res judicata* determination of such rights to retain and exclusively enforce such Retained Rights

of Action.  Absent such express waiver or release, the Liquidating Debtor, acting through the

Plan Administrator, or its successors or assigns shall have standing as the representative(s) of the

Debtor's Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to pursue Retained

Rights of Action, as appropriate, in accordance with the best interests of the Liquidating Debtor

(or its successors or future assigns).  The Retained Rights of Action may be asserted or

prosecuted before or after solicitation of votes on the Plan or before or after the Effective Date.

Absent an express waiver or release set forth in the Plan, nothing in the Plan shall

(or is intended to) prevent, estop or be deemed to preclude the Liquidating Debtor from utilizing,

pursuing, prosecuting or otherwise acting upon all or any of their Retained Rights of Action and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Retained Rights of Action upon or after Confirmation or Consummation.

## X.

## RELEASES, INJUNCTIONS, EXCULPATION AND RELATED PROVISIONS

### A.   Injunctions

#### 1.   Generally

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for in the Chapter 11 Case pursuant to sections 105 and 362 of the Bankruptcy Code or otherwise in effect on the Confirmation Date, shall remain in full force and effect until the Effective Date.  From and after the Effective Date, all Persons are permanently enjoined from, and restrained against, commencing or continuing in any court any suit, action or other proceeding, or otherwise asserting any claim or interest, seeking to hold (i) the Liquidating Debtor or its Estate, or (ii) the property of the Debtor or its Estate, liable for any Claim, obligation, right, interest, debt or liability that has been released pursuant to the Plan.

#### 2.   Injunction Related to Rights of Action and Claims, Administrative Expenses and Interests

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date, all Entities that have held, currently hold or may hold a Claim, Administrative Expense, Interest or other debt or liability against or in the Debtor are*

*permanently enjoined from taking any of the following actions against property of the Debtor or its Estate or the Liquidating Debtor on account of all or such portion of any such Claims, Administrative Expenses, Interests, debts or liabilities:  (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, (c) creating, perfecting or enforcing any lien or encumbrance; and (d) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan.*

B.      **Exculpation**

          As of and subject to the occurrence of the Effective Date, for good and valuable consideration, including the consideration provided under the Plan, (i) the Debtor, (ii) the independent managers of Revstone Transportation, Messrs. James B. Shein and Richard E. Newsted (including in their respective role as members of the Restructuring Committee) (the "Independent Managers") , (iii) the Debtor's attorneys and other professionals (solely in their respective capacity as professionals of the Debtor) (the "Debtor Retained Professionals"), (iv) the attorneys and professionals retained by the Restructuring Committee (solely in their capacity as such), (v) the Huron Parties (solely with respect to services rendered for the Debtor, including as officers, representatives, professionals for, and/or agent of the Debtor), and (vi) the respective successors or assigns of the foregoing parties, shall neither have nor incur any liability to any Person or Entity for any act taken or omitted to be taken, on or after the Petition Date, in connection with, or related to, the formulation, preparation, dissemination, implementation, administration, Confirmation or Consummation of the Plan or any contract, instrument, waiver,

release or other agreement or document created or entered into, in connection with the Plan, or any other act taken or omitted to be taken in connection with the Chapter 11 Case up to and including the Effective Date; provided, however, that the foregoing provisions of this subsection shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, the scope of the exculpation provided under this Article X.B does not cover any of the George Hofmeister Parties or the former and current officers, managers and representatives of the Debtor (other than the Independent Managers, the Debtor Retained Professionals, the attorneys and professionals retained by the Restructuring Committee, and the Huron Parties expressly exculpated above).

Notwithstanding anything in the Plan to the contrary, no Person serving as Plan Administrator shall have or incur any personal liability as the manager, member or officer of the Debtor or Liquidating Debtor for any act taken or omission made in connection with the wind-up or dissolution of the Liquidating Debtor or any nondebtor subsidiary or affiliate; provided, however, that the foregoing shall have no effect on the liability of the Plan Administrator that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.

C.     **Debtor's Release of CRO, Independent Managers, and Other Parties**

As of and subject to the occurrence of the Effective Date, for good and valuable consideration, the Debtor, for itself and the Estate, hereby irrevocably, unconditionally and generally releases (i) the Independent Managers, (ii) the Debtor Retained Professionals, (iii) the

attorneys and professionals retained by the Restructuring Committee (solely in their capacity as

such), (iv) the Huron Parties (solely with respect to services rendered for the Debtor, including as

officers, representatives, professionals for, and/or agent of the Debtor), and (v) the respective

successors or assigns of the foregoing parties (collectively, the "Released Parties"), from any and

all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether known or

unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or

unmatured, in law or equity or otherwise, which the Debtor or its Estate ever had, now have or

hereafter can, shall or may have against any of the Released Parties from the beginning of time to

the Effective Date that in any way relates to the Debtor, the Estate or the Chapter 11 Case.  For

the avoidance of doubt, the scope of the release provided under this Article X.C does not cover

any of the George Hofmeister Parties or the former and current officers, managers and

representatives of the Debtor (other than the Independent Managers, the Debtor Retained

Professionals, the attorneys and professionals retained by the Restructuring Committee, and the

Huron Parties expressly released above).

