IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**TPOP, LLC**<br><br>Debtor. | Chapter 11<br><br>Case No. 13-11831 (BLS)<br><br>Related to Docket No. 471, 490, 689, 704, 721 |

PACHULSKI STANG ZIEHL &
JONES, LLP
Alan J. Kornfeld, Esq.
Colin R. Robinson, Esq.
919 N. Market St., 17th Floor
Wilmington, DE 19801
*Counsel for the Debtor*

MORRIS JAMES
Jeffrey R. Waxman, Esq.
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
*Counsel for General Motors LLC*

HONIGMAN MILLER
SCHWARTZ AND COHN LLP
Lawrence J. Murphy, Esq.
Scott B. Kitei, Esq.
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
*Counsel for General Motors LLC*

## OPINION[1]

Before the Court is the Amended Motion (the "Motion") of General Motors LLC ("GM") to Compel Immediate Payment of GM's First Priority Secured Claim [Docket No. 689]. GM claims entitlement to $13,295,175 currently held in escrow following the sale of TPOP, LLC f/k/a Metavation, LLC ("Metavation," "TPOP," or the "Debtor"). It is undisputed that the assets of Metavation have been sold and that funds sufficient to pay GM are currently available, if GM's claim is allowed.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

The Debtor opposes the Motion on numerous grounds. For the reasons set forth below, the Court finds that GM is contractually entitled to repayment of the amount sought, subject to further proceedings to determine whether the Debtor has any valid affirmative defenses, set-offs, or counterclaims that may serve to reduce GM's claim. The Court further determines that GM has not carried its burden to show that immediate payment of its claim is warranted. Accordingly, while GM's claim will be allowed in the amount of $13,295,175, the Court will not direct immediate payment. The Court also directs the parties to meet and confer on a scheduling order for the Court's consideration of the Debtor's affirmative defenses, set-offs, or counterclaims.

## I. BACKGROUND

Metavation was a Michigan-based manufacturer of precision machined components and assemblies, including dampers, engine components, knuckles, and driveline products for the automotive industry. Formed in 2008 through the acquisition of multiple predecessor companies, Metavation used advanced engineering and manufacturing capabilities to become a leading supplier of engine and transmission dampers.[2] GM was one of the company's major customers.

Metavation filed a Chapter 11 petition on July 22, 2013, four days after the Debtor, Revstone Industries, LLC[3] ("Revstone"), certain affiliates,[4] and the Debtor's major customers entered into an Automotive Sale Transactions Support Agreement (the "Sale Support Agreement" or "Agreement").[5] Broadly speaking, the Sale Support Agreement pro-

---

[2] *Declaration of John C. DiDonato in Support of Metavation, LLC Petition and First Day Motions* ("First Day Declaration") [Docket No. 3].

[3] Revstone Industries, LLC and multiple affiliated debtors (Spara, LLC, Greenwood Forgings, LLC, US Tool & Engineering, LLC) filed for Chapter 11 relief on December 3, 2012. These cases are being jointly administered under Case No. 12-13262 (BLS). Metavation was a wholly-owned subsidiary of Revstone Transportation, LLC, which in turn was a wholly-owned subsidiary of Revstone Industries, LLC.

[4] In addition to Metavation and Revstone, the other signatories to the Sale Support Agreement include Revstone Transportation, LLC, Contech Casting, LLC, Contech Casting Real Estate Holdings, LLC, Metavation Mexico, LLC, Eptec S.A. De C.V., Aarkel Tool & Die Inc., Creative Lighting Solutions, LLC, and Fairfield Casting, LLC.

[5] The Sale Support Agreement was filed under seal pursuant to this Court's August 7, 2013 *Order Authorizing Metavation, LLC and Revstone Industries, LLC to File Under Seal Motion of Metavation, LLC and Revstone Industries, LLC for Entry of Interim and Final Order (A)*

vided that Metavation and a number of related businesses would be sold while GM and Chrysler Group, LLC[6] (collectively the "Supporting Customers") would provide financing to support operations until all sales closed ("Sale Support Payments"). If the Debtor complied with its obligations under the Sale Support Agreement, GM agreed to forgo repayment of its loans. GM contends, and the Debtor does not dispute, that $6,302,129 of GM's total claim constitutes Retained Participations[7] that are not subject to the forgiveness provisions in the Sale Support Agreement. Only $6,933,046 of GM's claim is thus directly at issue in this action.