## D.      **Release by Creditors**

        **As of and subject to the occurrence of the Effective Date, for good and**

**valuable consideration, each holder of a Claim that votes to accept the Plan (the "Creditor-**

**Releasors"), for itself and its respective present or former officers, directors, managers,**

**shareholders, trustees, partners and partnerships, members, agents, employees,**

**representatives, attorneys, accountants, professionals, and successors or assigns, in each**

**case solely in their capacity as such, shall be deemed to have completely, conclusively,**

unconditionally and irrevocably released (i) the Debtor, (ii) the Estate, (iii) the Independent

Managers, (iv) the Debtor Retained Professionals, (v) the attorneys and professionals

retained by the Restructuring Committee (solely in their capacity as such), (vi) the Huron

Parties (solely with respect to services rendered for the Debtor, including as officers,

representatives, professionals for, and/or agent of the Debtor), and (vii) the respective

successors or assigns of the foregoing parties (the "<u>Released Debtor Parties</u>"), from any

and all claims, obligations, rights, suits, damages, causes of action, and liabilities, whether

known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or

contingent, matured or unmatured, in law or equity or otherwise, which the Debtor or its

Estate ever had, now have or hereafter can, shall or may have against any of the Released

Parties from the beginning of time to the Effective Date that in any way relates to the

Debtor, the Estate or the Chapter 11 Case.  For the avoidance of doubt, the Released

Debtor Parties do not include any of the George Hofmeister Parties or the former and

current officers, managers or representatives of the Debtor, other than the Independent

Managers, the Debtor Retained Professionals, the attorneys and professionals retained by

the Restructuring Committee, and the Huron Parties expressly released above.

E.       <u>Release by Debtor's Non-Debtor Affiliates of the Released Debtor Parties</u>

Except as otherwise specifically provided in the Plan, for good and valuable

consideration, as of the Effective Date, all of the non-debtor, direct or indirect corporate

subsidiaries of the Debtor (the "<u>Releasor Affiliates</u>") shall conclusively, absolutely,

unconditionally, irrevocably and forever release and discharge the Released Debtor Parties

57

**from any and all claims, obligations, rights, suits, damages, causes of action, and liabilities whatsoever, which the Releasor Affiliates ever had, now have or hereafter can, shall or may have against any of the Released Debtor Parties from the beginning of time to the Effective Date that in any way relates to the Debtor, the Estate or the Chapter 11 Case.  For the avoidance of doubt, the Releasor Affiliates do not include Debtors Revstone Industries, LLC, Spara, LLC, Greenwood Forgings, LLC, and US Tool & Engineering, LLC.**

**F.    <u>No Discharge</u>**

Nothing contained in this Plan shall be deemed to constitute a discharge of the Debtor under Bankruptcy Code section 1141(d)(3).

## XI.

## <u>NO REGULATED RATE CHANGE WITHOUT GOVERNMENT APPROVAL</u>

The Debtor does not charge any rates for purposes of section 1129(a)(6) that are regulated by any governmental regulatory commission with jurisdiction under applicable non-bankruptcy law.

## XII.

## <u>EXEMPTION FROM CERTAIN TRANSFER TAXES</u>

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers by the Debtor pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar Tax or governmental assessment.

## XIII.

## RETENTION OF JURISDICTION AND MISCELLANEOUS MATTERS

**A.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the

Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Case and any

of the proceedings related to the Chapter 11 Case pursuant to section 1142 of the Bankruptcy

Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other

applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the

purpose and intent of the Plan are carried out.  Without limiting the generality of the foregoing,

the Bankruptcy Court shall retain jurisdiction for the following purposes:

(1)      establish the priority or secured or unsecured status of, allow, disallow, determine, liquidate, classify, or estimate any Claim, Administrative Expense or Interest (including, without limitation and by example only, determination of Tax issues or liabilities in accordance with section 505 of the Bankruptcy Code), resolve any objections to the allowance or priority of Claims, Administrative Expenses or Interests, or resolve any dispute as to the treatment necessary to reinstate a Claim, Administrative Expense or Interest pursuant to the Plan;

(2)      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(3)      resolve any matters related to the rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims or Administrative Expenses arising therefrom;

(4)      ensure that distributions to Holders of Allowed Claims, Administrative Expenses or Interests are made pursuant to the provisions of the Plan, and to effectuate performance of the provisions of the Plan;

(5)    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending before the Effective Date or that may be commenced thereafter as provided in the Plan;

(6)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Confirmation Order or in the Plan, including, without limitation, any stay orders as may be appropriate in the event that the Confirmation Order is for any reason reversed, stayed, revoked, modified, supplemented or amended;

(7)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order;

(8)    subject to the restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(9)    issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan or the Confirmation Order,

(10)    consider and act on the compromise and settlement of any Claim against, or Retained Right of Action of the Liquidating Debtor;

(11)    decide or resolve any Retained Rights of Action under the Bankruptcy Code;

(12)     enter such orders as may be necessary or appropriate in connection with the recovery of the assets of the Liquidating Debtor wherever located;

(13)     hear and decide any objections to Claims brought by the Liquidating Debtor;

(14)     hear and decide any litigation, including any Avoidance Claims, brought by the Liquidating Debtor;

(15)     hear and determine any motions or contested matters involving Tax Claims or Taxes either arising prior (or for periods including times prior) to the Effective Date or relating to the administration of the Chapter 11 Case, including, without limitation (i) matters involving federal, state and local Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, (ii) matters concerning Tax refunds due for any period including times prior to the Effective Date, and (iii) any matters arising prior to the Effective Date affecting Tax attributes of the Debtor;

(16)     determine such other matters as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(17)     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings issued or entered in connection with the Chapter 11 Case or the Plan;

(18)     remand to state court any claim, cause of action, or proceeding involving either of the Debtor that was removed to federal court, in whole or in part in reliance upon 28 U.S.C. § 1334;

(19)     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan;

(20)     determine any other matter not inconsistent with the Bankruptcy Code; and

(21)     enter an order or final decree concluding the Chapter 11 Case.