The parties stipulated that the Court would first resolve the contractual issues underlying this dispute.[8] As the Court herein finds that the Debtor's default relieves GM of its loan forgiveness obligations, phase two of this litigation will focus on whether the Debtor has any affirmative defenses, set-offs, counterclaims that may reduce the amount of GM's claim. A second issue raised by the parties will also be addressed during phase two. This issue relates to a $3.8 million Sale Support Payment that the Debtor argues GM is contractually obligated to pay. GM contends that because there has been an event of default under the Sale Support Agreement, it is relieved of its obligation to make this payment. The Debtor briefly touched on this issue in its papers and at oral argument. The Court views this issue as more appropriately dealt with during the next stage of litigation as the record on this issue has not been sufficiently developed.

Turning back to the threshold question of whether GM is obligated to forgive the loans it made to the Debtor, the Court's analysis is straightforward. First, has there been an event of default under the Sale Support Agreement? And then, if an event of default has occurred, is

---

*Approving Automotive Sale Transactions Support Agreement, (B) Modifying the Automatic Stay, and (C) Scheduling a Final Hearing* [Docket No. 105].

[6] For the avoidance of doubt, the Chrysler Group, LLC is not a party to this litigation as GM is the only Supporting Customer that contends there was a breach of the Sale Support Agreement.

[7] Retained Participations is a defined term in the Sale Support Agreement, and refers to certain obligations owed by the Debtor as outlined in Section 5.3 of the Sale Support Agreement.

[8] *See* Exhibit A ¶1, *Order Approving Stipulation* [Docket No. 684].

GM relieved of its contractual obligation to forgive the loans? The parties agree that Michigan law governs the contract dispute at hand. The matter is ripe for adjudication.

## II. THE PARTIES' POSITIONS

### A. General Motors' Position

GM first states that it holds undisputed, valid properly perfected first priority liens and security interests in the assets and proceeds of TPOP pursuant to the Final Financing Order.[9] GM then contends that the Debtor defaulted on more than ten separate obligations under the Sale Support Agreement. Because of these defaults, GM argues that numerous conditions precedent to GM's obligation to forgive certain loans made to the Debtor were not satisfied and thus all amounts due and owing under the Final Financing Order must be paid. GM also requests immediate payment of the total amount due, arguing that no party is harmed by immediate payment and that the funds are neither necessary for the Debtor's continued operations nor required for an effective reorganization.

### B. The Debtor's Position

The Debtor states that it has complied with all material obligations under the Sale Support Agreement because each business required to be sold under the Agreement has been sold. The Debtor therefore contends that GM received the benefit of its bargain under the Sale Support Agreement as there was no disruption to GM's supply chain during the sales process. If the Court were to find that an event of default occurred, the Debtor argues that any such occurrence was immaterial, and because the Debtor substantially performed its obligations under the Agreement, GM remains contractually obligated to forgive the loans made to the Debtor. Finally, the Debtor argues that GM's Motion is a breach of contract action, which requires evidence

---

[9] "Final Financing Order" refers to the *Final Order (A) Authorizing Debtor to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing Debtor to enter into Agreements with Wells Fargo Capital Finance, LLC as Agent* [Docket No. 185], entered by the Court on August 23, 2013.

that GM suffered damages resulting from any breach of the Agreement. Because GM has stipulated[10] for purposes of this stage of the proceeding that it did not suffer any monetary damages, the Debtor contends that, absent damages, GM's Motion must fail.