B.    **Miscellaneous Matters**

1.    **Headings**

The headings used in the Plan are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

2.    **Services by and Fees for Professionals and Certain Parties**

Notwithstanding any other provision herein, Professional Fee Claims shall be paid in accordance with the terms of the order(s) authorizing such payments as promptly as possible on the Effective Date for any outstanding amounts due as of the Effective Date, and as soon as practicable thereafter as such obligation to pay becomes due unless otherwise agreed upon by the applicable Professional.

From and after the Effective Date, the Liquidating Debtor shall in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professionals thereafter incurred by the Liquidating Debtor.

3.    **Bar Date for Administrative Expenses**

Requests for payment of all Administrative Expenses, other than for those for which a Bar Date was previously set (including the Bar Date set by the Bar Date Order) or for which a request and/or proof of Claim has previously been filed, must be Filed and served on the Liquidating Debtor and the United States Trustee by no later than thirty (30) days after the Effective Date.  The Liquidating Debtor shall have until ninety (90) days after the Effective Date to bring an objection to a Timely Filed request for payment of an Administrative Expense (as

DOCS_SF:85015.7 73864/002

may be extended pursuant to this section, the "Administrative Expense Objection Deadline"),

provided that the Liquidating Debtor may seek extension(s) thereof subject to Bankruptcy Court

approval and with notice only to parties that have requested such notice pursuant to Bankruptcy

Rule 2002.  Nothing in the Plan shall prohibit the Liquidating Debtor from paying

Administrative Expenses in the ordinary course in accordance with applicable law during or after

the Chapter 11 Case, but after the Effective Date, the Liquidating Debtor's obligation to pay an

Administrative Expense will depend upon the claimant's compliance with this section and such

Administrative Expense being Allowed under the provisions of the Plan.

Notwithstanding the foregoing provisions of this Article XIII.B.3, but except as

may be expressly provided in other sections of the Plan, Professional Persons requesting

compensation or reimbursement of expenses incurred after the Petition Date and prior to the

Effective Date must file and serve, on all parties entitled to notice thereof, a Fee Application for

final allowance of compensation and reimbursement of expenses in accordance with the various

orders of the Bankruptcy Court establishing procedures for submission and review of such

applications; provided that, if no last date is set in such procedures for filing such applications,

they must be filed no later than sixty (60) days after the Effective Date and any objections to

such applications must be made in accordance with applicable rules of the Bankruptcy Court.

## 4.    Non-Voting Equity Securities

If and to the extent applicable, the Debtor shall comply with the provisions of

section 1123(a)(6) of the Bankruptcy Code.

DOCS_SF:85015.7 73864/002

5.      **Subordination Agreements**

Pursuant to section 510(a) of the Bankruptcy Code, to the extent there is any

subordination agreement in place between creditors that is enforceable under nonbankruptcy law,

the Debtor shall honor such subordination agreement and turn over any distributions required to

be turned over pursuant to the terms of such agreements and the Bankruptcy Code.

6.      **Notices**

All notices and requests in connection with the Plan shall be in writing and shall

be hand delivered or sent by mail or facsimile addressed to:

> Plan Administrator:
>
> John C. DiDonato
> Huron Consulting Group
> 599 Lexington Ave., 25th Floor
> New York, NY 10022
> Telephone:  212-785-1900
> Facsimile:  212-785-1313
>
> Debtor's Counsel:
>
> PACHULSKI STANG ZIEHL & JONES LLP
> Attn:   Laura Davis Jones, Esq.
>         David M. Bertenthal, Esq.
>         Maxim B. Litvak, Esq.
> 919 North Market Street, 17th Floor
> Wilmington, DE 19899
> Telephone:  (302) 652-4100
> Facsimile: (302) 652-4400

All notices and requests to any Person of record holding any Claim,

Administrative Expense or Interest shall be sent to such Person at the Person's last known

address or to the last known address of the Person's attorney of record.  Any such Person may

designate in writing any other address for purposes of this section of the Plan, which designation

will be effective on receipt.

### 7.    Successors and Assigns

The rights, duties and obligations of any Person named or referred to in the Plan

shall be binding upon, and shall inure to the benefit of, the successors and assigns of such

Person.

### 8.    Severability of Plan Provisions

If, prior to Confirmation, any non-material term or provision of the Plan is held by

the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the

power to alter and interpret such term or provision to make it valid or enforceable to the

maximum extent practicable, consistent with the original purpose of the term or provision held to

be invalid, void or unenforceable, and such term or provision will then be applicable as altered or

interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the

terms and provisions of the Plan will remain in full force and effect and will in no way be

affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation

Order will constitute a judicial determination that each term and provision of the Plan, as it may

have been altered or interpreted in accordance with the foregoing, is valid and enforceable

pursuant to their terms.