### III. JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### IV. DISCUSSION

When two parties enter into an unambiguous contract, it is not the court's duty or obligation to rewrite the contract. Instead, a court must "enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 51, 664 N.W.2d 776 (Mich. 2003); *see also Rory v. Continental Ins. Co.*, 473 Mich. 457, 461, 703 N.W.2d 23 (Mich. 2005) (noting that "the judiciary is without authority to modify unambiguous contracts or rebalance the contractual equities struck by the contracting parties because fundamental principles of contract law preclude such subjective post hoc judicial determinations of 'reasonableness' as a basis upon which courts may refuse to enforce unambiguous contractual provision").

Determining ambiguity "is a question of law for the court to decide." *DaimelerChrysler Corp. v. Wesco Distribution, Inc.*, 281 Mich. App 240, 248, 760 N.W.2d 828 (Mich. App. 2008). A contractual provision is ambiguous "if it irreconcilably conflicts with another provision, or when it is equally susceptible to more than a single meaning." *Royal Property Group, LLC v. Prime Ins. Syndicate, Inc.*, 267 Mich. App. 708, 715, 706 N.W.2d 426 (Mich. App. 2008).

The Court's analysis begins with the language of the parties' contract, the Sale Support Agreement. Section 5.2, governing loan forgiveness, is reproduced in its entirety below.

---

[10] *See* Exhibit A, *Order Approving Stipulation* [Docket No. 684].

> Provided that no Event of Default has occurred, and subject to (i) closing and transfer of the assets of Metavation Business and Eptec Damper Business to a Qualified Buyer, and the Operating Contech Facilities to Shiloh prior to the deadlines set forth in Section 2 above, and (ii) subject to the terms of Section 5.6 below, the Customers and Agent will forgive (a) 100% of the Metavation Participations and the Contech Participations purchased by Customers prior to May 31, 2014 (excluding the Retained Participations) and (b) the first $4,000,000 of the Post-Petition Loans advanced by Customers (excluding the Retained Participations). Notwithstanding anything herein to the contrary, Customers will have no obligation to fund more than $9,000,000 of Post-Petition Loans through the expiration of the Funding Period, excluding the Vassar Operating Budget and Vassar Wind-Down Budget. The forgiveness will be effective upon the later to occur of (a) a closing of a sale of the last Business, and (b) satisfaction of the obligations in Section 7 below. All in-formula loans, if any, made under the DIP Financing Order will be repaid in full at closing of the Metavation sale.

GM argues that this section of the Sale Support Agreement unambiguously provides that the non-occurrence of an event of default is a condition precedent to loan forgiveness. The Court agrees with GM. Simply put, the Sale Support Agreement provides that loan forgiveness is conditioned upon the absence of an event of default.

### A. Events of Default under the Sale Support Agreement

GM argues in the Motion that the Debtor defaulted on ten separate obligations under the Sale Support Agreement. The defaults cited

include, for example: (i) failure to deliver a written certification to GM by Revstone's Chief Restructuring Officer ("CRO") in violation of Section 1.2(a) of the Agreement; (ii) non-compliance with the debtor-in-possession ("DIP") financing budget; (iii) failure to close the sale of Eptec Non-Damper business by September 6, 2013; (iv) failure to execute a binding asset purchase agreement to sell the Aarkel business no later than August, 7, 2013; and (v) failure to close the sale of the Aarkel business by September 6, 2013.[11] Counsel to GM stated at oral argument that any event of default would relieve GM of its obligation to forgive the loans, and that the Court should not consider materiality when determining whether an event of default has occurred.

The Debtor contends that it has fully performed its obligations under Sale Support Agreement. But, even if an event of default did occur, the Debtor argues that any default was hypertechnical and immaterial. With respect to the defaults cited above, the Debtor counters by pointing out that (i) the CRO certification had no bearing on either GM's continued receipt of component parts or the sale process; (ii) the DIP budget was complied with as a one-week shortfall was made up the following week; (iii) the delay in closing the Eptec Non-Damper business sale resulted from GM's selection of the buyer; and for (iv) and (v), GM consented to the sale of equity of Revstone Wallaceburg Canada, Inc., Aarkel's parent company, which completed the sale of Aarkel pursuant to the language and purpose of the Sale Support Agreement. Additionally, the Debtor argues that because Metavation, Eptec Damper, and the Contech facilities were timely sold, and any events of default related to these sales were immaterial, the Court should find that no event of default has occurred.