### 9.    No Waiver

Neither the failure of the Debtor to list a Claim in the Debtor's Schedules, the

failure of the Debtor to object to any Claim or Interest for purposes of voting, the failure of the

Debtor to object to a Claim, Administrative Expense or Interest prior to Confirmation or the

Effective Date, the failure of the Debtor to assert a Retained Right of Action prior to

Confirmation or the Effective Date, the absence of a proof of Claim having been filed with

respect to a Claim, nor any action or inaction of the Debtor or any other party with respect to a

Claim, Administrative Expense, Interest or Retained Right of Action other than a legally

effective express waiver or release shall be deemed a waiver or release of the right of the

Liquidating Debtor or its successors, before or after solicitation of votes on the Plan or before or

after Confirmation or the Effective Date to (a) object to or examine such Claim, Administrative

Expense or Interest, in whole or in part or (b) retain and either assign or exclusively assert,

pursue, prosecute, utilize, otherwise act or otherwise enforce any Rights of Action.

<p style="text-align:center">10.    <strong><u>Inconsistencies</u></strong></p>

In the event the terms or provisions of the Plan are inconsistent with the terms and

provisions of the exhibits to the Plan or documents executed in connection with the Plan, the

terms of the Plan shall control.

<p style="text-align:center">11.    <strong><u>U.S. Trustee Fees</u></strong></p>

All fees payable on or before the Effective Date pursuant to section 1930 of title

28 of the United States Code shall be paid by the Debtor on or before the Effective Date.  From

and after the Effective Date, the Liquidating Debtor shall pay the fees assessed against its Estate

until such time as the particular Chapter 11 Case is closed, dismissed or converted.  In addition,

the Liquidating Debtor shall file post-confirmation quarterly reports in conformity with the U.S.

Trustee guidelines until entry of an order closing or converting the Chapter 11 Case.

<p style="text-align:center">66</p>

12. **Plan Supplement**

No later than ten (10) days prior to the Confirmation Hearing, the Debtor shall

File with the Bankruptcy Court the Plan Supplement, which shall contain such substantially final

agreements, other documents and information as may be necessary or appropriate to effectuate

and further evidence the terms and conditions of the Plan.  Holders of Claims or Interests may

obtain a copy of the Plan Supplement upon written request to the Claims Agent.

13. **Preservation of Insurance**

The Debtor's release from and payment of Claims as provided in the Plan shall

not diminish or impair the enforceability of any insurance policy that may cover any Claims,

including, without limitation, any Claims on account of the Debtor's officers or managers.

14. **Waiver of Stay**

The Debtor requests as part of the Confirmation Order a waiver from the

Bankruptcy Court of the fourteen (14) day stay of Bankruptcy Rule 3020(e) and, to the extent

applicable, a waiver of the fourteen (14) day stay of Bankruptcy Rule 6004(h).

15. **Choice of Law**

Except to the extent a rule of law or procedures is supplied by federal law

(including but not limited to the Bankruptcy Code and the Bankruptcy Rules), this Plan shall be

governed by, and construed in accordance with, the laws of the State of Delaware applicable to

contracts executed in and to be performed in that State.

# XIV.

## CONDITIONS TO EFFECTIVENESS

The Plan will not be consummated and the Effective Date will not occur unless and until (A) the Confirmation Order is in a form acceptable to the Debtor; (B) all documents to be provided in the Plan Supplement are in form and substance acceptable to the Debtor; (C) the Confirmation Order shall be a Final Order; (D) the Debtor determines in its reasonable business judgment that it has sufficient Cash to pay all Allowed Administrative Expenses, Allowed Tax Claims and Allowed Priority Non-Tax Claims, as of the Effective Date, to the extent the holders thereof are entitled to payment as of such date under the Plan and unless otherwise agreed by such holders, and (E) the Debtor determines in its reasonable business judgment that the Debtor has sufficient Cash to pay all asserted, accrued and estimated Administrative Expenses that have not yet been Allowed or are otherwise not yet payable as of the Effective Date but which such Administrative Expenses are anticipated to be later Allowed or otherwise payable and the holders of any such Administrative Expenses have not agreed to alternative treatment.  Any of the foregoing conditions, other than conditions (D) and (E), may be waived by the Debtor and such waiver shall not require any notice, Bankruptcy Court order, or any further action.

# XV.

## EFFECT OF CONFIRMATION

### A.      Binding Effect of Confirmation

Confirmation will bind the Debtor, all Holders of Claims, Administrative Expenses, or Interests and other parties in interest to the provisions of the Plan whether or not the

68

Claim, Administrative Expense, or Interest of such Holder is Impaired under the Plan and whether or not the Holder of such Claim, Administrative Expense, or Interest has accepted the Plan.

**B.    Good Faith**

   Confirmation of the Plan shall constitute a finding that:  (i) the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code; and (ii) all Persons' solicitations of acceptances or rejections of the Plan and the offer, issuance, sale, or purchase of a security offered or sold under the Plan have been in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.    No Limitations on Effect of Confirmation**

   Nothing contained in the Plan will limit the effect of Confirmation as described in section 1141 of the Bankruptcy Code.

<div align="center">

**XVI.**

**MODIFICATION OR WITHDRAWAL OF PLAN**

</div>

**A.    Modification of Plan**

   The Debtor may seek to amend or modify the Plan at any time prior to its Confirmation in the manner provided by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise order, and except as otherwise set forth herein, the Debtor reserves the right to amend the terms of the Plan or waive any conditions to its

<div align="center">69</div>

Confirmation, effectiveness or consummation, if the Debtor determines that such amendments or waivers are necessary or desirable to confirm, effectuate or consummate the Plan.