It is clear that certain Sale Support Agreement milestones were not met, because the sale of the Eptec Non-Damper and Aarkel busi-

---

[11] The full list of defaults cited by GM can be found in the *Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* at ¶ 36 [Docket No. 689], and in the *Reply of General Motors LLC to the Debtor's Objection to Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors LLC* at ¶ 6 [Docket No. 721].

nesses did not close by the agreed upon date, September 6, 2013; the closing took place months later. The Debtor does not dispute these facts. The Court also notes that GM provided written notice to the Debtor of the occurrence of events of default on two separate occasions.[12] In those letters, GM expressly stated that it was not waiving any of its rights or remedies under the Sale Support Agreement. Given the undisputed evidence, the Court finds that events of default of the Sale Support Agreement have occurred.

### B. Conditions Precedent to Loan Forgiveness

The Court next turns to whether GM is relieved of its contractual obligation to forgive loans provided to the Debtor because the non-occurrence of an event of default is a condition precedent to loan forgiveness. GM focuses its argument on Section 5.2 of the Sale Support Agreement, which provides that loan forgiveness was effective "[p]rovided that no Event of Default has occurred." GM further points out that "Event of Default" is defined in Section 9.1 of the Agreement as "[t]he occurrence of any one or more" of a number of specific events and that Section 9.1(a) of the Agreement lists the "failure to meet the closing milestones . . . for any Business for any reason whatsoever[,]" as an event of default. Looking to the definition of "Business" in the Sale Support Agreement, GM argues that a breach of the sale milestones related to Eptec Non-Damper and Aarkel are clear events of default for purposes of Section 5.2 of the Sale Support Agreement and thus the condition precedent—"[p]rovided no Event of Default has occurred"—has not been met.

The Debtor argues that any events of default are simply broken promises, not conditions precedent to loan forgiveness. In support, the Debtor argues that "a condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. If the condition is not fulfilled, the right to enforce the contract does not come into existence." *Knox v. Knox*, 337 Mich. 109,

---

[12] Exhibits 13 & 14, *Amended Motion to Compel Immediate Payment of First Priority Secured Claim of General Motors* [Docket No. 689].

119, 59 N.W.2d 109 (Mich. 1953). Because GM did not enforce the rights and remedies provided to it under the Sale Support Agreement, or otherwise discontinue performance once the Debtor allegedly breached the Agreement, the Debtor contends that such conduct undecruts GM's condition precedent argument. Specifically, the Debtor points out that GM decided to fund an additional Sale Support Payment in September 2013, despite allegations that the Debtor had already breached the Agreement on numerous occasions. In the Debtor's view, GM's Motion is a breach of contract action, which requires a showing of damages. As mentioned above, because of the parties stipulated to the lack of monetary damages, the Debtor argues that the relief sought in GM's Motion should be denied.

The Court respectfully disagrees with the Debtor's characterization of the contract. A condition precedent is defined by Michigan courts as "a fact or event that the parties intend must take place before there is a right to performance." *Yeo v. State Farm Ins. Co.*, 219 Mich. App. 254, 257, 555 N.W.2d 893 (Mich. App. 1996) (citing *Knox*, 337 Mich. at 118). Certain terms such as "provided that" are generally used when the parties to a contract intend to create a condition, rather than a promise. *In re NextMedia Group Inc.*, 440 B.R. 76, 80-81 (Bankr. D. Del. 2010). Here, Section 5.2 of the Sale Support Agreement expressly states that "[p]rovided that no Event of Default has occurred[,]" and subject to the satisfaction of multiple other events, GM is bound to forgive its loans. This language, in the Court's view, created a condition precedent that the Debtor was required to satisfy before GM became obligated to forgive the loans it made to the Debtor.