After Confirmation of the Plan, but prior to the Effective Date, the Debtor may, pursuant to section 1127 of the Bankruptcy Code, seek to modify the Plan.  After the Effective Date, the Liquidating Debtor may apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to reconcile inconsistencies in the Plan.

**B.**     **Withdrawal of Plan**

The Debtor reserves the right to revoke and withdraw the Plan at any time prior to the Effective Date, in which case the Plan will be deemed to be null and void.  If the Debtor revokes or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then:  (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (if any), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests or Claims by the Debtor against any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

*[Remainder of Page Intentionally Left Blank]*

70

## XVII.

### CONFIRMATION REQUEST

   The Debtor requests that the Bankruptcy Court confirm the Plan and that it do so,

if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the rejection

of the Plan by any Impaired Class.

January 20, 2015

          John C. DiDonato
          Chief Restructuring Officer of Debtor TPOP, LLC f/k/a
          Metavation, LLC

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Maxim B. Litvak (CA Bar No. 215852)
919 Market Street, 17th Floor | P.O. Box 8705
Wilmington, Delaware  19899-8705
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:  ljones@pszjlaw.com
    dbertenthal@pszjlaw.com
    mlitvak@pszjlaw.com

Counsel to TPOP, LLC f/k/a Metavation, LLC,
Debtor and Debtor in Possession

**<u>Exhibit 2</u>**

**Disclosure Statement Order**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TPOP, LLC,[1] | ) | Case No. 13-11831 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | **Related Docket Nos. 734 & 735** |

**ORDER (I) APPROVING DISCLOSURE STATEMENT; (II) SCHEDULING
CONFIRMATION HEARING; (III) APPROVING FORM AND MANNER OF
NOTICE OF CONFIRMATION HEARING; (IV) ESTABLISHING PROCEDURES
FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT
PLANS, INCLUDING (A) APPROVING FORM AND CONTENTS OF SOLICITATION
PACKAGE; (B) ESTABLISHING RECORD DATE AND APPROVING PROCEDURES
FOR DISTRIBUTION OF SOLICITATION PACKAGES; (C) APPROVING FORMS OF
BALLOTS; (D) ESTABLISHING VOTING DEADLINE FOR RECEIPT OF BALLOTS
AND (E) APPROVING PROCEDURES FOR VOTE TABULATIONS;
(V) ESTABLISHING DEADLINE AND PROCEDURES FOR FILING OBJECTIONS
TO CONFIRMATION OF PLANS; AND (VI) GRANTING RELATED RELIEF**

This matter coming before the Court on the *Disclosure Statement in Respect of*

*Debtor's Chapter 11 Plan of Liquidation* (the "Disclosure Statement") [Docket No. 735] and the

*Debtor's Motion for an Order (i) Approving the Disclosure Statement (ii) Scheduling the*

*Confirmation Hearing; (iii) Approving Form and Manner of Notice of Confirmation Hearing;*

*(iv) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan,*

*Including (a) Approving the Form and Contents of the Solicitation Package; (b) Establishing*

*Record Date and Approving Procedures for Distributing Solicitation Packages; (c) Approving*

*the Forms of Ballots; (d) Establishing Voting Deadline for Receipt of Ballots; and (e) Approving*

---

[1] The Debtor in this chapter 11 case is TPOP, LLC f/k/a Metavation, LLC and the last four digits of the Debtor's federal tax identification numbers is 5884.  The location of the Debtor's headquarters and the service address for the Debtor is: TPOP, LLC c/o Huron Consulting Group Inc., 900 Wilshire Drive, Suite 270, Troy, MI 48084, Attn: John C. DiDonato, Chief Restructuring Officer.

*Procedures for Vote Tabulations; (v) Establishing the Deadline and Procedures for Filing Objections to Confirmation of Plan; and (vi) Granting Related Relief* (the "Motion")[2] filed by TPOP, LLC f/k/a Metavation, LLC (the "Debtor"); and after considering objections to the Motion, if any; and upon the record and after due deliberation thereon; and the Court finding that proper and adequate notice of the hearing on approval of the Disclosure Statement and of the Motion has been given to all parties in interest, and no other or further notice or hearing being necessary; and after due deliberation and sufficient cause appearing therefor; IT IS HEREBY FOUND, ORDERED AND ADJUDGED as follows:[3]

1.     The Motion is GRANTED as provided herein.

## **Approval of Disclosure Statement**

2.     The Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code regarding the *Debtor's Chapter 11 Plan of Liquidation* [Docket No. 734] (including all exhibits thereto and as amended, modified or supplemented, the "Plan"). Therefore, the Disclosure Statement is approved pursuant to 11 U.S.C. § 1125(b) and Fed. R. Bankr. P. 3017(b).

3.     All objections to the adequacy of the Disclosure Statement, if any, are, to the extent not consensually resolved as set forth herein, OVERRULED in their entirety.

---

[2] Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. Fed. R. Bank. P. 7052.

## Confirmation Hearing

4.      The hearing to consider confirmation of the Plan shall commence on

_March 5_, 2015 at 10 :00 a. m. **(prevailing Eastern time)** (the "Confirmation Hearing").  The

Confirmation Hearing may be continued from time to time by announcing such continuance in

open court or otherwise, all without further notice to parties in interest, and the Plan may be

modified, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during, or as a

result of, the Confirmation Hearing, without further notice to interested parties.