The Court also disagrees with the Debtor's contention that GM's Motion is effectively a breach of contract action. Putting aside the stipulated lack of damages, the Motion is more akin to an action sounding in debt where one party's loan has not been repaid. Framed in this manner, the Court finds that an action to compel repayment of the loan could be commenced without the showing of monetary damages. This view is self-evident after reviewing the language and intent of the parties' contract. Pursuant to the Sale Support Agreement, GM agreed to

loan the Debtor funds to support operations until all contemplated sales closed. These loans were critical to mitigating any disruption in the customers' supply chain, and GM undeniably earned a substantial benefit from the continued flow of parts. But, the language in the Sale Support Agreement evidences the parties' intent to structure the transaction as a loan, with forgiveness conditioned upon the non-occurrence of an event of default. The Court is acutely aware that GM may appear to receive a windfall as a result of this ruling, but to rule otherwise would be to rewrite the parties' contract.

One additional argument put forth by the Debtor is also unavailing. The Debtor argues that it complied with sale milestones for the sale of Metavation, Eptec Damper and Contech as required by Sections 2.3 and 2.4 of the Sale Support Agreement; it satisfied romanettes (i) and (ii) in Section 5.2 of the Agreement; and that each and every required sale closed. In support, the Debtor cites the sentence in Section 5.2 which states that "[loan] forgiveness will be effective upon the later to occur of (a) a closing of a sale of the last Business, and (b) satisfaction of the obligations in Section 7 below." Accordingly, because the Debtor's obligations in Section 7 were satisfied prior to all sales closing, the Debtor argues that GM remains obligated to forgive its loans. While this argument seeks to generalize the Sale Support Agreement, it fails to focus on the necessary condition precedent to loan forgiveness: that no event of default has occurred.[13]

### C. Request for Immediate Payment

Having determined that GM is not obligated to forgive loans made to the Debtor, the Court turns to GM's request for immediate payment. The general rule is that a distribution to creditors should not take place except pursuant to a confirmed plan of reorganization, absent extraordinary circumstances. *In re Conroe Forge & Mfg. Corp.*, 82

---

[13] At argument, counsel for GM observed that any default—even one as minor as a one-week variance from the DIP budget—would be sufficient to relieve GM of its forgiveness obligation. The Court need not reach this argument, as the record reflects that the Debtor missed certain key sale milestones by a wide margin, but such a circumstance would likely yield a result different from the Court's ruling today.

B.R. 781, 784 (Bankr. W.D. Pa. 1988); *In re Air Beds, Inc.*, 92 B.R. 419, 422 (B.A.P. 9th Cir. 1988); *see also* 11 U.S.C. § 1123(a)(5) (providing that the plan must provide adequate means for implementation); Fed. R. Bankr. Proc. 3021 (noting that distributions shall be made to creditors with allowed claims after confirmation of a plan).

GM seeks to bypass the general rule by arguing that proceeds of a secured creditor's collateral are routinely distributed to secured creditors outside of a plan where such distribution will not impact the debtor's reorganization. GM cites cases from this jurisdiction and others for this proposition, namely *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 942-43 (Bankr. S.D. Tex. 1988), *In re Industrial Office Bldg. Corp.*, 171 F.2d 890, 892-93 (3d Cir. 1949), *In re Flying J, Inc., et al.*, Docket No. 1578, Case No. 08-13384(MFW) (Bankr. D. Del. July 27, 2009), and *In re Avado Brands Inc.*, 2007 WL 4994670 (Bankr. D. Del. Dec. 10, 2007).

Each of these cases is distinguishable because the claims upon which immediate payment was sought were either undisputed or were adequately protected. Here, where the Debtor objects to immediate payment and intends to assert affirmative defenses, set-offs, or counterclaims that may reduce the amount of GM's claim, immediate payment is not warranted.

## V. CONCLUSION

For the foregoing reasons, the Court finds and rules that GM is not obligated to forgive the loans it provided to the Debtor pursuant to the Sale Support Agreement.

BY THE COURT:

Dated: January 30, 2015
Wilmington, Delaware

Brendan Linehan Shannon
Chief United States Bankruptcy Judge