## Approval of Solicitation Packages

5.      The Debtor shall transmit, or cause to be transmitted, the Solicitation

Packages, no later than _January 23_ , **2015** by first class, United States mail (or by

international courier if the addresses are not located in the United States) or by CD-Rom, to (a)

holders of Class 4 and Class 5 claims, the only classes entitled to vote on the Plan (collectively,

the "Voting Classes").

6.      To avoid duplication and reduce expenses, the Debtor shall serve only one

Solicitation Package to each creditor who has more than one claim, but shall include the

appropriate Ballots for each class of claim.

7.      Pursuant to Bankruptcy Rule 3017(d), the Debtor is not required to

transmit a Solicitation Package to the Non-Voting Classes.  The Debtor shall transmit or cause to

be transmitted no later than _January 23_ , **2015**, by first class, United States mail (or by

international courier if the addresses are not located in the United States), to each holder of a

claim or interest in the Non-Voting Classes, at its address to which notices are required to be sent

pursuant to Bankruptcy Rule 2002(g), a notice substantially in the form attached to the Motion as

Exhibit B (the "Non-Voting Class Notice"). The Non-Voting Class Notice will indicate that

Accepting Non-Voting Classes are entitled to receive a copy of the Plan and Disclosure

Statement, in electronic format unless specifically requested otherwise, at the expense of the

Debtor upon request. The Non-Voting Class Notice shall be deemed a summary of the Plan for

purposes of compliance with Bankruptcy Rule 3017(d).

### Approval of Form and Manner of Notice of the Confirmation Hearing

8.      The Confirmation Hearing Notice, in substantially the form attached to the

Motion as Exhibit A, as modified consistent with revisions to the Plan, is approved. As set forth

above, the Confirmation Hearing Notice shall be included as part of the Solicitation Package and

sent via regular mail to all creditors and parties in interest entitled to vote on the Plan. In

addition, the Debtor shall serve the Confirmation Hearing Notice upon (a) the Securities &

Exchange Commission; (b) the Internal Revenue Service; (c) the Office of the United States

Trustee; and (d) those parties that have requested service under Bankruptcy Rule 2002.

### Record Date and Approval of Procedures for Distribution of Solicitation Packages

9.      **January 15, 2015** shall be the record date (the "Record Date") for

purposes of determining which parties are entitled to receive the Solicitation Packages or the

Non-Voting Class Notice and, where applicable, vote on the Plan.

10.     Rust Consulting/Omni Bankruptcy ("Rust/Omni" or "Solicitation Agent")

shall serve the Solicitation Package and notices regarding the Confirmation Hearing, inspect,

monitor and supervise the solicitation process, serve as the tabulator of the ballots and certify to the Court the results of the balloting.

11.     The Debtor and/or the Solicitation Agent, as applicable, are permitted to dispense with the mailing of Solicitation Packages or Non-Voting Class Notices to addresses and entities to which the notice of the Disclosure Statement hearing was returned by the United States Postal Service.  The Debtor and/or the Solicitation Agent are further relieved of any obligation to attempt to locate the correct address and resend prior to the Voting Deadline the Solicitation Packages or the Non-Voting Class Notice that are returned as undeliverable.

12.     In cases where a party has executed a Ballot in accordance with the terms of this Order, and has indicated corrections or updates to the mailing address used in the service of the Solicitation Package, either physically on the face of the Ballot or otherwise separately enclosed with the Ballot, the corrected or updated mailing address shall be used to reflect the mailing address of the creditor on the official docket of Claims against the Debtor.

## **Approval of Forms of Ballots**

13.     The Ballots, substantially in the form attached to the Motion as Exhibits C-1 through C-2, as modified consistent with revisions to the Plan, are approved.

## **Deadline for Receipt of Ballots**

14.     Unless extended by the Debtor or its counsel in writing, Ballots accepting or rejecting the Plan must be <u>received</u> on or **before** <u>February 20</u> **2015 at 5:00 p.m. (Prevailing Eastern Time)** (the "<u>Voting Deadline</u>"), to Rust/Omni at the following address:

TPOP, LLC
Rust Consulting/Omni Bankruptcy
5955 DeSoto Avenue, Suite #100
Woodland Hills, CA 91367

15.     Ballots received via facsimile, electronic mail or other electronic

transmission will not be counted unless approved by the Debtor.

**Procedures for Vote Tabulation**

16.     Votes may not be changed after the Voting Deadline unless the Court, for

cause, permits such change after notice and hearing pursuant to Bankruptcy Rule 3018(a).

17.     Ballots must be properly executed and counted.  Any Ballot that is

illegible or contains insufficient information to permit the identification of the holder of a Class 4

through 5 Claim will not be counted.

18.     The following tabulation procedures are approved solely for purposes of

voting on the Plan:

> (a) If an objection has not been filed to a Claim, the amount of such Claim
> for voting purposes shall be the non-contingent, liquidated and
> undisputed Claim amount contained on a timely filed Proof of Claim
> or, if no timely filed Proof of Claim was filed, the non-contingent,
> liquidated and undisputed amount of such Claim listed in the Debtor's
> Schedules of Assets and Liabilities;

> (b) If a Claim for which a Proof of Claim has been timely filed is wholly
> contingent, unliquidated or disputed, undetermined or unknown in
> amount, such claim shall be temporarily allowed in the amount of
> $1.00 for voting purposes only, but not for purposes of allowance or
> distribution;

> (c) If a Claim is partially liquidated and partially unliquidated, such Claim
> shall be allowed for voting purposes only in the liquidated amount;

> (d) If a holder of a Claim in a Voting Class casts a Ballot with respect to a
> claim that is the subject of an objection filed no later than **twenty-one
> (21) days** prior to the Confirmation Hearing, the Debtor requests, in
> accordance with Bankruptcy Rule 3018, that the party's Ballot not be
> counted, unless the Court temporarily allows such claim for purposes

DOCS_DE:195552.4 73864/002                              6

of voting to accept or reject the Plan, and that such creditor be required to file a motion for such relief (the "Rule 3018 Motion") no later than a date that is **fourteen (14) days** before the Confirmation Hearing, and that the Court schedule a hearing on such motion for a date on or prior to the Confirmation Hearing.  Notwithstanding the foregoing, if the Debtor files an objection to a claim and requests that such claim be allowed in a specific amount, such creditor's ballot shall be counted in such specified amount;

(e)   Holders of Proofs of Claim filed for $0.00 are not entitled to vote;

(f) Notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased one or more duplicate Claims within the same Class shall be provided with only one Solicitation Package and one Ballot for voting a single Claim in such Class, regardless of whether the Debtor has objected to such duplicate Claims;

(g) If a Claim is the subject of an amended Proof of Claim, the originally filed Proof of Claim shall be deemed superseded by the later filed amended Proof of Claim, regardless of whether or not the Debtor has objected to such Claim, and only the amending Proof of Claim shall be used for the purpose of determining voting eligibility in accordance with the provisions herein;

(h) For purposes of the numerosity requirement of § 1126(c), separate Claims held by a single Creditor in a particular Class shall be aggregated as if such Creditor held one Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

(i) If a Claim has been disallowed by agreement of the applicable creditor or order of the Court at any time before the Voting Deadline, such Claim shall also be disallowed for voting purposes; and

(j) If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim shall be temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution.

19.    The following voting procedures and standard assumptions shall be used

in tabulating the Ballots:

a. Except to the extent the Debtor otherwise determine, or as permitted by the Court, Ballots received after the Voting Deadline will not be accepted or counted by the Debtor in connection with the confirmation of the Plan;

b. Claims shall not be split for purposes of voting; thus, each Creditor must vote the full amount of its Claim(s) within each class to either accept or reject the Plan. If a creditor attempts to split such vote on their Ballot, such Ballot will not be counted for voting purposes;

c. Any executed Ballot which does not indicate an acceptance or rejection shall not be counted;

d. Any executed Ballot which indicates both an acceptance and rejection of the Plan shall not be counted;

e. Votes cast pursuant to a Ballot that is not signed or does not contain an original signature shall not be counted, unless the Court orders otherwise;

f. Parties holding Claims in more than one Class under the Plan may receive more than one Ballot coded for each different Class;

g. The method of delivery of Ballots to be sent to the Solicitation Agent is at the election and risk of each holder of a Claim, but, except as otherwise provided in the Disclosure Statement, such delivery will be deemed made only when the original, executed Ballot is actually received by the Solicitation Agent;

h. Delivery of the original executed Ballot to the Solicitation Agent on or before the Voting Deadline is required. Delivery of a Ballot by facsimile, email or any other electronic means will not be accepted unless otherwise ordered by the Court;

i. No Ballot sent to the Debtor, or the Debtor's financial or legal advisors, shall be accepted or counted;

j. The Debtor expressly reserves the right, subject to the consent of the Court, to amend at any time and from time to time the terms of the Plan (subject to compliance with § 1127 and the terms of the Plan regarding modification). If the Debtor makes material changes in the terms of the Plan the Debtor will disseminate additional solicitation materials and will extend the solicitation, in each case to the extent directed by the Court;

k. If multiple Ballots are received from or on behalf of an individual holder of a Claim with respect to the same Claim prior to the Voting Deadline, the last properly completed Ballot timely received will be deemed to reflect the voter's intent and to supersede and revoke any prior Ballot;

l. If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or other person acting in a fiduciary or

8

representative capacity, such person should indicate such capacity when signing and, if requested by the Debtor, must submit proper evidence, satisfactory to the Debtor, of such person's authority to so act in such capacity;

m.  The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice.  Except as otherwise provided herein, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan;

n.  Unless otherwise ordered by the Court, all questions as to the validity, eligibility (including time of receipt) and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, which determination shall be final and binding;

o.  If a designation is requested under § 1126(e), any vote to accept or reject the Plan cast with respect to such Claim will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Court orders otherwise;

p.  Any holder of a Claim who has delivered a valid Ballot voting on the Plan may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

q.  Unless waived or as otherwise ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not been cured or waived by the Voting Deadline) will not be counted;

r.  Neither the Debtor, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to the delivery of Ballots, nor will any of them incur any liability for failure to provide such notification;

s.  No fees or commissions or other remuneration will be payable to any broker, dealer or other person for soliciting Ballots to accept the Plan;

t.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan; and

u.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest.

20.     If no Holder of a Claim or Interest eligible to vote in a particular Class

timely votes to accept or reject the Plan, the Debtor may seek to have the Plan deemed **accepted**

by the Holders of such Claims or Interests in such Class for purposes of section 1129(b) of the

Bankruptcy Code.

21.     The Solicitation Agent shall file with the Bankruptcy Court, no later than

three (3) business days prior to the Confirmation Hearing an affidavit regarding the results of the

tabulation of the Ballots received on the Plan.

22.     The Ballot does not constitute, and shall not be deemed to be, a proof of

Claim or an assertion or admission of a Claim.

**Deadline and Procedures for Filing**
**Objections to Confirmation of the Plan and the Confirmation Brief**

23.     All objections to confirmation of the Plan, including any supporting

memoranda, must be in writing, be filed with the Clerk of the United States Bankruptcy Court

for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801

together with proof of service, and shall (a) state the name and address of the objecting party and

the amount of its Claim or the nature of its interest in the Debtor's chapter 11 case, (b) state with

particularity the provision or provisions of the Plan objected to and, for any objection asserted,

the legal and factual basis for such objection, and (c) be served upon the following parties (the

"Notice Parties") so as to be received on or before **February 20 , 2015 at 4:00 p.m.**

**(Prevailing Eastern Time)** (the "Plan Objection Deadline"):  (a) counsel to the Debtor,

Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE

19899-8705, Attn:  Laura Davis Jones, Esq. and (b) counsel to the Office of the United States

Trustee, J. Caleb Boggs Federal Building, 844 N. King Street, Suite 2207, Lock Box 35,

Wilmington, DE 19801, Attn: Jane Leamy, Esq.

24.     All objections not timely filed and served in accordance with the

provisions of this Order are hereby deemed waived and will not be considered by this Court.

25.     The Debtor shall file at least **three (3) business days** before the

Confirmation Hearing a brief supporting confirmation of the Plan (including any supporting

memoranda) and replying to any objections or responses.  The Debtor shall serve the brief on the

parties that filed objections or responses to the Plan, the Office of the United States Trustee, and

all parties who have requested notice in these cases pursuant to Bankruptcy Rule 2002.

26.     Prior to mailing the Disclosure Statement, Solicitation Packages or the

Non-Voting Class Notice, the Debtor may fill in any missing dates and other information, correct

any typographical errors and make such other non-material, non-substantive changes as they

deem necessary.

27.     The Debtor and the Solicitation Agent are authorized and empowered to

take such steps, expend such monies, and perform such acts as may be necessary to implement

and effectuate the terms of this Order.

28.     This Court retains jurisdiction over any and all matters arising out of or

related to the interpretation or implementation of this Order.

Dated: January 15, 2015

_____
Honorable Brendan L. Shannon
Chief United States Bankruptcy Judge

DOCS_DE:195552.4 73864/002                    11

**<u>Exhibit 3</u>**

**Plan Recovery Analysis**

| Debtor: TPOP, LLC |
| :---: |
| Case no. 13-18131-BLS |
| Recovery Analysis |

|  |  | Amount ($000's) | |
| --- | --- | ---: | ---: |
|  |  | **Low** | **High** |
| **Estimated distributable assets** |  |  |  |
| Cash |  | 25,812 | 25,812 |
| Professional fee escrow account |  | 1,493 | 1,493 |
| Vassar land/building/fixtures, net of liens |  | - | - |
| **Total** |  | **27,305** | **27,305** |
| **a.  Unclassified Claims** |  |  |  |
| **GM Secured Claims (Disputed)** | [1] | 13,750 | - |
| **Administrative Expenses** |  |  |  |
| 1 Professional fees |  | 4,263 | 3,263 |
| 2 Management fees |  | 1,220 | 1,220 |
| 3 Trade payables |  | 100 | 50 |
| 4 Post-confirmation Expenses |  | 2,200 | 1,800 |
| Total |  | 7,784 | 6,334 |
| **Tax Claims** |  | 10 | - |
| **Estimated distributable assets available for Classified Claims** |  | **5,761** | **20,971** |
| **b. Classified Claims** |  |  |  |
| **Priority Non-Tax Claims** |  | - | - |
| Prepetition Credit Agreement Secured |  | - | - |
| Miscellaneous Secured Claims |  | 100 | - |
| **Estimated distributable assets available for General Unsecured and PBGC Claims** |  | **5,661** | **20,971** |
| General Unsecured Claims | [2] | 5,000 | 4,000 |
| Recovery amount |  | 214 | 640 |
| Recovery % |  | 4.3% | 16.0% |
| PBGC Claims |  | 95,000 | 95,000 |
| Recovery amount |  | 4,071 | 15,197 |
| Recovery % |  | 4.3% | 16.0% |
| DOL Claims |  | 32,100 | 32,100 |
| Recovery amount |  | 1,376 | 5,135 |
| Recovery % |  | 4.3% | 16.0% |
| Interests in Debtors |  | N/A | N/A |

Notes

[1] GM asserts approximately $13.3 million in secured claims plus fees, interest, and expenses against TPOP. TPOP's position is that nothing is due and owing to GM. GM's claims are the subject of ongoing litigation in the Bankruptcy Court and TPOP reserves all rights with respect thereto.

[2] Includes $2.6 million of prepetition intercompany claims of Revstone Industries, LLC against TPOP.

[3] In addition to its general unsecured claim, DOL has an allowed penalty claim of $6,413 which is subordinated to the recovery of general unsecured creditors

**Exhibit 4**

# Revstone Industries, LLC Organizational Chart



(Note: all entities formed in Delaware unless otherwise indicated.)
(Certain non-operating subsidiaries are omitted from this Organizational Chart)